Abby L. Dennis, DC Bar No. 994476
Peggy Bayer Femenella, DC Bar No. 472770
Joshua Goodman, NY Bar (No Number)
Jeanine Balbach, MD Bar (No Number)
Michael Barnett, TX Bar No. 24006801
E. Eric Elmore, NY Bar (No Number)
Justin Epner, DC Bar No. 1028431
Sean D. Hughto, DC Bar No. 421224
Frances Anne Johnson, MD Bar (No Number)
Andrew Lowdon, DC Bar No. 230095
Kristian Rogers, MA Bar No. 675951
Anthony R. Saunders, NJ Bar No. 008032001
Timothy Singer, DC Bar No. 1048769
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381
*adennis@ftc.gov; pbayer@ftc.gov:*
*jgoodman@ftc.gov; jbalbach@ftc.gov;*
*mbarnett@ftc.gov; eelmore@ftc.gov;*
*jepner@ftc.gov; shughto@ftc.gov;*
*fjohnson@ftc.gov; alowdon@ftc.gov;*
*krogers@ftc.gov; asaunders@ftc.gov;*
*tsinger@ftc.gov*

Erika Wodinsky, CA Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | Case No. _____ |
| **META PLATFORMS, INC.,** | **COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT** |
| **MARK ZUCKERBERG,** | |
| and | |
| **WITHIN UNLIMITED, INC.,** | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| Defendants. | |

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

1

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court for a temporary restraining order and preliminary injunction enjoining Defendants Meta Platforms, Inc., its subsidiaries (collectively "Meta"), and its controlling shareholder Mark Zuckerberg from consummating its proposed acquisition (the "Acquisition") of Within Unlimited, Inc. ("Within"). The Commission seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). Absent such relief, Meta, Mr. Zuckerberg, and Within (collectively, "Defendants") have represented that they would be free to consummate the Acquisition after 11:59 p.m. Eastern Time (or 8:59 p.m. Pacific Time) on July 31, 2022.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to issue an administrative complaint, and if such complaint is issued, adjudicate the merger's legality in an administrative proceeding. The Commission therefore seeks this preliminary relief "pending the issuance of a[n administrative] complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final." 15 U.S.C. § 53(b)(2). Pursuant to 15 U.S.C. § 53(b)(2), such an administrative complaint must be filed no later than 20 days after this Court grants a temporary restraining order.

A temporary restraining order enjoining the Acquisition is necessary to preserve this Court's ability to provide full and effective relief after considering the Commission's motion for a preliminary injunction. Preliminary injunctive relief is imperative to preserve the *status quo* and to protect competition "pending the issuance of a[n administrative] complaint by the Commission," and if such complaint is issued, while the Commission adjudicates whether the Acquisition is unlawful. Allowing the Acquisition to proceed would harm competition and consumers and undermine the Commission's ability to remedy the anticompetitive effects of the

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

2

Acquisition if the Commission issues an administrative complaint and the Acquisition is found

unlawful after a full administrative trial on the merits and any subsequent appeals.

**NATURE OF THE CASE**

1.      Meta, one of the largest technology companies in the world and ███████

provider of virtual reality ("VR") devices and applications ("apps") in the United States, seeks

to acquire Within, a software company that develops apps for VR devices, including the highly

popular ████████████ fitness app "Supernatural." If consummated, the Acquisition would

substantially lessen competition, or tend to create a monopoly, in the relevant market for VR

dedicated fitness apps and the broader relevant market for VR fitness apps. That lessening of

rivalry may yield multiple harmful outcomes, including less innovation, lower quality, higher

prices, less incentive to attract and keep employees, and less consumer choice.

2.      A global technology behemoth, Meta reaches into every corner of the world

through its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—with more

than three billion regular users. Seeking to expand its empire even further, Meta in recent years

has set its sights on building, and ultimately controlling, a VR "metaverse." One need look no

further than the rebranding of the company from Facebook to "Meta" in 2021 to understand its

vision—and its priorities—for the future. And Meta is serious about its goals: it has become the

largest provider of VR devices and apps to customers in the United States.

3.      Meta's campaign to conquer VR began in 2014 when it acquired Oculus VR,

Inc., a VR headset manufacturer. Since then, Meta's VR headsets have become the cornerstone

of its growth in the VR space: its current generation headset, the Meta Quest 2, is by far ███

████████████████████ with a significant majority of headset sales in 2021 and

2022. Meta CEO Mark Zuckerberg has publicly stated that Meta subsidizes its VR devices or

sells them at cost in order to attract users.

4.      And Meta's Quest Store (formerly Oculus Store) has become ███████

distribution platform for VR software apps in the United States, connecting app developers and

VR users in an online marketplace through which developers can offer their products to users

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT
TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

3

for download onto their individual VR devices. Meta controls the wildly popular app Beat Saber, which it acquired by purchasing Beat Games in November 2019. Beat Saber ███ ████████████████████████████████████████████████████ ████████████████████████████ In addition to Beat Games, Meta owns a number of other VR apps, some of which it developed in-house but most of which it acquired by rolling up other app studios.

5.      Meta has thus become a key player at each level of the VR ecosystem: in hardware with its Meta Quest 2 headset, in app distribution with the Quest Store, and in apps with Beat Saber and several other popular titles. This is not by accident; Meta has an explicit strategy of ████████████████████████████████████████████████████████ ██████ Meta could have chosen to try to compete with Within on the merits; instead, Meta decided it preferred to simply buy █████████████ in a vitally important, ███████████ category.

6.      As Meta fully recognizes, network effects on a digital platform can cause the platform to become more powerful—and its rivals weaker and less able to seriously compete—as it gains more users, content, and developers. The acquisition of new users, content, and developers each feed into one another, creating a self-reinforcing cycle that entrenches the company's early lead. This market dynamic can spur companies to compete harder in beneficial ways by, for example, adding useful product features or hiring additional employees. But it can also make anticompetitive strategies more attractive.

7.      Meta seeks to exploit the network-effects dynamic in VR. Indeed, Mr. Zuckerberg has made clear that his aspiration for the VR space is control of the *entire* ecosystem. As early as 2015, Mr. Zuckerberg instructed key Facebook executives that his vision for "the next wave of computing" was control of apps *and* the platform on which those apps were distributed, making clear in an internal email to key Facebook executives that a key part of this strategy was for his company to be "completely ubiquitous in killer apps"—i.e., in

significant VR apps that prove the value of the technology. In that same email, Mr. Zuckerberg told his executives that Facebook should "us[e] acquisitions opportunistically."

8.    The proposed acquisition of Within would be one more step along that path toward dominance. According to Within's co-founder and CEO, "Fitness is the killer use case for VR." But instead of choosing to compete on the merits through its own VR dedicated fitness app, Meta has resorted to proposing this unlawful acquisition.

9.    If Meta is able to proceed with this proposed acquisition of Within, the merger poses a reasonable likelihood of substantially lessening competition in the market for VR dedicated fitness apps, where Supernatural is ███████████████ .

10.    Having simply bought up the ████████████ , Meta would no longer have any incentive to develop its own competing app from scratch, add new features to Beat Saber or other existing Meta apps to compete with Supernatural on the merits, or ██████████ ██████████████████████████████████████████████ ██████ develop an app to compete with Supernatural. Instead of adding a significant new rival to the mix, the Acquisition would simply let Meta assume total control of ████████████ overnight. That lessening of competition violates the antitrust laws.

11.    Moreover, a company poised on the edge of a market may exert competitive pressure on existing participants. Regardless of whether such a company actually intends to enter, the possibility that it may do so can spur other companies already in the market to proactively ramp up their own competitive efforts. Meta, poised on the edge of the VR dedicated fitness app market with its popular Beat Saber app, and with all its vast resources and unique strategic advantages, exerts such an influence. ██████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████ . The Acquisition would eliminate that incentive for market participants to compete, again in contravention of the antitrust laws.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

5

12.     When viewed against the backdrop of the broader VR fitness app market, which includes both dedicated or deliberate fitness apps ("dedicated fitness apps") and apps, such as rhythm and active sports games, that provide an incidental fitness benefit ("incidental fitness apps"), the merger is no less anticompetitive. Letting Meta acquire Supernatural would combine the makers of two of the most significant VR fitness apps, thereby eliminating beneficial rivalry between Meta's Beat Saber app and Within's Supernatural app.

13.     Accordingly, this Acquisition poses a reasonable probability of eliminating both present and future competition. That lessening of competition may result in reduced innovation, quality, and choice, less pressure to compete for the most talented app developers, and potentially higher prices for VR fitness apps. And Meta would be one step closer to its ultimate goal of owning the entire "Metaverse."

14.     The Commission voted to file this Complaint seeking preliminary relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). The Commission is entitled to preliminary relief in this Court because of its likelihood of success on the merits and the weight of the equities. To succeed on the merits, the FTC must prove that the Acquisition violates Section 7 of the Clayton Act, which prohibits mergers the effect of which "may be substantially to lessen competition, or tend to create a monopoly." For the reasons described below, the FTC is likely to succeed in proving an antitrust violation, and the equities weigh strongly in favor of enforcing the antitrust laws.

15.     Preliminary injunctive relief restraining Defendants from proceeding with the Acquisition is necessary to prevent interim harm to competition "pending the issuance of a[n administrative] complaint by the Commission," and if such complaint is issued, during any subsequent administrative proceeding. Absent preliminary relief, Defendants can close the Acquisition and combine Meta's and Within's operations. Allowing Defendants to consummate the Acquisition before the Commission issues an administrative complaint, and before any administrative proceeding has concluded, is likely to cause immediate harm to competition and consumers and would undermine the Commission's ability to remedy the anticompetitive

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

effects of the Acquisition if it is found unlawful after a full trial on the merits and any

subsequent appeals.

16.     A temporary restraining order enjoining the Acquisition is necessary to preserve

the status quo and protect competition while the Court considers Plaintiff's application for a

preliminary injunction. Unless temporarily restrained by the Court, Defendants would be free to

consummate the Acquisition on or after August 1, 2022.

## JURISDICTIONAL STATEMENT

### A.     Jurisdiction

17.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. §

53(b), and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of

Congress protecting trade and commerce against restraints and monopolies and is brought by an

agency of the United States authorized by an Act of Congress to bring this action.

18.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating, or is about to
> violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the
> Commission and until such complaint is dismissed by the Commission or set
> aside by the court on review, or until the order of the Commission made
> thereon has become final, would be in the interest of the public—
>
> the Commission by any of its attorneys designated by it for such purpose
> may bring suit in a district court of the United States to enjoin any such
> act or practice. Upon a proper showing that, weighing the equities and
> considering the Commission's likelihood of ultimate success, such action
> would be in the public interest, and after notice to the defendant, a
> temporary restraining order or a preliminary injunction may be granted
> without bond. . . .

19.     Defendants and their relevant operating entities and subsidiaries are, and at all

relevant times have been, engaged in activities affecting "commerce" as defined in Section 4 of

the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

**B.    Venue**

20.    Venue in the Northern District of California is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 28 U.S.C. §§ 1391(b) and (c). Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein.

**C.    Intradistrict Assignment**

21.    Assignment to the San Francisco Division is proper. This action arises in San Mateo County because a substantial part of the events giving rise to these claims occurred in San Mateo County, where Defendant Meta is headquartered.

<u>**THE PARTIES AND PROPOSED ACQUISITION**</u>

22.    Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

23.    Defendant Meta is a publicly traded company organized under the laws of Delaware with headquarters in Menlo Park, California. Meta develops and sells VR and other extended reality hardware and software through its "Reality Labs" division. Reality Labs has been growing at breakneck speed: it generated revenues of $2.274 billion in 2021, which reflected a 127% jump from 2019 and a 100% increase since 2020. Meta's best-selling VR hardware product to date is the Meta Quest 2, while its best-selling VR software product is the wildly popular Beat Saber, which was initially released by Beat Games, a studio that Meta acquired in 2019. Meta continues to add new downloadable content to Beat Saber; for example, it recently added a "Lady Gaga Music Pack" available for a $12.99 add-on fee.

24.    Defendant Mark Zuckerberg is the founder, Chairman, CEO, and controlling shareholder of Defendant Meta. Mark Zuckerberg ultimately controls Meta. His offices are located at 1601 Willow Road, Menlo Park, California, 94025.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

8

25.     Defendant Within is a privately held virtual and augmented reality company organized under the laws of Delaware with headquarters—and its principal business—in Los Angeles, California. Founded by Chris Milk and Aaron Koblin, Within's flagship product is Supernatural, a VR subscription fitness service. Supernatural offers over 800 fully immersive VR workouts, each set to music and located in a virtual setting like the Galapagos Islands or the Great Wall of China. Through deals with major music studios, Supernatural continues to grow its catalog, which includes songs from A-list artists like Katy Perry, Imagine Dragons, Lady Gaga, and Coldplay. Supernatural's workouts are fitness classes that customers can access by paying a monthly subscription fee of $18.99, or a yearly subscription fee of $179.99. Supernatural is presently only available on the Meta Quest and Quest 2 and is sold in the United States and Canada.

26.     On October 22, 2021, Meta and Within signed an Agreement and Plan of Merger, pursuant to which Meta would acquire all shares of Within in a transaction valued at ████████.

27.     Unless this Court grants Plaintiff's temporary restraining order, Defendants are free to close the proposed Acquisition after 11:59 PM Eastern Time (or 8:59 p.m. Pacific Time) on July 31, 2022.

**INDUSTRY BACKGROUND**

28.     The VR industry is currently characterized by a high degree of innovation and growth. Global sales are predicted to more than double in just three years, from $5 billion in 2021 to more than $12 billion in 2024.

29.     Users typically engage with the VR experience through a headset with displays in front of each eye to place a user in a fully rendered, three-dimensional environment. Cutting-edge VR technology creates an immersive digital experience like no other. VR users can instantly be transported anywhere in the world, backward or forward in time, into outer space or fictional lands—all from the comfort and safety of their own homes. Unlike a game, video, or app on a tablet, phone, or monitor, the three-dimensional VR environment creates the

perception of completely surrounding the user, allowing the user to move around in the projected space. As Mark Zuckerberg explains, "you're right there with another person or in another place and that's very different from every experience of technology that we've had before. . . ."

30.     Meta's Quest 2 is the best-selling VR headset and has been since shortly after its launch in 2020. In 2020, Meta shipped more than 62% of all VR headsets sold worldwide. That percentage surged to 78% in 2021, when industry sources estimate that Meta sold more than 8.7 million Quest 2 headsets.

31.     The majority of users get apps for VR headsets from online app stores, which distribute products for use on individual VR devices. Meta controls its own app store called the "Meta Quest Store," with more than 400 apps available for download. Meta also offers the "App Lab," a Meta-produced tool that allows third-party developers to distribute apps not present in the Meta Quest Store directly to consumers. Other VR app stores include Valve's Steam Store and SideQuest, ███████████████████████████████████████ ██████

32.     VR software and studio companies like Within develop the apps that run on VR headsets. These apps run the gamut of genres from rhythm games to shooters to e-sports to creation and exploration and more.

33.     ████████████████████████████████████ Meta's Beat Saber, an enormously popular rhythm game "where you slash the beats of adrenaline-pumping music as they fly towards you, surrounded by a futuristic world." Meta acquired control of Beat Saber through its purchase of Beat Games ██████████████████████████ in November 2019.

34.     Since its acquisition of Beat Games, Meta has continued to acquire a series of studios behind many popular VR apps, and now boasts one of the largest first-party VR content organizations in the world:

a. In January 2020, Meta acquired Sanzaru games, maker of the fantasy Viking combat game Asgard's Wrath.

b. In May 2020, Meta acquired Ready at Dawn Studios, maker of Lone Echo II, a zero-gravity adventure game, and Echo VR, an online team-based sports game.

c. In April 2021, Meta acquired Downpour Interactive, maker of Onward, a team-based first-person shooter.

d. In May 2021, Meta acquired BigBox VR, maker of Population One, a multiplayer first-person arena shooter.

e. In June 2021, Meta acquired Unit 2 Games, the maker of Crayta, a collaborative platform that allows users to create and play their own games.

f. And, in November 2021, Meta acquired Twisted Pixel, a studio that makes various games, including Path of the Warrior (a fighting game), B-Team (a first-person shooter), and Wilson's Heart (a mystery noir thriller game).

35.    In addition to the aforementioned acquisitions, Meta has developed and released its own VR apps. These include:

a. Horizon Worlds, a Massively Multiplayer Online game that allows users to build, share, and interact in virtual worlds;

b. Horizon Workrooms, a productivity app that lets teams of people share their computer screens, collaborate on virtual whiteboards, and more;

c. Horizon Venues, a live-events app that lets users experience concerts, sporting events, and more; and

d. Horizon Home, a social-space app that lets users hang out with their friends, watch videos together, and join multiplayer VR games together.

36.    Among VR apps, dedicated fitness ███████████████████████████████████████████████████████████████. As Within's co-founder and CEO puts it, "Fitness is the killer use case for VR." ████████████████████████████████████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

11

███████████████████████████████████████████

████████████████████████████ platform-level tools such as
Oculus Move, a calorie and time counter that runs in the background of other Quest apps and
displays to users data about their activity levels while in VR. ██████████████████
███████████████████████████████████

**THE RELEVANT ANTITRUST MARKETS**

37.     The Acquisition would substantially lessen competition or tend to create a
monopoly in the relevant antitrust market for VR dedicated fitness apps in the United States
("VR Dedicated Fitness App market"). The Acquisition would also substantially lessen
competition or tend to create a monopoly in the broader relevant antitrust market of VR fitness
apps in the United States ("VR Fitness App market") that includes both dedicated fitness apps
and incidental fitness apps.

**A.     The VR Dedicated Fitness App Market**

38.     The VR Dedicated Fitness App market is a relevant product market. The market
consists of VR apps, like Within's Supernatural app, that are designed so that users can exercise
through a structured physical workout in their own homes.

39.     ████████████████████████████████
████████████████████████████████████
█████████████████

40.     Dedicated fitness apps offer distinct functionality when compared to other VR
apps, including VR incidental fitness apps. For example, they may feature adjusting difficulty
so that users never "fail" a workout; they may feature workouts designed by trainers or fitness
experts; they are designed to maximize exertion and physical movement for the purpose of
exercise; and they may feature classes or other active coaching.

41.     ████████████████████████████████
████████████████████████████████████
████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT
TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

12

1     ██ Dedicated fitness apps typically entail a higher degree of physical exertion than incidental

2     fitness apps. According to the Virtual Reality Institute of Health and Exercise, which rates

3     energy expenditures during VR app usage, Within's Supernatural currently has the highest

4     energy expenditure, at 12–13 calories per minute.

5           42.    VR dedicated fitness apps are also typically offered using a distinct,

6     subscription-based pricing model. ████████████████████████████████

7     ███████████████████████████████████████

8     ██████████████

9           43.    ████████████████████████████████

10    █████████████████████████████████████████

11    ████████████████████████████████████████████

12    █████████████████████████████████████████

13    ███████████████

14          44.    The VR Dedicated Fitness App market does not include other products that are

15    neither close substitutes for, nor offered under similar competitive conditions as, VR dedicated

16    fitness apps. For example, it does not include non-VR at-home smart fitness solutions, such as

17    digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video

18    games, or workout videos.

19          45.    Functional, practical, technological, and price differences show that non-VR at-

20    home smart fitness solutions and at-home exercise products are distinct from VR dedicated

21    fitness apps.

22          46.    VR offers a level of immersion that other at-home fitness experiences do not, and

23    cannot, offer. VR technology allows users to exercise from the comfort, privacy, and safety of

24    home with the feeling and visuals of being somewhere else—atop a mountain, on a tropical

25    island, in a futuristic world, virtually anywhere. The sensors in a VR headset and controllers

26    also allow for a degree of tracking, adjustment, and feedback that non-immersive exercise

27    programs cannot match. As Within's co-founder and CEO explained, "[W]orking out in

28
      COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT
      TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT
                                                13

Supernatural feels like you're a champion of a sport from the future. I love that and haven't felt that sense of athleticism ever on a treadmill or an exercise bike."

47.     There also tend to be substantial price differences between VR fitness and smart at-home fitness products. Most smart at-home fitness solutions have much higher up-front costs and much higher ongoing costs than current VR fitness apps. A Peloton smart bicycle, for example, costs over $1,000, with an additional $44 per month subscription cost, compared to the cost of a $299 Meta Quest 2 plus $18.99 per month for Supernatural. It also weighs 135 pounds.

48.     In addition to Supernatural, other apps in the VR Dedicated Fitness App market include FitXR, Holofit from Holodia, VZFit from Virzoom, and Les Mills Body Combat from Odders Lab.

49.     ███████████████████████████████████████

███ Other than Supernatural and FitXR, ████████████████████████████

████████████████████████████████████████████

## B.     The VR Fitness App Market

50.     The VR Fitness App market comprises VR apps that are recognized and marketed as providing a fitness benefit to the user. This broader market includes both VR dedicated fitness apps and incidental fitness apps, such as rhythm and active sports games—including Meta's ██████████ Beat Saber.

51.     The incidental fitness category includes VR apps whose primary focus is not fitness, but that allow users to get a workout as a byproduct of their use because of the physically active nature of these apps. This category includes "rhythm" games like Beat Saber, Pistol Whip, and OhShape, where a user must dodge, strike, or shoot targets along to music, as well as active sports games like Thrill of the Fight, a boxing simulator.

52.     ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

53.     Publicly, Meta has acknowledged a VR Fitness App market comprising both dedicated and incidental fitness apps. Meta includes Beat Saber in this market. In a post on the Oculus website entitled "Exercise By Accident: VR Games to Help You Work Out At Home," Meta extols the virtues of rhythm and sports games for physical exercise: "while our first port of call for VR fitness is dedicated fitness apps like Supernatural and FitXR, you can get a surprising amount of exercise 'by accident' with a bunch of the games below," including Meta's own Beat Saber app. Meta classified the type of exercise offered by Beat Saber as "Full-body, Aerobic"—the exact same type of exercise it listed for both Supernatural and FitXR.

54.     Technology and fitness reviewers also recognize the VR Fitness App market. Publications reviewing VR fitness options often include incidental fitness apps alongside dedicated fitness apps, with Beat Saber featuring prominently. Many reviews of Supernatural compare it to Beat Saber specifically, noting the similarities in game mechanics, comparing the exercise effect of each app, and comparing value for the price.

55.     For the reasons stated above with respect to the VR Dedicated Fitness App market, the VR Fitness App market also does not include non-VR at-home smart fitness solutions like digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video games, or workout videos. VR fitness apps offer their users all of the broader benefits of VR: they can exercise in fully immersive, 360-degree environments without any of the cost, discomfort, or risk of actually traveling to those environments. Again, as Mark Zuckerberg has explained, VR is "very different from every experience of technology that we've had before."

56.     Indeed, Meta advertises the immersive nature of VR, touting the ability to do "jabs on a glacier, [and] lunges on a volcano, all while getting the best workout of your life."

57.     Moreover, unlike "flat" or two-dimensional at-home workout content, VR apps can also be fully interactive, providing guided motion and haptic feedback in real time in three-dimensional space. Because of the cameras in the headset and sensors in the controllers, the VR

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

15

tracking system means that VR fitness apps "know how your body is moving through space at all times," as Within co-founder and CEO put it.

58.     Nor does the VR Fitness App market include VR apps that do not provide an exercise benefit and are neither marketed nor sought by users on that basis. Although many VR apps make use of some physical movement by the user to navigate the app or present an immersive experience to the user, not all VR apps involve physical movement that generates an exercise effect. Indeed, studies recognize the wide range of exercise effect that can be provided by different VR apps. ████████████████████████████████████████ ████████████████████████████████████. VR apps that provide a lower or negligible exercise effect accordingly do not compete in this market.

### C.     The Relevant Geographic Market

59.     The relevant geographic market in which to analyze the competitive effects of the Acquisition is the United States. While VR app suppliers may be located outside the United States, customers in the relevant markets affected by the Acquisition are located in the United States. The availability of VR apps and headsets for consumers varies by country, and VR consumers in the United States can only buy headsets and apps that are available in the United States. Industry participants recognize the United States as a market.

## MARKET CONCENTRATION AND
## THE ACQUISITION'S PRESUMPTIVE ILLEGALITY

60.     Both the VR Dedicated Fitness App market and the broader VR Fitness market are highly concentrated.

61.     Market concentration within a properly defined relevant antitrust market is a useful indicator of the competitive effects of a merger. The 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") measure market concentration using the Herfindahl–Hirschman Index ("HHI"). The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy of the FTC and Department of Justice with respect to mergers involving competitors. Though the Merger

Guidelines are not binding on the courts, courts frequently cite the Merger Guidelines as persuasive authority.

62.     The HHI for a given market is calculated by summing the squares of the individual firms' market shares. HHIs range from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). A market HHI above 2,500 is classified as highly concentrated.

63.     If a merger combines two participants in a relevant market, thereby increasing the HHI by more than 200 points and resulting in a highly concentrated market, it is presumed to enhance market power and is, therefore, presumptively unlawful.

**A.     The VR Dedicated Fitness App Market is Highly Concentrated**

64.     The market for VR Dedicated Fitness Apps is highly concentrated, ███████ ████████████████████████████████████████████████████████████████ █████████████████

65.     Supernatural ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

66.     The VR Dedicated Fitness App market HHI ████████████████████ ████████████████████ "concentrated" or "highly concentrated" under the Merger Guidelines.

**B.     The Acquisition Is Presumptively Illegal with Respect to the VR Fitness App Market**

67.     When analyzed within the broader market for VR fitness apps, in which both Meta's Beat Saber and Within's Supernatural compete, the Acquisition is presumed likely to

enhance market power because it would significantly increase concentration and result in a highly concentrated relevant market. This suffices to establish a prima facie case that the Acquisition is unlawful.

68.    In the VR Fitness App market, the Acquisition would increase HHI levels by ██████████████████████████████████████. The Acquisition is thus presumed likely to create or enhance market power and is presumptively unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## EVIDENCE OF LIKELY ANTICOMPETITIVE EFFECTS

69.    In addition to this presumption of illegality, additional evidence indicates that the Acquisition may substantially lessen competition in the relevant markets for VR dedicated fitness apps and for VR fitness apps.

### A.    Anticompetitive Effects in the VR Dedicated Fitness App Market

70.    The Acquisition would cause anticompetitive effects by eliminating potential competition from Meta in the relevant market for VR dedicated fitness apps. These include eliminating any probability that Meta would enter the market through alternative means absent the Acquisition, as well as eliminating the likely and actual beneficial influence on existing competition that results from Meta's current position, poised on the edge of the market. As the Merger Guidelines explain, "A merger between an incumbent and a potential entrant can raise significant competitive concerns."

### 1.  It Is Reasonably Probable That Meta Would Have Entered the VR Dedicated Fitness App Market Through Alternative Means Absent This Acquisition

71.    Meta has the economic characteristics, size, resources, capabilities, advantages, and incentives to enter the VR Dedicated Fitness App market—and it has seriously considered doing so—by means other than this Acquisition. Meta could have chosen to build a VR dedicated fitness app from scratch, add dedicated fitness functionality to an existing app, ████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

18

█████████████████████████████████████████████████████████

███████████ .

72.     Consistent with its long-term strategy for its VR devices to become a widely used platform that it ultimately will control, Meta has committed tens of billions of dollars to its Reality Labs division, which develops its VR and AR products, including more than $7.7 billion in 2020, $12.4 billion in 2021, and $3.6 billion in the three-month period ending in March 2022. Meta is already well on the way to realizing Mr. Zuckerberg's goals of owning both the dominant platform and the "killer apps" on that platform. Meta already produces the best-selling VR headset in the United States by a wide margin. Meta's Quest Store██████████ distribution platform of VR apps. And Meta ██████████ seller of VR apps, with a portfolio that includes Beat Saber, the ██████████ VR fitness app, and Horizon Worlds, a massive social app that features its own game-creation tools for users.

73.     Meta has the financial resources to develop a dedicated fitness app on its own— either by creating a new app or by adding new features to an existing app such as Beat Saber.█ ████████████████████████████████████████ Meta's formidable first-party studios group in developing a VR dedicated fitness app.

74.     In 2021, Meta had an annual profit of $46.7 billion, and spent more than $12 billion on its Reality Labs division.

75.     With its vast financial resources, Meta continues to add features and content to the apps it has already released, and to develop and release new apps. Meta has also developed multiple full-featured VR apps in-house. What's more, ██████████ it proposes to spend on this acquisition is ████████████████████████ ████████████████ During that time and on that budget, Within built Supernatural from the ground up into ██████████ VR dedicated fitness app.

76.     Meta could build instead of buy within a reasonable period of time if it could not proceed with this Acquisition. Indeed, █████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

19

1  ████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ██████████████████████████████████

5      77.    Meta has developed multiple VR apps from scratch before, including the

6  ambitious Horizon Worlds, which allows users to create and explore virtual worlds; Horizon

7  Workrooms, an app that lets Meta test out new use-cases and platform-level features in the

8  emerging VR productivity category and allows users to connect and collaborate in real-time; the

9  Horizon Venues live-events app; and the Horizon Home social-space app.

10      78.    Meta has also developed and released Oculus Move, a platform-level fitness

11  tracker on the Oculus Quest that allows users to track active time and calories burned across

12  apps.

13      79.    Through its string of prior acquisitions, Meta already owns seven of the most

14  successful VR development studios in the world, including Beat Games, the studio behind Beat

15  Saber. And, as of March 2021, Meta had nearly 10,000 employees housed within Reality Labs,

16  its division devoted to virtual reality.

17      80.    Meta's control over the Quest platform ████████████████████████████

18  ████████████████████████████████.

19      81.    In addition, Meta controls which VR apps appear and are featured in its Quest

20  Store. This control guarantees that Meta could reach millions of existing VR users with a built-

21  from-scratch or expanded app through an especially important avenue for consumer discovery.

22      82.    Meta—formerly known as "Facebook Inc."—rebranded its entire business as

23  "Meta" to reflect its focus on VR. Its brands, including Meta and Quest, are well-known to VR

24  users. Meta also has substantial marketing experience as to a wide range of VR apps, including

25  Beat Saber, that it could leverage to enter the VR Dedicated Fitness App market. Indeed, users

26  already associate Meta's Beat Saber app with incidental fitness. This "name awareness" would

27  facilitate Meta's organic entry into the VR Dedicated Fitness App market, as a dedicated

28

1   fitness-oriented version of Beat Saber would be in line with users' understanding of the Beat

2   Saber brand.

3           83.     Meta also has incentives to enter the VR Dedicated Fitness App market.

4           84.     ███████████████████████████████████████

5    ███████████████████████████████████████████

6    ██

7           85.     ███████████████████████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████

10          86.     ███████████████████████████████████████

11   ████████████████████████████████████████

12   █████████████████████████████████████████████

13   ██████████████████████████████████████████

14   ███████████████████████████████████████

15   ████████████

16          87.     ███████████████████████████████████████

17   ██████████████████████████████████████████████

18   █████████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████

24          88.     ████████████████████████████████████

25   ██████████████████████████████████████████████

26          89.     ████████████████████████████████████████

27   █████████████████████████████████████████████

28



90.

91.

92.

93. ███████████████, after Meta's acquisition of Beat Games and immediately prior to the launch of Supernatural, Beat Saber released a new track called "FitBeat," which included virtual "walls" or "obstacles" that users would have to dodge.████████████ ██████████████████████████ Obstacles also appear on other tracks, forcing users to duck and dodge, but they can be turned off.

94. ████████████████████████████████████ has already included both a 360-degree mode where targets come from all sides and a no-fail mode that allows users to complete tracks despite missing blocks in recent updates—a feature that fitness-focused users can adopt to ensure an uninterrupted workout.

1    95.    ████████████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████

6    ████████████████████████████████████████

7    ██████

8    96.    ██████████████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████████████

12   █████████████████

13   97.    ██████████████████████████████████

14   ██████████████████████████████████████

15        98.    Meta also hired away the head of product for Supernatural at Within to work at

16   Meta following the Supernatural launch. ████████████████████████

17   ████████████████████████

18        99.    ███████████████████████████████████

19   █████████████████████████████████

20   ████████████████████████████████████████

21   ███

22        100.   ███████████████████████████████████

23   ████████████████████████████████████

24   █████████████████

25        101.   Accordingly, absent this anticompetitive Acquisition, there is a reasonable

26   probability that Meta would have exercised one of its other available options to enter the VR

27   Dedicated Fitness App market.

28
COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT
TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

### 2.  It is Reasonably Probable That Alternative Entry by Meta Would Substantially Deconcentrate the Market and Have Other Procompetitive Effects

102.    Meta's entry into the VR Dedicated Fitness App market—whether by adding new features to one of its existing apps or developing a new VR dedicated fitness app from scratch—would have the effect of substantially deconcentrating and increasing competition in the market.

103.    Building instead of buying would entail developing additional expertise, undertaking product research and design, hiring more employees, and making other key investments. ███████████████████████████████████████████ ███████████████████████████████. But such efforts would reflect the very essence of competition, the dynamic that the antitrust laws seek to protect and promote.

104.    Alternative entry by Meta would introduce a new competitor into the market with the backing of one of the world's largest, most well-resourced, and most experienced VR industry participants. Such entry would increase consumer choice, increase innovation, spur additional competition to attract the best employees, and yield a host of other competitive benefits. Crucially, it would *also* maintain the independent presence and competitive vitality of the ███████████ VR dedicated fitness app ████████ Supernatural.

105.    The Acquisition would eliminate the probability of such entry, potentially dampening future innovation and leading to a market with less beneficial rivalry and competitive pressure.

### 3.  Within Reasonably Perceived Meta as a Potential Entrant to the VR Dedicated Fitness App Market

106.    In light of Meta's economic characteristics, size, resources, capabilities, advantages, and incentives, it would be eminently reasonable for a VR dedicated fitness app market participant to perceive Meta as a potential entrant.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

24

107.    As explained in detail above, Meta is a massive, wealthy company with extensive control over and experience in various aspects of the VR industry. It has recently expanded into a variety of VR-related areas, including by acquiring the ███ popular VR incidental fitness app (Beat Saber) and by internally developing a system-level fitness tracking tool that can run in the background of other apps (Oculus Move). In a recent earnings report, Meta announced that it anticipated spending some $10 billion across its Reality Labs division, which has found its biggest success to date with the Quest 2 Headset and Quest Store, and that it is committed to increasing those investments over the next several years. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███

108.    ███████████████████████████████████

███████████████████████████████████████████

██████████████████

109.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

110.    Meta also lured away Within's head of product for Supernatural shortly after Supernatural's launch.

**4.   Meta's Presence as a Perceived Potential Entrant Likely Influences Competition in the VR Dedicated Fitness App Market**

111.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

25



1

2             The Acquisition would

3 eliminate that competitive influence.

4        112.

5

6

7

8

9        113.

10

11

12

13        114.

14

15

16

17

18

19

20        115.

21

22

23

24        116.

25             That competitive

26 pressure—and all of the benefits it yields—would be eliminated by the Acquisition.

27

28

**B.**     **Anticompetitive Effects in the VR Fitness App Market**

117.     When viewed against the broader backdrop of the VR Fitness App market, the Acquisition is no less illegal. The Acquisition, if allowed to proceed, would see the maker of ████ ████████████████████████████████████████████████████. Beat Saber and Supernatural have been close competitors in this broader market, with ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████. The Acquisition would eliminate that competitive pressure between Defendants.

       **1.**     **Beat Saber and Supernatural Are Competitors in the VR Fitness App Market**

118.     Beat Saber and Supernatural compete in the highly concentrated VR Fitness App market. ███████████████████████████████████████████████████ ████████████████████████████.

119.     In part of 2021 and throughout most of the first half of 2022, Meta maintained a "fitness" landing webpage for its Quest and Quest 2 headsets. The link to the landing page was prominently displayed as part of the front page heading on Oculus.com. That fitness landing page featured Supernatural and Beat Saber, among other apps.

120.     The Quest Store itself has a search functionality that allows users to find apps. As of June 2022, a search in the United States for the keyword "exercise" returns 15 apps, including both Supernatural and Beat Saber.

121.     Both Within and Meta ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

27

1  ██████████████████████████████████████████████

2  ████████████████████.

3      122.    ████████████████ Beat Saber and Supernatural. ████████████

4  ████████████████████████████████ both employ the same "slashing" mechanic, in

5  which the player uses virtual bats or swords to hit incoming targets timed to music. ██████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ████████████████████████████████████████████

10  ████████████████████████████████

11      **2.   Competition Between Beat Saber and Supernatural Has Been Beneficial**

12          **to VR Fitness App Users**

13      123.    The ongoing competition between Beat Saber and Supernatural has ████████

14  ████████████████████████████████████████

15  benefited consumers.

16      124.    Meta has added fitness features to Beat Saber to better compete for users seeking

17  an exercise effect. For example, in April 2020—just before Supernatural's launch—Meta

18  released "FitBeat," a song for Beat Saber designed for fitness-focused beat maps. Media

19  coverage has attributed "FitBeat" as a reaction to Supernatural's release. ██████████████

20  ████████████████████████

21      125.    Similarly, Within has taken ██████████████████████████

22  ████████████████████████████████████

23  ████████████████████████████████████

24  ████████████████████████████████

25      126.    Moreover, prior to launching Supernatural, ████████████████

26  ████████████████████████████████████████████

27  ████████████████████████████████████████████

28

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████.

5     127.    ████████████████████████████████████

6 ███████████.

7     128.    ████████████████████.

8     129.    ████████████████████████████

9 ███████████████████████████

10     130.    This competition between Supernatural and Beat Saber in the VR Fitness App

market leads to innovations, new features, and consumer choice—and it will be eliminated as a

result of the Acquisition.

## LACK OF COUNTERVAILING FACTORS

    131.    Defendants cannot demonstrate that new entry or expansion by existing firms

will be timely, likely, or sufficient to offset the anticompetitive effects.

    132.    There are multiple barriers to entering or expanding in the relevant markets,

including time, network effects, ongoing development and content creation costs, post-launch

support, capital, ██████████ and the need for consumers to be able to discover the app.

Developing a high-quality entrant also ████████████████████████

████████████████████

    133.    To be sold on the Quest store, Meta itself must decide to approve an app through

a technical review and a curation process by Meta that examines "quality, polish, entertainment,

value, and utility." This can be a lengthy process and there is no guarantee any third-party app

will ultimately be approved.

    134.    No other company has the combination of resources, VR know-how, and control

over the ██████ app store and the overall Quest VR experience that Meta has.

135.    Once Meta—which also owns the Quest platform and app store—entrenches ████ ███████████████ VR dedicated fitness through the Acquisition, it will effectively raise barriers to entry and expansion as other companies interested in the space will understand that they need to compete with a deep-pocketed platform operator that owns the ████████ VR fitness app *and* the ████████ VR dedicated fitness app.

136.    Defendants cannot demonstrate cognizable, verifiable, transaction-specific efficiencies that would be sufficient to reverse the strong presumption and evidence of the Acquisition's likely significant anticompetitive effects.

## LIKELIHOOD OF SUCCESS ON THE MERITS,
## BALANCE OF THE EQUITIES, AND NEED FOR RELIEF

137.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to issue an administrative complaint, and if such complaint is issued, adjudicate the merger's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the equities, using a sliding scale. The principal equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interests cannot tip the scale against a preliminary injunction.

138.    The Commission is likely to succeed in proving that the effect of the Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act or Section 5 of the FTC Act.

139.    Preliminary relief is warranted and necessary. Should the Acquisition ultimately be adjudicated unlawful, reestablishing the status quo would be difficult, if not impossible, if the Acquisition has already occurred in the absence of preliminary relief. Allowing the Acquisition to close before the Commission issues an administrative complaint and the completion of any administrative proceeding would cause irreparable harm by, among other

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

30

things, enabling the combined firm to begin altering Within's operations and business plans, accessing Within's sensitive business information, eliminating key Within personnel, changing Within's product development efforts, and preventing Within from raising the funding necessary to continue operations and maintain its growth trajectory. In the absence of relief from this Court, substantial harm to competition would occur in the interim.

140.    Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

141.    Enter the temporary restraining order and preliminarily enjoin Defendants from taking any further steps to consummate the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

142.    Retain jurisdiction and maintain the *status quo* until the Commission issues an administrative complaint and any administrative proceeding initiated by the Commission is concluded; and

143.    Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: July 27, 2022                                  Respectfully submitted,

                                                      /s/ Abby L. Dennis
Of counsel:                                           ABBY L. DENNIS
                                                      Senior Trial Counsel

HOLLY VEDOVA                                          PEGGY BAYER FEMENELLA
Director                                              Acting Assistant Director
Bureau of Competition

JOHN M. NEWMAN                                        JOSHUA GOODMAN
Deputy Director                                       Acting Deputy Assistant Director
Bureau of Competition
                                                      JEANINE BALBACH
                                                      MICHAEL BARNETT
                                                      E. ERIC ELMORE
                                                      JUSTIN EPNER
                                                      SEAN D. HUGHTO
                                                      FRANCES ANNE JOHNSON
                                                      ANDREW LOWDON
                                                      KRISTIAN ROGERS
                                                      ANTHONY R. SAUNDERS

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT

TIMOTHY SINGER
ERIKA WODINSKY
Attorneys

Bureau of Competition