Abby L. Dennis, DC Bar No. 994476
Peggy Bayer Femenella, DC Bar No. 472770
Joshua Goodman, NY Bar (No Number)
Jeanine Balbach, MD Bar (No Number)
Michael Barnett, TX Bar No. 24006801
E. Eric Elmore, NY Bar (No Number)
Justin Epner, DC Bar No. 1028431
Sean D. Hughto, DC Bar No. 421224
Frances Anne Johnson, MD Bar (No Number)
Andrew Lowdon, DC Bar No. 230095
Kristian Rogers, MA Bar No. 675951
Anthony R. Saunders, NJ Bar No. 008032001
Timothy Singer, NY Bar (No Number), DC Bar No. 1048769
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381
*adennis@ftc.gov; pbayer@ftc.gov:*
*jgoodman@ftc.gov;jbalbach@ftc.gov;*
*mbarnett@ftc.gov;eelmore@ftc.gov;*
*jepner@ftc.gov; shughto@ftc.gov;*
*fjohnson@ftc.gov; alowdon@ftc.gov;*
*krogers@ftc.gov; asaunders@ftc.gov;*
*tsinger@ftc.gov*

Erika Wodinsky, Cal. Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

Attorneys for the Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **META PLATFORMS, INC.,** <br><br> **MARK ZUCKERBERG,** <br><br> and <br><br> **WITHIN UNLIMITED, INC.,** <br><br> Defendants. | Case No. 3:22-cv-04325-EJD <br><br> *Hearing: As soon as the matter may be heard.* <br><br> **PLAINTIFF FEDERAL TRADE COMMISSION'S NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiff's Mem. of Law in Support of Emergency Mot. for a Temp. Restraining Order

Case No. 3:22-cv-04325-EJD

## NOTICE OF MOTION AND MOTION[1]

PLEASE TAKE NOTICE that, as soon as the matter may be heard, Plaintiff Federal Trade Commission ("FTC" or "Commission") shall move and hereby does move the Court for a temporary restraining order ("TRO") against Defendants Meta Platforms, Inc., Mark Zuckerberg, and Within Unlimited, Inc., pursuant to 15 U.S.C. § 53(b) and Civil L.R. 7-2.

Plaintiff respectfully requests this Court to issue, prior to 8:59 p.m. PT on Sunday, July 31, 2022, a TRO that will preserve the status quo and prevent Defendant Meta Platforms, Inc. ("Meta") and its subsidiaries from consummating its proposed acquisition (the "Acquisition") of Within Unlimited, Inc. ("Within"), until this Court has had an opportunity to conduct an evidentiary hearing on the preliminary injunction requested in the Complaint.  Absent a TRO, Defendants will be able to consummate the Acquisition after 8:59 p.m. PT on July 31, 2022.

Plaintiff's motion is based on this Notice of Motion; the Memorandum of Points and Authorities in Support filed concurrently; the declarations of Justin Epner and Jennifer Snyder and the attachments thereto; all other pleadings on file in this action; and any other written or oral argument that Plaintiff may present to the Court.

## ISSUE TO BE DECIDED

Whether the Court should grant a temporary restraining order to preserve the status quo and prevent Defendants from consummating the Acquisition "pending the issuance of a[n administrative] complaint by the Commission," 15 U.S.C. § 53(b)(2), and if such administrative complaint is issued, until this Court has had an opportunity to conduct an evidentiary hearing on the preliminary injunction requested in Plaintiff's Complaint when (1) the Commission has found reason to believe that the proposed Acquisition may substantially lessen competition, or tend to create a monopoly, in one or more relevant markets; (2) Plaintiff is likely to succeed on the merits; and (3) the balance of the equities is in favor of Plaintiff.

---

[1] For reasons explained herein, this matter is urgent. The FTC respectfully requests that this Court act on this Motion as expeditiously as is possible.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................ i

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    FACTUAL BACKGROUND ........................................................................ 3

II.   ARGUMENT .................................................................................................. 6

    A.    The FTC Is Likely to Succeed in Showing That the Acquisition May
        Substantially Lessen Competition .......................................................... 8

     i.    The Relevant Markets Are (1) VR Dedicated Fitness Apps in the United States
        and (2) VR Fitness Apps in the United States. .................................... 10

        1. VR Dedicated Fitness Apps Is a Relevant Product Market ........................... 10

        2. VR Fitness Apps Is a Relevant Product Market. ............................................ 12

        3. The United States Is the Relevant Geographic Market. ................................. 13

     ii.   The Acquisition Has a Likelihood of Anticompetitive Effects in the VR
        Dedicated Fitness App Market ............................................................... 13

        1. The VR Dedicated Fitness App Market Is Concentrated. .............................. 14

        2. It Is Reasonably Probable That Meta Would Enter the Market Through Other
           Means Absent the Acquisition, Leading to Procompetitive Effects. .............. 15

        3. Within Reasonably Perceived Meta as a Potential Entrant, and Meta's
           Presence as Such Likely Influences Competition. ......................................... 18

     iii.  The Acquisition Poses a Reasonable Probability of Substantially Lessening
        Competition in the Broader VR Fitness App Market. ............................ 20

        1. The Acquisition Will Increase Concentration in the VR Fitness App Market to
           Such a Degree That It is Presumptively Unlawful. ........................................ 20

        2. Evidence Shows the Acquisition Will End Head-to-Head Competition ......... 21

     iv.   Defendants Cannot Rebut the FTC's Prima Facie Case. ...................... 22

    B.    The Equities Support a Temporary Restraining Order. ....................... 23

III.  CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341 (2021)................................................................ 1

*BOC Int'l Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977) ................................................................ 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...................................................... 10, 11

*Cal. v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271
  (1990)......................................................................................................................... 9, 20

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .......................................................... 7

*FTC v. Aloha Petroleum, Ltd.*, No. CV-05-00471 (D. Haw. July 27, 2005) ................................. 1

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ............................................... 22

*FTC v. Exxon Corp.*, No. 79-1975, 1979 WL 1654 (D.D.C. July 28, 1979) ............................... 7

*FTC v. Foster*, No. CIV 07-352 JB, 2007 WL 1302585 (D.N.M. Apr. 13, 2007) ....................... 7

*FTC v. Freeman Hosp.*, No. 95-1448, 1995 WL 155237 (8th Cir., Mar. 1 1995)........................ 8

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................... 1, 7, 9, 24

*FTC v. Hackensack Meridian Health, Inc.*, No. 20-18140, 2021 WL 4145062 (D.N.J. Aug. 4,
  2021) ................................................................................................................................. 8

*FTC v. Lancaster Colony Corp. Inc.*, 434 F. Supp. 1088 (S.D.N.Y. 1977)................................. 2

*FTC v. Nat'l Tea Co.,* 603 F.2d 694 (8th Cir. 1979) ............................................................. 8

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020)..................................... 8

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ..................................... 24

*FTC v. ProMedica Health Sys.*, No. 3:11-cv-47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011)
  .................................................................................................................................. 24

*FTC v. RagingBull.com, LLC*, 507 F. Supp. 3d 629 (D. Md. 2020)......................................... 2

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (2015)................................................................... 24

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)............................................... 7, 24

*FTC v. Universal Premium Servs.*, No. 06-0849, 2006 WL 8442134 (C.D. Cal. Mar. 14, 2006) . 7

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)........................................ *passim*

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ...................................... 7, 8

*Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195 (9th Cir. 1997) ........................................... 10

*Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) . 10

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775 (9th Cir. 2015) ................................................................................................................................................. *passim*

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ....................................................................................................................................... 9, 13, 22, 23

*United States v. Black & Decker Mfg Co.*, 430 F. Supp. 729 (D. Md. 1976) ............................... 19

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ...................................... 14, 18, 19

*United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129 (N.D. Cal. 1966), *aff'd mem.*, 385 U.S. 37 (1966) .......................................................................................................................... 10

*United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974) ...................................... 9, 10, 14, 15

*United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964) ........................................................ 15

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................................................. 21

*United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973), *aff'd, Phillips Petrol. Co. v. United States*, 418 U.S. 906 (1974) ........................................................................ 14, 15, 18

*Yamaha Motor Co. Ltd. v. FTC*, 657 F.2d 971 (8th Cir. 1981) ............................................. 14, 15

## **Statutes**

15 U.S.C. § 18 ......................................................................................................................... 2, 8

15 U.S.C. § 53(b) ............................................................................................................. 1, 2, 6, 8

15 U.S.C. § 53(b)(2) ...................................................................................................... 1, 2, 27

## **Other Authorities**

H.R. Rep. No. 73–624 (1973) (Conf. Rep.), reprinted in 1973 U.S.C.C.A.N. 2523) ................... 2

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ..... 13, 15, 18

Plaintiff's Mem. of Law in Support of Emergency Mot. for a Temp. Restraining Order

iv

Case No. 3:22-cv-04325-EJD

## MEMORANDUM OF POINTS AND AUTHORITIES

Over the past decade, Defendant Meta has leveraged its status as one of the largest technology companies in the world to become a key player in the rapidly growing virtual reality ("VR") industry.  Meta ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ popular Beat Saber app.  It now seeks to acquire Within, a competing VR software developer whose chief product is the fitness app Supernatural.  If consummated, the Acquisition may substantially lessen competition, or tend to create a monopoly, by eliminating potential competition in the market for VR dedicated fitness apps, where Meta is a potential entrant and exerts present competitive pressure, ████████████████████████████; and by eliminating present competition in the broader market for VR fitness apps, where Supernatural competes with Meta's Beat Saber.

The Commission filed a Complaint in this Court pursuant to 15 U.S.C. § 53(b) to preliminarily enjoin Defendants from completing the Acquisition "pending the issuance of a[n administrative] complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final." 15 U.S.C. § 53(b)(2).  Pursuant to 15 U.S.C. § 53(b)(2), such complaint must be filed no later than 20 days after this Court grants a TRO.[2]

---

[2] As the Supreme Court has stated, "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief."  *AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341, 1349 (2021).  Indeed, the Commission has often filed complaints seeking to preliminarily enjoin mergers under Section 13(b) pending the issuance of an administrative complaint.  *E.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) (preliminary injunction "was sought in aid of an FTC administrative proceeding which was subsequently instituted by complaint . . . ."); Compl., *FTC v. Aloha Petroleum, Ltd.*, No. CV-05-00471, 2005 WL 1991781 (D. Haw. July 27, 2005).

The issue now before the Court is Plaintiff's request for a TRO to preserve the status quo for a limited period of time, "pending the issuance of a[n administrative] complaint by the Commission," 15 U.S.C. § 53(b)(2), and if such administrative complaint is issued, until the Court has the opportunity to conduct an evidentiary hearing regarding the Commission's request for a preliminary injunction. If the administrative complaint "is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect." *Id*. If the administrative complaint is filed, Plaintiff, subject to this Court's availability and after meeting and conferring with Defendants, anticipates seeking a date in November for the evidentiary hearing regarding Plaintiff's request for a preliminary injunction. In other words, the proposed TRO would be of limited duration.

For the reasons set forth below, the Court should issue a TRO preventing Defendants from consummating the Acquisition pending the issuance of an administrative complaint, and if such complaint is filed, until a hearing on Plaintiff's motion for a preliminary injunction can be completed. [3]

---

[3] Unlike Federal Rule of Civil Procedure 65(b), Section 13(b) of the FTC Act does not prescribe any time limitations for a TRO if the administrative complaint is filed within 20 days of its entry. *Compare* Fed. R. Civ. P. 65(b) ("order expires at the time after entry—not to exceed 14 days—that the court sets") *with* 15 U.S.C. § 53(b) (providing no such limitation). Because Section 13(b) was enacted to preserve the FTC's ability to order relief upon completion of its administrative proceedings, *see* H.R. Rep. No. 73–624, at 31 (1973) (Conf. Rep.), reprinted in 1973 U.S.C.C.A.N. 2523), courts issue TROs sought under Section 13(b) for the period of time it takes the court to decide the motion for a preliminary injunction—assuming, of course, that the administrative complaint is filed within 20 days of entry of the TRO. *See, e.g.*, *FTC v. RagingBull.com, LLC*, 507 F. Supp. 3d 629, 636 (D. Md. 2020); *FTC v. Lancaster Colony Corp. Inc.*, 434 F. Supp. 1088, 1092 (S.D.N.Y. 1977).

## I.      FACTUAL BACKGROUND

The VR industry is currently characterized by a high degree of innovation and growth, with global sales predicted to jump from $5 billion in 2021 to more than $12 billion in 2024.[4] Cutting-edge VR technology creates an immersive digital experience like no other, allowing users to be transported anywhere—all from the comfort of their own homes.  As Meta's CEO and founder, Mark Zuckerberg, explains, "you're right there with another person or in another place and that's very different from every experience of technology that we've had before."[5]

Meta recognizes the explosive potential of VR.  While best known for its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—the company has committed substantial resources to building a VR "metaverse."  Meta spent almost $25 billion on its Reality Labs division from 2020 through March 2022[6]—and it intends to increase those investments over the next several years.[7]  One need look no further than the rebranding of the company from Facebook to "Meta" in 2021 to understand its vision for the future.[8]

Meta's foray into VR began in 2014 when it acquired Oculus VR, Inc., a headset manufacturer.[9]  Since then, Meta has emerged as key player at each level of the VR ecosystem: Its current generation headset, the Meta Quest 2, is the most widely used VR headset today.[10] ████ ███████████████████████████████████████████████████████—its Quest Store—

---

[4] PX1043 at 009.

[5] PX4066 at 004.

[6] PX4072 at 051; PX4075 at 008.

[7] PX4003 at 002.

[8] PX4067 at 001.

[9] PX4061 at 001; PX4062 at 001.

[10] PX4063 at 001.

through which app developers offer their products to VR users for download.[11] ████████

██████ app sellers, a position it obtained by both acquiring studios with existing apps—like

Beat Games, which it acquired for ██████ in 2019[12]—and developing its own apps.[13]

Meta's best-selling app—████████████████████████████[4]—is the

popular game Beat Saber, "where your goal is to slash the beats (represented by small cubes) as

they are coming at you" with "great sound and visual effects to emphasize the rhythm."[15]  Beat

Saber is recognized by industry participants as among a category of VR rhythm and active

sports games that provide incidental fitness benefits to users ("incidental fitness apps").  Meta

has repeatedly extolled the fitness benefits of Beat Saber on its Oculus website and in

advertisements to Quest users.[16]

Like Meta, Within is a software app developer.  Its flagship product is Supernatural, a

VR fitness app that offers over 800 fully immersive VR workouts, each set to music and located

in a virtual setting like the Galapagos Islands or the Great Wall of China.[17]  Supernatural's

workouts are fitness classes that customers can access by paying a monthly subscription fee of

$18.99, or a yearly subscription fee of $179.99.[18] ████████████ Supernatural as

among a category of apps referred to as "dedicated" or "deliberate" fitness apps that offer to

---

[11] Snyder Decl. at ¶ 7 ████████████████████████████████

██ PX1053 at 062 ████████████████████

[12] PX0004 at 117-119; PX1018 at 001; PX4018 at 001.

[13] PX0004 at 176-177; PX1042 at 005.

[14] PX1023 at 004.

[15] PX4043 at 001-02.

[16] *E.g.*, PX4034 at 001, 005; PX4023 at 007-08.

[17] PX0005 at 009.

[18] PX0003 at 006.

users a structured physical workout in their own homes ("dedicated fitness apps").[19]  Other

dedicated fitness apps include FitXR, Holofit, VZFit, and Les Mills Body ███████████

█████████████.[20]

     Among VR apps, dedicated fitness is ██████████████.[21]  ████████████

████████████████████████████████████████████

████████████████████████.[22]  ███████████████

███████████████3  ████████████," [24]  █████████

█████," [25]  ████████████████████████████

███████████████.[26]  █████████████████████

█████████████████████████████████████████

██████████████[27]  ██████████████████████

████████████████████.," [28]

  ██████████████████████████████████████

███████████████████████████.[29]  █████████

██████ industry participants and VR users view Beat Saber and Supernatural as already

---

[19] PX1003 at 007-09.

[20] PX1051 at 006.

[21] PX1003 at 053.

[22] PX1004 at 001.

[23] PX1027 at 003.

[24] PX1025 at 001.

[25] PX1019 at 001.

[26] PX1034 at 003.

[27] PX1029 at 002.

[28] PX1019 at 001.

[29] PX2015 at 008; PX2019 at 004.

offering very similar products.[30]  Both employ the same slashing mechanic, in which the player

uses virtual bats or swords to hit incoming targets timed to music.[31] ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████[32] ███████

████████████████████████████████████████████

█████████████████████[33] ████████████████████████

████████████████████████████████████████

████████████████[34]

      Meta, however, chose ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████[35]  Instead, Meta decided it preferred to simply buy ██████████████,[36]

which is more than █████████████████████ build Supernatural ██████

██████ VR dedicated fitness app.[37]

## II.    ARGUMENT

      Section 13(b), 15 U.S.C. § 53(b), of the FTC Act "allows a district court to grant the

Commission a preliminary injunction '[u]pon a proper showing that, weighing the equities and

---

[30] PX4023 at 007-08.

[31] PX4020 at 003.

[32] PX2015 at 008.

[33] PX2015 at 008-09.

[34] PX2016 at 002.

[35] PX1004 at 001.

[36] PX0004 at 161.

[37] PX0002 at 001.

considering the Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999).  The statute "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984).  "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *Affordable Media*, 179 F.3d at 1233 (quoting *Warner Commc'ns*, 742 F.2d at 1160)).  In weighing the equities under § 13(b), "public equities receive far greater weight." *Warner Commc'ns Inc.*, 742 F.2d at 1165.  These public equities include effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *Id.*; *H.J. Heinz Co.*, 246 F.3d at 726; *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991).  Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).  These same principles apply to the FTC's request for a TRO under Section 13(b). *FTC v. Universal Premium Servs.*, No. CV 06-0849 SJO, 2006 WL 8442134, at *3 (C.D. Cal. Mar. 14, 2006).

Due to the primacy of public equities over private interests, and taking into consideration the practical challenges of considering complex factual questions on a limited record, courts in previous merger cases have taken a pragmatic approach to the Commission's requests for a TRO.  *See FTC v. Foster*, No. CIV 07-352 JB, 2007 WL 1302585, at *4 (D.N.M. Apr. 13, 2007) (the court must grant a TRO so long as it finds "there is a serious question"); *FTC v. Exxon Corp.*, No. 79-1975, 1979 WL 1654, at *3 n.6 (D.D.C. July 28, 1979) (the FTC need not "make precisely the same showing at the temporary restraining order and preliminary injunction stages[ ] [p]articularly where, as here, the factual and legal issues are massive, and the time the Commission has had for the preparation of its case was relatively short").

Here, the Court should take a similarly pragmatic approach and issue a TRO "pending the issuance of a[n administrative] complaint by the Commission," 15 U.S.C. § 53(b), and if

such a complaint is filed, to preserve this Court's ability to effectively analyze factual questions for the limited period needed to conduct an evidentiary hearing on the Commission's motion for a preliminary injunction.[38]  Plaintiff is likely to ultimately succeed on the merits, and the equities weigh in favor of a TRO.  Moreover, where the Commission has alleged harm in two relevant antitrust markets, the TRO must issue if the Court determines that competition in either market is in danger.

### A. The FTC Is Likely to Succeed in Showing That the Acquisition May Substantially Lessen Competition.

In evaluating the FTC's likelihood of success on the merits, courts consider the FTC's ability to prove that the effect of the Acquisition "*may be* substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. *Warner Commc'ns*, 742 F.2d at 1160 (emphasis in original) ("It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect").  "The Commission meets its burden if it 'raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'"  *Id.* at 1162 (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)); *see also Whole Foods Market, Inc.*, 548 F.3d at 1036 ("[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction. One may have such doubts without knowing exactly what arguments will eventually prevail.").  Because

---

[38] Courts commonly conduct preliminary injunction hearings in connection with the Commission's merger challenges under Section 13(b).  *E.g.*, *FTC v. Hackensack Meridian Health, Inc.*, No. 20-18140, 2021 WL 4145062 (D.N.J. Aug. 4, 2021); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020); *cf. FTC v. Freeman Hosp.*, No. 95-1448, 1995 WL 155237, *1 (8th Cir. Mar. 1, 1995) (remanding for "an evidentiary hearing on FTC's complaint for injunctive relief").

the issue is a "narrow one," the Court at the preliminary injunction stage (let alone the TRO stage) "do[es] not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns*, 742 F.2d at 1164; *see also Cal. v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989) ("At this stage, we do not resolve conflicts in the evidence."), *rev'd on other grounds*, 495 U.S. 271 (1990).

Courts evaluate the likelihood that the FTC will succeed on the merits in the context of a Section 7 challenge through a burden-shifting framework. *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). The FTC first must establish a prima facie case, by showing "a likelihood of anticompetitive effects," which can be accomplished (among other ways) via market share statistics. *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *64 (N.D. Cal. Jan. 8, 2014); *see also United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 631 (1974) ("the Government established a prima facie case that the Spokane market was a candidate for the potential-competition doctrine"). The burden then shifts to defendants to try to rebut that case. *St. Alphonsus*, 778 F.3d at 783. If, but only if, defendants successfully rebut the FTC's prima facie case, the Commission must carry its burden of persuasion by presenting "additional evidence of anticompetitive effects." *Bazaarvoice*, 2014 WL 203966, at *64 (quoting *H.J. Heinz Co.*, 246 F.3d at 715).

Here, the Acquisition will result in "a likelihood of anticompetitive effects" by eliminating competition in one or both of the relevant antitrust markets. First, in the VR Dedicated Fitness App market, where Within's Supernatural ███████████, the Acquisition will both preclude Meta's reasonably probable entry through alternative means— which would have added another competitor to the market—and eliminate the threat of that entry as a likely procompetitive influence on existing competition in the market. Second, in the broader VR Fitness App market, where both Supernatural and Beta Saber compete, ████ ████████████████████████████████████████████████████

1    ███████████████████████████; moreover, direct evidence shows that Meta and

2    Within currently engage in head-to-head competition that the Acquisition will eliminate.

3          i.    **The Relevant Markets Are (1) VR Dedicated Fitness Apps in the United**

4                **States and (2) VR Fitness Apps in the United States.**

5          "Determination of the relevant product and geographic markets is a necessary predicate

6    deciding whether a merger contravenes the Clayton Act."  *St. Alphonsus*, 778 F.3d at 783.  This

7    is true whether the merger is alleged to have anticompetitive effects on existing competition or

8    on potential competition.  *Marine Bancorp., Inc.*, 418 U.S. at 618.  In defining relevant product

9    markets, courts often evaluate "such practical indicia as industry or public recognition of the

10   [relevant market] as a separate economic entity, the product's peculiar characteristics and uses,

11   unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and

12   specialized vendors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *accord Klein*

13   *v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561, at *7 (N.D. Cal. Jan. 14, 2022).

14   Notably, within a broader market, "well-defined submarkets may exist which, in themselves,

15   constitute product markets for antitrust purposes."  *Brown Shoe*, 370 U.S. at 325; *accord United*

16   *States v. Joseph Schlitz Brewing Co*., 253 F. Supp. 129, 146 (N.D. Cal. 1966), *aff'd mem.*, 385

17   U.S. 37 (1966). "The relevant geographic market is the area of effective competition where

18   buyers can turn for alternate sources of supply."  *St. Alphonsus*, 778 F.3d at 784 (internal

19   quotation marks omitted).  The Ninth Circuit has emphasized that "what constitutes a relevant

20   market is a factual determination" best suited for resolution on a well-developed record. *Klein*,

21   2022 WL 141561, at *6 (quoting *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203

22   (9th Cir. 1997)).

23         The *Brown Shoe* practical indicia show that VR Dedicated Fitness Apps and VR Fitness

24   Apps are relevant product markets.  The United States is the relevant geographic market.

25          1.   **VR Dedicated Fitness Apps Is a Relevant Product Market.**

26         The VR Dedicated Fitness App market consists of apps, like Within's Supernatural app,

27   that are designed so that users can exercise through a structured physical workout in an

28

immersive virtual setting anywhere they choose to use their VR headset.[39]

VR dedicated fitness apps typically feature workouts designed by trainers or fitness experts; they are designed to maximize exertion and physical movement for the purpose of exercise; and they may feature classes or other active coaching.  According to the Virtual Reality Institute of Health and Exercise, which rates energy expenditures during VR app usage, Supernatural currently has the highest rate of any VR app, at 12-13 calories per minute.[40]  In this way, VR dedicated fitness apps feature "peculiar characteristics and uses" that distinguish them from other VR apps.  *Brown Shoe*, 370 U.S. at 325.  They are distinct from other VR apps in other ways: They typically offer distinct prices as compared to other VR apps—specifically, a subscription-based pricing model as compared to a one-time fee[41]—███████████████████ ██████████████████████████████████████████.[42]

Moreover, functional, technological, and price differences show that non-VR at-home smart fitness solutions and at-home exercise products are distinct from VR dedicated fitness apps, through which users can exercise in fully immersive, 360-degree environments without any of the cost, discomfort, or risk of traveling to those environments.[43]  VR technology allows users to exercise from home with the feeling and visuals of being somewhere else, while the sensors in a VR headset and controllers provide for a degree of tracking, adjustment, and feedback that non-immersive exercise programs cannot match:  As Within's co-founder and CEO explained, "working out in Supernatural feels like you're a champion of a sport from the

---

[39] PX1003 at 028, 030.

[40] PX0001 at 010.

[41] PX2027 at 002.

[42] PX0001 at 002; PX1010 at 018-19.

[43] PX0005 at 009; PX0003 at 006.  ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████.

future.  I love that and haven't felt that sense of athleticism ever on a treadmill or an exercise bike."[44]  Additionally, most smart at-home fitness solutions have much higher up-front costs and much higher ongoing costs than current VR dedicated fitness apps.  A Peloton smart bicycle, for example, costs over $1,000, with an additional $44 per month subscription cost, compared to the cost of a $299 Meta Quest 2 plus $18.99 per month for Supernatural.[45]

### 2.  VR Fitness Apps Is a Relevant Product Market.

The broader VR Fitness Apps market comprises VR apps recognized and marketed as providing a fitness benefit.  It includes both VR dedicated fitness apps like Supernatural and incidental fitness apps, such as rhythm and active sports games like Beat Saber.  Meta and Within recognize the existence of a VR Fitness App market comprised of both dedicated and incidental fitness apps.[46]  In a post on the Oculus website entitled "Exercise By Accident: VR Games to Help You Work Out At Home," Meta extols the virtues of rhythm and sports games for physical exercise: "while our first port of call for VR fitness is dedicated fitness apps like Supernatural and FitXR, you can get a surprising amount of exercise 'by accident' with a bunch of the games below," including Beat Saber. It classified the type of exercise offered by Beat Saber as "Full-body, Aerobic"—the exact same type of exercise it listed for Supernatural.[47]

For the reasons stated above with respect to the VR Dedicated Fitness App market, the VR Fitness App market also does not include non-VR at-home smart fitness solutions like digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video games, or workout videos.  Again, as Meta's CEO has explained, VR is "very different from every experience of technology that we've had before."[48]  Meta advertises the immersive nature

---

[44] PX4024 at 003-04.

[45] PX0003 at 006.

[46] PX2026 at 004, 006; PX4034 at 001, 002, 005.

[47] PX4034 at 001, 002, 005.

[48] PX4066 at 004.

of VR, touting the ability to "[h]ave the time of your life with a high intensity workout that feels like a vacation . . . in stunning destinations, like the ruins of Machu Picchu and more."[49]

Nor does the VR Fitness App market include VR apps that do not provide an exercise benefit and are neither marketed nor sought by users on that basis. Although many VR apps make use of some physical movement by the user to navigate the app or present an immersive experience to the user, not all VR apps involve physical movement that generates an exercise effect. Indeed, studies recognize the wide range of exercise effects that can be provided by different VR apps.[50] ███████████████████████████████████████████████
███████████████████████████████████.[51]

### 3.  The United States Is the Relevant Geographic Market.

The United States is the relevant geographic market with respect to both relevant product markets. Even though "technology knows no borders," the "area of effective competition" is the United States because the "realities of selling" differ across national borders due to differences including in regulatory regimes, intellectual property considerations, and availability. *Bazaarvoice*, 2014 WL 203966, at *27, *68.[52] VR consumers in the United States can buy headsets and applications only if they are available in the United States, and thus the United States is the relevant geographic market.

### ii.  The Acquisition Has a Likelihood of Anticompetitive Effects in the VR Dedicated Fitness App Market.

It is well-settled that Section 7 of the Clayton Act prohibits the elimination of potential competition as well as present competition. *E.g.*, *United States v. Falstaff Brewing Corp.*, 410

---

[49] PX4074 at 012.

[50] PX4048 at 007; PX4073 at 020.

[51] PX2026 at 004, 006.

[52] *E.g.*, PX0004 at 164 ████████████████████████████████████████
███████████████████████████████████████

U.S. 526, 531-32 (1973); *see also Marine Bancorp.*, 418 U.S. at 623-25.  Courts have recognized two distinct types of anticompetitive harm that can occur from mergers that eliminate potential competition in a concentrated relevant market.  First, a merger can lessen "actual potential competition," when it eliminates a firm reasonably likely to enter the relevant market through alternative means absent the illegal acquisition.  *United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226, 1233 (C.D. Cal. 1973), *aff'd*, *Phillips Petrol. Co. v. United States*, 418 U.S. 906 (1974); *see also Yamaha Motor Co. Ltd. v. FTC*, 657 F.2d 971, 977-79 (8th Cir. 1981).  Some Courts describe this as an "entry effect."  *Phillips Petrol.*, 367 F. Supp. at 1232.  Second, a merger can lessen "perceived potential competition" when it eliminates "a potential competitor on the fringe of the market with likely influence on existing competition."  *Falstaff Brewing Corp.*, 410 U.S. at 533-34; *accord Marine Bancorp.*, 418 U.S. at 624.  In other words, the merger eliminates an "edge effect," or the *present effect* on the existing market that results from the perception that a firm may become a competitor in the future.  *Phillips Petrol.*, 367 F. Supp. at 1232-33.  A merger can lessen competition "even if it were assumed that the potential competitor would *not actually have entered* the market."  *Id.* at 1234 (emphasis added).

### 1.   The VR Dedicated Fitness App Market Is Concentrated.

"The potential-competition doctrine has meaning only as applied to concentrated markets."  *Marine Bancorp.*, 418 U.S. at 630.  "A commonly used metric for determining market share is the Herfindahl-Hirschman Index ('HHI')."  *St. Alphonsus*, 778 F.3d at 786.  HHI is calculated by summing the squares of the market shares of each market participant.  *Id.*; *see generally* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (hereinafter "HMG") § 5.3 (2010) (describing HHI).  Two firms ████████████████████ ████████████████████████████████████████████████  Indeed, the

---

[53] The firms included in the VR Dedicated Fitness App market are based on ████████████ ████████████████████████████████████████████████████████

(Continued…)

market HHI ██████████████████████████████████████████████

████████████████████████████ under the Horizontal Merger Guidelines.[54]

### 2.   It Is Reasonably Probable That Meta Would Enter the Market Through Other Means Absent the Acquisition, Leading to Procompetitive Effects.

A firm "must be considered a significant potential entrant" "where credible objective evidence shows the basic economic facts of the acquiring company's overall size, resources, capability, and motivation with respect to entry into an adjacent attractive market involving a line of commerce in which the firm is already heavily engaged." *Phillips Petrol.*, 367 F. Supp. at 1239; *accord Marine Bancorp.*, 418 U.S. at 633 (considering whether the acquiring firm had "available feasible means" of entering absent the proposed acquisition).  The standard is one of reasonable probability, as "[u]nequivocal proof that an acquiring firm actually would have entered de novo but for a merger is rarely available." *Marine Bancorp.*, 418 U.S. at 624; *accord United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 175 (1964) ("to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty.  This we will not do."); *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 29 n.7 (2d Cir. 1977) ("In view of the ample express authority, including congressional authority, in favor of a reasonable probability standard . . . , we decline to adopt any more stringent standard here.").  If alternative entry was reasonably probable, the question becomes whether it offered a "substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects." *Marine Bancorp.*, 418 U.S. at 633; *accord Yamaha Motor*, 657 F.2d at 979 (entry "would have had an obvious procompetitive effect leading to some deconcentration.").

Here, Meta's "overall size, resources, capability, and motivation with respect to entry" demonstrate a reasonable probability that Meta would have entered the relevant market—██

██████████████████████. Given the early stage of the proceedings, the FTC reserves the right to revise its calculations as appropriate as this matter progresses.

[54] Snyder Decl. at ¶ 5.

1   ███████████████████████████████████ if it could not acquire ██████████,

2   Supernatural.  Meta has the financial resources to develop a dedicated fitness app on its own—

3   either by creating a new app or by adding features to an existing app such as Beat Saber.  It also

4   has more than enough resources to enter the market through ████████████████████

5   ████████████████████████████████████████████████████

6   ███   One of the largest, most valuable, and most technologically advanced companies in the

7   world, Meta has committed tens of billions of dollars to its Reality Labs division, which

8   develops its AR and VR products, including more than $7.7 billion in 2020, $12.4 billion in

9   2021,[55] and $3.7 billion (an increase of 55%) in the three-month period ending in March 2022,[56]

10  and stated it anticipates spending billions more in the coming years to build its VR ecosystem.[57]

11          Meta already produces the best-selling VR headset in the United States.[58]  Its Quest

12  Store is the ███████████████████████.[59]  And Meta is ████████████ of VR

13  apps.  With its vast financial resources, Meta continues to add features and content to the apps it

14  has already released, and to develop and release new apps in-house—something it has done

15  previously, including with the ambitious Horizon Worlds, a massive social app that features its

16  own game-creation tools for users.[60]  The ████████ price tag on this Acquisition alone

17  demonstrates Meta's financial capabilities: the money that Meta proposes using to acquire

18  Within is ███████████████████████████████████████████████

19  █████████████████████—during which time Within developed Supernatural from

---

[55] PX4072 at 051.

[56] PX4075 at 008.

[57] PX4003 at 002.

[58] PX4063 at 001.

[59] Snyder Decl. at ¶ 7 ██████████████████████████████████████

      ███ PX1053 at 062 ████████████████████████

[60] PX1023 at 004; PX0004 at 176-177; PX1042 at 007.

scratch.[61]  The Horizontal Merger Guidelines caution against this precise type of transaction, where "one of the merging firms has capabilities that are likely to lead it to develop new products in the future that would capture substantial revenues from the other merging firm."[62]

Meta also has incentives to enter the VR Dedicated Fitness App market.  Its motivation to expand further into the metaverse is beyond question:  It changed its name from one of the most visible brand names in the world to "Meta" the same week that it announced the proposed Acquisition.[63]  Market facts also establish why a firm like Meta is motivated to enter the VR Dedicated Fitness App market.  Among VR apps, dedicated fitness is ██████████████ ████████.[64] ████████████████████████████████████████████████████ ███████████████████████████████████,[65] and its personnel have proclaimed that ██████████ ██████████████████████████"[66]  What's more, ████████████████████████████████ ████████████████████████████s.[67]  This "name awareness" would facilitate Meta's organic entry into dedicated fitness, as a fitness-oriented version of Beat Saber would be in line with users' understanding of that brand.

In addition to the aforementioned objective facts, ████████████████████████ ████████████████████████████████████████████████████ ████████████████  ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[61] PX0002 at 001.

[62] HMG § 6.4.

[63] PX4013 at 001; PX4014 at 001.

[64] PX1003 at 053.

[65] PX0004 at 163.

[66] PX1039 at 002.

[67] PX1003 at 008.

1  █████████████████████.”[68]  Since then, Meta CEO Mark Zuckerberg has proclaimed that █

2  ████████████████████████████████████████.[69]  Thus,

3  it is not surprising that ███████████████████████████.[70]

4  Meta may try to argue it was never going to enter but for the Acquisition, but objective,

5  economic facts refute any subjective evidence Meta may present, *Phillips Petrol.*, 367 F. Supp.

6  at 1239 ("subjective evidence, while relevant and entitled to consideration, cannot be

7  determinative in evaluating the legality of the acquisition under § 7.  If strong objective

8  evidence points to a contrary conclusion, the objective evidence must prevail"), and, in any

9  event, a disputed question of fact is not appropriate to resolve on this motion.

10      Alternative entry by Meta would introduce a new competitor into the market with the

11  backing of one of the world's largest, most well-resourced, and most experienced VR industry

12  participants. Such entry would increase consumer choice, increase innovation, spur additional

13  competition to attract the best talent, and yield a host of other competitive benefits.  Crucially, it

14  would also maintain the independent presence and competitive vitality of the most successful

15  VR dedicated fitness app to date, Supernatural.  The Acquisition would eliminate the

16  probability of such entry, leading to less beneficial rivalry and competitive pressure.

### 3. Within Reasonably Perceived Meta as a Potential Entrant, and Meta's Presence as Such Likely Influences Competition.

19      The "same facts" that a district court must assess in determining a Clayton Act violation

20  based on actual potential competition are "probative of [a] violation of § 7 through loss of a

21  procompetitive on-the-fringe influence." *Falstaff Brewing Corp.*, 410 U.S. at 534 n.13; *accord*

22  *Phillips Petrol.*, 367 F. Supp. at 1255.  For a claim based on loss of perceived potential

23  competition, a court must "determine whether in any realistic sense [the acquiring firm] could

[68] PX1040 at 001.

[69] PX1027 at 003; PX1004 at 001.

[70] PX1048 at 001.

be said to be a potential competitor on the fringe of the market with likely influence on existing competition." *Falstaff Brewing Corp.*, 410 U.S. at 534.  Probabilistic proof of "likely influence" on existing competitors is sufficient; proof of "actual influence" is not necessary.  *Id.* at 534 n.13 ("The Government did not produce direct evidence of how members of the New England market reacted to potential competition from Falstaff, but circumstantial evidence is the lifeblood of antitrust law"); *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 773 (D. Md. 1976) ("the government need not introduce evidence of actual market response").

Here, both direct and circumstantial evidence establish that Meta "could be said to be a potential competitor on the fringe of the market." *Falstaff Brewing Corp.*, 410 U.S. at 534.  As explained in detail above, Meta is a massive, wealthy company with extensive experience in various aspects of the VR industry.  It has recently expanded into a variety of VR fitness-related areas, including by acquiring the ███████████ incidental fitness app (Beat Saber) and by internally developing a system-level fitness tracking tool (Oculus Move).[71] ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████[72] ████████████████████████████████

████████████████████████[73]

Meta's perceived potential entry also has "likely influence on existing competition." *Falstaff Brewing Corp.*, 410 U.S. at 534. ████████████████████████████

████████████████████████████████████[74] ████████

---

[71] PX0004 at 177.

[72] PX2015 at 008.

[73] PX2019 at 003-04.

[74] *E.g.*, PX2021 at 002.

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ██████████████████████ .[75] ██████████████████████████████████

4 ████████████████████████████████████████████ .  That competitive

5 pressure—and all of the benefits it yields—would be eliminated by the Acquisition.

     **iii.**    **The Acquisition Poses a Reasonable Probability of Substantially Lessening**

           **Competition in the Broader VR Fitness App Market.**

Viewed through the broader lens of the relevant antitrust market for all VR fitness apps, Meta and Within are *already* head-to-head competitors.  When the challenged acquisition involves two present competitors, as it does for Within's Supernatural and Meta's Beat Saber in the VR Fitness App market, a "prima facie case can be established simply by showing high market share." *St. Alphonsus*, 778 F.3d at 785.  Here, the Acquisition will increase market concentration in the VR Fitness App market to levels sufficient to trigger a presumption that the Acquisition will result in enhanced market power and is, therefore, presumptively unlawful.

     **1.**   **The Acquisition Will Increase Concentration in the VR Fitness App**

          **Market to Such a Degree That It is Presumptively Unlawful.**

As described above, the *Brown Shoe* practical indicia establish that there is a broader relevant antitrust market for VR Fitness Apps, consisting of both VR dedicated fitness apps (e.g., Within's Supernatural) and VR incidental fitness apps (e.g., Meta's Beat Saber).

"Statistics that indicate excessive post-merger market share and market concentration create a presumption that the merger violates the Clayton Act." *Am. Stores Co.*, 872 F.2d at 842.  Specifically, if a merger increases the HHI of the relevant market by more than 200 points to a post-merger total of more than 2,500 points, the merger is "presumed to be likely to enhance market power." *St. Alphonsus*, 778 F.3d at 786.  Here, Beat Saber ████████

---

[75] PX2015 at 008-09.

1 ███████ The pre-merger HHI is ████████, and the proposed acquisition of Within by Meta

2 would increase the HHI ██████████.[77] "The extremely high HHI on its own establishes the

3 prima facie case." *St. Alphonsus*, 778 F.3d at 788.[78]

### 2. Evidence Shows the Acquisition Will End Head-to-Head Competition.

5 The high market shares and HHIs establish a clear presumption of illegality, and

6 Defendants cannot produce "evidence clearly showing that the merger is not likely to have such

7 anticompetitive effects," as they are required to do to rebut the presumption of illegality.

8 *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  Nonetheless, abundant direct

9 evidence of competition between Meta and Within, which the Acquisition would eliminate,

10 corroborates the presumption of harm.

11 Meta and Within are head-to-head competitors at this very moment in the VR Fitness

12 Apps market.  That competition has forced both merging parties to sharpen their respective

13 offerings.  Meta has added fitness features to Beat Saber to better compete for users seeking an

14 exercise effect.  For example, in April 2020—just before Supernatural's launch—Meta released

15 "FitBeat," a song for Beat Saber designed for fitness-focused beat maps.[79]  Media coverage at

16 the time attributed "FitBeat" as a reaction to Supernatural's release.[80] ████████████

17 ████████████████████████████████████████████

18

_____

19 [76] Snyder Decl. at ¶ 6.

20 [77] *Id.*

21 [78] The firms included in the VR Fitness App Market are based ████████████████

22 ██████████████████████████ and a search for the terms "exercise" and

23 "fitness" on the Meta Quest Store (excluding meditation-focused apps). ██████████

24 █████████████████████████ Given the early stage of the proceedings, the

25 FTC reserves the right to revise its calculations as appropriate as this matter progresses.

26 [79] PX1021 at 003.

27 [80] *Id.*

28

1

2 ██████████████████████████[82]██████████████████████████

3 ██████████████████████████████████████████████.[83]

4 ██████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 █████████████████████████████████████.[84]

In sum, Beat Saber ████████████ incidental fitness VR app and Supernatural ████████ ████████ dedicated fitness app, facts that pit the two squarely and uniquely head-to-head in the VR Fitness App market.  This competition leads to innovations, new features, and consumer choice—and it will be eliminated as a result of the proposed Acquisition.

      **iv.**    **Defendants Cannot Rebut the FTC's Prima Facie Case.**

At this early stage of the proceeding, Defendants have not advanced rebuttal arguments before the Court, so it is premature for the FTC to attempt to address them in detail, other than to observe that recognized methods of rebutting a prima facie case are unavailable.

Defendants cannot demonstrate expansion of existing firms or entry by new firms will replace the existing and potential competition that the Acquisition will eliminate.  *See Bazaarvoice*, 2014 WL 203966, at *71.  "[D]evelopment of complex, customizable, and integrated software is a[] significant barrier to entry," *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 52 (D.D.C. 2009), and that is precisely what would be required here.  There are multiple other barriers to entering or expanding in the relevant markets, including time, ongoing development and content creation, post-launch support, capital, brand recognition, and the need for consumers to be able to discover the app.  Developing a high-quality entrant also requires

---

[81] PX2008 at 001.

[82] PX2009 at 001-02.

[83] PX2013 at 001.

[84] PX2027 at 002.

██████████████████████████████████████████████████████

████████████████.[85]  Moreover, Meta itself controls the surest paths to putative rivals' entry and expansion through its control of the Quest Store.  Meta examines "quality, polish, entertainment value, and utility" when deciding what apps to permit into the Quest Store.[86] This can be a lengthy process and there is no guarantee any app will ultimately be approved.[87]

Defendants will also be unable to present proof of "cognizable, merger-specific efficiencies that will be passed through to customers and will be sufficient to offset the anticompetitive effects of the transaction."  *See Bazaarvoice*, 2014 WL 203966, at *64.  As a preliminary matter, the "Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," *St. Alphonsus*, 778 F.3d at 788-89 ("*Brown Shoe* cast doubt on the defense . . ."), and the Ninth Circuit has stated that it "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *Id.* at 790.  Indeed, the FTC is aware of no court that has ever relied on efficiencies to rescue an otherwise unlawful transaction.  In any event, Defendants will not be able to "clearly demonstrate that the proposed merger enhances rather than hinders competition because of the increased efficiencies." *Id.* (internal quotation marks omitted); *accord id.* ("proof of 'extraordinary efficiencies' is required to offset the anticompetitive concerns in highly concentrated markets").  Nor will they be able to show that any efficiencies are merger-specific and verifiable and passed down to consumers.

### B.  The Equities Support a Temporary Restraining Order.

"The second step in deciding whether to grant [preliminary relief] is to balance the equities." *Warner Commc'ns*, 742 F.2d at 1165.  In weighing the equities under § 13(b), "public equities receive far greater weight"; indeed, if the Commission has shown a likelihood of success, "a countershowing of private equities alone does not justify denial of a preliminary

---

[85] PX1020 at 001.

[86] PX4054 at 001.

[87] *E.g.*, PX1050 at 001 ("████████████████████████████

injunction." *Id.* "The principal public equity weighing in favor of issuance of preliminary [] relief is the public interest in effective enforcement of the antitrust laws." *H.J. Heinz Co.*, 246 F.3d at 726; *Univ. Health*, 938 F.2d at 1225.  An important public equity is preserving the FTC's ability to obtain "effective relief if the Commission ultimately prevails and divestiture is ordered." *Warner Commc'ns*, 742 F.2d at 1165.  Without preliminary relief, the Commission may find it difficult to "unscrambl[e] the eggs" if the Acquisition is ultimately deemed unlawful.  *Peabody Energy*, 492 F. Supp. 3d at 918 ("Allowing the transaction to proceed and then later 'unscrambling the eggs' upon a finding of illegality by the FTC is a daunting and potentially impossible task" (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 87 (D.D.C. 2015))).  As such, "[n]o court has denied relief to the FTC in a [Section] 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v. ProMedica Health Sys.*, No. 3:11-cv-47, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011).

Here, the equities clearly support a TRO.  Consumers are vulnerable to immediate harm if Defendants combine Meta's and Within's operations "pending the issuance of a[n administrative] complaint by the Commission," 15 U.S.C. § 53(b)(2), and if such complaint is issued, before the Court rules on the FTC's request for a preliminary injunction.  Denial of a TRO may also "preclude relief if the Commission ultimately prevails and divestiture is ordered." *Warner Commc'ns*, 742 F.2d at 1165.  Restraining Defendants will cause them minimal harm. The contract for the Acquisition provides for an outside closing date of ███████.  There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353 (3d Cir. 2016).

## III.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a TRO before 8:59 PM Pacific Time on July 31, 2022, preventing Defendants from completing the Acquisition pending the issuance of an administrative complaint by the Commission, and if such complaint is issued, before the Court rules on Plaintiff's requested preliminary injunction.

1  Dated:  July 27, 2022                          Respectfully submitted,

2                                                 */s/ Abby L. Dennis*
                                                  Abby L. Dennis
3                                                 Peggy Bayer Femenella
                                                  Joshua Goodman
4                                                 Jeanine Balbach
                                                  Michael Barnett
5                                                 E. Eric Elmore
                                                  Justin Epner
6                                                 Sean D. Hughto
                                                  Frances Anne Johnson
7                                                 Andrew Lowdon
                                                  Kristian Rogers
8                                                 Anthony R. Saunders
                                                  Timothy Singer
9
                                                  Federal Trade Commission
10                                                600 Pennsylvania Avenue, NW
                                                  Washington, DC 20580
11                                                Tel: (202) 326-2381

12                                                Erika Wodinsky

13                                                Federal Trade Commission
                                                  90 7th Street, Suite 14-300
14                                                San Francisco, CA 94103

15                                                *Counsel for Plaintiff Federal Trade*
                                                  *Commission*
16

17

18

19

20

21

22

23

24

25

26

27

28