# EXHIBIT 1

**FEDERAL TRADE COMMISSION**

---

**IN RE PETITION FOR RECUSAL OF
CHAIR LINA M. KHAN FROM
INVOLVEMENT IN THE
PROPOSED MERGER BETWEEN
META PLATFORMS, INC. AND
WITHIN UNLIMITED, INC.**

---

**PETITION FOR RECUSAL**

Meta Platforms, Inc. ("Meta") respectfully petitions Chair Lina M. Khan and the Federal Trade Commission to recuse Chair Khan from participating in any decisions concerning the FTC's review of Meta's proposed merger with Within Unlimited, Inc. ("Within"), including any upcoming agency action or vote related to the merger. Meta previously petitioned the Commission for Chair Khan's recusal in the FTC's antitrust lawsuit against it, and adopts and incorporates those arguments by reference here.[1]

As explained in Meta's prior petition, Chair Khan has consistently and publicly maintained that Meta has violated the antitrust laws and that the FTC generally must block acquisitions by the company.[2] Prior to her service on the Commission, Chair Khan advocated for the FTC to "[p]rohibit all future acquisitions by Facebook for at least five years,"[3] and she

---

[1] *See In re Petition for Recusal of Chair Lina M. Khan from Involvement in the Pending Antitrust Case Against Facebook, Inc.* (July 14, 2021). That Petition and its supporting documents are attached as **Exhibit A**. *See also FTC v. Facebook, Inc.*, No. 20-cv-03590-JEB (D.D.C. Oct. 4, 2021), ECF No. 83 (motion to dismiss FTC's amended complaint and accompanying exhibits). Meta continues to reserve the right to seek Chair Khan's recusal from any additional matters presenting similar prejudgment concerns.

[2] *See generally* Ex. A (collecting statements).

[3] Press Release, Open Markets Inst., *Fines for Facebook Aren't Enough: The Open Markets Institute Calls on FTC to Restructure Facebook to Protect Our Democracy* (Mar. 22, 2018),

expressed her "hope" that "if Facebook tomorrow announces it is acquiring another company, . . . the FTC would look at that very closely and block it."[4] In 2020, Chair Khan characterized Meta's "acquisition strategy" as "basically a land grab to . . . lock up the market,"[5] and she called upon "enforcers" to put an end to what she averred is the company's "copy-acquire-kill" approach to mergers and acquisitions.[6]

These and other public statements confirm that Chair Khan has prejudged the propriety of the pending merger between Meta and Within. Chair Khan's public statements and writings reflect her belief that the government should block future acquisitions by Meta, regardless of the merits of the transaction. For the reasons enumerated in Meta's prior petition, Chair Khan's participation in the FTC's review related to the instant merger would violate both due process and her obligations of impartiality under the federal ethics rules.[7]

---

https://www.openmarketsinstitute.org/publications/fines-for-facebook-arent-enough-theopen-markets-institute-calls-on-ftc-to-restructure-facebook-to-protect-our-democracy (accessed July 14, 2021) [https://perma.cc/P4AU-C4CZ].

[4] The Bernie Sanders Show: *The Greatest Threat to Our Democracy?* (May 15, 2018) (starting at 20:29), https://www.youtube.com/watch?v=wuCAy10hlHI.

[5] Sway, *She's Bursting Big Tech's Bubble*, N.Y. Times (Oct. 29, 2020) (transcript), https://www.nytimes.com/2020/10/29/opinion/sway-kara-swisher-lina-khan.html?showTranscript=1 (accessed July 24, 2022).

[6] Lina M. Khan (@linamkhan), Twitter (Dec. 9, 2020, 4:20PM), https://web.archive.org/web/20210614143417/https://twitter.com/linamkhan/status/133682805669 5136259. These tweets were deleted but are available through the use of archive.org (i.e., the "Wayback Machine").

[7] *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (disqualification based on prejudgment is required where "a disinterested observer may conclude that [the decision maker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it" (citation omitted)); *see also* 5 C.F.R. § 2635.501(a) (instructing a federal employee to "avoid an appearance of loss of impartiality in the performance of [her] official duties" by not participating in "a particular matter involving specific parties . . . if [s]he determines that a reasonable person with knowledge of the relevant facts would question [her] impartiality in the matter"); 5 C.F.R. § 2635.101(b)(14) ("Employees

Meta acknowledges Judge Boasberg's decision that Chair Khan's public statements and previous roles did not require her recusal from the essentially prosecutorial decision to file an amended complaint in its pending antitrust lawsuit.[8] But as Judge Boasberg explained, Chair Khan's vote to authorize an amended complaint in that case "hardly occurred on a blank slate."[9] Here, the agency slate is blank because the transaction is in the pre-merger review stage, and the Commission has not yet voted on the merger. If it does vote to issue an administrative complaint within its own forum, Chair Khan would also become an adjudicator in the matter, reviewing the ALJ's decision on an appeal to the Commission.[10] Accordingly, with respect to the FTC's upcoming votes, the recusal issue cannot be resolved on the basis of a distinction between Chair Khan's role as a "prosecutor" and her role as an "adjudicator." Indeed, the "FTC has not lost a single case [in its administrative proceedings] in the past quarter-century"[11] because it reaches its own conclusions regardless of those of its ALJs.  If Chair Khan participates in authorizing the issuance of an administrative complaint, she would also then serve as an adjudicator on the merits, infusing the overall proceedings with the prejudicial effect of her predetermined views of Meta. Accordingly, the Commission should consider the recusal issue anew and conclude that Chair Khan's recusal here is necessary to protect the fairness and impartiality of the proceedings.

---

shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part.").

[8] *See FTC v. Facebook, Inc.*, No. 20-cv-3590-JEB, 2022 WL 103308, at *20 (D.D.C. Jan. 11, 2022).

[9] *Id.* at *18.

[10] 16 C.F.R. § 3.52 (ALJ decision appealable to the Commission); 16 C.F.R. § 4.17 (establishing procedures for Commission to review a motion seeking disqualification of a Commissioner from adjudicative proceedings).

[11] *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021).

Respectfully submitted,

Dated: July 25, 2022

*[s] Chantale Fiebig*
Chantale Fiebig
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
Chantale.Fiebig@weil.com

Diane P. Sullivan
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, NJ 08542
(609) 986-1100
Diane.Sullivan@weil.com

*Counsel for Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 25, 2022, I sent via electronic mail Meta Platforms, Inc.'s

foregoing Petition for Recusal to the following:

**Lina Khan**
Chair of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
lkhan@ftc.gov

**Noah Joshua Phillips**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
nphillips@ftc.gov

**Rebecca Kelly Slaughter**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
rslaughter@ftc.gov

**Christine S. Wilson**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
cwilson3@ftc.gov

**Alvaro Bedoya**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
abedoya@ftc.gov

**April J. Tabor**
Secretary of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
atabor@ftc.gov

*[s] Chantale Fiebig*
Chantale Fiebig

# EXHIBIT 2

## FEDERAL TRADE COMMISSION

IN RE PETITION FOR RECUSAL OF
CHAIR LINA M. KHAN FROM
INVOLVEMENT IN THE PENDING
ANTITRUST CASE AGAINST
FACEBOOK, INC.

## PETITION FOR RECUSAL

Facebook, Inc. respectfully petitions Chair Lina M. Khan and the Federal Trade

Commission ("FTC" or "Commission") to recuse Chair Khan from participating in any decisions

concerning whether and how to continue the FTC's antitrust case against the company.[1]

## INTRODUCTION AND SUMMARY

Due process entitles any targeted individual or company to fair consideration of its

factual and legal defenses by unbiased Commissioners who, before joining the Commission,

have not already made up their minds about the target's legal culpability.  When a new

Commissioner has already drawn factual and legal conclusions and deemed the target a

lawbreaker, due process requires that individual to recuse herself from related matters when

acting in the capacity of an FTC Commissioner.  For example – and of particular relevance here

– the D.C. Circuit deemed it an "appalling" violation of due process when a prior FTC Chair

---

[1] *See FTC v. Facebook, Inc.*, No. 1:20-cv-03590-JEB, Dkt. No. 72 (D.D.C. June 28, 2021) (order dismissing the FTC's complaint).  This petition addresses the agency's pending antitrust case against Facebook, including any decision to file a revised complaint in federal court or in a Part 3 administrative proceeding based on the same or similar allegations.  The recusal question presented is particularly urgent, given the Commission's 30-day deadline for filing any amended complaint in federal court.  Facebook reserves the right to seek Chair Khan's recusal from any additional matters presenting similar prejudgment concerns.

participated in a matter against a specific defendant because he "had investigated and developed many of the[] same facts" regarding that defendant as a congressional staffer.[2]  That precedent, as well as the federal ethics rules, compel Chair Khan's recusal from any decisions regarding the pending antitrust case against Facebook.[3]  Chair Khan has consistently made public statements not only accusing Facebook of conduct that merits disapproval but specifically expressing her belief that the conduct *meets the elements of an antitrust offense* under Section 2 of the Sherman Act, thereby constituting an unfair method of competition in violation of Section 5(a) of the FTC Act.  Indeed, she has led an organization lobbying the Commission to impose particular remedies against Facebook and, more recently, commented publicly as to her personal beliefs on the merits of the very complaint filed by the Commission last December, the dismissal of which must be addressed in some fashion by the Commission in the coming weeks.

These statements – which Facebook vigorously disputes as unsupported and contrary to law – convey to any disinterested observer that Chair Khan, well before becoming a Commissioner, had already decided the material facts relevant to Facebook's liability in the Commission's pending antitrust lawsuit and already reached legal conclusions that Facebook

---

[2] *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quoting *Am. Cyanamid Co. v. FTC*, 363 F.2d 757, 767 (6th Cir. 1966)).

[3] Amazon.com, Inc. has filed a petition with the Commission asking that Chair Khan be recused from certain matters based on her prior statements regarding Amazon.  Recusal Pet. by Amazon.com, Inc. at 1, *Motion To Recuse Chair Lina M. Khan from Involvement in Certain Antitrust Matters Involving Amazon.com, Inc.* (June 30, 2021).  Facebook agrees with Amazon's arguments concerning the circumstances where a Commissioner's prior statements require recusal and incorporates those legal arguments, as well as the ethics analysis offered by Amazon's expert Professor Thomas D. Morgan.  *See* Expert Decl. of Prof. Thomas D. Morgan in Supp. of Recusal Pet. by Amazon.com, Inc. (June 29, 2021) (Ex. A).

was liable under the antitrust laws.  She made these public and repeated statements in multiple

roles over the course of the last decade:

- ***In Her Work for the Open Markets Institute.***  At various times between 2011 and 2018, Chair Khan worked for the Open Markets Institute, a political advocacy group, and she authored numerous articles opining on Facebook's allegedly unlawful antitrust conduct.[4] While Chair Khan was the Legal Director at Open Markets, the organization advocated for the Commission to "[r]everse the approvals for Facebook [*sic*] purchases of WhatsApp and Instagram, and reestablish these as competing social networks."[5]

- ***In Her Academic Writing.***  Chair Khan published academic articles discussing her belief that Facebook violated the antitrust laws.  She has already concluded that Facebook "has both foreclosed competitors from its platform and appropriated their business information and functionality" and that, "[d]espite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course—perhaps because it no longer faced serious competition in the social network market."[6]

- ***As Leader of the House Antitrust Investigation and Report.***  From March 2019 to October 2020, Chair Khan was Majority Counsel for the U.S. House Committee on the Judiciary – Subcommittee on Antitrust, Commercial, and Administrative Law.[7]  In her own words, she "led the congressional investigation into digital markets and the publication of [the] final report"[8] by the Subcommittee that purported to make *specific factual findings* and reach *legal conclusions* about the challenged acquisitions at issue in the FTC's district court complaint against Facebook.  The Report concluded that Facebook "acquired Instagram to neutralize a nascent competitive threat" that "was growing significantly at the time of the transaction" and that "Facebook's support of

---

[4] Lina M. Khan, Resume, https://www.commerce.senate.gov/services/files/AB3EF7E3-1D58-4EB4-9646-3FBB5ADD144F, at 20-21 (Ex. B).

[5] Press Release, Open Markets Inst., *Fines for Facebook Aren't Enough: The Open Markets Institute Calls on FTC to Restructure Facebook to Protect Our Democracy* (Mar. 22, 2018), https://www.openmarketsinstitute.org/publications/fines-for-facebook-arent-enough-the-open-markets-institute-calls-on-ftc-to-restructure-facebook-to-protect-our-democracy (accessed July 14, 2021) [https://perma.cc/P4AU-C4CZ].

[6] *See* Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 1001, 1004 (2019).

[7] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).

[8] Lina M. Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active) [https://perma.cc/9GB5-F78G] (Ex. C).  Recently, most of Chair Khan's personal website was deleted, including the reference to her leadership role in the House Subcommittee.  Accordingly, Facebook has attached as Exhibit C a copy of the "Bio" page of that website as it existed on July 1, 2021.

Instagram's growth after acquiring it is overstated."[9]  The Report also concluded that "Facebook acquired WhatsApp to expand its dominance" and to take over "a maverick competitor."[10]

- **In Her Public Appearances.**  In interviews and media appearances, Chair Khan has discussed her beliefs on Facebook's culpability under the antitrust laws, including in the context of discussing the Subcommittee's Report.  Last year, she told the *New York Times* that Facebook had engaged in "killer acquisition[s] . . . in several cases" and that "Facebook's acquisition strategy was basically a land grab to . . . lock up the market."[11] In particular, she concluded that Facebook's "purchase of Instagram was an effort to really neutralize . . . competitive threats," and the FTC's decision to "allow[] [the Instagram acquisition] to go through" in 2012 was an "institutional failure" that demands "a moment of reckoning."[12]

- **In Her Posts on Twitter.**  Hours after the Commission filed its complaint against Facebook in federal district court, Chair Khan commented on the substance of the Commission's pending litigation on Twitter, expressing her opinions on the facts and merits.  She applauded the FTC and the States for "suing Facebook for violating antitrust laws—and requesting divestitures/breakups, among other forms of relief."[13]  She also presumed that Facebook has a monopoly in "social networking" and has a "copy-acquire-kill" strategy, calling on "enforcers" to stop Facebook.[14]

Although Facebook strongly disagrees with Chair Khan's factual and legal conclusions about Facebook, it does not criticize her for having participated in the Open Markets Institute, in academic scholarship, in the Subcommittee's investigation and subsequent Report, or, more generally, for speaking on issues of public concern and seeking to vigorously enforce the

---

[9] Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations*, at 151, 154-55 (Oct. 2020) (hereinafter "Report").

[10] *Id.* at 158, 160.

[11] *See* Sway, *She's Bursting Big Tech's Bubble*, N.Y. Times (Oct. 29, 2020) (transcript), https://www.nytimes.com/2020/10/29/opinion/sway-kara-swisher-lina-khan.html?showTranscript=1 (accessed July 14, 2021).

[12] *Id.*

[13] Lina M. Khan (@linamkhan), Twitter (Dec. 9, 2020), https://web.archive.org/web/20210614143417/https://twitter.com/linamkhan/status/1336828056695136259 (Ex. D).  These tweets were recently deleted but are available through the use of archive.org (*i.e.*, the "Wayback Machine").

[14] *Id.*

antitrust laws.  But her acknowledged leadership of the investigation and authorship of the Report, as well as her repeated and consistent public claims that Facebook is culpable for antitrust violations, would lead any disinterested observer to conclude that she has prejudged Facebook's alleged antitrust liability.  Under controlling D.C. Circuit precedent, that appearance of prejudgment requires her immediate recusal from any involvement in the antitrust litigation against Facebook.

That conclusion would follow even if Chair Khan were a non-Chair Commissioner, but her elevation to Chair makes her recusal obligation particularly obvious and urgent.  If she does not recuse herself, she will inevitably play a pivotal role as Chair in any upcoming decision by the Commission about how to respond to the district court's dismissal of the Commission's antitrust complaint, including whether to attempt to abandon the court case in favor of a Part 3 administrative proceeding, in which Chair Khan would ultimately rule on Facebook's liability. Because, "[a]s counsel for the [House] Subcommittee," Chair Khan "investigated and developed many of the[] same facts" the Commission has alleged and would allege here, her participation in any decision to revive this case would reflect a fundamental "insensitivity to the requirements of due process."[15]  Any decisions made with her participation would thus be subject to dismissal on that threshold ground.[16]  Facebook respectfully requests that Chair Khan recuse herself from any decisions regarding the Commission's pending litigation against Facebook.

---

[15] *Cinderella*, 425 F.2d at 591.

[16] *Id.* at 591-92.  With this filing, Facebook also puts Chair Khan and all other Commission personnel on notice to preserve all emails, memoranda, and other documents reflecting or relevant to her participation in this or any other Facebook matter, both before and after she joined the Commission.

## BACKGROUND

For the entirety of her professional career, Chair Khan has consistently and very publicly concluded that Facebook is guilty of violating the antitrust laws.  She has built her career, in large part, by singling out Facebook as a professed antitrust violator in her work at the Open Markets Institute, in academic writings, as leader of a congressional investigation and drafting of a final report, in public appearances and speeches, and on Twitter.

## I. Chair Khan Has Prejudged Facebook's Antitrust Culpability

### A. Chair Khan's Work On Behalf Of The Open Markets Institute

In 2011, Chair Khan started working at what would become the Open Markets Institute.[17] This political advocacy organization claims to have "pioneered analysis of how Google, Amazon, and Facebook wield [monopoly] power in ways that threaten democracy and individual liberty."[18]  Chair Khan was a Policy Analyst and Reporter at Open Markets until 2014 and later became the Legal Director of the Institute in 2017.[19]  She held that role throughout 2018,[20]

---

[17] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).  The Open Markets Institute "[l]aunched as an independent organization in September 2017."  Open Markets Inst., *About, Our Mission*, https://www.openmarketsinstitute.org/our-mission (accessed July 14, 2021) [https://perma.cc/TTU4-RS96].  Before 2017, "the Open Markets Team spent eight years studying, speaking, and writing about the problem of market concentration as the Open Markets Program at New America."  *Id.*

[18] Open Markets Inst., *Programs*, *Technology & Power*, https://www.openmarkets institute.org/technology-power (accessed July 14, 2021) [https://perma.cc/9ABQ-5Y3N].

[19] *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B).  As of December 12, 2017, Open Markets' website listed Chair Khan as the "Director of Legal Policy."  Open Markets Inst., *About Open Markets* (Dec. 12, 2017), https://web.archive.org/web/20171212181705/http:/openmarkets institute.org/meet-our-team.

[20] Chair Khan's resume does not specify when in 2018 she stopped working at the Open Markets Institute, although she spoke on behalf of the organization at a conference on October 17, 2018.  *See* Open Markets Inst., *Testimony by Open Markets Senior Fellow Lina Khan at the FTC's Hearing #3: Competition and Consumer Protection in the 21st Century* (Oct. 17, 2018), https://www.openmarketsinstitute.org/publications/testimony-open-markets-senior-fellow-lina-

6

during which time "Open Markets' grassroots arm, Citizens Against Monopoly," started a

campaign called "Freedom from Facebook"[21] that Open Markets "spearheaded."[22]  The Freedom

from Facebook movement described itself as "a diverse coalition of organizations asking the

FTC to break up Facebook's monopoly on American social media," in part by "[s]pinning off

WhatsApp, Instagram, and [Facebook] Messenger to establish greater competition and support

market-based accountability[.]"[23]  Freedom from Facebook announced on its website that "five

members of the Federal Trade Commission . . . can make Facebook safe for our democracy by

breaking it up," and stated, "[t]ogether, we will make sure that they do."[24]

---

khan-ftcs-hearing-3-competition-consumer-protection-21st-century (accessed July 14, 2021).
[https://perma.cc/CDW9-VJUW].  In July 2018, Commissioner Rohit Chopra hired Chair Khan
as a Legal Fellow in his office.  *See* Lina M. Khan, Resume, *supra* note 4 (Ex. B); Nancy Scola,
*FTC Democrat hires tech industry critic who's taken aim at Amazon*, POLITICO (July 9, 2018),
https://www.politico.com/story/2018/07/09/prominent-tech-critic-joins-dem-ftc-office-674511
(accessed July 14, 2021).

[21] Open Markets Inst., *The Corner Newsletter, May 31, 2018: Warren Buffet's Monopoly
Win – Corporate Buyers Contribute to Wage Stagnation – Growing Support for Single-Price
Health Care* (May 31, 2018), https://www.openmarketsinstitute.org/publications/corner-
newsletter-may-31-2018-warren-buffetts-monopoly-win-corporate-buyers-contribute-wage-
stagnation-growing-support-single-price-health-care (accessed July 14, 2021) [https://perma.cc
/G2YG-99V5].

[22] Open Markets Inst., *Freedom From Facebook's Comment to the FTC's "Competition
and Consumer Protection in the 21st Century" Hearing* (Aug. 20, 2018),
https://www.openmarketsinstitute.org/publications/freedom-facebooks-comment-ftcs-
competition-consumer-protection-21st-century-hearing (accessed July 14, 2021) [https://perma.
cc/2CLY-E4VP].

[23] Comment from Freedom from Facebook to FTC on "Competition and Consumer
Protection in the 21st Century Hearing, Project Number P181201" (Aug. 20, 2018),
https://static1.squarespace.com/static/5e449c8c3ef68d752f3e70dc/t/5ebf5afb915c861317ea5d1b/
1589598972273/FFF-FTC-Comment.pdf (accessed July 14, 2021) [https://perma.cc/EKE9-9F
6H].

[24] Freedom from Facebook, Home Page (Apr. 16, 2019), https://web.archive.org/web/
20190416162812/https://freedomfromfb.com/.

Not only did Open Markets "spearhead" this anti-Facebook group while Chair Khan was the Director of Legal Policy, Open Markets also submitted a letter to the Commission in November 2017 on "Facebook's dominance in social networking and online advertising."[25] Chair Khan personally signed the letter, asking the agency to "assess the hazards that this dominance poses to commerce and competition, basic democratic institutions, and national security."[26]  The letter alleged "facts" positioning Facebook as a so-called "top-tier platform monopolist[ ]," claiming, among other things, that "Facebook has 77% of mobile social networking traffic in the United States" and that Facebook had "captured" 38% of "the growth in online advertising last year."[27]  Chair Khan and her organization claimed that "[t]he most obvious immediate step to address Facebook's current power is to prohibit mergers between Facebook [*sic*] other potentially competitive social networks or other new and promising products and services."[28]

While Chair Khan was Director of Legal Policy at the Open Markets Institute, the organization also advocated for the Commission to:

- "Spin off Facebook's ad network[.]"[29]

- "Reverse the approvals for Facebook [*sic*] purchases of WhatsApp and Instagram, and reestablish these as competing social networks."[30]

---

[25] Press Release, Open Markets Inst., *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions* (Nov. 1, 2017), https://www.openmarketsinstitute.org/publications /open-markets-institute-calls-on-the-ftc-to-block-all-facebook-acquisitions (accessed July 14, 2021) [https://perma.cc/DT2Y-D9XM].

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Press Release, *supra* note 5.

[30] *Id.*

- "Prohibit all future acquisitions by Facebook for at least five years."[31]

- "Threaten to bring further legal action against Facebook unless top executives immediately agree to work with the FTC to restructure their corporation to ensure the safety and stability of our government and economy."[32]

**B.      Chair Khan's Academic Writings**

In the fall of 2018, Chair Khan became an Academic Fellow at Columbia Law School, where she authored law review articles that reiterated her belief that Facebook has violated the antitrust laws.[33]  Before the Commission informed Facebook that it had opened an antitrust investigation and before the House Subcommittee ever began its antitrust investigation, Chair Khan criticized Facebook at length in an article published in 2019, beginning a five-page section of the article with the claim that "Facebook is a dominant social network."[34]  The article further claimed:

- Facebook "has both foreclosed competitors from its platform and appropriated their business information and functionality."[35]

- "In addition to blocking apps that it deemed competitive threats, Facebook has also systematically copied them."[36]

- "Facebook has established a systemic informational advantage (gleaned from competitors) that it can reap to thwart rivals and strengthen its own position, either through introducing replica products or buying out nascent competitors."[37]

---

[31] *Id.*

[32] *Id.*

[33] News Release, Columbia Law School, *Antitrust Scholar Lina Khan Joins Faculty* (Dec. 2, 2020), https://www.law.columbia.edu/news/archive/antitrust-scholar-lina-khan-joins-faculty (accessed July 14, 2021) [https://perma.cc/LQ5K-VT5F].

[34] *See* Khan, *supra* note 6, at 1001-05.

[35] *Id.* at 1001.

[36] *Id.* at 1002.

[37] *Id.* at 1003.

- "Despite facing public backlash for both its apparent deception and its pervasive surveillance, Facebook did not change course—perhaps because it no longer faced serious competition in the social network market."[38]

In another article published in 2019, Chair Khan (and a co-author) again criticized Facebook, presenting various legal conclusions about Facebook's allegedly anticompetitive conduct.[39]  The article also accused Facebook of using data in ways "that threaten the users' best interests, from allowing predatory advertising and enabling discrimination to inducing addiction and sharing sensitive details with third parties."[40]

### C.     Chair Khan's Leadership Of The House Majority's Investigation And Report

After a few months as an Academic Fellow, Chair Khan went on leave from Columbia Law School in March 2019 to join the U.S. House Committee on the Judiciary – Subcommittee on Antitrust, Commercial, and Administrative Law as Majority Counsel.[41]  According to her website, Chair Khan "*led* the congressional investigation into digital markets and the publication of [the] final report" of the Subcommittee's Majority Staff.[42]  That document is explicitly styled as a report, not of the Subcommittee itself, but of the Subcommittee's "Majority Staff," on which Chair Khan served as "Counsel."

A 42-page section of that Report, entitled "Facebook," includes numerous purported factual findings that ostensibly support the Report's core legal conclusions – that Facebook has

---

[38] *Id.* at 1004.

[39] *See* Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497 (2019).

[40] *Id.* at 498.

[41] Lina M. Khan, Resume, *supra* note 4 (Ex. B); News Release, *supra* note 33.

[42] Lina M. Khan, Bio, *supra* note 8 (Ex. C) (emphasis added).

"monopoly power" in a relevant antitrust market, that it both obtained and maintained that monopoly power through anticompetitive means, and that its conduct harmed consumers.

Especially relevant here, the Report's "Facebook" section specifically purports to find that Facebook "acquired Instagram to neutralize a nascent competitive threat" that "was growing significantly at the time of the transaction" and that "Facebook's support of Instagram's growth after acquiring it is overstated."[43]  As for Facebook's acquisition of WhatsApp, the Report purports to find that "Facebook acquired WhatsApp to expand its dominance" and to takeover "a maverick competitor."[44]

The remainder of the Report's "Facebook" section appears calculated to support, with purported legal and factual findings, the essential elements of a Section 2 offense.

*First*, the Report concludes that "social networking" is a relevant antitrust market.[45]  The Report defines this market as separate from the market for "social media," based on the Subcommittee's "review[] [of] relevant market data and documents provided during the investigation."[46]  The Report further describes the "social networking" market as having "high entry barriers . . . that discourage direct competition by other firms."[47]

---

[43] Report, *supra* note 9, at 151, 154-55.

[44] *Id.* at 158, 160.

[45] *Id.* at 11 (identifying the market for "social networking" as one of "[s]everal markets investigated by the Subcommittee"); *id.* at 90 (distinguishing "between social networking and social media markets"); *id.* at 12 (claiming that Facebook operates "in the market for social networking"); *id.* at 13 (same); *id.* at 133 (same); *id.* at 134 (same); *id.* at 136 (same); *id.* at 138 (same); *id.* at 144 (same); *id.* at 147 (same); *id.* at 149 (same); *id.* at 160 (same); *id.* at 170 (same); *id.* at 172 (same).

[46] *Id.* at 139.

[47] *Id.* at 133.

*Second*, the Report concludes that Facebook has "monopoly power" in that supposed market.[48]  It purports to find that "Facebook and its family of products—Facebook, Instagram, Messenger, and WhatsApp—control a significant share of users and high reach in the social networking market,"[49] and this "demonstrates its monopoly power."[50]

*Third*, the Report concludes that Facebook illegally acquired and maintained its supposed monopoly power through anticompetitive means.[51]  It purports to find that "the company acquired firms it viewed as competitive threats to protect and expand its dominance in the social networking market,"[52] including Instagram and WhatsApp.  For example, the Report asserts that "the purpose of acquiring nascent competitors like Instagram was to neutralize competitive threats"[53] and that Facebook acquired WhatsApp because it "viewed WhatsApp as a potential threat to Facebook Messenger."[54]  The Report concludes that these "serial acquisitions reflect the

---

[48] *Id.* at 12 ("Facebook has monopoly power in the market for social networking."); *id.* at 133 (same); *id.* at 136 (same); *id.* at 13 ("Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms."); *id.* at 137 ("Facebook's maintenance of these high market shares over a long time period demonstrates its monopoly power."); *id.* at 147 ("Facebook has a significant data advantage [that] . . . reinforc[es] Facebook's monopoly power."); *id.* at 170 ("Facebook has monopoly power in online advertising in the social networking market.").

[49] *Id.* at 136.

[50] *Id.* at 137.

[51] *Id.* at 12 ("Facebook acquired its competitive threats to maintain and expand its dominance."); *id.* at 149 (same); *id.* at 14 ("The company used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms."); *id.* at 160 (same); *id.* at 166 ("Facebook [w]eaponized [a]ccess to its [p]latform.").

[52] *Id.* 149.

[53] *Id.* at 149-50.

[54] *Id.* at 150.

company's interest in purchasing firms that had the potential to develop into rivals before they could fully mature into strong competitive threats."[55]

*Finally*, the Report concludes that Facebook's conduct has caused cognizable consumer harm. It claims, "[i]n the absence of competition, Facebook's quality has deteriorated over time, resulting in worse privacy protections for its users and a dramatic rise in misinformation on its platform."[56]

Chair Khan's personal involvement in both the investigation and the Report was extensive, including personally participating in calls, emails, and an in-person meeting with Facebook's outside counsel. In these communications, Chair Khan regularly spoke on behalf of the Committee, describing the scope of the investigation and her beliefs on the sufficiency of Facebook's responses.

### D.     Chair Khan's Public Appearances

Before and after she led the congressional investigation into Facebook, Chair Khan publicly shared her beliefs about Facebook's allegedly anticompetitive conduct. For example, in 2018, Chair Khan said, "to make sure Facebook isn't acquiring further power . . . , if Facebook tomorrow announces it is acquiring another company, I would hope that the FTC would look at that very closely *and block it*," both presuming that Facebook has too much "power" and proposing that the government block *any* future acquisition.[57]

---

[55] *Id.*

[56] *Id.* at 14.

[57] *The Bernie Sanders Show* (May 15, 2018) (starting at 20:29), https://www.youtube.com/watch?v=wuCAy10hlHI&t=1229s (emphasis added).

Two years later, shortly after the Report was issued in October 2020, Chair Khan reaffirmed her belief in its purported conclusions about Facebook in a transcribed interview for the *New York Times*.[58]  She expressed satisfaction that "more of [Facebook's] predatory practices are coming to account," such as "near-perfect market intelligence it can use . . . to cut off any competitor, to buy up that competitor, to introduce replica services."[59]  She claimed that Facebook had engaged in "killer acquisition[s] . . . in several cases," in that it "acquire[d] a company for the purpose of shutting it down, for the purpose of killing it because [Facebook] recognize[d] that a product could be a threat to them."[60]  She reaffirmed her personal belief in the Report's conclusions that "Facebook's acquisition strategy was basically a land grab to . . . lock up the market" and, in particular, that its "purchase of Instagram was an effort to really neutralize . . . competitive threats."[61]  And she claimed that the FTC's decision to "allow[] [the Instagram acquisition] to go through" in 2012 was an "institutional failure" that demands "a moment of reckoning."[62]

In addition, Chair Khan publicly stated that Facebook and others "control the infrastructure on which digital commerce and communications take place," noting that "[t]hey've used their gatekeeper power both to *extort* and to *exploit* the individuals and entities that rely on

---

[58] *See* Sway, *supra* note 11.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

their technologies.  They've maintained and extended their power through serial acquisitions and through *coercive* and *predatory* tactics."[63]

### E.        Chair Khan's Statements On Twitter

On December 9, 2020, the same day that the Commission and States filed their complaints against Facebook in federal district court, Chair Khan reaffirmed her prior conclusions about Facebook's antitrust culpability in a series of tweets that are no longer visible on her Twitter profile but are available through the use of archive.org (*i.e.*, the "Wayback Machine").[64]  In those tweets, she applauded the FTC and state attorneys general for "suing Facebook for violating antitrust laws—and requesting divestitures/breakups, among other forms of relief."[65]  She described the "States' complaint [as] especially impressive" in that it "fully showcas[ed] how Instagram & WhatsApp acquisitions were part of [a] broader monopoly maintenance strategy."[66]  She further presumed that Facebook has a monopoly in "social networking" and has long used a "copy-acquire-kill" strategy to preserve its dominance, calling on "enforcers" to stop Facebook from continuing this strategy.[67]  She also criticized Facebook for making "another acquisition" just "two days before being sued by the federal government & 48 AGs for a series of illegal acquisitions."[68]

---

[63] Andy Fitch, *Concentrated Control: Talking to Lina Khan*, L.A. Rev. of Books (Dec. 19, 2020), https://blog.lareviewofbooks.org/interviews/concentrated-control-talking-lina-khan/ (accessed July 14, 2021) [https://perma.cc/B3XZ-J25G ] (emphases added).

[64] Lina M. Khan, Twitter, *supra* note 13 (Ex. D).

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

## II.     Chair Khan's Prejudgment Of Facebook's Broader Conduct

Chair Khan has also made numerous statements that would demonstrate to a disinterested observer that she has a broadly negative view of the company.  For instance, in one of her academic articles, Chair Khan and a co-author analogized Facebook to a doctor, named "Marta Zuckerberg," who "has planted surveillance devices all around your neighborhood as well as her office" and whose "main source of income is enabling third parties to market you goods and services."[69]  The emphasis of the comparison was that, "unlike doctors, Facebook does not come close to putting its customers first in any serious sense—notwithstanding Zuckerberg's protestations to the contrary."[70]  The article also described how Facebook "serves (or disserves)" its users, characterizing the relationship as "an elaborate system of social control whose terms are more imposed than chosen."[71]

Going further, Chair Khan alleged that Facebook is "associated with a host of social ills," including "serving as a tool for the incitement of genocide in Myanmar" and "amplifying the influence of 'fake news,' conspiracy theories, bot-generated propaganda, and inflammatory and divisive content more broadly."[72]  Again, consistent with the Open Markets Institute's Freedom from Facebook mission, Chair Khan supported "antitrust lawsuits reversing key acquisitions and penalizing forms of monopoly leveraging" and suggested that "Facebook and Google have achieved their dominance through anticompetitive means."[73]

* * *

---

[69] Khan & Pozen, *supra* note 39, at 514.

[70] *Id.* at 514 n.81.

[71] *Id.* at 520.

[72] *Id.* at 526-27 (footnote omitted).

[73] *Id.* at 538-39.

Facebook reiterates that it is not seeking Chair Khan's recusal because she has generally criticized "Big Tech" or expressed an eagerness to vigorously enforce the antitrust laws.  Rather, recusal is appropriate because she has consistently and repeatedly concluded that Facebook in particular has engaged in conduct that satisfies the elements of an antitrust offense under existing law.  For the reasons discussed below, Chair Khan's public prior statements would lead any disinterested observer to conclude that her participation in this matter would deny Facebook due process.

## ARGUMENT

I. **Commissioners Must Be Recused When Their Prior Congressional Work Or Public Statements Convey An Appearance That They Have Prejudged The Liability Of A Particular Defendant**

Cases from the D.C. Circuit and other courts are directly on point and unequivocal in their holdings.  The relevant court cases clearly invalidated FTC decisions tainted by the participation of a Commissioner whose prior investigatory work or public statements would lead "a disinterested observer [to] conclude" that she "has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."[74]  The Sixth Circuit's holding in *American Cyanamid* – which the D.C. Circuit reaffirmed in *Cinderella* – is particularly relevant because the due process violation in that case is nearly identical to the due process violation the Commission would commit here in the absence of Chair Khan's recusal.

---

[74] *Cinderella*, 425 F.2d at 591 (internal citation omitted); *see also Am. Cyanamid*, 363 F.2d at 757; *Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *vacated and remanded on other grounds*, 381 U.S. 739 (1965); *see also Inova Health Sys. Found.*, 2008 WL 2307161, at *3 (F.T.C. May 29, 2008) (citing *Cinderella*, 425 F.2d at 591, and explaining that disqualification is appropriate "if there [is] a demonstration of bias, prejudgment or apparent unfairness on the part of the decision-maker be he an ALJ or a Commissioner").

In *American Cyanamid*, FTC Chair Paul Rand Dixon refused to recuse himself from an antitrust case, even though, as counsel to a Senate Subcommittee, he had "played an 'active role' in an [antitrust] investigation by that Subcommittee of many of the same facts and issues and of the same parties as are involved in this [FTC] proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties."[75]  The Sixth Circuit was "not impressed with the Commission's argument that the proceedings before the Senate Subcommittee had no relationship to the proceedings before the Commission because the former were 'legislative' and 'investigative' in nature."[76]  And it concluded that Chair Dixon's participation in the FTC's case against the same defendants for the same conduct "amounted to a denial of due process which invalidated the order under review."[77]  The court added:  "It is fundamental that both unfairness and the appearance of unfairness should be avoided.  Wherever there may be reasonable suspicion of unfairness, it is best to disqualify."[78]

The D.C. Circuit reaffirmed that holding in *Cinderella* several years later.  There, the court vacated a different FTC order on the ground that Chair Dixon had given a speech that, in one passage, appeared to prejudge the defendants' legal culpability.  The court held that FTC Commissioners may not "make speeches which give the appearance that [a] case has been prejudged" because doing so "may have the effect of entrenching a Commissioner in a position

---

[75] *Am. Cyanamid*, 363 F.2d at 763, 767.

[76] *Id.* at 767.

[77] *Id.* (quoting *Texaco*, 336 F.2d at 760) (ellipsis omitted).

[78] *Id.*

which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record."[79]

The D.C. Circuit then pointedly criticized Chair Dixon for his participation in the earlier FTC matter at issue in *American Cyanamid*. The court agreed with the Sixth Circuit that Chair Dixon had displayed an "appalling . . . insensitivity to the requirements of due process" when – "[i]ncredible though it may seem" – he participated in an FTC case against particular defendants even though he "had investigated and developed many of the[ ] same facts" asserted against those defendants as a congressional staffer.[80]

For recusal purposes, Chair Khan stands in an even worse position than Chair Dixon. Like Chair Dixon, she "played an 'active role' in an investigation by [a congressional] Subcommittee of many of the same facts and issues" that would be asserted in any new FTC complaint or appeal involving Facebook, and she "participated in the preparation of the report of the Subcommittee on the same facts [and] issues."[81]  And, like Chair Dixon in *Cinderella*, she has made additional public statements against Facebook that "may have the effect of entrenching [her] in a position" regarding Facebook, "making it difficult, if not impossible, for h[er] to reach a different conclusion in the event [s]he deems it necessary to do so after consideration of the record."[82]  Her participation in the congressional investigation and Report, as well as her repeated public condemnations of Facebook, independently require her recusal from

---

[79] *Cinderella*, 425 F.2d at 590; *see also Texaco*, 336 F.2d at 760 (finding a due process violation because of a different speech by Chair Dixon).

[80] *Cinderella*, 425 F.2d at 591.

[81] *Am. Cyanamid*, 363 F.2d at 763, 767.

[82] *Cinderella*, 425 F.2d at 590.

participating in any decisions by the Commission regarding the future of its antitrust case against Facebook.

Specifically, as set forth above, *see supra* pages 10-13, the Report contains purported factual findings and legal conclusions to the effect that Facebook has violated Section 2 of the Sherman Act.  For instance, the Report finds that Facebook obtained monopoly power in a "social networking" market, acquired Instagram in 2012 "to maintain Facebook's position," and that Facebook acquired WhatsApp in 2014 "to further entrench Facebook's dominance," all to consumers' supposed detriment. [83]  All of these "findings" and "conclusions" are attributable to Chair Khan, who avowedly "led the congressional investigation into digital markets and the publication of [the] final report" before joining the Commission.[84]  Again, settled precedent requires recusal of any FTC Commissioner from an antitrust case if, in a prior job, she "played an 'active role' in [a congressional antitrust] investigation . . . of many of the same facts and issues and of the same parties as are involved in" the FTC case and "participated in the preparation of the report of the Subcommittee on the same facts, issues and parties."[85]  That is plainly the case here.

Chair Khan has also made a variety of public statements before joining the Commission that would leave any disinterested observer with the impression that she has already concluded that Facebook is liable for violating the antitrust laws.  As explained in greater detail above, Chair Khan has reached definitive conclusions about essential elements of Facebook's alleged Section 2 liability, including market definition, monopoly power, and the nature and

---

[83] Report, *supra* note 9, at 150.

[84] Lina M. Khan, Bio, *supra* note 8 (Ex. C).

[85] *Am. Cyanamid*, 363 F.2d at 763, 767; *see also Cinderella*, 425 F.2d at 591-92.

consequences of Facebook's acquisitions and Platform policies.  She has reaffirmed these conclusions in multiple academic articles, in public appearances, and on Twitter, and has done so in the context of the very antitrust case that she might now direct or rule on in her role as Chair.

In sum, these public statements confirm Chair Khan's deeply-held commitment to the conclusions that she drew about Facebook in the Report, independently warranting her recusal. Like the Report, her statements in law review articles, public interviews, and tweets promote her conclusions that Facebook has monopoly power in a defined antitrust market, that it acquired and maintained that monopoly power through unlawful and anticompetitive means, including specifically by acquiring Instagram and WhatsApp, and that it should now face "divestitures/breakups, among other forms of relief."[86]  Indeed, her statements about Facebook are far more numerous and explicit than Chair Dixon's statements at issue in *Cinderella* that the D.C. Circuit found sufficient to vacate the FTC orders tainted by his participation.[87]

## II.    Chair Khan's Recusal Is Required Now, Before The Commission Decides How To Proceed

Chair Khan should not be permitted to participate in deciding whether and, if so, how the FTC's case against Facebook should proceed.  Due process requires a Commissioner who appears to have prejudged a case on the basis of her prior work or public statements to recuse herself from participating in that case, and a Commissioner recused on this basis cannot lawfully participate in developing the Commission's strategy for how to proceed going forward.[88]  Chair Khan does not come to this juncture in the agency's decisionmaking regarding Facebook with views formed by the FTC's investigation but rather with beliefs formed and expressed on social

---

[86] Lina M. Khan, Twitter, *supra* note 13 (Ex. D).

[87] *See Cinderella*, 425 F.2d at 591; *Texaco*, 336 F.2d at 760.

[88] *See Cinderella*, 425 F.2d at 591.

media, in academic writings, and in the Report before she joined the Commission.  What she brings to any decision regarding Facebook is thus not objective weighing of the evidence gathered in the course of the agency's investigation, but prejudgment of those very same issues from her activities outside the agency, many of which predated even the beginning of the FTC's investigation.

Moreover, with respect to the FTC's Part 3 procedures, there is little distinction between Chair Khan's role as a "prosecutor" and her role as an "adjudicator."  For one thing, as a matter of historical practice, the "FTC has not lost a single case [in its administrative proceedings] in the past quarter-century"[89] because it reaches its own conclusions regardless of those of its Administrative Law Judges.  Accordingly, if Chair Khan participates in authorizing a Part 3 complaint against Facebook, such authorization effectively guarantees that the Commission would ultimately find liability, and thus her participation in authorizing the Part 3 complaint is functionally an adjudication on the merits.  Furthermore, Chair Khan's participation in the decision as to *whether* the Commission should proceed would violate Facebook's due process rights because of her "prejudice concerning specific controverted factual issues" and her conclusions on "the ultimate issue of liability."[90]  But, more than that, Chair Khan's powers go beyond merely voting, as her role as Chair of the FTC vests her with tremendous powers to use her discretion to direct the Commission.

---

[89] *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021).

[90] *Kellogg Co.*, 92 F.T.C. 877, 1978 WL 206540, at *1 (F.T.C. Nov. 30, 1978).

No matter her role or the decision that the Commission reaches, every "government lawyer in a civil action or administrative proceeding" owes a minimal "duty of neutrality."[91] When, as here, she "has a personal interest in the litigation," or even the mere appearance of a personal interest, "the neutrality so essential to the system is violated."[92]  Indeed, an interested prosecutor violates the "fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion."[93]  As Professor Thomas D. Morgan of The George Washington University opined, "it is reasonable to conclude that an FTC Chair whose impartiality could reasonably be questioned by an objective observer must step aside rather than personally participate in those decisions."[94]

Here, Chair Khan cannot meet any standard for neutrality that would permit her to participate in any decisionmaking regarding the FTC's pending antitrust litigation.  Her numerous statements throughout her career that reflect her belief in Facebook's culpability under

---

[91] *People ex rel. Clancy v. Superior Ct.*, 705 P.2d 347, 350-51 (Cal. 1985); *see, e.g.*, Charlie Savage, *Biden Administration Punts on Due Process Rights for Guantánamo Detainees*, N.Y. Times (July 9, 2021), https://www.nytimes.com/2021/07/09/us/politics/guantanamo-detainees-due-process.html (accessed July 14, 2021) (noting that U.S. Attorney General Merrick B. Garland "recused himself from playing any role in the litigation" before the D.C. Circuit on "whether Guantánamo detainees have any due process rights").

[92] *Clancy*, 705 P.2d at 351; *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) (due process imposes enforceable "limits on the partisanship of administrative prosecutors").

[93] *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987); *see also United States ex rel. SEC v. Carter*, 907 F.2d 484, 488 (5th Cir. 1990) (disqualifying SEC attorneys from leading criminal contempt prosecutions arising out of underlying SEC enforcement case); *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.) (prosecutor must be disqualified if she is not "disinterested" or has "an axe to grind against the defendant"); Am. Bar Ass'n, Model Rules of Prof'l Conduct R. 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

[94] *See* Expert Decl. of Prof. Thomas D. Morgan, *supra* note 3, at 17-18 (Ex. A).

the antitrust laws, as well as her "active role" in the investigation of "many of the same facts and issues and of the same part[y]" as counsel to the House Antitrust Subcommittee's Majority Staff, create the appearance that she has prejudged the merits of the FTC's case against Facebook and thus require her recusal.[95]  Moreover, her comments that "Facebook does not come close to putting its customers first in any serious sense"[96] and that Facebook is "associated with a host of social ills"[97] suggest that Chair Khan has "an axe to grind against" Facebook.[98]  Her negative statements about Facebook even predate her attending law school.[99]

A disinterested observer would conclude that she could not revisit her conclusions about Facebook with an open mind now that she is the FTC Chair, even in the face of contrary evidence.  It has only been about 9 months since she led preparation of the House Antitrust Report, with its conclusions that Facebook has violated the antitrust laws.  Not long before this, she was personally involved in lobbying the FTC "to address Facebook's current power" by "prohibit[ing] mergers between Facebook [*sic*] other potentially competitive social networks or other new and promising products and services."[100]  And during this same time, her organization "spearheaded" the "Freedom From Facebook coalition"[101] and advocated for, among other things, the FTC to "[r]everse the approvals for Facebook [*sic*] purchases of WhatsApp and

---

[95] *Am. Cyanamid*, 363 F.2d at 763.

[96] Khan & Pozen, *supra* note 39, at 514 n.81.

[97] *Id.* at 526.

[98] *Wright*, 732 F.2d at 1056.

[99] *See*, *e.g.*, Zephyr Teachout & Lina Khan, *Market Structure and Political Law: A Taxonomy of Power*, 9 Duke J. Const. L. & Pub. Pol'y 37, 55 (2014) (written on Aug. 15, 2014).

[100] Press Release, *supra* note 25.

[101] Public Comment, *supra* note 22.

Instagram, and reestablish these as competing social networks."[102]  Even more than the speech at issue in *Cinderella*, Chair Khan's public authorship of the Report and advocacy as part of the Open Markets Institute "ha[d] the effect of entrenching [her] in a position which [s]he has publicly stated, making it difficult, if not impossible, for h[er] to reach a different conclusion in the event [s]he deems it necessary to do so after consideration of the record."[103]

Finally, for many of the same reasons, Chair Khan's participation in the Facebook antitrust litigation would violate not only due process but also her obligations of impartiality under the federal ethics rules.  Those rules require any federal official to "avoid an appearance of loss of impartiality in the performance of [her] official duties."[104]  The Office of Government Ethics has specifically noted that an official's "political . . . association[s] . . . may raise an appearance question" requiring recusal even if they do not give rise to a "covered relationship."[105] Chair Khan's leadership of the Subcommittee's investigation and Majority Staff Report illustrates exactly the type of "political association" that warrants recusal.

## CONCLUSION

Facebook respectfully requests that Chair Khan be recused from participating in any decisions regarding whether and how to continue the Commission's antitrust case against

---

[102] Press Release, *supra* note 5.

[103] *Cinderella*, 425 F.2d at 590.

[104] 5 C.F.R. § 2635.501(a); *see also* Ethics Orientation for New FTC Employees, at 10-11 (rev. June 2019), https://www.ftc.gov/system/files/attachments/office-general-counsel/ieo_for_n ew_ftc_employees.pdf (accessed July 14, 2021) (noting that the FTC itself requires "every employee" to "act impartially and not give preferential treatment to any private organization or individual").

[105] Mem. to Designated Agency Ethics Officials Regarding Recusal Obligation and Screening Arrangements, OGE Informal Advisory Mem. 99 X 8, 1999 WL 33308429, at *2 (Apr. 26, 1999).

Facebook.  Chair Khan's statements – which are unsupported and contrary to law – convey to any disinterested observer that she has already decided the material facts relevant to the Commission's pending antitrust lawsuit against Facebook, well before becoming a Commissioner.  Chair Khan has also already concluded that Facebook was liable under the antitrust laws.  Thus, Chair Khan's recusal is necessary in order to protect the fairness and impartiality of the proceedings.

Respectfully submitted,

Dated:  July 14, 2021

/s/  *Geoffrey M. Klineberg*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
gklineberg@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2021, I sent via electronic mail Facebook, Inc.'s foregoing Petition for Recusal to the following:

**Lina Khan**
Chair of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
lkhan@ftc.gov

**Noah Joshua Phillips**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
nphillips@ftc.gov

**Rohit Chopra**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
rchopra@ftc.gov

**Rebecca Kelly Slaughter**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
rslaughter@ftc.gov

**Christine S. Wilson**
Commissioner of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
cwilson3@ftc.gov

**April J. Tabor**
Secretary of the Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
atabor@ftc.gov

/s/  *Geoffrey M. Klineberg*
Geoffrey M. Klineberg

# Exhibits to Facebook, Inc.'s Petition for Recusal (July 14, 2021)

# Exhibit A

**BEFORE THE FEDERAL TRADE COMMISSION**

| | |
|---|---|
| _____ | ) |
| **In re Motion to Recuse** | ) |
| **Chair Lina M. Khan** | ) |
| **from Involvement in Certain Antitrust Matters** | ) |
| **Involving Amazon.com, Inc.** | ) |
| _____ )_____ | |

**EXPERT DECLARATION OF PROFESSOR THOMAS D. MORGAN**

---

**1.      Professional Experience and Background**

I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois.  I am S. Chesterfield Oppenheim Professor Emeritus of Antitrust and Trade Regulation Law at The George Washington University Law School where I was on the faculty from 1989 to 1998 and from 2000 to 2013.  From 1998 to 2000, I was the first Rex E. Lee Professor of Law at the J. Reuben Clark Law School, Brigham Young University.  From 1980 to 1985, I was Dean of the Emory University School of Law, and from 1985 to 1989, I was a professor at Emory.  From 1966 to 1980, less time for military service, I was a professor at the College of Law, University of Illinois.

I have taught both antitrust law and administrative law during my career, and my law school casebook, *Modern Antitrust Law and Its Origins* (5th ed. 2014), was published by West Academic. However, most of my teaching and scholarly research has been in the field of legal and judicial ethics.  I taught courses in both subjects one or more times each year for the forty years from 1974

through my retirement in 2013.  I continue to co-author a law school casebook covering both legal and judicial ethics, *Professional Responsibility: Problems and Materials* (13th ed. 2018), published by Foundation Press.

I served as one of two Associate Reporters for the American Law Institute (ALI) project that produced the comprehensive *Restatement of the Law (Third): The Law Governing Lawyers* (2000).  I then served as one of the two Associate Reporters for the American Bar Association's (ABA) Commission on Revision of the Model Rules of Professional Conduct—the Ethics 2000 Commission—whose work led to extensive revision of the ABA Model Rules in 2002.  I currently serve as an Advisor to the ALI project on Principles of Government Ethics.  I have received two awards for lifetime contributions to legal ethics scholarship—the American Bar Foundation's Keck Award in 2000 and the New York State Bar Association's Sanford D. Levy Award in 2008.[1] My curriculum vitae listing my publications, presentations and professional activities is attached to this report.

## 2.    My Engagement

Outside counsel for Amazon.com, Inc. (Amazon) has retained me as an expert to consider whether it would be appropriate to conclude that judgments about Amazon expressed by FTC Chair Lina M. Khan prior to her confirmation as a Commissioner at the Federal Trade Commission (FTC) compel Chair Khan to recuse herself from all antitrust cases involving Amazon that consider factual issues she purports to have determined in her academic articles, her public advocacy publications, and her leadership role in preparation of a recent Majority Staff Report of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law.  I have previously rendered expert opinions on questions concerning obligations of lawyers and judges in

---

[1] Organizations named above are for identification only.  None is responsible for the content of this Declaration.

2

affidavits, depositions, and testimony in approximately one hundred cases, and my declarations, affidavits, and testimony as an expert have been admitted in state and federal courts all over the country.  I am being compensated by counsel at my current regular rate for time spent preparing this report and any time later required.  No part of the compensation I receive is dependent on the conclusions I reach or the result in any matter in which this Declaration might be introduced.

## 3.      The Factual Record Relevant to My Opinions

Lina M. Khan graduated from college in 2010.  In 2011, she went to work in the Open Markets Program at the New America Foundation, a think-tank advocating about what it sees as issues relating to the exercise of corporate power.  She maintained an affiliation with that organization and its successor, the Open Markets Institute, in various roles through 2018.  She was a Policy Analyst (2011-14), a Fellow (2014-17), and Legal Director (2017-18).  Ms. Khan then served as Counsel to the Majority Staff of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, and as an Associate Professor of Law at Columbia Law School.

Professor Khan was confirmed by the Senate and sworn in as a Commissioner of the Federal Trade Commission (FTC) on June 15, 2021.  That same day, President Biden named Commissioner Khan the FTC Chair.  In her new role, Chair Khan has all "the executive and administrative functions of the Commission, including functions of the Commission with respect to (1) the appointment and supervision of personnel employed under the Commission, (2) the distribution of business among such personnel and among administrative units of the Commission, and (3) the use and expenditure of funds."[2]  In short, Chair Khan is in a position today to direct

---

[2] 15 U.S.C. § 41, implementing the Reorganization Act of 1949 pursuant to Reorganization Plan No. 8 of 1950 and Reorganization Plan No. 4 of 1961.

Federal Trade Commission staff to take action that affects particular companies. Whether the law permits her to so act in antitrust matters involving Amazon is the subject of this Declaration.

Beginning in 2014, the year she became a student at Yale Law School, Chair Khan began to write prolifically. She did some of her work at Yale, and later, some at Columbia. Some of Chair Khan's articles are written at a high level of generality and are not the subject of this Declaration. My focus will be on a series of other articles, begun at Open Markets/New America, in which Chair Khan has been aggressive in her condemnation of Amazon by name and in which she makes numerous specific assertions that Amazon has engaged in illegal practices that are within the jurisdiction of the FTC. I summarize each article briefly here to provide the context for my later opinions.

*A Remedy for the Amazon-Hachette Fight?* (2014) was an article for CNN about a dispute in which Amazon allegedly raised prices of books sold on the Amazon website that were published by Hachette, a major French publisher. Chair Khan said Amazon then offered to lower the prices to consumers (and thereby increase Hachette's sales) only if Hachette would lower prices at which it sold the books to Amazon. Chair Khan proposed invoking the Robinson-Patman Act against Amazon, saying that the Act "prohibits a retailer from wielding its mere size to bully suppliers for discounts." Amazon might be willing to sell books to consumers at lower prices than traditional publishers, she asserted, but the purpose of the Robinson-Patman Act is to "give smaller entities a fair chance at competing." "It's worth remembering," she concluded, "that [Amazon's] tactic— holding the publisher hostage unless it concedes to better terms—flouts the principles of anti-price-discrimination laws."

*What Everyone's Getting Wrong About Amazon*, QZ [Quartz] (Oct. 17, 2014), continued Chair Khan's attack on Amazon by name for charging low prices. Responding to articles

defending Amazon's growth, she contended that a "major way Amazon has secured its dominance is through steeply discounting products and using books as 'loss-leaders' to sell its other wares." She dismissed suggestions that Amazon faced serious competition in retail sales.  "First off, approximating Amazon's command as a percent of *everything sold* (minus gas, food & drinks, building supplies) in America is insane.  It dissolves the dominance Amazon enjoys in specific sectors—like books, but also in electronics like televisions and in industrial goods like valves." Amazon, she declared, "has a monopoly in books.  It has also attained a dominant position in our economy unlike anything we've seen in the last 50 years.  That alone should alarm us."

*How to Reboot the FTC*, POLITICO (Apr. 13, 2016), was Chair Khan's call for antitrust enforcement action against Amazon as a platform company.  She argued that a reinvigorated Federal Trade Commission should "take seriously the threats to competition posed by online platform monopolies," and included Amazon in her list of supposed threats.  While acknowledging that platforms often provide "great ease and convenience for consumers," Chair Khan complained that the companies "can also use their market power to squeeze or disadvantage the sellers and suppliers that depend on them."

*Amazon's Antitrust Paradox*, 126 YALE L.J. 710 (2017), a student note, assembled many of the charges Chair Khan previously made against Amazon into an integrated series of findings indicting Amazon for its alleged "structural dominance" and alleged "anticompetitive" activity.

> "In addition to using below-cost pricing to establish a dominant position in e-books, Amazon has also used this practice to put pressure on and ultimately acquire a chief rival. * * * In 2008, Quidsi was one of the world's fastest growing e-commerce companies.  It oversaw several subsidiaries: Diapers.com (focused on baby care), Soap.com (focused on household essentials), and BeautyBar.com (focused on beauty products).  Amazon expressed interest in acquiring Quidsi in 2009, but the company's founders declined Amazon's offer.  Shortly after Quidsi rejected Amazon's overture, Amazon cut its prices for diapers and other baby products by up to 30%. * * * Struggling to keep up with Amazon's pricing war, Quidsi's owners began talks with Walmart about potentially selling

the business. Amazon intervened and made an aggressive counteroffer.  * * * After completing its buy-up of a key rival—and seemingly losing hundreds of millions of dollars in the process—Amazon went on to raise prices**.**"

*Id.* at 768-70.

Chair Khan asserted as established fact that:

"As its history with Quidsi shows, Amazon's willingness to sustain losses has allowed it to engage in below-cost pricing in order to establish dominance as an online retailer.  Amazon has translated its dominance as an online retailer into significant bargaining power in the delivery sector, using it to secure favorable conditions from third-party delivery companies.  This in turn has enabled Amazon to extend its dominance over other retailers by creating the Fulfillment-by-Amazon service and establishing its own physical delivery capacity.  This illustrates how a company can leverage its dominant platform to successfully integrate into other sectors, creating anticompetitive dynamics."

*Id.* at 774.

Chair Khan outlined the future antitrust significance of her findings:

"Amazon is positioned to use its dominance across online retail and delivery in ways that involve tying, are exclusionary, and create entry barriers.  That is, Amazon's distortion of the delivery sector in turn creates anticompetitive challenges in the retail sector.  For example, sellers who use [Fulfillment-by-Amazon] have a better chance of being listed higher in Amazon search results than those who do not, which means Amazon is tying the outcomes it generates for sellers using its retail platform to whether they also use its delivery business."

*Id.* at 778.

Chair Khan summed up her conclusions about Amazon's likely antitrust liability:

"Amazon has responded to popular third-party products by producing them itself. * * * The anticompetitive implications here seem clear:  Amazon is exploiting the fact that some of its customers are also its rivals. The source of [Amazon's market] power is:  (1) its dominance as a platform, which effectively necessitates that independent merchants use its site; (2) its vertical integration—namely, the fact that it both sells goods as a retailer and hosts sales by others as a marketplace; and (3) its ability to amass swaths of data, by virtue of being an internet company.  Notably, it is this last factor—its control over data—that heightens the anticompetitive potential of the first two."

6

*Id.* at 782-83.

In *Amazon Bites Off Even More Monopoly Power*, NEW YORK TIMES (June 21, 2017), Chair Khan protested Amazon's plan to acquire Whole Foods.

> "Amazon on Friday announced plans to acquire Whole Foods, the high-end grocer. * * * Amazon will argue to federal authorities, most likely the Federal Trade Commission, that the deal should be blessed because the combined entity's share of the American grocery market will be less than 5 percent. But antitrust officials would be naïve to view this deal as simply about groceries. Buying Whole Foods will enable Amazon to leverage and amplify the extraordinary power it enjoys in online markets and delivery, making an even greater share of commerce part of its fief."

Chair Khan called Amazon a "vast empire" that "self-deal[s] with great finesse" and "dictates terms and prices to those dependent on" its services.

*Stop Amazon From Selling Books—or Anything Else—Below Cost* is a portion of *6 Ideas to Rein in Silicon Valley, Open Up the Internet, and Make Tech Work for Everyone*, NEW YORK MAGAZINE (Dec. 11, 2017), and another article in which Chair Khan asserts the factual truth of her premises for deeming Amazon's practices unlawful:

> "In 2009, Amazon executives realized that another company was winning the diapers market, Diapers.com—a subsidiary of Quidsi—offered young parents a range of baby products, and soon became one of the fastest-growing online retailers in the country. When the founders declined an offer by Amazon to buy up the company, Amazon settled on another tactic to tame its rival: drive it into the ground. Amazon began slashing prices on baby products, pricing goods below the cost of production. Over the course of months, Amazon lost millions. While Quidsi initially tried to keep up, the relative newcomer lacked Amazon's almost endless ability to absorb losses. Soon, Quidsi's investors began to panic, and when Amazon then made another bid, the start-up's founders conceded. Once it had Quidsi in its grip, Amazon first jacked prices back up and scaled back loyalty programs. Then it shut down the operation completely."

Predatory pricing "is a standard trick from the monopolist's playbook," Chair Khan asserted, as she called for prosecution of Amazon for allegedly engaging in it.

*Sources of Tech Platform Power*, 2 GEO. L. TECH. REV. 325 (2018), continued Chair Khan's attack on "dominant platforms," a group in which she includes Amazon.

> "Platforms can use their gatekeeper power to extort and extract better terms from the business users that depend on their infrastructure.  For example, Amazon has disabled the 'buy-buttons' for book publishers in order to extract better terms; executives have also described how the company tweaks algorithms during negotiations to remind firms of its power to sink their sales, through demoting their rank below where users usually look when making purchases.  Recently, the company has started offloading costs onto suppliers by subsidizing shipping costs through increased fees for the companies that sell through its platform.  Merchants attempting to negotiate with Amazon risk seeing their accounts suspended, and getting kicked off its platform often means not just seeing lower revenue, but having to lay off employees."

*Id.* at 327.

Platforms also can allegedly engage in "information exploitation" to enhance their own profits and penalize others. Chair Khan accuses Amazon, for example, of collecting

> "swaths of information on the merchants selling through its Marketplace.  It routinely uses this data to inform its own sales and products, exploiting insights generated by third-party retailers and producers to go head-to-head with them, rolling out replica products that it can rank higher in search results or price below-cost.  In this way Amazon's platform functions as a petri dish, where independent firms undertake the initial risks of bringing products to market and Amazon gets to reap from their insights, often at their expense. Notably, it is the other forms of power—the fact that Amazon is a gatekeeper and integrated across lines of business—that enable it to exploit information in this way; those two forms of power enhance its ability to leverage the third."

*Id.* at 327.

*The Separation of Platforms and Commerce*, 119 COLUM. L. REV. 973 (2019), again makes Amazon a target on the basis of Chair Khan's purported specific factual findings.

> "Amazon * * * is the dominant online marketplace, the world's largest cloud computing service, a massive shipping and logistics network, a media producer and distributor, a grocer, a small-business lender, a live video-gaming streaming platform, a digital home assistant, a designer of apparel, and an online pharmacy," she reports.  "Two areas where it both serves as a bottleneck facility and competes with those reliant on its bottleneck include online retail and digital home-assistant systems."

8

*Id.* at 985.  The core allegation of the article is that firms such as Amazon are "gatekeepers" for access to customers in Internet commerce.  Platform companies like Amazon, Chair Khan asserts, should not also be able to sell their own products over their platforms in competition with third-party sellers.

Recently, Chair Khan served as Counsel to the Majority Staff of the House Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law, a role in which she says that she "led the congressional investigation into digital markets and the publication of its final report." http://www.linamkhan.com/bio-1.  The final report contains an 83-page section detailing Amazon conduct that allegedly violated the antitrust laws.  Staff of H. Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations* (2020) [hereafter Majority Staff Report].  The report, also critical of Alphabet/Google, Apple and Facebook, extends Chair Khan's earlier articles into a call for use of the antitrust laws against Amazon and others.  The Majority Staff Report begins:

> "Amazon has significant and durable market power in the U.S. online retail market. * * * Although Amazon is frequently described as controlling about 40% of U.S. online retail sales, this market share is likely understated, and estimates of about 50% or higher are more credible."

Majority Staff Report at 15.

The Report continues:

> "Amazon achieved its current dominant position, in part, through acquiring its competitors * * *.  It has also acquired companies that operate in adjacent markets, adding customer data to its stockpile and further shoring up its competitive moats.  This strategy has entrenched and expanded Amazon's market power in e-commerce, as well as in other markets.  The company's control over and reach across its many business lines enable it to self-preference and disadvantage competitors in ways that undermine free and fair competition.  As a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success.

"Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers.  Publicly, Amazon describes third-party sellers as 'partners.'  But internal documents show that, behind closed doors, the company refers to them as 'internal competitors."  Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.  This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct. * * * The company's early leadership in this market is leading to the collection of highly sensitive consumer data, which Amazon can use to promote its other business, including e-commerce and Prime Video."

Majority Staff Report at 16.

In a later discussion of barriers to entry in e-commerce, the Majority Staff Report asserts:

"If current trends continue, no company is likely to pose a threat to Amazon's dominance in the near or distant future. * * * While some of [the] barriers to entry are inherent to e-commerce—such as economies of scale and network effects—others result from Amazon's anticompetitive conduct.  As discussed elsewhere in the Report, Amazon's acquisition strategy and many of its business practices were successfully designed to protect and expand its market power."

Majority Staff Report at 87.

Chair Khan is now clearly in a position to order Federal Trade Commission staff to investigate whether to pursue Amazon based on some or all of the issues on which the Majority Staff Report makes findings.

**4.     My Opinions**

**a.     Parties in Matters Before the FTC Have a Right to Neutral Decisionmakers**

When the work of the Federal Trade Commission becomes focused on individual citizens and companies, targets have the right to be investigated, prosecuted, and judged by impartial Commissioners and an impartial Chair.  For example, the law prohibits an FTC Commissioner from voting in a case when the Commissioner has a direct financial interest in the outcome.  18 U.S.C. § 208 and 5 C.F.R. §§ 2635.501-.502, "Impartiality in Performing Official Duties."  Such

a vote would violate a defendant's right to due process of law, *e.g.*, *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986), and any Commissioner in a position to cast such a vote would clearly be obliged to recuse herself.

In my opinion, the same principles that underlie disqualification in financial conflict cases would extend to a Commissioner's non-financial interests as well. FTC Commissioners are as subject as any other government officers to the principle that those who are judged or prosecuted are entitled to have those decisions made by "impartial" persons who can hear all sides fairly. How that principle applies to someone in the position of Chair Khan is the key issue presented in deciding whether she must recuse herself from participation in future matters that involve Amazon.

### b.   The Appropriate Standards By Which to Judge Impartiality

Three cases involving former FTC Chairman Paul Rand Dixon are particularly helpful in understanding the legal standards that are relevant here. *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), was a case of alleged deceptive advertising. While the case was pending before the Commission, Chairman Dixon gave a speech before the National Newspaper Association that suggested he believed the advertisement in question was deceptive. The court found that the Chairman's speech required reversal of the Commission's later cease and desist order.

> "[The law] does not give individual Commissioners license to prejudge cases or to make speeches which give the appearance that the case has been prejudged. Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record."

425 F.2d at 590.

The court concluded:

"The test for disqualification has been succinctly stated as being whether 'a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 489 (2d Cir.), cert. denied, 361 U.S. 896 * * * (1959).'"

425 F.2d at 591.

*American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), involved alleged fraud in obtaining pharmaceutical patents.   During several years when the matter was under FTC investigation, Paul Rand Dixon was Chief Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee.  The Report of the Senate Committee expressed conclusions about many of the same issues and evidence that were before the FTC when Mr. Dixon became Chairman of the Commission.   The 6th Circuit vacated the FTC cease and desist order and remanded for de novo consideration of the record without involvement of Chairman Dixon, saying:

"It is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify. See Prejudice and the Administrative Process, 59 Nw. U. L. Rev. 216, 231 (1964); Disqualification of Administrative Officials for Bias, 13 Vand. L. Rev. 713, 727 (1960).

"It is to be emphasized that the Commission is a fact-finding body.  As Chairman, Mr. Dixon sat with the other members as triers of the facts and joined in making the factual determination upon which the order of the Commission is based.  As counsel for the Senate Subcommittee, he had investigated and developed many of these same facts.

"The result of the participation of Chairman Dixon in the decision of the Commission is not altered by the fact that his vote was not necessary for a majority. 'Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.' *Berkshire Employees Association of Berkshire Knitting Mills v. N.L.R.B.*, 121 F.2d 235, 239 (C.A.3 [1941])."

363 F.2d at 767-768.

Earlier still, *Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964), *rev'd on other grounds*, 381 U.S. 739 (1965), was a case against Texaco and several tire companies. While the case was pending before an FTC hearing examiner, then newly-appointed Chairman Dixon gave a speech before the National Congress of Petroleum Retailers.  In it, he said:

> "We at the Commission are well aware of the practices which plague you and we have challenged their legality in many important cases.  You know the practices—price fixing, price discrimination, and overriding commissions on TBA. You know the companies—Atlantic, Texas * * * Goodyear, Goodrich, and Firestone.

> * * *

> "You may be sure that the Commission will continue and, to the extent that increased funds and efficiency permit, will increase its efforts to promote fair competition in your industry."

336 F.2d at 759.

The D.C. Circuit's reaction was concise and definitive:

> "In this case, a disinterested reader of Chairman Dixon's speech could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the Act. * * * We conclude that Chairman Dixon's participation in the hearing amounted in the circumstances to a denial of due process which invalidated the order under review."

*Id.* at 760.

In my opinion, it is fair to conclude that Chair Khan's published views about Amazon were even more definitive and critical than those of Chair Dixon that required reversal in the Commission cases just noted.  Interestingly, the principle running through all the cases is closely analogous to the statutory standard for recusal of a federal judge.  Judicial recusal is required when the judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a), while 5 C.F.R. §§ 2635.501(a) & .502(a), "Impartiality in Performing Official Duties," use the same "question regarding * * * impartiality" test to describe when federal ethics regulations presumptively require

13

disqualification of any federal official, including an FTC Commissioner, in any "particular matter involving specific parties."  In short, a person's fundamental right to an impartial adjudicator is essentially the same whether a judge or a Commissioner is involved and whether a lack of impartiality is asserted under the Due Process clause or under federal ethics standards.[3]

The 28 U.S.C. § 455(a) judicial standard is given further specificity in three circumstances that are also relevant to situations in which FTC Commissioners might find themselves. The section requires that a judge disqualify himself or herself:

"(1)    Where he [or she] has a personal bias or prejudice concerning a party, or [2] personal knowledge of disputed evidentiary facts concerning the proceeding; * * * [or]

"(3)    Where he [or she] has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

28 U.S.C. § 455(b).

In my opinion, one key point of both the judicial and the general federal ethics requirements is that disqualification turns on the prior formation of opinions about questions of fact rather than policy judgments.  The principles outlined in § 455(a) do not make it a violation of due process "for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law."  *FTC v. Cement Inst.*, 333 U.S. 683, 702-03 (1948).  A judge also ordinarily may hear a matter in which he or she learned particular facts in earlier proceedings in the matter.  *Liteky v. United States*, 510 U.S. 540 (1994).

---

[3] 5 C.F.R. § 2635.502(d) provides that an "agency designee" may authorize a federal official to continue acting in a matter in spite of a lack of impartiality if the designee determines "that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's programs and operations."  It seems unlikely that an agency designee could make that determination in this situation, but even if the designee did, in my opinion, the action might negate the official's liability under the ethics regulations, but it could not negate the government's due process obligation to persons affected by agency action.

A second key point of both requirements is that the standards are objective, not subjective. As applied to the FTC, they ask whether a reasonable person who knew all the facts and circumstances would decide that the Commissioner's impartiality is reasonably in doubt, not that future improper conduct is a certainty.[4]  Fellow Commissioners can apply such an objective standard in reviewing each other's recusal decisions without casting aspersions on their colleague's personal integrity.  Congress and reviewing courts can apply the standard in the same spirit.  The standard neither requires nor permits proof about whether one Commissioner will act fairly while another will not, primarily because such judgments are personally awkward and often impossible to make in advance.

The specific examples of required recusal found in 28 U.S.C. § 455(b) are also informative here.  It is beyond question that Chair Khan has published a great deal of independent research that she purports gives her what § 455(b) calls "personal knowledge of disputed evidentiary facts." Amazon, like any other defendant, will have the right to try to convince her and the other Commissioners that she has gotten the facts and inferences wrong, but the effect of taking such definitive public positions cannot help but "entrench[]" Chair Khan in her positions and make "it difficult, if not impossible * * * to reach a different conclusion in the event [s]he deems it necessary to do so after consideration of the record." *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d at 590.

In addition, like Chair Dixon, Chair Khan comes to the FTC after service as a leading staff member of a Congressional Committee studying issues that may later come before the Federal Trade Commission.  There is good reason that 28 U.S.C. § 455(b) makes prior government service

---

[4] The relevant provision of the current Code of Conduct for United States Judges, Commentary on Canon 2A, uses the term "appearance of impropriety" to describe the inquiry that underlies this objective test: "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's *** impartiality *** is impaired."

as counsel in a matter that comes before the same person as judge a specific circumstance mandating recusal.  The Majority Staff Report in which Chair Khan played a large part in effect asserts that Amazon is guilty of violating the law.  In my opinion, in any future matter tried before the FTC, Amazon is entitled to decision makers who have a more open mind about those issues than Chair Khan would appear to a reasonable observer to have.

> c.      **Standards Affecting the Propriety of a Commissioner Voting to Investigate or to Bring an Action in Federal Court**

Of course, each of the cases just discussed involved matters being tried before the FTC.  That situation makes the judicial ethics analogy easy to see.  It is at least possible that the matter facing Amazon might be a prolonged FTC investigation or the filing of an action in federal court.  Such choices would not make the issue of Chair Khan's recusal go away.  In my opinion, the fact or appearance of a Chair's lack of impartiality in the decision to investigate a firm or to file a judicial proceeding would most likely violate both the agency's due process obligations and the Chair's ethical duties to named respondents and to the public.

To be sure, a prosecutor who initiates proceedings plays a different role in our justice system than a judge does.  A prosecutor presents the case that a defendant has violated the law.  Prosecutors

> "need not be entirely 'neutral and detached.' * * * [T]hey are necessarily permitted to be zealous in their enforcement of the law. * * * [T]he strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-50 (1980).

But acknowledging the differences between judges and prosecutors is only the start of the relevant analysis.  The Supreme Court made equally clear in *Jerrico* that the decision to prosecute a private party is also subject to due process standards.

> "We do not suggest * * * that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors.  Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States*, 295 U.S. 78, 88 (1935). * * * Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. Cf. 2 K. Davis, Administrative Law Treatise 215-256 (2d ed. 1979). A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."

*Id.*

In my opinion, the Court in *Jerrico* was making the point that, while the impartiality of judges and prosecutors may take different forms, an FTC Chair who votes to have her agency initiate a matter may not simply act as if she were only a partisan.  American Bar Association Model Rules of Professional Conduct, Rule 3.8, Comment 1, offers this often-heard insight about the role of a prosecutor:

> "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons."

A decision to prosecute involves choices of which firms to charge, what charges are appropriate, and how many of an agency's limited resources should be committed to one matter rather than another.  That is as true at the FTC as in any prosecutor's office around the country.  In my opinion, it is reasonable to conclude that an FTC Chair whose impartiality could reasonably

be questioned by an objective observer must step aside rather than personally participate in those decisions.

Cases prohibiting government agencies from delegating prosecution of enforcement cases to affected private parties help make the point.  In *People ex rel. Clancy v. Superior Court*, 705 P.2d 347 (Cal. 1985), a California city passed an ordinance defining stores that principally sell "obscene publications" as a public nuisance.  The city declared a local book store such a nuisance and retained a local attorney to go to court to abate it.  The attorney's fee would be $60 per hour, but if the city were to lose the case, the fee would drop to $30 per hour.

The court found that having a personal interest in a government victory was "antithetical to the standard of neutrality that an attorney representing the government must meet * * *."  *Id.* at 353.  It justified the neutrality requirement particularly well, saying:

> "[A] prosecutor's duty of neutrality is born of two fundamental aspects of his employment.  First, he is a representative of the sovereign; he must act with the impartiality required of those who govern.  Second, he has the vast power of the government available to him' he must refrain from abusing that power by failing to act evenhandedly.  These duties are not limited to criminal prosecutors: 'A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results.'" (quoting ABA Code of Professional Responsibility, EC 7-14).

*Id.* at 350.  For that reason, the court said, "prosecutors and other government attorneys can be disqualified for having an interest in the case extraneous to their official function." *Id.* at 351.[5]

---

[5] The most prominent federal case establishing the same principle is *Young v. United States ex rel. Vuitton et fils, S.A.*, 481 U.S. 787 (1987), in which the Supreme Court held that counsel for private parties who had settled a trademark case could not later be appointed as the special prosecutors in an action charging criminal contempt to enforce the injunction they had obtained.  Instead, the lawyer must ask the U.S. Attorney to file the contempt action, and if that office appoints someone else the contempt, it must be someone not connected with the underlying matter.

The focus on financial incentives in many cases has led to a series of cases testing whether private counsel compensated by contingent fee are *per se* barred from representing public entities in civil cases.  Several of the cases involve qui tam actions under the False Claims Act, 31 U.S.C. § 3730(b), under which a private party may file suit in

Explaining what it means to have "an interest in the case extraneous to [the prosecutor's] official function," the court in *Clancy* cited *People v. Superior Court (Greer)*, 561 P.3d 1164 (Cal. 1977), where the mother of a victim of violent crime was a non-lawyer employee in the office of the prosecutor. The employee was to be a material witness for the prosecution and, if the defendant were convicted, she might gain custody of her grandchild. The prosecutor had no personal financial interest in the case, but the court recognized that a reasonable judge could conclude that the interest of the prosecutor's employee might unduly influence the prosecutor. Constitutional guarantees of a fair trial, the court said

> "would seem better served when judges have discretion to prevent even the possibility of their violation. Individual instances of unfairness, although they may not separately achieve constitutional dimensions, might well cumulate and render the entire proceeding constitutionally invalid. The trial judge need not delay until the last straw of prejudice is added, by which time it might be too late to avert a mistrial or a reversal."

*Id.* at 1170.

That principle seems to describe Amazon's situation as well. Chair Khan has built a large portion of her professional reputation by articulating her own factual conclusions and legal opinions about Amazon's alleged guilt under the antitrust laws. Amazon will have the legal right to put on a defense, but in the words used by the D.C. Circuit about Chair Dixon: "[A] disinterested observer may conclude that [Chair Khan] has in some measure adjudged the facts as well as the

---

the name of the Government and then be awarded a percentage of any sums recovered. That statutory scheme has been upheld in cases such as *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), in part because the statute lets disinterested Government lawyers take a case over from private counsel. Indeed, government counsel may even dismiss the case if the court approves, *e.g.*, *United States ex rel. Cimznhca, LLC v. UCB, Inc.*, 970 F.3d 835 (7th Cir. 2020). *American Bankers Management Company, Inc. v. Heryford*, 885 F.3d 629 (9th Cir. 2018), extended the qui tam precedents to uphold a contingent fee in a suit to collect civil penalties under the California unfair competition law. In my opinion, such cases have been decided under the particular statutory schemes involved and, in spite of sometimes broad dicta, they do not undercut the principle that disinterested FTC officials must make key investigatory and prosecutorial decisions, not simply the final decisions, in agency matters.

law of a particular case in advance of hearing it," *Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission*, 425 F.2d 583, 591 (D.C. Cir. 1970).  And in the words of 5 C.F.R. § 2635.502(a), "the circumstances would cause a reasonable person with knowledge of the facts to question [her] impartiality in the matter."  *Cf.* 28 U.S.C. § 455(a).

Relying on the published statements cited earlier in this Declaration, in my opinion it would be reasonable to conclude that Chair Khan may not ethically participate in FTC antitrust matters involving Amazon and may not supervise FTC investigations into Amazon relating to practices about which Chair Khan has previously opined.

5.      **Conclusion**

I have never met Chair Khan.  I have no personal animus toward her; indeed, I have genuine respect for her energy and scholarly output.  I presume that she can be expected to use her position as Chair to assess the conduct of most potential FTC respondents in a fair and impartial manner.

Chair Khan is clearly a person with strong opinions about how the U.S. economy should be structured and about industry practices that she believes too readily lead to industry concentration.  Nothing in this Declaration is meant to say that an FTC Commissioner is biased merely because she brings her own sense of desirable public policy to the Commission's work.  Nor do I believe that having written scholarly articles about subjects a Commissioner or Chair will face should disqualify an academic from service on a regulatory agency.  The nation would be denied many fine public servants if that were the applicable standard.

The point of this Declaration is that when a Commissioner is in a position to sit in judgment on, or assume the function of an investigator or prosecutor against, a particular defendant after having built a great deal of her professional reputation asserting conclusions about the guilt of that defendant, in my opinion, it is reasonable to conclude that the Commissioner is required by federal

20

law and regulations to step aside and permit others who have not yet formed their opinion make those decisions.

In my opinion, it would be appropriate for Chair Khan to announce that she will recuse herself in all cases against Amazon that consider factual issues she purports to have determined in her academic articles, her public advocacy publications, or the Majority Staff Report.  If she does not recuse herself voluntarily, in my opinion it would be appropriate for her fellow Commissioners to direct her to do so.

_____June 29, 2021_____
Date

*Thomas D. Morgan*
_____
Thomas D. Morgan

**Attachment**

**Curriculum Vitae**
**THOMAS D. MORGAN**

**Personal Data:**

Born:  February 8, 1942, in Peoria, Illinois

Home Office: 4251 Gulf Shore Blvd. N., Apt. 11D, Naples, FL 34103     (239) 263-7353

E-mail: tmorgan@law.gwu.edu

Bar Membership:  Illinois, since 1965

**Undergraduate Education:**

Northwestern University, Evanston, Illinois, 1959-62
        B.A. degree, highest distinction   Member, Phi Beta Kappa

**Legal Education:**

University of Chicago Law School, Chicago, Illinois, 1962-65
        J.D. degree with honors; Member, Order of the Coif
        Comment Editor, Volume 32, University of Chicago Law Review

**Professional Experience:**

Oppenheim Professor of Antitrust and Trade Regulation Law, George Washington
        University, 1989-1998; 2000-2013; Emeritus, since 2014

Rex E. Lee Professor of Law, Brigham Young University, 1998-2000

Dean, Emory University School of Law, 1980-85
        Distinguished Professor of Law 1985-89

Professor of Law, University of Illinois, 1974-80
        Associate Professor, Illinois, 1970-74; Assistant Professor, Illinois, 1966-67

Visiting Professor, Brigham Young University, Fall 1994
        Monash University (Australia), Spring 1988
        Cornell University, Winter 1974

Special Assistant to Assistant Secretary of Defense, 1969-70
        Attorney, Office of Air Force General Counsel, 1967-69

Bigelow Teaching Fellow, University of Chicago Law School, 1965-66

22

**Publications:**

**A.    In the Field of Professional Responsibility**

THE VANISHING AMERICAN LAWYER (Oxford University Press 2010)

PROFESSIONAL RESPONSIBILITY: PROBLEMS AND MATERIALS (Foundation
    Press 1976); 2nd Edition 1981; 3rd Edition 1984; 4th Edition 1987; 5th Edition
    1991; 6th Edition 1995, 7th Edition 2000, 8th Edition 2003, 9th Edition 2006, 10th
    Edition 2008 (co-authored with R. Rotunda); 11th Edition 2011; 12th Edition 2014,
    13th Edition 2018 (co-authored with R. Rotunda and J. Dzienkowski); all with
    Teachers' Manuals.

SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (1981-2018),
    (co-authored with R. Rotunda); (2019 – 2021), published alone.

AMERICAN LAW INSTITUTE, RESTATEMENT OF THE LAW (THIRD): THE
    LAW GOVERNING LAWYERS (2000) (with C. Wolfram & J. Leubsdorf)

LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL
    CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW
    GOVERNING LAWYERS (2005)

LEGAL ETHICS (Gilbert Law Summaries) (9th Edition 2017)

"Where Do We Go From Here with Fee Schedules?" 59 A.B.A.J. 1403 (1973)

"The Evolving Concept of Professional Responsibility," 90 Harvard L. Rev. 702 (1977)

"Appropriate Limits on Participation by a Former Agency Official in Matters Before an
    Agency," 1980 Duke L.J. 1

"Conflicts of Interest and the Former Client in the Model Rules of Professional Conduct,"
    1980 American Bar Foundation Res. J. 993

"The Fall and Rise of Professionalism," 19 U. Richmond L. Rev. 451 (1985)

"Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem," 10
    Univ. Arkansas (Little Rock) L. J. 37 (1987-88)

"An Introduction to the Debate over Fee Forfeitures," 36 Emory L. J. 755 (1987)

"Public Financial Disclosure by Federal Officials: A Functional Approach," 3
    Georgetown J. Legal Ethics 217 (1989).

"The Quest for Equality in Regulating the Behavior of Government Officials:  The Case of Extrajudicial Compensation," 58 George Washington L. Rev. 490 (1990)

"Thinking About Lawyers as Counselors," 42 Florida L. Rev. 439 (1990)

"Vintage Freedman in a New Bottle," Review of Freedman, Understanding Lawyers' Ethics, 4 Georgetown J. Legal Ethics 847 (1991)

"Heroes for Our Time: Going Beyond Ethical Codes," Clark Memorandum (Brigham Young University), Fall 1992, p. 23

"Economic Reality Facing 21st Century Lawyers," 69 Washington L. Rev. 625 (1994)

"Sanctions and Remedies for Attorney Misconduct," 19 S. Illinois U. L. Rev. 343 (1995)

"Legal Representation in a Pluralist Society," 63 George Washington L. Rev. 984 (1995) (co-authored with Robert W. Tuttle)

"American Perspectives on the Duty of Loyalty: Conflicts of Interest and Other Issues of Particular Concern to the International Practitioner," in Mary C. Daly & Roger J. Goebel, Eds., Rights, Liability, and Ethics in International Law Practice (1995)

"Law Faculty as Role Models," in ABA Section of Legal Education, Teaching and Learning Professionalism: Symposium Proceedings (1996)

"Suing a Present Client," 9 Georgetown J. Legal Ethics 1157 (1996), reprinted in 1 Journal of Institute for Study of Legal Ethics 87 (1996)

"Conflicts of Interest in the *Restatement*: Comments on Professor Moore's paper," 10 Georgetown J. Legal Ethics 575 (1997)

"Whose Lawyer Are You Anyway?," 23 William Mitchell L. Rev. 11 (1997)

"Use of the Problem Method for Teaching Legal Ethics," 39 William & Mary L. Rev. 409 (1998)

"Conflicts of Interest and the New Forms of Professional Associations," 39 S. Texas L. Rev. 215 (1998)

"What Insurance Scholars Should Know About Professional Responsibility," 4 Conn. Insurance L. J. 1 (1997-98)

"Interview with Professor Thomas Morgan on Professional Responsibility," 13 Antitrust 4 (Fall 1998).

"The Impact of Antitrust Law on the Legal Profession," 67 Fordham L. Rev. 415 (1998)

24

"Toward a New Perspective on Legal Ethics," Am Bar Foun, Researching the Law (2000)

"Real World Pressures on Professionalism," 23 U. Ark. (Little Rock) L. J. 409 (2001)

"Practicing Law in the Interests of Justice in the Twenty-First Century," 70 Fordham L. Rev. 1793 (2002)

"Toward Abandoning Organized Professionalism," 30 Hofstra L. Rev. 947 (2002)

"Creating a Life as a Lawyer," 38 Valparaiso L. Rev. 37 (2003)

"Sarbanes-Oxley: A Complication, Not a Contribution in the Effort to Improve Corporate Lawyers' Professional Conduct," 17 Georgetown J. Legal Ethics 1 (2003)

"The Client(s) of a Corporate Lawyer," 33 Capital U. L. Rev. 17 (2004)

"Educating Lawyers for the Future Legal Profession," 30 Okla City U. L. Rev. 537 (2005)

"The Corporate Lawyer and the Perjury Trilemma," 34 Hofstra L. Rev. 965 (2006)

"It's Not Perfect, But the ABA Does a Key Job in State-Based Regulation of Lawyers," 11 Tex. Rev. of L. & Politics 381 (2007)

"Comment on Lawyers as Gatekeepers," 57 Case Western Res. L. Rev. 375 (2007)

"Professional Malpractice in a World of Amateurs," 40 St. Mary's L. J. 892 (2009).

"It's Not Your Parents' Profession Anymore: The Changing Course of Legal Careers," GW Law School Alumni Magazine, Summer 2010, p. 18.

"Should the Public Be Able to Buy Stock in Law Firms?" 11 Engage 111 (Sept. 2010).

"Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements," 79 George Washington L. Rev. 734 (2011).

"Realistic Questions About Modern Lawyer Regulation," part of an on-line symposium at http://truthonthemarket.com/2011/09/19/thomas-morgan-on-realistic-questions-about-modern-lawyer-regulation.

"Calling Law a 'Profession' Only Confuses Thinking about the Challenges Lawyers Face," 9 U. St. Thomas L.J. 542 (2011).

"On the Declining Importance of Legal Institutions," 2012 Mich. St. L. Rev. 255.

"The Rise of Institutional Law Practice," 40 Hofstra L. Rev. 1005 (2012).

"*The Lost Lawyer*: An Important Outline of Symptoms, But a Flawed Diagnosis," 2014 J. Professional Lawyer 83.

"The Shift to Institutional Law Practice," in Paul A. Haskins, ed., THE RELEVANT LAWYER: IMAGINING THE FUTURE OF THE LEGAL PROFESSION (2015).

"The Challenge of Writing Rules to Regulate Lawyer Conduct," 49 Creighton L. Rev. 807 (2016).

"Inverted Thinking about Law as a Profession or Business," 2016 J. Prof. Lawyer 115.

"Roger C. Cramton & the Delivery of Legal Services," 103 Cornell L. Rev. 1337 (2018).

**B.    In the Fields of Economic Regulation and Administrative Law**

MODERN ANTITRUST LAW AND ITS ORIGINS: CASES AND MATERIALS (West Publishing Co. 1994; 2nd Ed. 2001; 3rd Ed. 2005; 4th Ed. 2009; 5th Ed. 2014)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (West Publishing Co. 1976)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (2nd Edition 1985) (co-authored with J. Harrison & P. Verkuil)

REGULATION AND DEREGULATION: CASES AND MATERIALS (West Publishing Co. 1997; 2nd Edition 2004) (co-authored with Harrison and Verkuil)

"The General Accounting Office: One Hope for Congress to Regain Parity of Power with the President," 51 N. Carolina L. Rev. 1279 (1973)

Review of "Inner City Housing and Private Enterprise," 1972 U Ill. L Forum 833 (1973)

"Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained Administrative Process," 1974 Wisconsin L. Rev. 301

"Toward a Revised Strategy for Ratemaking," 1978 U. Illinois L. Forum 21

"Procedural Impediments to Optimal Rate Making," in W. Sichel, Ed., Public Utility Rate Making in an Energy-Conscious Environment (Westview Press 1979)

"Federal Chartering of Corporations" and "Shareholder Remedies in Corporations" in M.B. Johnson, Ed., The Attack on Corporate America: The Corporate Issues Sourcebook (McGraw-Hill 1978)

26

Review of "Economic Analysis and Antitrust Law," 33 Vanderbilt L. Rev. 1523 (1980)

"The Deregulation Bandwagon: Too Far, Too Fast?," 2 J. Law & Commerce 1 (1982)

Review of "Antitrust Stories," Antitrust Source, www.antitrustsource.com (Aug 2008)

"Antitrust Implications of Accreditation Standards That Limit Law School Enrollment," 101 Antitrust & Trade Regulation Report 2508 (BNA, July 15, 2011).

**C.      In the Field of Legal Education**

"Computer-Based Legal Education at the University of Illinois:  A Report of Two Years' Experience," 27 J. Legal Education 138 (1975) (with P. Maggs)

"Teaching Students for the 21st Century," 36 J. Legal Education 285 (1986)

"Thinking About Bar Examining: The Challenge of Protecting the Public," 55 Bar Examiner 27 (Nov.1986)

"President's Address", 90-1 AALS Newsletter 1 (Feb. 1990)

"Should We Oppose Ranking of Law Schools?, 90-2 AALS Newsletter 1 (Apr. 1990)

"Legal Education Organizations in Business," 90-3 AALS Newsletter 1 (Aug. 1990)

"The Challenge to Maintain Diversity in Legal Education," 90-4 AALS Newsletter 1 (Nov. 1990)

"A Defense of Legal Education in the 1990s," 48 Wash. & Lee L. Rev. 1 (1991)

"Admission of George Mason to Membership in the Association of American Law Schools," 50 Case Western Reserve L. Rev. 445 (1999)

"Training Law Students For the Future: On Train Wrecks, Leadership and Choices," 6 St. Thomas L. Rev. 297 (2009).

"The Changing Face of Legal Education: Its Impact on What it Means to Be a Lawyer," 45 Akron L. Rev. 811 (2012).

**Participation in Public Programs:**

**A.   Endowed Lectures Given**

      Mellon Lecture, University of Pittsburgh - 1981
      Altheimer Lecture, University of Arkansas (Little Rock) - 1987
      Dunwody Lecture, University of Florida - 1990
      Lane Foundation Lecture, Creighton University - 1990 & 2010
      Tucker Lecture, Washington & Lee University - 1990
      Pirsig Lecture, Wm. Mitchell Law School - 1996
      Van Arsdell Lecture, University of Illinois - 1997
      Keck Award Lecture, American Bar Foundation - 2000
      Tabor Lecture, Valparaiso University - 2003
      Sullivan Lecture, Capital University - 2004
      Miller-Becker Lecture, University of Akron - 2011
      Lichtenstein Lecture, Hofstra Law School - 2012
      Payne Lecture, Mississippi College – 2012
      TePoel Lecture, Creighton University -- 2016

**B.   Representative Programs on Which Served as Speaker or Panelist**

      Let's Make a Deal (the Ethics of Negotiation) - ABA Conference on Professional
          Responsibility (Palm Beach) - June 1992

      Reporting a Client's Continuing Crime or Fraud - ABA Conference on Professional
          Responsibility (Chicago) - May 1993

      Ethical Issues in Representing Older Clients - Fordham University School of Law
          (New York) - December 1993

      Problem of Representing a Regulated Client, Eleventh Circuit Judicial Conference
          (Orlando) - May 1994

      Ethical Issues in Products Liability Cases - Products Liability Committee of the ABA
          Litigation Section (Tucson) - February 1995

      Ethical Issues Arising in the O.J. Simpson Case - University of Washington School of
          Law (Seattle) - May 1995

      Competition Policy for the New South Africa (Pretoria) - November 1995

      Ethical Issues in Representing Children - Fordham University School of Law (New York)
          - December 1995

28

Are We a Cartel? The ABA/DOJ Consent Decree - AALS Annual Meeting (San
    Antonio) - January 1996

Professional Responsibilities of the Law Teacher - AALS (Washington) - July 1996

Ethical Issues for Mediators and Advocates - ABA Annual Meeting (Orlando) -
    August 1996

Legal Issues in Cyberspace - ABA Annual Meeting (Orlando) - August 1996

Teaching Legal Ethics by the Problem Method - College of William & Mary--Keck
    Foundation Conference (Williamsburg) - March 1997

Litigators Under Fire: Handling Professional Dilemmas In and Out of Litigation -
    televised ALI/ABA CLE program (Washington) - April 1997

Conflicts of Interest in the New Forms of Law Practice - South Texas Law School
    Symposium (Houston) - September 1997

Fiduciary Obligations in Dismissal of a Law Firm Partner - Washington & Lee Law
    School Symposium (Lexington, VA) - April 1998

Impact of Disciplinary Action on Lawyer's Status as Certified Specialist - ABA
    Committee on Specialization National Roundtable (Washington) - May 1998

Conflicts of Interest in the Restatement of the Law Governing Lawyers - National
    Organization of Bar Counsel (Toronto) - July 1998

The Ethics of Teaching Legal Ethics - Association of American Law Schools
    (Washington) - October 1998

The New Restatement of the Law Governing Lawyers: What Is It & How Does It Affect
    Your Practice? -  Assn of Bar of City of New York (New York) - November 1998

Imputation, Screens & Personal Conflicts - ABA Conference on Professional
    Responsibility (La Jolla) - June 1999

The Future of Legal Education - Dedication of Sullivan Hall, the new Seattle University
    Law Building (Seattle) - October 1999

Legal Ethics in the New Millennium - J. Reuben Clark Soc. (Dallas) - November 1999

Unauthorized Practice of Law and Ethical Risks to Lawyers from Multistate Practice -
ALAS Telephone Seminar (Chicago) - December 1999

Ethics 2000: Rewriting the Standards for Lawyer Conduct - American Intellectual
Property Law Association (La Quinta, CA) - January 2000

Real World Pressures on Professionalism - University of Arkansas at Little Rock Law
School (Little Rock, AR) - February 2000

Professional Responsibility Issues Arising Out of Electronic Commerce - ABA Section
of Public Contract Law (Annapolis, MD) - March 2000

Multidisciplinary Practice: Curse, Cure or Tempest in a Teapot - American Intellectual
Property Law Association (Pittsburgh, PA) - May 2000

Ethics 2000: Proposed Changes in the Law Governing Lawyers - Conference of Chief
Justices (Rapid City, SD) - July 2000

Attorney Standards in Federal Courts and Developments in the Multidisciplinary Practice
Controversy - Conference of Chief Justices (Baltimore) - January 2001

Multijurisdictional Practice - Turner Seminar (Memphis) - February 2001

Ethical Issues in Large Firms – Ass'n of Legal Administrators (Baltimore) - May 2001

Law Firm Ancillary Services - ALAS Annual Meeting (Bermuda) - June 2001

New Rule 1.6 on Disclosure of Confidential Client Information - ABA Civil Justice
Roundtable (Washington) - March 2002

Ethics for Corporate In-House Counsel - American College of Investment Counsel
(Chicago) - April 2002

Treading Water: A Young Lawyer's Guide to Ethics in Varying Practice Environments -
ABA Tax Section Young Lawyers Committee (Washington) - May 2002

Shifting Ethical Sands: Ethics 2000 and Beyond - Federal Communications Bar Ass=n
(Washington) - June 2002

Multijurisdictional Practice - ABA Forum on Franchising (Phoenix) - October 2002

The Sarbanes-Oxley Act of 2002 and the ABA Task Force on Corporate Responsibility
Report (ALAS Telephone Seminar) - October 2002

At the Bar and in the Boardroom: The Ethics of Corporate Lawyering - Federalist Society
(Washington) - Nov. 2002

Law Firm Risk Management: Post-Enron Challenges - Hildebrandt Conference (New
York) - Nov. 2002

Future Regulation of Securities Lawyers - ABA Section of Business Law, Committee on
Federal Securities Regulation (Washington) - Nov. 2002

What Lawyers Need to Know to Comply with the New SEC Professional Conduct Rules
- ABA Section of Business Law Televised Forum (Washington) - Feb 2003

Ethics in Representing Organizational Clients After Sarbanes-Oxley - ABA Section of
Business Law Spring Meeting (Los Angeles) - April 2003

Corruption in the Executive Suite: The Nation Responds - National Teleconference from
ABA Public Utility Section Spring Meeting (Washington) - April 2003

Sarbanes-Oxley Revolution in Disclosure and Corporate Governance: Complying with
the New Requirements - ABA National Institute (Washington) - May 2003

Client Confidentiality, Corporate Representation and Sarbanes-Oxley - ABA National
Conference on Professional Responsibility (Chicago) - May 2003

Friend or Foe: The Restatement of Law Governing Lawyers - ABA National Legal
Malpractice Conference (La Jolla) - September 2003

Where Were the Lawyers in Enron? - Cato Institute (Washington) - October 2003

Testified before the House Subcommittee on Capital Markets' Hearing on the Role of
Attorneys in Corporate Governance (Washington) - February 2004

The Lawyer-Lobbyist "on the Frontier": What Legal and Ethical Rules Apply? - ABA
Mid-Year Meeting (San Antonio) - February 2004

The Client(s) of a Corporate Lawyer - Capital U. Law School (Columbus) - March 2004

Ethical Issues Facing Public Interest Law Firms - Heritage Foundation (Washington) -
October 2004

Drafting an Ethical Code for a Diverse Legal Profession - Univ. of Memphis Law School
(Memphis) - October 2004

31

Ethical Issues in International Trade Cases - International Trade Trial Lawyers
Association (Washington) - November 2004

Professional Regulation of Business Lawyers Isn't Going to Get Any Easier - ABA
Section of Business Law (Washington) - November 2004

Problems for Corporate Lawyers in Complying with the Sarbanes-Oxley Act - New
Jersey Corporate Counsel Association (Livingston, NJ) - January 2005

Avoiding Conflicts in Business Law Practice: Seven Deadly Sins - ABA Section of
Business Law (Nashville) - April 2005

Fireside Chat on Legal and Accounting Ethics - SEC Historical Society (Washington) -
November 2005

When Good Clients Go Bad - ALAS Annual Meeting (Toronto) - June 2006

Lawyers Face the Future - St. Thomas Univ. Law School (Minneapolis) - August 2006

Regulating Corporate Morality - George Washington Corporate & Business Law Society
(Washington) - September 2006

Comments on Noisy Withdrawal - Case Law School Leet Symposium (Cleveland) -
October 2006

The ABA Role in Law School Accreditation - Federalist Society Lawyers' Convention
(Washington) - November 2006

Investigative Techniques: Legal, Ethical and Other Limits - ABA Section of Antitrust
Law (National) - December 2006

Ethics Issues in Corporate Internal Investigations - Georgia Bar (Atlanta) - March 2007

Are Regulatory Lawyers' Ethical Obligations Changing? - ABA Section of Public Utility
Law (Washington) - April 2007

Antitrust Litigation Ethics From Soup to Nuts - ABA Section of Antitrust Law
(Washington) - April 2007

How to Survive in Today's Competitive Environment and Comply With the Rules of
Professional Conduct - Wisconsin State Bar (Milwaukee) - May 2007

Audit Response Letters: Will There Be Peace Under the Treaty? - ABA National
    Conference on Professional Responsibility (Chicago) - May 2007

The Buried Bodies Case: Alive and Well After Thirty Years - ABA National Conference
    on Professional Responsibility (Chicago) - May 2007

Organization and Discipline for an Independent Legal Profession - Visit of Leaders of the
    Iraqi and Kurdistan Bar Associations (Washington) - November 2007

Feeling Conflicted? The Experts Opine and Prescribe - Tennessee Bar Foundation
    (Nashville) - January 2008

Ethics Issues in Qui Tam Litigation - ABA National Institute on Civil False Claims
    (Washington) - June 2008.

Ethics and the Lawyer-Lobbyist - ABA Administrative Law Conference (Washington) -
    October 2008

Ethics in the Early Going - ABA Tort & Insurance Practice Section, Aviation & Space
    Law Committee Litigation National Program (Washington) - October 2008

Professional Malpractice in a World of Amateurs - St. Mary's Law School Symposium
    on Legal Malpractice (San Antonio) - February 2009

The World Economic Crisis and the Legal Profession - Order of Advocates of Brazil
    (Brazilian counterpart of the ABA) - (Rio de Janeiro) - May 2009

Principles of United States Antitrust Law - Commissioners and Staff of the CADE
    (Brazilian counterpart of the FTC) - (Brazilia) - May 2009

The World Economic Crisis, Antitrust Law and the Lawyer - Institute of Advocates of
    Brazil (Brazilian counterpart of the ALI) - (Rio de Janeiro) - May 2009

The World Economic Crisis and Antitrust Law - American Chamber of Commerce -
    (Bela Horizonte, Brazil) - May 2009

Antitrust Law: The Real U.S. Policies - Seminar celebrating the retirement of Prof. Joao
    Bosco Leopoldino da Fonseca of the Federal University of Minas Gerais (Bela
    Horizonte) - May 2009

Where Does It End? Duties to Former Clients - American Bar Association Center for
    Professional Responsibility (Chicago) - May 2009

33

The Last Days of the American Lawyer - Creighton Law School (Omaha) - Oct. 2009

Ethics Challenges for National Security Lawyers In and Out of Government - ABA
     Standing Committee on Law and National Security (Washington) - Nov. 2009

The Transformative Effect of International Initiatives on Lawyer Practice and Regulation:
     The Financial Action Task Force Guidelines - Association of American Law
     Schools Annual Meeting (New Orleans) - Jan. 2010

Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in
     Aggregate Settlements - Humphreys Complex Litigation Center Conference on
     Aggregate Litigation: Critical Perspectives (Washington) - March 2010

Abandoning Homogeneity in Legal Education - Georgetown Center for Study of
     the Legal Profession Program on Law Firm Evolution: Brave New World or
     Business as Usual? (Washington) - March 2010

Ethics Issues in Housing - ABA Forum on Affordable Housing (Washington) - May 2010

The Vanishing American Lawyer - Conference on Regulating and Deregulating Lawyers
     - Institute for Advanced Legal Studies (London) - June 2010

The Vanishing American Lawyer - Federalist Society Podcast - Sept. 2010.

Developments in Ethics 2010 - ABA Teleconference - Jan. 2011

A Transforming Legal Profession: The Challenges for Bar Associations - National
     Conference of Bar Presidents (Atlanta) - Feb. 2011

A Transforming Profession: The Challenges for Lawyers Starting Out - ABA Law
     Student Division (Washington) - Feb. 2011

A Transforming Profession: A Look Back Forty Years and the Challenges Ahead -
     Alabama Bar Annual Meeting (Point Clear) - July 2011
     Florida Bar Board of Governors (Palm Beach) - July 2011

On the Declining Importance of Legal Institutions - Conference at Michigan State Law
     School (East Lansing) - Sept. 2011

Calling Law a Profession Only Confuses Thinking About Challenges Lawyers Face -
     Conference at University of St. Thomas Law School (Minneapolis) - Sept. 2011

The Changing Face of Legal Education: Its Impact on What It Means to be a Lawyer - Miller-Becker Lecture at University of Akron Law School (Akron) - Oct. 2011

Law School Accreditation - Federalist Society (Washington) - Nov. 2011

Aggregate Litigation: Don't Let Your End Game Blow-Up - ALM Litigation Summit (Washington) - Nov. 2011

So Someone Objects to Your New Client - ABA Administrative Law & Regulatory Practice Section Fall Conference (Washington) - Nov. 2011

Ethical Dilemmas Facing Lawyers Practicing National Security Law - ABA Standing Committee on Law and National Security (Washington) - Dec. 2011

Needed Law Schools' Response to Changes in the Legal Profession - AALS Annual Meeting (Washington) - Jan. 2012

The Rise of Institutional Law Practice - Lichtenstein Lecture at Hofstra Law School (Hempstead, NY) - Feb. 2012

Blazing New Pathways Through the Legal World - Washington Area Legal Recruitment Administrators Association (Washington) - Mar. 2012

Ethics in Privacy and Social Media - ABA Antitrust Section (Washington) - Mar. 2012

Ethical Issues in Alternative Litigation Funding – Humphries Center at GW Law (Washington) – May 2012

The Vanishing American Lawyer: The Road Ahead - Utah Bar (Sun Valley, ID) - July 2012

The Vanishing American Lawyer: The Changing Legal Profession -- Federal Bar Ass'n (Memphis, TN) -- Oct. 2012

The Professional World Facing New American Lawyers – 2012 Georgia Convocation on Professionalism (Atlanta) -- Nov. 2012

Testimony -- ABA Task Force on the Future of Legal Education (Dallas) - Feb. 2013

Public Ownership of Stock in Law Firms -- Federalist Society Teleforum - Apr. 2013

The ABA's 2012 Changes in Ethics Rules -- ABA Antitrust Section Spring Meeting (Washington) -- Apr. 2013

Proposals for Training Required for Bar Admission – AALS Annual Meeting (New York) – Jan. 2014

Law Professors of the Future: A New Balance of Teaching, Scholarship and Service? – AALS Annual Meeting (New York) – Jan. 2014

Are Lawyers Vanishing? – Transport. Lawyers' Ass'n (St. Petersburg, FL) – May 2014

Higher Education: Run for the Benefit of Students, Faculty or Administrators? -- Federalist Society (Washington) – Nov. 2014

The Challenge of Writing Rules to Regulate Lawyer Conduct – Creighton Law School Symposium on the Kutak Commission – March 2016

Inverted Thinking About Law as a Profession or Business – International Legal Ethics Conference VII – Fordham Law School – July 2016

Who Wants To Be An Ethics Millionaire? – ABA Antitrust Law Section Spring Meeting (Washington) – March 2017

Ethical Issues for Antitrust Lawyers – ABA Antitrust Law Section Spring Meeting (Washington) – April 2018

Ronald D. Rotunda Memorial Lecture – Federalist Society Podcast – March 2019

Duty to Whom? Ethics Dilemmas Confronted by Government Lawyers – American Law Institute Annual Meeting (Washington) – May 2019

Covid-19 and Coming Changes in Lawyer Regulation – Georgetown Roundtable for Law Firm Counsel (virtual) – June 2020

Lawyer Discipline and Executive Branch Lawyers – Cardozo Law School (virtual) – Oct. 2020

**Major Civic and Professional Activities:**

**A.  In the Field of Professional Responsibility**

Associate Reporter, American Law Institute Restatement of the Law (Third), The Law Governing Lawyers, 1986-2000

Associate Reporter, American Bar Association Ethics 2000 Commission, 1998-99

Reporter, American Bar Association Commission on Professionalism, 1985-86
Adviser, American Law Institute Principles of the Law, Government Ethics, since 2009.

Member, Advisory Board, ABA/BNA Lawyers' Manual on Professional Conduct, since
    1984; Chair 1986-87 & 1992-93

Member, Advisory Council, Project on a Digital Archive of the Birth of the Dot Com
    Era: The Brobeck Papers, Library of Congress and Univ. of Maryland, 2005-2009

Chair, Federalist Society Practice Group on Professional Responsibility and Legal
    Education 2005-2007; Member since 2001

Member, Drafting Committee, Multistate Professional Responsibility Examination,
    National Conference of Bar Examiners, 1986-89

Member, Committee on Professional Ethics, Illinois State Bar Association, 1974-1980;
    Vice Chair 1979-80

**B.    In the Fields of Economic Regulation and Administrative Law**

Vice Chair, ABA Section of Administrative Law & Regulatory Practice, 2001-2002;
    Council Member, 1983-86

Consultant, Administrative Conference of the U.S., 1975-1979 & 1985-1989

Chair, Section on Law and Economics, Ass'n of American Law Schools, 1979-1980

**C.    In the Field of Legal Education**

President, Association of American Law Schools, 1990

Member, AALS Executive Committee, 1986-1991

Chair, AALS Special Committee on ABA Accreditation Standards, 2010

Chair, AALS Nominating Committee for President-Elect and Members of the Executive
    Committee, 2010 (Member 2008 & 2011)

AALS Delegate to the ABA House of Delegates, 2011-2013

Chair, AALS Long Range Planning Committee, 1988-1989

Member, Planning Committee for Workshop on Tomorrow's Law Schools: Economics, Governance and Justice, 2013

Member, AALS Special Committee on Faculty Recruitment Practices, 2005-2007

Member, AALS Committee on the Ethical and Professional Responsibilities of Law Professors, 1988-1989

**Special Honors Received:**

Illinois State Bar Foundation, Honorary Fellow (1988) (for contributions to study of lawyer professionalism)

American Bar Foundation, Keck Foundation Award (2000) (for distinguished scholarship in legal ethics and professional responsibility)

New York State Bar Association, Sanford D. Levy Professional Ethics Award (2008) (for lifetime contributions to legal ethics scholarship)

**Legal Consulting:**

Testified in twenty-seven contested trials or hearings involving issues such as lawyer discipline, disqualification, right to fees and malpractice.

Gave depositions in thirty cases resolved prior to trial.

Submitted declarations or affidavits in forty-three other cases, typically in connection with motions for summary judgment, disciplinary investigations or motions to disqualify.

**Organization Memberships:**

American Bar Association
American Law Institute (Life Member)
American Bar Foundation (Life Fellow)
Illinois State Bar Association
Illinois Bar Foundation (Honorary Fellow)
ABA Center for Professional Responsibility
Association of Professional Responsibility Lawyers
The Federalist Society

**Current as of June 2021**

# Exhibit B

LINA M. KHAN

435 West 116th Street, New York, NY 10027
lkhan@law.columbia.edu

## EMPLOYMENT

**Columbia Law School**                                                          Fall 2020-present
*Associate Professor of Law*

**U.S. House Committee on the Judiciary—Subcommittee on Antitrust,**      Mar. 2019-Oct. 2020
**Commercial, and Administrative Law**
*Majority Counsel*

**Columbia Law School**                                                                  2018-2019
*Academic Fellow*

**Federal Trade Commission**                                                                   2018
*Legal Fellow in the Office of Commissioner Rohit Chopra*

**Open Markets Institute**, Washington, DC                                              2017-2018
*Legal Director*

**Consumer Financial Protection Bureau**                                            Summer 2016
*Legal Intern—Enforcement Division*

**Cohen Milstein Sellers & Toll PLLC,**                                             Summer 2016
*Summer Associate*

**Gupta Wessler PLLC**                                                             Summer 2015
*Summer Associate*

**New America, Open Markets Program**                                                 2011- 2014
*Policy Analyst & Reporter*

## EDUCATION

**Yale Law School**, J.D., 2017
*Honors*:   Israel H. Peres Prize for best student Note or Comment appearing in the *Yale Law Journal*
            Michael Egger Prize for best student *Yale Law Journal* Note on current social problems
            Reinhardt Fellow 2016-2017, scholarship for demonstrated commitment to public interest law
*Activities*: Mortgage Foreclosure Litigation Clinic, Student Co-Director
            Information Society Project, Student Fellow
            *Yale Law Journal*, Editor, Vol. 126

**Williams College**, B.A. *magna cum laude* with highest honors in political theory, 2010
*Honors*:   Phi Beta Kappa
            Arthur B. Graves Essay Prize for best essay in Political Science
*Thesis*: "Rethinking (In)action: World Alienation in the Thought of Hannah Arendt"
*Activities*: Editor-in-Chief of *The Williams Record*, the independent student newspaper

Lina M. Khan

## ACADEMIC PUBLICATIONS

*Digital Platforms, Democracy, and the Antimonopoly Tradition*, in DEMOCRACY & THE AMERICAN ANTIMONOPOLY TRADITION (eds. Daniel A. Crane & William J. Novak) (forthcoming 2022)

*The End of Antitrust History Revisited*, 133 HARVARD LAW REVIEW 1655 (2020)

*The Case for "Unfair Methods of Competition" Rulemaking*, 87 UNIVERSITY OF CHICAGO LAW REVIEW 357 (2020) (with Rohit Chopra)
- Received 2020 Antitrust Writing Award for "Best General Antitrust Academic Article"

*A Skeptical View of Information Fiduciaries*, 133 HARVARD LAW REVIEW 497 (2019) (with David E. Pozen)

*The Separation of Platforms and Commerce*, 119 COLUMBIA LAW REVIEW 973 (2019)
- Received Jerry S. Cohen Memorial Fund Writing Award for "Best Antitrust Article of 2019 on Remedies"

*The Ideological Roots of America's Market Power Problem*, 127 YALE LAW JOURNAL FORUM 960 (2018)

*Sources of Tech Platform Power*, 2 GEORGETOWN LAW & TECHNOLOGY REVIEW 325 (2018)

*The New Brandeis Movement: America's Antimonopoly Debate*, 9 JOURNAL OF EUROPEAN COMPETITION LAW & POLICY 3 (Mar. 2018)

*Amazon's Antitrust Paradox*, 126 YALE LAW JOURNAL 710 (2017)
- Received 2018 Antitrust Writing Award for "Best Academic Unilateral Conduct Article"
- Cited in *Erie Insurance Co. v. Amazon.com*, 925 F.3d 135, 144 (4th Cir. 2019) (Motz, J., concurring)
- Published as chapter in DIGITAL DOMINANCE (Oxford University Press, 2018)
- Featured in: Steven Pearlstein, *Is Amazon Getting Too Big?*, WASH. POST (July 30, 2017); Robinson Meyer, *How to Fight Amazon (Before You Turn 29)*, ATLANTIC MAG. (July 2018); David Streitfeld, *Amazon's Antitrust Antagonist Has a Breakthrough Idea*, N.Y. TIMES (Sept. 9, 2018); Rana Foroohar, *'This isn't just about antitrust. It's about values,'* FINANCIAL TIMES (Mar. 19, 2019).

*Market Power and Inequality*, 11 HARVARD LAW & POLICY REVIEW 234 (2017) (with Sandeep Vaheesan)

*Arbitration as Wealth Transfer*, 35 YALE LAW & POLICY REVIEW 101 (2017) (with Deepak Gupta)

*Market Structure and Political Law: A Taxonomy of Power*, 9 DUKE JOURNAL OF CONSTITUTIONAL LAW & PUBLIC POLICY 37 (2014) (with Zephyr Teachout)

## HONORS

POLITICO 50 (2018); FOREIGN POLICY "Global Thinkers" (2018); THE PROSPECT "Top 50 Thinkers" (2019); WIRED25 (2019); TIME MAGAZINE "Next Generation Leader" (2019); NATIONAL JOURNAL 50 (2019); WASHINGTONIAN 40 Under 40 (2020); TIME MAGAZINE 100 Next (2021)

## BAR ADMISSION

New York

# Exhibit C

## Perma.cc record

Captured July 1, 2021 4:53 pm    See the Capture View (/9GB5-F78G)    What is Perma.cc? (/about)

(http://www.linamkhan.com/bio-1)

Show record details                    View the live page



# LINA KHAN

ABOUT    BIO    WRITINGS    PRESENTATIONS    PHOTOS    CONTACT

LEXEY SWALL / NYT

Lina Khan is an associate professor of law at Columbia Law School,
where she teaches and writes on antitrust law, infrastructure industries
law, and the antimonopoly tradition. Her recent scholarship has
focused on how the current antitrust regime is unequipped to capture
the power of dominant digital platforms. Prior to joining Columbia,
Khan served as counsel to the U.S. House Judiciary Committee's
Subcommittee on Antitrust, Commercial, and Administrative Law,
where she led the congressional investigation into digital markets and
the publication of its final report.

Khan's scholarship has been published by the *Harvard Law Review*,
*University of Chicago Law Review*, *Columbia Law Review*, and *Yale
Law Journal*. The *New York Times* has described her work as having

"reframed decades of monopoly law," and _Politico_ has called her "a leader of a new school of antitrust thought." Her article "Amazon's Antitrust Paradox" was awarded the 2018 Antitrust Writing Award for "Best Academic Unilateral Conduct Article," the Yale Law School's Israel H. Peres Prize, and the Yale Law Journal's Michael Egger Prize; her article "The Separation of Platforms and Commerce"  won the 2019 Jerry S. Cohen Memorial Fund's Best Antitrust Article on Remedies; and her co-authored article "The Case for 'Unfair Methods of Competition' Rulemaking" received the 2020 Antitrust Writing Award for "Best General Antitrust Academic Article." She has presented her work before the Department of Justice's Antitrust Division, the Federal Trade Commission, the House Judiciary Committee, and the European Commission.

Khan's work has been profiled in the _Atlantic_, _Boston Globe_, _Financial Times_, _New York Times_, _Washington Monthly_, _Washington Post_, _Yahoo Finance_, _Le Figaro_, _El Pais_, _and_ _Manager Magazin_, as well as being widely discussed in both U.S. and international press, including by _Bloomberg_, the _Economist_, and the _Wall Street Journal_. She has appeared on CNBC, C-SPAN, Fox Business News, and BBC and been featured on Planet Money, 1A, Current Affairs, Vergecast, and The Bernie Sanders Show. Khan was recently named to the Politico 50, Foreign Policy Magazine's "Global Thinkers," The Prospect's "Top 50 Thinkers," the WIRED25, the National Journal 50, and TIME Magazine's "Next Generation Leaders."

Khan previously served as a legal advisor in the office of Commissioner Rohit Chopra at the Federal Trade Commission and as legal director at the Open Markets Institute. During law school she litigated on behalf of homeowners through Yale's Mortgage Foreclosure Litigation Clinic and spent summers at Gupta Wessler, Cohen Milstein, and the Consumer Financial Protection Bureau. Khan is a graduate of Williams College and Yale Law School, where was awarded the Reinhardt Fellowship for public interest law.

Powered by Squarespace

# Exhibit D

By using Twitter'
analytics, person



Follow

×

Home    Ab                                    ccount? Log in ▾



**Lina Khan** ✔
@linamkhan

1. Solid complaints from FTC & 48 AGs suing Facebook for violating antitrust laws -- and requesting divestitures/breakups, among other forms of relief. Hopeful that it marks yet another step forward in the growing efforts to rehabilitate antitrust laws & recover antimonopoly.

4:20 PM - 9 Dec 2020

**Lina Khan**
@linamkhan

Antitrust and ant
Professor of Law
Formerly at @Ho
Subcommittee a

 law.columbia

 Joined Febru

**298** Retweets **1,111** L kes 

💬 26    ↺ 298    ♡ 1.1K

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020

2. States' complaint is especially impressive. Tight narrative, compelling facts, told in a way where the full force of the story really lands. It's a persuasive document, fully showcasing how Instagram & WhatsApp acquisitions were part of broader monopoly maintenance strategy.

💬 1    ↺ 23    ♡ 169

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020

3. States' complaint also reveals a sophisticated understanding of harms. It notes FB entered market by competing on privacy, but degraded privacy once it had eliminated rivals & secured a safe monopoly position -- an echo of @DinaSrinivasan's excellent work.

💬 1    ↺ 46    ♡ 226

 **Lina Khan** ✔ @linamkhan · 9 Dec 2020

4. States also note that when seeking approval for WhatsApp acquisition, FB told enforcers (including FTC) that it wouldn't combine data sets or use WhatsApp data for ads. A few years later it did so anyway. European Commission fined FB $122M for the deception. FTC did nothing.

176. While Facebook did not evince any genuine desire to expand WhatsApp's feature set and user base, it did take active steps to utilize WhatsApp data in efforts to promote its core platform, despite disavowing any plans at the time of the acquisition. In the course of negotiating and securing regulatory approval for the acquisition of WhatsApp, Facebook had represented to the U.S. Federal Trade Commission, European regulators, the WhatsApp founders, and WhatsApp users that Facebook would not combine user data across the services, that it would not change the way WhatsApp used customer data, and that WhatsApp data would not be useful to Facebook's ad-targeting business.

177. But once free from the competitive threat WhatsApp presented, in August 2016, Facebook changed WhatsApp's terms of service and privacy policy and eroded the pre-acquisition promises it had made. It combined user data across the services by linking WhatsApp user phone numbers with accounts on Facebook Blue, enabling WhatsApp user data to be used across all Facebook products. Thus, Facebook Blue users who had declined to give their phone numbers to Facebook suddenly found their phone numbers connected to their Facebook Blue accounts anyway. Facebook was able to use that additional data in its

💬 1    ↺ 59    ♡ 273



By using Twitter'<br>
analytics, person



ng for

✕

Home   Ab     ccount? Log in ▾



**Lina Khan**

@linamkhan

Antitrust and ant<br>
Professor of Law<br>
Formerly at @H<br>
Subcommittee a

🔗 law.columbia

📅 Joined Febru



**Lina Khan** ✔ @linamkhan · 9 Dec 2020      ∨

(5. At the time of the deal @EPICprivacy & @DigitalDemoc raised alarms with FTC, prompting FTC to tell FB that reneging on WhatsApp's privacy commitments could violate law and/or a preexisting FTC order. This whole episode is absent from FTC complaint

epic.org/2016/08/facebo… )

> WhatsApp's privacy policy clearly states, among other things, that users' information will not be used for advertising purposes or sold to a third party for commercial or marketing use without the users' consent. Facebook's purchase of WhatsApp would not nullify these promises and WhatsApp and Facebook would continue to be bound by them. Further, Facebook has recently promised consumers that it would not change the way WhatsApp uses customer information. Therefore, any use of WhatsApp's subscriber information that violates these privacy promises, by either WhatsApp or Facebook, could constitute a deceptive or unfair practice under the FTC Act. Moreover, such an action could violate the FTC's order against Facebook. Among other things, the Order enjoins Facebook and its subsidiaries from misrepresenting the extent to which they maintain the privacy or security of consumers' personal information and requires Facebook and its subsidiaries to obtain consumers' affirmative express consent before sharing their nonpublic information in a manner that materially exceeds any privacy setting.

💬 2     ⟲ 18     ♡ 127

**Lina Khan** ✔ @linamkhan · 9 Dec 2020      ∨

6. Also very glad to see states connect FB's monopolization to all around quality degradation, including increase in ad load, proliferation of fake accounts, and inaccurate performance & other metrics for advertisers (see, e.g., wsj.com/articles/faceb…).

💬 3     ⟲ 30     ♡ 180

**Lina Khan** ✔ @linamkhan · 9 Dec 2020      ∨

7. States also describe how acquiring Onavo (& the surveillance of rivals it enabled) was key to FB's strategy for identifying competitive threats at the earliest stages. They note FB foreclosed other firms from having access to Onavo data.

> 142.    By July 2013, it became apparent to Zuckerberg and his team that ==Onavo could make an even greater contribution to their overriding goal of maintaining Facebook's monopoly if Onavo were owned and controlled—not merely licensed—by Facebook.== Such an acquisition would enable Facebook to gain exclusive control over what could be a key component to an early warning system for detecting competitive threats, allowing it to identify and eliminate or debilitate those threats in their nascency. Acquiring Onavo also allowed Facebook to terminate the access of rivals and potential rivals to Onavo's valuable tools.

💬 1     ⟲ 17     ♡ 118

**Lina Khan** ✔ @linamkhan · 9 Dec 2020      ∨

8. States discuss several other competitive threats FB acquired or cut off from APIs. Complaint marshals full set of facts in a very effective way. Net effect is clear picture of how FB's conduct was systemic, exactly what you want for Sec 2 (though states also sued under Sec 7).

💬 2     ⟲ 10     ♡ 106

**Lina Khan** ✔ @linamkhan · 9 Dec 2020      ∨

9. Interestingly FTC sued only under Sec 2, not Sec 7. Also notable that many of the docs cited to show Instagram & WhatsApp purchases were illegal were available at the time FTC reviewed the deals (though FTC investigated only Instagram ($1bn) in depth, not WhatsApp ($19bn)).

💬 1     ⟲ 8     ♡ 107

✕

7/11/2021    Lina Khan on Twitter: "1. Solid complaints from FTC & 48 AGs suing Facebook for violating antitrust laws — and requesting divestitures/ br...

Case 5:22-cv-04325-EJD    Document 93-2    Filed 09/23/22    Page 84 of 228

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

10. Many of the Instagram docs cited build on the material the House Antitrust Subcommittee made public through its investigation. In July @JerryNadler confronted Zuckerberg with some of this evidence c-span.org/video/?c492945...

💬 1    ♻ 8    ♡ 91

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

11. Finally, both FTC's and states' request for relief includes requirements that would implicate future acquisitions. FTC requests "a prior notice and prior approval obligation for future mergers and acquisitions."

💬 2    ♻ 7    ♡ 92

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

12. States request FB be prohibited from deals valued at or > $10million without first informing the states, & that FB submit deal-related disclosures it'd make to FTC/DOJ. This is potentially very significant. 48 AGs would have chance to review these deals, not just FTC/DOJ.

💬 1    ♻ 9    ♡ 108

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

13. Notably, during the course of the investigation FB acquired Giphy, which FB could use to deprive rivals of access and/or to collect significant data. FB didn't report the deal to enforcers, presumably bc it was structured to avoid reporting thresholds.

💬 2    ♻ 15    ♡ 111

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

14. And just this week Facebook purchased Kustomer, a business software company, reportedly for ~$1 billion. So two days before being sued by the federal government & 48 AGs for a series of illegal acquisitions, Facebook made another acquisition.

💬 3    ♻ 17    ♡ 111

**Lina Khan** ✔ @linamkhan · 9 Dec 2020 ⌄

15. FB is now following this playbook in the virtual reality space. Quoting @PramilaJayapal & House report, Bloomberg notes FB is using same "copy-acquire-kill" strategy it used to monopolize social networking. Key task for enforcers is to prevent a repeat

💬 5    ♻ 19    ♡ 82

## Loading seems to be taking a while.

Twitter may be over capacity or experiencing a momentary hiccup. Try again or visit Twitter Status for more information.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>       Plaintiff,<br><br>       v.<br><br>FACEBOOK, INC.,<br><br>       Defendant. | Case No. 1:20-cv-03590-JEB |

**MEMORANDUM IN SUPPORT OF
FACEBOOK, INC.'S MOTION TO DISMISS
THE FTC'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .......................................................................................................1

LEGAL STANDARD ..................................................................................................6

ARGUMENT ...............................................................................................................6

I.     THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY
ESTABLISHING MONOPOLY POWER ........................................................6

     A.    The FTC Fails To Cure the Fatal Deficiency the Court Identified
Because the Agency Alleges No Facts Plausibly Supporting Any
PSNS Market Share ...............................................................................6

     B.    The FTC's Alleged Facts Undermine Its Claim of Barriers to Entry ...................13

     C.    The FTC Still Has No Facts To Support Its "Rare" Direct-
Evidence Theory ...................................................................................16

II.    THE FTC HAS NOT PLAUSIBLY ALLEGED LEGALLY
COGNIZABLE EXCLUSIONARY CONDUCT ..........................................20

     A.    The FTC Fails To Allege a Plausible Section 2 Acquisition
Challenge ..............................................................................................20

     B.    The FTC's Attempt To Revive Dismissed and Defective Platform
Allegations Fails as a Matter of Law ...................................................33

III.   THE FTC'S VOTE PURPORTING TO AUTHORIZE THE AC WAS
INVALID; THE COURT SHOULD ACCORDINGLY DISMISS THE
AC ..................................................................................................................38

     A.    Chair Khan's Prejudgment of Facebook's Liability Required Her
Recusal ..................................................................................................40

     B.    In the Absence of a Valid Commission Vote, the AC Must Be
Dismissed .............................................................................................44

     C.    In the Alternative, the Court Should Stay the Case and Remand to
the FTC To Resolve the Recusal Issue Now ........................................45

CONCLUSION...........................................................................................................45

# TABLE OF AUTHORITIES[*]

Page

CASES

\* *Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011)........................................................39, 45

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ................................30

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235
    (3d Cir. 1987) ..................................................................................................................31

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991
    (9th Cir. 2010) ..................................................................................................................4

\* *Am. Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966) ...........................................................41

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021) ..............................................................36

*Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962) ..........................................................45

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................6, 12, 22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)....................................36

*Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577
    (D.C. Cir. 1984) ...............................................................................................................30

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)..........................................................................................................11

*BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116 (3d Cir. 2021) ....................................................17

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................1, 3, 6, 10, 11, 13,
                                       15, 22, 26, 27, 28, 29

\* *Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26 (D.D.C. 2017), *aff'd*,
    720 F. App'x 1 (D.C. Cir. 2018)...............................................................................33, 34

*Bigio v. Coca-Cola Co.*, 2010 WL 3377503 (S.D.N.Y. Aug. 23, 2010), *aff'd*,
    675 F.3d 163 (2d Cir. 2012)............................................................................................34

*Blackbook Cap., Inc. v. Fin. Indus. Reg. Auth., Inc.*, 2021 WL 1827268
    (D.N.J. May 5, 2021) .......................................................................................................34

---

[*] Authorities principally relied upon are marked with an asterisk.

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406
(7th Cir. 1995) ................................................................................................... 20

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612
(S.D.N.Y. 2013) .................................................................................................. 10

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606
(W.D. La. 2016) ................................................................................................... 25

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................ 21

\* *Cinderella Career Coll. & Finishing Schs., Inc. v. FTC*, 425 F.2d 583
(D.C. Cir. 1970) ............................................................................................ 40, 44

*Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) ............ 39

*Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562 (S.D.N.Y. 2021) ....................... 40

*CREW v. Pompeo*, 2020 WL 5748105 (D.D.C. Sept. 25, 2020) ................................... 6

*Cummings v. City of New York*, 2021 WL 1163654 (S.D.N.Y. Mar. 26, 2021),
*appeal pending*, No. 21-1380 (2d Cir.) .............................................................. 34

\* *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) .......... 23, 27

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002) .............................................................................. 22, 29

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
*aff'd*, 724 F. App'x 556 (9th Cir. 2018) ......................................................... 21, 26

*Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925
(N.D. Cal. Sept. 10, 2021), *appeal pending*, No. 21-16506 (9th Cir.) .................. 17

*Epicenter Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910 (9th Cir. 2003) ............. 14

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. July 20,
2010) ................................................................................................................... 38

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) .............................................. 39

*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................ 28

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) .......................... 27

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 2015 WL 4036319
(D. Colo. July 1, 2015) ........................................................................................ 34

*FTC v. Guignon*, 390 F.2d 323 (8th Cir. 1968) ........................................................ 44

iii

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................................................23

\* *FTC v. Libbey, Inc.*:

    211 F. Supp. 2d 34 (D.D.C. 2002) ...................................................................44

    No. 1:02-cv-00060-RBW, ECF No. 76 (D.D.C. Apr. 3, 2002) ...........................39

\* *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)...........................32, 36, 37

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) .................................24, 25

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir. 2016) ...............................44

*ICC v. S. Ry. Co.*, 543 F.2d 534 (5th Cir. 1976) ........................................................44

*Indep. Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155 (C.D. Cal. 2002), *aff'd in part, rev'd in part, and remanded sub nom. Indep. Ink, Inc. v. Ill. Tool Works, Inc.*, 396 F.3d 1342 (Fed. Cir. 2005), *vacated and remanded*, 547 U.S. 28 (2006)...........................................................................11-12

*Jones v. Shea*, 532 A.2d 571 (Vt. 1987) .....................................................................43

\* *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) .............................................9

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996)...................................................33

*Lowry v. Soc. Sec. Admin.*, 2000 WL 730412 (D. Or. June 7, 2000) ...........................39

*Marchese v. Cablevision Sys. Corp.*, 2011 WL 3022529 (D.N.J. July 21, 2011) ..........................9

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002)...............................8

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422 (9th Cir. 2020)..........................8

\* *New York v. Facebook*, --- F. Supp. 3d ---, 2021 WL 2643724 (D.D.C. June 28, 2021), *appeal pending*, No. 21-7078 (D.C. Cir.).......................................35, 36

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)....................................................16

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ..........................16-17

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020).................38

\* *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ........................8, 10

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .................11

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012) ...................38

*Set-Top Cable Television Box Antitrust Litig., In re*, 2011 WL 1432036
    (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016)....................................................................................8

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016) .......................9

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479 (6th Cir. 2021)............35

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ..................................................32

*State v. Gonzales*, 119 P.3d 151 (N.M. 2005)...............................................................43

*State v. Hohman*, 420 A.2d 852 (Vt. 1980) ..................................................................43

*State v. King*, 956 So. 2d 562 (La. 2007)......................................................................43

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)........................23

*Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 763 F. Supp. 2d 1341
    (S.D. Fla. 2011), *aff'd*, 711 F.3d 1264 (11th Cir. 2013)......................................31

*Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) .......9

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ....................................................................21

\* *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) .............................19

*Top Rank, Inc. v. Haymon*, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)......................9

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ............................................................6

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .....................................27

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911)...............................................25

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C.), *aff'd*, 855 F.3d 345
    (D.C. Cir. 2017) ...................................................................................................23

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*,
    916 F.3d 1029 (D.C. Cir. 2019) ..........................................................................16

\* *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)......................15, 21

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........................25

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)...................................................25

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................23

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ............................................27

*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) ..............................29

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .........................................3, 16, 17

\* *United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ..................................................14, 31

*Vasser v. McDonald*, 228 F. Supp. 3d 1 (D.D.C. 2016) ..............................................................40

\* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ................................................................................................................................20, 22

*Wilcox v. Georgetown Univ.*, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ......................................39

\* *Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984) ....................................................38, 41, 43

CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const. art. III ...........................................................................................................................42

Clayton Act, 15 U.S.C. § 12 *et seq.* .....................................................................................3-4, 21, 29

§ 7, 15 U.S.C. § 18...........................................................................................3, 4, 21, 23, 27, 29

§ 7A(i)(1), 15 U.S.C. § 18a(i)(1) .........................................................................................21

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ...................................................32, 36, 42

§ 13(b), 15 U.S.C. § 53(b) ...............................................................................32, 36, 37, 39, 44

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 ...........................................................................................................................22

Sherman Act, 15 U.S.C. § 1 *et seq.* ..............................................................................................3, 20

§ 2, 15 U.S.C. § 2.............................................................................3, 4, 5, 6, 9, 13, 20, 21, 25, 26, 30, 31, 32, 35, 37, 40

5 C.F.R. § 2635.501(a).....................................................................................................................43

16 C.F.R. § 1.61 ...............................................................................................................................44

Fed. R. Evid. 201 .............................................................................................................................39

## LEGISLATIVE MATERIALS

Majority Staff of Subcomm. on Antitrust, Com. & Admin. Law of the H. Comm. on
the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets:
Majority Staff Report and Recommendations* (Oct. 2020),
https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.......... 40-41

## ADMINISTRATIVE MATERIALS

Fed. Trade Comm'n:

Compl., *In re Snapchat, Inc.*, File No. 132 3078 (FTC May 8, 2014)..............................18

Dissenting Statement of Commissioner Christine S. Wilson, *Facebook,
Inc.*, Matter No. 1910134 (Aug. 19, 2021), https://www.ftc.gov/system/
files/documents/public_statements/1594737/facebook_-_dissenting_
statement_-_first_amended_complaint_-_final.pdf................................................22, 39, 42

Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey M.
Klineberg re:  Recusal Petition (Aug. 19, 2021)..........................................................39, 42

Facebook, Inc. Pet. for Recusal, *In re Petition for Recusal of Chair Lina
M. Khan from Involvement in the Pending Antitrust Case Against
Facebook, Inc.* (July 14, 2021) ..............................................................38, 39, 40, 42, 45

Mem. in Support of Plaintiff FTC's Mot. for Temp. Restraining Order and
Prelim. Inj., *FTC v. Steris Corp.*, No. 15-cv-01080-DAP, ECF No. 21
(N.D. Ohio June 4, 2015)..............................................................................................23, 24

Press Release, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury
Scheme to Crush Competition After String of Failed Attempts to Innovate,
FTC (Aug. 19, 2021), https://www.ftc.gov/news-events/press-
releases/2021/08/ftc-alleges-facebook-resorted-illegal-buy-or-bury-
scheme-crush............................................................................................................42

Reorganization Plan No. 8 of 1950, 15 Fed. Reg. 3175 (May 25, 1950) .........................43

Statement of Commissioner Christine S. Wilson Regarding the
Announcement of Pre-Consummation Warning Letters (Aug. 9, 2021),
https://www.ftc. gov/system/files/documents/public_statements/
1593969/pre-consummation_warning_letters_statement_v11.pdf...................................22

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ............22, 23

OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

  Vol. IV (2d ed. 1998)........................................................................................29

  Vol. IVA (4th ed. 2020)....................................................................................32

  Vol. V (4th ed. 2020)........................................................................................27

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3
  (1940)................................................................................................................43

Lina Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active)
  [https://perma.cc/9GB5-F78G (visited Oct. 4, 2021)]......................................40

Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973
  (2019)................................................................................................................41

Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*,
  133 Harv. L. Rev. 497 (2019)...........................................................................41

N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 683 (June 7, 1996),
  https://nysba.org/app/uploads/1996/06/Opn683.pdf.........................................43

*New York v. Facebook, Inc.*, No. 1:20-cv-3589-JEB (D.D.C.):

  Mem. in Support of Facebook, Inc.'s Mot. To Dismiss States' *Parens
  Patriae* Compl., ECF No. 114-1 (Mar. 10, 2021).............................................37

  Reply Br. in Support of Facebook, Inc.'s Mot. To Dismiss States' *Parens
  Patriae* Compl., ECF No. 123 (Apr. 21, 2021).................................................37

  States' Mem. in Opp. to Facebook's Mot. To Dismiss, ECF No. 121
  (Apr. 7, 2021)...................................................................................................37

Irving Scher, *Antitrust Adviser* (4th ed. 2001)...........................................................29

# INTRODUCTION

The Federal Trade Commission ("FTC") alleged no plausible factual basis for branding Facebook an unlawful monopolist. *See FTC v. Facebook, Inc.*, --- F. Supp. 3d ---, No. 20-3590, ECF No. 73, at 27 (D.D.C. June 28, 2021) ("Op."). This Court gave the agency a second chance to make a valid claim. But the same deficiency that was fatal to the FTC's initial complaint remains: the Amended Complaint, ECF No. 82 ("AC"), still pleads no facts plausibly establishing that Facebook has, and at all relevant times had, monopoly power – the power to raise price or restrict output – in what the Court characterized as the "idiosyncratically drawn" "Personal Social Networking Services" ("PSNS") market. Op. 27. The FTC's initial complaint asserted the unsupported conclusion that Facebook had "in excess of 60%" of that alleged market. Compl. ¶ 64, ECF No. 51. The agency provided no facts to support either the numerator (Facebook's portion of the PSNS market) or the denominator (the total alleged PSNS market), and it offered no plausible means of calculating any market share. The AC repeats previously rejected arguments, but adds no factual allegations supporting the claim of a 60%-plus market share; it merely ratchets up its groundless projection to 70% or even 80%, replacing unsupported assertion with "arguendo" assumption. The agency has to take this tack because no reliable data exists for its contorted PSNS market, which is a litigation-driven fiction at odds with the commercial reality of intense competition with surging rivals like TikTok and scores of other attractive options for consumers. The AC rests on guesswork rather than facts and fails the *Twombly* test for multiple reasons.

***The FTC Still Has No Valid Factual Basis for Alleging Monopoly Power.*** The FTC has again failed to allege a plausible factual basis for the necessary claim that Facebook has and had a dominant share of the alleged PSNS market. The Court dismissed for this reason, but granted leave to amend so that the agency could try to supply the necessary factual allegations.

It has not come close to doing so. To support its new, supercharged market-share numbers, the FTC relies on commercial data regarding total usage of only three cherry-picked apps: Facebook, Instagram, and Snapchat. The vendor of this data disclaims any responsibility for its accuracy or completeness. But the FTC uses it nonetheless to calculate PSNS market share – *even though the data does not even purport to measure PSNS usage*. Rather, it measures overall usage – including non-PSNS usage. Admitting this mismatch, the agency asks the Court to *assume* "arguendo" that data from a different market can establish share in the alleged market, without any facts to support that assumption. This is legally insufficient; as the Court has already warned, aggregate (*i.e.*, non-PSNS) metrics cannot show PSNS market share. *See* Op. 29-30. Courts routinely dismiss antitrust claims that rely on data that does not correspond to the market actually alleged. Our research has disclosed no decision in which a court has permitted a case to proceed based on such admittedly inapposite data paired with conceded guesswork. The absence of any data, from any source, for a "PSNS" market makes clear that the proposed market reflects the FTC's litigation imperatives – not commercial realities.

The FTC's effort to allege market power through dominant share fails for an additional reason: the agency still has not alleged any facts plausibly establishing that Facebook's market position was protected by "barriers to entry" that prevented competition. *See* Op. 18 ("market power is meaningful only if it is durable") (brackets omitted). Instead, the FTC's factual allegations taken as true establish the opposite: entry not only was possible, but in fact occurred, including by startups like Instagram and Snapchat. And the FTC alleges nothing that would prevent services with established networks – the agency names several, including YouTube (Google), iMessage (Apple), Twitter, and TikTok (ByteDance) – from becoming PSNS rivals. That is exactly what the FTC claims WhatsApp would have done – indeed, that is the sole basis for its challenge to Facebook's acquisition of that company.

The FTC hedges its bets by returning to claims the Court already rejected, without invitation to replead.  It recycles the claim that direct evidence proves Facebook's monopoly power.  But the FTC again fails to allege facts sufficient to support a "rare" case of such direct evidence – that is, facts plausibly establishing that Facebook actually limited output to "'profitably raise prices above the competitive level.'"  *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam)).  The agency effectively acknowledged before that it could not make that case.  *See* FTC Opp'n 8, ECF No. 59 (acknowledging that such proof is "only rarely available").  And for good reason:  Facebook has never charged users any price and has never restricted output – not before it allegedly became a monopolist and never since.  The FTC also reasserts that Facebook's quality is somehow lower and that Facebook's total revenues from advertising somehow indicate monopoly power in a market for free PSNS products.  These assertions differ little from those the Court already found inadequate and do not come close to establishing a plausible, fact-based claim of monopoly power.

***The FTC Still Has No Valid Factual Basis for Claiming That Facebook Maintained Monopoly Power Through Unlawful Exclusionary Conduct.***  To satisfy *Twombly*, the agency must also plead *facts* establishing a plausible claim that Facebook maintained a PSNS monopoly through unlawful "exclusionary conduct."  But, as before, the AC fails to allege facts showing that either Facebook's *cleared* acquisitions or its *lawful* Platform policies violated antitrust law.

As to the acquisitions, the agency offers only *its* speculation that consumers might have better products if Instagram and WhatsApp had remained independent, based on the theory that each might have someday grown into a unique Facebook rival, and *Facebook's* speculation that these firms might become rivals.  Such speculation has *never* been a valid basis for condemning acquisitions as "exclusionary" under Section 2 of the Sherman Act.  Tellingly, the agency itself reviewed and cleared the Instagram and WhatsApp transactions under Section 7 of the Clayton

Act, which Congress passed to block acquisitions that could not amount to violations of Section 2. No such cleared acquisition has *ever* been found years later to violate Section 2.

What the agency is doing here is patent:  it seeks to upend settled law.  Indeed, it seeks to do so twice over, asking the Court both to condemn under Section 2 acquisitions that the FTC cleared under Section 7, and to do so based on a novel "nascent competitor" theory that conflicts with decades of settled antitrust precedent.  The FTC falls back on arguing that acquisitions can be unlawful merely because they "neutralize" independent firms.  But that cannot be the law because it would condemn every acquisition of an actual or potential competitor.

Taking the allegations in the AC as true, the FTC actually establishes the legality of Facebook's acquisitions when it alleges that Facebook used Instagram and WhatsApp to broaden its competitive "moat" by operating both acquisitions "at scale" and introducing superior services and features – making them more popular with consumers.  Those allegations demonstrate that the transactions were procompetitive success stories.  Every firm, including an alleged monopolist, is legally privileged to improve its product and service offerings for the benefit of consumers.  *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010).  That is the essence of competition that the antitrust laws protect, not exclusionary conduct that the antitrust laws forbid.

Regarding the Platform allegations, the FTC simply ignores the Court's prior, controlling, and correct decision.  The AC reiterates rejected allegations and adds rhetoric but no material facts.  As this Court explained after review of the Platform policies themselves, those policies were lawful, and the agency lacks authority to litigate long-past applications of the policies.  *See* Op. 39.  And, once again, the agency has no facts whatsoever to establish a plausible claim that policies ended in 2018 and last enforced even earlier are "imminently" to be restored, much less

that such policies will imminently be enforced in a manner that will somehow squeeze through any "narrow-eyed needle" that may still be open for such claims.  Op. 36.

### *The AC Was Not Approved by Valid FTC Vote; the Chair Should Have Been Recused.*

The FTC's vote to authorize the AC was invalid, and the AC should be dismissed for that reason. The new Chair cast the decisive vote in a split 3-2 decision.  As Facebook demonstrated in its Petition to recuse the Chair from participation in this proceeding, the Chair's authorship of a House Judiciary Subcommittee report asserting that Facebook has violated Section 2 – among other ad hominem public charges – at the very least creates the appearance that the Chair has prejudged the facts and cannot be unbiased or impartial.  *See* Hansen Decl. Exs. A, B.  The Chair's participation in the proceeding violates both basic due process safeguards and federal ethics rules.  The FTC refused even to consider the Petition on the merits.  It instead took the remarkable position that due process and federal ethics rules *do not apply* except when the Commissioners are engaged in rulemaking or sitting as judges in an administrative proceeding. That is not the law.

\* \* \*

It is now clear that the agency had no basis for its naked allegation that Facebook has or had a monopoly PSNS market share and no facts to support a claim that barriers to entry prevented the vigorous competition and output expansion that have, in fact, occurred.  The FTC challenges acquisitions that the agency cleared after its own contemporaneous review and that resulted not in harm but product improvements, price cuts, and dramatic output expansion to the benefit of many millions of U.S. consumers (all for free, in unlimited quantities).  And the agency relitigates claims concerning Platform policies and long-past applications of those policies that this Court already properly dismissed.  The case is entirely without legal or factual support. This is as true now as it was before.  The case was refiled, on a 3-2 vote, by an agency that seeks

unapologetically to expand antitrust law beyond its settled and appropriate bounds.  The Court should now dismiss the FTC's case with prejudice.

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court should not accept as true " 'a legal conclusion couched as a factual allegation,' [or] an inference unsupported by the facts set forth in the Complaint."  *CREW v. Pompeo*, 2020 WL 5748105, at *4 (D.D.C. Sept. 25, 2020) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

## ARGUMENT

I.   **THE FTC AGAIN FAILS TO ALLEGE FACTS PLAUSIBLY ESTABLISHING MONOPOLY POWER**

A.   **The FTC Fails To Cure the Fatal Deficiency the Court Identified Because the Agency Alleges No Facts Plausibly Supporting Any PSNS Market Share**

The Court correctly held that an essential element of any Section 2 claim is the power to raise price substantially above and restrict output substantially below competitive levels. *See* Op. 18.  The Court also correctly held that the FTC had not provided *any facts* supporting a plausible case of monopoly power in the "idiosyncratically drawn" PSNS market it defined. Op. 27.  Rejecting the agency's half-hearted assertion that it could offer direct proof of Facebook's power, *see* Op. 19, the Court directed the FTC to plead facts, if it could, to support its opening assertion that Facebook had, at all relevant times, a PSNS market share "in excess of 60%," Compl. ¶ 64.  This was the specific task set for the agency.  *See* Op. 32 (directing FTC to "cure *these* deficiencies") (emphasis added) (cleaned up).

But given nearly two months to supplement its deficient allegations, which followed a year and a half of exhaustive investigation, the agency has returned with no facts plausibly supporting its claim that Facebook had and has a greater than 60% share – now upped to 70% or 80% – of the alleged PSNS market.  It is now evident that the FTC's monopoly-power allegation was "naked" all along.  Op. 2.

1.    ***The FTC's avowedly inapt Comscore data measuring non-PSNS usage provides no plausible basis for an allegation of PSNS market share.***  The Court's initial ruling was expressly tied to its recognition that "some of the features offered by a Facebook or Instagram or Path are not, seemingly, part of those firms' PSN-services offerings as defined by the FTC."  Op. 29-30.  To strategically exclude many of the obvious rivals that compete with Facebook for user time and attention online, the FTC claims that a service is in the alleged market only if it offers a peculiarly defined, three-element feature; and then only if consumers "primarily" use that feature instead of all other features the service offers; and then only if consumers use that primary feature for the specific purpose of sharing content with friends and family.  AC ¶¶ 166-168; 172-176.  Because of "the uncertainty left open by the Complaint as to exactly which features of Facebook, Instagram, *et al.* do and do not constitute part of their PSN services," the FTC assumed the burden of alleging Facebook's share of this "idiosyncratically drawn" market for PSNS use – not the market for all time spent on apps that have PSNS features.  Op. 27, 30.

But that is exactly what the FTC has failed to do, ignoring the Court's warning that "time spent 'on Facebook' or 'on Instagram' bears an uncertain relationship to the actual metric that would be relevant:  time spent using their PSN services in particular."  Op. 30.  The agency relies on a commercial data source (Comscore) that does not track PSNS usage; it instead tracks users of online services and total time spent on those services (PSNS and non-PSNS alike).  Comscore itself warns against reliance on this data, disclaiming responsibility for its "accuracy or

completeness." AC ¶ 182 n.1. But, apart from that fatal flaw, the Comscore data does not even purport to measure PSNS usage. The FTC does not claim otherwise, alleging in the AC only that Facebook's "share of the time spent by users of apps *providing* [PSNS]" has exceeded certain thresholds. *Id.* ¶ 199 (underlining removed; emphasis added). That measures the wrong thing: *not* PSNS usage, but overall time spent using all of an app's features, including, *e.g.*, interest-based broadcast or discovery (*id.* ¶ 174), "video or audio consumption" (*id.* ¶ 175), "content broadcasting and consumption" (*id.* ¶ 176), and the many other things Facebook and Instagram offer other than "friends and family" PSNS sharing.

The Court's skepticism of data measuring all time spent on Facebook and Instagram was well-founded: estimates of overall usage are legally insufficient to support a plausible allegation of market share in the specific PSNS market the FTC defined. *See Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (affirming order granting motion to dismiss antitrust claim where plaintiff sought to "infer" power in the alleged market from "statistics indicating" that defendant was "an important player" in a different market); *see also Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423-24 (9th Cir. 2020) (affirming dismissal where market-share statistics did not match the alleged market). "It would be as if [the FTC] had adequately alleged a product market consisting of orange juice, but relied on the defendant's position in the overall beverage industry as evidence of market power." *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011) (granting motion to dismiss), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016). Accordingly, data showing "a defendant's market share in a market other than the alleged relevant market is irrelevant." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1212 (11th Cir. 2002) (affirming order directing verdict in favor of antitrust defendant

because, "as a matter of law," the asserted "market share could not be imputed to the alleged relevant market" based on data from a "separate market").

Courts, therefore, routinely dismiss antitrust claims where there is a mismatch between statistics used to claim monopoly power and the market actually alleged. *See Kaufman*, 836 F.3d at 147-48 (affirming order granting motion to dismiss because plaintiffs "cannot plausibly derive Time Warner's market power over Premium Cable Services from broad allegations about the nationwide market for basic cable"); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 483-84 (S.D.N.Y. 2016) (rejecting "vague generalities about the [alleged] market . . . combined with evidence about trading in specific spread contracts"); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) (granting motion to dismiss Section 2 claim where market-power allegations were "disconnected from the relevant market definition"); *Marchese v. Cablevision Sys. Corp.*, 2011 WL 3022529, at *4 (D.N.J. July 21, 2011) (dismissing antitrust claims where market-share allegations "conflate[d]" different product markets). Indeed, the FTC's present effort to allege power in a market by reference to share in another is "[e]ven more problematic" than the agency's initial attempt to allege power by "randomly" asserting a market share (*see* Compl. ¶ 64) because it confirms the absence of any facts as to "market share in th[e] particular product market" actually alleged. *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (granting motion to dismiss antitrust counterclaims with prejudice).

The FTC asks the Court to accept a square peg pounded, futilely, into a round hole. The agency includes in the numerator of its market-share calculation time spent using features of Facebook and Instagram that are outside its alleged market and for which Facebook faces competitors like YouTube, TikTok, LinkedIn, Twitter, and others (*i.e.*, non-PSNS time spent on Facebook and Instagram). At the same time, the FTC omits from the denominator all time spent

on PSNS using apps that the FTC asserts are not "primarily" PSN services (*e.g.*, YouTube,

TikTok, LinkedIn, Twitter, and others), regardless of whether users spend PSNS time on those

services. *See Rick-Mik*, 532 F.3d at 973 (rejecting share statistics that "do not distinguish

between [in-market] sales and other potential types of sales"). This mix-and-match predictably

inflates the FTC's market-share figure while providing no coherent basis to infer anything about

how competition works in the real world. This "self-undermining" attempt to infer PSNS market

share from an amalgamation of total time spent in concededly "distinct" markets cannot support

a "reasonabl[e] infer[ence]" of power in the market actually alleged. *Bookhouse of Stuyvesant*

*Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013) (granting motion to

dismiss). Like the FTC's initial complaint, the AC says "nothing concrete on the key question

of how much power Facebook actually had, and still has," in the alleged market. Op. 31.

        **2.**      ***The FTC cannot overcome this pleading defect by speculating as to PSNS time***

***spent.***  The FTC alleges no facts regarding how much time spent on Facebook "was not in fact

spent using personal social networking services." AC ¶ 202. That should foreclose its claim.

Indeed, the fulcrum of its allegation is hypothesis: the FTC expressly asks the Court to "assume"

various possibilities, including the chance "that half of the[ ] time" spent on Facebook is PSNS

time. *Id.* The FTC alleges no more basis for a 50% assumption than a 20% assumption or an

80% assumption (or its earlier 60% market-share assertion). Alleging what is "conceivable"

does not make an assertion "plausible" – this is precisely the conclusory approach the Supreme

Court has prohibited. *See Twombly*, 550 U.S. at 570. *Twombly* simply does not countenance

assuming "arguendo" that just enough time spent on Facebook qualifies as time in the alleged

market sufficient to establish power; this is rank "speculati[on]" that invites the Court to reach

the agency's desired "legal conclusion." *Id.* at 555. The Supreme Court has instructed that "[i]t

is not . . . proper to assume that the [antitrust plaintiff] can prove facts that it has not alleged."

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see id.* at 545 (holding allegations "insufficient as a matter of law" to state a claim).

Worse, the FTC's proffered assumptions have no factual support. The FTC alleges (at ¶ 202) that it "indicate[d]" how Facebook is "predominantly used" and that this "indicat[ion]" somehow supports its pleading-by-assumption approach. But the AC is devoid of actual relevant facts alleging market power or share. *See Twombly*, 550 U.S. at 556 (requiring "factual matter"). Indeed, what few facts the FTC pleads (at ¶ 178) do nothing to ground its numerical claims:

- Facebook's recognition that friends and family sharing is one important part of its multi-feature service cannot overcome the lack of any facts supporting allegations of PSNS share or time spent.

- Stray comments from Mark Zuckerberg and Sheryl Sandberg that Facebook is "about real connections to actual friends" and documents stating that Facebook is "focused" on connecting "friends and family" say nothing about what percentage of time spent on Facebook is PSNS.

- A snapshot 2018 poll finding that consumers use Facebook to follow "people [they] care about" – which could, of course, include celebrities, influencers, athletes, friends, or family – likewise says nothing about how much time this activity takes relative to others, let alone what PSNS usage was like in 2012 or what it is like today.

Circuit precedent forecloses the FTC's reliance on these vague, unquantified, and conclusory observations, which – on their face – provide no support for the math the FTC asks the Court to assume. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 (D.C. Cir. 1986) ("[G]eneral comments were not evidence of anything, and, in particular, they were certainly not evidence that the industry recognized some specific submarket as a 'separate economic entity.'"). Such "non-economic, qualitative descriptions of market success are insufficient to establish that an antitrust defendant exercises market power," particularly where – as here – the descriptions make no mention of the "relevant product market" actually alleged. *Indep. Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155, 1172 (C.D. Cal. 2002), *aff'd in part, rev'd in part on other grounds, and remanded sub nom. Indep. Ink, Inc. v. Ill. Tool Works, Inc.*,

396 F.3d 1342 (Fed. Cir. 2005), *vacated and remanded*, 547 U.S. 28 (2006). If there were

actually a recognized market for PSNS, there would be data that could be used to calculate

shares; there is no such data, and thus, all the agency can do is ask the Court to accept

unsupported assumptions in lieu of plausible facts.

> **3.**  **The FTC's total MAU and DAU figures cannot plausibly support any PSNS**
>
> ***market share.*** The FTC gets no further using its Comscore data to assert that Facebook has

more than 70% of "daily active users" ("DAUs") and 65% of "monthly active users" ("MAUs")

of the under-inclusive set of apps the agency asserts "predominantly" offer PSN services.

AC ¶¶ 200-202. MAUs and DAUs cannot plausibly be used to calculate relative market share,

both because the same individuals may (and often do) use more than one service and, more

fundamentally, because the mere fact that an individual uses a service says nothing about how

much time (if any) that person spends consuming PSNS on that service. *Cf. Iqbal*, 556 U.S.

at 679 (claims must be plausible in light of "judicial experience and common sense"). The FTC

even acknowledges some of these shortcomings. *See* AC ¶ 204 ("DAUs and MAUs do not

reflect a person's intensity of use"). The Court rightly foreclosed reliance on such inapt metrics,

finding that they "might significantly overstate or understate any one firm's market share

depending on the various proportions of users who have accounts on multiple services, not to

mention how often users visit each service and for how long." Op. 29. The FTC alleges nothing

new here, and nothing showing that the Court's analysis was wrong before.

* * *

These defects strike at the heart of the claim's plausibility. The FTC cannot cite any

relevant data because the PSNS construct is a litigation-driven fiction. After a year-and-a-half

investigation, tens of millions of pages of documents, dozens of investigative hearings, and

review by a staff of economists, the agency fails to cite any data on and does not even have

12

a single reference – not one – to "personal social networking service" usage.  The FTC's allegations are at most "conceivable," albeit only if one makes the right "assum[ptions]" (AC ¶ 202), but not supported by facts and thus not plausible.  *See Twombly*, 550 U.S. at 570.  The FTC defined a market for which there is no data (none; zero) measuring any firm's share, and the only basis for alleging market shares is admitted guesswork using disclaimed data inconsistent with the market the FTC actually alleges.  No court has ever allowed such a Section 2 claim to proceed.

### B.   The FTC's Alleged Facts Undermine Its Claim of Barriers to Entry

The Court did not need to "address the issue of whether the FTC ha[d] sufficiently alleged entry barriers" in its prior decision.  Op. 27.  But the agency did not allege and still has not alleged such facts.  On the contrary, taking the FTC's allegations as true, the agency has pleaded itself out of court:  its conclusory labels (*e.g.*, "network effects" and "switching costs") are undone by its allegations that other service providers with substantial networks could add PSNS offerings along with other services.  Simply put, the FTC's entire basis for challenging Facebook's alleged conduct is squarely inconsistent with the assertion that entry barriers protect the alleged PSNS market.  *See* AC ¶¶ 108-109 (alleging that a firm can build a network outside the PSNS market, where Facebook has no power, and then add "additional features and functionalities" to build a PSNS offering).

As the Court explained, "a plaintiff proceeding by the indirect method of providing a relevant market and share thereof must also show that there are 'barriers to entry' into that market."  Op. 18.  The FTC asserts the pure conclusion (at ¶¶ 212-213) that network effects and switching costs impede building a PSNS from scratch.  But its theory of the case is that "differentiated" firms can "gain[] scale" outside of the PSNS market and then – once the non-PSNS network is established – begin "adding additional features and functionalities" to "enter

13

the personal social networking market at competitive scale." AC ¶¶ 9, 66, 108.  Without those

allegations, the FTC has no theory of exclusionary conduct.  It alleges Facebook bought

Instagram and WhatsApp to prevent them from developing a non-PSNS "mechanic" to gain

scale and then adding PSNS features.  *See id.* ¶¶ 212-217.  Its allegation concerning acquisitions

is that the targets might grow into significant threats.  *See id.* ¶¶ 66, 68-69, 71, 74.  And its

(already dismissed) Platform allegations are similarly directed at Facebook's supposed efforts

to discourage competitors from offering competitive PSNS features.  *See id.* ¶¶ 130, 157-158.

As to network effects, the agency alleges that non-PSNS firms are able to grow to

massive scale outside the PSNS market; WhatsApp, for example, "had more than 450 million

monthly active users worldwide and was gaining users at a rate of one million per day."  *Id.*

¶ 113.  Yet the FTC itself identifies at least a half dozen other networks that achieved huge scale.

*See id.* ¶ 114 (Apple's iMessage), ¶ 175 (Google's YouTube), ¶ 176 (ByteDance's TikTok),

¶ 185 (Snapchat), ¶ 174 (Twitter and Pinterest), ¶ 173 (LinkedIn and Strava).  Such service

providers are not prevented from entering the (supposed) PSNS market by any "direct network

effects" (AC ¶ 212) because they already have huge networks (including many of the same

people who use Facebook).  *See* Op. 29.  And such networks are not deterred by switching costs,

because a user can multihome, building and enriching connections on one network as they

migrate their usage to the PSNS they prefer.  *See id.* (noting that "users . . . have accounts on

multiple services").  "Network effects" are not the issue for competitors; the stiff competition

provided by Facebook is.  And the FTC cannot support a claim of "entry barriers" merely by

alleging that users prefer Facebook's products to those offered by competitors.  *See United States*

*v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990) (holding that, as a matter of law, product

efficiency and quality are not and cannot be "a structural barrier to entry"); *cf. Epicenter*

*Recognition, Inc. v. Jostens, Inc.*, 81 F. App'x 910, 911-12 (9th Cir. 2003) (holding that a firm's

"good reputation" for high-quality service is not "itself an entry barrier" where customers can "switch to different or additional vendors at will").

This is no mere tension, but a glaring contradiction at the heart of the FTC's case, which depends on the theory that Facebook was genuinely threatened in its (supposed) PSNS monopoly by *any* service provider that attained a network of significant scale.  The AC offers no plausible way to square two of its core allegations:  that (1) Instagram and WhatsApp had the ability to leverage a growing network by "adding additional features and functionalities" to become a PSNS, AC ¶ 108; but (2) at the same time massive firms like Google, Apple, Twitter, Snapchat, Microsoft, and ByteDance could not do the same, *see id.* ¶ 90 (alleging Instagram was a "small team" with "10-25 employees").  That forecloses the FTC's claim.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 988 (D.C. Cir. 1990) (Thomas, J.) (noting that it is sufficient to preclude a merger challenge if "the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs," and that defendants "need not show that any firm *will* enter the relevant market").

The FTC has asserted, and will surely say again, that Instagram and WhatsApp were different – and that Facebook clairvoyantly acquired the only two companies worth worrying about.  But where, as here, the agency *alleges facts* showing that entry barriers were no obstacle for some firms, more must be pleaded than the naked assertion that those firms were special.  *See Twombly*, 550 U.S. at 555 (requiring facts, "more than labels and conclusions," "to raise a right to relief above the speculative level").  The conclusory allegations (at ¶¶ 66-67, 184) that Instagram (photos), WhatsApp (messaging), and Snapchat (ephemeral content) developed unique "social mechanics" that "differentiated" them from Facebook – allowing each to build massive networks and then pivot into the PSNS market – do not plausibly explain why other firms, with other social mechanics, were and are not similarly free to differentiate, enter, and compete.

The FTC does not allege, nor could it plausibly assert, that there are only three (or four or forty) "mechanics" for engaging with content online; this universe, which the FTC does not allege Facebook hinders, is limited only by human ingenuity and imagination. The FTC even alleges (AC ¶ 151) that the next "technological transition" – "use of artificial intelligence" or the "metaverse" – is looming and will impose "acute competitive pressures" on Facebook. *Cf. United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018) (explaining that emerging technological "revolution" with a "transforming" effect on how consumers use products dramatically undermines the likelihood of anticompetitive effects), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

## C.      The FTC Still Has No Facts To Support Its "Rare" Direct-Evidence Theory

Hedging its bets, the agency returns with a theory that it need not cure its market-share fiction, because it can directly allege monopoly power. The Court correctly determined before that the FTC failed to state a claim of monopoly power based on supposed "direct proof." Op. 19. Indeed, in opposition to Facebook's first motion to dismiss, the agency admitted that "'direct proof' that a defendant has monopoly power is 'only rarely available.'" FTC Opp'n 8 (quoting *Microsoft*, 253 F.3d at 51). The Court did not invite the agency to try again on this theory. But the FTC has tried again anyway, still – as before – without alleging any facts establishing that this is one of those "rare" cases.

The "ability to profitably restrict output and set supracompetitive prices is the *sine qua non* of monopoly power." *Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008). The FTC alleges neither. Price is still zero and output has exploded, and not only for Facebook. For instance, Snapchat, an alleged PSNS provider that did not exist before 2011 (when Facebook supposedly achieved dominance), has grown to "about 75 million" monthly users who spend hundreds of millions of minutes on the app each day. AC ¶ 185. *See Rebel Oil Co. v. Atl.*

*Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) (stating that "undisputed evidence indicat[ed] that competitors have expanded output" and that this can warrant "summary disposition" because "expansion by competitors would suggest that the defendant . . . lacked the market power to control marketwide output in the first place").  And Facebook is a price cutter, having made WhatsApp free after the acquisition.  *Cf.* AC ¶¶ 60, 127, 226.  These allegations foreclose a finding of direct evidence of power.  *See Epic Games, Inc. v. Apple Inc.*, --- F. Supp. 3d ---, 2021 WL 4128925, at \*95 (N.D. Cal. Sept. 10, 2021) (expanding output forecloses finding of "direct evidence of monopoly power," even if – unlike here – prices are "higher"), *appeal pending*, No. 21-16506 (9th Cir.).

   1.  *Past privacy concerns cannot establish monopoly power.*  The FTC alleges (at ¶ 207) that the Court can infer market power from the fact that the *agency* itself complained about Facebook's "user privacy" practices and that Facebook settled those allegations.  No court has ever endorsed the theory the FTC espouses here:  that the amount of "privacy" on a service can demonstrate monopoly power.  To even articulate a theory based on service quality, the agency would need facts plausibly establishing that Facebook's *overall* PSNS quality was *substantially* below a competitive level.  But the FTC has not alleged that Facebook's overall PSNS quality – of which "privacy" could be one aspect – has diminished at all, let alone substantially below a competitive level.  And just as price increases cannot be alleged as direct evidence of power in the absence of facts showing that the increase is above a competitive baseline, so too a quality decrease would need to be shown to be substantially below the competitive level.  *See, e.g.*, *Microsoft*, 253 F.3d at 51 (actionable exercise of power must drive quality "substantially" below the "competitive level"); *cf. BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021) ("[P]rice increases, without more, do not constitute

supracompetitive pricing."). The FTC makes no attempt to allege a competitive baseline of "privacy" or even of PSNS quality generally.

There is no logical or legal connection between the FTC's privacy-related suits and monopoly power: the FTC charges *many* firms – including those that the FTC alleges in this case have no market power – with similar defects. *See* Compl., *In re Snapchat, Inc.*, File No. 132 3078 (FTC May 8, 2014); *see also* Op. 9 ("[T]he Court may take judicial notice of . . . public agency action."). Furthermore, beyond the mere conclusion, the agency has alleged no facts showing that any privacy-related aspect of quality has declined at all: it alleges *nothing* about Facebook's privacy features today, let alone net PSNS quality of which "privacy" could be one dimension. For example, the FTC itself alleges (at ¶¶ 46, 49-50) that Facebook collects data to improve "rich ad targeting," which is a benefit both to Facebook's advertisers – which get a better advertising product – *and* to its users, who get a free service supported by relevant and "interactive ads" of such high quality that they "can be similar in appearance to" and "resemble 'native' content" the user chooses to view. In any event, there is not even a conclusory allegation that "privacy" or total quality on Facebook can be measured objectively, much less measured as below a competitive level at any point in time.

The agency's theory is also illogical on its face. As the FTC acknowledges (at ¶ 202), PSNS accounts for only *part* of the time users spend on Facebook. *See also* Op. 29-30. Using its "arguendo" assumption that 50% of time spent on Facebook is outside the supposedly monopolized market, any claimed reduction in quality across the entire Facebook service would logically – were the agency's allegations plausible – nudge time spent away from Facebook, at least as to features that other services admittedly offer. But while the agency claims that Facebook degraded user privacy with respect to *all* features that Facebook offers – not just PSNS, *see* AC ¶¶ 205-207 – it also alleges Facebook has maintained overall growth despite

18

competition from, among many others, YouTube and TikTok for "video . . . consumption" (*id.* ¶¶ 175-176), Twitter for "topics that interest" users (*id.* ¶ 174), and iMessage for messaging (*id.* ¶¶ 114, 172). The FTC does not (and could not) plausibly allege that the fallout from Cambridge Analytica (*id.* ¶ 206) or the reaction to Facebook's settlement with the FTC (*id.* ¶ 207) somehow affected only Facebook's PSN services, *i.e.*, the only market in which the FTC alleges that Facebook has power. Facebook has succeeded overall – not only in the supposedly monopolized market, but also in markets where it faces vigorous competition. If the FTC's theory were plausible, and Facebook had deliberately reduced the quality of its entire product, that could not have occurred.

     **2.**    ***Total Facebook revenues cannot establish PSNS power.*** The FTC's allegation (at ¶¶ 208-209) that the Court can infer Facebook's market power from the revenues its *advertising* business earns ignores the Court's conclusion that "[t]he overall revenues earned by PSN services cannot be the right metric for measuring market share here, as those revenues are all earned in a separate market." Op. 29. This is consistent with established antitrust principles the Supreme Court decided long ago. *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 610 (1953) (antitrust plaintiff must prove the alleged monopolist's "dominant position" in the market alleged, even if defendant "is a dual trader in separate though interdependent markets").

     The FTC compounds this fatal flaw by relying (at ¶ 208) on *all* of Facebook's advertising revenue – not revenue attributed to ads that Facebook shows to users engaging in PSNS specifically. And, on its own mistaken terms, the allegation misses the mark: the AC is devoid of any facts that could establish that Facebook's advertising prices are above a competitive level; the AC therefore cannot support a claim of power in some unalleged advertising market, much less in the PSNS market actually alleged. In any event, "there is not even a good economic

theory that associates monopoly power with a high rate of return" because "competitive firms may be highly profitable merely by virtue of having low costs as a result of superior efficiency" or "because it is offering better service." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995).

## II.   THE FTC HAS NOT PLAUSIBLY ALLEGED LEGALLY COGNIZABLE EXCLUSIONARY CONDUCT

The FTC's two counts of monopoly maintenance under Section 2 of the Sherman Act fail for the additional reason that, as before, the FTC fails to allege that Facebook engaged in any unlawful exclusionary conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (antitrust violation requires facts establishing plausible claim of "anticompetitive *conduct*").[1]

### A.   The FTC Fails To Allege a Plausible Section 2 Acquisition Challenge

The agency seeks to enjoin, almost a decade after the fact, two acquisitions based on a novel legal theory without precedent: that cleared acquisitions of "nascent" competitors, or even non-competitors, can be condemned under Section 2 based on speculation that these firms might have become powerful rivals, delivering unknowable benefits to consumers at some future date. The agency has neither law nor factual allegations supporting such a claim here.

### 1.   *The FTC's prior clearance renders its belated Instagram and WhatsApp challenges implausible.*   The FTC's claim that the Instagram and WhatsApp acquisitions were "anticompetitive" collides with the judicially noticeable fact that the FTC itself cleared both transactions in 2012 and 2014. *See* Op. 9. The AC – like the initial complaint – "conveniently

---

[1] Count 1 is based entirely on Facebook's allegedly "anticompetitive acquisitions" – the 2012 acquisition of Instagram and the 2014 acquisition of WhatsApp, with other smaller acquisitions alluded to but briefly; Count 2 adds to that mix Facebook's Platform policies, which the Court previously dismissed from the case.

omits any mention of this review." *Id.* The FTC thus fails to explain why the agency's prior clearances should not be taken as a strong indication – if not a decisive one – that neither transaction can support a plausible claim of unlawful or anticompetitive conduct. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006) ("presum[ing]" that a joint venture was "lawful," including because it was "approved by federal and state regulators"); *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (prior FTC clearance "weigh[ed] against the conclusion" that acquisition could "be plausibly characterized as an unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).

The FTC unconditionally cleared both acquisitions under Section 7 of the Clayton Act, which Congress enacted to address incipient threats to competition that Section 2 *would not* condemn. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962). This supports the inference that the agency did not believe (or did not believe it could prove) that a substantial lessening of competition and resultant consumer harm was likely when Facebook took the risk of investing in Instagram and WhatsApp. And while the agency can bring post-clearance challenges, *see* 15 U.S.C. § 18a(i)(1), the FTC's about-face begs for an explanation that is consistent with the requirement that it plead facts plausibly establishing that anticompetitive effects were likely at the time of the transactions. *See Baker Hughes*, 908 F.2d at 989. Relieving the FTC of that burden – particularly where the FTC alleges that Instagram and WhatsApp have grown and thrived as part of Facebook – risks undermining certainty in the procompetitive investments that antitrust laws encourage.

Facebook is unaware of any case condemning an FTC-cleared acquisition under Section 2 years after the fact, and the FTC's unprecedented effort to plow new ground here is contrary to the purposes of antitrust law. FTC Commissioner Wilson emphasized this in her dissent from the Commission's 3-2 decision to file the AC: the decision to bring this case

"undermine[s] the integrity of the premerger notification process established by Congress and the repose that it provides to merging parties that have faithfully complied with its requirements." Hansen Decl. Ex. C at 1 (Dissenting Statement of Commissioner Christine S. Wilson (Aug. 19, 2021) ("Wilson Dissent")); *see also Trinko*, 540 U.S. at 412 (explaining that "the existence of a regulatory structure designed to deter and remedy anticompetitive harm" – which the Hart-Scott-Rodino Act's clearance provisions supplied here – makes it "less plausible that the antitrust laws contemplate such additional scrutiny"). At the very least, the plausibility of the FTC's allegations must be evaluated against the judicially noticed backdrop of the FTC's prior contemporaneous judgments, which were untainted by hindsight. After *Twombly*, claims must be plausible in light of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The FTC's belated challenges to acquisitions it cleared nearly a decade ago are not.

> **2.** ***The FTC fails to allege facts to support any claim that the Instagram and WhatsApp acquisitions were unlawful exclusionary conduct.***

**a.** Acquisitions, even by large or dominant firms, are not presumptively unlawful; most are "benign or beneficial." Hansen Decl. Ex. D at 4 (Statement of Commissioner Christine S. Wilson Regarding the Announcement of Pre-Consummation Warning Letters (Aug. 9, 2021)) ("roughly 95 percent of deals are viewed as benign or beneficial"); *see also Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("horizontal mergers are much more likely to be procompetitive than anticompetitive"). Accordingly, enforcement agencies and courts have developed (and refined) objective standards, grounded in knowable market facts, to identify those transactions that pose an unacceptable risk of harm. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (2010). Successful modern challenges to horizontal mergers have almost invariably rested on factual allegations, and proof supporting those allegations, that the mergers would result in aggregations

of market shares exceeding prescribed numerical thresholds.  *See*, *e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703-04 (4th Cir. 2021).

But the FTC alleges no increase in market concentration:  if Instagram had a PSNS market share in 2012, it has not been calculated or alleged; and WhatsApp concededly had no such share in 2014 because the FTC alleges it was outside the PSNS market.  *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763-64 (9th Cir. 2018) (affirming order granting motion to dismiss Section 7 claim where plaintiff failed to allege acquisition increased the acquirer's market share).  An agency applying the *Horizontal Merger Guidelines* in 2012 or 2014 – as the FTC presumably did – could have relied on the absence of any such increase in market concentration to give those proposed mergers clean bills of health.  Courts have relied on these guidelines and have made them part of modern antitrust law.  *See*, *e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 209 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 71-72 (D.D.C. 2011).  They reflect a practical, objective way to discern what is otherwise difficult to predict:  which acquisitions may be likely to result in consumer harm.

The law governing acquisitions has developed largely under Section 7, which Congress enacted to address anticompetitive transactions.  Yet there is no successful Section 7 challenge remotely similar to the agency's claim here.  Indeed, the FTC cannot even satisfy the legal standard that the agency itself previously proposed for potential-competitor acquisitions under Section 7 (a legal standard itself that no court has ever adopted).  *See* Hansen Decl. Ex. E at 6 (Mem. of FTC, *FTC v. Steris Corp.*, No. 15-cv-01080-DAP, ECF No. 21 (N.D. Ohio June 4, 2015)) ("The acquisition of an actual potential competitor violates Section 7 if . . . the competitor 'probably' would have entered the market . . . [and] there are few other firms that can enter effectively.").

The FTC has alleged no facts concerning the "objective" likelihood that WhatsApp would be a significant PSNS rival.  *See id.* at 10-11 (stating that assessing the probability of entry requires both "subjective evidence" of intent and "objective evidence" including "financial capabilities" and "management and marketing expertise" relevant to the alleged market); *see also FTC v. Steris Corp.*, 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015) (reciting without accepting the FTC's legal theory, and denying the FTC's motion for a preliminary injunction to halt an acquisition because the FTC could not show the acquiree "probably" would enter the alleged market).  There are no allegations that, before the acquisition, WhatsApp planned or took any concrete preparatory steps to enter the alleged PSNS market, much less facts making a plausible case that such entry was *probable*.

And, although the FTC *asserts* that Instagram was a competitor, the AC alleges that there was little actual overlap between Instagram – then a mobile-only photo-sharing app – and Facebook, which "had grown dominant in the desktop age" and was attempting (allegedly without success) to develop such an app.  AC ¶¶ 6, 83.  The FTC's own allegations suggest that the perceived "major threat" posed by Instagram would come, from Facebook's perspective, "over the next few years," *if* Instagram were able to "copy what we're doing now."  *Id.* ¶ 84.  The allegations regarding Instagram, no less than those regarding WhatsApp, depend on speculation that Instagram would develop into an unusually significant PSNS rival to Facebook down the road.

Instead of alleging that "there [we]re few other firms that c[ould] enter effectively" the PSNS market, *Steris*, 133 F. Supp. 3d at 966, the AC alleges the opposite:  Facebook feared entry from multiple "apps that [we]re gaining prominence in the mobile eco-system," each "a potential rival" that could "gain scale" in the alleged market.  AC ¶¶ 71-72.  The FTC even alleges that there was a "global *trend*" of "messaging apps" – plural – threatening "to build more general

24

mobile social networks." *Id.* ¶ 108 (emphasis added). Multiple such apps directly "threatened

to develop into competitive threats to Facebook." *Id.* ¶ 158.

The AC's passing dismissal of other obvious entrants is implausible on its face. If

WhatsApp was a potential PSNS entrant, then there is no straight-face argument that Apple's

iMessage is not. The allegation that the latter is "confined to the iOS operating system" says

nothing about the significance of that universe of consumers. *Id.* ¶ 114. Indeed, the FTC's

central theory is that effective entry into PSNS can come from many and varied sources: "the

most significant competitive threats to Facebook . . . may arise from a differentiated product that

is able to gain scale quickly by offering users a superior 'mechanic' " – that is, an undefined and

unlimited set of potential entrants. *Id.* ¶ 66 (TikTok, for example). These examples unmask the

FTC's speculative and inconsistent theorizing and show that it cannot even satisfy its own test.

*See Steris*, 133 F. Supp. 3d at 966.

The only acquisitions that courts have held exclusionary under Section 2 bear no

similarity whatsoever to the acquisitions at issue here. Successful acquisition challenges under

that provision involve, *e.g.*, the shuttering of significant and established rivals or of providers

of key inputs needed for competition – all to restrict output (and thereby increase prices). *See*

*United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (acquirer used acquisitions to maintain

market-allocation agreement between former competitors to limit output); *United States v. E.I.*

*du Pont de Nemours & Co.*, 353 U.S. 586, 603-05 (1957) (acquirer used non-controlling stock

interest to steer supply contracts to itself, foreclosing a substantial share of the market); *United*

*States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (acquirer bought up multiple competing

plants in order to shut them down); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,

176 F. Supp. 3d 606, 621-22 (W.D. La. 2016) (similar). The agency again alleges the opposite

here: Facebook did not shut down Instagram or WhatsApp, but instead kept (and keeps) both

apps "operating at scale" to the indisputable benefit of the increasing numbers of consumers who enjoy these products.  AC ¶ 129; *see also id.* ¶ 21.

      **b.**      The FTC's challenges to the acquisitions rest on three legally invalid and factually implausible constructs:  (1) that Instagram and WhatsApp would have given rise to even better products if left on their own; (2) that acquisitions are inherently suspect because they necessarily eliminate independent entities; and (3) that the acquisitions were so successful in providing additional consumer benefits that they made it hard for Facebook's rivals to compete.  Each novel theory fails under established antitrust law.  *Cf. Eastman*, 2016 WL 1640465, at *9 (granting motion to dismiss Section 2 acquisition claim because "plaintiffs cannot rely on the fact of the acquisitions alone," but instead "must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition").

      **i.**      *First*, speculation is not a valid basis for condemnation.  The agency asserts that, in the "but for" world without the two challenged acquisitions, consumers would have better PSNS products today.  But the agency alleges no facts substantiating that claim; the theory is instead admitted speculation.  *See, e.g.*, AC ¶ 221 (asserting that additional competition could result in "some or all" of undefined "new features" or "improved features," among other undefined "quality improvements"); *id.* ¶ 226 (alleging "social networks *may* also have explored . . . models that consumers . . . *could* have preferred") (emphases added).  There are no facts establishing what those new products would be, how they would come about, or why they would be offered when they are not being offered now.  The law is clear:  the agency *cannot* rely on speculation that Instagram and WhatsApp might have grown and developed into substantial PSNS competitors with even better and even more widely adopted services than those they offer today.  *See Twombly*, 550 U.S. at 555.

Courts have regularly warned against just such speculation.  As the First Circuit has noted,
"there is no possible way to predict just what would happen" had a challenged transaction not
occurred.  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002).  Accordingly,
courts have not embraced such untethered "potential competition" theorizing, even under
Section 7.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974)
(expressly declining to recognize this legal theory); *United States v. Aetna Inc.*, 240 F. Supp.
3d 1, 75 (D.D.C. 2017) ("Whether actual potential competition is a viable theory of *section 7
liability* has not been answered by the Supreme Court.") (emphasis added).  Rather, courts
have rejected as implausible such claims where allegations about "competitive effects would
be entirely speculative."  *DeHoog*, 899 F.3d at 764-65.  "The bottom line is that the complaint
offers only speculation as to how" Instagram and WhatsApp might have sought to "do business"
but for the acquisitions, which is "a classic speculative conclusion" that "'stops short of the line
between possibility and plausibility of entitlement to relief.'"  *Id.* at 765 (quoting *Twombly*, 550
U.S. at 557).

Speculation about the possible competitive trajectory of Instagram and WhatsApp is the
only thing the AC alleges to support the claim that the acquisitions were *likely* to harm consumers
at the time the transactions closed.  *See* V Phillip E. Areeda & Herbert Hovenkamp, *Antitrust
Law* ¶ 1205a (4th ed. 2020) ("Areeda") (legality must be assessed "on the basis of evidence
of the situation existing at the time of the acquisition").  The FTC seeks to bolster its own
speculation with speculation it cherry-picked from internal Facebook and Instagram documents,
*e.g.*, that Facebook executives mused about the possibility that Instagram might develop more
features and become more like Facebook and that, in the course of trying to raise money,
Instagram suggested that it might one day become a "complete social networking service" or an
advertising competitor.  AC ¶¶ 87, 89, 100-101.  But speculation is only that – speculation – no

27

matter its source.  According to the very documents cited by the FTC, Facebook speculated
similarly about a host of possible rivals, some of which thrived while others failed despite early
success.  *See*, *e.g.*, *id.* ¶ 90.  And there is no factual allegation that Instagram was actually
competing beyond its limited photo-sharing app or that WhatsApp had plans to add PSNS
elements – such as allowing users to find strangers' contact information – to its "privacy-
focused" service.  *Id.* ¶ 127; *see Twombly*, 550 U.S. at 555-56 (requiring facts, not speculation).

      The FTC cannot allege that consumer harm was *likely* at the time of the acquisitions
because it cannot even allege (years later) that consumers *were* harmed – the defining
characteristic of an unlawful transaction.  It speculates instead that things could have been
even better.  This pie in the sky bears no resemblance to fact-based reality.  No alleged facts
support the agency's intimation that Instagram and WhatsApp would have achieved the same
growth in a better (undefined) way for consumers, if those services were not part of Facebook.
*Cf. Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) ("Plaintiffs' allegations
of hypothetical loss of consumer choice and innovation are entirely too conclusory and
speculative.").  Similarly, no alleged facts support the speculation that, but for the acquisitions,
Facebook or any other PSNS provider might have a different "ad load and level of privacy."
AC ¶ 105.  The FTC tellingly alleges nothing about "ad load and level of privacy" on Snapchat
today, for instance.  There is only agency speculation about unspecified, unsupported "additional
innovation," "quality improvements," and "consumer choice."  *Id.* ¶ 221.  There is not a single
fact as to what any of these vague buzzwords actually would entail, much less facts establishing
that it was likely these things would have occurred but for the acquisitions.  *See Twombly*, 550
U.S. at 555 ("formulaic recitation" without facts is not enough).

      The same fanciful claims could be made in *any* challenge to *any* transaction; it can
always be hypothesized that Jack's magic beans were destined to grow to the sky.  But the

law demands more than fairy tales to unwind highly successful business transactions that
have produced indisputable and substantial value for consumers and shareholders alike.

  **ii.**  *Second*, the FTC asserts that "neutralization" of an "independent" firm via
acquisition is itself anticompetitive.  AC ¶ 105.  This theory proves far too much:  every
acquisition entails the elimination of an independent firm and an actual or potential competitor.
Unsurprisingly, there is no such dramatic theory of strict liability for acquisitions.  *See Dresses
for Less*, 2002 WL 31164482, at *12 ("'the mere fact that a merger eliminates competition
between the firms concerned has never been a sufficient basis for illegality'" because "horizontal
mergers are much more likely to be procompetitive than anticompetitive") (quoting IV Areeda
¶ 901a (2d ed. 1998), and citing Irving Scher, *Antitrust Adviser* § 3.61, at 3-167 (4th ed. 2001));
*United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 930 (S.D.N.Y. 1965) ("Necessarily,
such a merger combines the shares of the constituent parties and eliminates one firm from the
market.  It thereby automatically creates a firm with an increased share and increases
concentration of the number of firms in the market.  Yet, Congress, in enacting Clayton Act § 7,
did not forbid all horizontal mergers but only those which may lessen competition substantially
or tend to create a monopoly.").  Instead, and before embarking on "a potentially massive factual
controversy," *Twombly*, 550 U.S. at 558, the FTC must allege facts to plausibly support the
conclusory and speculative assertion that consumers would be better off had Facebook not turned
Instagram and WhatsApp into the services that consumers enjoy for free today.  But the FTC has
alleged nothing close.

  **iii.**  *Third*, the FTC claims that Facebook's *successful* development and operation of
Instagram and WhatsApp unlawfully "maintains a protective 'moat' that deters and hinders
competition."  AC ¶¶ 105, 127.  This gives the game away entirely.  In essence, the FTC seeks
to punish Facebook for delivering ever-greater value to consumers.  *See id.* ¶ 21 (alleging that

output expansion – *i.e.*, enlarging PSNS activity – "increases" "the value of the service to individual consumers"). Instead of shuttering Instagram or WhatsApp, Facebook has made them thrive. The FTC expressly alleged that Facebook has been able to "win" in photo-sharing and messaging "mechanics," which makes it "difficult" for a competitor "to supplant [Facebook] without *doing something different*." *Id.* ¶ 66 (emphasis added). According to the FTC, once Facebook (or any firm) "wins" a mechanic, a competitor cannot "get much traction" with the *same* mechanic so long as Facebook keeps its winning "mechanics deployed *at scale*." *Id.* ¶¶ 66-67 (emphases omitted in part).

In other words, when Facebook competes successfully by expanding output and providing consumers experiences they value, it makes life harder for copycat rivals that do not innovate by developing new "mechanics" to attract consumers. It is remarkable that the FTC seeks to condemn this as a Section 2 violation, when it is the very competition that the antitrust laws encourage. *See Ass'n for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 586 n.15 (D.C. Cir. 1984) (per curiam) ("[O]nly use of monopoly power to restrict output or exclude competitors, as opposed to promoting the efficiency of production, is unlawful."); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) (antitrust laws encourage and "do not stand as an obstacle" to even a dominant firm that "sustains a level of efficiency or innovation such that its rivals cannot effectively compete").

No court has ever adopted the FTC's theory that acquiring a firm and winning by operating the acquired company successfully and "at scale" is unlawful. On the contrary, that theory has been summarily rejected: "[W]hen a producer deters competitors by . . . operat[ing] his business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served, even if no actual competitors see fit to enter the market at a particular time," for, "[w]hile the successful competitor should not be raised above the law, neither should

he be held down by law."  *Syufy*, 903 F.2d at 668 (rejecting as a matter of law a Section 2

acquisition challenge claiming that, after the acquisitions, the monopolist's "effectiveness as a

competitor creates a structural barrier to entry, rendering illicit [the defendants'] acquisition of

its competitors' [assets]").

       **3.**     ***The FTC's other acquisition allegations are without substance.***  The AC

borrows vague snippets from the dismissed States' complaint, to wit that Facebook's acquisitions

of non-PSNS firms Onavo (AC ¶ 70), tbh (AC ¶ 72), Octazen (AC ¶ 74), Glancee (AC ¶ 75), and

EyeGroove (AC ¶ 76) were exclusionary.  But little is alleged about these transactions, and there

are no facts supporting any claim that, singly or jointly, these non-PSNS acquisitions are even

relevant to the Section 2 claims.

       **a.**     The FTC alleges (at ¶ 74) that Facebook acquired Onavo to monitor "potential

threats," but it is procompetitive to improve one's own products by monitoring how competitors

are successfully meeting consumers' needs.  *See Sunbeam Television Corp. v. Nielsen Media

Rsch., Inc.*, 763 F. Supp. 2d 1341, 1351-52 (S.D. Fla. 2011) (improved market-intelligence

product is procompetitive innovation, not exclusionary conduct), *aff'd*, 711 F.3d 1264 (11th

Cir. 2013).  The FTC does not even suggest that Onavo was an essential input necessary for

competition or the only firm providing market research.  *See Alberta Gas Chems. Ltd. v. E.I. Du

Pont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("Clearly, de minimis foreclosure

of a market is not an antitrust dereliction in itself.").  Nor could it:  the FTC bases its entire

theory of monopoly power on data from Comscore, a "commercially-available data source"

and Onavo competitor that "track[s] users' activity online."  *Compare* AC ¶ 69 *with id.* ¶ 182.

       As to Octazen (AC ¶ 74), a "contact importing" service, the acquisition took place in

2008 – years before Facebook is alleged to have had power in any market – and the FTC does

not allege (because it cannot) that contact importing was necessary for competition or that

Octazen was the only commercially available contact-importing service. *Cf. Standard Oil Co. v. United States*, 221 U.S. 1, 32-33 (1911) (Section 2 violation where monopolist bought every competing refinery and thereafter "limit[ed] production" to drive up oil prices). The FTC just cites (at ¶ 74) internal speculation that the acquisition "could" at most "slow some competitors down for a quarter or so" – far from the "monopolistic proportions" of foreclosure required to state a Section 2 claim. *See* IVA Areeda ¶ 1001.

Even less is said about the other apps – tbh (AC ¶ 72), Glancee (AC ¶ 75), and EyeGroove (AC ¶ 76). The FTC does not allege that they were significant PSNS competitors or potential competitors, that they were essential inputs to competition, or that they had any competitive significance at all. Nor does the FTC allege why Facebook shut down these supposedly promising apps rather than use them, as it did with Instagram and WhatsApp, to broaden Facebook's supposed "moat." The agency makes no serious effort to allege plausible claims about any of them.

**b.** The agency cannot challenge any of these transactions before the Court in any event. The agency proceeds under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), *see* AC ¶ 17, meaning it can challenge only conduct that "is violating" or "is about to violate" federal law, 15 U.S.C. § 53(b). But Facebook allegedly shut down all five apps years before the agency filed its suit. That deprives the FTC of "statutory authority to seek an injunction 'based on [such] long-past conduct.'" Op. 3 (quoting *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019)) (brackets in Op.). Accordingly, the allegation that Facebook shut down these apps years ago renders "an injunction under Section 13(b) unavailable as a matter of law." Op. 17.

B.    **The FTC's Attempt To Revive Dismissed and Defective Platform Allegations Fails as a Matter of Law**

The Court found, after review of the actual Platform policies incorporated by reference in the FTC's initial complaint, that these policies were lawful.  And the Court reached the "conclusion[] of law" that the FTC's "challenge to Facebook's policy of refusing interoperability permissions with competing apps fails to state a claim for injunctive relief" because "there is nothing unlawful about having such a policy in general."  Op. 2-3.  The Court likewise held that particular applications of those policies were "long-past conduct" for which "the FTC lacks statutory authority to seek an injunction" (the only remedy available to the agency in federal court, as it lacks statutory authority to pursue damages) and that the only "actionable violation" would need to be "ongoing or about to occur."  Op. 3, 42.

The Court did not suggest that the FTC could replead these legally invalid Platform claims, which the Court dismissed as a matter of law.  Op. 3.  The FTC nonetheless returns with the same allegations as before, with only cosmetic changes.  But the agency's claim is barred by the law-of-the-case doctrine:  "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  In any event, now as before, the allegations have no merit:  Facebook's policies were indeed lawful, as the Court correctly held; and the long-past instances of application cannot, as a matter of law, support a future injunction, as the Court also correctly ruled.

1.    ***The FTC's attempt to revive its Platform claims is barred by the law of the case.***
The attempt to reinject discredited Platform claims into this case is barred by the law of the case because the Court already decided that indistinguishable allegations failed to state a claim.  *See LaShawn*, 87 F.3d at 1393; *see also Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26, 35-36 (D.D.C. 2017) (applying law-of-the-case doctrine to dismiss claims in amended complaint

33

already rejected in initial complaint), *aff'd*, 720 F. App'x 1 (D.C. Cir. 2018) (per curiam);

*Blackbook Cap., Inc. v. Fin. Indus. Reg. Auth., Inc.*, 2021 WL 1827268, at *2-3 (D.N.J. May 5,

2021) (same); *Cummings v. City of New York*, 2021 WL 1163654, at *7 (S.D.N.Y. Mar. 26,

2021) (same), *appeal pending*, No. 21-1380 (2d Cir.); *Friedman v. Dollar Thrifty Auto. Grp.,

Inc.*, 2015 WL 4036319, at *8 (D. Colo. July 1, 2015) (similar); *Bigio v. Coca-Cola Co.*,

2010 WL 3377503, at *2 (S.D.N.Y. Aug. 23, 2010) (same), *aff'd*, 675 F.3d 163 (2d Cir. 2012).

The AC's allegations regarding Facebook's Platform policies and their application raise the

exact same issues that this Court addressed before.  Judicial economy requires parties to accept

court rulings and not treat them as occasion for repetitive reargument; the "previous judicial

determination" controls.  *Berryman-Turner*, 233 F. Supp. 3d at 35.

       a.    ***No new facts or law justify revisiting the Court's holding that the Platform***

***policies were lawful.***  Because the Platform policies were incorporated by reference in the initial

complaint, the Court appropriately reviewed those policies – and not just the FTC's gloss on them.

*See* Op. 49-50.  The Court correctly held that the policies were neither an unlawful "refusal to

deal" nor "conditional dealing."  Op. 39-40, 50.  As the Court already held, "[r]egardless of

whether the FTC can amend its Complaint to plausibly allege market power . . . , the conduct

it has alleged regarding Facebook's interoperability policies cannot form the basis for Section 2

liability."  Op. 3.

       The agency continues pressing both points.  It claims (at ¶¶ 79, 132, 238) that the same

policies were "conditional dealing."  But the Court has already explained why that is unfounded:

Facebook's announcement and enforcement of its terms for developers to access proprietary

Facebook APIs did not "in fact interfere[ ] . . . with the ability of competing social-networking

services to deal with app developers."  Op. 48-49.  The Court went on to explain that, in the

absence of any alleged interference between rivals and third parties, the FTC had failed to state

a Section 2 claim for unlawful "conditional dealing." *Id.* The AC still alleges no interference with rivals, and in fact continues to challenge only API "restrictions [that] limited the types of activities developers could engage in *using the platform.*" AC ¶ 133 (emphasis added).

The FTC also reasserts that the policies were unlawful refusals to deal, ignoring the preclusive effect of *Trinko*, its progeny, and this Court's holding. As the Court explained, the "central teaching" of refusal-to-deal law, as relevant here, "is that Facebook had no antitrust duty to avoid creating [the] deterrent" to competitor entry that the FTC said Facebook created. Op. 39. Moreover, "Facebook's general policy of withholding API access from competitors . . . was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing." Op. 40. And any violation would require facts establishing that Facebook was acting irrationally, sacrificing short-term profits solely to harm the firms with which it had previously and voluntarily dealt. *See* Op. 38-39.

The AC continues to rely on the discredited "core argument" (Op. 39) that Facebook's alleged Platform policies unlawfully "changed the incentives of app developers and deterred them from developing competing functionalities or supporting competing personal social networks." AC ¶ 148; *see* Op. 39 (rejecting same theory). The FTC points to the same policies the Court already considered, and it cannot cite any intervening change in law that could justify a departure from this Court's prior decision. The only new ruling of relevance supports Facebook: the Sixth Circuit recently *adopted* this Court's legal standard for a refusal-to-deal claim in *St. Luke's Hospital v. ProMedica Health System, Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (citing *New York v. Facebook, Inc.*, --- F. Supp. 3d ---, 2021 WL 2643724, at *11 (D.D.C. June 28, 2021), *appeal pending*, No. 21-7078 (D.C. Cir.)).

      **b.** ***There is no valid basis for reconsideration of the Court's decision that the past instances of enforcement of a terminated policy cannot support injunctive relief.*** The Court

also ruled that the FTC's allegations concerning Facebook's pre-2018 *implementation* of its policies fail to state a claim. This Court correctly reasoned that Section 13(b) of the FTC Act "'is prospective, not retrospective,'" and authorizes suit only when a defendant "'is violating' or 'is about to violate'" the antitrust laws. Op. 42 (quoting *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021)); *see also* 15 U.S.C. § 53(b). Accordingly, the FTC could not bring suit in federal court challenging alleged refusals to deal that were long past. *See* Op. 41-42.

The FTC had not shown any likelihood of recurrence because it did not plead facts showing that Facebook would "not only . . . imminently reinstate its policies" but also "imminently take the kind of further action that might come within *Aspen Skiing* [*Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)]: target its competitors with which it had a previous, voluntary course of dealing for API revocation in a manner that suggests predatory, short-term-profit-sacrificing behavior." Op. 44; *see also Shire*, 917 F.3d at 160 ("vague allegations" of restarting terminated conduct do not plausibly support imminence "when the alleged misconduct ceased almost five years before filing of the complaint").

The AC recycles the same, stale "they might do it again" rhetoric that the Court correctly rejected last time. The FTC now mentions one additional developer that was allegedly subject to API restrictions – five years ago. *See* AC ¶ 158. But whether five or eight years ago, such past enforcement of discarded policies cannot support the necessary element of a claim: an imminent likelihood of Facebook imposing an unlawful restriction and then enforcing it in a manner that threads the "narrow-eyed needle" of *Aspen Skiing*'s strict and demanding standard. Op. 36; *see also Facebook*, 2021 WL 2643724, at *12, *14 (holding that no injunction could redress alleged refusals to deal from 2015; also noting *Aspen Skiing* requirements that the agency had not even attempted to satisfy).

36

The AC adds a few sentences of new speculation about conditions that the agency thinks *could* one day drive Facebook to revive the Platform policies. But none of these allegations (at ¶ 151) about unknown "competitive pressures" from some future "period of technological transition" – much less the FTC's unsupported and vague claim that Facebook in some respect "continues to screen developers" – comes close to facts plausibly showing that Facebook will "imminently reinstate its policies," much less that it will "imminently" grant and then restrict the API access of unspecified competitors in a way that suggests otherwise irrational predatory profit sacrifice in violation of Section 2. *See* Op. 44. And the FTC's allegations (at ¶¶ 152-153) regarding Facebook's interactions with regulators have nothing to do with whether Facebook "is about to violate" Section 2 through an unlawful and otherwise-irrational course of dealing with developers. 15 U.S.C. § 53(b). As the Court correctly held, the FTC's speculation about a future problem cannot make the requisite showing, and the agency has given the Court no valid reason to reconsider its decision. *See* Op. 43 (explaining that "conditional and conclusory allegation[s]" would be "insufficient" to establish imminence); *see also Shire*, 917 F.3d at 156.

      **2.**      ***The past Platform policies cannot support any valid claim of antitrust violation as a matter of law.*** Even if the Court were writing on a blank slate and considering these issues for the first time, the FTC's allegations regarding policies that have not been in effect since 2018 simply cannot be litigated by the agency under its Section 13(b) authority. The parties briefed these issues extensively in the last round. *See* FB FTC Br. 36-39, ECF No. 56-1; FTC Opp'n 31-38; FB FTC Reply 17-22, ECF No. 62; *see also* FB States Br. 28, No. 1:20-cv-3589-JEB, ECF No. 114-1; States Opp'n 34-42, No. 1:20-cv-3589-JEB, ECF No. 121; FB States Reply 24-25, No. 1:20-cv-3589-JEB, ECF No. 123. The agency has not materially changed its factual allegations – adding only an additional 2016 Platform policy application that still falls outside the reach of Section 13(b) and more speculation about why Facebook might want to reinstate the

policies.  *See* AC ¶¶ 151, 158.  The Court's prior decision was correct, and there is no valid basis

for a different result this time.

Every court to address similar refusal-to-deal claims based on Facebook's Platform

policies has upheld Facebook's conduct on the merits.  *See Reveal Chat Holdco, LLC v.

Facebook, Inc.*, 471 F. Supp. 3d 981, 1002-03 (N.D. Cal. 2020) (granting motion to dismiss

interoperability claims); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075

(S.D. Cal. 2012) ("Facebook has a right to control its own product, and to establish the terms

with which . . . application developers . . . must comply in order to utilize this product.");

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010)

(dismissing claims based on prior Platform policies).  Facebook's Platform policies lie in the

heartland of the general rule that a firm may choose its terms of dealing – including terms to

prevent rivals from free-riding on the firm's assets.  *See* AC ¶ 146.

## III.  THE FTC'S VOTE PURPORTING TO AUTHORIZE THE AC WAS INVALID; THE COURT SHOULD ACCORDINGLY DISMISS THE AC

Chair Khan's participation in the decision to file the AC violates due process and federal

ethics rules.  Facebook submitted a Petition to the agency explaining that due process and the

federal ethics rules require Chair Khan to be recused from this case because any disinterested

observer would conclude that Chair Khan came to the FTC having already made up her mind

that Facebook has violated the antitrust laws and with an "axe to grind" against the company.

*Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.); *see* Hansen Decl.

Exs. A, B (Facebook's Petition for Recusal ("Recusal Petition") and supporting expert

declaration of Professor Daniel B. Rodriguez ("Rodriguez Decl.")).

Yet the new Chair, who controls the FTC's agenda, refused to address Facebook's Recusal

Petition on the merits or allow the full Commission to do so before pressing forward with a vote

on the AC. That failure violates due process and federal ethics rules and invalidates the

Commission's 3-2 vote on the AC. *See* Hansen Decl. Ex. F at 2 (Order, *FTC v. Libbey, Inc.*,

No. 1:02-cv-00060-RBW, ECF No. 76 (D.D.C. Apr. 3, 2002)) (Commission vote required

under § 13(b) to authorize filing of amended complaint).

As Commissioner Wilson wrote in her dissent, Facebook's Recusal Petition raised

serious issues worthy of careful consideration. Wilson Dissent at 1. The only excuse the agency

gave for not taking up the Petition was that the agency simply has no mechanism to consider the

serious issues raised by Facebook's Petition as they apply to Commissioners except for when

Commissioners are engaged in rulemaking or sitting as judges in administrative proceedings.

*See* Hansen Decl. Ex. G (Email from April J. Tabor, Office of the Sec'y, FTC, to Geoffrey

M. Klineberg (Aug. 19, 2021) ("Tabor Email")). That makes no sense. A federal agency is

obligated "to comport its actions to the standards required by the Constitution," and, "[i]f

promulgating new regulations is the only manner in which the [agency] can properly conform

its conduct, then the [agency] must do so." *Lowry v. Soc. Sec. Admin.*, 2000 WL 730412, at *14

(D. Or. June 7, 2000) (denying Social Security Administration's motion to dismiss claims

challenging adequacy of the agency's disqualification procedures); *see also Aera Energy LLC

v. Salazar*, 642 F.3d 212, 223 (D.C. Cir. 2011) (explaining that agencies may need "to adapt

established internal procedures" to ensure that their decisions are "untainted").[2]

---

[2] The Court may take judicial notice of Facebook's Recusal Petition and supporting
Rodriguez declaration, the public statements quoted in the Petition (as well as the underlying
news articles, publications, and tweets), and the agency's response to the Petition. *See* Fed. R.
Evid. 201; *see also*, *e.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (courts may
take judicial notice of public "articles" and "publications"); *Wilcox v. Georgetown Univ.*, 2019
WL 132281, at *4 n.5 (D.D.C. Jan. 8, 2019) (courts may take judicial notice of facts "generally
known because of newspaper articles"); *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp.
3d 279, 306 n.23 (D.D.C. 2018) (courts may take judicial notice of "correspondence" from

The Court should dismiss the AC because it was not properly authorized by the Commission. In the alternative, it should direct the FTC to address on the merits the serious issues presented in the Recusal Petition: whether Chair Khan's participation comported with federal law.

### A.    Chair Khan's Prejudgment of Facebook's Liability Required Her Recusal

**1.**    Chair Khan's prior statements make clear to a disinterested observer that, before she became an FTC Commissioner, she had prejudged Facebook's Section 2 liability and was biased against the company. *See* Recusal Petition at 11-13 (collecting statements). Binding D.C. Circuit precedent requires an FTC Commissioner's recusal where "a disinterested observer" would "conclude that [she] has in some measure adjudged the facts as well as the law of a particular case in advance." *Cinderella Career Coll. & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970); *see* Recusal Petition at 17-20 (collecting authorities); Rodriguez Decl. at 3-6 (same).

Less than a year ago, Chair Khan, by her own admission, "*led* the congressional investigation into digital markets [by the House Antitrust Subcommittee] and the publication of" a report that purported to conclude that Facebook engaged in conduct that meets all the elements of a Section 2 violation. *See* Lina Khan, Bio, http://www.linamkhan.com/bio-1 (no longer active) [https://perma.cc/9GB5-F78G (visited Oct. 4, 2021)] (emphasis added). The report purported to make factual and legal findings that Facebook has "monopoly power" in a relevant antitrust market, maintained that monopoly power through anticompetitive means, and harmed consumers. *See* Majority Staff of Subcomm. on Antitrust, Com. & Admin. Law of the H. Comm.

---

agency); *Vasser v. McDonald*, 228 F. Supp. 3d 1, 10-11 (D.D.C. 2016) (courts may take judicial notice of materials filed with an agency); *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 581 n.5 (S.D.N.Y. 2021) (courts may take judicial notice of websites).

on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations* 132-73 (Oct. 2020).  Having completed this report just months before her nomination and confirmation to the FTC, Chair Khan cannot plausibly be expected to set those conclusions aside and conduct a fresh, impartial review of the evidence.

The Sixth Circuit addressed a similar situation in *American Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966), holding that then-Chair Paul Rand Dixon's participation in a case "amounted . . . to a denial of due process" where he had "played an 'active role' in an [antitrust] investigation by [a congressional] Subcommittee of many of the same facts and issues and of the same parties as are involved in this [FTC] proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties." *Id.* at 763, 767 (ellipsis in original).  The court explained that it was sufficient that then-Chair Dixon's conduct created an *appearance* of prejudgment and the "reasonable suspicion of unfairness" because "[i]t is fundamental that both unfairness and the appearance of unfairness should be avoided." *Id.* at 767.

Chair Khan's participation is even more concerning because her public statements regarding Facebook go well beyond the congressional report and reveal that Chair Khan has an "axe to grind" against the company.  *Wright*, 732 F.2d at 1056.  She has accused Facebook of being responsible for "a host of social ills," including "genocide," Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 526-27 (2019), and of having "appropriated [competitors'] business information and functionality," Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 1001 (2019).  Such hyperbolic animus is incompatible with the requirement of both the fact and the appearance of unbiased exercise of the FTC's prosecutorial power.

**2.** Chair Khan, purportedly upon advice from the FTC's General Counsel, bypassed the serious issues raised by Facebook's Recusal Petition. *See* Hansen Decl. Ex. H at 2 (Press Release, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury Scheme to Crush Competition After String of Failed Attempts to Innovate (Aug. 19, 2021) ("Press Release")) (stating that the Recusal Petition had been "dismissed" by the Office of the Secretary). In particular, the full Commission was not given the chance to address the merits of the Petition. In dissenting from the decision to authorize the AC, Commissioner Wilson explained that, "[i]f the Commission were to review Facebook's recusal petition, [she] would evaluate the petition carefully, applying the relevant law, including Constitutional due process considerations, to the applicable facts." Wilson Dissent at 1 (footnote omitted).

The FTC's explanation for not even considering these issues was both sweeping and unsupported: the agency asserted that it simply had no mechanism to evaluate the application of due process rules to Commissioners in the exercise of their authority under the FTC Act except in specific and limited circumstances. *See* Tabor Email (stating that the "recusal petition and the supporting declaration ha[ve] been procedurally reviewed" but that, "[a]s there are currently no adjudicative or rulemaking proceedings before the Commission in which Facebook . . . is a subject, target, or defendant/respondent, this petition is premature"). The agency likewise maintains that federal-court jurisdiction is all the process to which a defendant is entitled and that a defendant has no right to an unbiased agency decision when it will ultimately have its case decided by an Article III judge. *See* Press Release at 2 (stating that, because "the case will be prosecuted before a federal judge, the appropriate constitutional due process protections will be provided to the company").

That position cannot be squared with federal law. The fact that Chair Khan was not acting as a formal adjudicator did not remove her obligation to avoid the appearance of

prejudgment or bias.  The Chair of the FTC exercises extraordinary power within the agency: the entire FTC staff is an extension of the Chair.  *See* Reorganization Plan No. 8 of 1950, 15 Fed. Reg. 3175 (May 25, 1950).  As the head of a powerful agency entrusted with making enforcement decisions, Chair Khan has an obligation to approach decisions to bring the power of the agency to bear with an open mind through a process that gives fair consideration to all parties.  *See* Rodriguez Decl. at 3-8; *see also* 5 C.F.R. § 2635.501(a).

Indeed, all prosecutors – not just those subject to the heightened expectations of neutrality that apply to commissioners of independent administrative agencies – are subject to disqualification when they have an "axe to grind" against the defendant or are not otherwise impartial.  *Wright*, 732 F.2d at 1056; *see also* Rodriguez Decl. at 8-16 (collecting authorities). Prosecutors are expected to engage in "fair play," Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 4 (1940), and to exercise their discretion to bring cases in a "disinterested, nonpartisan fashion," N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 683, at 4 (June 7, 1996).[3]  While prosecutors do not make the ultimate decision of guilt or innocence, they still have "quasi-judicial" responsibilities because they are charged with important decisions about whether and how to bring claims.  *See* Rodriguez Decl. at 11 (collecting authorities). The cavalier assertion that the Constitution and federal ethics rules place *no* limits on the Chair's ability to exercise her considerable power against a defendant, no matter how apparent her bias and prejudice are to any disinterested observer, is both breathtaking and incorrect.

---

[3] *See also*, *e.g.*, *State v. King*, 956 So. 2d 562, 563 (La. 2007) (disqualifying prosecutor who had "strong personal feelings of animosity" toward defendant); *State v. Gonzales*, 119 P.3d 151, 162 (N.M. 2005) (disqualifying prosecutor who had previously made "expressions of animosity" toward defendant); *State v. Hohman*, 420 A.2d 852, 854-55 (Vt. 1980) (finding error in trial court's denial of motion to disqualify state's attorney because he formerly pledged to prosecute the defendant in a campaign advertisement), *overruled on other grounds by Jones v. Shea*, 532 A.2d 571 (Vt. 1987).

**B.      In the Absence of a Valid Commission Vote, the AC Must Be Dismissed**

For the reasons explained above, the AC has not been properly authorized, and the agency has failed to satisfy the requirements of Section 13(b), which provides that "the Commission" must make the decision to "bring suit in a district court of the United States." 15 U.S.C. § 53(b).  That plain language requires a valid vote of the Commission itself.  *See FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 42 n.19 (D.D.C. 2002); 16 C.F.R. § 1.61.  In the absence of a valid vote, the agency's staff lacks authority to file a complaint, and any complaint they do file is not "properly before" the Court.  *Libbey*, 211 F. Supp. 2d at 42 n.19; *see also*, *e.g.*, *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 554-55 & n.2 (9th Cir. 2016) (dismissing National Labor Relations Board petition for injunctive relief that lacked "valid authorization"); *ICC v. S. Ry. Co.*, 543 F.2d 534, 535 (5th Cir. 1976) (dismissing case where Interstate Commerce Commission lacked the necessary authorization to "bring suit to enforce its orders in the federal district courts"); *FTC v. Guignon*, 390 F.2d 323, 329-30 (8th Cir. 1968) (dismissing FTC subpoena enforcement action where FTC lacked statutory authorization to bring the action).

Even if Chair Khan's vote had not been decisive – which it was – her participation would invalidate the FTC's vote.  For example, in *Cinderella*, the D.C. Circuit held that then-Chair Dixon's failure to recuse himself from a vote after giving a speech that gave "the appearance that the case ha[d] been prejudged" invalidated the entirety of the Commission's unanimous vote because there was "no way" to measure "the influence of [then-Chair Dixon] upon the others." 425 F.2d at 590, 592.  The taint on the FTC's action is even more apparent here, because the Chair cast the deciding vote for the FTC's action.[4]  Dismissal of the AC is therefore required.

---

[4] Given the Chair's authority to direct the actions of the FTC's staff, Chair Khan's failure to recuse herself is also an ongoing due process violation that will taint all of the agency's litigation choices.

C. **In the Alternative, the Court Should Stay the Case and Remand to the FTC To Resolve the Recusal Issue Now**

Whether Chair Khan's participation comported with due process and federal ethics rules is an issue that this Court should resolve before this case proceeds. As an alternative to this Court deciding the recusal issue, the Court could also stay this case and order the agency to act on Facebook's Recusal Petition. *See Aera Energy*, 642 F.3d at 220 (the preferred remedy in cases involving allegations that "political considerations have tainted agency action" has been to give "the agency an opportunity to issue a new, untainted decision"); *Amos Treat & Co. v. SEC*, 306 F.2d 260, 267-68 (D.C. Cir. 1962) (requiring Securities and Exchange Commission to "determin[e] upon a complete record whether or not any Commissioner should have been disqualified" or end the case). That action may bring the case to an end; at a minimum, it would provide a basis for this Court to evaluate the legal and factual grounds for any ruling by the Commission that Chair Khan's recusal is not required.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and dismiss the FTC's case.

Respectfully submitted,

October 4, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
Jared M. Beim (D.C. Bar No. 1723465)*
Hannah D. Carlin (D.C. Bar No. 1719743)*
L. Vivian Dong (D.C. Bar No. 1722506)
Kimberly V. Hamlett (D.C. Bar No. 1722207)*
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*

* Applications for Admission to the Bar of the U.S.
District Court for the District of Columbia Pending

# EXHIBIT  4

## Politics

# FTC's Khan Overruled Staff to Sue Meta Over VR App Deal

- Commission voted 3-2 against Meta's pursuit of VR fitness app
- Staff had recommended against opposing acquisition of Within



Lina Khan *Photographer: Al Drago/Bloomberg*

By Leah Nylen
July 29, 2022 at 9:00 AM EDT *Updated on July 29, 2022 at 1:40 PM EDT*

Federal Trade Commission Chair Lina Khan led her fellow Democrats in the agency's majority vote to sue Meta Platforms Inc. this week, despite the staff recommending against bringing a case to challenge the company's acquisition of Within Unlimited Inc., according to three people with knowledge of the decision.

The move demonstrates Khan's new, more aggressive approach to antitrust enforcement compared with her predecessors -- as well as the challenges she faces in bringing the agency along with her.

Agency leadership has been reluctant in the past to counter a recommendation from staff lawyers and economists, whose job it is to provide a technical assessment of whether proposed deals are anticompetitive and whether the agency has the elements to build a winning case.

In public comments and writings, Khan has emphasized the need to rein in the biggest technology companies, particularly Facebook parent Meta, which she argues has used acquisitions as a form of "land grab" to conquer new markets and "neutralize competitive threats."

In a 2021 report, the FTC found that the five tech giants -- Alphabet Inc., Apple Inc., Amazon.com Inc., Microsoft Corp. and Meta -- acquired hundreds of smaller firms over the previous decade, often using loopholes in the law to avoid notifying antitrust regulators about the takeovers.

Despite the ratcheting up of regulatory scrutiny under the Biden administration, acquisitions by the five tech giants are on pace this year to match or exceed the annual totals under former president Donald Trump. In the first six months of 2022, the five announced plans to acquire 24 companies, exceeding the total for the first half for four of the five previous years, according to data compiled by Bloomberg.

While most of those transactions involved small private companies without the terms being disclosed, Microsoft's planned $69 billion takeover this year of Activision Blizzard Inc. would be the company's largest ever and one of the 30 biggest deals of all time. The FTC is also reviewing that merger.

For more: Microsoft's Activision Deal Set to Test Biden's Antitrust Regime

In the lawsuit filed against Meta on Wednesday, the FTC alleged the deal would give the social networking company a leg up in dominating the burgeoning virtual reality market. The suit represents the first time the agency has preemptively challenged an acquisition by the social media giant, which has bought more than 100 smaller companies over the past decade, according to a 2020 House report.

The FTC has asked a federal court in California to bar Meta from closing the deal until after it has a chance to hear the suit challenging the merger. Meta said it would fight the complaint.

While critics are accusing Khan of overreach in seeking to block the deal, antitrust advocates have urged the agency to be more aggressive in stopping technology giants from acquiring startups that could eventually become rivals.

The FTC's five commissioners split 3-2 on whether to file the complaint, with the two Republicans, Noah Phillips and Christine Wilson, voting against the suit. Each of the commissioners had the

Case 5:22-cv-04325-EJD   Document 93-2   Filed 09/23/22   Page 144 of 228

opportunity to test out Meta's Oculus product, Within's Supernatural and Meta's Beat Saber, two of the people said.



A Meta Oculus Quest 2 VR headset at a Meta Store in Burlingame, California. *Photographer: David Paul Morris/Bloomberg*

The FTC declined to comment.

The lawsuit follows the FTC's 2020 monopolization case against Meta seeking to unwind its acquisitions of Instagram in 2012 and WhatsApp in 2014, after failing to challenge them at the time. Phillips and Wilson also opposed that case, which could go to trial in 2024 in federal court in Washington. The FTC alleges the acquisitions were part of an illegal scheme to monopolize the market for social networking.

Meta has denied the allegations and is also contesting that case.

Alvaro Bedoya -- who joined the commission in May, giving Khan a Democratic majority -- had multiple meetings with FTC staff and Khan's office about the Within deal to address his concerns about overruling the staff recommendation, two of the people said. Bedoya, through an FTC spokesman, declined to comment on his deliberations.

Before Bedoya joined the commission, it was deadlocked 2-2, allowing the two Republicans to stymie several of Khan's more aggressive ideas to promote competitive markets.

For more: Path For Democrat-Led FTC Opens as Senate Advances Last Nominee

Meta announced last October its plan to acquire Within, the maker of the popular virtual reality fitness app Supernatural, for an undisclosed sum. The proposed deal followed Meta's purchase of six other virtual or augmented reality app makers over the past three years, none of which were challenged by the FTC.

Formerly known as Facebook, Meta rebranded itself last year in an effort to better focus on the metaverse -- a more immersive version of the internet, where people can populate an alternative virtual world to go shopping, go to work and see friends. The company is the world's top VR headset maker with its Oculus product controlling about 80% of the market, according to research firm IDC.

---

### The latest in global politicsThe latest in global politicsThe latest in global politics

Get insight from reporters around the world in the Balance of Power newsletter.Get insight from reporters around the world in the Balan e of Power newsletter.Get insight from reporters around the world in the Balan e of Power newsletter.

 Sign up to this newsletter

---

Within's Supernatural offers immersive VR workouts complete with music and fitness instructors. In its complaint, the FTC alleged that Within's Supernatural app competes with Meta's own Beat Saber, a VR rhythm game where users hit targets in time to music. Meta also has the financial resources and expertise to easily add features to Beat Saber or develop a separate dedicated fitness app that could more directly compete with Supernatural, the FTC said.

"The FTC's case is based on ideology and speculation, not evidence," Meta lawyer Nikhil Shanbhag said in a blog post about the case. "We are confident this transaction does not reduce competition in any way, will bring countless benefits to people and VR developers, and should therefore be allowed to proceed."

During the nine-month inquiry, the FTC didn't take any sworn interviews of company executives, which it often uses to help build a case, two of the people said, speaking anonymously to discuss the confidential probe. But a few weeks before the Within deal was set to close on July 31, Khan's office sent the company additional questions and began drafting a legal challenge, the people said.

*— With assistance by Michael Hytha*

Case 5:22-cv-04825-EJD   Document 93-2   Filed 09/23/22   Page 146 of 228

*(Updates with continued pace of tech deals from sixth paragraph)*

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy
©2022 Bloomberg L P  All Right  Re  erved
Career   Made in NYC  Adverti  e  Ad Choice       Help

# EXHIBIT 5

UNITED STATES OF AMERICA

BEFORE

# FEDERAL TRADE COMMISSION

DOCKET NO.

## D-09411

IN THE MATTER OF:

# MARK ZUCKERBERG/WITHIN UNLIMITED, INC.

# COMPLAINT

UNITED STATES OF AMERICA

BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:          Lina M. Khan, Chair
                        Noah Joshua Phillips
                        Rebecca Kelly Slaughter
                        Christine S. Wilson
                        Alvaro M. Bedoya

In the Matter of:

    Meta Platforms, Inc.,
      a corporation,

    Mark Zuckerberg,
      a natural person,

    and

    Within Unlimited, Inc.,
      a corporation.

Docket No. 9411
[PROPOSED] REDACTED
PUBLIC VERSION

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents Meta Platforms, Inc. ("Meta"), a corporation controlled by Respondent Mark Zuckerberg, has agreed to acquire Within Unlimited, Inc. ("Within"), in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

## NATURE OF THE CASE

1.      Meta, one of the largest technology companies in the world and the leading provider of virtual reality ("VR") devices and applications ("apps") in the United States, seeks to acquire Within, a software company that develops apps for VR devices, including the highly

popular and rapidly growing fitness app "Supernatural." If consummated, the Proposed Acquisition would substantially lessen competition, or tend to create a monopoly, in the relevant market for VR dedicated fitness apps and the broader relevant market for VR fitness apps. That lessening of rivalry may yield multiple harmful outcomes, including less innovation, lower quality, higher prices, less incentive to attract and keep employees, and less consumer choice.

2.      A global technology behemoth, Meta reaches into every corner of the world through its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—with more than three billion regular users. Seeking to expand its empire even further, Meta in recent years has set its sights on building, and ultimately controlling, a VR "metaverse." One need look no further than the rebranding of the company from Facebook to "Meta" in 2021 to understand its vision—and its priorities—for the future. And Meta is serious about its goals: it has become the largest provider of VR devices and apps to customers in the United States.

3.      Meta's campaign to conquer VR began in 2014 when it acquired Oculus VR, Inc., a VR headset manufacturer. Since then, Meta's VR headsets have become the cornerstone of its growth in the VR space: its current generation headset, the Meta Quest 2, is by far the most widely used VR headset today, with a significant majority of headset sales in 2021 and 2022. Meta CEO Mark Zuckerberg has publicly stated that Meta subsidizes its VR devices or sells them at cost in order to attract users. One day before a complaint was filed in federal court to preliminarily enjoin the Proposed Acquisition, Meta announced that it was raising the price of all new Quest 2 headsets by $100.

4.      And Meta's Quest Store (formerly Oculus Store) has become the leading distribution platform for VR software apps in the United States, connecting app developers and VR users in an online marketplace through which developers can offer their products to users for download onto their individual VR devices. Meta controls the wildly popular app Beat Saber, which it acquired by purchasing Beat Games in November 2019. Beat Saber ████████████ ████████████ Along with Meta's recent announcement that it was increasing headset prices, it also announced that, for a limited time, every new headset purchase will include an offer to download Beat Saber without paying any separate download fees. In addition to Beat Games, Meta owns a number of other VR apps, some of which it developed in-house but most of which it acquired by rolling up other app studios.

Along with Meta's recent announcement that it was increasing Quest 2 headset prices, it also announced that for a limited time, every new headset purchase will include an offer to download Beat Saber without paying a separate download fee.

5.      Meta has thus become a key player at each level of the VR ecosystem: in hardware with its Meta Quest 2 headset, in app distribution with the Quest Store, and in apps with Beat Saber and several other popular titles. This is not by accident; Meta has an explicit strategy of harnessing strong network effects in VR to ensure its leading status in this growing industry. Meta could have chosen to try to compete with Within on the merits; instead, Meta decided it preferred to simply buy the ████████ in a vitally important, ████████ category.

6. As Meta fully recognizes, network effects on a digital platform can cause the platform to become more powerful—and its rivals weaker and less able to seriously compete—as it gains more users, content, and developers. The acquisition of new users, content, and developers each feed into one another, creating a self-reinforcing cycle that entrenches the company's early lead. This market dynamic can spur companies to compete harder in beneficial ways by, for example, adding useful product features or hiring additional employees. But it can also make anticompetitive strategies more attractive.

7. Meta seeks to exploit the network-effects dynamic in VR. Indeed, Mr. Zuckerberg has made clear that his aspiration for the VR space is control of the *entire* ecosystem. As early as 2015, Mr. Zuckerberg instructed key Facebook executives that his vision for "the next wave of computing" was control of apps *and* the platform on which those apps were distributed, making clear in an internal email to key Facebook executives that a key part of this strategy was for his company to be "completely ubiquitous in killer apps"—i.e., in significant VR apps that prove the value of the technology. In that same email, Mr. Zuckerberg told his executives that Facebook should "us[e] acquisitions opportunistically."

8. The proposed acquisition of Within would be one more step along that path toward dominance. According to Within's co-founder and CEO, "Fitness is the killer use case for VR." But instead of choosing to compete on the merits through its own VR dedicated fitness app, Meta has resorted to proposing this unlawful acquisition.

9. If Meta is able to proceed with the Proposed Acquisition, the merger poses a reasonable likelihood of substantially lessening competition in the market for VR dedicated fitness apps, where Supernatural ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10. Having simply bought up the ▮▮▮▮▮▮▮▮▮▮ Meta would no longer have any incentive to develop its own competing app from scratch, add new features to Beat Saber or other existing Meta apps to compete with Supernatural on the merits, or acquire a small generalist studio that could supplement Meta's considerable existing resources and VR know-how to develop an app to compete with Supernatural. Instead of adding a significant new rival to the mix, the Acquisition would simply let Meta assume total control of the ▮▮▮▮▮▮ overnight. That lessening of competition violates the antitrust laws.

11. Moreover, a company poised on the edge of a market may exert competitive pressure on existing participants. Regardless of whether such a company actually intends to enter, the possibility that it may do so can spur other companies already in the market to proactively ramp up their own competitive efforts. Meta, poised on the edge of the VR dedicated fitness app market with its popular Beat Saber app, and with all its vast resources and unique strategic advantages, exerts such an influence. That pressure spurs the market leader, Within, to add new features, retain employees, continue innovating, and generally compete harder in order to stay a step ahead of Meta in the event it decides to enter. The Proposed Acquisition would eliminate that incentive for market participants to compete, again in contravention of the antitrust laws.

12. When viewed against the backdrop of the broader VR fitness app market, which includes both dedicated or deliberate fitness apps ("dedicated fitness apps") and apps, such as

rhythm and active sports games, that provide an incidental fitness benefit ("incidental fitness apps"), the merger is no less anticompetitive. Letting Meta acquire Supernatural would combine the makers of two of the most significant VR fitness apps, thereby eliminating beneficial rivalry between Meta's Beat Saber app and Within's Supernatural app.

13.     Accordingly, the Proposed Acquisition poses a reasonable probability of eliminating both present and future competition. That lessening of competition may result in reduced innovation, quality, and choice, less pressure to compete for the most talented app developers, and potentially higher prices for VR fitness apps. And Meta would be one step closer to its ultimate goal of owning the entire "Metaverse."

## JURISDICTION

14.     Respondents Meta and Within are each "corporations" as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, and in Section 1 of the Clayton Act, 15 U.S.C. § 12.

15.     Respondent Mark Zuckerberg is a natural person and a "person" within the meaning of Section 1 of the Clayton Act, 15 U.S.C. § 12(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18.

16.     Respondents and each of their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

17.     The Proposed Transaction constitutes a transaction subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## RESPONDENTS AND PROPOSED ACQUISITION

18.     Respondent Meta is a publicly traded company organized under the laws of Delaware with headquarters in Menlo Park, California. Meta develops and sells VR and other extended reality hardware and software through its "Reality Labs" division. Reality Labs has been growing at breakneck speed: it generated revenues of $2.274 billion in 2021, which reflected a 127% jump from 2019 and a 100% increase since 2020. Meta's best-selling VR hardware product to date is the Meta Quest 2, while its best-selling VR software product is the wildly popular Beat Saber, which was initially released by Beat Games, a studio that Meta acquired in 2019. Meta continues to add new downloadable content to Beat Saber; for example, it recently added a "Lady Gaga Music Pack" available for a $12.99 add-on fee.

19.     Respondent Mark Zuckerberg is the founder, Chairman, CEO, and controlling shareholder of Respondent Meta. Mark Zuckerberg is the Ultimate Parent Entity of and ultimately controls Respondent Meta. His offices are located at 1601 Willow Road, Menlo Park, California, 94025.

20.     Respondent Within is a privately held virtual and augmented reality company organized under the laws of Delaware with headquarters—and its principal business—in Los Angeles, California. Founded by Chris Milk and Aaron Koblin, Within's flagship product is Supernatural, a VR subscription fitness service. Supernatural offers over 800 fully immersive VR workouts, each set to music and located in a virtual setting like the Galapagos Islands or the Great Wall of China. Through deals with major music studios, Supernatural continues to grow its catalog, which includes songs from A-list artists like Katy Perry, Imagine Dragons, Lady Gaga, and Coldplay. Supernatural's workouts are fitness classes that customers can access by paying a monthly subscription fee of $18.99, or a yearly subscription fee of $179.99. Supernatural is presently only available on the Meta Quest and Quest 2 and is sold in the United States and Canada.

21.     On October 22, 2021, Meta and Within signed an Agreement and Plan of Merger, pursuant to which Meta would acquire all shares of Within in a transaction valued at ▆▆▆▆▆.

## INDUSTRY BACKGROUND

22.     The VR industry is currently characterized by a high degree of innovation and growth. Global sales are predicted to more than double in just three years, from $5 billion in 2021 to more than $12 billion in 2024.

23.     Users typically engage with the VR experience through a headset with displays in front of each eye to place a user in a fully rendered, three-dimensional environment. Cutting-edge VR technology creates an immersive digital experience like no other. VR users can instantly be transported anywhere in the world, backward or forward in time, into outer space or fictional lands—all from the comfort and safety of their own homes. Unlike a game, video, or app on a tablet, phone, or monitor, the three-dimensional VR environment creates the perception of completely surrounding the user, allowing the user to move around in the projected space. As Mark Zuckerberg explains, "you're right there with another person or in another place and that's very different from every experience of technology that we've had before. . . ."

24.     Meta's Quest 2 is the best-selling VR headset and has been since shortly after its launch in 2020. In 2020, Meta shipped more than 62% of all VR headsets sold worldwide. That percentage surged to 78% in 2021, when industry sources estimate that Meta sold more than 8.7 million Quest 2 headsets.

25.     The vast majority of users get apps for VR headsets from online app stores, which distribute products for use on individual VR devices. Meta controls its own app store called the "Meta Quest Store," with more than 400 apps available for download. Meta also offers the "App Lab," a Meta-produced tool that allows third-party developers to distribute apps not present in the Meta Quest Store directly to consumers. Other VR app stores include Valve's Steam Store and SideQuest, but the Meta Quest Store is the leading VR app store in the United States.

26.     VR software and studio companies like Within develop the apps that run on VR headsets. These apps run the gamut of genres from rhythm games to shooters to e-sports to creation and exploration and more.

27.     ███████████████████████████████████ Meta's Beat Saber, an enormously popular rhythm game "where you slash the beats of adrenaline-pumping music as they fly towards you, surrounded by a futuristic world." Meta acquired control of Beat Saber through its purchase of Beat Games ███████████████████████████████████ in November 2019.

28.     Since its acquisition of Beat Games, Meta has continued to acquire a series of studios behind many popular VR apps, and now boasts one of the largest first-party VR content organizations in the world:

      a. In January 2020, Meta acquired Sanzaru games, maker of the fantasy Viking combat game Asgard's Wrath.

      b. In May 2020, Meta acquired Ready at Dawn Studios, maker of Lone Echo II, a zero-gravity adventure game, and Echo VR, an online team-based sports game.

      c. In April 2021, Meta acquired Downpour Interactive, maker of Onward, a team-based first-person shooter.

      d. In May 2021, Meta acquired BigBox VR, maker of Population One, a multiplayer first-person arena shooter.

      e. In June 2021, Meta acquired Unit 2 Games, the maker of Crayta, a collaborative platform that allows users to create and play their own games.

      f. And, in November 2021, Meta acquired Twisted Pixel, a studio that makes various games, including Path of the Warrior (a fighting game), B-Team (a first-person shooter), and Wilson's Heart (a mystery noir thriller game).

29.     In addition to the aforementioned acquisitions, Meta has developed and released its own VR apps. These include:

      a. Horizon Worlds, a Massively Multiplayer Online game that allows users to build, share, and interact in virtual worlds;

      b. Horizon Workrooms, a productivity app that lets teams of people share their computer screens, collaborate on virtual whiteboards, and more;

      c. Horizon Venues, a live-events app that lets users experience concerts, sporting events, and more; and

      d. Horizon Home, a social-space app that lets users hang out with their friends, watch videos together, and join multiplayer VR games together.

30.    Among VR apps, dedicated fitness is ███████████
████████████████████████ As Within's co-founder and CEO puts it,
"Fitness is the killer use case for VR." ████████████████████
████████████████████████████████████████
████████████████████████ platform-level tools such as
Oculus Move, a calorie and time counter that runs in the background of other Quest apps and
displays to users data about their activity levels while in VR. ████████████████
████████████

## THE RELEVANT ANTITRUST MARKETS

31.    The Proposed Acquisition would substantially lessen competition or tend to create
a monopoly in the relevant antitrust market for VR dedicated fitness apps in the United States
("VR Dedicated Fitness App market"). The Proposed Acquisition would also substantially lessen
competition or tend to create a monopoly in the broader relevant antitrust market of VR fitness
apps in the United States ("VR Fitness App market") that includes both dedicated fitness apps
and incidental fitness apps.

### A.    The VR Dedicated Fitness App Market

32.    The VR Dedicated Fitness App market is a relevant product market. The market
consists of VR apps, like Within's Supernatural app, that are designed so that users can exercise
through a structured physical workout in their own homes.

33.    ████████████████████████████████████████████████
████████████████████████

34.    Dedicated fitness apps offer distinct functionality when compared to other VR
apps, including VR incidental fitness apps. For example, they may feature adjusting difficulty so
that users never "fail" a workout; they may feature workouts designed by trainers or fitness
experts; they are designed to maximize exertion and physical movement for the purpose of
exercise; and they may feature classes or other active coaching.

35.    VR Fitness App market participants distinguish VR dedicated fitness apps from
VR incidental fitness apps like rhythm and sports games that offer fitness benefits simply
because they require users to move and physically exert themselves while engaging with the app.
Dedicated fitness apps typically entail a higher degree of physical exertion than incidental fitness
apps. According to the Virtual Reality Institute of Health and Exercise, which rates energy
expenditures during VR app usage, Within's Supernatural currently has the highest energy
expenditure, at 12–13 calories per minute.

36.    VR dedicated fitness apps are also typically offered using a distinct, subscription-
based pricing model. Industry participants recognize that this is a distinguishing characteristic of
dedicated fitness VR apps when compared to other VR apps, including incidental fitness apps.

37. ████████████████████████████████

38.    The VR Dedicated Fitness App market does not include other products that are neither close substitutes for, nor offered under similar competitive conditions as, VR dedicated fitness apps. For example, it does not include non-VR at-home smart fitness solutions, such as digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video games, or workout videos.

39.    Functional, practical, technological, and price differences show that non-VR at-home smart fitness solutions and at-home exercise products are distinct from VR dedicated fitness apps.

40.    VR offers a level of immersion that other at-home fitness experiences do not, and cannot, offer. VR technology allows users to exercise from the comfort, privacy, and safety of home with the feeling and visuals of being somewhere else—atop a mountain, on a tropical island, in a futuristic world, virtually anywhere. The sensors in a VR headset and controllers also allow for a degree of tracking, adjustment, and feedback that non-immersive exercise programs cannot match. As Within's co-founder and CEO explained, "[W]orking out in Supernatural feels like you're a champion of a sport from the future. I love that and haven't felt that sense of athleticism ever on a treadmill or an exercise bike."

41.    There also tend to be substantial price differences between VR fitness and smart at-home fitness products. Most smart at-home fitness solutions have much higher up-front costs and much higher ongoing costs than current VR fitness apps. A Peloton smart bicycle, for example, costs over $1,000, with an additional $44 per month subscription cost, compared to the cost of a $299 Meta Quest 2 plus $18.99 per month for Supernatural. It also weighs 135 pounds.

42.    In addition to Supernatural, other apps in the VR Dedicated Fitness App market include FitXR, Holofit from Holodia, VZFit from Virzoom, and Les Mills Body Combat from Odders Lab.

43. ████████████████████████████████
Other than Supernatural and FitXR, ████████████████████████

## B.    The VR Fitness App Market

44.    The VR Fitness App market comprises VR apps that are recognized and marketed as providing a fitness benefit to the user. This broader market includes both VR dedicated fitness apps and incidental fitness apps, such as rhythm and active sports games—including Meta's category-leading Beat Saber.

8

45.     The incidental fitness category includes VR apps whose primary focus is not fitness, but that allow users to get a workout as a byproduct of their use because of the physically active nature of these apps. This category includes "rhythm" games like Beat Saber, Pistol Whip, and OhShape, where a user must dodge, strike, or shoot targets along to music, as well as active sports games like Thrill of the Fight, a boxing simulator.

46.     ████████████████████████████████████████████████████

47.     Publicly, Meta has acknowledged a VR Fitness App market comprising both dedicated and incidental fitness apps. Meta includes Beat Saber in this market. In a post on the Oculus website entitled "Exercise By Accident: VR Games to Help You Work Out At Home," Meta extols the virtues of rhythm and sports games for physical exercise: "while our first port of call for VR fitness is dedicated fitness apps like Supernatural and FitXR, you can get a surprising amount of exercise 'by accident' with a bunch of the games below," including Meta's own Beat Saber app. Meta classified the type of exercise offered by Beat Saber as "Full-body, Aerobic"— the exact same type of exercise it listed for both Supernatural and FitXR.

48.     Technology and fitness reviewers also recognize the VR Fitness App market. Publications reviewing VR fitness options often include incidental fitness apps alongside dedicated fitness apps, with Beat Saber featuring prominently. Many reviews of Supernatural compare it to Beat Saber specifically, noting the similarities in game mechanics, comparing the exercise effect of each app, and comparing value for the price.

49.     For the reasons stated above with respect to the VR Dedicated Fitness App market, the VR Fitness App market also does not include non-VR at-home smart fitness solutions like digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video games, or workout videos. VR fitness apps offer their users all of the broader benefits of VR: they can exercise in fully immersive, 360-degree environments without any of the cost, discomfort, or risk of actually traveling to those environments. Again, as Mark Zuckerberg has explained, VR is "very different from every experience of technology that we've had before."

50.     Indeed, Meta advertises the immersive nature of VR, touting the ability to do "jabs on a glacier, [and] lunges on a volcano, all while getting the best workout of your life."

51.     Moreover, unlike "flat" or two-dimensional at-home workout content, VR apps can also be fully interactive, providing guided motion and haptic feedback in real time in three-dimensional space. Because of the cameras in the headset and sensors in the controllers, the VR tracking system means that VR fitness apps "know how your body is moving through space at all times," as Within co-founder and CEO put it.

52.     Nor does the VR Fitness App market include VR apps that do not provide an exercise benefit and are neither marketed nor sought by users on that basis. Although many VR apps make use of some physical movement by the user to navigate the app or present an immersive experience to the user, not all VR apps involve physical movement that generates an

exercise effect. Indeed, studies recognize the wide range of exercise effect that can be provided by different VR apps. Apps that provide a higher exercise effect, whether dedicated or incidentally, compete for users seeking that effect. VR apps that provide a lower or negligible exercise effect accordingly do not compete in this market.

### C.  The Relevant Geographic Market

53.     The relevant geographic market in which to analyze the competitive effects of the Proposed Acquisition is the United States. While VR app suppliers may be located outside the United States, customers in the relevant markets affected by the Proposed Acquisition are located in the United States. The availability of VR apps and headsets for consumers varies by country, and VR consumers in the United States can only buy headsets and apps that are available in the United States. Industry participants recognize the United States as a market.

### MARKET CONCENTRATION AND
### THE PROPOSED ACQUISITION'S PRESUMPTIVE ILLEGALITY

54.     Both the VR Dedicated Fitness App market and the broader VR Fitness market are highly concentrated.

55.     Market concentration within a properly defined relevant antitrust market is a useful indicator of the competitive effects of a merger. The 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") measure market concentration using the Herfindahl–Hirschman Index ("HHI"). The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy of the FTC and Department of Justice with respect to mergers involving competitors. Though the Merger Guidelines are not binding on the courts, courts frequently cite the Merger Guidelines as persuasive authority.

56.     The HHI for a given market is calculated by summing the squares of the individual firms' market shares. HHIs range from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). A market HHI above 2,500 is classified as highly concentrated.

57.     If a merger combines two participants in a relevant market, thereby increasing the HHI by more than 200 points and resulting in a highly concentrated market, it is presumed to enhance market power and is, therefore, presumptively unlawful.

### A.  The VR Dedicated Fitness App Market is Highly Concentrated

58.     The market for VR Dedicated Fitness Apps is highly concentrated ██████

59.     Supernatural ████████

60.     The VR Dedicated Fitness App market HHI has been well above the thresholds for a market to be considered "concentrated" or "highly concentrated" under the Merger Guidelines.

### A.     The Proposed Acquisition Is Presumptively Illegal with Respect to the VR Fitness App Market

61.     When analyzed within the broader market for VR fitness apps, in which both Meta's Beat Saber and Within's Supernatural compete, the Proposed Acquisition is presumed likely to enhance market power because it would significantly increase concentration and result in a highly concentrated relevant market. This suffices to establish a prima facie case that the Proposed Acquisition is unlawful.

62.     In the VR Fitness App market, the Proposed Acquisition would increase HHI levels by more than 600 points to a post-merger HHI of over 3,600 points. The Proposed Acquisition is thus presumed likely to create or enhance market power and is presumptively unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### EVIDENCE OF LIKELY ANTICOMPETITIVE EFFECTS

63.     In addition to this presumption of illegality, additional evidence indicates that the Proposed Acquisition may substantially lessen competition in the relevant markets for VR dedicated fitness apps and for VR fitness apps.

### A.     Anticompetitive Effects in the VR Dedicated Fitness App Market

64.     The Proposed Acquisition would cause anticompetitive effects by eliminating potential competition from Meta in the relevant market for VR dedicated fitness apps. These include eliminating any probability that Meta would enter the market through alternative means absent the Proposed Acquisition, as well as eliminating the likely and actual beneficial influence on existing competition that results from Meta's current position, poised on the edge of the market. As the Merger Guidelines explain, "A merger between an incumbent and a potential entrant can raise significant competitive concerns."

### 1.     It Is Reasonably Probable That Meta Would Have Entered the VR Dedicated Fitness App Market Through Alternative Means Absent The Proposed Acquisition

65.     Meta has the economic characteristics, size, resources, capabilities, advantages, and incentives to enter the VR Dedicated Fitness App market—and it has seriously considered

11

doing so—by means other than this Proposed Acquisition. Meta could have chosen to build a VR dedicated fitness app from scratch, add dedicated fitness functionality to an existing app, and/or acquire a smaller studio that could support and supplement Meta's existing strengths to facilitate its entry.

66.    Consistent with its long-term strategy for its VR devices to become a widely used platform that it ultimately will control, Meta has committed tens of billions of dollars to its Reality Labs division, which develops its VR and AR products, including more than $7.7 billion in 2020, $12.4 billion in 2021, and $3.6 billion in the three-month period ending in March 2022. Meta is already well on the way to realizing Mr. Zuckerberg's goals of owning both the dominant platform and the "killer apps" on that platform. Meta already produces the best-selling VR headset in the United States by a wide margin. Meta's Quest Store is the leading distribution platform of VR apps. And Meta is the leading seller of VR apps, with a portfolio that includes Beat Saber, the market-leading VR fitness app, and Horizon Worlds, a massive social app that features its own game-creation tools for users.

67.    Meta has the financial resources to develop a dedicated fitness app on its own— either by creating a new app or by adding new features to an existing app such as Beat Saber. It also has more than enough resources to enter the market through acquiring a generalist studio that could supplement Meta's formidable first-party studios group in developing a VR dedicated fitness app.

68.    In 2021, Meta had an annual profit of $46.7 billion, and spent more than $12 billion on its Reality Labs division.

69.    With its vast financial resources, Meta continues to add features and content to the apps it has already released, and to develop and release new apps. Meta has also developed multiple full-featured VR apps in-house. What's more, the ▮▮▮▮▮▮ t proposes to spend on this acquisition ▮▮▮▮▮▮ During that time and on that budget, Within built Supernatural from the ground up into the ▮▮▮▮▮ VR dedicated fitness app.

70.    Meta could build instead of buy within a reasonable period of time if it could not proceed with the Proposed Acquisition. Indeed, ▮▮▮▮▮▮

71.    Meta has developed multiple VR apps from scratch before, including the ambitious Horizon Worlds, which allows users to create and explore virtual worlds; Horizon Workrooms, an app that lets Meta test out new use-cases and platform-level features in the emerging VR productivity category and allows users to connect and collaborate in real-time; the Horizon Venues live-events app; and the Horizon Home social-space app.

72.     Meta has also developed and released Oculus Move, a platform-level fitness tracker on the Oculus Quest that allows users to track active time and calories burned across apps.

73.     Through its string of prior acquisitions, Meta already owns seven of the most successful VR development studios in the world, including Beat Games, the studio behind Beat Saber. And, as of March 2021, Meta had nearly 10,000 employees housed within Reality Labs, its division devoted to virtual reality.

74.     Meta's control over the Quest platform also gives it unique access to VR user data, which it uses to inform strategic decisions.

75.     In addition, Meta controls which VR apps appear and are featured in its Quest Store. This control guarantees that Meta could reach millions of existing VR users with a built-from-scratch or expanded app through an especially important avenue for consumer discovery.

76.     Meta—formerly known as "Facebook Inc."—rebranded its entire business as "Meta" to reflect its focus on VR. Its brands, including Meta and Quest, are well-known to VR users. Meta also has substantial marketing experience as to a wide range of VR apps, including Beat Saber, that it could leverage to enter the VR Dedicated Fitness App market. Indeed, users already associate Meta's Beat Saber app with incidental fitness. This "name awareness" would facilitate Meta's organic entry into the VR Dedicated Fitness App market, as a dedicated fitness-oriented version of Beat Saber would be in line with users' understanding of the Beat Saber brand.

77.     Meta also has incentives to enter the VR Dedicated Fitness App market.



78.

79.     Meta is well aware that fitness VR apps could enable it to reach new categories of consumers.

80.

81.



82. ██████████████████████████████████████████████

83. ██████████████████████████████████████████████

84. ██████████████████████████████████████████████

85. ██████████████████████████████████████████████

86. ██████████████████████████████████████████████

87.     Thus, not surprisingly, after Meta's acquisition of Beat Games and immediately prior to the launch of Supernatural, Beat Saber released a new track called "FitBeat," which included virtual "walls" or "obstacles" that users would have to dodge. ████████████████ ████████████████████████ Obstacles also appear on other tracks, forcing users to duck and dodge, but they can be turned off.

88.     ████████████████████████ has already included both a 360-degree mode where targets come from all sides and a no-fail mode that allows users to complete tracks despite missing blocks in recent updates—a feature that fitness-focused users can adopt to ensure an uninterrupted workout.

89. ██████████████████████████████████████████████



91.    In fact, Meta's internal codename for the proposed acquisition of Within was "Project Eden," a reference to its belief that Apple was also interested in acquiring Within.

92.    Meta also hired away the head of product for Supernatural at Within to work at Meta following the Supernatural launch. That individual's portfolio at Meta included expanding Meta's presence into new verticals, including the VR fitness vertical.



95.    Accordingly, absent this anticompetitive Proposed Acquisition, there is a reasonable probability that Meta would have exercised one of its other available options to enter the VR Dedicated Fitness App market.

### 2. It is Reasonably Probable That Alternative Entry by Meta Would Substantially Deconcentrate the Market and Have Other Procompetitive Effects

96.    Meta's entry into the VR Dedicated Fitness App market—whether by adding new features to one of its existing apps or developing a new VR dedicated fitness app from scratch—would have the effect of substantially deconcentrating and increasing competition in the market.

97.    Building instead of buying would entail developing additional expertise, undertaking product research and design, hiring more employees, and making other key investments. Meta recognizes that building its own VR dedicated fitness app would require time, additional developer talent, and effort. But such efforts would reflect the very essence of competition, the dynamic that the antitrust laws seek to protect and promote.

98.    Alternative entry by Meta would introduce a new competitor into the market with the backing of one of the world's largest, most well-resourced, and most experienced VR industry participants. Such entry would increase consumer choice, increase innovation, spur additional competition to attract the best employees, and yield a host of other competitive

benefits. Crucially, it would *also* maintain the independent presence and competitive vitality of the █████████ VR dedicated fitness app █████ Supernatural.

99. The Proposed Acquisition would eliminate the probability of such entry, potentially dampening future innovation and leading to a market with less beneficial rivalry and competitive pressure.

### 3. Within Reasonably Perceived Meta as a Potential Entrant to the VR Dedicated Fitness App Market

100. In light of Meta's economic characteristics, size, resources, capabilities, advantages, and incentives, it would be eminently reasonable for a VR dedicated fitness app market participant to perceive Meta as a potential entrant.

101. As explained in detail above, Meta is a massive, wealthy company with extensive control over and experience in various aspects of the VR industry. It has recently expanded into a variety of VR-related areas, including by acquiring the most popular VR incidental fitness app (Beat Saber) and by internally developing a system-level fitness tracking tool that can run in the background of other apps (Oculus Move). In a recent earnings report, Meta announced that it anticipated spending some $10 billion across its Reality Labs division, which has found its biggest success to date with the Quest 2 Headset and Quest Store, and that it is committed to increasing those investments over the next several years. The VR dedicated fitness app market is especially attractive for a host of reasons, giving Meta a strong incentive to enter it. And Meta internally identified multiple means of entering the VR dedicated fitness app market.



102.

103.

104. Meta also lured away Within's head of product for Supernatural shortly after Supernatural's launch.

### 4. Meta's Presence as a Perceived Potential Entrant Likely Influences Competition in the VR Dedicated Fitness App Market



105.



The Proposed Acquisition would eliminate that competitive influence.

That competitive pressure—and all of the benefits it yields—would be eliminated by the Proposed Acquisition.

### B.   Anticompetitive Effects in the VR Fitness App Market

111.    When viewed against the broader backdrop of the VR Fitness App market, the Proposed Acquisition is no less illegal. The Proposed Acquisition, if allowed to proceed, would see the maker of by far the largest VR fitness app acquire a fast-growing, premium rival. Beat Saber and Supernatural have been close competitors in this broader market, with Respondents closely monitoring each other's features, growth, and market shares. Respondents have marketed their apps to the same set of users seeking a fitness effect in VR. Their close competition has spurred the innovation of new features. The Proposed Acquisition would eliminate that competitive pressure between Respondents.

17

1.  **Beat Saber and Supernatural Are Competitors in the VR Fitness App Market**

112.    Beat Saber and Supernatural compete in the highly concentrated VR Fitness App market. Respondents understand and acknowledge that Beat Saber and Supernatural compete for VR users seeking an exercise effect from VR.

113.    In part of 2021 and throughout most of the first half of 2022, Meta maintained a "fitness" landing webpage for its Quest and Quest 2 headsets. The link to the landing page was prominently displayed as part of the front page heading on Oculus.com. That fitness landing page featured Supernatural and Beat Saber, among other apps.

114.    The Quest Store itself has a search functionality that allows users to find apps. As of June 2022, a search in the United States for the keyword "exercise" returns 15 apps, including both Supernatural and Beat Saber.

115.    Both Within and Meta ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, Meta views its target market for Beat Saber as gamers and acknowledges that its users appreciate its fitness benefits.

116.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Beat Saber and Supernatural, ▮▮▮▮▮▮▮▮▮▮ both employ the same "slashing" mechanic, in which the player uses virtual bats or swords to hit incoming targets timed to music. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2.  **Competition Between Beat Saber and Supernatural Has Been Beneficial to VR Fitness App Users**

117.    The ongoing competition between Beat Saber and Supernatural has inspired new features and factored into pricing considerations in VR fitness apps, both of which have benefited consumers.

118.    Meta has added fitness features to Beat Saber to better compete for users seeking an exercise effect. For example, in April 2020—just before Supernatural's launch—Meta released "FitBeat," a song for Beat Saber designed for fitness-focused beat maps. Media coverage has attributed "FitBeat" as a reaction to Supernatural's release. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



119.   Similarly, Within has taken

120.   Moreover, prior to launching Supernatural,

121.

122.

123.

124.   This competition between Supernatural and Beat Saber in the VR Fitness App market leads to innovations, new features, and consumer choice—and it will be eliminated as a result of the Proposed Acquisition.

## LACK OF COUNTERVAILING FACTORS

125.   Respondents cannot demonstrate that new entry or expansion by existing firms will be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

126.   There are multiple barriers to entering or expanding in the relevant markets, including time, network effects, ongoing development and content creation costs, post-launch support, capital, brand recognition, and the need for consumers to be able to discover the app. Developing a high-quality entrant also requires hiring the "talent needed to create true triple-A VR experiences," talent that Meta acknowledges is increasingly scarce.

127.   To be sold on the Quest store, Meta itself must decide to approve an app through a technical review and a curation process by Meta that examines "quality, polish, entertainment, value, and utility." This can be a lengthy process and there is no guarantee any third-party app will ultimately be approved.

128.   No other company has the combination of resources, VR know-how, and control over the leading app store and the overall Quest VR experience that Meta has.

129.   Once Meta—which also owns the Quest platform and app store—entrenches ▮▮ in VR dedicated fitness through the Proposed Acquisition, it will

effectively raise barriers to entry and expansion as other companies interested in the space will understand that they need to compete with a deep-pocketed platform operator that owns the ███████ VR fitness app *and the* ███████ VR dedicated fitness app.

130.    Respondents cannot demonstrate cognizable, verifiable, transaction-specific efficiencies that would be sufficient to reverse the strong presumption and evidence of the Proposed Acquisition's likely significant anticompetitive effects.

## VIOLATION

### COUNT I – Illegal Acquisition

131.    The allegations above in paragraphs 1 to 130 are incorporated by reference as though fully set forth.

132.    The Proposed Acquisition, if consummated, may substantially lessen competition or tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 and is an unfair method of competition that violates Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## **NOTICE**

Notice is hereby given to the Respondents that the ██ h of ████████ at 10:00 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Acquisition challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1.  A prohibition against any transaction between Respondents that combines their business, except as may be approved by the Commission.

2.  If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate businesses, with the ability to offer such products and services as Meta and Within were offering and planning to offer prior to the Acquisition.

3.  A requirement that, for a period of time, Respondents shall not, without giving prior notice to and obtaining the prior approval of the Commission, acquire, merge with, consolidate, or combine their businesses with any other company engaged in business activity in the relevant markets and, if necessary, in related business activity and markets.

4.  A requirement to file periodic compliance reports with the Commission.

5.  Requiring that Respondents' compliance with the order may be monitored at Respondents' expense by an independent monitor, for a term to be determined by the Commission.

6.  Any other relief to correct or remedy the anticompetitive effects of the Acquisition or to restore Within as an independent business.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this 11th day of August, 2022.

By the Commission.

April J. Tabor
Secretary

SEAL:

22

# EXHIBIT 6



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Office of the Secretary

August 24, 2022

(Via email at chantale.fiebig@weil.com)
Ms. Chantale Fiebig
Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036

(Via email at diane.sullivan@weil.com)
Ms. Diane P. Sullivan
Weil, Gotshal & Manges LLP
17 Hulfish Street, Suite 201
Princeton, NJ 08542

Dear Mses. Fiebig and Sullivan:

We are in receipt of your July 25, 2022, Petition for Recusal seeking the recusal of Chair Lina M. Khan from participating in any decisions concerning the Commission's review of the proposed merger of Meta Platforms, Inc., and Within Unlimited, Inc. According to Commission Rules, parties may seek to disqualify a Commissioner from "any adjudicative or rulemaking proceeding."[1] There was no pending adjudicative or rulemaking proceeding affecting your client, Meta Platforms, Inc., when you filed your petition. Accordingly, your petition is defective.

Nevertheless, on August 11, 2022, the Commission issued an administrative complaint naming your client as a respondent. Therefore, the Commission will exercise its discretion and treat your petition as if it had been filed properly pursuant to Commission Rule 4.17. Under that rule, your petition will be addressed initially by Chair Khan.[2] If Chair Khan declines to recuse herself, the Commission will rule on your petition without her participation.[3] Your petition will be placed on the public record of the adjudicative proceeding.[4]

Please let us know if you have questions regarding any of the above.

Sincerely,

April J. Tabor
Secretary

---

[1] 16 CFR 4.17.
[2] 16 CFR 4.17(3)(i).
[3] 16 CFR 4.17(3)(ii).
[4] 16 CFR 4.9(c).

# EXHIBIT 7

**Prepared Statement of the Federal Trade Commission**
**Before the United States Senate Committee on the Judiciary**
**Subcommittee on Antitrust, Competition Policy and Consumer Rights**
**"Oversight of the Enforcement of the Antitrust Laws"**
**September 20, 2022**

Chairwoman Klobuchar, Ranking Member Lee, and distinguished members of the Subcommittee, I am Lina Khan, Chair of the Federal Trade Commission, and I am pleased to testify today on behalf of the Commission.[1] I want to thank members of this Committee for the opportunity to discuss our current competition enforcement activities and priorities as well as for their support of our work.

Vigorous antitrust enforcement is critical to the growth and dynamism of our economy, as well as to our shared prosperity and liberty. Recent decades have vividly illustrated how Americans lose out when markets become more consolidated and less competitive. Prices rise, wages fall, and our markets become more fragile and less resilient. These effects have been on full display over the last year, as supply shocks stemming from the pandemic and contaminated products have led to severe shortages and steep price hikes.

Examples of these effects abound throughout the economy. We at the FTC have learned directly about some of them during recent public listening sessions convened to hear from people with first-hand experience regarding the effects of concentration in our markets.[2] For example, nurses described how hospitals, after merging, drastically reduced staffing, closed primary-care clinics, cut geriatric services, and eliminated essential programs like rural cancer care.[3] Diabetes patients explained that they have been forced to ration their insulin and jeopardize their health because scant competition among insulin producers has resulted in dramatic price increases for this essential product, despite no increase in manufacturing costs.[4] And family ranchers and small farmers told us about their struggles to get their products to market because of the anticompetitive practices of large supermarket chains and dominant agribusiness firms, including meat processors and dairy bottlers.[5]

These facts invite us to reassess how we can enforce the antitrust laws to ensure maximal efficacy. At the FTC, we are doing so by reactivating the full set of authorities that Congress granted us and by ensuring that we are being faithful to controlling law and precedent. We are also updating our tools to ensure they better correspond to new market realities.

---

[1] This written statement presents the views of the Federal Trade Commission. The oral statement and responses to questions by Chair Khan do not necessarily reflect the views of the Commission or any other Commissioner.
[2] Press Release, Fed. Trade Comm'n, FTC and Justice Department Launch Listening Forums on Firsthand Effects of Mergers and Acquisitions (Mar. 17, 2022), http://www.ftc.gov/news-events/news/press-releases/2022/03/ftc-justice-department-launch-listening-forums-firsthand-effects-mergers-acquisitions.
[3] FTC and Justice Department Listening Forum on Firsthand Effects of Mergers and Acquisitions: Health Care (Apr. 14, 2022) (transcript available at http://www.ftc.gov/system/files/ftc_gov/pdf/FTC-DOJ-Listening-Forum-%20Health-Care-Transcript.pdf) at 4.
[4] *Id.* at 8.
[5] FTC and DOJ Merger Guidelines Listening Forum (Mar. 28, 2022) (transcript available at http://www.ftc.gov/system/files/ftc_gov/pdf/FTC-DOJ%20Merger%20Guidelines%20Listening%20Forum_FTC_March%2028%202022.pdf) at 2-4.

In practice, this means reorienting our enforcement efforts to better capture harm from mergers involving firms at different levels of the supply chain (*i.e.*, non-horizontal mergers) and to better anticipate future competition concerns before markets are dominated by only a few firms, as contemplated by the Clayton Act's call to arrest monopolies "in their incipiency." It also requires a focus not only on the output side of markets, such as the goods and services offered to consumers, but on the input side as well. This means ensuring competitive markets for workers' labor, which help workers receive fair pay and better working conditions and benefits.

To maximize the efficacy of the agency's scarce resources, we are orienting our enforcement efforts around targeting root causes of competitive harm rather than looking at one-off effects. This means focusing on structural conditions and incentives that enable and motivate unlawful conduct—be it certain conflicts of interest, business models, or structural dominance—as well as looking upstream at the firms that are enabling and profiting from this conduct. To accomplish this, we are making greater use of technologists, computer scientists, and a broad range of methodological skillsets to enhance our understanding of new and emerging markets and next-generation technologies. Investing in this horizon-scanning work can enable timely intervention, allowing us to tackle problems at their incipiency, thereby limiting harms and saving resources over the long term.

As we undertake this work, the FTC is prioritizing clarity, administrability, and public participation. Notably, this effort includes issuing policy statements and other guidance to provide clear notice of FTC enforcement practices and priorities.[6] It has also included changing our rules of practice to make it easier for members of the public to petition the agency for new rules or changes to existing rules, opening up our processes to greater public input and scrutiny.[7] And since last summer the FTC has held monthly Commission meetings that are open to the public and where members of the public can sign up to share their views and perspectives directly with the Commission.

Finally, to maximize the impact of our efforts, we are focused on enhancing and deepening collaboration with other governmental institutions. This includes not only traditional partners, such as the DOJ, state attorneys general, and international enforcers, but also other federal agencies, such as the Departments of Defense and Agriculture and National Labor Relations Board ("NLRB")[8]. While the FTC is an independent agency, we very much recognize

---

[6] *See, e.g.*, Policy Statement on Rebates and Fees in Exchange for Excluding Lower Cost Products (Jun. 16, 2022), http://www.ftc.gov/legal-library/browse/policy-statement-federal-trade-commission-rebates-fees-exchange-excluding-lower-cost-drug-products; Statement of the Commission on the Use of Prior Approval Provisions in Merger Orders (Oct. 25, 2021), https://www.ftc.gov/system/files/documents/public_statements/1597894/p859900priorapprovalstatement.pdf.

[7] Press Release, Fed. Trade Comm'n, FTC Opens Rulemaking Petition Process, Promoting Public Participation and Accountability (Sep. 15, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/09/ftc-opens-rulemaking-petition-process-promoting-public-participation-accountability.

[8] The FTC entered into a Memorandum of Understanding with the NRLB in July 2022, intended to increase collaboration on key issues such as labor market concentration, one-sided contract terms, and labor developments in the "gig economy." *See* Press Release, Fed. Trade Comm'n, Federal Trade Commission, National Labor Relations Board Forge New Partnership to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices (Jul. 19, 2022), http://www.ftc.gov/news-events/news/press-releases/2022/07/federal-trade-commission-national-labor-relations-board-forge-new-partnership-protect-workers.

2

the benefits of a "whole-of-government" approach to competition. Collaborating with other federal agencies ensures we are benefiting from expertise across government, drawing on industry-specific knowledge, and in turn helping equip other agencies to diagnose and address competition problems more directly.

None of this work would be possible without our talented agency staff, whose diligence and dedication are second to none. Despite facing severe resource constraints and formidable defendants, our staff bring unmatched courage and commitment to protecting the American people from unlawful business practices and promoting fair competition.

## I.    Law Enforcement

Guided by the vigorous and faithful execution of the federal antitrust laws, the Commission is focusing its enforcement efforts and resources on targeting mergers and conduct that pose the greatest threats to open, competitive, and fair markets. Reestablishing deterrence is a key goal, and we are working to achieve this by redoubling our effort to pursue effective remedies and by providing clarity about how we will execute the law through both individual actions and broader guidance.

### A.    Promoting Rigorous Merger Enforcement

Together, the FTC and the DOJ represent the American people's front-line defense against unlawful consolidation, and the work we do to prevent that consolidation is critically important. Our staff has worked tirelessly to meet the enormous demand of enforcing the laws against unlawful mergers amid a historic surge: in 2021, global deal-making soared to $5.8 trillion, the highest level ever recorded.[9] A record 3,644 transactions were reported to the FTC and DOJ in FY 2021, which is 87% more than the average number of transactions reported over the past five years,[10] and they remain at historically high levels.[11] FTC staff continues to do an outstanding job during this challenging period of record dealmaking despite facing serious staffing and resource constraints.

Against this backdrop, the FTC remains committed to challenging unlawful deals. Over the past year we have moved to challenge major transactions in critical sectors of the economy, including semiconductors, defense, energy, healthcare, and digital markets.[12] This includes filing

---

[9] Kaye Wiggins et al., *Dealmaking Surges Past $5.8tn to Highest Levels on Record*, FIN. TIMES (Dec. 30, 2021), https://www.ft.com/content/6dfdd78a-e229-4524-a400-144396524eb6.

[10] *Premerger Notification Program*, FED. TRADE COMM'N, https://www.ftc.gov/enforcement/premerger-notification-program (last visited Sept. 14, 2022); FED. TRADE COMM'N & DEP'T OF JUSTICE, HART-SCOTT-RODINO ANNUAL REP. FISCAL YEAR 2020, Exh. A, Tbl. I, Tbl. IV (2021), https://www.ftc.gov/system/files/documents/reports/hart-scott-rodino-annual-report-fiscal-year-2020/fy2020_-_hsr_annual_report_-_final.pdf.

[11] FY 2022 only trails FY 2021 as the highest number of filings since merger notification thresholds were adjusted in 2000. *Premerger Notification Program*, FED. TRADE COMM'N, https://www.ftc.gov/enforcement/premerger-notification-program (last visited Sept. 14, 2022).

[12] Complete FY 2022 FTC enforcement numbers will be available at a later date on the FTC website at https://www.ftc.gov/policy/reports/annual-competition-reports.

suit to block six mergers outright so far in FY 2022,[13] and parties have abandoned several other anticompetitive mergers shortly before the Commission voted out a complaint to challenge them.[14]

Among these merger enforcement efforts is critical FTC work to prevent further consolidation in markets for hospital services. On the same day in June 2022, the Commission voted to block two proposed hospital mergers: HCA's acquisition of Steward Health Care System[15] and RWJBarnabas's acquisition of Saint Peter's Healthcare System.[16] Each of these mergers threatened to raise healthcare costs at a time when American families are still reeling from the health and financial challenges of the COVID pandemic. Healthcare experts have shown that competition among health systems—not consolidation—results in lower prices and improved health outcomes for patients,[17] as well as better wages and benefits for employees.[18] It

[13] Press Release, Fed. Trade Comm'n, FTC Seeks to Block Virtual Reality Giant Meta's Acquisition of Popular App Creator Within (July 27, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/07/ftc-seeks-block-virtual-reality-giant-metas-acquisition-popular-app-creator-within; Press Release, Fed. Trade Comm'n, FTC Sues to Block Merger Between Utah Healthcare Rivals HCA Healthcare and Steward Health Care System (Jun. 2, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-utah-healthcare-rivals-hca-healthcare-steward-health-care-system; Press Release, Fed. Trade Comm'n, FTC Sues to Block Merger Between New Jersey Healthcare Rivals RWJBarnabas Health and Saint Peter's Healthcare System (Jun. 2, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-new-jersey-healthcare-rivals-rwjbarnabas-health-saint-peters; Press Release, Fed. Trade Comm'n, FTC and Rhode Island Attorney General Step in to Block Merger of Rhode Island's Two Largest Healthcare Providers (Feb. 17, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/02/ftc-rhode-island-attorney-general-step-block-merger-rhode-islands-two-largest-healthcare-providers; Press Release, Fed. Trade Comm'n, FTC Sues to Block Lockheed Martin Corporation's Vertical Acquisition of Aerojet Rocketdyne Holdings Inc. (Feb. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-sues-block-lockheed-martin-corporations-44-billion-vertical-acquisition-aerojet-rocketdyne; Press Release, Fed. Trade Comm'n, FTC Sues to Block $40 Billion Semiconductor Chip Merger (Dec. 2, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chipmerger.

[14] See, e.g., Press Release, Fed. Trade Comm'n, Expected Federal Trade Commission Opposition to Transaction Leads Great Outdoors Group, LLC and Rival Sportsman's Warehouse Holdings, Inc. to Abandon Plans for Proposed Merger (Dec. 3, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/12/expected-federal-trade-commission-opposition-transaction-leads-great-outdoors-group-llc-rival.

[15] Press Release, Fed. Trade Comm'n, FTC Sues to Block Merger Between Utah Healthcare Rivals HCA Healthcare and Steward Health Care System (Jun. 2, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-utah-healthcare-rivals-hca-healthcare-steward-health-care-system.

[16] Press Release, Fed. Trade Comm'n, FTC Sues to Block Merger Between New Jersey Healthcare Rivals RWJBarnabas Health and Saint Peter's Healthcare System (Jun. 2, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-new-jersey-healthcare-rivals-rwjbarnabas-health-saint-peters.

[17] See, e.g., Zack Cooper et al., *The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured*, 134 Q.J. Econ. 51 (2019); Nancy Beaulieu et al., *Changes in Quality of Care after Hospital Mergers and Acquisitions*, 382 New Eng. J. Med. 51 (2020). For surveys of the research literature, *see, e.g.*, Martin Gaynor & Robert Town, *The Impact of Hospital Consolidation*, The Synthesis Project, Robert Wood Johnson Foundation (June 2012), http://www.rwjf.org/content/dam/farm/reports/issue_briefs/2012/rwjf73261; Martin Gaynor, Kate Ho & Robert Town, *The Industrial Organization of Health-Care Markets*, 53 J. Econ. Literature 235 (2015).

[18] See, e.g., Elena Prager & Matt Schmitt, *Employer Consolidation and Wages: Evidence from Hospitals*, 111 Am. Econ. Rev. 397 (2021); Daniel Arnold & Christopher Whaley, *Who Pays for Health Care Costs? The Effects of Health Care Prices on Wages* (RAND Health Care Working Paper, 2021), https://www.ehealthecon.org/pdfs/Whaley.pdf. The Commission laid out much of this empirical evidence in a recent

is imperative that the Commission continue to identify and challenge hospital mergers that threaten access to critical healthcare services.[19]

In addition to tackling anticompetitive deals involving direct competitors, the Commission is taking steps to better capture the full set of ways in which mergers can harm competition. Central to this effort is placing greater weight on assessing both non-horizontal and forward-looking competitive harm. This approach is being incorporated into FTC merger review generally and has been reflected in several recent merger challenges.

For example, in December 2021, the FTC sued to stop U.S. chip supplier Nvidia Corp.'s proposed $40 billion acquisition of U.K. chip design provider Arm Ltd.[20] When announced, this deal represented the largest semiconductor merger ever attempted. More than two months into its litigation with the FTC, Nvidia abandoned its acquisition of Arm—representing the first abandonment of a litigated vertical merger in many years. The proposed merger would have given one of the largest chip companies control over its rivals' designs for competing chips. By doing so, the FTC's complaint alleged that the combined firm would have had the means and incentive to stifle next-generation technologies, including those used to run datacenters and driver-assistance systems in cars. Blocking the deal preserved competition for key technologies and safeguarded future innovation while also preventing further disruption to an already distressed semiconductor supply chain. The FTC team did outstanding work on the investigation and litigation.

This effort also includes the Commission's February 2022 lawsuit to block Lockheed's proposed acquisition of Aerojet, a $4.4 billion defense merger that would have eliminated the country's only remaining independent supplier of key missile propulsion inputs and given Lockheed the ability to cut off its competitors' access to these critical components.[21] The FTC's investigation, conducted in close collaboration with the Department of Defense, determined that the deal would have resulted in higher prices and diminished quality and innovation for programs critical to our national security. This challenge dovetailed with a DoD report indicating that

---

policy paper highlighting the pitfalls of Certificates of Public Advantage (COPAs), which are efforts by states to replace beneficial healthcare competition with state oversight, that have proven to be detrimental for patient costs, quality, and reduced employee wages. Press Release, Fed. Trade Comm'n, FTC Policy Paper Warns About Pitfalls of COPA Agreements for Patient Care and Healthcare Workers (Aug. 15, 2022), http://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-policy-paper-warns-about-pitfalls-copa-agreements-patient-care-healthcare-workers.

[19] In addition to the two challenges highlighted above, the two largest healthcare systems in Rhode Island, Lifespan Corp. and Care New England Health System, called off their merger after the FTC, in conjunction with the Rhode Island Attorney General, sought to block the merger. *See* Press Release, Fed. Trade Comm'n, Statement Regarding Termination of Attempted Merger of Rhode Island's Two Largest Healthcare Providers (Mar. 2, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/03/statement-regarding-termination-attempted-merger-rhode-islands-two-largest-healthcare-providers.

[20] Press Release, Fed. Trade Comm'n, FTC Sues to Block $40 Billion Semiconductor Chip Merger (Dec. 2, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chipmerger.

[21] Press Release, Fed. Trade Comm'n, Statement Regarding Termination of Lockheed Martin Corporation's Attempted Acquisition of Aerojet Rocketdyne Holdings Inc. (Feb. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/02/statement-regarding-termination-lockheed-martin-corporations-attempted-acquisition-aerojet.

consolidation within the defense-industrial base poses a risk to national defense and identifying strong merger enforcement as a key tool to address it.[22]

And, without commenting on the merits since the case is currently pending in an administrative proceeding, the Commission in March 2021 challenged Illumina's vertical acquisition of Grail.[23] The Commission's complaint alleges that the deal between Illumina, the only viable provider of DNA sequencing tools, and Grail, a maker of multi-cancer early detection tests, would lead to reduced innovation for these lifesaving tests.[24]

The FTC takes seriously its Congressional mandate to arrest monopolies in their incipiency. This is demonstrated, in particular, by its July 2022 challenge to Meta's proposed acquisition of Within Unlimited.[25] As noted in the complaint, social-media firm Meta has become the largest provider of virtual reality devices and a leading provider of related apps in the U.S., while Within is an independent virtual reality development studio that designed and built Supernatural, a popular app in the dedicated fitness virtual reality app market. The complaint contends that Meta is a potential entrant in the virtual reality dedicated fitness app market with the required resources and a reasonable probability of building its own virtual reality app to compete in the space. The complaint alleges that Meta's choice to buy Supernatural rather than entering independently will reduce consumer choice, innovation, and competition to attract the best employees. The complaint further alleges that the mere possibility of Meta's entry has likely influenced competition in the virtual reality dedicated fitness app market.

Importantly, the Commission has been reassessing the efficacy of its approach to merger remedies and identifying how to learn from lessons of the past. Specifically, we now strongly disfavor behavioral remedies and will not hesitate to reject proposed divestitures that cannot fully cure the underlying harm.

The Commission is also focused on including provisions in consent orders that will protect against future unlawful mergers, especially those that might not trigger a merger notification obligation and would otherwise move forward without agency review. Last summer the Commission withdrew the 1995 Policy Statement on Prior Approval and Prior Notice Provisions and reinstated the Commission's longstanding practice of requiring parties that proposed unlawful mergers to receive prior approval and give prior notice for future transactions. The FTC has already included prior approval provisions in a number of consent decrees, including, for example, imposing strict limits on future mergers by DaVita, Inc., a dialysis service provider with a history of fueling consolidation in life-saving health industries. DaVita

---

[22] DEP'T OF DEFENSE, OFF. OF THE UNDER SECRETARY OF DEFENSE FOR ACQUISITION AND SUSTAINMENT, STATE OF COMPETITION WITHIN THE DEFENSE INDUSTRIAL BASE 4 (2022).
[23] Press Release, Fed. Trade Comm'n, FTC Challenges Illumina's Proposed Acquisition of Cancer Detection Test Maker Grail (Mar. 30, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/03/ftc-challenges-illuminas-proposed-acquisition-cancer-detection-test-maker-grail.
[24] Complaint, *In re Illumina, Inc.*, Docket No. 9401, https://www.ftc.gov/system/files/documents/cases/redacted_administrative_part_3_complaint_redacted.pdf.
[25] Press Release, Fed. Trade Comm'n, FTC Seeks to Block Virtual Reality Giant Meta's Acquisition of Popular App Creator Within (Jul. 27, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/07/ftc-seeks-block-virtual-reality-giant-metas-acquisition-popular-app-creator-within.

must obtain the FTC's approval before acquiring any new ownership interest in a dialysis clinic statewide for a period of ten years.

The Commission is concerned about the anticompetitive roll-up strategies of private equity firms, particularly when they buy up small firms in already concentrated markets. Earlier this year, the FTC entered into two separate consent decrees with JAB Consumer Partners, a private equity firm that has been acquiring specialty and emergency veterinary clinics around the country, many of which have fallen below the threshold requiring the parties to file merger notifications with the antitrust agencies.[26] In 2020, the Commission reviewed a prior JAB acquisition and required the divestiture of three clinics.[27] But this year, given the rapid pace of JAB's continuing acquisitions of veterinary clinics throughout the country and the ongoing consolidation in the industry,[28] more was needed to ensure that the agency has the opportunity to review any new JAB acquisitions in concentrated markets. The Commission's order includes forward-looking provisions that will curb the ability of JAB to engage in future anticompetitive dealmaking across the United States, including a first-of-its-kind nationwide remedy that serves as a notice to other companies contemplating unlawful transactions. The Commission will not hesitate to identify and impose broad relief to protect Americans and deter illegal activity now and in the future.

### 1. *Key Initiatives to Strengthen Our Merger Enforcement Tools*

Over the past year, we have been examining how we can better harness our tools to further strengthen our ability to detect, deter, and stop illegal mergers. In January 2022, together with the Department of Justice, we began the process of revising our merger guidelines.[29] This important guidance explains the analytical techniques, practices, and enforcement policies used by the federal antitrust agencies in reviewing mergers. It also informs our staff reviewing proposed mergers, market participants considering whether to pursue mergers, and courts adjudicating merger challenges. Unfortunately, empirical evidence shows that our approach has led to underenforcement and markets that are more concentrated and less dynamic. Our goal in pursuing the current revision of the merger guidelines is to ensure that our guidelines accurately

---

[26] Press Release, Fed. Trade Comm'n, FTC Acts to Protect Pet Owners from Private Equity Firm's Anticompetitive Acquisition of Veterinary Services Clinics (Jun. 13, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-acts-protect-pet-owners-private-equity-firms-anticompetitive-acquisition-veterinary-services; Press Release, Fed. Trade Comm'n, FTC Takes Second Action Against JAB Consumer Partners to Protect Pet Owners from Private Equity Firm's Rollup of Veterinary Services Clinics (Jun. 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-takes-second-action-against-jab-consumer-partners-protect-pet-owners-private-equity-firms-rollup-of-veterinary-services-clinics.

[27] Press Release, Fed. Trade Comm'n, FTC Requires Veterinary Service Providers Compassion First and National Veterinary Associates to Divest Assets in Three Local Markets (Feb. 14, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-requires-veterinary-service-providers-compassion-first-national-veterinary-associates-divest.

[28] Ross Kelly, *Pandemic Hastens Ongoing Trend in Veterinary Consolidation*, VINNEWS (Dec. 30, 2021) ("Frenetic merger activity among veterinary hospitals in 2021 has lifted the market share of corporate consolidators in the United States to close to 50% of all companion animal practice revenue by at least one estimate, as the pandemic spurs demand for pet-care services."), https://news.vin.com/default.aspx?pid=210&Id=10652228.

[29] Press Release, Fed. Trade Commission and Justice Department Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/01/federal-trade-commission-justice-department-seek-strengthen-enforcement-against-illegal-mergers.

reflect modern commercial realities, are faithful to our statutory mandate, and are administrable and predictable.

The FTC and DOJ are also working on ensuring that we can more readily detect potentially problematic deals. Pursuant to the Hart-Scott-Rodino Act of 1976, the federal antitrust agencies issue rules to ensure that we receive the information we need to be able to identify anticompetitive mergers. We periodically consider how the rules need to be updated to best facilitate that, and such an effort is now underway. We are currently engaged in a thorough review of the information that market participants currently submit to us and an assessment of the additional information we need to most effectively and efficiently identify transactions that warrant a deeper investigation. Once we have identified the set of information needed, we will initiate a Commission rulemaking requiring merging parties to submit upfront probative information about each proposed transaction, increasing the efficiency with which agency staff can determine whether a proposed deal is likely to prove unlawful.[30]

## B.  Targeting Anticompetitive Conduct for Maximum Impact

Despite a heavy merger workload, the FTC continues to maintain and develop a robust program to identify and stop anticompetitive activity outside of the merger context. Specifically, the FTC is orienting its limited enforcement resources around targeting and rectifying root causes to avoid a whack-a-mole approach that imposes significant enforcement burden with few long-term benefits. We are also ensuring that our work is tackling the most significant harms across markets, particularly by dominant firms whose business practices affect many Americans.

As part of this strategy, the FTC continues to scrutinize digital markets, recognizing that distinct features of digital technologies have ushered in new market dynamics and business strategies that require us to update our enforcement approach. As the Subcommittee is well aware, dominant digital platforms have captured control over key arteries of commerce and communications in ways that can undermine competition. The FTC's investigations in digital markets recognize the critical role of data, network externalities, moat building strategies, and other key factors to make sure that our enforcement is reflecting commercial realities.

Notably, last year the FTC successfully amended its complaint against Facebook (d/b/a Meta) in a lawsuit that, in addition to other forms of relief, seeks the divestment of Instagram and WhatsApp.[31] The amended complaint placed greater emphasis on the competitive importance of data and noted that privacy degradation can constitute an antitrust harm—a fact that the court

---

[30] Under current case law, the FTC is prevented from disclosing information filed pursuant to the HSR Act with state antitrust enforcers. *See Lieberman v. FTC*, 771 F.2d 32 (2d Cir. 1985); *Mattox v. FTC*, 752 F.2d 116 (5th Cir. 1985). This can create a meaningful barrier to cooperation with the states. Legislation adding a statutory exemption to the HSR Act that would specifically allow disclosure of relevant information to Attorney Generals could foster enhanced cooperation.

[31] Press Release, Fed. Trade Comm'n, FTC Alleges Facebook Resorted to Illegal Buy-or-Bury Scheme to Crush Competition After String of Failed Attempts to Innovate (Aug. 19, 2021), https://www.ftc.gov/newsevents/news/press-releases/2021/08/ftc-alleges-facebook-resorted-illegal-buy-or-bury-scheme-crush-competitionafter-string-failed.

also acknowledged. In January of this year, the federal court denied Facebook's motion to dismiss the FTC's case and the lawsuit is ongoing.[32]

The Commission is also prioritizing action against business practices that unlawfully restrict consumers' ability to repair their products, costing them more over the long term. In July 2021, the FTC unanimously voted to issue a statement signaling our intent to ramp up law enforcement against unlawful repair restrictions that prevent small businesses, workers, consumers, and even government entities from fixing their own products.[33] As detailed in the Commission's report to Congress, there is scant evidence to support manufacturers' justifications for repair restrictions.[34] While efforts by dominant firms to restrict repair markets are not new, changes in technology and more prevalent use of software have created fresh opportunities for companies to limit independent repair. The policy statement encourages reporting of violations of the Magnuson-Moss Warranty Act, which prohibits, among other things, tying a consumer's product warranty to the use of a specific service provider or product, unless the FTC has issued a waiver or the service or product is provided free of charge.[35] Further, the policy statement noted that the Commission will target repair restrictions that violate the antitrust laws or the FTC Act's prohibitions on unfair or deceptive acts or practices. This multi-pronged approach allows the FTC to use the full range of its expertise when seeking to enforce the law. Since issuing the statement, a number of large tech firms have amended their repair policies[36] and the FTC has pursued enforcement action against several major companies that had imposed restrictive repair policies.[37]

The FTC continues to prioritize deterring and stopping anticompetitive conduct in the health care sector, and a recent case underscores the FTC's willingness to seek individual liability for antitrust violations when appropriate. In January 2020, the FTC and the New York Attorney General sued "Pharma Bro" Martin Shkreli, his company, Vyera Pharmaceuticals, and others alleging that the company and its leaders raised the price of a life-saving drug by more

---

[32] *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022).

[33] Press Release, Fed. Trade Comm'n, FTC to Ramp Up Law Enforcement Against Illegal Repair Restrictions (Jul. 21, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions.

[34] Press Release, Fed. Trade Comm'n, FTC Report to Congress Examines Anti-Competitive Repair Restrictions, Recommends Ways to Expand Consumers' Repair Options (May 6, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/05/ftc-report-congress-examines-anti-competitive-repair-restrictions-recommends-ways-expand-consumers.

[35] Magnuson-Moss Warranty Act, 15 U.S.C. 50 §§ 2301-2312.

[36] *See, e.g.*, Press Release, Apple, Apple Announces Self Service Repair (Nov. 17, 2021), https://www.apple.com/newsroom/2021/11/apple-announces-self-service-repair/; Press Release, Samsung Electronics Am., Samsung Expands Customer-First Care Experience with New Self-Repair Program (Mar. 31, 2022), https://news.samsung.com/us/samsung-self-repair-program-ifixit-customer-first-care-experience/; Ana Corrales, *Coming Soon: More Ways to Repair Your Pixel Phone*, Google Sustainability Blog (Apr. 8, 2022), https://blog.google/outreach-initiatives/sustainability/pixel-phone-repairs/.

[37] Press Release, Fed. Trade Comm'n, FTC Takes Action Against Harley-Davidson and Westinghouse for Illegally Restricting Customers' Right to Repair (Jun. 23, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-takes-action-against-harley-davidson-westinghouse-illegally-restricting-customers-right-repair-0; Press Release, Fed. Trade Comm'n, FTC Takes Action Against Weber for Illegally Restricting Customers' Right to Repair (Jul. 7, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/07/ftc-takes-action-against-weber-illegally-restricting-customers-right-repair.

than 4000% and then engaged in unlawful conduct to maintain that revenue.[38] In January 2022, the federal court held Shkreli liable for antitrust claims brought by the FTC and seven state enforcers. Finding that Shkreli's conduct was egregious, deliberate, repetitive, long-running, and ultimately dangerous, the Court imposed a lifetime ban on Shkreli from participating in the pharmaceutical industry and found him liable for $64.6 million in disgorgement.[39] The federal court's decision to ban Shkreli for life from the pharmaceutical industry is a victory for Americans and should signal to corporate executives that they may be held personally liable for antitrust violations that they direct and may be banned for life from certain industries.

Additionally, the FTC's litigation against Surescripts, an e-prescription giant, remains ongoing.[40] The FTC alleges that Surescripts intentionally kept e-prescription customers from using additional platforms (a practice known as multi-homing) through their use of anticompetitive exclusivity agreements, threats, and other exclusionary tactics. That conduct resulted in the exclusion of all meaningful competition in prescription routing and eligibility, leading to higher prices, reduced innovation, lower output, and no customer choice.

## C.    Preventing Harm to Workers

The Commission has a legal obligation to ensure that we are using our tools and authorities to tackle unfair methods of competition that affect workers. Last December, the FTC and DOJ hosted a two-day workshop to explore a wide range of competition issues affecting labor markets and the welfare of workers.[41] In March, the Treasury Department issued a report on the state of labor market competition, highlighting several ways in which either market concentration or unfair methods of competition is hurting workers.[42] The report notes that many labor markets in America display very high levels of concentration, and mergers can make this concentration even worse, further lowering wages, reducing benefits, and degrading working conditions.[43] As part of our initiative to revise the merger guidelines, the FTC and DOJ solicited

---

[38] Press Release, Fed. Trade Comm'n, FTC and NY Attorney General Charge Vyera Pharmaceuticals, Martin Shkreli, and Other Defendants with Anticompetitive Scheme to Protect a List-Price Increase of More than 4,000 Percent for Life-Saving Drug Daraprim (Jan. 27, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-ny-attorney-general-charge-vyerapharmaceuticals-martin-shkreli-other-defendants-anticompetitive.

[39] Statement of Chair Lina M. Khan on the Ruling by Judge Denise L. Cote in Federal Trade Commission et al. v. Vyera Pharms., LLC et al. (Jan. 14, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/01/statement-chair-lina-m-khan-ruling-judge-denise-l-cote-federal-trade-commission-et-al-v-vyera.

[40] Complaint, *FTC v. Surescripts, Inc.*, No. 1:19-cv-01080 (D.D.C., Apr. 24, 2019), https://www.ftc.gov/system/files/documents/cases/surescripts_redacted_complaint_4-24-19.pdf.

[41] Press Release, Fed. Trade Comm'n, FTC and DOJ Announce Agenda for Dec. 6 and 7 Workshop, Making Competition Work: Promoting Competition in Labor Markets (Dec. 1, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-doj-announce-agenda-dec-6-7-workshop-making-competition-work-promoting-competition-labor-markets.

[42] DEP'T OF TREASURY, THE STATE OF LABOR MARKET COMPETITION (Mar. 2022), https://home.treasury.gov/system/files/136/State-of-Labor-Market-Competition-2022.pdf.

[43] In the Commission's recent challenge of a hospital merger in Rhode Island, Chair Khan and Commissioner Slaughter would have supported a Clayton Act claim regarding the potential effect of the proposed transaction on competition in the relevant labor markets. Concurring Statement of Commissioner Slaughter and Chair Khan regarding FTC and State of Rhode Island v. Lifespan Corporation and Care New England, at 1-2 (Feb. 17, 2022), https://www.ftc.gov/public-statements/2022/02/concurring-statement-commissioner-slaughter-chair-khanregarding-ftc-state.

comments on whether our current enforcement approach is fully accounting for relevant harms to workers and labor market competition.[44]

Notably, the Commission is closely scrutinizing the growing use of non-compete clauses throughout the economy. For example, we have already taken action against the use of non-compete clauses found in merger agreements that would operate as barriers to entry against future competitors. The Commission's order against DaVita, Inc., a large provider of dialysis services, prevents the company from entering into agreements with physicians that would restrict their ability to work for a competitor.[45] The FTC is also exploring the use of its rulemaking authority to limit non-compete clauses that restrict workers' post-employment choices.

## II.     Resource Constraints and Legal Challenges

Despite the many successes highlighted above, it is worth highlighting a couple of significant headwinds the Commission faces. First, as our work illustrates, Congress has charged the FTC with policing unlawful conduct across a broad swath of the U.S. economy—in sectors ranging from technology, energy, and retail to pharmaceuticals and health care. Although we are at the front lines of many of the most pressing issues Americans face today, the number of full-time employees at the FTC is about two-thirds of what it was at the beginning of 1980, while the nation's GDP has increased six-fold. Demands on the Commission continue to grow as we receive more consumer complaints,[46] review more corporate mergers,[47] conduct more complex and expensive litigation, and respond to burgeoning requests for research and investigation of various economic sectors. While we constantly strive to enforce the law to the best of our capabilities, there is no doubt that—despite the increased appropriations Congress has provided in recent years—we continue to lack sufficient funding. We seek to work with Congress to ensure that the Commission has the resources and tools it needs to vigorously protect the American people from unlawful mergers and conduct.[48]

---

[44] Request for Information on Merger Enforcement, FTC-2022-0003, https://www.regulations.gov/docket/FTC-2022-0003 (last visited Sep. 9, 2022).

[45] Press Release, Fed. Trade Comm'n, FTC Imposes Strict Limits on DaVita, Inc.'s Future Mergers Following Proposed Acquisition of Utah Dialysis Clinics (Oct. 25, 2021), https://www.ftc.gov/newsevents/press-releases/2021/10/ftc-imposesstrict-limits-davita-incs-future-mergers-following. Although not arising in the employment context, the Commission also prohibited fuel supply company GPM from enforcing overly broad non-compete provisions contained in its merger agreement to acquire fuel stations from Corrigan. Those provisions went far beyond those necessary to protect any goodwill GPM might hope to acquire with the Corrigan stations. In particular, they applied to areas much broader than the local markets served by the purchased assets, effectively serving as an illegal market allocation agreement between potential competitors. To ensure robust competition in the affected markets for fuel in Michigan, the Commission's order prohibits GPM from enforcing the non-compete restrictions. Press Release, Fed. Trade Comm'n, FTC Approves Final Order Restoring Competitive Markets for Gasoline and Diesel in Michigan and Ohio (Aug. 9, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-approves-final-order-restoring-competitive-markets-gasoline-diesel-michigan-ohio.

[46] For example, over the past five years, annual consumer complaints we receive has increased from 2.9 to 5.7 million. Consumer fraud reports alone increased from 1.3 to 2.8 million and reported consumer fraud losses exploded from $1.1 billion in 2017 to over $5 billion in 2021.

[47] As noted above, merger filings are at or near all-time highs, stretching our ability to screen the filings for problematic deals.

[48] *See, e.g.*, Concurring Statement of Commissioner Rebecca Kelly Slaughter, Joined by Chair Lina M. Khan Regarding the 2022 Revised Clayton Act Thresholds (Jan. 24, 2022),

Second, the FTC faces several significant legal challenges to statutory authorities that have been important tools in executing our dual competition and consumer protection missions. The Supreme Court issued its decision in *AMG Capital Management v. FTC* in April 2021,[49] upending decades of lower court rulings that had held that Section 13(b) of the FTC Act[50] enabled the FTC to pursue equitable monetary relief in federal court. Practically, *AMG* ended the FTC's ability to seek monetary relief for consumers in competition matters. Most concretely, this has already affected our work in the pharmaceutical industry. In the sham patent litigation case the FTC brought against AbbVie, the district court awarded $493 million in monetary relief to consumers harmed by inflated drug prices resulting from AbbVie's illegal conduct.[51] Previewing what the Supreme Court would ultimately make final in *AMG*, the Third Circuit held that the district court lacked authority under Section 13(b) to grant monetary relief to consumers.[52] Defendants were able to keep their nearly $500 million in illegal proceeds, and consumers received nothing.[53] In consumer protection cases, while Section 19 of the FTC Act authorizes the Commission to seek monetary relief for some consumers in federal court after an administrative proceeding, legal challenges to agency administrative processes have made it more difficult for the Commission to use this mechanism for returning money to consumers harmed by illegal conduct. And in competition cases, the Commission cannot use Section 19 at all, wholly foreclosing the ability of the Commission to obtain monetary relief for violations of the antitrust laws. To enable the Commission to continue to execute on its mission, all current Commissioners have repeatedly called on Congress to address this situation and restore the FTC's full authority to return money to injured consumers.

## III.   Policy Development and Research Agenda

Alongside enforcement, the Commission is making long-term investments to maximize the impact of our policy and research work. To tackle the pressing issues of today and tomorrow, we are broadening our institutional skillsets to ensure we are fully grasping market realities, especially as the economy becomes increasingly digitized. For example, as part of the

---

https://www.ftc.gov/system/files/documents/public_statements/1600207/p859910hsrthresholdskhanslaughterstatement_0.pdf.

[49] *AMG Capital Mgmt., LLC v. FTC*, 141 S.Ct. 1341 (2021).

[50] 15 U.S.C. § 53(b).

[51] *FTC v. AbbVie Inc.*, 107 F. Supp. 3d 428 (E.D. Pa. 2015).

[52] *FTC v. AbbVie Inc.*, 976 F.3d 327, 379 (3d Cir. 2020).

[53] In addition to litigated cases, the FTC's ability to obtain monetary relief has yielded substantial disgorgement in connection with settlements as well. For example, in 2015, the Commission recovered $1.2 billion in ill-gotten gains from Teva Pharmaceuticals, Inc. as part of a settlement resolving the Commission's antitrust suit charging Teva subsidiary Cephalon with illegally blocking generic competition to its blockbuster sleep-disorder drug Provigil. Press Release, Fed. Trade Comm'n, FTC Settlement of Cephalon Pay for Delay Case Ensures $1.2 Billion in Ill-Gotten Gains Relinquished; Refunds Will Go To Purchasers Affected By Anticompetitive Tactic (May 28, 2015), https://www.ftc.gov/news-events/news/press-releases/2015/05/ftc-settlement-cephalon-pay-delay-case-ensures-12-billion-ill-gotten-gains-relinquished-refunds-will. The FTC also obtained $100 million in disgorgement from drugmaker Mallinckrodt to settle FTC charges that Mallinckrodt made a killer acquisition after buying the rights to a drug that threatened its monopoly in the U.S. market for adrenocorticotropic hormone (ACTH) drugs that treat seriously ill infants. Press Release, Fed. Trade Comm'n, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants (Jan. 18, 2017), https://www.ftc.gov/news-events/news/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it-illegally-maintained-its-monopoly.

Commission's prioritization of digital markets, in the last year we onboarded a number of renowned technologists to provide additional expertise to our staff in cutting-edge litigation and horizon-scanning efforts, as well as in pursuit of a robust research agenda.

Even amid the tidal wave of merger filings and scorched-earth tactics used by highly resourced parties during investigations and in litigation, we have continued to prioritize making substantial investments to remain faithful to our mandate to engage in policy and research development pursuant to Section 6 of the FTC Act. Through Section 6(b) of the FTC Act, Congress gave the agency broad investigative powers to conduct market-wide inquiries and keep pace with new business practices and market trends.

From its inception, the FTC has used its 6(b) authority to shed light on problems in major sectors, such as the massive study of public utility holding companies in the 1930s that exposed rampant financial fraud and led to the creation of the Securities and Exchange Commission,[54] or to provide a factual foundation to revamp merger analysis and target unlawful conduct in pharmaceutical markets.[55] More recently, the FTC issued a report on non-reportable acquisitions by the nation's five largest technology companies.[56] The report captures the extent to which these firms have devoted tremendous resources to acquiring start-ups, patent portfolios, and entire teams of technologists, largely outside the purview of federal enforcers. The report highlighted ways in which the existing HSR reporting thresholds, by using deal size as a rough proxy for the potential competitive significance of an acquisition, may provide an incomplete and inadequate mechanism for checking unlawful deals in digital markets.

The Commission is working to complete a report from its 6(b) study of ongoing supply chain disruptions.[57] As the recent shortage of baby formula illustrates, in industries dominated by a few large suppliers, a single plant closure can have ripple effects throughout the supply chain, leaving some Americans struggling to find essential products. Last November, the Commission used its 6(b) authority to order nine large retailers, wholesalers, and consumer goods suppliers to provide detailed information needed to better understand both the factors that have contributed to supply chain disruptions and how they may have contributed to bottlenecks, shortages, anticompetitive practices, or rising consumer prices. We are endeavoring to complete this timely study as quickly as possible.

---

[54] Kelly Signs, FTC Milestones: Making the Case for Reform of Public Utility Holding Company Laws, FTC COMPETITION MATTERS BLOG (Nov. 18, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/11/ftc-milestones-making-case-reform-public-utility-holding-company-laws.

[55] See Prepared Remarks of Jonathan Nuechterlein, General Counsel, Fed. Trade Comm'n: How the FTC Works: Lessons from the Commission's Supreme Court Trifecta (Mar. 20, 2015) (discussing the impact of 6(b) studies on the rulings of the Supreme Court), https://www.ftc.gov/system/files/documents/public_statements/632081/150320adminlawreview.pdf.

[56] Press Release, Fed. Trade Comm'n,  FTC Staff Presents Report on Nearly a Decade of Unreported Acquisitions by the Biggest Technology Companies (Sep. 15, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/09/ftc-staff-presents-report-nearly-decade-unreported-acquisitions-biggest-technology-companies.

[57] Press Release, Fed. Trade Comm'n, FTC Launches Inquiry into Supply Chain Disruptions (Nov. 29, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/11/ftc-launches-inquiry-supply-chain-disruptions.

In June, the Commission authorized a 6(b) study of the contracting practices of Pharmacy Benefits Managers.[58] After seeking and receiving public input from a wide variety of stakeholders,[59] the Commission has issued orders to the largest PBMs to obtain nonpublic information about their operations, including negotiations with manufacturers over formulary design and rebates, as well as fees paid to and by pharmacies who contract with PBMs to provide dispensing services. This comprehensive study will shine a light on the opaque operations of these large pharmacy middlemen who can dictate the pricing and access to life-saving drugs for so many Americans. In addition to these studies, the Commission has several other 6(b) studies underway.[60] These studies help guide FTC enforcement efforts as well as fulfill its unique mission as an expert agency that studies market trends and recommends solutions for policymakers.[61]

## IV.    Democratizing the Agency

In addition to the substantive reforms highlighted above, the Commission is also changing how it interfaces with the public by providing greater insight into the Commission's work and greater opportunity for public participation.

Since July 2021, the Commission has held twelve open meetings, providing a platform for Commissioners to hear directly from a broad range of stakeholders, including individuals directly affected by the decisions we make. Anyone can sign up to speak, and they need not be represented by a lawyer. These meetings also provide the public with an opportunity to see the

---

[58] Press Release, Fed. Trade Comm'n, FTC Launches Inquiry Into Prescription Drug Middlemen Industry (Jun. 7, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry. Consistent with the competition concerns that prompted the PBM study, the Commission issued a "Policy Statement on Rebates and Fees in Exchange for Excluding Lower Cost Products," putting the drug industry on notice that paying rebates and fees to exclude competition from formularies violates the antitrust laws. Press Release, Fed. Trade Comm'n, FTC to Ramp Up Enforcement Against Any Illegal Rebate Schemes, Bribes to Prescription Drug Middlemen that Block Cheaper Drugs (Jun. 16, 2022), http://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-ramp-up-enforcement-against-illegal-rebate-schemes.

[59] Press Release, Fed. Trade Comm'n, FTC Requests Public Comments on the Impact of Pharmacy Benefit Managers' Practices, (Feb. 24, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/02/ftc-requests-public-comments-impact-pharmacy-benefit-managers-practices.

[60] Press Release, Fed. Trade Comm'n, FTC Issues Orders to Nine Social Media and Video Streaming Services Seeking Data About How They Collect, Use, and Present Information (Dec. 14, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/12/ftc-issues-orders-nine-social-media-video-streaming-services-seeking-data-about-how-they-collect-use; Press Release, Fed. Trade Comm'n, FTC to Study the Impact of Physician Group and Healthcare Facility Mergers (Jan. 14, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/01/ftc-study-impact-physician-group-healthcare-facility-mergers; Press Release, Fed. Trade Comm'n, FTC to Study the Impact of COPAs (Oct. 21, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/10/ftc-study-impact-copas.

[61] Press Release, Fed. Trade Comm'n, The Federal Trade Commission's First Report on E-Cigarette Sales and Advertising Reveals Disturbing Trends Affecting the Health of Young Americans (Mar. 17, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/03/federal-trade-commissions-first-report-e-cigarette-sales-advertising-reveals-disturbing-trends; Press Release, Fed. Trade Comm'n, FTC Staff Report Finds Many Internet Service Providers Collect Troves of Personal Data, Users Have Few Options to Restrict Use (Oct. 21, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-staff-report-finds-many-internet-service-providers-collect-troves-personal-data-users-have-few; Press Release, Fed. Trade Comm'n, New FTC Staff Report Outlines Impact of Fraud on Communities of Color (Oct. 15, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/10/new-ftc-staff-report-outlines-impact-fraud-communities-color.

Commission deliberate on pressing issues affecting their daily lives, ranging from the Commission's policy on privacy breaches involving healthcare information to our work to halt Made-in-USA fraud.[62]

We have also issued Requests for Information to seek the public's help in identifying contracting practices that undermine open and fair competition,[63] new ideas for analyzing pharmaceutical mergers,[64] and the impact of non-compete clauses on workers.[65] Together with the Antitrust Division's AAG Kanter, we hosted public listening sessions in conjunction with our merger guidelines revision project to hear directly from those affected by mergers in critical sectors, such as food and agriculture, healthcare, media and entertainment, and technology.[66] The goal is to ensure that we receive input from those with direct experience with the markets we cover so that their first-hand understanding can help guide our policies and priorities as we enforce the law.

## V.     Collaboration Across Government to Promote Fair Competition

The FTC recognizes the value and importance of deepening our collaboration and partnerships with other government entities. These relationships act as force multipliers to promote fair competition throughout our economy.

In July 2021, the President underscored the importance of government's role in promoting competition throughout the economy when he issued an Executive Order on Competition,[67] proposing that the FTC and DOJ partner with agencies across the federal government in pursuit of a whole-of-government approach to competition policy. Consistent with that Order, the antitrust agencies provided input to two Treasury reports, one addressing competition issues related to the sale and distribution of alcohol[68] and another on labor market competition. Ongoing work with the USDA, Department of Commerce, and other agencies will result in other public reports this year. In July, the FTC entered into an agreement with the National Labor Relations Board that lays out how the two agencies will work together on key issues such as labor market concentration, one-sided contract terms, and labor developments in

---

[62] For summaries of the Commission's open meetings, see https://www.ftc.gov/news-events/events/open-meetings.
[63] *See* Request for Public Comment Regarding Contract Terms That May Harm Fair Competition, FTC-2021-0036, https://www.regulations.gov/docket/FTC-2021-0036 (last accessed Sep. 9, 2022).
[64] *See* Press Release, Fed. Trade Comm'n, Multilateral Pharmaceutical Merger Task Force Seeks Public Input (May 11, 2021), http://www.ftc.gov/system/files/attachments/press-releases/multilateral-pharmaceutical-merger-task-force-seeks-public-input/final_ftc_notice_for_multilateral_pharmaceutical_merger_task_force.pdf.
[65] *See* Making Competition Work: Promoting Competition in Labor Markets, FTC-2021-0057, https://www.regulations.gov/docket/FTC-2021-0057 (last accessed Sep. 9, 2022).
[66] Press Release, Fed. Trade. Comm'n, FTC and Justice Department Launch Listening Forums on Firsthand Effects of Mergers and Acquisitions (Mar. 17, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/03/ftc-justice-department-launch-listening-forums-firsthand-effects-mergers-acquisitions.
[67] Exec. Order No. 14,036, 86 Fed. Reg. 36,987 (July 14, 2021). *See also* Fact Sheet: Executive Order on Promoting Competition in the American Economy, THE WHITE HOUSE (Jul. 9, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-orderonpromoting-competition-in-the-american-economy.
[68] DEP'T OF TREASURY, COMPETITION IN THE MARKETS FOR BEER, WINE, AND SPIRITS (Feb. 2022), https://home.treasury.gov/system/files/136/Competition-Report.pdf.

the "gig economy."[69] Overall, these collaborations have deepened our relationships with sector regulators, providing a basis for future coordination and cooperation.

Other opportunities for deepening our partnerships lie with both the state attorneys general and in the international arena. We regularly engage with our state and international enforcement partners on both policy initiatives as well as enforcement matters. This includes filing cases jointly with state attorneys general[70] as well as cooperation on many matters with foreign antitrust agencies.[71] The course-correction we are on has made these partnerships even more critical as we learn and benefit from the experience of our domestic and overseas counterpart agencies. Reflecting the importance of this shared learning, we and the DOJ convened an Enforcers Summit earlier this year to collect ideas from our state and international peers related to our merger guidelines revision project.[72]

## VI.   Conclusion

Thank you for this opportunity to share highlights of the progress the Commission has made as we continue to work to ensure that our approach to competition enforcement and policy best positions us to tackle the many competition challenges we currently face. The Commission looks forward to continuing to work with the Subcommittee and Congress to ensure that the FTC is best positioned to faithfully discharge its statutory obligations and fully deliver on its mission.

---

[69] Press Release, Fed. Trade Comm'n, Federal Trade Commission, National Labor Relations Board Forge New Partnership to Protect Workers from Anticompetitive, Unfair, and Deceptive Practices (Jul. 19, 2022), http://www.ftc.gov/news-events/news/press-releases/2022/07/federal-trade-commission-national-labor-relations-board-forge-new-partnership-protect-workers.

[70] *See, e.g.*, Press Release, Fed. Trade Comm'n, FTC and Rhode Island Attorney General Step in to Block Merger of Rhode Island's Two Largest Healthcare Providers (Feb. 17, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/02/ftc-rhode-island-attorney-general-step-block-merger-rhode-islands-two-largest-healthcare-providers; Press Release, Fed. Trade Comm'n, FTC and NY Attorney General Charge Vyera Pharmaceuticals, Martin Shkreli, and Other Defendants with Anticompetitive Scheme to Protect a List-Price Increase of More than 4,000 Percent for Life-Saving Drug Daraprim (Jan. 27, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/01/ftc-ny-attorney-general-charge-vyerapharmaceuticals-martin-shkreli-other-defendants-anticompetitive.

[71] This includes our review of the now abandoned merger between Nvidia and Arm, where we cooperated closely with agencies in many jurisdictions, including the European Union, Japan, South Korea, and the United Kingdom. Press Release, Fed. Trade Comm'n, FTC Sues to Block $40 Billion Semiconductor Chip Merger (Dec. 2, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-sues-block-40-billion-semiconductor-chipmerger

[72] Press Release, Fed. Trade Comm'n, Federal Trade Commission and Justice Department to Hold Joint Spring Enforcers Summit (Mar. 10, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/03/federal-trade-commission-justice-department-hold-joint-spring-enforcers-summit.

# EXHIBIT 8

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      Lina M. Khan, Chair,
                                Noah Joshua Phillips
                                Rebecca Kelly Slaughter
                                Christine S. Wilson
                                Alvaro M. Bedoya

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Meta Platforms, Inc., ) | |
|    a corporation, ) | |
| ) | Docket No. 9411 |
| Mark Zuckerberg, ) | |
|    a natural person, ) | PUBLIC |
| ) | |
| and ) | |
| ) | |
| Within Unlimited, Inc., ) | |
|    a corporation. ) | |

**RESPONDENT'S MOTION TO STAY THIS ADMINISTRATIVE PROCEEDING**

Respondent Meta Platforms, Inc. ("Meta") hereby respectfully moves to stay all administrative proceedings pursuant to 16 C.F.R. §§ 3.22(a), 3.21(c)(1), and 3.41(f)(1)(i), until after a ruling on the Federal Trade Commission's complaint seeking a preliminary injunction in the United States District Court for the Northern District of California in *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD.

The FTC filed its complaint for a preliminary injunction in the Northern District of California on July 29, 2022,[1] and its administrative complaint on August 11, 2022. *See* Complaint,

---

[1] Complaint, *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD (N.D. Cal. July 27, 2022), ECF No. 1; Leah Nylen, *FTC's Khan Overruled Staff to Sue Meta Over VR Deal*, Bloomberg (July 29,

*In re Meta Platforms, Inc., Mark Zuckerberg, and Within Unlimited Inc.*, Docket No. 9411 (F.T.C. Aug. 11, 2022), DE 1 ("Compl.").[2] The preliminary injunction hearing is set for December 8, 2022. But the evidentiary hearing in the administrative proceeding is scheduled to begin on January 19, 2023. Thus, while the preliminary injunction proceeding in court and the administrative proceeding before the Commission are currently scheduled to occur in parallel, the court will likely rule on the preliminary injunction before the administrative proceeding is resolved.

In these situations—when a pending "collateral federal court action [] relates to [an] administrative adjudication"—FTC Rule 3.41(f)(1) authorizes the Commission to stay the administrative proceeding for good cause. *See also* 16 C.F.R. § 3.21(c)(1) (authorizing the Commission to "upon a showing of good cause[] order a later date for the evidentiary hearing than the one specified in the complaint"). Because "the public interest is not ideally served if litigants and third parties bear expenditures that later prove unnecessary," *In re Sanford Health*, Docket No. 9376, 2017 WL 5845596 (F.T.C. Nov. 21, 2017), the Commission has repeatedly found good cause to delay evidentiary hearings because a forthcoming district court decision was likely to "obviate the need for [the] administrative hearing." *In re RAG-Stiftung*, Docket No. 9384, 2020 WL 91294, at *2 (F.T.C. Jan. 2, 2020); *see also In re Hackensack Meridian Health, Inc.*, Docket No. 9399, 2021 WL 2379546, at *1 (F.T.C. May 25, 2021) (granting continuance of administrative proceeding because parties agreed it was "highly likely that [the preliminary injunction] ruling will cause these administrative proceedings to be suspended or rendered moot") (alteration in original);

---

2022), https://www.bloomberg.com/news/articles/2022-07-29/ftc-s-khan-overruled-staff-to-sue-meta-over-virtual-reality-deal (accessed August 23, 2022), attached hereto as Obaro Decl. Ex. A.

[2] The FTC served the nonpublic Complaint on Meta's outside counsel on August 12, 2022.

2

PUBLIC

*In re Thomas Jefferson Univ.*, Docket No. 9392, 2020 WL 7237952 (F.T.C. Nov. 6, 2020) (similar).

There is good cause to stay this administrative proceeding because the district court's ruling on the preliminary injunction will likely obviate the need for the proceeding here. Meta has publicly stated that, if the court grants the FTC's motion for a preliminary injunction, the transaction will likely be unable to close by the contractual deadline of April 22, 2023. *See* Joint Stipulated Case Management Order at 1-2, *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD (N.D. Cal. Aug. 12, 2022), ECF No. 69. And if the court denies the FTC's motion for a preliminary injunction, decades of FTC practice indicate it will not pursue this proceeding further. *See* Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, Remarks to U.S. Chamber of Commerce: A SMARTER Section 5, at 17 (Sept. 25, 2015), https://www.ftc.gov/system/files/documents/public_statements/804511/150925smartersection5.pdf (Commissioner Ohlhausen: "the Commission has not pursued a Part III proceeding following a PI loss in federal court for twenty years"), attached hereto as Obaro Decl. Ex. B. The outcome of the preliminary injunction proceeding is therefore likely to determine whether the transaction may proceed. Accordingly, the significant expenditures both parties (as well as third parties) would incur in this proceeding will likely "prove unnecessary" regardless of the result in the district court. *Sanford Health*, 2017 WL 5845596, at *1. This constitutes good cause to stay the proceeding.

To be sure, Rule 3.41(f) contemplates administrative proceedings occurring at the same time as federal court proceedings given the "Commission's commitment to move forward as expeditiously as possible with its administrative hearings." *Hackensack Meridian*, 2021 WL 2379546, at *1. But expedition serves no purpose when the proceeding is unlikely to result in a final decision on the merits—in that scenario, accelerated proceedings only compound the

inefficiencies for everyone involved. Rule 3.41(f) includes a "good cause" exception to ensure the Commission has the flexibility to issue stays where, as here, doing so avoids unnecessarily burdening not only Meta, but the Commission and third parties, which will expend unnecessary resources.

In addition, there is good cause for a stay because Meta has objected to Chair Khan's participation in these proceedings as a violation of Meta's due process rights based on her apparent bias against Meta and her prejudgment of the material issues in the case. *See Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970). Chair Khan's participation thus undermines the legitimacy of these proceedings. *See Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016) ("[T]he appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself."). The agency should stay the administrative case—and avoid any ongoing due process violations—pending the district court's disposition of the agency's preliminary injunction complaint.

***

For the foregoing reasons, Meta respectfully moves to stay all administrative proceedings pursuant to 16 C.F.R. §§ 3.22(a), 3.21(c)(1), and 3.41(f)(1)(i), pending a ruling on the FTC's preliminary injunction complaint in *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD (N.D. Cal.).

Dated:   August 26, 2022                    Respectfully submitted,


                                             */s/ Chantale Fiebig*

                                             Chantale Fiebig, Esq
                                             Michael Moiseyev, Esq
                                             Jeffrey Perry, Esq
                                             Weil, Gotshal & Manges LLP
                                             2001 M Street NW, Suite 600

4

Washington, D.C. 20036
Telephone No.: (202) 682-7235
Facsimile No.: (202) 857-0940
Chantale.Fiebig@weil.com
Michael.Moiseyev@weil.com
Jeffrey.Perry@weil.com

Eric Hochstadt, Esq
Diane Sullivan, Esq
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone No.: (212) 310-8000
Facsimile No.: (212) 310-8007
Eric.Hochstadt@weil.com
Diane.Sullivan@weil.com

Bambo Obaro, Esq
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone No.: (650) 802-3000
Facsimile No.: (650) 802-3100
bambo.obaro@weil.com

Mark C. Hansen, Esq
Geoffrey M. Klineberg, Esq
Aaron M. Panner, Esq
Kellogg, Hansen, Todd, Figel & Frederick,
P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone No.: (202) 326-7900
Facsimile No.: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
apanner@kellogghansen.com
*Counsel for Meta Platforms, Inc.*

5

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     **Lina M. Khan, Chair**
                                     **Noah Joshua Phillips**
                                     **Rebecca Kelly Slaughter**
                                     **Christine S. Wilson**
                                     **Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of**<br><br>**Meta Platforms, Inc.,**<br>   **a corporation,**<br><br>**Mark Zuckerberg,**<br>   **a natural person,**<br><br>**and**<br><br>**Within Unlimited, Inc.,**<br>   **a corporation.** | )<br>)<br>)<br>)<br>)<br>)   **Docket No. 9411**<br>)<br>)   **PUBLIC**<br>)<br>)<br>)<br>)<br>) |

### [Proposed] Order Granting Respondent's Motion To Stay This Administrative Proceeding

      The Commission has considered Meta Platforms, Inc.'s motion to stay the administrative proceeding pending a ruling on the Federal Trade Commission's request for a preliminary injunction in the United States District Court for the Northern District of California in *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD. Good cause having been shown, the motion is GRANTED. This administrative proceeding is stayed until after the district court rules on the Federal Trade Commission's request for a preliminary injunction.

      By the Commission.

                                                  _____

                                                        Secretary

      ISSUED: _____

6

PUBLIC

## CERTIFICATE OF SERVICE

I hereby certify that, on August 26, 2022, I caused the foregoing document to be electronically filed with the Secretary of the Commission using the Federal Trade Commission's e-filing system, causing the document to be served on all of the following registered participants:

April J. Tabor
Secretary of the Federal Trade Commission
Federal Trade Commission
600 Pennsylvania Ave., NW, Rm. H-113
Washington, D.C. 20580
ElectronicFilings@ftc.gov

The Honorable D. Michael Chappell
Administrative Law Judge
Federal Trade Commission
600 Pennsylvania Ave., NW, Rm. H-110
Washington, D.C. 205080
OALJ@ftc.gov

I also certify that I caused the foregoing document to be served via email to:

Abby Dennis
Peggy Bayer Femenella
Jeanine Balbach
Michael Barnett
E. Eric Elmore
Justin Epner
Joshua Goodman
Sean D. Hughto
Frances Anne Johnson
Andrew Lowdon
Lincoln Mayer
Kristian Rogers
Anthony R. Saunders
Timothy Singer
adennis@ftc.gov
pbayer@ftc.gov
jbalbach@ftc.gov
mbarnett@ftc.gov
eelmore@ftc.gov
jepner@ftc.gov
jgoodman@ftc.gov
shughto@ftc.gov
fjohnson@ftc.gov
alowdon@ftc.gov

lmayer@ftc.gov
krogers@ftc.gov
asaunders@ftc.gov
tsinger@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

Erika Wodinsky
Federal Trade Commission
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
Email: ewodinsky@ftc.gov

*Counsel Supporting the Complaint*

Christopher J. Cox, Esq
Hogan Lovells US LLP
855 Main St., Suite 200
Redwood City, CA 94063
Telephone No.: (650) 463-4000
Facsimile No.: (650) 463-4199
chris.cox@hoganlovells.com

Lauren Battaglia, Esq
Logan M. Breed, Esq
Benjamin Holt, Esq
Charles A. Loughlin, Esq
Hogan Lovells US LLP
Columbia Square, 555 Thirteenth St., NW
Washington, D.C. 20004
Telephone No.: (202) 637-5600
Facsimile No.: (202) 637-5910
lauren.battaglia@hoganlovells.com
logan.breed@hoganlovells.com
benjamin.holt@hoganlovells.com
chuck.loughlin@hoganlovells.com

*Counsel for Respondent Within Unlimited, Inc.*

8

## CERTIFICATE FOR ELECTRONIC FILING

I certify that the electronic copy sent to the Secretary of the Commission is a true and correct copy of the original filing, and that I possess a paper original of the signed document that is available for review by the parties and the adjudicator.

*/s/ Chantale Fiebig*
Chantale Fiebig

9

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:      **Lina M. Khan, Chair,**
                                  **Noah Joshua Phillips**
                                  **Rebecca Kelly Slaughter**
                                  **Christine S. Wilson**
                                  **Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of** | ) |
| | ) |
| **Meta Platforms, Inc.,** | ) |
| **a corporation,** | ) |
| | )   **Docket No. 9411** |
| **Mark Zuckerberg,** | ) |
| **a natural person,** | )   **PUBLIC** |
| | ) |
| **and** | ) |
| | ) |
| **Within Unlimited, Inc.,** | ) |
| **a corporation.** | ) |

**<u>DECLARATION OF BAMBO OBARO IN SUPPORT OF RESPONDENT'S MOTION
TO STAY THIS ADMINISTRATIVE PROCEEDING</u>**

I, Bambo Obaro, hereby affirm under penalty of perjury, as follows:

1.      I am a member of the Bar of the State of California and a partner of the law firm

Weil, Gotshal & Manges LLP, counsel to Respondent Meta Platforms, Inc. ("Meta"). I am one of

the counsel of record for Meta in the above-captioned matter.

2.      I respectfully submit this declaration to provide certain documents that are

referred to in Respondent's Motion to Stay this Administrative Proceeding.

3.      Attached as Exhibit A is a true and correct copy of Leah Nylen, *FTC's Khan

Overruled Staff to Sue Meta Over VR Deal*, Bloomberg (July 29, 2022),

https://www.bloomberg.com/news/articles/2022-07-29/ftc-s-khan-overruled-staff-to-sue-meta-over-virtual-reality-deal (accessed August 23, 2022).

4.      Attached as Exhibit B is a true and correct copy of Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, Remarks to U.S. Chamber of Commerce: A SMARTER Section 5, at 17 (Sept. 25, 2015), https://www.ftc.gov/system/files/documents/public_statements/804511/150925smartersection5.pdf.

Dated:    August 26, 2022                     Respectfully submitted,


                                              */s/ Bambo Obaro*
                                              Bambo Obaro
                                              **WEIL, GOTSHAL & MANGES LLP**
                                              201 Redwood Shores Parkway
                                              Redwood Shores, California 94065
                                              Telephone: (650) 802-3083
                                              Facsimile: (650) 802-3100
                                              Email: bambo.obaro@weil.com

                                              *Counsel for Meta Platforms, Inc.*

PUBLIC

# EXHIBIT A

**Politics**

# FTC's Khan Overruled Staff to Sue Meta Over VR App Deal

- Commission voted 3-2 against Meta's pursuit of VR fitness app
- Staff had recommended against opposing acquisition of Within



Lina Khan  *Photographer: Al Drago/Bloomberg*

By Leah Nylen
July 29, 2022 at 9:00 AM EDT  *Updated on July 29, 2022 at 1:40 PM EDT*

Federal Trade Commission Chair Lina Khan led her fellow Democrats in the agency's majority vote to sue Meta Platforms Inc. this week, despite the staff recommending against bringing a case to challenge the company's acquisition of Within Unlimited Inc., according to three people with knowledge of the decision.

PUBLIC

The move demonstrates Khan's new, more aggressive approach to antitrust enforcement compared with her predecessors -- as well as the challenges she faces in bringing the agency along with her.

Agency leadership has been reluctant in the past to counter a recommendation from staff lawyers and economists, whose job it is to provide a technical assessment of whether proposed deals are anticompetitive and whether the agency has the elements to build a winning case.

In public comments and writings, Khan has emphasized the need to rein in the biggest technology companies, particularly Facebook parent Meta, which she argues has used acquisitions as a form of "land grab" to conquer new markets and "neutralize competitive threats."

In a 2021 report, the FTC found that the five tech giants -- Alphabet Inc., Apple Inc., Amazon.com Inc., Microsoft Corp. and Meta -- acquired hundreds of smaller firms over the previous decade, often using loopholes in the law to avoid notifying antitrust regulators about the takeovers.

Despite the ratcheting up of regulatory scrutiny under the Biden administration, acquisitions by the five tech giants are on pace this year to match or exceed the annual totals under former president Donald Trump. In the first six months of 2022, the five announced plans to acquire 24 companies, exceeding the total for the first half for four of the five previous years, according to data compiled by Bloomberg.

While most of those transactions involved small private companies without the terms being disclosed, Microsoft's planned $69 billion takeover this year of Activision Blizzard Inc. would be the company's largest ever and one of the 30 biggest deals of all time. The FTC is also reviewing that merger.

For more: Microsoft's Activision Deal Set to Test Biden's Antitrust Regime

In the lawsuit filed against Meta on Wednesday, the FTC alleged the deal would give the social networking company a leg up in dominating the burgeoning virtual reality market. The suit represents the first time the agency has preemptively challenged an acquisition by the social media giant, which has bought more than 100 smaller companies over the past decade, according to a 2020 House report.

The FTC has asked a federal court in California to bar Meta from closing the deal until after it has a chance to hear the suit challenging the merger. Meta said it would fight the complaint.

While critics are accusing Khan of overreach in seeking to block the deal, antitrust advocates have urged the agency to be more aggressive in stopping technology giants from acquiring startups that could eventually become rivals.

The FTC's five commissioners split 3-2 on whether to file the complaint, with the two Republicans, Noah Phillips and Christine Wilson, voting against the suit. Each of the commissioners had the

PUBLIC

opportunity to test out Meta's Oculus product, Within's Supernatural and Meta's Beat Saber, two of the people said.



A Meta Oculus Quest 2 VR headset at a Meta Store in Burlingame, California. *Photographer: David Paul Morris/Bloomberg*

The FTC declined to comment.

The lawsuit follows the FTC's 2020 monopolization case against Meta seeking to unwind its acquisitions of Instagram in 2012 and WhatsApp in 2014, after failing to challenge them at the time. Phillips and Wilson also opposed that case, which could go to trial in 2024 in federal court in Washington. The FTC alleges the acquisitions were part of an illegal scheme to monopolize the market for social networking.

Meta has denied the allegations and is also contesting that case.

Alvaro Bedoya -- who joined the commission in May, giving Khan a Democratic majority -- had multiple meetings with FTC staff and Khan's office about the Within deal to address his concerns about overruling the staff recommendation, two of the people said. Bedoya, through an FTC spokesman, declined to comment on his deliberations.

PUBLIC

Before Bedoya joined the commission, it was deadlocked 2-2, allowing the two Republicans to stymie several of Khan's more aggressive ideas to promote competitive markets.

For more: Path For Democrat-Led FTC Opens as Senate Advances Last Nominee

Meta announced last October its plan to acquire Within, the maker of the popular virtual reality fitness app Supernatural, for an undisclosed sum. The proposed deal followed Meta's purchase of six other virtual or augmented reality app makers over the past three years, none of which were challenged by the FTC.

Formerly known as Facebook, Meta rebranded itself last year in an effort to better focus on the metaverse -- a more immersive version of the internet, where people can populate an alternative virtual world to go shopping, go to work and see friends. The company is the world's top VR headset maker with its Oculus product controlling about 80% of the market, according to research firm IDC.

### The latest in global politicsThe latest in global politicsThe latest in global politics

Get insight from reporters around the world in the Balance of Power newsletter.Get insight from reporters around the world in the Balance of Power newsletter.Get insight from reporters around the world in the Balance of Power newsletter.

 Sign up to this newsletter

Within's Supernatural offers immersive VR workouts complete with music and fitness instructors. In its complaint, the FTC alleged that Within's Supernatural app competes with Meta's own Beat Saber, a VR rhythm game where users hit targets in time to music. Meta also has the financial resources and expertise to easily add features to Beat Saber or develop a separate dedicated fitness app that could more directly compete with Supernatural, the FTC said.

"The FTC's case is based on ideology and speculation, not evidence," Meta lawyer Nikhil Shanbhag said in a blog post about the case. "We are confident this transaction does not reduce competition in any way, will bring countless benefits to people and VR developers, and should therefore be allowed to proceed."

During the nine-month inquiry, the FTC didn't take any sworn interviews of company executives, which it often uses to help build a case, two of the people said, speaking anonymously to discuss the confidential probe. But a few weeks before the Within deal was set to close on July 31, Khan's office sent the company additional questions and began drafting a legal challenge, the people said.

*— With assistance by Michael Hytha*

Case 5:22-cv-04825-EJD   Document 93-2   Filed 08/23/22   Page 208 of 228

*(Updates with continued pace of tech deals from sixth paragraph)*

---

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy

©2022 Bloomberg L.P. All Rights Reserved

Careers  Made in NYC  Advertise  Ad Choices      Help

PUBLIC

# EXHIBIT B

PUBLIC



**United States of America**
# Federal Trade Commission

---

**A SMARTER Section 5**

**Remarks of Maureen K. Ohlhausen[1]**
**Commissioner, Federal Trade Commission**

**U.S. Chamber of Commerce**
**Washington, D.C.**

**September 25, 2015**

## I.      Introduction

Good morning.  Let me thank Sean Heather of the U.S. Chamber of Commerce (Chamber) for inviting me to speak today.  I am honored to be back at the Chamber to discuss the Federal Trade Commission's (FTC) unfair methods of competition (UMC) authority under Section 5 of the FTC Act and my agency's recently issued policy statement.[2]  As you may recall, the Chamber hosted in me in 2013 when I set out my views on Section 5 in a speech I called "Principles of Navigation."[3]  Since that time, there have been some developments that, in my view, amount to little real progress and include some serious missteps.

Now, it is certainly entertaining to view the UMC statement in terms of an academic debate among current and former Commissioners about its length, and breadth, and limitations,

---

[1] The views expressed in this speech are my own and do not necessarily reflect the views of the Federal Trade Commission or any other Commissioner.  I am grateful to my attorney advisor, Greg Luib, for his invaluable assistance in preparing this speech.

[2] Fed. Trade Comm'n, Statement of Enforcement Principles Regarding "Unfair Methods of Competition" under Section 5 of the FTC Act (Aug. 13, 2015), *available at* https://www.ftc.gov/system/files/documents/public_statements/735201/150813section5enforcement.pdf.

[3] Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, *Section 5: Principles of Navigation*, Remarks before the U.S. Chamber of Commerce (July 25, 2013), *available at* http://ftc.gov/speeches/ohlhausen/130725section5speech.pdf.

whether implicit or explicit.  This misses what I believe is the crucial question about a policy statement that purports to be guidance to those subject to our standalone Section 5 oversight and enforcement.  Do you—business interests and the members of the bar who advise you—believe the new policy statement provides what the courts have demanded:  a "workable standard" "for what is or is not to be considered an unfair method of competition under § 5" or will this policy statement instead lead to "uncertain guesswork rather than workable rules of law."[4]  This standard does not come from me but from the court that rejected the last litigated FTC standalone Section 5 challenge, the *Abbott Labs* case.

The reaction that I have seen from the bar and industry to the policy statement thus far suggests that the large majority of you do not perceive this as a workable standard that will, in practice, reduce uncertainty and guesswork.  As I stated in my dissent from the statement, I also do not view this as meaningful guidance.  What I want to make clear today is that this is not simply a weak stab at guidance and a missed opportunity for the Commission.  Rather, the few principles the statement does clearly embrace amplify already existing concerns about the FTC's role in antitrust enforcement that are animating legislation to change our antitrust oversight powers.

In my remarks this morning, I will review the statement and my objections, elaborating on some of the points I made in my dissent.  I will next briefly revisit my arguments for why Section 5 largely should be limited to the antitrust laws and the factors I would have included in the statement.  I will then turn to the SMARTER Act, recently proposed legislation aimed at standardizing merger review across the FTC and Department of Justice (DOJ).  As I will explain,

---

[4] FTC v. Abbott Labs., 853 F. Supp. 526, 535-36 (D.D.C. 1994) ("The Second Circuit stated emphatically that some workable standard must exist for what is or is not to be considered an unfair method of competition under § 5. Otherwise, companies subject to FTC prosecution would be the victims of 'uncertain guesswork rather than workable rules of law.'") (quoting E.I. du Pont de Nemours & Co. v. FTC, 729 F.2d 128, 139 (2d Cir. 1984)).

I believe the open-ended Section 5 statement implicates the same core concerns driving the

SMARTER Act, including undue leverage for the FTC and different liability standards across the

two antitrust agencies.

## II.     My Objections to the Section 5 Policy Statement

As many of you know, I voted against issuing the policy statement and in my dissent

explained my objections—both procedural and substantive—to the Commission's stated views

on the scope of Section 5.  As I quickly run through my main objections, I will offer additional

reactions that I and others have had since the statement issued.

As a preliminary matter, I agree that the statement will restrain the Commission from

pursuing Section 5 to its broadest theoretical extent to reach conduct that is in bad faith,

fraudulent, or oppressive without any possible relation to competition.  With your indulgence,

here I will revive the nautical analogy from my previous Section 5 speech to illustrate what the

Commission actually did.  It basically said it will not sail off the "competition chart" in

interpreting UMC.  This means it will not do this:



One should ask if the Commission was likely to pursue that course without a statement,

however.  Regardless of the few remarks by individual Commissioners in speeches and the

urging of a handful of law professors to go beyond competition concerns, in actual practice the

Commission has not relied solely on a non-competition rationale to support a UMC violation for

forty-some years.  Thus, as practitioners have noted, the statement constrains very little, if anything, in this regard.[5]

Turning to my dissent, I took issue with the statement's lack of content.  Unlike the detailed analysis in our policy statements on deception and unfairness on the consumer protection side,[6] the UMC statement fails to mention, much less grapple with, the existing case law.  Although the majority might like to sweep that unfortunate history under the rug, the fact is that the courts repeatedly rebuffed the FTC when it last tried to assert broad Section 5 authority, with the *Abbott Labs* case mentioned above being the fourth and final loss.[7]  Further, implicitly disregarding the *Abbott* court's suggested path, the UMC statement includes no examples of either lawful or unlawful conduct to provide practical guidance on how the Commission will implement its enforcement policy.

I want to address a few of the objections that I have heard to a more detailed policy statement.  First, some have stated that it is hard to draft a comprehensive policy statement.  Yes, that is most certainly true.  However, the Commission was able to do that on the consumer protection side for its unfair acts or practices authority, which was quite a bit more controversial at the time.[8]  Second, the Chairwoman in her speech announcing the policy statement rejected

---

[5] *See, e.g.*, Kirkland & Ellis LLP, *FTC Issues Policy Statement on the Reach of Section 5 of FTC Act*, at 1 (Aug. 2015) ("For businesses concerned about the potential for an activist FTC to apply Section 5 in novel ways, this statement provides little comfort.").

[6] *See* Fed. Trade Comm'n, Commission Statement of Policy on the Scope of the Consumer Unfairness Jurisdiction, 104 F.T.C. 1070, 1071 (1984) (*appended to In re* Int'l Harvester Co., 104 F.T.C. 949 (1984)), *available at* http://www.ftc.gov/bcp/policystmt/ad-unfair.htm; Fed. Trade Comm'n, Policy Statement on Deception (*appended to In re* Cliffdale Assocs., Inc., 103 F.T.C. 110, 174 (1984)), *available at* http://www.ftc.gov/bcp/policystmt/ad-decept.htm.

[7] *See* E.I. du Pont de Nemours & Co. v. FTC, 729 F.2d 128, 139 (2d Cir. 1984); Boise Cascade Corp. v. FTC, 637 F.2d 573, 582 (9th Cir. 1980); Official Airline Guides, Inc. v. FTC, 630 F.2d 920, 927 (2d Cir. 1980).

[8] *See, e.g.*, J. Howard Beales, *Brightening the Lines: The Use of Policy Statements at the Federal Trade Commission*, 72 ANTITRUST L.J. 1057, 1065 (2005) (recounting Congressional backlash, including a shutdown of

the notion of issuing "a detailed and comprehensive code of legitimate business conduct."[9]
However, that is a straw man—and not what agency stakeholders, including the Chamber, have
sought from the Commission.  Rather, you have asked for something more along the lines of the
Unfairness and Deception Statements—in terms of both guidance and constraint on future
agency discretion.  After a hundred years, I think the agency's many stakeholders, particularly
the firms subject to our jurisdiction, deserved better than what they got here.[10]

In addition, I noted the lack of internal deliberation and external consultation surrounding
this policy statement—as opposed to the topic of Section 5 more generally.  In particular, the
Commission's lack of interest in any public input troubled me.  Putting the statement out for
public comment would have allowed the Commission to hear from key stakeholders, including
Congress, the Antitrust Division, the business community, and the antitrust bar.

Unfortunately, this appears to be a bad habit for the Commission of late: making
significant shifts in enforcement policy without seeking input from key stakeholders.  That is not
going to help maintain the support for the agency's mission that is so crucial for it to be
effective.[11]

---

the agency, to the Commission's use of its unfairness authority to enact rules and bring cases targeting, among other
things, advertising to children).

[9] Edith Ramirez, Chairwoman, Fed. Trade Comm'n, Address before George Washington University Law School
Competition Law Center, at 6 (Aug. 13, 2015), *available at*
https://www.ftc.gov/system/files/documents/public_statements/735411/150813section5speech.pdf.

[10] As one leading commentator has put it, "[T]he American public deserve a well-reasoned and cohesive approach to
Section 5's unfair methods of competition standard, not a bullet-point press release filled with cliches."  Lawrence J.
Spiwak, *FTC Misses Mark with New "Unfair Methods of Competition" Statement*, THE HILL (Sept. 22, 2015),
*available at* http://thehill.com/blogs/pundits-blog/technology/254463-ftc-misses-mark-with-new-unfair-methods-of-
competition.

[11] I also objected in 2012 to the Commission's withdrawal, without any public input, of its policy statement on
pursuing disgorgement in competition matters.  *See* Statement of Commissioner Maureen K. Ohlhausen Dissenting
from the Commission's Decision to Withdraw its Policy Statement on Monetary Equitable Remedies in Competition
Cases (July 31, 2012), *available at* http://www.ftc.gov/os/2012/07/120731ohlhausenstatement.pdf.

Turning back to the substance, it is certainly the case that no policy statement can anticipate all issues or questions that are likely to arise in the enforcement of a statute.  However, I argued that this statement raises many more questions than it answers.  The client alerts issued by the antitrust bar make it clear that they also see little in this statement to help them counsel their clients.  As one firm put it, "It turns out that the guidance is significant only because it is the first guidance that the FTC has issued regarding enforcement under Section 5 of the FTC Act."[12] I agree with the Chamber's opinion that the policy statement is "disappointing as it fails to establish an objective standard that closes the door to varying interpretations."[13]

What business and its counselors have instead is a statement of three general principles, which leave unanswered several key questions.  For example, in what way does "a framework similar to the rule of reason" differ from a traditional rule of reason analysis?  In her speech announcing the statement, the Chairwoman stressed that the majority was using the term "rule of reason" in its "broad, modern sense."[14]  She then went on to discuss only the quick look or abbreviated rule of reason analysis.  Does that mean quick-look analysis will be the default standard for all standalone Section 5 cases?  Likewise, does the policy statement mandate a true balancing of the harms and efficiencies, as we would do under the rule of reason (at least in

---

[12] Nixon Peabody LLP, *FTC Issues Unprecedented but Vague Guidance on Unfair Methods of Competition*, at 1 (Aug. 20, 2015); *see also, e.g.*, King & Spalding, *FTC Issues Statement on "Unfair Methods of Competition" Prohibited by Section 5 of the FTC Act*, at 2 ("At bottom, the FTC seems to have missed an opportunity to provide businesses with meaningful guidance in a controversial area of its enforcement authority."); Skadden, Arps, Slate, Meagher & Flom LLP, *After Long Debate, FTC Issues Only General Principles Regarding Section 5*, at 1 ("Those anxious for guidance . . . will not find the FTC's statement on Section 5 wholly satisfying."); Crowell & Moring, *Federal Trade Commission Issues Policy Statement on Unfair Methods of Competition*, at 2 ("It offers little that the Commission has not stated previously in the context of enforcement actions brought over the past decade."); Morrison & Foerster LLP, *Key Take-Aways from the FTC's New Section 5 Statement*, at 2 ("The Statement . . . does not disappoint those who expected little guidance.").

[13] U.S. Chamber of Commerce, Statement on the FTC's Section 5 Authority (Aug. 13, 2015), *available at* https://www.uschamber.com/press-release/statement-the-ftc-s-section-5-authority.

[14] Ramirez, *supra* note 9, at 7.

theory)?  Or will the efficiencies be given short shrift in a Section 5 analysis?  It is particularly

puzzling to me that some who have repeatedly asserted that the FTC overlooks or undervalues

efficiencies in its merger review would take comfort from a vague commitment to "take into

account cognizable efficiencies" in a much less settled area of law.

Similarly, the Chairwoman and others tout the fact that Section 5 now incorporates

widely-used antitrust concepts, such as "harm to competition" and "cognizable efficiencies"—as

though those concepts are well-settled, rather than frequently debated terms of art in traditional

antitrust law.  Further, as the Chamber observed, although the rule of reason standard may be

acceptable for the antitrust laws, Section 5 needs a more stringent standard.

Turning to the statement's third and final principle, it gives the Commission wide latitude

to pursue under Section 5 conduct that it considers insufficiently addressed by the antitrust laws.

Specifically, the majority said it is merely "less likely" to use Section 5 in those circumstances.

That leaves the Commission with a tremendous amount of leeway to pursue Section 5 claims

when the antitrust laws have already established the boundaries of legal conduct.  Under the

policy statement, the Commission can take the same approach it did in the *Intel* case, which is to

allege that conduct, such as loyalty discounts or bundling, is a Section 2 and/or a Section 5

violation.[15]  Even worse, perhaps, if the Commission believes the Section 2 case law in a given

area is too restrictive, it can recast the same conduct as a Section 5 violation, with a lower

liability standard.  For example, the *Intel* complaint included an assertion to the effect that no

showing of a dangerous probability of recoupment is necessary to make out a predatory pricing-

---

[15] In *Intel*, the Commission's complaint identified the same conduct—including the offering of loyalty discounts to key customers—as violating both Section 5 and the Sherman Act.  *See In re* Intel Corp., FTC File No. 061-0247, Complaint, at 17 (Dec. 16, 2009) [hereinafter *Intel* Complaint], *available at* https://www.ftc.gov/sites/default/files/documents/cases/091216intelcmpt.pdf.

type claim under Section 5.[16]  Perhaps *Intel* is an outlier; but the Commissioners supporting the policy statement did not disclaim it.  In fact, the Chairwoman repeatedly emphasized that the statement changes nothing about the Commission's modern approach to UMC.

Although commenters have rightly focused much attention on what the statement lacks, an examination of the principles a majority of the Commission explicitly embraces is even more troubling for businesses who are under the authority of both the FTC and the DOJ.  One of the few guiding principles included in the statement is the pronouncement that Section 5 covers conduct that "contravenes the spirit of the antitrust laws" or which, "if allowed to mature or complete, could violate" the antitrust laws.  First, with respect to the ethereal spirit of the antitrust laws, as Professor Hovenkamp observed, "[T]he spirit and letter of the antitrust laws are identical."[17]  That is, "[n]othing prevents [the Sherman and Clayton Acts] from working their own condemnation of practices violating their basic policies."[18]  Thus, what territory outside the letter of the antitrust laws does the Commission want to claim?

Similarly, by invoking incipiency as a guiding principle, the statement opens the door to significant expansion of Section 5—particularly into areas of conduct that are legal under the Sherman Act.  Although it is true that antitrust law focuses on mergers to stop anticompetitive behavior that has not yet occurred, the UMC statement clearly states that it may apply to conduct that the Sherman and Clayton Act do not condemn.  Does this mean the Commission will pursue matters that are insufficiently incipient for the antitrust laws but incipient enough for Section 5?

---

[16] *See id.* at 9 ("Although it is not a necessary element under a Section 5 claim, Intel as a monopolist is likely to recoup any losses that it suffered as a result of selling any of its products to certain OEMs below cost.").

[17] II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law  ¶ 302h, at 30 (4th ed. 2014).

[18] *Id.* at 31.

The main problem with the incipiency doctrine is identifying the precise moment when nascent conduct transforms into a true threat to competition.  At what market share should a firm without monopoly power be concerned about triggering an incipient violation through its otherwise lawful conduct?  I have often talked about what Friedrich Hayek calls the knowledge problem that hampers regulators trying to predict the future, particularly in fast-moving industries.[19]  The Commission's expressed interest in pursuing incipient antitrust violations under Section 5 will only exacerbate that problem.

More importantly, the policy statement's combined claim of authority over conduct outside the letter of the antitrust laws, invocation of incipiency, and vague limitations about when to use Section 5 for conduct reachable under the antitrust laws raises the specter of the FTC using UMC to rewrite well-settled areas of antitrust law.  To return to my nautical theme, the Commission could try to sail the FTC boat onto lands already mapped by antitrust law.  Given past history, following that course could end up looking something like this:



---

[19] *See, e.g.*, Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, *Regulatory Humility in Practice*, Remarks before the American Enterprise Institute, at 3-4 (Apr. 1, 2015), *available at* https://www.ftc.gov/system/files/documents/public_statements/635811/150401aeihumilitypractice.pdf.

The statement also explicitly permits the Commission to pursue conduct under Section 5 in the absence of substantial harm to competition.  As I noted, however, our Unfairness Statement contains a substantial harm requirement, and thoughtful commentary from leading antitrust scholars suggests that such a requirement be included in any UMC statement.  In any case, the fact that this policy statement requires some harm to competition does little to constrain the Commission, as every Section 5 theory pursued in the last 45 years, no matter how controversial or convoluted, can be and has been couched in terms of protecting competition and/or consumers.

Some have expressed the view that having any Section 5 policy statement—no matter how open-ended—is better than having no statement at all.  I strongly disagree.  Arming the FTC staff with this sweeping new statement is likely to embolden them to explore the limits of Section 5 in both conduct and merger investigations.  I fear that this will ultimately lead to more, not less, uncertainty and burdens for the business community.

Finally, as I already noted, the expansive policy statement raises significant concerns for our dual antitrust enforcement framework.  Principles of fairness and predictability require that we seek to minimize divergence in liability standards between the two agencies resulting from enforcement of Section 5.  Only where the risk to competition is the greatest should we have any type of divergence in such standards.  Otherwise, firms may face liability (or not), depending solely on which agency reviews their conduct.  This could transform the FTC and DOJ's informal clearance process from a matter of administrative efficiency to a deciding factor in finding firms liable for certain types of conduct.  Even worse from a fairness standpoint is the prospect of the Commission leveraging its expansive Section 5 authority to pursue conduct by a

firm whose time-sensitive merger happens to be under review by the Commission.  I will discuss this more fully in my discussion of the SMARTER Act.

## III.     Limiting the Scope of Section 5

The weakness of the UMC policy statement reinforced for me the primary reasons that I believe, if the FTC wants to pursue UMC cases, it should provide clearer guidance that actually significantly cabins the use of its standalone Section 5 authority.[20]  Among the most important principles that I believe should guide the Commission's efforts—both generally and with respect to Section 5 in particular—are transparency and predictability.  Transparency in our law enforcement efforts, of course, offers guidance to businesses on how to comply with the law.  Predictability, meanwhile, goes to procedural due process and, quite simply, any notion of good government.

Another important guiding principle for any government agency, including the FTC, is policy coherence.  Former Chairman Bill Kovacic has argued that policy coherence is one of the most important factors for predicting the long-term success of an agency.[21]  However, in its Section 5 cases over the past several years, the agency has undermined the policy coherence that I have otherwise seen at the Commission.[22]  The UMC policy statement continues this trend.

An additional guiding principle for any successful agency is maintaining political support for its mission.  By "political" support, I mean both Congressional support and support from the

---

[20] Rather than seeking to expand the scope of Section 5, I believe the FTC ought to focus its efforts and available tools on developing the antitrust laws.

[21] *See* David A. Hyman & William E. Kovacic, *Why Who Does What Matters: Governmental Design and Agency Performance*, 82 GEO. WASH. L. REV. 1446, 1484 (2014).

[22] *See, e.g.*, *Intel* Complaint, *supra* note 15, at 17-18 (casting conduct simultaneously as monopoly maintenance, attempted monopolization, unfair methods of competition, and unfair or deceptive acts or practices); *In re* Negotiated Data Solutions LLC, FTC File No. 051-0094, Complaint, at 8 (Jan. 23, 2008), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2008/01/080122complaint.pdf (alleging breach of licensing agreement constituted both an unfair method of competition and an unfair act or practice).

11

agency's key stakeholders more generally.  That support is dependent—in large part—on a clearly stated mission for the agency.  Congress, the courts, the business community, and the antitrust bar have raised significant concerns regarding the reach of our Section 5 authority. Unfortunately, in issuing the statement, the Commission did not try to build support among its key stakeholders for a broader Section 5 by seeking public comment.

Finally, there are several substantive reasons why the Commission's UMC authority should be very limited in scope.[23]  One reason is the need to avoid false positives—that is, the condemning of business conduct that is procompetitive or competitively neutral—as well as the chilling of efficient conduct.  Putting aside the invitation to collude cases, the Commission's standalone Section 5 cases over the past decade have been focused virtually entirely on the technology space.  That includes *Intel*, *N-Data*, *Bosch*, and *Google/Motorola Mobility*.  It is in the technology space where our application of any competition law—whether it is the Sherman Act or the FTC Act—is going to be most challenging, given the dynamic nature of competition in that area.  Although I am not arguing that antitrust has no place in technology markets, with a statute as elastic as Section 5, I think the Commission ought to tread extremely lightly in that space.  Otherwise, it runs a serious risk of chilling innovation in what are arguably some of the most important industries in our economy.

## IV.    Ingredients for a Better Section 5 Policy Statement

I will now briefly turn to the factors I had proposed for a Section 5 policy statement in my "Principles of Navigation" speech.[24]  In it I asked what I believe continues to be the most

---

[23] *See* Ohlhausen, *Principles of Navigation*, *supra* note 3, at 16.

[24] I proposed looking to the principles and underlying philosophy expressed in Executive Order 12866, which established a regulatory philosophy and twelve principles of regulation for use by federal agencies in deciding whether and how to regulate.  President Clinton issued the Order in 1993, and although it has been supplemented and amended since then, the philosophy and guiding principles remain in effect and relevant today.  At its core, the

crucial question: Why will consumers and competition be better off in the future with the FTC defining its Section 5 authority expansively?

The first factor I proposed is substantial harm to competition. The FTC's unfair methods of competition authority should be used solely to address substantial harm to competition or the competitive process, and thus to consumers.[25] The substantiality requirement I proposed would mirror the one in our Unfairness Statement on the consumer protection side.

I grounded the second factor in the need to avoid false positives. The FTC should challenge conduct as an unfair method of competition only in cases in which: (1) there is a lack of <u>any</u> procompetitive justification for the conduct;[26] or (2) the conduct at issue results in harm to competition that is disproportionate to its benefits to consumers and to the economic benefits to the defendant. The more demanding this test, the more confidence we will have that we are challenging conduct that is something other than competition on the merits.

My third proposed factor is a requirement to avoid, or at least minimize, imposing different liability standards on business conduct than does the DOJ Antitrust Division, which also enforces the Sherman and Clayton Acts, but not Section 5. Nor should the FTC use its Section 5 authority to rehabilitate a deficient Sherman or Clayton Act claim. If there is a viable

---

Order seeks to ensure that a regulation does more good than harm for the public. *See* Ohlhausen, *Principles of Navigation*, *supra* note 3, at 5-7.

[25] This proposed factor takes into account both actual and likely harm to competition. That is, there may be circumstances in which all of my proposed Section 5 criteria are met, except that the substantial harm has not yet taken place. In such cases, the Commission ought to intervene only if there is a high likelihood of the harm taking place. I have in mind a standard of likelihood that is comparable to the "dangerous probability of success" element in attempted monopolization claims.

[26] This is the standard that former Commissioner Wright proposed in 2013. *See* Joshua D. Wright, Comm'r, Fed. Trade Comm'n, *Proposed Policy Statement Regarding Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act* (June 19, 2013), *available at* http://www.ftc.gov/speeches/wright/130619umcpolicystatement.pdf.

claim under those Acts that the FTC can pursue for a particular type of conduct, then we should not use Section 5 in such a case.

My fourth proposed factor goes to the evidence required for any Section 5 enforcement. We should anchor any effort to expand Section 5 beyond the antitrust laws in robust economic evidence that the challenged practice is anticompetitive and reduces consumer welfare. Prior to filing an enforcement action targeting particular business conduct, the agency, through its policy research and development efforts, should acquire substantial expertise regarding such conduct and its effects on consumer welfare.

My fifth proposed factor calls for the agency to consider its non-enforcement tools as an alternative to any Section 5 enforcement. The FTC has often sought to address a competitive concern in the marketplace via its many non-enforcement tools, such as conducting research, issuing reports and studies, and engaging in competition advocacy.

My final proposed factor requires the FTC to provide clear guidance in the Section 5 area. Fundamentally, this means that a firm must be reasonably able to determine that its conduct would be deemed unfair at the time it undertakes the conduct and not have to rely on an after-the-fact analysis of the impact of the conduct that was not foreseeable.[27] I believe the case law on Section 5, such as the *Abbott Labs* decision I already mentioned, demands this type of guidance.

---

[27] Beyond a policy statement of some kind, I called for the Commission to take additional steps in the interest of transparency when it brings a standalone Section 5 case. First, the Commission ought to explain why the particular conduct at issue is best addressed by Section 5. That is, the agency ought to identify the institutional advantages of the FTC as an agency and those of Section 5 as a statute that justify the application of Section 5 to the particular conduct. Second, the agency should explain why the antitrust laws could not reach the conduct at issue. Finally, in the interest of providing clear guidance and avoiding doctrinal confusion, the Commission generally should not pursue particular conduct as both an unfair method of competition and an unfair or deceptive act or practice, without clearly spelling out how particular alleged conduct meets each of the elements of a UMC and a consumer protection claim.

## V.    Section 5 and the SMARTER Act

The reasons counseling against expanding UMC much beyond the borders of traditional antitrust law bring me to the next topic I would like to address: the nexus between a broadly defined Section 5 and the SMARTER Act, also known by its full name as the Standard Merger and Acquisition Reviews through Equal Rules Act (the Act).  For those of you not familiar with the different versions of the legislation,[28] the bills generally would implement two reforms to the FTC Act.  First, they would harmonize the preliminary injunction (PI) standards that the FTC and DOJ must meet in federal court when challenging proposed mergers or acquisitions.  Second, the bills would remove the FTC's ability to pursue so-called Part III administrative litigation with respect to such proposed transactions.

Because the SMARTER Act—like many bills in Congress—is still in a state of flux, with various amendments under consideration, I will talk generally about the legislation, rather than comment on a specific version of the bill.

Regarding the harmonization of the PI standards, given my concern about divergent standards between FTC and DOJ, I would support legislation that ensured that courts apply the same PI standard to actions brought by the FTC and DOJ.  Although I do believe that in practice, the courts largely apply the same standard, to preclude the possibility of divergent PI standards going forward, this portion of the SMARTER Act appears to be a wise reform.[29]  And frankly, as

---

[28] In the current session, H.R. 2745 was introduced last June.  *See* H.R. 2745, 114th Cong. (2015).  In the last Congress, H.R. 5402 was reported out of committee, but was not voted on by the full House.  *See* H.R. 5402, 113th Cong. (2014).

[29] *See, e.g.*, American Bar Association Section of Antitrust Law, Comments on Proposed Legislation: The Standard Merger and Acquisitions Review through Equal Rules Act of 2014, at 8 n.26 (June 20, 2014) ("In the Section's view this is an area that is far too important to leave in doubt and thus the Section recommends adoption of the same standard as reflected in the proposed SMARTER Act to remove any and all doubt in this regard.").

15

some have recently pointed out,[30] the FTC seems to be doing just fine without a lower PI standard.

The Part III amendments in the SMARTER Act raise slightly more complicated issues. As I have discussed on numerous occasions, the FTC has many unique institutional features, including its administrative litigation, research capabilities, and bipartisan composition, which it has used to improve the antitrust laws over the past three decades, racking up an impressive 6-1 record at the Supreme Court in the process.

However, there are several important considerations in assessing the various proposed Part III amendments.  First, the Commission's unique features have been utilized much more frequently in conduct matters, which would not be affected by the SMARTER Act, as it is limited to merger reviews.  Under the SMARTER Act, it appears the Commission could continue to challenge consummated mergers that it has reason to believe are anticompetitive.  In that way, the agency will still be able to develop merger law through its Part III authority, as it did in the *ProMedica*[31] and *Evanston*[32] hospital-merger cases.  Even in unconsummated mergers, the Commission could still appeal a PI loss to the circuit court of appeals, if the transaction raised a significant legal issue worth pursuing, as recently happened in the *Phoebe Putney* matter.[33]

---

[30] *See* Mark J. Botti & Anthony W. Swisher, *Regrettable Outcome of Sysco/U.S. Foods Merger Challenge Reflects FTC Has Nothing to Fear from "SMARTER" Act*, Washington Legal Foundation Legal Pulse (July 17, 2015), *available at* http://wlflegalpulse.com/2015/07/17/regrettable-outcome-of-syscou-s-foods-merger-challenge-reflects-ftc-has-nothing-to-fear-from-smarter-act/ ("[T]he FTC presented a more serious case on the merits and in doing so demonstrated why it doesn't need special treatment to enforce the antitrust laws.").

[31] *In re* ProMedica Health System, Inc., F.T.C. Dkt. No. 9346, Commission Opinion (Mar. 28, 2012), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2012/03/120328promedicabrillopinion.pdf, *aff'd*, FTC v. ProMedica Health System, Inc., 749 F.3d 559 (6th Cir. 2014).

[32] *In re* Evanston Northwestern Healthcare Corp., 144 F.T.C. 1, 375 (2007) (Commission opinion).

[33] *See* FTC v. Phoebe Putney Health System, Inc., 133 S. Ct. 1003 (2013).

16

The second relevant consideration for me is the fact that the Commission has not pursued a Part III proceeding following a PI loss in federal court for twenty years.  Opponents of the SMARTER Act cite this fact as a basis for arguing that there should be minimal concern about any misuse or overuse of our Part III authority.  However, the lack of use over the past twenty years cuts both ways: it also means the Commission would not be losing a frequently used tool.

Further, I share the concerns created by past Commission statements expressing its intention to pursue Part III litigation no matter the outcome in federal court.[34]  That is one of the reasons I championed the change to our internal rules earlier this year.  Very briefly, the rule at issue, Rule 3.26, addresses the situation where the FTC has lost a PI proceeding in federal court and is considering whether to nonetheless continue with the Part III administrative litigation.  The rule change flipped the presumption in that situation to withdrawal of the Part III case from litigation following a motion by the respondent.[35]  I understand that proponents of the SMARTER Act appreciated the rule change, but are justifiably interested in making that change to our Part III authority more permanent and restrictive.

Finally, I appreciate the concerns that have been raised regarding any increased leverage the FTC gains from the prospect of Part III proceedings and the potential for differing liability standards across the two antitrust agencies.  Those concerns have even more resonance with me following the Commission's issuance of this expansive policy statement, which will only widen divergent legal standards between the FTC and DOJ, as the former explores the outer reaches of statutory authority that the latter does not share.  As I mentioned previously, I am concerned that

---

[34] *See* Rules of Practice, 73 Fed. Reg. 58,832, 58,837 (Oct. 7, 2008) (proposed rules) ("[T]he Commission believes the norm should be that the Part 3 case can proceed even if a court denies preliminary relief.").

[35] *See* Revisions to Rules of Practice, 80 Fed. Reg. 15,157, 15,158-59 (Mar. 23, 2015).

the bounds of that authority could be pushed not only in conduct investigations, but also in the context of merger reviews,[36] an even worse outcome from a fairness perspective.

Thus, because I do not think this bill will significantly impact the good work the Commission does in the antitrust area,[37] and because I share the leverage and liability concerns animating the bill, I support legislative efforts at making the merger review process as similar as possible across the two antitrust agencies.  I will add that I had some concerns regarding early versions of the SMARTER Act, which appeared to make the FTC subordinate to DOJ in challenging unconsummated mergers or otherwise impinged on the independence of the FTC.  I appreciate the refinements that have been made to date.  Nonetheless, I would hope to see the following in any bill that gets enacted: (1) independent litigating authority for the FTC; (2) the ability for the FTC to settle merger cases on its own—that is, without having to go through any Tunney Act proceedings; and (3) as much clarity as possible regarding the scope of the Part III carve-out to ensure that it does not go beyond the limited extent contemplated in the legislation—that is, unconsummated transactions.[38]  If the Part III amendments in the SMARTER Act include those elements, I would gladly support enactment of this legislation.

---

[36] *See, e.g.*, *In re* Robert Bosch GmbH, FTC File No. 121-0081, Decision and Order (Nov. 26, 2012), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2012/11/121126boschdo.pdf (settling Section 5 allegations in context of Hart-Scott-Rodino merger review).

[37] To that end, I would prefer not to see any further limitations on the FTC's Part III authority in the merger or antitrust areas beyond those contemplated by the SMARTER Act.

[38] In particular, it would be beneficial to the FTC, firms subject to our jurisdiction, and the public interest to minimize any ambiguity as to the transactions that are subject to the SMARTER Act.  The various bills that have been proposed use the language "proposed mergers, acquisition, joint ventures, and similar transactions."  There is some concern about how broadly "similar transactions" may be read by the courts.  One possibility for minimizing ambiguity on the scope of the Act would be to limit the Part III carve-out to transactions reportable under the Hart-Scott-Rodino Act, consistent with the recommendation of the Antitrust Modernization Commission.  *See* ANTITRUST MODERNIZATION COMM'N, REPORT AND RECOMMENDATIONS 140 (2007) ("Congress should amend Section 13(b) of the [FTC] Act to prohibit the [FTC] from pursuing administrative litigation in Hart-Scott-Rodino Act merger cases.").

VI.      **Conclusion**

Let me return to Section 5 and provide some concluding remarks.

The business community, the antitrust bar, and Congress will ultimately be the judges of this policy statement—in terms of both the guidance it may (or may not) provide and any limitation it may put on the FTC's Section 5 authority.  The statement gives the majority nominal cover with respect to Congressional interest in some type of Section 5 policy statement. However, I believe Congress should and will continue to keep a very close eye on the Commission and its use of Section 5.

To be fair, we may not know for some time whether the Commission will use this statement to expand significantly the scope of Section 5 enforcement or to exert additional leverage in its enforcement of the Sherman and Clayton Acts.  In her speech announcing the statement, Chairwoman Ramirez conveyed her view that the issuance of the statement does not reflect a change in Section 5 policy for the Commission.[39]  That, however, is her view alone. There is nothing in the policy statement itself, or the accompanying majority statement, that reflects such a view.  At the same time, I take the Chairwoman at her word.  I do not think she (herself) is interested in significantly expanding Section 5 beyond the territory that it has covered over the past five years or so that she has been on the Commission.  Still, the Commission's definition of Section 5 over the past decade has already been too expansive for my taste.

Thank you for your attention.  I would be happy to address any questions you may have.

---

[39] *See* Ramirez, *supra* note 9, at 6.