# EXHIBIT 9

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     **Lina M. Khan, Chair**
**Noah Joshua Phillips**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**
**Alvaro M. Bedoya**

|  |  |
|---|---|
| **In the Matter of**<br><br>     **Meta Platforms, Inc.,**<br>          **a corporation,**<br><br>     **Mark Zuckerberg,**<br>          **a natural person,**<br><br>          **And**<br><br>     **Within Unlimited, Inc.,**<br>          **a corporation.** | **Docket No. 9411**<br><br>**PUBLIC** |

**COMPLAINT COUNSEL'S OPPOSITION TO RESPONDENT META**
**PLATFORMS, INC.'S MOTION TO STAY THIS ADMINISTRATIVE PROCEEDING**

Complaint Counsel respectfully opposes the motion to stay submitted by Respondent Meta Platforms, Inc. ("Meta").  Meta contends that good cause exists to stay this administrative proceeding (1) because there is a parallel district court proceeding to decide the Commission's request for a preliminary injunction and (2) because Meta objects to Chair Khan's participation in this administrative proceeding.  Mot. at 3-4.  Meta is wrong.  Granting a stay under these circumstances would be contrary to the Commission's regulations and precedents.  Moreover, Meta's assertions about what might happen after the district court hearing (which is not even scheduled to begin for three months) are irrelevant and speculative. The Commission should deny Meta's motion to stay these proceedings.

1. **Under the Part 3 Rules and Past Precedent, Respondents Must Show "Good Cause" for a Stay of the Proceeding.**

"[T]o the extent practicable and consistent with requirements of law, the Commission's policy is to conduct [adjudicative] proceedings expeditiously." *In re Phoebe Putney Health Sys.*, Docket No. 9348, 2013 WL 1151917, *2 (F.T.C. Mar. 14, 2013) (alteration in original) (quoting 16 C.F.R. § 3.1). In furtherance of this policy, Commission Rules of Practice disfavor staying administrative proceedings.  "The pendency of a collateral federal court action that relates to the administrative adjudication *shall not stay* the proceeding . . . unless a court of competent jurisdiction, or the Commission for good cause, so directs." 16 C.F.R. § 3.41(f) (emphasis added); *see also* 16 C.F.R. § 3.22(b) (no stay for dispositive motions unless "the Commission so orders or unless otherwise provided by an applicable rule").  The Commission adopted these and other measures in 2009 in response to criticism that "the Commission's Part 3 adjudicatory process [is] too protracted."  73 Fed. Reg. 58832 (Oct. 7, 2008) (proposed rules) (citing district court, circuit court, private practitioner, and American Bar Association sources). "The default rule is, thus, that the pendency of a collateral proceeding in federal court does not constitute a

basis to stay the administrative proceeding." *In re Axon Enterprise, Inc.*, Docket No. 9389, 2020 WL 1041712, *2 (F.T.C. Feb. 27, 2020).

Although the Commission retains its inherent authority to stay a Part 3 proceeding, it does so exceedingly infrequently: only a handful of times in the 13 years since the Commission modified its rules.  In *Ardagh Group S.A.*, the Commission stayed an administrative hearing because a settlement was imminent, the parties jointly requested a stay, and the parties had stipulated to a preliminary injunction.[1]  In *Phoebe Putney Health System, Inc.*, the Commission granted the respondents' unopposed motion to stay the administrative proceedings, while the Eleventh Circuit reviewed, on an expedited basis, the district court's decision denying the motion for a preliminary injunction based on the state action doctrine.  Docket No. 9348, 152 F.T.C. 1035, 2011 WL 11798466 (F.T.C. July 15, 2011). None of the circumstances in which the Commission granted a stay in the past are present here.[2]

Indeed, the very cases Meta cites show that the Commission has granted stays in circumstances very different than found here.  *In re Sanford Health*, Docket No. 9376, 2017 WL 5845596 (F.T.C. Nov. 21, 2017); *In re RAG-Stiftung*, Docket No. 9384, 2020 WL 91294 (F.T.C.

---

[1] *See* Order, *In re Ardagh Group S.A.*, Docket No. 9356, 2013 WL 6826957 (F.T.C. Dec. 18, 2013).

[2] Those circumstances have included when: (1) Complaint Counsel and Respondent jointly moved the Commission; (2) the preliminary injunction hearing and post-hearing filings had concluded in federal district court; (3) the parties stated that they would abandon the proposed transaction if the court granted the preliminary injunction; and (4) imminent deadlines in the administrative schedule that imposed undue burden on third parties (e.g., motions for *in camera* treatment due within days for 23 third parties). *See In re RAG-Stiftung*, Docket No. 9384, 2020 WL 91294, *1-2 (F.T.C. Jan. 2, 2020).  The Commission also granted joint motions for stays during the height of the COVID-19 pandemic.  *See* Second Order Regarding Scheduling in Light of Public Health Emergency, *In re Thomas Jefferson University*, Docket No. 9392 (F.T.C. Apr. 13, 2020), *available at* https://www.ftc.gov/system/files/documents/cases/d09392_commission_order_ext_staying_evidentiary_hearingpublic.pdf.

Jan. 2, 2020); and *In re Hackensack Meridian Health, Inc.*, Docket No. 9399, 2021 WL 2379546 (F.T.C. May 25, 2021) all involved joint motions to delay administrative proceedings when the district court preliminary injunction hearing had already concluded.  In *Sanford*, the Commission granted "a limited continuance" due to "the present circumstances, where the district court has concluded its hearing and has stated a goal to provide an opinion shortly."  2017 WL 5845596 at *1.  *See also RAG-Stiftung*, 2020 WL 91294 at *1 ("The preliminary injunction hearing and post-hearing filings ha[d] concluded in the federal district court action" when the parties filed their joint motion); *Hackensack*, 2021 WL 2379546 at *1 ("The preliminary injunction hearing concluded on May 18, 2021").  Moreover, the Commission favors stays of limited duration. *See In re Sanford Health*, Docket No. 9376, 2017 WL 5623692, at *1 (F.T.C. Nov. 3, 2017) (denying motion for a two-month stay and instead entering a two-week stay because "the Commission has committed to moving forward as expeditiously as possible with administrative hearings on the merits"). Here, by contrast, no district court decision is pending and Meta has not requested a narrow stay with any clear, short-term endpoint. Rather, Meta requests a stay of indeterminate duration more than three months before the district court preliminary injunction hearing is slated to begin.

**2.   The Preliminary Injunction Proceeding in Federal District Court Does Not Constitute Good Cause to Stay This Administrative Proceeding.**

The mere fact that there is a preliminary injunction proceeding in the Northern District of California does not constitute good cause to stay this proceeding. The Commission has repeatedly, and consistently, rejected arguments that parallel federal proceedings can provide the basis for a stay of an administrative proceeding.  *See, e.g.*, *In re Penn State Hershey Med. Ctr.*, Docket No. 9368, 2016 WL 1239232, *1 (F.T.C. Mar. 21, 2016) ("Respondents rest their motion to stay on the suggestion that the district court may not rule on the preliminary injunction request

until after the administrative hearing begins on May 17, 2016. Respondents' conjecture, however, is not a basis for delaying the administrative hearing."); *In re Advocate Health Care Network*, Docket No. 9369, 2016 WL 1130010, *1 (F.T.C. Mar. 18, 2016) (same).  Meta argues that parallel proceedings are "unnecessarily burdening not only Meta, but the Commission and third parties" and "will expend unnecessary resources," Mot. at 4, but avoidance of ordinary litigation expenses is not sufficient to make a showing of good cause.  *In re RagingWire Data Ctrs., Inc.*, Docket No. 9386, 2020 WL 91293, *1 (F.T.C. Jan. 6, 2020) (collecting cases and denying stay during pendency of dispositive motion); *In re La. Real Estate Appraisers Bd.*, Docket No. 9374, 2018 WL 2949560, *2 n.3 (F.T.C. June 6, 2018) ("Generally, routine discovery costs do not outweigh the competing public interest in the efficient and expeditious resolution of litigated matters.").

Meta further asserts that a stay is warranted because the outcome in district court is "likely" dispositive, but Meta provides no basis for that assertion.  Indeed, Meta has steadfastly refused to state that it will abandon the merger if it loses in the federal court proceeding. *Compare* Mot. at 3 ("if the court grants the FTC's motion for a preliminary injunction, the transaction will likely be unable to close by the contractual deadline of April 22, 2023"), *with Sanford*, 2017 WL 5845596 at *1 (granting joint motion to stay where "Respondents reiterate[d] that if, after all appeals in the injunction proceedings are exhausted they are enjoined from consummating the acquisition, they will abandon the transaction").  Moreover, even if Meta were to make such a representation, that still would not constitute good cause for staying this administrative proceeding. *In re Wilh. Wilhelmsen Holding ASA*, Docket No. 9380, 2018 WL 3046376, *1 (F.T.C. June 13, 2018) (rejecting argument "that a parallel action brought by the Federal Trade Commission in federal district court . . . will likely obviate the need for an

administrative hearing" and granting continuance solely because "the hearings in [another Part 3 adjudication] and in this matter are likely to clash").  Meta also incorrectly contends that "if the court denies the FTC's motion for a preliminary injunction, decades of FTC practice indicate it will not pursue this proceeding further." Mot. at 3. Meta ignores the Commission's long track record of appealing district court orders denying preliminary injunctions.[3]  Moreover, contrary to Meta's claim, it is not and has never been "FTC practice" to simply abandon merger challenges following adverse district court rulings on preliminary injunctions.  Instead, the Commission's practice is to conduct a searching inquiry to determine whether the public interest requires maintaining the administrative litigation.  *See* 16 CFR § 3.26.  For example, in the *Whole Foods* litigation, the FTC failed to obtain a preliminary injunction in district court; the Commission determined to proceed with an appeal; Complaint Counsel pursued the administrative litigation; and the case ultimately settled (with a divestiture agreed) shortly before the administrative hearing was scheduled to commence.  *See In re Whole Foods Mkt., Inc.*, Docket No. 9324, 2008 WL 5369556 (F.T.C. Dec. 19, 2008) (denying motion to stay administrative proceedings after "[t]he Court of Appeals in reversing the district court's denial of a preliminary injunction determined that the Commission had established a likelihood of success on the merits"); 2009 WL 1557334 (F.T.C. May 29, 2009) (Decision & Order approving divestiture).

3. **Meta's Objections to Chair Khan's Participation Do Not Constitute Good Cause to Stay This Administrative Proceeding.**

Meta further contends that "there is good cause for a stay because Meta has objected to Chair Khan's participation in these proceedings as a violation of Meta's due process rights."

---

[3] *See, e.g.*, *FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991); *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008); *FTC v. Advocate Health Care Network*, 841 F. 3d 460 (7th Cir. 2016); *FTC v. Penn State Hershey Med. Ctr.*, 838 F. 3d 327 (3d Cir. 2016).

PUBLIC

Mot. at 4.  The Commission will undoubtedly consider Meta's objections in due course, but Meta raising objections does not in and of itself constitute good cause to stay the administrative proceeding. Otherwise, any respondent's "objection" to a Commissioner's participation would be sufficient to stay administrative proceedings. The Commission rejected a similar argument that a supposed inability to adjudicate constituted good cause in *In re LabMD, Inc.*, Docket No. 9357, 2013 WL 6826948 (F.T.C. Dec. 13, 2013). LabMD argued for a stay on the grounds that forcing it to litigate when the Commission allegedly lacked jurisdiction was inherently unjust and "violate[d] its due process rights." *Id*. at \*3 (quotation marks omitted). The Commission disagreed and concluded "that the fact that LabMD has challenged the Commission's authority to bring this case does not justify a stay." *Id*.

## CONCLUSION

For the foregoing reasons, Complaint Counsel respectfully requests that the Commission deny Respondent Meta Platforms, Inc.'s Motion to Stay this Administrative Proceeding.

Dated: September 6, 2022

Respectfully submitted,

*s/ Abby L. Dennis*

Abby L. Dennis
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2381
Email: adennis@ftc.gov

*Counsel Supporting the Complaint*

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2022, I filed the foregoing document electronically using the FTC's E-Filing System, which will send notification of such filing to:

> April Tabor
> Secretary
> Federal Trade Commission
> 600 Pennsylvania Ave., NW, Rm. H-113
> Washington, DC 20580
> ElectronicFilings@ftc.gov

> The Honorable D. Michael Chappell
> Administrative Law Judge
> Federal Trade Commission
> 600 Pennsylvania Ave., NW, Rm. H-110
> Washington, DC 20580

I also certify that I caused the foregoing document to be served via email to:

| | |
|---|---|
| Michael Moiseyev | Logan M. Breed |
| Weil, Gotshal & Manges LLP | Hogan Lovells LLP |
| 2001 M Street, NW, Suite 600 | 555 13th Street, NW |
| Washington, DC 20036 | Washington, DC 20004 |
| (202) 682-7235 | (202) 637-6407 |
| michael.moiseyev@weil.com | logan.breed@hoganlovells.com |
| Meta.ALJ.Case-Weil.KH@weil.com | WithinFTC9411@hoganlovells.com |
| | |
| *Counsel for Meta Platforms, Inc.* | *Counsel for Within Unlimited, Inc.* |

Geoffrey M. Klineberg
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7928
gklineberg@kellogghansen.com
ZUCKERBERG-ALJ@lists.kellogghansen.com

*Counsel for Mark Zuckerberg*

By:   *s/ Abby L. Dennis*
      Abby L. Dennis

*Counsel Supporting the Complaint*

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff | Civil Action No. 3:22-CV-04325-EJD |
| v. | |
| **META PLATFORMS, INC., et al.** | |
| Defendants. | |

**DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION**
**OF DOCUMENTS TO PLAINTIFF**

Pursuant to Federal Rules of Civil Procedure 29 and 34, Defendants Meta Platforms, Inc., ("Meta") and Within Unlimited Inc. ("Within") request that Plaintiff Federal Trade Commission ("FTC") produce the documents described below at the offices of Chantale Fiebig, Weil, Gotshal & Manges LLP, 2001 M Street NW, Suite 600 Washington, DC, 20005, and Logan Breed, Hogan Lovells US LLP, Columbia Square, 555 Thirteenth Street NW, Washington, DC, 20001, no later than 30 days from the service of these requests, unless a shorter deadline is agreed to by the parties.[1]

**DEFINITIONS**

The following terms shall have the meanings set forth below whenever used in the Requests for Production.

---

[1] Defendants serve these requests for production jointly, without prejudice to their right to submit additional requests for production either jointly or individually.

1.      "6(b) Study" means a study by the Federal Trade Commission pursuant to Section 6(b) of the FTC Act.

2.      "Action" means the action captioned *Federal Trade Commission, et al. v. Meta Platforms, Inc., et al.*, Case No. 3:22-CV-04325-EJD, which is currently pending in the United States District Court for the Northern District of California.

3.      "Administrative Complaint" means the administrative action captioned *In the Matter of Meta Platforms, Inc., et al.*, Docket No. 9411, filed before the Federal Trade Commission on August 11, 2022.

4.      "Communication" means any exchange of information between two or more Persons, through any mode of conveying information, including but not limited to telephone calls, e-mails and all other forms of electronic communication and electronic messaging, letters, faxes, conversations, interviews, meetings, hearings, or other written, electronic or spoken language or graphics, however transmitted or stored.

5.      "Concerning," "Related to," and "Regarding" means analyzing, alluding to, concerning, considering, commenting on, consulting, comprising, containing, describing, dealing with, evidencing, identifying, involving, reporting on, relating to, reflecting, referring to, regarding, studying, mentioning, or pertaining to, in whole or in part.

6.      "Data" means facts, statistics, or other information of any kind, however produced or reproduced, which can be used for purposes of calculation or analysis.

7.      "Document" means written or graphic material of any kind, however produced or reproduced, whether draft or final, original or reproduction, including: contracts, memoranda, brochures, pamphlets, letters, emails (including attachments, message content, and header information), faxes, diaries, financial statements, bank statements, bills, invoices, wire transfer confirmations, minutes, notes, summaries of communications, photographs, and audio or video recordings. "Document" also includes all drafts or non-identical copies, such as those bearing comments in the margin or other marks or notations not present on the original or final copy. If any "Communication" or "Data" is reduced to writing or other recordation, it is also a "Document."

8.      "Extended Reality" means hardware and software components relating to delivering virtual reality, mixed reality, augmented reality, or other enhanced reality experiences to users.

9.      "FTC" means the Federal Trade Commission.

10.      "Merger" means the proposed acquisition of Within Unlimited, Inc. by Meta Platforms, Inc.

11.     "Meta" means:

(a)     Meta Platforms, Inc., its subsidiaries, affiliates, divisions, either collectively, individually, or in any subset; and

(b)     The present and former officers, directors, employees, agents, and other persons acting on behalf of Meta, its divisions, subsidiaries, and/or affiliates.

12.     "Person" means any natural person, corporation, association, organization, firm, company, partnership, joint venture, trust, estate, or other legal or governmental entity, whether or not possessing a separate juristic existence.

13.     "Testimony" means any sworn testimony, including, but not limited to, affidavits, declaration, depositions, or investigational hearings.

14.     "Within" means:

(a)     Within Unlimited Inc., its affiliates, divisions, either collectively, individually, or in any subset; and

(b)     The present and former officers, directors, employees, agents, and other persons acting on behalf of Within, its divisions, subsidiaries, and/or affiliates.

15.     "You" and "Your" mean the FTC, its officers, Commissioners, employees, agents, representatives, affiliates, consultants, advisors, successors, or predecessors, as well as all persons acting on the FTC's behalf, and any and all persons associated with, affiliated with, or controlled by the FTC.

16.     Unless clearly indicated otherwise: (a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses; (b) the use of the feminine, masculine, or neuter genders shall include all genders; (c) the singular form of a word shall include the plural, and vice versa; (d) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of any request all information that might otherwise be construed to be outside of its scope; (e) the word "any" shall include, without limitation, "each and every"; (f) the terms "all" and "each" shall be construed as "all and each"; (g) the term "including" is intended to be comprehensive and means "including, but not limited to"; and (h) the terms "between" and "among" shall be construed as "between" or "among" as necessary to bring within the scope of any request all responses and documents that might otherwise be construed to be outside its scope.

17.     For the purposes of the Requests for Production, terms not specifically defined shall be given their ordinary meanings as You understand them to be used in the trade or pursuant to ordinary usage.

18.     The use of any definition for the purposes of the Requests for Production shall not be deemed to constitute an agreement or acknowledgment that such definition is accurate, meaningful, or appropriate for any other purpose in this Action.

## **INSTRUCTIONS**

1.     Furnish all responsive Documents, Data, and backup materials in Your possession, custody, or control.

2.     For each request, You are to produce entire documents including all attachments, enclosures, cover letters, memoranda and appendices. Copies that differ in any respect from an original (because, by way of example only, handwritten or printed notations have been added) shall be treated as separate documents and produced separately. Each draft of a document is a separate document. A request for a document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures or attachments to the document, in addition to the document itself.

3.     Provide all electronically stored information ("ESI") in standard, single-page Group IV TIFF format with searchable text and metadata in a Concordance or similar load file. Also, provide any spreadsheet or presentation files, including Microsoft Access, Excel, and PowerPoint files, as well as audio, audiovisual, and video files, in their native formats. Provide all hard copy documents as image files with searchable OCR text and unitize the hard copy documents to the extent possible (*i.e.*, multi-page documents shall be produced as a single document and not as several single-page documents). Hard copy documents shall be produced as they are kept, reflecting attachment relationships between documents and information about the file folders within which the document is found. Produce the metadata for any responsive ESI with the responsive Data, including the following fields: custodian, author(s), recipient(s), blind copy recipient(s), subject, file sent date/time, file creation date/time, file modification date/time, file last accessed date/time, beginning Bates, ending Bates, parent beginning Bates, attachment(s) beginning Bates, hash value, application type, file type, file name, file size, file path, and folder path. Documents produced in native format shall be accompanied by a native link field.

4.     These document requests shall not be deemed to call for identical copies of documents. "Identical" means precisely the same in all respects; for example, a document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks.  For the avoidance of doubt, all instances of documents that are otherwise "identical" must be produced if attached or enclosed to separate parent documents, pursuant to Instruction No. 2.

5.     The Documents responsive to these requests are to be produced as they were kept in the ordinary course of business and are to be labeled in such a way as to show which files and offices they came from.

6.      If You assert that part of the request is objectionable, respond to the remaining parts of the request to which You do not object. For those portions of any document request to which You object, please state the reasons for such objection and describe the Documents or categories of Documents that are not being produced.

7.      If any privilege is asserted in objecting to any request or sub-part thereof, and any Document is withheld (in whole or in part) on the basis of such assertion, provide a log ("Privilege Log") describing the basis for the claim of privilege and all information necessary for Defendants and the Court to assess the claim of privilege. The Privilege Log shall include the following:

(a)      Specific grounds for the claim of privilege;

(b)      The type of document withheld;

(c)      The date of the privileged communication;

(d)      The persons involved in the privileged communication;

(e)      A description of the subject matter of the privileged communication in sufficient detail to assess the claim of privilege; and

(f)      The specific request to which the privileged information is responsive.

(g)      The identity of and any production Bates number assigned to any attachment(s), enclosure(s), cover letter(s), or cover email(s) of each Document, including the information outlined in subsections (a) through (g) above for each such attachment, enclosure, cover letter, or cover email.

Attachments, enclosures, cover letters, and cover emails shall be entered separately on the Privilege Log. The Privilege Log shall include the full name, title, and employer of each author, addressee, and recipient, denoting each attorney with an asterisk. Submit all non-privileged portions of any responsive Document (including non-privileged or redactable attachments, enclosures, cover letters, and cover emails) for which a claim of privilege is asserted, noting where redactions to the Document have been made.

8.      These requests are continuing in nature, and You must supplement Your responses pursuant to Federal Rule of Civil Procedure 26(e). Defendants specifically reserve the right to seek supplementary responses and the additional supplementary production of Documents before trial.

## REQUESTS FOR DOCUMENTS

**Request No. 1:**

All Documents, Communications, and Testimony that You obtained, considered, or relied upon in connection with your investigation of the Merger, the drafting or filing of the Complaint filed in this Action on July 27, 2022, the drafting or filing of the Administrative Complaint on August 11, 2022, or your prosecution of this Action, other than Documents or Communications You received from Meta or Within.

**Request No. 2:**

All Documents Concerning Your past, present, or future contact, or considered or contemplated contact, with any non-parties or any other Persons Related to the Merger and/or Your investigation of the Merger, including Documents Related to telephone conferences, in-person conferences, meetings, interviews, or correspondence with actual or potential customers or competitors of the Defendants, or any other Persons, in connection with the Merger or Extended Reality industry.

**Request No. 3:**

All Documents Related to the FTC's past, present, or future communications with any non-parties or any other Persons in connection with the Merger, Complaint, or Extended Reality industry, including, but not limited to, notes, summaries, transcripts, or records of interviews or discussions with any such non-parties or other Persons.

**Request No. 4:**

All Documents relating to any Communications between You and any other members of the federal government, including the Executive and Legislative branches, any other governmental regulator, or former Federal Trade Commissioners or personnel in relation to Your investigation of the Merger.

**Request No. 5:**

All Documents Concerning Defendants' respective businesses, including Documents that define or otherwise analyze candidate, proposed, or alleged relevant antitrust markets, market share, and future growth projections or opportunities.

**Request No. 6:**

For the period of January 1, 2019 to present, all public and non-public Documents Concerning the Extended Reality industries (including, but not limited to, virtual, augmented, or

mixed reality fitness), as well as connected fitness, at-home fitness, and other in-person fitness products or services, including Documents that define or otherwise analyze candidate, proposed, or alleged relevant antitrust markets, market share, future growth projections or opportunities of any Extended Reality software and hardware developers, and any intergovernmental Documents such as speeches, correspondence, communications, congressional sessions, and meetings, as they Relate to the fitness and Extended Reality industries.

**Request No. 7:**

For the period of January 1, 2019 to present, All Documents Concerning proposed, actual, or contemplated transactions Related to any fitness and Extended Reality (not limited to fitness) industry.

**Request No. 8:**

All Documents Concerning the calculation of market shares or application of the Herfindahl-Hirschman Index to the Merger.

**Request No. 9:**

All Documents Concerning any growth synergies, cost synergies, or other quantitative or qualitative efficiencies or benefits that Meta[2] may be able to realize in connection with the Merger.

**Request No. 10:**

For the period of June 15, 2021 to present, all Documents and Communications in which Lina Khan has discussed Meta and/or Mark Zuckerberg.

**Request No. 11:**

All Documents and Communications that Lina Khan relied upon or considered in connection with review of the Merger, the vote to file the Complaint in this Action on July 27, 2022, or the vote to file the Administrative Complaint on August 11, 2022, other than Documents or Communications from or with Meta or Within.

**Request No. 12:**

All Documents and Communications Concerning the participation of any Commissioner in review of the Merger, the decision to authorize the Complaint, and any of the allegations

---

[2] In addition to the definition of Meta as stated in the "Definitions" section, for Requests No. 9 and No. 10, Meta should also mean Facebook and any acronyms or code names used for Meta.

contained in the Complaint and Memorandum of Points and Authorities in support of Your Motion for Temporary Restraining Order.

**Request No. 13:**

All Documents identified or reviewed in order to respond to any Interrogatory, Request for Admission, or deposition issued pursuant to Federal Rule of Civil Procedure 30(b)(6) from any Defendant in this Action.

**Request No. 14**:

All Documents created, prepared, collected, or received by You in connection with the Merger to the extent not responsive to Document Requests Nos. 1-13 set forth above, including, but not limited to, any Bureau of Economics and/or Bureau of Competition memoranda evaluating the Merger.

**Request No. 15**:

All Documents and analyses Concerning acquisitions by technology platform companies and the effects of those acquisitions on early-stage investment.

**Request No. 16**:

All Documents and analyses Concerning the FTC's 6(b) Study of acquisitions by technology platform companies in FTC Matter No. P201201.

Dated: August 16, 2022

/s/ Bambo Obaro
Bambo Obaro, CA Bar No. 267683
bambo.obaro@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Chantale Fiebig, DC Bar No. 487671
Chantale.Fiebig@weil.com
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
Michael R. Moiseyev (*pro hac vice*)
Michael.Moiseyev@weil.com
Telephone: (202) 682-7235
Facsimile: (202) 857-0940
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036

Eric S. Hochstadt, NY Bar No. 4222683
eric.hochstadt@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Mark C. Hansen, DC Bar No. 425930
Geoffrey M. Klineberg
Aaron M. Panner
KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Meta Platforms, Inc.*

Christopher J. Cox, CA Bar No. 151650
HOGAN LOVELLS US LLP
855 Main St.

Suite 200
Redwood City, CA 94063
Telephone No.:  (650) 463-4000
Facsimile No.:  (650) 463-4199
chris.cox@hoganlovells.com

Lauren Battaglia, DC Bar No. 1007093
Logan M. Breed, DC Bar No. 479628
Benjamin Holt (*pro hac vice*)
Charles A. Loughlin, DC Bar No.
4482019
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth St., NW
Washington, D.C. 20004
Telephone No.:  (202) 637-5600
Facsimile No.:  (202) 637-5910
lauren.battaglia@hoganlovells.com
logan.breed@hoganlovells.com
benjamin.holt@hoganlovells.com
chuck.loughlin@hoganlovells.com

*Counsel for Within Unlimited, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2022, a true and correct copy of the foregoing Defendant's First Set of Requests for Production of Documents to Plaintiff was served by e-mail on the following counsel:

Peggy Bayer Femenella
Joshua Goodman
Jeanine Balbach
Michael Barnett
E. Eric Elmore
Justin Epner
Sean D. Hughto
Frances Anne Johnson
Andrew Lowdon
Lincoln Mayer
Kristian Rogers
Anthony R. Saunders
Timothy Singer
pbayer@ftc.gov
jgoodman@ftc.gov
jbalbach@ftc.gov
mbarnett@ftc.gov
eelmore@ftc.gov
jepner@ftc.gov
shughto@ftc.gov
fjohnson@ftc.gov
alowdon@ftc.gov
lmayer@ftc.gov
krogers@ftc.gov
asaunders@ftc.gov
tsinger@ftc.gov

Dated: August 16, 2022

_Patricia Dresel_
Patricia Dresel

# EXHIBIT  11

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff<br><br>v.<br><br>**META PLATFORMS, INC., et al.**<br><br>Defendants. | Case No. 3:22-cv-04325-EJD |

## DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 33 of the Local Civil Rules of the United States District Court for the Northern District of California, Defendants Meta Platforms, Inc. ("Meta") and Within Unlimited, Inc. ("Within"), by and through their undersigned counsel, propound the following Interrogatories to Plaintiff Federal Trade Commission ("FTC"). The Interrogatories are to be answered fully and under oath, within fifteen (15) days from the date of service, in accordance with the definitions and instructions set forth below.[1]

In serving these Interrogatories, Defendants reserve all their rights, including without limitation the rights to promulgate additional discovery requests covering these same topics. The Interrogatories are continuing in nature, and Plaintiff is under a duty to supplement its responses to the Interrogatories when necessary in accordance with Federal Rule of Civil Procedure 26(e).

---

[1] Defendants serve these Interrogatories jointly, without prejudice to their right to submit additional interrogatories either jointly or individually.

## DEFINITIONS

The following terms shall have the meanings set forth below whenever used in the Interrogatories:

1.      "Action" means the action captioned *Federal Trade Commission, et al. v. Meta Platforms, Inc., et al.,* Case No. 3:22-cv-04325-EJD, which is currently pending in the United States District Court for the Northern District of California.

2.      "Concerning," "Related to," and "Regarding" means analyzing, alluding to, concerning, considering, commenting on, consulting, comprising, containing, describing, dealing with, evidencing, identifying, involving, reporting on, relating to, reflecting, referring to, regarding, studying, mentioning, or pertaining to, in whole or in part.

3.      "Communication" means any exchange of information between two or more Persons, through any mode of conveying information, including but not limited to telephone calls, e-mails and all other forms of electronic communication and electronic messaging, letters, faxes, conversations, interviews, meetings, hearings, or other written, electronic or spoken language or graphics, however transmitted or stored.

4.      "Complaint" means the complaint for a temporary restraining order and preliminary injunction filed by Plaintiff FTC in the Action on July 27, 2022.

5.      "Data" means facts, statistics, or other information of any kind, however produced or reproduced, which can be used for purposes of calculation or analysis.

6.      "Document" means written or graphic material of any kind, however produced or reproduced, whether draft or final, original or reproduction, including: contracts, memos, brochures, pamphlets, letters, emails (including attachments, message content, and header information), faxes, diaries, financial statements, bank statements, bills, invoices, wire transfer confirmations, minutes, notes, photographs, and audio or video recordings. "Document" also includes all drafts or non-identical copies, such as those bearing comments in the margin or other marks or notations not present on the original or final copy. If any "Communication" or "Data" is reduced to writing or other recordation, it is also a "Document."

7.      "Extended Reality" means software and hardware relating to delivering virtual reality, mixed reality, augmented reality, or other enhanced reality experiences to users.

8.      "FTC" means the Federal Trade Commission.

9.      "Identify," when used with regard to Persons, means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. "Identify," when used with regard to Documents, means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s). In the alternative, You may produce the Documents, together with identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

2

10.     "Merger" means the proposed acquisition of Within Unlimited, Inc. by Meta Platforms, Inc.

11.     "Meta" means:

(a)     Meta Platforms, Inc., its subsidiaries, affiliates, divisions, either collectively, individually, or in any subset; and

(b)     The present and former officers, directors, employees, agents, and other persons acting on behalf of Meta, its divisions, subsidiaries, affiliates.

12.     "Person" means any natural person, corporation, association, organization, firm, company, partnership, joint venture, trust, estate, or other legal or governmental entity, whether or not possessing a separate juristic existence.

13.     "Within" means:

(a)     Within Unlimited Inc., its affiliates, divisions, either collectively, individually, or in any subset; and

(b)     The present and former officers, directors, employees, agents, and other persons acting on behalf of Within Unlimited Inc., its divisions, subsidiaries, affiliates.

14.     "You" and "Your" mean the FTC, its officers, commissioners, employees, agents, representatives, affiliates, consultants, advisors, successors, or predecessors, all persons acting on the FTC's behalf, and any and all persons associated with, affiliated with, or controlled by the FTC.

15.     "Relating to" means concerning, constituting, showing, explaining, describing, summarizing, discussing, analyzing, or having any legal or factual connection to.

16.     Unless clearly indicated otherwise: (a) the use of a verb in any tense shall be construed as the use of that verb in all other tenses; (b) the use of the feminine, masculine, or neuter genders shall include all genders; (c) the singular form of a word shall include the plural, and vice versa; (d) the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of any request all information that might otherwise be construed to be outside of its scope; (e) the word "any" shall include, without limitation, "each and every"; (f) the terms "all" and "each" shall be construed as "all and each"; (g) the term "including" is intended to be comprehensive and means "including, but not limited to"; and (h) the terms "between" and "among" shall be construed as "between" or "among" as necessary to bring within the scope of any request all responses and documents that might otherwise be construed to be outside its scope.

17.     For the purposes of the Interrogatories, terms not specifically defined shall be given their ordinary meanings as You understand them to be used in the trade or pursuant to ordinary usage.

18.     The use of any definition for the purposes of the Interrogatories shall not be deemed to constitute an agreement or acknowledgment that such definition is accurate, meaningful, or appropriate for any other purpose in this Action.

## **INSTRUCTIONS**

1.     Respond to each of the Interrogatories in writing.

2.     Set forth the text of each Interrogatory immediately above Your response to that Interrogatory.

3.     Each Interrogatory shall be answered completely, separately, and fully, and in accordance with the requirements of the applicable Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Northern District of California.

4.     If an answer to an Interrogatory is based on information and belief, specify and Identify the source of the information and grounds for the belief.

5.     If Your answer to any of the Interrogatories derives from a Document, Identify the Document and include a copy thereof with Your response. This includes Documents in Your possession and in the possession of Your agents, representatives, experts, and Persons consulted Relating to any factual matters or matters of opinion Relating to any of the facts or issues involved in this Action.

6.     If You claim any ambiguity in interpreting an Interrogatory or a definition or instruction applicable thereto, You shall set forth as part of Your response to such Interrogatory the language deemed to be ambiguous and the interpretation used in responding to the Interrogatory, and You shall respond to the Interrogatory as You interpret it.

7.     If You object to an Interrogatory, state the legal and factual basis for Your objection in the space provided for Your response. If You object to only part of an Interrogatory, specify the part of the Interrogatory to which You object and the legal and factual basis of Your objection, then respond to the unobjectionable part.

8.     If any privilege is claimed as a ground for not responding to an Interrogatory, provide a privilege log describing the basis for the claim of privilege and all information necessary for Defendants and the Court to assess the claim of privilege. The privilege log shall include the following:

(a)     Specific grounds for the claim of privilege;

(b)     The date of the privileged communication;

(c)     The persons involved in the privileged communication;

4

(d)     A description of the subject matter of the privileged communication in sufficient detail to assess the claim of privilege;

(e)     The specific Interrogatory to which the privileged information is responsive.

9.     These Interrogatories are continuing in nature. If, after responding to the Interrogatories, You obtain or become aware of additional responsive information, such information shall be provided by way of a supplemental response pursuant to Federal Rule of Civil Procedure 26(e).

## INTERROGATORIES

## INTERROGATORY NO. 1

Identify each Person with whom You have communicated about the Merger and the means of these Communications, including but not limited to any subpoenas, civil investigative demands, and voluntary requests for information You issued to each Person and any formal or informal responses to such Communications that You received, including in the form of Documents or Data.

## INTERROGATORY NO. 2

For each year from 2019 to present, Identify each Person Plaintiff considers or alleges to be a competitor to Meta or Within with respect to any component of Extended Reality, and for each such competitor, Identify each specific fitness-related offering that the FTC believes competes in a specified alleged antitrust market.

## INTERROGATORY NO. 3

For any application that You considered but did not include in any relevant market in the Complaint, Identify all criteria You applied to determine that those applications were not competitors in any alleged relevant market and Identify Your bases for excluding such applications from any relevant market You assert.

## INTERROGATORY NO. 4

Identify the basis for, underlying evidence, precise contours, specific criteria for inclusion or exclusion, and methodology used to derive the alleged relevant markets presented in the Complaint and Memorandum of Points and Authorities in support of Your Motion for Temporary Restraining Order.

## INTERROGATORY NO. 5

Identify all applications or products included in the "VR dedicated fitness applications" and "VR fitness applications" markets identified in Your Complaint, as well as all anticipated or

potential entrants into each relevant market, including the anticipated month and year for each such anticipated or potential entry.

## INTERROGATORY NO. 6

Identify each Person with whom Lina Khan Communicated about the Merger and the means of these Communications, including but not limited to her Communications with members of Congress or the Executive Branch, or the staff or advisers of any members of Congress or officials in the Executive Branch.

## INTERROGATORY NO. 7

Identify the basis for, underlying evidence, and methodology You used to calculate any market share figures presented in the Complaint and Memorandum of Points and Authorities in support of Your Motion for a Temporary Restraining Order, as well as any alternative or other market share calculations You made or considered but did not present in the Complaint, including for each such market share figure:

a. Each of the specific Documents and Data used by You or Jennifer Snyder to calculate such figures;

b. Assignment(s) or instruction(s) by You as to which applications to include and exclude in each market;

c. The manner in which You or Jennifer Snyder processed or otherwise manipulated each such Document and Data to arrive at the market share estimates referred to above, including but not limited to the content of any programs, formulas, or other manual or automated methods used by You to arrive at such market share estimates.

## INTERROGATORY NO. 10

Identify any unpaid consultants or experts who were involved with or assisted the FTC in its investigation of the Merger, in deriving the alleged relevant markets presented in the Complaint and Memorandum of Points and Authorities in support of Your Motion for a Temporary Restraining Order, or in calculating the estimated market share figures presented in the Complaint and Memorandum of Points and Authorities in support of Your Motion for a Temporary Restraining Order, and for any such unpaid consultants or experts, identify their title and describe their responsibilities, decision-making authority, reporting line, specific involvement in the Merger investigation, and their qualifications.

Dated: August 16, 2022

/s/ *Bambo Obaro*
Bambo Obaro, CA Bar No. 267683
bambo.obaro@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Chantale Fiebig, DC Bar No. 487671
Chantale.Fiebig@weil.com
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
Michael R. Moiseyev (*pro hac vice*)
Michael.Moiseyev@weil.com
Telephone: (202) 682-7235
Facsimile: (202) 857-0940
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036

Eric S. Hochstadt, NY Bar No. 4222683
Eric.hochstadt@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Mark C. Hansen, DC Bar No. 425930
Geoffrey M. Klineberg
Aaron M. Panner
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
apanner@kellogghansen.com

*Counsel for Meta Platforms, Inc.*

7

Christopher J. Cox, CA Bar No. 151650
HOGAN LOVELLS US LLP
855 Main St.
Suite 200
Redwood City, CA 94063
Telephone No.:  (650) 463-4000
Facsimile No.:  (650) 463-4199
chris.cox@hoganlovells.com

Lauren Battaglia, DC Bar No. 1007093
Logan M. Breed, DC Bar No. 479628
Benjamin Holt (*pro hac vice*)
Charles A. Loughlin, DC Bar No. 4482019
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth St., NW
Washington, D.C. 20004
Telephone No.:  (202) 637-5600
Facsimile No.:  (202) 637-5910
lauren.battaglia@hoganlovells.com
logan.breed@hoganlovells.com
benjamin.holt@hoganlovells.com
chuck.loughlin@hoganlovells.com

*Counsel for Within Unlimited, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2022, a true and correct copy of the foregoing Defendants' First Set of Interrogatories to Plaintiffs was served by e-mail on the following counsel:

Peggy Bayer Femenella
Joshua Goodman
Jeanine Balbach
Michael Barnett
E. Eric Elmore
Justin Epner
Sean D. Hughto
Frances Anne Johnson
Andrew Lowdon
Lincoln Mayer
Kristian Rogers
Anthony R. Saunders
Timothy Singer
pbayer@ftc.gov
jgoodman@ftc.gov
jbalbach@ftc.gov
mbarnett@ftc.gov
eelmore@ftc.gov
jepner@ftc.gov
shughto@ftc.gov
fjohnson@ftc.gov
alowdon@ftc.gov
lmayer@ftc.gov
krogers@ftc.gov
asaunders@ftc.gov
tsinger@ftc.gov

Dated: August 16, 2022

_____
Patricia Dresel

# EXHIBIT  12



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Mergers II
Bureau of Competition

September 8, 2022

**By Electronic Mail**

Eric Hochstadt, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

      RE:    *FTC v. Meta Platforms, Inc., et al.*, Case No. 5:22-cv-04325 (N.D. Cal.)

Dear Eric:

      We write in response to your letters dated August 31, 2022 and September 7, 2022 and to follow up on the parties' September 2, 2022 meet and confer. Specifically, we address the remaining areas of dispute between the parties and offer additional compromises, where appropriate, in a good-faith effort to resolve the parties' differences.

**Requests for Production**

*FTC Interview Notes and Memoranda (RFP Nos. 2 & 3)*

      As we have repeatedly explained, the FTC's interview notes and memoranda are protected opinion work product. Providing Defendants with this information would necessarily reveal attorney mental impressions, legal theories, opinions, and analysis, as courts have routinely held. *See, e.g.*, *U.S. v. Booz Allen Hamilton, Inc.*, No. CCB-22-1603 (D. Md. Aug. 30, 2022); *U.S. v. Nat'l CineMedia*, 14-cv-8732 (S.D.N.Y. Feb. 5, 2015); *U.S. v. US Airways*, 2013 WL 12341600 (D.D.C. Oct. 10, 2013). Further, Defendants have failed to demonstrate a substantial need to overcome the work product doctrines' protections because Defendants can obtain the factual information purportedly sought from third parties directly. *See U.S. v. Am. Airlines*, 1:21-cv-11558 (D. Mass. Feb. 17, 2022)

      The cases cited in your September 7, 2022 letter do not support the proposition that Defendants are entitled to the FTC's interview notes and memoranda. *See United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 155-56 (D. Del.1999) ("Justice is clearly not required to turn over its attorneys' memoranda resulting from the interviews, and Dentsply does not contend otherwise since this type of information involves the mental impressions protected by the work

Letter to E. Hochstadt
September 8, 2022
Page 2

product doctrine.").  Further, *California State Foster Parent Ass'n v. Wagner*, 2008 WL 2872775, at *5 (N.D. Cal. July 23, 2008) and *Sanchez v. Johnson*, 2001 WL 1870308, at *7 (N.D. Cal. Nov. 19, 2001), do not discuss the attorney work product doctrine and are therefore inapposite.

    The FTC has already compromised on this issue by providing Defendants the names and contact information of every industry participant with which the investigative team has communicated concerning the proposed acquisition to date in response to Interrogatory No. 1.  The FTC has also provided Defendants with all its written communications with these parties in response to Request for Production Nos. 1 through 3 and agrees to search additional custodians and produce any non-privileged documents as described below.   The remainder of what Defendants appear to seek regarding Plaintiff's interview notes and memoranda is privileged information to which they are not entitled.

*Custodial Searches (RFP Nos. 1, 2, 3, 11 & 12)*

    In our August 30, 2022 letter, the FTC agreed to search for non-privileged third-party documents and communications—excluding those with other governmental entities—in the possession, custody, or control of FTC Commissioners, Holly Vedova, and John Newman.[1] August 30, 2022 Ltr. from S. Musser to E. Hochstadt.  You rejected this proposal and asked the FTC to further expand its custodial search to include Helder Agostinho and any other FTC personnel who "engaged with Defendants during the Second Request."  August 31, 2022 Ltr. from E. Hochstadt to S. Musser at 3.  In the spirit of compromise, we agree to search the files of Helder Agostinho in addition to the Commissioners, Holly Vedova, and John Newman for non-privileged third-party documents and communications—excluding those with other governmental entities— relating to this merger through the date of the federal-court complaint in response to Requests Nos 1, 2, 3, 11, and 12.  To the extent that Defendants are aware of any other FTC employee beyond the case team and the newly added custodians that interacted with them on this investigation and that Defendants believe would have non-duplicative, relevant materials, please identify that FTC employee and we will consider expanding our search to include him or her.

*Documents Related to Defendants' Affirmative Defenses (RFP Nos. 4, 10, 11 & 12)*

    You asked us to expand our proposed searches to include documents that are purportedly relevant to Defendants' affirmative defenses, which you filed *after* serving the FTC with Defendants' First Set of Requests for Production.  August 31, 2022 Ltr. from E. Hochstadt to S. Musser at n. 2.  Discovery relating to Meta and Within's Fourteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, and Twenty-First Affirmative Defenses, and Within's Seventeenth, Eighteenth, and Nineteenth Affirmative Defenses, however, is improper because those alleged defenses are legally deficient under controlling authority.  *See, e.g., Axon Enter. v. FTC*,  986 F.3d 1173, 1177 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 895 (2022) (federal district courts have

---

[1] As we have explained, the FTC has already conducted a reasonable search of all former and current FTC employees on the investigative team that handled the pre-complaint investigation into the proposed acquisition and has produced all non-privileged documents related to this investigation that it identified during that search.

Letter to E. Hochstadt
September 8, 2022
Page 3

no jurisdiction to hear constitutional challenges to the FTC's administrative proceedings, and defendants must present such challenges in a federal court of appeals after the administrative process is complete); *United States v. Armstrong*, 517 U.S. 456 (1996) (setting forth a "rigorous standard" for a defendant to gain discovery on a "selective prosecution" defense); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (setting forth general pleading standards under Rule 8).  Given these legal deficiencies, the FTC will be filing a motion to strike these affirmative defenses.  As such, discovery of communications between the FTC and other government entities in response to Request No. 4 and internal FTC documents or communications in response to Requests No. 10-12 as they pertain to Defendants' purported affirmative defenses is thus unwarranted.  *See* September 7, 2022 Ltr. from E. Hochstadt to S. Musser.

*The "Extended Reality industry" (RFP Nos. 7 & 16)*

In our August 30 letter to you, we noted that Defendants had not identified any specific transactions for which it is seeking information, and that a reasonable search for FTC investigations regarding mergers focused on software applications (or "apps") for virtual reality or augmented reality within the last three years did not identify any such merger. *See* August 30, 2022 Ltr. from S. Musser to E. Hochstadt. In response to our concerns regarding the breadth of Meta's definition of Extended Reality, Defendants proposed narrowing the definition of Extended Reality in Request No. 7 and 16 to seek "any transaction in the FTC's 6(b) study of acquisitions by technology platform companies in FTC Matter No. P201201 involving the acquisition of virtual reality companies, including virtual reality studios and makers of VR hardware and XR hardware."[2]  While the scope of Defendants request is less than clear, we understand Defendants response to be that they are asking for both a list of the non-reportable transactions as well as any underlying 4-C documents for reportable transactions.  Defendants are entitled to neither.

Information provided to the FTC under either the Hart-Scott-Rodino Act or through the 6(b) process is highly confidential and protected from disclosure by statute.[3] "Private parties are not permitted to discover information provided to the government by third parties when its disclosure would contravene a strong statutory policy of non-disclosure." *In re Wheat Farmers Antitrust Class Action Litig.*, No. 81-0249, 1983 WL 1791, at *2 (D.D.C. Mar. 4, 1983). Disclosing the competitively sensitive information of third parties to defendants such as Meta would "undoubtedly have a chilling effect on . . . parties' willingness to provide confidential information essential the [FTC's] fact-finding processes." *Azko v. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986).  Further, the referenced 6(b) study examined transactions from five large technology companies, including Defendant Meta, that are already well known to Defendants because they were publicly identified in the study: Alphabet (Google), Amazon, Apple, Facebook, and Microsoft.[4]  To the extent Defendants seek discovery of certain of these firms' documents as

---

[2] Defendants' Requests, however, also seek evidence related to Extended Reality through Requests Nos. 2, 3, and 6.  These Requests suffer from the same deficiencies as Requests Nos. 7 and 16.

[3]  15 U.S.C. § 46(f) prohibits the FTC from disclosing a corporation's trade secrets except to government employees to be "used only for official law enforcement purposes." *See also*, 15 U.S.C. 18a(h).

[4] *See* "Non-HSR Reported Acquisitions by Select Technology Platforms, 2010-2019:

Letter to E. Hochstadt
September 8, 2022
Page 4

part of their defense, they are free to subpoena those materials directly from those companies and
have been free to do so since discovery started—indeed, Defendants have already subpoenaed
Apple, Fitbit (which is owned by Google), and Microsoft. Seeking this information from third
parties will more effectively allow those parties to protect their information while providing
targeted discovery as appropriate. Conversely, a FTC search for files from an unrelated
investigations that included highly confidential third-party materials  collected for purposes
unconnected to this matter will create undue and disproportionate burdens on the FTC  particularly
given the marginal relevance (if any) to the claims alleged in the complaint.

Moreover, discovery from unrelated FTC investigations is also not permitted under the
FTC administrative rules. As you know, this federal action is a proceeding seeking limited interim
relief; the question at issue is only whether the FTC is likely to succeed on the merits in the
administrative proceeding (commonly referred to as "Part 3"). *FTC v. Warner Commc'ns Inc.*,
742 F.2d 1156, 1159 (9th Cir. 1984).  As such, the scope of federal-court discovery is guided by
what evidence the parties may present in the merits proceeding in Part 3.   FTC Rule 3.31(c)(2)
explicitly provides that Meta and Within are only entitled to discovery of "materials that were
collected or reviewed in the course of the investigation of the matter or prosecution of the case and
that are in the possession, custody or control of the Bureaus of Offices of the Commission that
investigated the matter" during the administrative proceeding unless Defendants can meet the
requirements of Rule 3.36.   16 C.F.C § 3.31(c)(2). Rule 3.36 requires in relevant part that
Defendants show that the material requested is reasonable in scope, is reasonably relevant, and
cannot be obtained by other means.  Here, Defendants' broad requests fail to meet any of the Rule
3.36 criteria and, as such, are not discoverable in either the Part 3 proceeding or the federal court
litigation.

### **Interrogatories**

*Interrogatory No. 1*

During the September 2, 2022 meet and confer, Defendants asked the FTC to supplement
its response to Interrogatory No. 1 with the names and titles of the individuals with whom the FTC
communicated at each company.  As the FTC indicated during that conversation, most of this
information has been provided to Defendants as part of the FTC's Initial Disclosures.  For the
additional third-party contacts identified in response to Interrogatory No. 1, the FTC agrees to
supplement its response with the names and titles of individual contacts where applicable.

*Interrogatory Nos. 2, 3 & 4*

To the extent that Interrogatories Nos. 2-4 call for factual information in the FTC's
possession, custody, or control prior to discovery in this action, the FTC believes it has already
provided Defendants with the information sought by these Interrogatories, but, in the interest of

---

An FTC Study," at 1, available at https://www.ftc.gov/system/files/documents/reports/non-hsr-
reported-acquisitions-select-technology-platforms-2010-2019-ftc-
study/p201201technologyplatformstudy2021.pdf.

Letter to E. Hochstadt
September 8, 2022
Page 5

compromise, we agree to review our prior response and supplement as appropriate to add greater clarity to the extent possible. To the extent that Interrogatories Nos. 2-4 are contention interrogatories, the FTC will supplement its responses at the close of discovery. To the extent that Interrogatories Nos. 2-4 call for expert analysis, the FTC will supplement its responses at the close of expert discovery.

*Interrogatory No. 5*

With respect to Interrogatory No. 5, the FTC has already responded with the list of firms included in each relevant product market for purposes of the FTC's preliminary market concentration analyses. The FTC has also provided Defendants with a description of the relevant markets and the criteria it used to identify these firms in those markets for the preliminary market concentration analysis. As provided in our Responses and Objections, "The firms preliminarily included in the relevant markets were based on characterizations by Meta in its submissions to the FTC, see PX0001 at 019, PX0007 at 009, *and* a search for the terms "exercise" and "fitness" on the Meta Quest Store (excluding meditation-focused apps)." (emphasis added). There were no additional criteria used to identify these firms, and therefore, the FTC has no additional criteria to provide Defendants at this time.

Nonetheless, the FTC agrees to supplement its response to Interrogatory No. 5 to include the names of recent and potential entrants known to the FTC. The FTC believes at this time that Les Mills' Body Combat VR and Liteboxer VR both entered into the VR Dedicated Fitness App Market in 2022. The FTC is unaware of any additional recent or potential entrants. The FTC will supplement its interrogatory response accordingly and further agrees to supplement its response at the close of discovery if appropriate.

*Interrogatory No. 6*

In the interest of compromise and without waiving any objections, the FTC agrees to supplement its response to identify any non-governmental third parties with whom the Chair communicated about the merger through the date of the federal-court complaint.

*Interrogatory No. 7*

In both our meet and confer and Defendant's September 7, 2022 letter, Defendants asked the FTC to supplement its response to Interrogatory No. 7 with any instructions or assumptions provided to Jennifer Snyder in connection with her market share calculations. As we have explained, FTC staff attorneys provided Ms. Snyder with a list of applications for each of the FTC's alleged relevant product markets along with revenue data obtained from Defendants during the investigation. These lists of applications were developed by FTC attorneys for the purpose of preliminary market share analysis using the criteria previously explained to Defendants on multiple occasions and also described above in this letter regarding Interrogatory No. 5. Ms. Snyder was instructed to calculate market share and Herfindahl-Hirschman Index ("HHI") figures based on 2021 revenue data. Ms. Snyder was not given any additional instructions and no written instructions exist.

Letter to E. Hochstadt
September 8, 2022
Page 6

  While we disagree that Ms. Snyder can be characterized as an "expert", even if she were, as explained in the FTC's September 2, 2022 letter, any communications between Ms. Snyder and FTC attorneys are exempt from disclosure pursuant to the parties' agreement. *See* Joint Stipulated Discovery Plan and Briefing Schedule C(2)(a)(i) (exempting from disclosure "any form of communication or work product shared between any of the parties' counsel and their expert(s) or consultants, or between any of the experts or consultants themselves"). Defendants' citation to *In re iPhone, iPad App. Consumer Privacy Litig.*, 2012 U.S. Dist. LEXIS 166711 at * 31 (N.D. Cal. Nov. 21, 2012) is inapposite because, as we have repeatedly informed you, Ms. Snyder will not be a testifying expert for the FTC at the preliminary injunction hearing. *See Intervet, Inc. v. Merial, Ltd.* 2007 WL 1797643 (D. Neb. June 20, 2007) (declaration of a non-testifying expert attached to a moot preliminary injunction motion did not waive any privileges). Moreover, Ms. Snyder was not even an expert (testifying or otherwise) for purposes of the FTC's Emergency Motion for a Temporary Restraining Order; as we have explained and consistent with her declaration, she merely calculated market share and HHI figures for the list of applications in the relevant antitrust markets provided by FTC staff attorneys. Instead, Ms. Snyder is an FTC employee and, at most, a consulting expert. Either way, Ms. Snyder communications with other FTC employees are privileged. *See* Joint Stipulated Discovery Plan and Briefing Schedule E(1).

***

  The FTC is still considering Defendants' position with respect to Interrogatory No. 10 and will respond to those issues in a separate correspondence.

        Sincerely,

        */s/* Susan A. Musser
        Susan A. Musser

        */s/* Frances Anne Johnson
        Frances Anne Johnson

        *Counsel for Plaintiff Federal Trade Commission*

# EXHIBIT  13

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Eric S. Hochstadt**
+1 (212) 310-8538
eric.hochstadt@weil.com

BY EMAIL

September 11, 2022

Susan Musser
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

Re: *Fed. Trade Comm'n v. Meta Platforms, Inc., et al.*, 5:22-cv-04325-EJD (N.D. Cal.) – Defendants'
Outstanding Discovery Requests and Plaintiff's Motion to Strike Affirmative Defenses

Dear Susan,

We are continuing to evaluate the FTC's latest responses in your letter dated September 8, 2022.  For the interrogatory responses the FTC has agreed to supplement, please provide such supplemental responses by Tuesday, September 13, 2022, as the deadline for the FTC's responses has passed, and so that Defendants are not further prejudiced by the FTC's delay.

Separately, the parties are at an impasse on a number of issues, and Defendants ask that the FTC be prepared by Wednesday, September 14, 2022 to share its portion of the required five-page joint statement as required by Magistrate Judge Van Keulen's Civil and Discovery Referral Matters Standing Order on at least the issues of (i) the FTC's bases for the definitions of the alleged relevant markets (Interrogatory Nos. 2-5); (ii) the facts communicated to the FTC by third parties during interviews (RFP Nos. 1-3 and Interrogatory No. 1); and (iii) discovery relating to Meta's affirmative defenses (RFP Nos. 4, 10, 11, and 12, and Interrogatory No. 6).

With respect to category (iii), we do not agree that the FTC's Motion to Strike Defendants' Affirmative Defenses, filed September 9, 2022, justifies the FTC choosing not to comply with legitimate discovery requests.  Indeed, filing a motion to strike is not a unilateral grant of a stay, and, unless and until the FTC seeks and obtains a protective order, it should be searching for, reviewing and producing the requested documents by September 15, 2022, the deadline for the FTC to comply with Defendants' First Set of Requests for Production of Documents.  If the FTC nevertheless intends to continue withholding discoverable information, given the short timeframe for discovery in this case, the FTC is on notice that it should be undertaking its search and review for the requested information during the pendency of the FTC's motion to strike.  Please confirm that the FTC will do so, and that if the motion to strike is denied, the FTC will provide documents and information relevant to Defendants' affirmative defenses,

**Weil, Gotshal & Manges LLP**

September 11, 2022
Page 2


including documents responsive to RFP Nos. 4, 10, 11, and 12, and a supplemental response to
Interrogatory No. 6.


Sincerely,


*/s/ Eric S. Hochstadt*
Eric S. Hochstadt

# EXHIBIT  14



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

September 12, 2022

Susan A. Musser
Bureau of Competition
Phone: (202) 326-2122
Email: smusser@ftc.gov

**By Electronic Mail**

Eric Hochstadt, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

RE: *FTC v. Meta Platforms, Inc. et al.*, **5:22-cv-054325-EJD**

Dear Eric:

Thank you for your letter of Sunday, September 11, 2022.  In the first instance, we disagree that Meta has been "prejudiced by the FTC's delay." September 11, 2022 Ltr. from E. Hochstadt to S. Musser at 1.  The FTC has continuously engaged in good faith with Defendants regarding the FTC's Responses and Objections to Defendant's First Set of Interrogatories, promptly responding to all requests to meet and confer and engaging diligently to respond to Meta's demands and to gain the clarity necessary to provide additional responses as appropriate.  During this process, we have offered, and made, numerous concessions and compromises with Meta, despite receiving hardly any in return.  Nonetheless, and although we are under no obligation to comply with your arbitrary deadlines, we agree to supplement our Responses and Objections to Meta's First Set of Interrogatories tomorrow.  Given the expedited nature of our response, we continue to reserve the right to further supplement our Responses and Objections to the extent necessary, as allowed under Rule 26(e).

Separately, you write that "the parties are at impasse on a number of issues" and ask that the "FTC be prepared by Wednesday, September 2022 to share its portion of the required five-page joint statement" regarding "at least" three issues.  To the extent that you are implying that you intend to move Magistrate Judge Van Keulen to compel on certain issues, you are of course free to do so.  Your letter, however, is on its face vague as to what issues Meta intends to move to compel and on which grounds.  September 11, 2022 Ltr. from E. Hochstadt to S. Musser at 1 ("Defendants ask that the FTC be prepared by Wednesday, September 14, 2022 to share its portion of the required five-page joint statement . . . on at least" three issues set forth in letter).  Moreover, we are aware of no obligation, and you point to none, that requires the party resisting a motion to compel to provide its portion of any joint statement prior to the moving party. As such, to the extent that you provide your portion of the joint statement on Wednesday, September 14, 2022 (or

on the date of your choosing), we will provide our response to your portion of the joint statement within two business days.

       With regard to Defendants' document requests relating to Defendants' affirmative defenses, we can confirm that the FTC is continuing to preserve documents.  Furthermore, we can confirm that, subject to and without waiving any applicable objections set forth in the FTC's Responses and Objections to Defendants' First Set of Requests for Production, dated August 23, 2022, we will be in a position to produce non-privileged, responsive documents that can be located through a reasonable search within a week of any ruling denying the FTC's Motion to Strike Meta and Within's Affirmative Defenses.

       Best regards,


       /s/ Susan A. Musser
       Susan A. Musser
       *Counsel for the Plaintiff Federal Trade Commission*

# EXHIBIT  15



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers IV Division

September 22, 2022

**By Electronic Mail**

Eric Hochstadt, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

**RE:    FTC v. Meta Platforms, Inc. et al., 5:22-cv-054325-EJD**

Dear Eric:

I write in response to your letter of September 19, 2022.

Intergovernmental Communications (RFP No. 4, Interrogatory No. 6)

As we informed you in our letter of September 12, 2022, the FTC is conducting a reasonable search for intergovernmental communications (including those involving Chair Khan) through the date of the Complaint regarding Meta's acquisition of Within (RFP No. 4) and will produce all non-privileged documents resulting from that search following an order by the Court, if any, denying the FTC's motion to strike.  Following such an order, the FTC will also update its response to Interrogatory No. 6 to reflect the identities, if any, of any persons (including members of Congress or the Executive Branch, or the staff or advisors of any members of Congress or officials in the Executive Branch) with whom Chair Khan communicated about the acquisition.

The FTC previously confirmed in its response to Interrogatory No. 6 that, based upon its reasonable investigation to date, the FTC is unaware of any communications between Chair Khan and non-governmental third parties concerning the merger prior to the filing of the Complaint, and confirmed that the FTC will supplement its response to Interrogatory No. 6 if it becomes aware of any such communications.  The FTC is not withholding any such information on the grounds of its burden objection.

Documents Considered by Chair Khan and Documents Concerning Participation of Commissioners in Review of the Acquisition (RFP Nos. 11 & 12)

In the spirit of compromise, in the interest of not burdening the Court, and notwithstanding the FTC's objections that these requests did not seek information relevant to any valid claim or defense, the FTC has already searched for and produced any non-privileged documents to or from nongovernmental third parties from the files of Commissioners and the Bureau of Competition's

Front Office. These searches included as custodians, among others, Chair Khan's attorney advisors.

In addition to calling for information not relevant to any valid claim or defense, your requests for "documents Chair Khan considered or relied upon in connection with review of the acquisition or the FTC's votes to file the Complaint and Administrative Complaint" and "documents Concerning the participation of any Commissioner in review of the acquisition, the decision to authorize the Complaint, and any allegations in the Complaint or legal memorandum supporting the TRO motion" (Ltr. at 2) go to the heart of the deliberative process and work product privileges. As such, the FTC will not be conducting a further search for these documents beyond the search and production we have already undertaken in the spirit of compromise. *See, e.g.*, *Doe v. Manhattan Beach Unified Sch. Dist.*, 2020 WL 11271845, at *6 (C.D. Cal. Oct. 20, 2020) (holding discovery not proportional, including the need "to conduct a review for privileged or private information"); *cf. Mon Cheri Bridals, LLC v. Cloudflare, Inc.*, 2021 WL 1222492, at *3 (N.D. Cal. Apr. 1, 2021) (holding documents are "so overwhelmingly likely to be privileged and work product that requiring Plaintiffs to log them all [would be] a pointless waste of time").

Although your letter suggests that Defendants have a "substantial need" for the materials requested, Defendants have not articulated such a need. Moreover, under Ninth Circuit law, opinion work product is not discoverable unless it is "*at issue* in the case and the need for the material is compelling," a standard that requires a showing "beyond the substantial need/undue hardship test required under Rule 26(b)(3) for non-opinion work product." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992). Defendants have not and cannot make that showing.

<u>Chair Khan's Communications regarding Meta and/or Mark Zuckerberg (RFP No. 10)</u>

As to Defendants' request for "all documents in which Chair Khan has discussed Meta and/or Mark Zuckerberg", you have failed to articulate how this request is relevant to any claim or defense and how it is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). We ask that you provide more information as to the defense at issue, what information Defendants are looking for, and how the information relates to that defense. As reflected above, to the extent RFP No. 10 seeks information for purposes of the affirmative defenses that the FTC has moved to strike, whether such discovery is relevant and proportional to the needs of the case depends, in part, on how the court resolves FTC's motion to strike. Even if Defendants' improper affirmative defenses are not stricken, the scope of this request appears unduly burdensome and not proportional.

Moreover, to the extent not duplicative with other requests, RFP No. 10 appears to focus overwhelmingly on Chair Khan's communications with her FTC colleagues, which constitute work product and/or deliberative process privileged materials. For the same reasons as we articulated above with respect to RFP Nos. 11 and 12, the FTC will not be conducting a search for these documents.

<u>Documents Concerning Other Transactions (RFP Nos. 7, 15 & 16)</u>

Defendants previously stated that documents responsive to RFP No. 7 are "highly relevant to the FTC's claims regarding market concentration, the purported lack of entry in the relevant

markets, and whether the Merger could possibly harm competition." *See* Aug. 31, 2022 Ltr. from E. Hochstadt to S. Musser at 4 n.3. Changing course, in your September 19 letter, you state for the first time that such documents are relevant to the affirmative defense of "selective enforcement." Ltr. at 1. As a preliminary matter, it is "difficult to even conceptualize how a selective enforcement claim applies in the antitrust context" because, under longstanding Supreme Court precedent, "each merger must be functionally viewed in the context of its particular industry and in light of a variety of factors—including the transaction's size, structure, and potential to generate efficiencies or enable evasion of rate regulation—that are relevant in determining whether a transaction is likely to lessen competition." *United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (citation and quotation marks omitted).

In any event, even assuming *arguendo* that the Court denies the FTC's motion to strike, Defendants must provide a plausible factual basis to support this defense before they are entitled to take any discovery on it. Indeed, notwithstanding the inflammatory rhetoric in your letter—that the FTC's claim is "unprecedented" and "illegitimate"—and notwithstanding Meta's position in the industry, Meta has never identified a "requisite comparator" for its selective enforcement defense. *AT&T*, 290 F. Supp. 3d at 2. Absent a factual basis and "requisite comparator," Defendants are not entitled to discovery of "All Documents Concerning proposed, actual, or contemplated transactions Related to any fitness and Extended Reality (not limited to fitness) industry," "All Documents and analyses Concerning acquisitions by technology platform companies and the effects of those acquisitions on early-stage investment," and "All Documents and analyses Concerning the FTC's 6(b) Study of acquisitions by technology platform companies in FTC Matter No. P201201."

Privilege Log

Your letter demands that the FTC "explain (i) whether the FTC is withholding any documents or information on the basis of privilege, (ii) if so, the specific privilege(s) the FTC is/are relying upon, and (iii) the specific bases for the FTC's invocation(s) of privilege(s)." Ltr. at 3. As you know, Paragraph E.1 of the Joint Stipulated Discovery Plan and Briefing Schedule governs the production of any privilege log in this matter. *See* Dkt. 86. For those discovery requests for which the FTC has agreed to conduct a reasonable search for responsive documents, the FTC will produce a privilege log in accordance with the Joint Stipulated Discovery Plan and Briefing Schedule at E.1.

The FTC's September 15 Document Production

We apologize for the technical issues concerning Plaintiff's document production from September 15, 2022. Within hours of receipt of your letter, we transmitted a corrected production on Monday, September 19, 2022. We trust that the corrected production addresses the issues identified in your letter. If not, please let us know. In the future, if Defendants have any technical issues with the FTC's document productions, we ask that you contact us as soon as possible, instead of waiting four days to inform us in a letter about unrelated discovery issues.

Sincerely,


*/s/  Adam Pergament*
Adam Pergament
*Counsel for the Plaintiff Federal Trade Commission*

# EXHIBIT 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION,**

Plaintiff,

v.

**FACEBOOK, INC.**

Defendant.

Civil Action No. 1:20-cv-03590 (JEB)

**<u>PUBLIC REDACTED VERSION OF</u>**
**<u>DOCUMENT FILED UNDER SEAL</u>**

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

I. THE AC ADEQUATELY ALLEGES FACEBOOK'S MONOPOLY POWER IN PSN SERVICES ............................................................................................................ 3

   A. The AC Adequately Alleges "Indirect" Evidence of Facebook's Monopoly Power .......... 4

      1. The AC Alleges that Facebook Has a Dominant Share of the U.S. PSN Services Market as Measured by Three Key Measures of Output ................................ 4

      2. Facebook's Attacks on the AC's Market Share Allegations Are Unfounded ............. 6

      3. The AC Alleges Significant Barriers to Entry in the PSN Services Market ................ 9

   B. The AC Also Pleads Facebook's Monopoly Power via Direct Evidence ......................... 12

II. THE COMPLAINT DETAILS HOW FACEBOOK HAS MAINTAINED ITS MONOPOLY POSITION THROUGH AN ANTICOMPETITIVE COURSE OF CONDUCT ...................................................................................................... 15

   A. Count 1 States a Claim that Facebook Maintained Its Monopoly Through the Acquisitions of Instagram and WhatsApp ....................................................... 16

      1. The AC Pleads Facts Establishing that Facebook's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct ............................................. 16

      2. Facebook's Rehashed Arguments Are Unavailing ................................................... 17

      3. The AC's Allegations Regarding "Other Acquisitions" Provide Supporting Factual Context ........................................................................................... 21

   B. Count 2 Alleges an Ongoing Monopoly Maintenance Offense Comprising Anticompetitive Acquisitions and Anticompetitive Platform Conduct ............................ 22

      1. The FTC's Allegations Regarding Facebook's Agreements with Developers Support a Claim for Monopoly Maintenance ................................................................... 22

      2. Facebook's Agreements with Developers Are Not Unilateral Refusals to Deal ........ 28

      3. The FTC's Allegations Meet Even the Standards Applicable to Unilateral Refusals to Deal ......................................................................................................... 31

      4. Count 2 Is Not Barred by the Law of the Case ....................................................... 35

III. SECTION 13(B) DOES NOT PROVIDE A BASIS TO DISMISS COUNT 1 OR COUNT 2 ........................................................................................................ 36

   A. Section 13(b) Authorizes the FTC to Obtain Injunctive Relief to Remedy Facebook's Ongoing Violation of the FTC Act ......................................................................... 37

   B. Section 13(b) Authorizes Both Count 1 and Count 2, and the Allegations Supporting Each Cause of Action Must be Considered as a Whole ................................................ 38

C.  The AC Plausibly Pleads that Facebook's Illegal Platform Conduct Is Likely to Recur . 40

**IV. CHAIR KHAN PROPERLY PARTICIPATED IN THE VOTE ON THE AMENDED COMPLAINT .................................................................................................. 42**

A.  Relevant Background ........................................................................................... 42

B.  Prejudgment Is Not a Basis for Recusal from Commission Votes Authorizing Federal Court Litigation ........................................................................................................ 43

C.  The Court Cannot "Remand" to the Commission ................................................. 45

**CONCLUSION ........................................................................................................... 45**

# TABLE OF AUTHORITIES

## Cases

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126 (D.D.C. 2018) . 4, 5

*Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011)........................................................ 45

*Am. Cyanamid Co. v. FTC,* 363 F.2d 757 (6th Cir. 1966)...................................................... 43, 44

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)............................................................. 37

*Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962)......................................................... 45

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)................ 21, 32, 34, 35

*Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979) ................................... 43

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................... 3

*Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26 (D.D.C. 2017) .............................. 36

*Bouchet v. Nat'l Urban League*, 730 F.2d 799 (D.C. Cir. 1984).................................................. 35

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.,*  176 F. Supp. 3d 606 (W.D. La. 2016) ................................................................................................................................................ 5,18

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................................... 14

*Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir. 1979)........................................................ 12

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998)........... 22

*Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970).............. 43, 44

*CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926 (D. Or. 2018) ................. 4, 8

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................................... 16

*Covad Commc'ns. Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005).................................... 32

*Dist. No. 1 v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327 (D.D.C. 2014) ........................................ 36

*Dist. No. 1, P. Coast Dist., Marine Engineers' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp* 815 F.3d 834 (D.C. Cir. 2016). ................................................................................................. 36

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................................. 10, 28

*Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ......................... 31

*EuroTec Vertical Flight Sols. LLC.  v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240
   (N.D. Tex. Aug. 1, 2019) ......................................................................................................... 9

*Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166 (D.D.C. 2018)............................................ 35

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................................ 37

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) .......................................... 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................ 41

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020)........................................................................... 4

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)............................................................ 39

*\*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)................................................................... 13, 23, 29

*FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218 (N.D. Ga. 2019).................. 40

*FTC v. Neora LLC*, 2021 WL 3398153 (N.D. Tex. Aug. 2, 2021) .............................................. 38

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)...................................................... 42

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ................................ 40

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) ........................................................ 40

*FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31 (S.D.N.Y. 2020) ................................. 32, 37, 38

*FTC v. Warner Chilcott Holdings Co. III*, 2007 WL 158746 (D.D.C. Jan. 22, 2007) ................ 39

*Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484 (1st Cir. 1952).............. 25

*General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) .................... 23

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004).......................... 29

*Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021) ....................................................... 16, 17

*In re Murchison*, 349 U.S. 133 (1955)......................................................................................... 43

*In re Sanctuary Belize*, 482 F. Supp. 3d 373 (D. Md. 2020) ...................................................... 41

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959).......................................... 5

*Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016)................................................................. 7

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................................................................................................. 22

*LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ............................................... 36

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ................................................ 23

*Maris Distributing Co. v Anheuser-Busch Inc.*, 302 F.3d 1207 (11th Cir. 2002) ................ 7

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ................................................................ 43

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422 (9th Cir. 2020) ................ 7

*Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F. Supp. 2d 1133 (D. Minn. 2011) ............................................................................................................................ 13

*Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994) ........................................................ 5

*N. Sec. Co. v. United States*, 193 U.S. 197 (1904) ........................................................... 37

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) .......................................... 23, 24, 27

*Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013) ................ 14

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ..................................................... 45

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...................................... 29

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) ............... 33

*\*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ........................................... 23

*Post v. Pearson*, 108 U.S. 418 (1883) ............................................................................. 35

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) .......................... 35

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir. 1990) ........... 10

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ...................................... 10

*Rick-Mik Enters. Inc v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008) ....................... 7

*Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200 (D.D.C. 2020) ............................ 36

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ......................................... 19, 37, 39

*Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011) ........ 7

*Texaco v. Dagher*, 547 U.S. 1 (2006) .............................................................................. 21

*Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ..................... 32

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430

  (6th Cir. 2008)........................................................................................................... 9

*Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637 (1947)........................... 30

*United States v. Anthem, Inc.*, 2016 WL 11755535 (D.D.C. Sept. 30, 2016)............................... 8

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) ................................. 1, 23

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ...................................... 9, 11

*\*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014)................. passim

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ............................................................ 28, 29

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ........................................................ 20

*\*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ...................................... 13, 24

*United States v. Gen. Elec. Co.*, 80 F. Supp. 989 (S.D.N.Y. 1948).............................................. 30

*United States v. Griffith*, 334 U.S. 100 (1948)............................................................................. 3

*\*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)......................................................... passim

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ....................................... 9

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975)............................................. 20

*United States v. Loew's*, 371 U.S. 38 (1962) .............................................................................. 29

*United States v. Microsoft Corp.,* 1:98-cv-01232, 1998 WL 35241886 (D.D.C., May 18, 1998)..9

*United States v. Microsoft Corp*, 84 F. Supp. 2d 9 (D.D.C. 1999). ................................. 13, 14, 18

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................................ passim

*United States v. MyLife.com, Inc.,* 499 F. Supp. 3d 757 (C.D. Cal. 2020) ................................. 41

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ................................. 37

*United States v. SBC Commc'ns, Inc.*, 1999 WL 1211458 (D.D.C. Aug. 2, 1999)....................... 9

*United States v. U.S. Gypsum Co.*, 340 U.S. 76 (1950)............................................................... 40

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)............................................................... 39

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004) ........ passim

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ..................................... 22, 30, 34

*Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984) .......................................... 44, 45

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ............................... 24, 25

## Statutes and Rules

15 U.S.C. § 4 ......................................................................................................... 39

15 U.S.C. § 45(b) ................................................................................................. 42

16 C.F.R. § 4.17. .................................................................................................. 43

18 U.S.C. § 208 .................................................................................................... 44

5 C.F.R. § 2635.402 ............................................................................................. 44

5 U.S.C. § 554(a)(1) ............................................................................................. 44

5 U.S.C. § 556(b) ................................................................................................. 44

Fed. R. Civ. P. 12(f) ............................................................................................. 40

Fed. R. Civ. P.12(b)(6) ........................................................................................ 40

Federal Trade Commission Act,

   § 5, 15 U.S.C. § 45(a) ..................................................................................... 1

   § 13(b), 15 U.S.C. § 53(b) ...................................................................... passim

Sherman Act

   § 2, 15 U.S.C. § 2 .................................................................................... passim

## Other Authorities

Herbert Hovenkamp, *Digital Cluster Markets*, COL. BUS. L. REV. (forthcoming 2021), available

   at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3820062 .................................... 12,13

Herbert Hovenkamp, *FRAND and Antitrust*, 105 CORNELL L. REV. (2020)). .............................. 30

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles

   And Their Application (4th ed. 2020)*;* ............................................................................ passim

## **INTRODUCTION**

For at least a decade, Facebook has wielded enormous power, impacting the lives of millions of Americans. Facebook has maintained this power not by outcompeting its potential rivals, but by hobbling or eliminating them in anticompetitive ways. Left unimpeded, the competitive process would have rewarded the firms best able to innovate and adapt to technological change. But Facebook has interfered with the competitive process by targeting nascent threats through exclusionary conduct in a successful effort to protect its monopoly power over personal social networking ("PSN") services in the United States.

Facebook has eliminated some threats entirely by acquiring them; others it has targeted by conditioning valuable growth tools on agreements to refrain from competing with Facebook or assisting its competitors—and enforcing these agreements when necessary to deny potential competitors scale. As explained below, these anticompetitive actions violate Section 2 of the Sherman Act and thus Section 5 of the FTC Act. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (monopolist's acquisitions unlawful where they "eliminated any possibility of an outbreak of competition that might have occurred"); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (monopolist preserved entry barriers by preventing nascent threats from gaining scale); *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 160-65 (D.D.C. 1982) (monopolist's policies, *inter alia*, "deterred potential competitors from entering").

The Court has already determined, correctly, that the FTC has adequately pleaded that Facebook participates in a relevant antitrust market for PSN services in the United States. ECF No. 73 ("Op.") 23-26. The FTC's Amended Complaint ("AC," ECF No. 82) alleges, in two separate and independently sufficient ways, that Facebook is a monopolist in this market. First, the AC provides reliable metrics establishing that Facebook controls a dominant share of the market and detailed allegations describing the significant entry barriers that protect Facebook's

position.  *Infra* § I.A.  In addition to this "indirect" proof of market power, Op. 18-19, the AC alleges "direct" evidence that Facebook is a monopolist with the power to profitably reduce quality (which is equivalent to a price increase) and exclude competition.  *Infra* § I.B.  These well-supported allegations establish that Facebook holds monopoly power in the U.S. PSN services market.  Facebook's arguments to the contrary are unavailing.

Further, the AC alleges that Facebook has maintained its monopoly power unlawfully through a decade-long course of exclusionary conduct.  Count 1 alleges that Facebook maintained its monopoly position in the U.S. PSN services market through its acquisitions of Instagram and WhatsApp, and pleads ample facts demonstrating that these acquisitions harmed the competitive process by eliminating nascent threats.  *Infra* § II.A.

Count 2 alleges that Facebook's course of monopoly maintenance includes not only the acquisitions of Instagram and WhatsApp, but also its adoption and enforcement of agreements with developers that deterred competition and impeded potential rivals' ability to distribute and promote their apps.  *Infra* § II.B.1.  Facebook's agreements with developers, and enforcement thereof, do not constitute unilateral refusals to deal, and in any event violate the antitrust laws even if branded as unilateral refusals to deal.  *Infra* §§ II.B.2-3.  Contrary to Facebook's claims, Count 2 is barred neither by law of the case (*infra* § II.B.4) nor by Section 13(b) of the FTC Act, which empowers the FTC to obtain injunctive relief to remedy Facebook's ongoing violation of Section 2.  *Infra* §§ III.A-B.  Moreover, the AC plausibly alleges that Facebook's exclusionary platform conduct is likely to recur.  *Infra* § III.C.

Finally, Facebook's recusal argument fails because in this case the Commission is acting as a plaintiff or prosecutor rather than performing a judicial or quasi-judicial function, and Facebook identifies no factors that would require recusal in such circumstances.  *Infra* § IV.

## **ARGUMENT**

As the Court has already recognized, Op. 17, Section 2 of the Sherman Act has two elements: the possession of monopoly power and the maintenance of that power through conduct that tends "'to destroy competition itself' via 'means other than competition on the merits.'" Op. 52 (quoting *Microsoft*, 253 F.3d at 58, 62); *see also United States v. Griffith*, 334 U.S. 100, 107 (1948) ("The anti-trust laws are as much violated by the prevention of competition as by its destruction. . . . [T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."). The AC plausibly alleges Facebook's monopoly power, *infra* § I, and amply alleges facts sufficient to show that Facebook engaged in anticompetitive conduct to maintain that power, *infra* § II. The AC thus states a claim for relief that is plausible on its face, and Facebook's motion to dismiss should be denied. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

## I. The AC Adequately Alleges Facebook's Monopoly Power in PSN Services

The Court has already determined, correctly, that the FTC has adequately pleaded a relevant antitrust market for PSN services in the United States. Op. 23-26. The Court held, however, that the FTC's original Complaint failed to provide enough facts supporting its allegation that Facebook holds monopoly power within that relevant market. *Id.* at 27. As detailed below, the AC addresses the Court's concern by alleging both indirect and direct evidence of Facebook's monopoly power. *Microsoft,* 253 F.3d at 51 (describing methods of proving monopoly power). The bolstered AC robustly pleads monopoly power through detailed factual allegations describing: Facebook's market share (AC ¶¶ 199-201); other firms' limited ability to constrain Facebook's market power (*id.* ¶¶ 184-89); the significant entry barriers that protect Facebook's position (*id.* ¶¶ 187-88, 212-17); Facebook's history of degrading the user

experience with minimal loss of user engagement (*id.* ¶¶ 206-09); and Facebook's ability to exclude firms that could emerge as or aid competitive threats (*id.* ¶¶ 210-11).

**A. The AC Adequately Alleges "Indirect" Evidence of Facebook's Monopoly Power**

     **1. The AC Alleges that Facebook Has a Dominant Share of the U.S. PSN Services Market as Measured by Three Key Measures of Output**

The AC pleads the first prong of an indirect showing of monopoly power by alleging that Facebook has had at all relevant times a dominant share of the U.S. PSN services market as measured by three key metrics: time spent using the services, Daily Active Users ("DAUs"), and Monthly Active Users ("MAUs"). AC ¶¶ 190-204. The AC identifies both current and defunct participants in the relevant market, AC ¶¶ 184-89, describes their size compared to Facebook, and calculates current and historical market shares across all three metrics. AC ¶¶ 199-201 (Facebook's market share and combined shares of other PSN service providers); *see also* AC ¶¶ 194-97 (reliance on these metrics by Facebook and other services); AC ¶¶ 182-83 (number of U.S. users visiting Facebook Blue and Instagram in 2020 and aggregate time spent); AC ¶¶ 184-86 (similar metrics for Snapchat and MeWe). These allegations address the concerns identified in the Court's prior ruling. Op. 28-30.

The AC alleges that for nearly a decade, Facebook's share of time spent for U.S. PSN services has exceeded 80%; that its share of DAUs has exceeded 70%; and that its share of MAUs has exceeded 65%. AC ¶¶ 199-201. These market share figures exceed the levels that courts have found sufficient to establish monopoly power. *See, e.g., FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (shares above 60%); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140 (D.D.C. 2018) (shares as low as 54%); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 959 (D. Or. 2018) (shares above 60%).

Further, the AC explains that the three proffered market share metrics accurately indicate

the competitive significance of a PSN service provider because a PSN service's competitive significance "is related to its number of users and how intensively its users engage with the service." AC ¶ 192. Taken together, time spent, DAUs, and MAUs provide an indication of both number of users and intensity of use: indeed, Facebook implicitly concedes the utility of these metrics—arguing that Snapchat's time spent and MAU figures support Facebook's claim that "output has exploded." ECF No. 83-1 ("Mem.") 16.

Courts regularly rely on output- or consumption-based metrics as indications of competitive significance when evaluating market power because "[o]utput is the usual measure of a market and of the shares within it." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles And Their Application ¶ 535 (4th ed. 2020); *see also, e.g.*, *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249 (1959) (market share measured by number of boxing events promoted and staged); *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 n.3 (8th Cir. 1994) (number of cardiac surgery patients); *2301 M Cinema LLC,* 342 F. Supp. 3d at 140 (movie screens controlled); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 611 (W.D. La. 2016) (hospital admissions).

Here, the utility of the output metrics identified in the AC is confirmed by the fact that Facebook and other participants in the PSN services market, including Snapchat and Google+, rely on them for competitive benchmarking. AC ¶¶ 194-95; *cf. United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32-*33 (N.D. Cal. Jan. 8, 2014) (relying on market share metrics used by defendant and other industry participants). All three metrics indicating output and consumption confirm one another and provide a compelling indication of Facebook's market power. *See, e.g.*, *id.* at *32 (expert "analyzed the market shares using several different metrics, each of which confirmed the commanding position occupied by [defendants]").

5

### 2.    Facebook's Attacks on the AC's Market Share Allegations Are Unfounded

Facebook levies several attacks on the bolstered AC allegations.  Each is groundless.

*First*, Facebook claims, wrongly, that the market share figures only include Facebook, Instagram, and Snapchat.  Mem. 2.  To the contrary, as alleged, the market shares account for multiple current and former PSN service providers, including Google+, Myspace, Path, and MeWe—and still, Facebook's position is dominant.  AC ¶¶ 199(a), 200(a), 201(a).

*Second*, Facebook faults the AC's reliance on Comscore data because, Facebook claims, the data "does not track PSNS usage."  Mem. 2, 7.  This misses the mark because it ignores the AC's allegation that Facebook Blue and Instagram are "predominantly used" as PSN services.  AC ¶ 202.  This allegation is corroborated by Facebook's executives and internal analysis indicating that Facebook both understands the distinction between PSN services and other services (AC ¶ 177) and recognizes that PSN services are the predominant use of Facebook Blue and Instagram.  AC ¶¶ 178-79.  Thus, in measuring use of Facebook Blue and Instagram, the Comscore data are measuring PSN services usage.  Even if the data capture some non-PSN usage of Facebook Blue and Instagram, this would not undermine the AC's allegation that Facebook has a dominant share in PSN services.  *Bazaarvoice*, 2014 WL 203966 at *32 (market share figures need not exclude minor revenues attributable to "other offerings that complement" the relevant product).  Indeed, the AC explicitly accounts for the possibility of non-PSN use by pointing out that even in an alternative scenario—one where users spent only *half* of their time on Facebook Blue and Instagram using PSN services, but *all* of their time on other services such as Snapchat and Google+ using PSN services—Facebook's market shares would still be enormous, averaging 85% since September 2012 and never falling below around 70% for time spent.  AC ¶ 202.  The AC therefore alleges facts establishing that Facebook's share of PSN

services output exceeds the level that indicates monopoly power, AC ¶¶ 190-201, and bolsters this allegation by making the point that this would be true, *even assuming, arguendo, a set of facts more favorable to Facebook than the facts alleged in the AC*.  AC ¶ 202.

Facebook's overwhelming share of the time spent, DAU, and MAU figures provided in the AC therefore establishes its dominant share of *PSN services* output.  This contrasts sharply with the inapposite cases relied on by Facebook in which plaintiffs attempted to use a defendant's share of *some other market* to indicate dominance in the relevant market.  Mem. 8-10; *see, e.g.*, *Rick-Mik Enters. Inc v. Equilon Enters. LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (defendant's dominant position as a seller in one market did not indicate dominant position as a buyer in a different market); *Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423-24 (9th Cir. 2020) (share in wholesale market did not suggest share in retail market); *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) (dominant position in broad market did not indicate dominant position in smaller submarket); *Maris Distributing Co. v. Anheuser-Busch Inc.*, 302 F.3d 1207, 1214 (11th Cir. 2002) (rejecting attempt to infer market power in the relevant market from defendant's dominant position in another market).

**Third**, Facebook attacks MAUs and DAUs because they do not reflect a person's *intensity* of use "within a day (for DAUs) or within a month (for MAUs)."  AC ¶ 204; Mem. 12.  But this is immaterial because the FTC has also provided allegations regarding time spent: each metric is a somewhat different way of measuring PSN services usage by consumers, and thus output by PSN service providers.  Notably, Facebook's share generally *increases* as one moves from less granular metrics to more granular ones (that is, from MAUs to DAUs to time spent).  AC ¶¶ 199-201, 204.  This suggests that MAUs and DAUs are *conservative* indicators of

7

Facebook's competitive significance in the PSN services market. AC ¶ 204.

**Fourth**, Facebook assails MAUs and DAUs because "the same individuals may (and often do) use more than one service[.]" Mem. 12. That assertion is not an obstacle to calculating market shares in this case or any other: a person's consumption of a product from multiple providers is reflected in the denominator used to calculate market shares. Here, if a user were to visit Facebook Blue and Snapchat in the same day, both visits would be included in the denominator used to calculate all PSN service providers' market shares.

**Finally**, equally unavailing is Facebook's suggestion that Comscore's *data* is unreliable because of an unremarkable disclaimer that Comscore did not review the FTC's *analysis* of its data. AC p. 81 n.1; Mem. 7-8. This merely reflects the reality that Comscore sells data, not antitrust analysis. Comscore data is relied on by marketplace participants, as well as by other competition enforcers (AC ¶¶ 196-97, 203), and unquestionably provides an appropriate input for the FTC's analysis. *See, e.g.*, *Bazaarvoice*, 2014 WL 203966, at *32.

In any event, the question at this stage is not whether the AC identifies the perfect source of data, but instead whether the AC's allegations, taken as true, state a claim. Any disputes over the methodology or data employed by the FTC in calculating shares are properly addressed in expert reports and at trial, on a full record, not at the pleading stage. *See, e.g.*, *CollegeNet*, 355 F. Supp 3d at 959 (disputes about complaint's market share calculations not appropriate at the pleading stage); *U.S. v. Anthem, Inc.*, 2016 WL 11755535, at *7-*8 (D.D.C. Sept. 30, 2016) (recommending denial of motion to compel revelation of "market share calculations and the methodology used to reach those calculations" prior to expert report), *R & R adopted*, 2016 WL 11755527 (D.D.C. Oct. 14, 2016) (denying motion in relevant part).

Indeed, courts do not require perfect market share data even at trial. *See, e.g., United*

*States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 207 (D.D.C. 2017) ("While economic measures play a role in antitrust analysis, plaintiffs need not present market shares . . . with the precision of a NASA scientist.  The closest available approximation often will do.") (internal quotations omitted); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) ("A reliable, reasonable, close approximation of relevant market share data is sufficient . . . ."); *United States v. SBC Commc'ns, Inc.*, 1999 WL 1211458, at *15 (D.D.C. Aug. 2, 1999) (approving use of "subscriber data [] to estimate market shares because those data are more readily available," even though "other measures of market share may provide a more precise indication of market concentration or a firm's competitive significance"); *Bazaarvoice*, 2014 WL 203966, at *32 ("The data that exist regarding this market are imperfect, in part because the market is relatively new.  But that does not mean that one should ignore the existing data or the market realities.").

Here, the AC's market share allegations, AC ¶¶ 181-204, far exceed the level of detail provided in other successful, fully litigated, antitrust complaints.  *See, e.g.*, Complaint, *United States v. Microsoft Corp.*, 1:98-cv-01232, 1998 WL 35241886 (D.D.C., May 18, 1998) ¶ 58. And they far surpass the meager allegations that have led to dismissal in other cases.  Op. 28, 31 (citing, *inter alia*, *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (complaint identified no other market participants) and *EuroTec Vertical Flight Sols. LLC.  v. Safran Helicopter Engines S.A.A.*, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (complaint did not allege market shares beyond "the conclusory statement that defendants have 'a market share over 50 percent'")).

### 3. The AC Alleges Significant Barriers to Entry in the PSN Services Market

The AC also adequately pleads the second prong of an indirect showing of monopoly power by alleging facts that describe the significant entry barriers that protect Facebook's

dominant position.  AC ¶¶ 212-17; *cf. Microsoft*, 253 F.3d at 51.  Entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1439 (9th Cir. 1995) (citations omitted).

The AC alleges in detail that Facebook's position is insulated by entry barriers in the form of direct network effects and switching costs, AC ¶¶ 212-13, which are well established in case law and economic literature as factors that create barriers to entry.  *See, e.g.*, *Microsoft*, 253 F.3d at 56 (finding that network effects impose a barrier to entry in Intel-compatible PC operating systems); *Bazaarvoice*, 2014 WL 203966, at *50 (defendant benefited from "a network effect that is a significant and durable competitive advantage for [defendant]"); Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. Chi. L. Rev. 1, 9 (2001) ("[C]onsumers can become 'locked in' to a particular network. . . .  This lock-in effect, in turn, makes entry or expansion by rivals more difficult because they cannot attain a critical mass of customers."); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473, 476-77 (1992) (holding that consumers' switching costs were a primary factor supporting defendant's market power).

The AC also describes how multiple well-financed firms have tried and failed to enter the U.S. PSN services market, and how the remaining market participants, such as Snapchat and MeWe, have not dented Facebook's dominant share.  AC ¶¶ 185-89.  *Cf. Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 971 (10th Cir. 1990) (finding substantial entry barriers where "no other entrant remotely approached [defendant's] domination of the market"); *Rebel Oil Co.*, 51 F.3d at 1440 ("Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals.").

Facebook's critiques of the AC's entry barrier allegations are unpersuasive.  Facebook

10

first repeats the logically flawed assertion that entry barriers must be low because the AC alleges

that excluded firms posed nascent threats to Facebook's monopoly power. Mem. 13-15. This

tension would exist in any Section 2 case: for example, in *Microsoft* the Court of Appeals found

no tension between the structural "applications barrier to entry" and the existence of nascent

threats that might "erode" the barrier absent Microsoft's anticompetitive conduct. 253 F.3d at

53-56. In any event, any supposed tension provides no basis for a motion to dismiss, because it

cannot erase the AC's specific factual allegations that network effects form a barrier to entry

(e.g., AC ¶¶ 4, 21, 65), that Facebook itself recognizes high entry barriers (AC ¶¶ 66, 212-13,

216) and that many entrants have failed (AC ¶¶ 185-89).

Facebook's other arguments likewise attempt to dispute or contradict the AC's specific

factual allegations. Facebook points to the growth or size of firms outside the relevant market,

Mem. 14, but that does not contradict the presence of entry barriers for PSN services. Facebook

also suggests that there are an infinite number of possible social mechanics that a new entrant

could invent "limited only by human ingenuity and imagination." Mem. 16. But that factual

assertion contradicts the words of Facebook's own CEO, who wrote that "there are network

effects around social products and a finite number of different social mechanics to invent." AC ¶

66. Facebook's attempt to dispute its own CEO's analysis is entitled to little weight even on a

full record, and certainly cannot provide the basis for dismissal on the pleadings. *See, e.g.*,

*Anthem, Inc.*, 236 F. Supp. 3d at 198 ("defendants' own ordinary course of business operations"

provide "real world evidence").

Finally, Facebook argues that entry barriers do not exist because there might be a

technological transition in the future that puts new competitive pressure on the company. Mem.

16. That possibility has no bearing on the AC's allegations that Facebook has been a monopolist

for a decade and remains one today, underscoring the significant barriers to entry.

**B. The AC Also Pleads Facebook's Monopoly Power via Direct Evidence**

The AC pleads facts indicating, through direct evidence, that Facebook possesses monopoly power over U.S. PSN services. These facts provide an alternative to, and further confirmation for, the indirect showing of monopoly power described above.

"Monopoly power is the power to control prices or exclude competition," *Microsoft*, 253 F.3d at 51, and it is well established that market power can manifest in reduced quality and service, in addition to higher prices. FTC Brief in Opposition ("BIO," ECF No. 59) 7; *see also* Herbert Hovenkamp, *Digital Cluster Markets*, COL. BUS. L. REV. at 25 (forthcoming 2021) ("quality operates as a surrogate for price" for market power purposes). Here, the AC pleads facts indicating both Facebook's ability to control "price" and quality for PSN services, and to exclude competition. First, the AC alleges that Facebook, lacking a PSN services competitor of significance, has been able to cause significant user dissatisfaction, without losing significant user business. AC ¶ 206-207 (describing multiple public revelations of Facebook's abuse of user data and privacy). As the AC explains, "the ability to withstand significant user dissatisfaction while experienc[ing] a minimal loss of user engagement" is an indicator of market power. AC ¶¶ 206; *see also Byars v. Bluff City News Co.*, 609 F.2d 843, 853 n.26 (6th Cir. 1979) (finding "strong support to plaintiff's contention that [defendant] possesses monopoly power" in evidence that monopolist provided "inferior service at greater cost which the small retailers were forced to bear since they had nowhere else to turn").

Second, the AC pleads facts indicating Facebook's ability to exclude competitors and impede competition. In particular, the AC alleges that Facebook's commanding position as a PSN service provider allows it to shape the success or failure of other applications through API access decisions, and thus gives Facebook the power to impose restrictive agreements on

developers to deter them from competing.  AC ¶¶ 130-63, 210; *see also id.* ¶ 155 (Facebook's termination of Path's "access to key API functionality" slowed Path's growth "significantly"), *id.* ¶ 156 (Circle's "daily new users dropped from six hundred thousand per day to nearly zero"). These factual allegations indicate Facebook's ability to induce other firms not to compete with it, and to impede the growth of actual and potential rivals, and thus support a direct inference of monopoly power.  Hovenkamp, *Digital Cluster Markets* at 25 (noting that the FTC's Amended Complaint alleges exclusionary contracts that "would not have been able to succeed in the absence of market power" and "[t]hat claim, if factually supportable, also succeeds"); *see also, e.g.*, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005) (finding direct evidence from history of excluding competitors); *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 110 (D.D.C. 1999) (Microsoft "greatly imped[ed] Java's progress . . . with a series of actions whose sole purpose and effect were to do precisely that"); *Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc.*, 789 F. Supp. 2d 1133, 1145 (D. Minn. 2011) (allegations of exclusion of competitors sufficient to allege market power).

Further, the AC alleges that Facebook has for years achieved sustained high profit margins, which dwarf the profit margins of its nearest rival (which has never even turned a profit), and far exceed the margins earned by the average firm in the S&P 500 information technology sector.  AC ¶¶ 208-09.  While Facebook does not charge users a nominal price for using its PSN services, Facebook does serve them advertisements, and generates nearly all of its revenue and profits by doing so.  AC ¶¶ 46, 52.  Thus, as alleged, "Facebook's durable monopoly power over users is a significant driver of" its enormous profits.  AC ¶ 208.  Sustained high profits can indicate monopoly power.  *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("[H]igher-than-competitive profits [are] a strong indication of market power[.]").

13

The foregoing factual allegations, individually and taken together, indicate monopoly power. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007) (indirect and direct evidence of monopoly power, including ability to extract supra-competitive pricing); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (allegations of high profit margins and setting supra-competitive prices).

Facebook's contrary arguments are unpersuasive. To start, Facebook repeats the spurious arguments that it cannot have market power because the price of its product is nominally "zero," Mem. 16, and that it is purportedly novel for market power to present in the form of reduced quality, including abuse of user data and privacy. Mem. 17-19. As explained previously, these assertions are bad law and bad economics, because the exercise of market power can manifest in ways other than increases in nominal prices charged to consumers. BIO 7-8.

Next, Facebook invents a requirement that stating a claim of monopoly power requires a complaint to specify a competitive baseline—such as a specific level of privacy—that would prevail absent monopoly power. Mem. 17-18. To the contrary, courts have found direct evidence of monopoly power without defining a competitive baseline even on a full trial record. *Microsoft*, 253 F.3d at 57; *see also Microsoft*, 84 F. Supp. 2d at 28 (citing Microsoft's conduct as direct evidence of monopoly power).

Further, Facebook ignores the specific factual allegations that underscore that the PSN services market is not competitive. As detailed in the AC, Facebook is aware that other services are not substitutes for PSN services. AC ¶ 177 (YouTube not cannibalizing Facebook, and YouTube and Facebook serve "disjoint use cases"); *id.* (TikTok services a "very different job" and is "not directly competing in the core areas of focus for our business"). And Facebook is aware that it has a commanding position as a provider of PSN services that deters entry and gives

14

it power over users.  AC ¶ 212 ("Why are we hard to compete with.  Your friends are here."); *id.*
¶¶ 212-13, 216 (users face significant switching costs and Facebook's comprehensive directory
of people confers "a huge structural advantage").

Moreover, the AC specifically alleges that users suffer due to a lack of PSN services
competition, AC ¶¶ 9, 98, 206-07, 222, bolstered by Facebook's own recognition that if it faced
"real competition" and consumers had "real choice" for PSN services, it would be forced to
provide better quality and service to users.  AC ¶ 187 (Facebook executives feared the successful
entry of Google+ as a PSN alternative would "have the same impact on us as competition has in
every industry—we will have to be better to win [and] our margins may go down").  Facebook
cannot prevail on a motion to dismiss simply by ignoring these allegations, or by offering
contrary assertions that the market is competitive.  Mem. 16-17 (injecting purported facts that
Facebook is a "price cutter" and that output has "exploded").

Finally, Facebook claims that sustained high profits do not indicate market power, Mem.
19, but in doing so, once again contradicts its own executives' statements, AC ¶ 187 (COO
feared that competition in PSN services would mean "our margins may go down"), and ignores
the allegations that Facebook's monopoly power over users drives its profits.  AC ¶¶ 46, 52, 187.

## II.    The Complaint Details How Facebook Has Maintained Its Monopoly Position Through an Anticompetitive Course of Conduct

The AC alleges that Facebook has maintained its monopoly power through a nearly
decade-long effort to suppress and deter competitive threats through strategies other than
competition on the merits.  Specifically, Count 1 alleges that Facebook has engaged in
anticompetitive conduct by acquiring Instagram and WhatsApp, which were competitive threats
to its dominance.  Count 2 alleges that Facebook's acquisitions of Instagram and WhatsApp,
along with its agreements and practices related to Facebook Platform, constitute a course of

anticompetitive conduct. Both counts state claim Section 2 claims. And when assessing each

count, the overall anticompetitive effect of Facebook's course of conduct must be considered.

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); BIO 20-21.

### A. Count 1 States a Claim that Facebook Maintained Its Monopoly Through the Acquisitions of Instagram and WhatsApp

#### 1. The AC Pleads Facts Establishing that Facebook's Acquisitions of Instagram and WhatsApp Constitute Anticompetitive Conduct

It is "well established" law, Op. 52 (citing *Grinnell*), that a monopolist's acquisition of

any "actual or likely potential competitor is properly classified as anticompetitive" conduct that

represents a core concern of Section 2, "for it tends to augment or reinforce the monopoly by

means other than competition on the merits." Areeda & Hovenkamp ¶ 701a; *see also id.* ¶ 701c

(a monopolist's "[a]cquisition of any firm with nontrivial potential as a substantial rival serves to

maintain monopoly power"); *id.* (a monopolist's "acquisition of any firm that has the economic

capabilities for entry and is a more-than-fanciful possible entrant is presumably anticompetitive,

unless the acquired firm is no different in these respects from many other firms"); BIO 21-23.

Here, the AC provides detailed factual allegations that Facebook engaged in such

anticompetitive conduct by acquiring an actual rival (Instagram) and a threatening potential rival

(WhatsApp) rather than outcompeting them. AC ¶¶ 80-85, 93-94, 112, 115-118, 120. Further,

the claim that Instagram and WhatsApp posed competitive threats to Facebook is supported by

detailed factual allegations from Facebook's records and other evidence, *see, e.g.*, AC ¶¶ 80-100;

107-125, and thus is far from speculative. Mem. 26-28. Such allegations therefore comfortably

plead that Facebook's acquisitions of Instagram and WhatsApp satisfy the anticompetitive

conduct element of a Section 2 claim by neutralizing actual and potential competitive threats.

*See, e.g.*, *Grinnell*, 384 U.S. at 576 (acquisitions "eliminated any possibility of an outbreak of

competition that might have occurred"); *cf. Impax Labs., Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir.

2021) ("Eliminating potential competition is, by definition, anticompetitive."). In addition, the AC details the resulting harm to users from this disruption of the competitive process. AC ¶¶ 105, 127, 220-21 (loss of alternative suppliers, loss of a competitive check on Facebook, and loss of sources of innovation and competitive decision-making); *cf.* Areeda & Hovenkamp ¶ 701c (identifying each of these as harms from a monopolist's acquisition of even a "minor" rival).

## 2. Facebook's Rehashed Arguments Are Unavailing

Facebook's arguments that the Court must nonetheless dismiss Count 1 are largely rehashed from its prior briefing, *see generally* BIO 23-30, and lack merit, as explained below.

***First***, Facebook again erroneously suggests, in various forms, that a Section 2 plaintiff must establish a change in price or output, or other specific change in consumers benefits, flowing from a monopolist's anticompetitive conduct. Mem. 26-28 (asserting that the AC must allege that "but for" the Instagram and WhatsApp acquisitions "consumers would have better PSNS products today," or that "Instagram and WhatsApp would have achieved the same growth in a better . . . way for consumers").

Section 2 imposes no such burden of pleading or proof; it requires only that the monopolist harm the "competitive *process*." *Microsoft*, 253 F.3d at 58-59; *see also* BIO 23-26. As described above, the AC alleges that Facebook harmed the competitive process by acquiring the nascent threats it identified in Instagram and WhatsApp, after it failed in its efforts to compete against them. BIO 21-24 (citing cases); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (monopolist's conduct foreclosed ability of rival to compete, "which harmed competition itself"). Consumer harm flows inherently from a monopolist's maintenance of its position through conduct that is not merits competition, and a plaintiff is not required to show a specific change in market outcomes. BIO 24-25 (citing cases); *see also Impax*, 994 F.3d at 495 ("The fact that generic competition was possible, and that [the defendant] was willing to pay a

large amount to prevent that risk, is enough to infer anticompetitive effect.").

Relatedly, Facebook suggests that the AC is deficient because "there is no possible way to predict just what would happen" absent Facebook's anticompetitive acquisitions.  Mem. 27 (quoting *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002)).  But this flatly contradicts binding precedent: where a monopolist eliminates nascent threats "*the defendant* is made to suffer the uncertain consequences of its own undesirable conduct."  *Microsoft*, 253 F.3d at 79 (emphasis added) (where nascent threats are eliminated, "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the exclusionary conduct," and as a result a plaintiff need not prove "that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct").  Indeed, in *Microsoft*, the Court of Appeals upheld liability even though the factual findings conclusively established a *lack* of evidence that the nascent threats targeted by Microsoft would have "ignited genuine competition" in the relevant market absent Microsoft's conduct.  *Id.* at 78-79 (quoting ¶ 411 of the district court's factual findings, 84 F. Supp. 2d 9, 111-12 (D.D.C. 1999)).

Further, if Facebook means to posit that the acquisitions were justified, this factual argument is not cognizable on a motion to dismiss.  *See BRFHH Shreveport, LLC*, 176 F. Supp. 3d at 624-25 (denying motion to dismiss and rejecting defendant's justification defense because it raised factual issues).  Indeed, any such claimed justification faces significant hurdles, in light of the serious harm to the competitive process when a monopolist acquires a potential threat. Areeda & Hovenkamp ¶ 701h ("[A]n efficiency defense cannot be allowed in monopoly cases in the absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms.").

**Second**, Facebook repeats its claim that Section 2 condemns only acquisitions that result

18

in "shuttering" assets or some other special circumstance. Mem. 25-26. This is wrong: the core of a Section 2 claim is not the shuttering of assets, but the exclusion of potential constraints on monopoly power—and prior cases did not involve a closing of assets. BIO 23 (citing *Grinnell* (where monopolist continued to operate acquired firms) and *Standard Oil* (where monopolist continued to operate some acquired oil refineries)).

Facebook is also wrong in suggesting that the AC seeks to "punish" it for offering products to consumers. Mem. 29-30. The AC does not claim that Facebook is violating the law by currently offering products branded "Instagram" and "WhatsApp." Rather, the AC alleges Facebook has engaged in anticompetitive conduct by acquiring Instagram and WhatsApp, and that Facebook's acquisition strategy not only neutralized both firms as innovative rivals and direct threats but also maintains the network effects entry barrier that insulates Facebook's monopoly power, just as Facebook intended. *See, e.g.*, AC ¶¶ 66, 67.

**Third**, there is no merit to Facebook's argument that a Section 2 complaint must allege that a challenged acquisition combined firms with market shares that "exceed[] prescribed numerical thresholds." Mem. 22-23. To the contrary, as described above, the AC alleges the core of a Section 2 acquisition claim—that Facebook targeted actual (Instagram) and potential (WhatsApp) competitors for acquisition. *Supra* § II.A.1. A monopolist can violate Section 2 through anticompetitive conduct—including an acquisition—that eliminates a nascent threat that does not even participate in the relevant monopolized market: for example, in *Microsoft*, the eliminated middleware threats did not participate in the relevant market for operating systems. *Microsoft*, 253 F.3d at 54 ("Nothing in § 2 of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes."); *see also* Areeda & Hovenkamp ¶ 701a, d (acquisitions of potential competitors by dominant

firms actionable under Section 2).  Indeed, allegations of "prescribed numerical thresholds" are not required even in a Section 7 case.  *Cf. United States v. Continental Can Co.*, 378 U.S. 441, 458 (1964) ("Market shares are the primary indicia of market power but a judgment under § 7 is not to be made by any single qualitative or quantitative test.").

*Fourth*, Facebook also errs in repeating the suggestion that a Section 2 claim must allege facts that might satisfy Section 7's potential competition doctrine.  Mem. 23-24; *id.* 27.  Here, as set forth above, the AC explains in detail that Facebook's acquisition of Instagram and WhatsApp eliminated nontrivial threats to Facebook's monopoly power.  *Supra* § II.A.1.  It is "well established" law, Op. 52, that such acquisitions constitute anticompetitive conduct, and no authority suggests that a monopolist's anticompetitive conduct violates Section 2 only if it eliminates threats that might satisfy the potential competition doctrine.  BIO 29-30 (discussing authorities indicating that Section 2 and Section 7 set out distinct violations and detailing how *Microsoft* condemned conduct directed at nascent threats, without finding that those threats were imminently about to enter the relevant market or displace Microsoft's dominant position).

Relatedly, Facebook misstates the law in claiming that Section 2 condemns a monopolist's elimination of a nontrivial threat only if the acquisition was "likely to harm consumers at the time the transactions closed."  Mem. 27 (citing Areeda & Hovenkamp ¶ 1205a, which analyzes acquisitions under Section 7).  This requirement does not appear in any Section 2 cases, and even in the Section 7 context Supreme Court precedent states otherwise.  *United States v. ITT Continental Baking Co*., 420 U.S. 223, 242 (1975) ("[T]here can be a violation [of Section 7] at some time later even if there was clearly no violation—no realistic threat of restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition.").

*Fifth*, Facebook recycles its already-rebutted argument that the FTC's prior HSR review

20

should increase the FTC's burden of pleading or proof. Mem. 20-22. HSR filings do not result in acquisitions being approved or blessed by the FTC or DOJ. BIO 27-29. Rather, the HSR Act merely established reporting requirements for acquisitions over a certain size, while providing explicitly that the FTC or DOJ can proceed at any time under any provision of law to challenge any acquisition—whether it is HSR-reportable or not. None of Facebook's cited authority suggests the contrary. BIO 28-29 (distinguishing *Eastman*, *Texaco*, and *Trinko*).

**Finally**, Facebook inaccurately suggests that the AC posits "strict liability for acquisitions." Mem. 29. The AC alleges that a monopolist eliminated a rival (Instagram) and a meaningful potential entrant (WhatsApp), and thereby extinguished specific nascent threats to its dominant position. These allegations do not imply that every acquisition is unlawful.

### 3. The AC's Allegations Regarding "Other Acquisitions" Provide Supporting Factual Context

Facebook also takes issue with the AC's allegations regarding acquisitions other than Instagram and WhatsApp. The AC alleges a course of conduct, and it is inappropriate to parse each factual allegation to determine whether it is sufficient to state a claim. In any event, the AC does not allege that the acquisitions of Onavo (AC ¶ 70), tbh (AC ¶ 72), Octazen (AC ¶ 74), Glancee (AC ¶ 75), and EyeGroove (AC ¶ 76) each *standing alone,* violated the antitrust laws. Instead, the allegations provide factual context for Facebook's anticompetitive course of conduct: they establish that Facebook identified potential threats in order to acquire them (using Onavo), deprived rivals of a key technology to "slow some competitors down" (Octazen), and made it a practice to spend millions to purchase—and shutter—innovative firms to squelch potential rivals (Glancee, EyeGroove, tbh). These factual allegations provide relevant evidence that the intent of Facebook's course of conduct was to interfere with rivals through means other than competition on the merits. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

21

585, 602 (1985) ("Intent is . . . relevant to the question of whether the challenged conduct is fairly characterized as exclusionary or anticompetitive."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230-31 (S.D.N.Y. 2019) (denying motion to dismiss product design claims and noting that overall course of conduct and intent evidence rendered claims plausible).

### B. Count 2 Alleges an Ongoing Monopoly Maintenance Offense Comprising Anticompetitive Acquisitions and Anticompetitive Platform Conduct

Count 2 alleges that Facebook maintained its monopoly power through a course of conduct that, as in *Grinnell*, involved both acquisitions and exclusionary conduct—here, anticompetitive agreements and practices related to Facebook Platform. *See Grinnell*, 384 U.S. 563, 576 (monopolization course of conduct comprising "restrictive agreements," "pricing practices," and "acquisitions"). These agreements and practices are exclusionary under principles articulated in *Microsoft* and other cases and lack a procompetitive justification. *Infra* § II.B.1. Such conduct is not governed by *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, (2004) (hereinafter *Trinko*), but even if collapsed into a formalistic unilateral refusal to deal framework, it is still actionable. *Infra* §§ II.B.2., II.B.3.

### 1. The FTC's Allegations Regarding Facebook's Agreements with Developers Support a Claim for Monopoly Maintenance

Monopolists have "myriad" "means of illicit exclusion." *Microsoft*, 253 F.3d at 58. Anticompetitive conduct "can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). "Although 'the standard for a § 2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (citing Areeda & Hovenkamp ¶ 777a).

22

Nonetheless, several key principles serve as a common thread in assessing a monopolist's challenged conduct.  ***First***, conduct is anticompetitive or exclusionary if a monopolist acts "through something other than competition on the merits" to "significantly reduc[e] usage of rivals' products."  *Microsoft,* 253 F.3d at 65; *see also New York v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).  Such conduct includes a monopolist's use of agreements, threats, or other arrangements to prevent third parties from dealing with potential rivals.  *See, e.g., Microsoft*, 253 F.3d at 60-61 (Microsoft's licenses with OEMs "prevent[ed] many OEMs from distributing [rival] browsers"); *see also Lorain Journal Co. v. United States*, 342 U.S. 143, 148 (1951); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802-803 (8th Cir. 1987).  Such conduct also includes inducing or coercing a potential rival to forgo competition.  *See, e.g., FTC v. Actavis*, 570 U.S. at 157-58 (agreements with potential rivals to "prevent the risk of competition"); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("agreements not to compete" violate Section 2); *AT&T*, 552 F. Supp. at 160-62 (monopolist's practices "deterred" competition).

***Second,*** in evaluating whether a monopolist's conduct is impermissibly exclusionary, courts look to its effects.  Courts broadly recognize that a monopolist violates Section 2 when its "exclusionary acts . . . prevent[] the effective distribution and use of products that might threaten that monopoly," including when it enters agreements that "help keep usage of" such products "below the critical level necessary for [that firm] or any other rival to pose a real threat to [its] monopoly."  *Microsoft*, 253 F.3d at 58, 71.  Where otherwise neutral conduct produces such an effect, it "may be impermissibly exclusionary when practiced by a monopolist."  *Dentsply*, 399 F.3d at 187; *see also Microsoft*, 253 F.3d at 70.  Further, "as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a

defendant's continued monopoly power," because "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft,* 253 F.3d at 79.

**Third**, a monopolist's anticompetitive conduct is condemned where it cannot be justified by procompetitive considerations. *See New York v. Actavis*, 787 F.3d at 652 (citing *Microsoft*, 253 F.3d at 58-59).

Applying these principles, the AC plausibly alleges that Facebook violated Section 2 by entering agreements with and imposing conditions upon developers that prevented the developers from emerging as threats to Facebook, and also interfered with those developers' dealings with Facebook's potential rivals.

**First**, the AC alleges that Facebook engaged in "something other than competition on the merits" *Microsoft,* 253 F.3d at 65, when it "required that developers seeking to use Facebook Platform and access commercially significant APIs" agree to and abide by anticompetitive contract terms. AC ¶ 133. Developers agreed "that their apps would not compete with Facebook," AC ¶ 133; *see also id.* ¶ 141, and that they "would not promote competitors" through delineated actions. AC ¶ 133; *see also id.* ¶¶ 137, 140, 141. Just as the OEMs in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282-83 (3d Cir. 2012), agreed to remain loyal to the monopolist Eaton (in exchange for rebates), and the Internet Access Providers in *Microsoft* agreed not to "promote" non-Microsoft browsers (in exchange for favorable icon placement), *Microsoft*, 253 F.3d at 68, the AC alleges that many developers agreed to and did refrain from enabling, promoting, or becoming rivals to Facebook in exchange for valuable platform interconnections. AC ¶¶ 8, 148, 154.

These developers' loyalty, whether coaxed or forced, was further cemented by "Facebook's decision to aggressively enforce these provisions," sending "the message" that "competing with Facebook would come at a serious cost." AC ¶ 154; *see also id.* ¶ 160. Just as Microsoft's threats to Intel and Eaton's coercive terms in *ZF Meritor* worked to ensure third parties' loyalty to those monopolists, Facebook struck forcefully to ensure developers' acquiescence. Specifically, certain developers' failure to comply with Facebook's conditions resulted in them losing "access to those interconnections, forcing some out of business." AC ¶ 8. Facebook "terminated API access of several third-party developers because their apps allowed users to move their Facebook contacts into Google+ or another social network." AC ¶ 138. Further, when Facebook worried that app developers themselves might emerge as competitive threats, it cut off API functionality access to threatening apps. AC ¶¶ 142-43, 155-58. These actions thwarted the ability of these app developers to work or interconnect with Facebook rivals and impeded their ability to emerge as rivals themselves. *See Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484, 488 (1st Cir. 1952) (exclusion of competitor by prohibiting him from "hawking his wares beside them any longer at the very moment of his affiliation with a potentially lower priced outsider . . . establishes a prima facie case of the purpose to monopolize").

**Second**, the AC alleges that Facebook's conduct and agreements in fact harmed competition, as Facebook successfully coaxed, pressured, or induced developers to remain loyal and not compete directly or promote competition from rivals. AC ¶¶ 136-137, 146, 148, 154. The allegation that Facebook harmed competition is buttressed by factual allegations that: APIs provided developers with a valuable tool for growth and distribution, AC ¶¶ 35-39; Facebook's agreements sent a "message" to developers to avoid competing or helping competitors or else

lose access to this valuable tool, AC ¶ 144; specific apps did in fact make changes to their products to maintain access to relevant APIs, AC ¶ 143; and a developer that became aware of Facebook's enforcement recognized the implication of non-compliance and was "super concerned." AC ¶ 160. And Facebook's agreements broadly prohibited replication of Facebook's functionality, inducing apps to refrain completely from competing with Facebook in order to retain access to valuable APIs. AC ¶¶ 141-49, 160.

Further, Facebook's Platform agreements and practices produced the additional anticompetitive effect of "exclud[ing] potential competitors from effective distribution channels and thus den[ying] these firms the scale needed to emerge as meaningful competitors." AC ¶ 219. This allegation is bolstered by the AC's concrete allegations that Facebook's termination of API access frustrated the growth of specific potential competitive threats. AC ¶¶ 155 (Path); 156 (Circle); 157 (slowing Vine's growth); 158(a)-(b) (Voxer and MessageMe "shut down"). As such, Facebook's anticompetitive agreements and practices directly "hindered the ability of individual businesses to threaten" its monopoly. AC ¶ 162.

The allegations of harm are further bolstered by the AC's allegations that Facebook intended and expected that this conduct would "harm the prospects for—and deter the emergence of—competition." AC ¶ 137; *see also id.* ¶ 146. Anticompetitive effect can be shown through proof of a monopolist's internal understanding that conduct will have the desired effect. *See Microsoft*, 253 F.3d at 34, 77 (internal documents and testimony confirmed "anticompetitive effect and intent" of Microsoft's threats to Intel). Here, the AC alleges "the immediate impetus for" Facebook's policies was competition from Google+, "the real reason for the discriminatory denial of access was ████████████████████████████████████████████████

██████ and ████████████████████████████ and Facebook knew that enforcement would likely

have the effect of "altering / killing prospects of many startups[.]" AC ¶¶ 137, 146, 149; *see also id.* ¶¶ 145-46 (enforcement targeted at "top 5 messaging apps," apps that *added* relevant functionality, or were particularly threatening based on "'significant volumes of users and/or a high growth rate.'"). Such specific allegations regarding Facebook's anticompetitive motivations are highly probative of "the likely effect of the monopolist's conduct," *Microsoft*, 253 F.3d at 59, and strongly support the inference that Facebook's conduct was intentionally designed to—and did—harm competition and limit consumer choice.

The foregoing detailed factual allegations sufficiently allege that Facebook's conduct "in fact," Op. 48, harmed competition, both by deterring and preventing direct competition from app developers and by interfering with app developers' ability to work with competing PSN providers. Further, the AC's allegations are not undermined by the theoretical possibility that some non-competing apps, such as a chess app, could have created two separate versions, one connected to Facebook and one not. Op. 48-49. The AC provides no basis for concluding that "app splitting" would be efficient or desirable from apps' point of view, nor that nascent PSN threats, which benefit from a unified social graph, AC ¶ 167, would have been able to bifurcate their products in this way. To the contrary, the AC's allegations about Facebook's aims and expectations in adopting its policies, *supra*, are inconsistent with the conclusion that apps could easily have found a workaround.

*Third*, while it is not a plaintiff's burden to rebut procompetitive justifications on the pleadings, the AC alleges that Facebook has no procompetitive justification sufficient to justify its anticompetitive Platform conduct. AC ¶ 163; *see Microsoft*, 253 F.3d at 59; *New York v. Actavis*, 787 F.3d at 652. The AC supports this allegation with further concrete factual allegations that: (1) Facebook's anticompetitive restrictions for developers were not an essential

part of Facebook Platform but rather were a change that the company implemented only once it feared the emergence of competitive threats, AC ¶¶ 131-32, 134, 137; and (2) the purpose and intent of Facebook's Platform related conduct was to "harm the prospects for—and deter the emergence of—competition, including personal social networking competitors." AC ¶ 137.

## 2. Facebook's Agreements with Developers Are Not Unilateral Refusals to Deal

Facebook repeats the argument that the FTC has alleged a unilateral refusal to deal governed by *Trinko*, Mem. 35, ignoring detailed allegations that Facebook provided valuable API access to developers on the condition that developers *agree* to refrain from competing with Facebook. *See, e.g.*, AC ¶¶ 8, 79, 132-33, 136, 140-41, 147-48, 154, 161-62, 238, 240. This distinction is critical because over a century of Supreme Court precedent establishes that "antitrust law is far more tolerant of unilateral behavior," Op. 47, than it is of concerted action.

While the Sherman Act does not restrict the "right of [a] trader or manufacturer" "to exercise his own independent discretion as to parties with whom he will deal," *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), the Supreme Court has clearly distinguished this "right" from actions to restrain counterparties from dealing with a monopolist's rivals, *see, e.g., Microsoft*, 253 F.3d at 62, or from competing with a monopolist. *See, e.g., Otter Tail*, 410 U.S. at 377 ("agreements not to compete, with the aim of preserving or extending a monopoly" violate Section 2). For example, in *Eastman Kodak*, the Court rejected Kodak's argument that Kodak's policy of selling replacement parts to third parties "only if they agreed not to buy service from [Independent Service Operators]," was equivalent to "a unilateral refusal to deal." 504 U.S. at 463 & n.8. As the Court explained, "[a]ssuming, arguendo, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not." *Id.* Likewise,

in *Trinko*, the Court explained that specific standards apply to Section 2 challenges to unilateral refusals to deal because of "the difficulty of identifying and remedying anticompetitive conduct *by a single firm*." 540 U.S. at 408 (emphasis added).

Put simply, the right described in *Colgate* and *Trinko* does not extend to restraining the dealings of *other* firms. The specific legal standard that applies to Section 2 claims that seek to impose on a monopolist a generalized duty to deal correspondingly does not apply to claims challenging agreements that contain restrictive conditions. *See generally Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013). Rather, courts apply traditional antitrust standards to such claims.

These traditional standards apply to a monopolist's use of agreements with others that are challenged as exclusionary conduct under Section 2. *See, e.g., Microsoft*, 253 F.3d at 70 (monopolization claim based on exclusive contracts that impeded competitor); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 501 (2d Cir. 2004) (monopolization claim based on exclusive supply agreement); *Otter Tail*, 410 U.S. at 377 ("agreements not to compete" state a monopolization claim); *FTC v. Actavis*, 570 U.S. at 157-58 (agreements with potential rivals to "prevent the risk of competition . . . constitutes the relevant anticompetitive harm"). As in *Microsoft*, these agreements may involve terms that altered the way a counterparty operates, at a cost to the counterparty. *See Microsoft*, 253 F.3d at 62 (discussing license agreements with OEMs that "impose[d] significant costs upon the OEMs"); *see generally United States v. Loew's*, 371 U.S. 38, 49 (1962) (licensees agreed to undesired licenses insisted on by distributors).

Applying these standards, courts have made clear that monopolists open themselves up to Section 2 scrutiny by dealing conditionally even if they would not face liability if they refused to deal entirely. For example, a conditional patent license may violate Section 2 if it preserves

monopoly power—even though a patent holder is under no obligation to grant a license at all. *See, e.g., Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 648 (1947); *see also United States v. Gen. Elec. Co.*, 80 F. Supp. 989, 1005-1006 (S.D.N.Y. 1948); Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property § 5.6 (2017). Similarly, in *Microsoft*, the Court of Appeals held that a copyright holder's statutory right to exclude another entirely from use of its copyrighted work does not encompass a privilege to *condition* the use of a copyrighted work on anticompetitive terms. *Microsoft*, 253 F.3d at 63.

The AC amply alleges that Facebook acted to restrain the dealings of others, rather than merely acting unilaterally, by conditioning access to its APIs on the acceptance of anticompetitive terms. Specifically, "developers could only access Facebook's platform if they agreed (i) not to compete with Facebook's core services and (ii) not to facilitate the growth of potential rivals to Facebook." AC ¶ 8; *see also id.* ¶¶ 132-33. And the complaint amply alleges that developers' dealings were restrained by these agreements. AC ¶¶ 8, 148, 154, 159, 161.

Addressing the FTC's prior allegations, the Court suggested that Facebook's conduct should be analyzed as a unilateral refusal to deal, because Facebook's conduct "'conditioned [access] on a firm's status that cannot readily be changed.'" Op. 46 (quoting Herbert Hovenkamp, *FRAND and Antitrust*, 105 CORNELL L. REV. 1683, 1697 (2020)). But the quoted source further explains that a firm's conditioning access on another firm's acceptance of certain terms—such as, here, an agreement not to compete—is *not* an unconditional refusal to deal. *Id.*; *see also Viamedia*, 951 F.3d at 453 (citing same article and stating that "[a] simple refusal to deal is conduct where one firm refuses to deal no matter what," while conditional dealing exists where "one firm will refuse to deal with another firm unless some condition is met.") (quotations omitted).

Moreover, the "considerations of antitrust policy" that counsel a permissive review of a monopolist's unilateral refusal to deal, Op. 35-36, are inapplicable to the agreements described in the AC. First, the AC's factual allegations contradict any suggestion that Facebook's conditions were necessary to provide the incentive to invest in "economically beneficial facilities." Op. 35 (cleaned up). The AC alleges that *prior* to introducing the anticompetitive conditions, Facebook unconditionally provided access to important APIs and assured all developers that "competing applications" would compete "on a level playing field with applications built by Facebook." AC ¶ 26; *see also id.* ¶¶ 136-151. Second, nothing in the AC suggests that this Court will have to act as a "central planner." Op. 35 (cleaned up). While appropriate equitable relief is a question for a later stage, no allegations in the AC suggest that in order to fashion a remedy the Court will need to grapple with detailed questions regarding competitors' access to facilities, such as would have been required in *Trinko*—instead, courts commonly fashion orders prohibiting conditional dealing. *See, e.g., Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *120 (N.D. Cal. Sept. 10, 2021) (injunction prohibiting Apple from imposing conditions on developers). Third, the AC does not suggest that any opportunity for collusion would result from a prohibition of Facebook inducing developers not to compete with it; to the contrary, such a remedy would prohibit anticompetitive concerted action.

### 3. The FTC's Allegations Meet Even the Standards Applicable to Unilateral Refusals to Deal

Even if analyzed under the standards applicable to unilateral refusals to deal, the AC provides sufficient factual allegations to support the conclusion that Facebook's conditions on access to its platform are actionable. Given the "myriad" "means of illicit exclusion," *Microsoft*, 253 F.3d at 58, no universal standard governs all refusal-to-deal claims. Instead, the question is "whether the allegations of [the plaintiff's] complaint fit within existing exceptions" to the

general right to refuse to deal "or provide a basis, under traditional antitrust principles, for
recognizing a new one." *Trinko*, 540 U.S. at 408.  A key consideration is whether a monopolist's
conduct is motivated "by competitive zeal" or "by anticompetitive malice."  *Id.* at 409; *see also*
*In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015)
(proxies for assessing the defendant's "anti-competitive motivation" and "lack of legitimate
business justification[.]").  As this Court has noted, Op. 38, evidentiary proxies for
anticompetitive motivation include a defendant's willingness to forgo short-run profits.  *See*
*Aspen Skiing*, 472 U.S. at 608; *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 673, 675
(D.C. Cir. 2005) (applying *Trinko*).

 Here, the evidentiary proxy is unnecessary because the AC alleges, based on Facebook's
own internal documents, that Facebook's conditions on API access were driven by
anticompetitive motivations and lacked a legitimate business justification.  Facebook's goal was
to "restrict[] access to competitors," with successful apps particularly targeted.  AC ¶ 146; *see*
*also id.* ¶¶ 161-62.  As an employee recognized, the restrictions were "anti user" and a reflection
of not "compet[ing] on our own merits."  *Id.* ¶ 137.  Such evidence strongly supports the AC's
contention that Facebook's conduct violates the antitrust laws—a monopolist's right to refuse to
deal with rivals "does not permit action taken for the purpose of creating or maintaining
monopoly power."  *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 49 (S.D.N.Y. 2020)
(rejecting defendants' argument that "they have no duty to transact business with a competitor").

 In any event, the AC also contains allegations that satisfy the "short-term economic loss"
proxy.  Specifically, the AC concretely alleges that Facebook benefitted from developers' access
to valuable APIs through increased "user engagement with Facebook, which in turn helped to
fuel Facebook's massive advertising profits," AC ¶¶ 8, 25, 147, and made a "deliberate decision

to sacrifice the benefits that cut-off apps would otherwise bring to Facebook, including ad spend" in order to "extinguish[] potential competitive threats and maintain[] monopoly power." AC ¶ 134. Thus, even if "predatory motivation" could be proven only through profit sacrifice, Op. 39, the AC's allegations are sufficient.

Facebook's general course of dealing with developers further indicates that it sacrificed short-term economic benefits to preserve its monopoly position. First, the AC alleges that Facebook continued to provide API access on its standard terms to developers that it did not view as competitive threats, while cutting off developers that threatened its monopoly position. AC ¶¶ 8, 144 ("[S]o we are literally going to group apps into buckets based on how scared we are of them and give them different APIs?"), 145-47. This parallels the behavior condemned in *Otter Tail*, where the defendant power company violated Section 2 when it provided transmission services to non-competing customers but denied access to municipal services that sought to compete with it. 410 U.S. at 370-71, 377-78; *see also Trinko*, 540 U.S. at 410 (leaving *Otter Tail* undisturbed); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (citing *Otter Tail* and stating: "The monopoly supplier who retaliates against customers who have the temerity to compete with him, by cutting such customers off, is severing a collateral relationship in order to discourage competition."). And this case therefore differs from *Trinko*, which involved a monopolist that refused to provide interconnections when each interconnection provided to a rival *necessarily* cost the monopolist a customer it otherwise would have served at a higher (retail) rate of compensation. *Trinko*, 540 U.S. at 409 (refusal to provide interconnections at cost-based rate "tells us nothing about dreams of monopoly").[1]

---

[1] The AC's allegations that Facebook sacrificed immediate benefits in order to increase barriers to entry are sufficient: no authority binding on this court suggests that a refusal to deal is actionable only if "predatory motivation" is its "only conceivable rationale or purpose." Op. 39.

Second, the AC alleges that Facebook voluntarily engaged in prior dealings with developers, in particular, during a sustained period in which it invited developers—including nascent threats—to interconnect with Facebook Platform. AC ¶¶ 26, 29-40. Such a prior voluntary course of dealing further indicates that the monopolist sacrificed profits by changing course, which has supported liability in previous refusal-to-deal cases. *See, e.g., Aspen Skiing*, 472 U.S. at 608; *Viamedia*, 951 F.3d at 463.

Notably, prior case law does not indicate that the economic-loss or prior-dealing proxies must be judged with respect to each specific firm with whom the defendant refused to deal. To the contrary, in *Otter Tail*, the Supreme Court's decision did not focus on a prior course of dealing between the monopolist and a *specific* potential threat to its power. 410 U.S. at 377-78. Instead, the Court focused on the monopolist's dealings with other customers, which demonstrated that it would have been in the monopolist's interest to deal with the potential entrants if not for the monopolist's aversion to the competition that might result. *See also Covad*, 398 F.3d at 673 (affirming dismissal of "refusal to cooperate" claim that alleged neither that defendant "had at one time voluntarily dealt with [plaintiff] *nor that it would ever have been in [the monopolist's] interest to have done so*") (citing *Trinko*) (emphasis added).

Further, the AC contains additional allegations underscoring the problematic nature of Facebook's conduct. In particular, Facebook advanced an "open-first, closed-later" API access scheme through which Facebook induced developers to help it grow, before reversing course by cutting off access. AC ¶¶ 5, 8, 24-42, 142. *Trinko* suggested a reluctance to make dominant firms share "the source of their advantage" and the fruits of their investment, 540 U.S. at 408, 414, but here Facebook grew partly on the back of third-party investment. *Cf. Microsoft*, 253 F.3d at 55 (developers benefited monopolist by writing numerous applications). Facebook's

34

changed course also provides a further reason that its actions with respect to API access had

anticompetitive consequences.  *Cf. PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820-

21 (6th Cir. 1997) (discussing *Kodak* and describing change in policy after lock-in).

Where all the above-described indications of anticompetitive consequences—direct

evidence of anticompetitive purpose, profit sacrifice, prior dealing, and changed course of

conduct—are present, Section 2 jurisprudence is not so narrow and rigid as to require dismissal

of a claim that a monopolist unjustifiably harmed competition by refusing to deal.  To the

contrary, the Supreme Court has recognized that a flexible inquiry is instead required.  *Cf. Trinko*

540 U.S. at 408 (declining to treat the *Aspen Skiing* fact pattern as the exclusive avenue for

stating a claim); *see also Viamedia*, 951 F.3d at 457 ("*Aspen Skiing* factors help case-by-case

assessments of whether a challenged refusal to deal is indeed anticompetitive, even though no

factor is always decisive by itself.").  And, contrary to Facebook's claim, Mem. 38, other courts

have not held that its agreements with developers *cannot* violate the antitrust laws.  BIO 37-38.

### 4.    Count 2 Is Not Barred by the Law of the Case

Facebook contends that the AC's platform allegations are "barred by the law-of-the-case

doctrine."  Mem. 33-34.  That is incorrect for several reasons.  First, that doctrine only applies to

aspects of a court's decision that are "essential to its holding."  *Ferring Pharms., Inc. v. Azar*,

296 F. Supp. 3d 166, 177 (D.D.C. 2018); *see also Bouchet v. Nat'l Urban League*, 730 F.2d 799,

806 (D.C. Cir. 1984).  Here, the Court dismissed the FTC's initial complaint for insufficient

allegations of monopoly power, Op. 2, and the Court's further guidance regarding the platform

allegations, *id.* at 3, was not essential to that holding.

Second, courts are not barred by the law-of-the-case doctrine from "entertaining[] the

same question of law upon a fuller development of the facts."  *Post v. Pearson*, 108 U.S. 418,

422 (1883).  Here, the AC furnishes additional factual allegations that warrant a new assessment, including allegations describing Facebook's anticompetitive agreements (AC ¶¶ 8, 136-41), the value Facebook gained from Platform (AC ¶¶ 24-25, 27-28, 32), and the benefits Facebook sacrificed when it cut off access to third-party apps (AC ¶ 134).

Third, Facebook faces no prejudice if the Platform conduct allegations are considered anew.  *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 235 (D.D.C. 2020) (Boasberg, J.) (declining to apply law of the case when defendant did not rely on nor would be prejudiced by reconsideration of an issue); *see also Dist. No. 1 v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327, 350 (D.D.C. 2014) (same), *aff'd*, 815 F.3d 834 (D.C. Cir. 2016).

Finally, Facebook's cited authorities are inapposite.  *See, e.g., LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (when multiple appeals are taken, decisions on the first appeal should not be revisited on later appeals); *Berryman-Turner v. Dist. of Columbia*, 233 F. Supp. 3d 26, 35-36 (D.D.C. 2017) (amended complaint did not make "any effort" to address deficiency identified in court's original holding).

## III. Section 13(b) Does Not Provide a Basis to Dismiss Count 1 or Count 2

The Court has already determined that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to bring Count 1 of the AC, Op. 50-52, as Facebook appears to concede. Section 13(b) likewise authorizes the FTC to bring Count 2, for three reasons.  *First*, Facebook is violating the Sherman Act by continuing to wield unlawfully maintained monopoly power. *Second*, the Instagram and WhatsApp acquisitions form the basis for Count 2 as well as Count 1, and Section 13(b) requires analysis of the FTC's cause of action, not each individual allegation therein.  *Third*, even if the platform conduct allegations are inappropriately evaluated in isolation, the AC alleges Facebook's platform conduct is likely to recur.

### A. Section 13(b) Authorizes the FTC to Obtain Injunctive Relief to Remedy Facebook's Ongoing Violation of the FTC Act

Section 13(b) of the FTC Act empowers the FTC to seek an injunction in federal court when the Commission "has reason to believe" that a defendant "is violating, or is about to violate" any provision of law enforced by the FTC. 15 U.S.C. § 53(b). The AC alleges that Facebook's course of conduct is an ongoing act of monopolization and that Facebook thereby "is violating" Section 2. The Court should deny the motion to dismiss Count 2 on this ground alone. *See, e.g., Vyera*, 479 F. Supp. 3d at 44 (defendants "continued to execute" unlawful scheme, "which continued to have an anticompetitive impact").

Section 2 is directed not merely at discrete acts; rather, a monopolist *is violating* the statute while the "monopolizing effects" of anticompetitive conduct persist: i.e., as long as the monopolist continues to wield unlawfully maintained monopoly power. As the Court of Appeals has observed, "[t]he condition of monopolization is itself a violation of the Sherman Act" that constitutes a "continuing violation" subject to "remedies to cure the monopolizing effects of the forbidden anticompetitive combination or acquisition." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1148 (D.C. Cir. 2009) (internal citations omitted); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 574 n.9 (1972) (quoting *N. Sec. Co. v. United States*, 193 U.S. 197, 357 (1904)); *Standard Oil Co. v. United States*, 221 U.S. 1, 74 (1911) (monopolist's elimination of competition brought about "a perennial violation of [Section 2 of the Sherman Act]").

By willfully continuing to hold and exercise monopoly power maintained through anticompetitive conduct, as alleged in both counts of the AC, Facebook *is violating* the Sherman Act's prohibition on monopolization today, as it has for a decade. The FTC therefore may seek an injunction, consistent with the statutory text and purpose of Section 13(b), which is to make available prospective relief to address ongoing or likely-to-reoccur violations. *AMG Cap.*

37

*Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021).

### B. Section 13(b) Authorizes Both Count 1 and Count 2, and the Allegations Supporting Each Cause of Action Must be Considered as a Whole

Section 13(b) authorizes the Commission to "bring suit in a district court of the United States." 15 U.S.C. § 53(b). Because Section 13(b) authorizes *suits*, the question at the pleading stage is whether the complaint states a viable *cause of action*. Here, the Court correctly concluded that the allegations about Instagram and WhatsApp provide a basis for injunctive relief. Op. 50-52. Those allegations are reiterated in the AC and are incorporated into both Count 1 and Count 2. Accordingly, the FTC's suit, and both causes of action stated therein, "*do[] contend* that the defendant[] [is] currently engaged in violations of federal antitrust laws," and the 13(b) inquiry ends there. *Vyera*, 479 F. Supp. 3d at 44 (emphasis added).

Facebook suggests a contrary and unprecedented result, asking the Court to ignore Section 13(b)'s focus on causes of action and instead to parse the AC to determine whether each factual allegation independently satisfies the "is violating, or is about to violate" requirement. Facebook does not cite any case, and the FTC is aware of none, in which a court has applied its proposed piecemeal approach to Section 13(b), blessing some allegations while tossing out others, to dismiss parts of a complaint that alleged maintenance of an ongoing monopoly. That is because courts consider Section 13(b) challenges at the *complaint and cause of action* level, not the allegation level. For example, in *FTC v. Neora LLC*, 2021 WL 3398153 (N.D. Tex. Aug. 2, 2021), the court denied in relevant part, without striking any allegations, defendant's motion to dismiss a complaint that contained allegations both of "long past" completed conduct and of conduct that was ongoing or likely to reoccur. The same result is appropriate here, where the AC alleges a series of related anticompetitive acts, some completed and some ongoing.

Facebook's approach to Section 13(b) would mean that the FTC could not

38

comprehensively address in federal court an ongoing monopolization offense that comprises multiple acts, some completed and others ongoing. Instead, if Facebook's proposed approach were adopted—with allegations about certain acts "dismissed"—courts would be forced to assess Section 2 liability (and craft a remedy) without accounting for the entire monopolization scheme. This approach is at odds with the established antitrust principle that a course of conduct should be assessed in aggregate. BIO 44.

Moreover, this approach would also treat the availability of injunctive relief in a monopolization case differently depending on whether the case were brought by the FTC or instead by the FTC's sister agency, the Department of Justice ("DOJ"). DOJ can clearly state a claim for equitable relief to remedy ongoing monopolization, even where some of the acts took place in the past. *See, e.g., Standard Oil*, 221 U.S. at 82 (Section 2 claim, based in part on conduct dating back 32 years). Similar to the FTC, DOJ has statutory authority to "institute proceedings in equity to prevent and restrain," 15 U.S.C. § 4, violations of Section 2 of the Sherman Act, and courts have repeatedly held that DOJ and FTC are subject to the same standard to establish entitlement to injunctive relief. *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (propriety of injunctive relief sought by FTC determined by *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), which also governs injunctive relief sought by DOJ); *FTC v. Warner Chilcott Holdings Co. III*, 2007 WL 158746, at *9 (D.D.C. Jan. 22, 2007) (same). Yet the FTC is aware of no monopolization case brought by DOJ in which a court has parsed a complaint to "dismiss" allegations related to past conduct that maintained an ongoing monopoly. And neither authority nor reasoned argument suggests that a monopolist's course of conduct should violate the antitrust laws if DOJ brings suit, but not if the FTC brings suit.

Further, Count 2's platform allegations are relevant to appropriate remedies. If the FTC

demonstrates at trial that any of the alleged conduct is a violation of the antitrust laws, the Court

will have to decide what remedy is necessary and appropriate to restore competition. *Grinnell*,

384 U.S. at 577; *Ford Motor*, 405 U.S. at 573 (adequate relief must "restore competition").

Facebook's use of interoperability and API access to stymie competition, and the effects of that

conduct on the ability of rivals to compete, will be highly relevant to crafting a remedy. *United*

*States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950) (injunctive relief for monopolization "is

not limited to prohibition of the proven means by which the evil was accomplished, but may

range broadly through practices connected with acts actually found to be illegal").

In any event, if Facebook wanted the Court to excise *allegations* from the AC, the

appropriate instrument for that request would have been a motion to strike the allegations under

Rule 12(f), not a motion to dismiss under Rule 12(b)(6). But Facebook made no such motion,

and it could not support one, because the Platform-related allegations supporting Count 2 plainly

are not "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

### C. The AC Plausibly Pleads that Facebook's Illegal Platform Conduct Is Likely to Recur

Even if the Platform conduct allegations are parsed out separately from the rest of the

AC—which they should not be, *supra* § III.B—the AC's allegations are sufficient "to support a

reasonable inference that [Facebook's] behavior will reoccur." *FTC v. Hornbeam Special*

*Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019); *accord FTC v. USA Fin., LLC*,

415 F. App'x 970, 975 (11th Cir. 2011).

To plead a likelihood of recurrence, a plaintiff must plausibly allege that the defendant

retains the ability and incentive to resume the illegal conduct. *See, e.g., Accusearch,* 570 F.3d at

1202. "Once a violation is demonstrated, all that need be shown is that there is some reasonable

likelihood of future violations, and past unlawful conduct is highly suggestive of the likelihood

of future violations." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000) (internal quotation omitted). Prospective injunctive relief is appropriate unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation omitted). The AC alleges that Facebook engaged in illegal conduct relating to Platform through at least December 2018, stopped the conduct due to government scrutiny, and retains the ability to engage in the same or similar practices at any time. AC ¶¶ 150-51, 240. The AC further alleges that Facebook's suspension of its anticompetitive policies is a temporary measure that Facebook is likely to reverse once antitrust scrutiny—which includes this lawsuit— has passed or it again faces acute threats to its dominant position. AC ¶¶ 151, 240. "[C]ourts have repeatedly held that defendants' cessation of violations as a direct result of government intervention is treated as if the violations never stopped—or, at a minimum, are imminently about to recur." *United States v. MyLife.com, Inc.,* 499 F. Supp. 3d 757, 767 (C.D. Cal. 2020). Facebook may dispute these allegations, but that is a question for trial, not a motion to dismiss.

Courts also find a likelihood of recurrence where the defendant failed to acknowledge culpability or make sincere assurances that it will not commit future violations. *See, e.g., In re Sanctuary Belize*, 482 F. Supp. 3d 373, 466-72 (D. Md. 2020); *Think Achievement*, 144 F. Supp. 2d at 1017. Here, Facebook has not acknowledged culpability: to the contrary, it defends its conduct as "lawful." Mem. 3. Furthermore, the AC alleges no assurances by Facebook that it will not reinstitute the Platform conduct, and any assurances would merit little weight in any event, for Facebook has made "meaningless" representations to enforcers "on multiple occasions," and paid enormous fines for misleading European regulators and "stunning" violations of its commitments to the FTC. AC ¶¶ 152-53. Taken together, the AC's allegations

readily clear the bar for pleading a likelihood of recurrence.

Facebook cites to *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), but that case is simply inapposite.  In *Shire*, the Third Circuit held that Section 13(b) did not authorize a suit where the FTC conceded that the defendant no longer controlled the product it once monopolized.  Thus, in *Shire* there was concededly no ongoing violation of the antitrust laws, the defendant was no longer a monopolist, and recurrence of the conduct to maintain the monopoly in the future was therefore *impossible*.  *Id.* at 150.  The AC, by contrast, alleges an extant monopoly, *supra* § I, an ongoing violation of the antitrust laws, *supra* §§ III.A-B, and, as just explained, facts that meet the standard to establish a likelihood of recurrence.

## IV.     Chair Khan Properly Participated in the Vote on the Amended Complaint

Facebook argues that the AC should be dismissed or "remanded" because Chair Lina M. Khan allegedly "prejudged" the facts and should have been recused from the Commission vote. Its argument fails because any prohibition on prejudgment applies to officials acting in a judicial or quasi-judicial capacity, and Chair Khan and the Commission are not acting as judges here.

### A.   Relevant Background

The Commission enforces the laws under its purview through two pathways: administrative proceedings where the Commission acts as an adjudicatory body, 15 U.S.C. § 45(b), and actions (like this one) in federal court seeking injunctive relief, *id.* § 53(b).  In the former, the Commission finds facts and makes legal rulings, but in a federal court action, the Commission acts as a litigation plaintiff—the court finds the facts and determines the law.

The Commission voted to file this lawsuit in 2020 under Chairman Joseph J. Simons. After Chairman Simons stepped down, President Biden nominated Professor Khan to fill the vacancy and, following her Senate confirmation, designated her as Chair.  Prior to her confirmation, Chair Khan wrote extensively about competition issues in digital markets as a law

42

professor and antitrust scholar.  She also participated in a Congressional investigation that issued

a report on the activities of four major technology companies, including Facebook.  President

Biden presumably chose Chair Khan to lead the Commission in part because of her experience.

Following the dismissal of the original complaint, Facebook sought to file a petition to

recuse Chair Khan from participating in "any decisions concerning whether and how to continue

the FTC's antitrust case against the company," on the grounds that she had prejudged the issues.

Hansen Decl. Ex. A.  The Commission's rules, however, allow recusal petitions only in

adjudicative or rulemaking proceedings.  16 C.F.R. § 4.17.  Since no such proceeding involving

Facebook was pending, the Secretary of the Commission rejected Facebook's petition.  Hansen

Decl. Ex. G.  The Commission thereafter voted, 3-2, to authorize the AC.

## B. Prejudgment Is Not a Basis for Recusal from Commission Votes Authorizing Federal Court Litigation

Facebook's argument that Chair Khan was required to recuse herself rests primarily on

two cases involving a former FTC Chairman's participation in *administrative proceedings* where

a disinterested observer could conclude that he had prejudged the issues.  *See Am. Cyanamid Co.

v. FTC,* 363 F.2d 757, 763-68 (6th Cir. 1966); *Cinderella Career & Finishing Schs., Inc. v. FTC*,

425 F.2d 583, 589-92 (D.C. Cir. 1970).  These cases are rooted in the rule that "[a] fair trial in a

fair *tribunal* is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136 (1955)

(emphasis added).  But the Supreme Court has held that "[t]he rigid requirements . . . designed

for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a

prosecutorial or plaintiff-like capacity."  *Marshall v. Jerrico, Inc*., 446 U.S. 238, 248 (1980).

Prosecutors "need not be entirely neutral and detached," and "are necessarily permitted to be

zealous in their enforcement of the law."  *Id.* (internal quotation omitted); *see also Ass'n of Nat'l

Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979) ("We must not impose judicial

43

roles upon administrators when they perform functions very different from those of judges.").

Unlike in *American Cyanamid* and *Cinderella*, in this case the Commission is acting as a plaintiff or prosecutor, and the Court will make the factual findings and legal rulings and determine the appropriate remedy. The case law regarding prejudgment in administrative proceedings is thus inapplicable. Indeed, the Administrative Procedure Act expressly provides that the rules governing adjudications, 5 U.S.C. § 556(b), do not apply to "a matter subject to a subsequent trial of the law and the facts de novo in a court." *Id.* § 554(a)(1).

That does not mean there are no circumstances in which a Commissioner may be recused from voting on the filing of a federal court complaint. For example, federal law and ethics regulations bar Executive Branch officers and employees from participating in matters where they have a financial interest. 18 U.S.C. § 208; 5 C.F.R. § 2635.402. But Facebook does not and cannot claim that Chair Khan has any such interest. Tellingly, although Facebook repeatedly asserts that Chair Khan has violated "federal ethics rules," its brief does not cite any such rule. Facebook simply argues that Chair Khan has expressed views that are adverse to it, which is not a basis for disqualification of an agency official acting in a prosecutorial capacity.

*Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984), is inapposite. In that case, the AUSA who obtained an indictment was married to a political opponent of the defendant, and "almost certainly harbored personal animosity" against him. *Id.* at 1055. Facebook does not and cannot allege that Chair Khan is motivated by any such personal animosity, and the Commission initiated this lawsuit before she even arrived. Furthermore, *Wright* held that even if the AUSA's participation was "ill advised," it did not "deprive[] [the defendant] of due process of law"; at most it "deprived him of the chance that, with another prosecutor, he might undeservedly have escaped indictment and consequent conviction for crimes of which he was properly found to be

44

guilty." *Id.* at 1058.

### C.  The Court Cannot "Remand" to the Commission

Facebook's alternative argument that the Court should "remand" to the Commission and order it to act on the company's recusal petition is equally meritless.  First, as shown above, Facebook has identified no facts that would warrant Chair Khan's recusal.  Second, the Commission's rules provide only for disqualification motions in connection with an adjudicative or rulemaking proceeding—*i.e.*, where the Commission acts as a decisionmaker.  Third, the Commission has not conducted an administrative adjudication, much less issued a final order, so there is nothing to "remand."  Finally, if Facebook contends the Commission failed to take required action, the proper remedy is to file a suit for mandamus to compel agency action under 5 U.S.C. § 706(1).  *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-65 (2004).

Facebook's cases are not remotely on point.  *Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011), involved a review of final agency action under the APA where the initial agency decision was tainted by improper political pressure.  Here, the Commission has not taken any final action, the Court is not conducting APA review, and there is no allegation that Chair Khan was influenced by improper political pressure.  *Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C. Cir. 1962), involved an administrative proceeding; the court directed issuance of an injunction barring the SEC from continuing the proceeding because one of its Commissioners had previously been in charge of investigating and prosecuting the matter.  But as shown above, the requirements that apply to agency officials acting as adjudicators do not apply where the agency is acting as a prosecutor or plaintiff in court.  *Marshall*, 446 U.S. at 248.

### CONCLUSION

Facebook's Motion to Dismiss should be denied for the reasons set forth above.  The FTC respectfully requests oral argument, pursuant to Local Rule 7(f).

Dated: November 17, 2021

Respectfully submitted,

/s/ Daniel Matheson

Daniel Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Patricia Galvan
Robert Zuver (D.C. Bar 987216)
Maria Dimoscato (D.C. Bar 489743)
Eric Cochran (D.C. Bar 981148)
Mitchell London (D.C. Bar 1029408)
Owen Masters (D.C. Bar 242139)
Michael Mikawa
Noel Miller (D.C. Bar 1026068)
David Owyang
Mark Silvia
Michael Smith (D.C. Bar 996738)
Rebecca Weinstein
Sylvia Zhang

Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, D.C. 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

# EXHIBIT 17

This copy is for your personal, non commercial use only Distribution and use of this material are governed by our ubscriber Agreement and by copyright law For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/sony-to-buy-videogame-maker-bungie-in-3-6-billion-deal-11643653787

TECH

# Sony to Buy Videogame Maker Bungie in $3.6 Billion Deal

Agreement to purchase the studio behind the Halo and Destiny franchises follows Microsoft's move to acquire Activision Blizzard



*By Sarah E. Needleman          and Will Feuer*

pdated Jan 31, 2022 4 45 pm ET

Sony Group Corp.'s  SONY **-0.76%** ▼  videogame unit said Monday that it is buying videogame developer Bungie Inc., the studio that created the Halo and Destiny franchises, in a deal valued at $3.6 billion.

Bungie is known as the original creator of Halo and Destiny, popular first-person shooter franchises. Today Halo is owned by Sony  SONY **-0.76%** ▼  rival Microsoft Corp. and the series is available through Microsoft's Xbox system and not Sony's PlayStation. With the deal for Bungie, Sony would gain control of Destiny, which is already on both PlayStation and Xbox.

Sony's announcement comes after Microsoft said in mid January that it is buying videogame company Activision Blizzard Inc.  ATVI **2 27%** ▲  in an all-cash deal valued at roughly $75 billion.

Advertisement - Scroll to Continue



The recent deal activity gives big console makers additional ways to compete against each other by acquiring content they could offer exclusively to their customers at launch, through subscription services or other means.

Microsoft stands to gain one of the most popular shooter franchises, Activision's Call of Duty, once those companies merge. A Call of Duty title has been the best‑ or second‑best‑selling game in the U.S. every year since 2010, according to market-research firm NPD Group.

Sony's and Microsoft's planned acquisitions, which are pending regulatory approval, would give the console makers additional ways to compete against each other by adding more content to their portfolios that they could offer exclusively to customers.

"Sony and Microsoft have been in a multiyear arms race of sorts for talent and developers," said Jefferies analyst Andrew Uerkwitz. "Being at a critical juncture in the console cycle and on the cusp of bigger subscription services, first-party titles have never been more important."

After the deal closes, Bungie will be an independent subsidiary of Sony Interactive Entertainment and will continue to be run by its board chaired by Chief Executive Pete Parsons and Bungie's current management team, Sony said.

"Bungie has created and continues to evolve some of the world's most beloved videogame franchises and, by aligning its values with people's desire to share gameplay experiences, they bring together millions of people around the world," said Sony Group Chairman and Chief Executive Kenichiro Yoshida.

Mr. Parsons said in a separate release that the deal will help grow Bungie while preserving the studio's creative independence.

"Today, Bungie begins our journey to become a global multi-media entertainment company," he said.

In 2000, Microsoft acquired Bungie to develop games for its then forthcoming Xbox console. The studio found success in the early 2000s before it was split off from Microsoft in 2007. Microsoft's Xbox Game Studios has continued to produce new Halo games since then and the company owns the intellectual property behind the franchise.

In 2010 the Bellevue, Wash.-based Bungie signed an exclusive 10-year publishing deal for its Destiny franchise with Activision. The tie up ended a year early in 2019, with Activision saying the shooter series didn't meet its financial expectations.

Sony said Monday the Bungie team will remain focused on the long-term development of "Destiny 2" and work on expanding the Destiny universe and creating new properties.

Analysts at Cowen estimate that Bungie generates annual revenue from Destiny in the mid-$100 millions range. While Destiny's "trajectory has been bumpy at times, it is still one of the most popular franchises in gaming," the firm says in a note to investors.

In addition to Sony's deal for Bungie and Microsoft's deal for Activision, Take Two Interactive Software Inc. said in January that it had agreed to acquire mobile game maker Zynga Inc. for $11 billion. The activity comes after mergers-and-acquisitions deals within the game industry at large nearly tripled to $26.2 billion in 2021 from $8.9 billion in 2020, according to data from PitchBook.

  ast year global consumer spending on game software rose 1.4% to about $180.3 billion, according to industry tracker Newzoo BV. In 2020, such spending jumped about 23% from the previous year, as the pandemic's social-distancing restrictions prompted people to turn to online entertainment, the analytics firm said.

**Write to** Sarah E. Needleman at sarah.needleman@wsj.com and Will Feuer at will.feuer@wsj.com

Advertisement - Scroll to Continue

9/22/22, 8:13 PM
Case 5:22-cv-04325-EJD Document 93-3 Filed 09/23/22 Page 110 of 110
Sony to Buy Videogame Maker Bungie in $3.6 Billion Deal - WSJ

*Appeared in the February 1, 2022, print edition as 'Sony Buys 'Halo' Creator Bungie'.*