Abby L. Dennis, DC Bar No. 994476
Peggy Bayer Femenella, DC Bar No. 472770
Joshua Goodman, NY Bar (No Number)
Jeanine Balbach, MD Bar (No Number)
Michael Barnett, TX Bar No. 24006801
E. Eric Elmore, NY Bar (No Number)
Justin Epner, DC Bar No. 1028431
Sean D. Hughto, DC Bar No. 421224
Frances Anne Johnson, MD Bar (No Number)
Andrew Lowdon, DC Bar No. 230095
Kristian Rogers, MA Bar No. 675951
Anthony R. Saunders, NJ Bar No. 008032001
Timothy Singer, DC Bar No. 1048769
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2381
*adennis@ftc.gov; pbayer@ftc.gov:
jgoodman@ftc.gov; jbalbach@ftc.gov;
mbarnett@ftc.gov; eelmore@ftc.gov;
jepner@ftc.gov; shughto@ftc.gov;
fjohnson@ftc.gov; alowdon@ftc.gov;
krogers@ftc.gov; asaunders@ftc.gov;
tsinger@ftc.gov*

Erika Wodinsky, CA Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
*ewodinsky@ftc.gov*

Attorneys for Plaintiff Federal Trade Commission

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>    Plaintiff,<br><br>  v.<br><br>**META PLATFORMS, INC., et al.,**<br><br>    Defendants. | Case No. 5:22-cv-04325-EJD<br><br>**AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court for a preliminary injunction enjoining Defendants Meta Platforms, Inc., and its subsidiaries (collectively "Meta") from consummating its proposed acquisition (the "Acquisition") of Within Unlimited, Inc. ("Within"). The Commission seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). Absent such relief, Meta and Within (collectively, "Defendants") have represented that they would be free to consummate the Acquisition after 11:59 p.m. Eastern Time (or 8:59 p.m. Pacific Time) on December 31, 2022.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding. Preliminary injunctive relief is imperative to preserve the *status quo* and to protect competition while the Commission adjudicates whether the Acquisition is unlawful. The Commission initiated the administrative proceeding on the legality of the Acquisition under antitrust law, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on August 11, 2022. Pursuant to FTC regulations, the administrative trial will begin on January 19, 2023. Allowing the Acquisition to proceed would harm competition and consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Acquisition if the Commission issues an administrative complaint and the Acquisition is found unlawful after a full administrative trial on the merits and any subsequent appeals.

## NATURE OF THE CASE

1. Meta, one of the largest technology companies in the world and the leading provider of virtual reality ("VR") devices and applications ("apps") in the United States, seeks to acquire Within, a software company that develops apps for VR devices, including the highly popular and rapidly growing fitness app "Supernatural." If consummated, the Acquisition would

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

2

1    substantially lessen competition, or tend to create a monopoly, in the relevant market for VR

2    dedicated fitness apps. That lessening of rivalry may yield multiple harmful outcomes,

3    including less innovation, lower quality, higher prices, less incentive to attract and keep

4    employees, and less consumer choice.

5         2.    A global technology behemoth, Meta reaches into every corner of the world

6    through its "Family of Apps"—Facebook, Instagram, Messenger, and WhatsApp—with more

7    than three billion regular users. Seeking to expand its empire even further, Meta in recent years

8    has set its sights on building, and ultimately controlling, a VR "metaverse." One need look no

9    further than the rebranding of the company from Facebook to "Meta" in 2021 to understand its

10   vision—and its priorities—for the future. And Meta is serious about its goals: it has become the

11   largest provider of VR devices and apps to customers in the United States.

12        3.    Meta's campaign to conquer VR began in 2014 when it acquired Oculus VR,

13   Inc., a VR headset manufacturer. Since then, Meta's VR headsets have become the cornerstone

14   of its growth in the VR space: its current generation headset, the Meta Quest 2, is by far the

15   most widely used VR headset today, with a significant majority of headset sales in 2021 and

16   2022. Meta CEO Mark Zuckerberg has publicly stated that Meta subsidizes its VR devices or

17   sells them at cost in order to attract users.

18        4.    And Meta's Quest Store (formerly Oculus Store) has become the leading

19   distribution platform for VR software apps in the United States, connecting app developers and

20   VR users in an online marketplace through which developers can offer their products to users

21   for download onto their individual VR devices. Meta controls the wildly popular app Beat

22   Saber, which it acquired by purchasing Beat Games in November 2019. Beat Saber ████

23   ████████████████████████████████████████████████████

24   ███████████████████ In addition to Beat Games, Meta owns a number of other VR

25   apps, some of which it developed in-house but most of which it acquired by rolling up other app

26   studios.

27

28

5.      Meta has thus become a key player at each level of the VR ecosystem: in hardware with its Meta Quest 2 headset, in app distribution with the Quest Store, and in apps with Beat Saber and several other popular titles. This is not by accident; Meta has an explicit strategy of harnessing strong network effects in VR to ensure its leading status in this growing industry. Meta could have chosen to try to compete with Within on the merits; instead, Meta decided it preferred to simply buy the ████████ in a vitally important, ████████ ████████

6.      As Meta fully recognizes, network effects on a digital platform can cause the platform to become more powerful—and its rivals weaker and less able to seriously compete— as it gains more users, content, and developers. The acquisition of new users, content, and developers each feed into one another, creating a self-reinforcing cycle that entrenches the company's early lead. This market dynamic can spur companies to compete harder in beneficial ways by, for example, adding useful product features or hiring additional employees. But it can also make anticompetitive strategies more attractive.

7.      Meta seeks to exploit the network-effects dynamic in VR. Indeed, Mr. Zuckerberg has made clear that his aspiration for the VR space is control of the *entire* ecosystem. As early as 2015, Mr. Zuckerberg instructed key Facebook executives that his vision for "the next wave of computing" was control of apps *and* the platform on which those apps were distributed, making clear in an internal email to key Facebook executives that a key part of this strategy was for his company to be "completely ubiquitous in killer apps"—i.e., in significant VR apps that prove the value of the technology. In that same email, Mr. Zuckerberg told his executives that Facebook should "us[e] acquisitions opportunistically."

8.      The proposed acquisition of Within would be one more step along that path toward dominance. According to Within's co-founder and CEO, "Fitness is the killer use case for VR." But instead of choosing to compete on the merits through its own VR dedicated fitness app, Meta has resorted to proposing this unlawful acquisition.

9.      If Meta is able to proceed with this proposed acquisition of Within, the merger poses a reasonable likelihood of substantially lessening competition in the market for VR dedicated fitness apps, where Supernatural is ███████████████████

10.     Having simply bought up the ████████████ Meta would no longer have any incentive to develop its own competing app from scratch, add new features to Beat Saber or other existing Meta apps to compete with Supernatural on the merits, or acquire a small generalist studio that could supplement Meta's considerable existing resources and VR know-how to develop an app to compete with Supernatural. Instead of adding a significant new rival to the mix, the Acquisition would simply let Meta assume total control of the █████ overnight. That lessening of competition violates the antitrust laws.

11.     Moreover, a company poised on the edge of a market may exert competitive pressure on existing participants. Regardless of whether such a company actually intends to enter, the possibility that it may do so can spur other companies already in the market to proactively ramp up their own competitive efforts. Meta, poised on the edge of the VR dedicated fitness app market with its popular Beat Saber app, and with all its vast resources and unique strategic advantages, exerts such an influence. That pressure spurs the market leader, Within, to add new features, retain employees, continue innovating, and generally compete harder in order to stay a step ahead of Meta in the event it decides to enter. The Acquisition would eliminate that incentive for market participants to compete, again in contravention of the antitrust laws.

12.     Accordingly, this Acquisition poses a reasonable probability of eliminating competition. That lessening of competition may result in reduced innovation, quality, and choice, less pressure to compete for the most talented app developers, and potentially higher prices for VR dedicated fitness apps. And Meta would be one step closer to its ultimate goal of owning the entire "Metaverse."

13.     The Commission voted to file this Complaint seeking preliminary relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). The Commission is entitled to preliminary

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

5

relief in this Court because of its likelihood of success on the merits and the weight of the equities. To succeed on the merits, the FTC must prove that the Acquisition violates Section 7 of the Clayton Act, which prohibits mergers the effect of which "may be substantially to lessen competition, or tend to create a monopoly." For the reasons described below, the FTC is likely to succeed in proving an antitrust violation, and the equities weigh strongly in favor of enforcing the antitrust laws.

14.     On August 11, 2022, the Commission found reason to believe that the Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. On August 11, 2022, the Commission commenced an administrative adjudication proceeding to determine whether the Acquisition is unlawful. An administrative trial before an Administrative Law Judge, is scheduled to begin on January 19, 2023. The ongoing administrative trial provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. *See* 16 C.F.R. § 3.41. The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

15.     Preliminary injunctive relief restraining Defendants from proceeding with the Acquisition is necessary to prevent interim harm to competition during the pending administrative proceeding. Absent preliminary relief, Defendants can close the Acquisition and combine Meta's and Within's operations. Allowing Defendants to consummate the Acquisition before any administrative proceeding has concluded is likely to cause immediate harm to competition and consumers and would undermine the Commission's ability to remedy the anticompetitive effects of the Acquisition if it is found unlawful after a full trial on the merits and any subsequent appeals.

## JURISDICTIONAL STATEMENT

### A.     Jurisdiction

16.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of

Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

17.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

18.     Defendants and their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

**B.     Venue**

19.     Venue in the Northern District of California is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 28 U.S.C. §§ 1391(b) and (c). Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein.

**C.     Intradistrict Assignment**

20.     Assignment to the San Francisco Division is proper. This action arises in San Mateo County because a substantial part of the events giving rise to these claims occurred in San Mateo County, where Defendant Meta is headquartered.

## THE PARTIES AND PROPOSED ACQUISITION

21.     Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

7

The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

22.    Defendant Meta is a publicly traded company organized under the laws of Delaware with headquarters in Menlo Park, California. Meta develops and sells VR and other extended reality hardware and software through its "Reality Labs" division. Reality Labs has been growing at breakneck speed: it generated revenues of $2.274 billion in 2021, which reflected a 127% jump from 2019 and a 100% increase since 2020. Meta's best-selling VR hardware product to date is the Meta Quest 2, while its best-selling VR software product is the wildly popular Beat Saber, which was initially released by Beat Games, a studio that Meta acquired in 2019. Meta continues to add new downloadable content to Beat Saber; for example, it recently added a "Lady Gaga Music Pack" available for a $12.99 add-on fee.

23.    Defendant Within is a privately held virtual and augmented reality company organized under the laws of Delaware with headquarters—and its principal business—in Los Angeles, California. Founded by Chris Milk and Aaron Koblin, Within's flagship product is Supernatural, a VR subscription fitness service. Supernatural offers over 800 fully immersive VR workouts, each set to music and located in a virtual setting like the Galapagos Islands or the Great Wall of China. Through deals with major music studios, Supernatural continues to grow its catalog, which includes songs from A-list artists like Katy Perry, Imagine Dragons, Lady Gaga, and Coldplay. Supernatural's workouts are fitness classes that customers can access by paying a monthly subscription fee of $18.99, or a yearly subscription fee of $179.99. Supernatural is presently only available on the Meta Quest and Quest 2 and is sold in the United States and Canada.

24.    On October 22, 2021, Meta and Within signed an Agreement and Plan of Merger, pursuant to which Meta would acquire all shares of Within in a transaction valued at ███████

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

8

1

## INDUSTRY BACKGROUND

2

     25.    The VR industry is currently characterized by a high degree of innovation and

3

growth. Global sales are predicted to more than double in just three years, from $5 billion in

4

2021 to more than $12 billion in 2024.

5

     26.    Users typically engage with the VR experience through a headset with displays

6

in front of each eye to place a user in a fully rendered, three-dimensional environment. Cutting-

7

edge VR technology creates an immersive digital experience like no other. VR users can

8

instantly be transported anywhere in the world, backward or forward in time, into outer space or

9

fictional lands—all from the comfort and safety of their own homes. Unlike a game, video, or

10

app on a tablet, phone, or monitor, the three-dimensional VR environment creates the

11

perception of completely surrounding the user, allowing the user to move around in the

12

projected space. As Mark Zuckerberg explains, "you're right there with another person or in

13

another place and that's very different from every experience of technology that we've had

14

before. . . ."

15

     27.    Meta's Quest 2 is the best-selling VR headset and has been since shortly after its

16

launch in 2020. In 2020, Meta shipped more than 62% of all VR headsets sold worldwide. That

17

percentage surged to 78% in 2021, when industry sources estimate that Meta sold more than 8.7

18

million Quest 2 headsets.

19

     28.    The majority of users get apps for VR headsets from online app stores, which

20

distribute products for use on individual VR devices. Meta controls its own app store called the

21

"Meta Quest Store," with more than 400 apps available for download. Meta also offers the

22

"App Lab," a Meta-produced tool that allows third-party developers to distribute apps not

23

present in the Meta Quest Store directly to consumers. Other VR app stores include Valve's

24

Steam Store and SideQuest, but the Meta Quest Store is the leading VR app store in the United

25

States.

26

27

28

29.     VR software and studio companies like Within develop the apps that run on VR headsets. These apps run the gamut of genres from rhythm games to shooters to e-sports to creation and exploration and more.

30.     ██████████████████████████████ Meta's Beat Saber, an enormously popular rhythm game "where you slash the beats of adrenaline-pumping music as they fly towards you, surrounded by a futuristic world." Meta acquired control of Beat Saber through its purchase of Beat Games ██████████████████████████████ in November 2019.

31.     Since its acquisition of Beat Games, Meta has continued to acquire a series of studios behind many popular VR apps, and now boasts one of the largest first-party VR content organizations in the world:

  a.   In January 2020, Meta acquired Sanzaru games, maker of the fantasy Viking combat game Asgard's Wrath.

  b.   In May 2020, Meta acquired Ready at Dawn Studios, maker of Lone Echo II, a zero-gravity adventure game, and Echo VR, an online team-based sports game.

  c.   In April 2021, Meta acquired Downpour Interactive, maker of Onward, a team-based first-person shooter.

  d.   In May 2021, Meta acquired BigBox VR, maker of Population One, a multiplayer first-person arena shooter.

  e.   In June 2021, Meta acquired Unit 2 Games, the maker of Crayta, a collaborative platform that allows users to create and play their own games.

  f.   And, in November 2021, Meta acquired Twisted Pixel, a studio that makes various games, including Path of the Warrior (a fighting game), B-Team (a first-person shooter), and Wilson's Heart (a mystery noir thriller game).

32.     In addition to the aforementioned acquisitions, Meta has developed and released its own VR apps. These include:

a. Horizon Worlds, a Massively Multiplayer Online game that allows users to build, share, and interact in virtual worlds;

b. Horizon Workrooms, a productivity app that lets teams of people share their computer screens, collaborate on virtual whiteboards, and more;

c. Horizon Venues, a live-events app that lets users experience concerts, sporting events, and more; and

d. Horizon Home, a social-space app that lets users hang out with their friends, watch videos together, and join multiplayer VR games together.

33.     Among VR apps, dedicated or deliberate fitness is ████████████ ████████████████████████ As Within's co-founder and CEO puts it, "Fitness is the killer use case for VR." ███████████████ ████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████ platform-level tools such as Oculus Move, a calorie and time counter that runs in the background of other Quest apps and displays to users data about their activity levels while in VR. █████████████████████████████ ████████████████████

## THE RELEVANT ANTITRUST MARKET

34.     The Acquisition would substantially lessen competition or tend to create a monopoly in the relevant antitrust market for VR dedicated fitness apps in the United States ("VR Dedicated Fitness App market").

### A.     The VR Dedicated Fitness App Market

35.     The VR Dedicated Fitness App market is the relevant product market. The market consists of VR apps, like Within's Supernatural app, that are designed so that users can exercise through a structured physical workout in their own homes.

36.   ████████████████████████████████████
████████████████████████████████████████
████████████████████████

37.   Dedicated fitness apps offer distinct functionality when compared to other VR apps, including apps, such as rhythm and active sports games, that provide an incidental fitness benefit ("incidental fitness apps"). For example, they may feature adjusting difficulty so that users never "fail" a workout; they may feature workouts designed by trainers or fitness experts; they are designed to maximize exertion and physical movement for the purpose of exercise; and they may feature classes or other active coaching.

38.   VR Fitness App market participants distinguish VR dedicated fitness apps from VR incidental fitness apps like rhythm and sports games that offer fitness benefits simply because they require users to move and physically exert themselves while engaging with the app. Dedicated fitness apps typically entail a higher degree of physical exertion than incidental fitness apps. According to the Virtual Reality Institute of Health and Exercise, which rates energy expenditures during VR app usage, Within's Supernatural currently has the highest energy expenditure, at 12–13 calories per minute.

39.   VR dedicated fitness apps are also typically offered using a distinct, subscription-based pricing model. Industry participants recognize that this is a distinguishing characteristic of dedicated fitness VR apps when compared to other VR apps, including incidental fitness apps.

40.   █████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████

41.   The VR Dedicated Fitness App market does not include other products that are neither close substitutes for, nor offered under similar competitive conditions as, VR dedicated

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

12

fitness apps. For example, it does not include non-VR at-home smart fitness solutions, such as digitally connected exercise bikes, treadmills, weight machines, mobile phone apps, video games, or workout videos.

42.     Functional, practical, technological, and price differences show that non-VR at-home smart fitness solutions and at-home exercise products are distinct from VR dedicated fitness apps.

43.     VR offers a level of immersion that other at-home fitness experiences do not, and cannot, offer. VR technology allows users to exercise from the comfort, privacy, and safety of home with the feeling and visuals of being somewhere else—atop a mountain, on a tropical island, in a futuristic world, virtually anywhere. The sensors in a VR headset and controllers also allow for a degree of tracking, adjustment, and feedback that non-immersive exercise programs cannot match. As Within's co-founder and CEO explained, "[W]orking out in Supernatural feels like you're a champion of a sport from the future. I love that and haven't felt that sense of athleticism ever on a treadmill or an exercise bike."

44.     There also tend to be substantial price differences between VR fitness and smart at-home fitness products. Most smart at-home fitness solutions have much higher up-front costs and much higher ongoing costs than current VR fitness apps. A Peloton smart bicycle, for example, costs over $1,000, with an additional $44 per month subscription cost, compared to the cost of a $299 Meta Quest 2 plus $18.99 per month for Supernatural. It also weighs 135 pounds.

45.     In addition to Supernatural, other apps in the VR Dedicated Fitness App market include FitXR, Holofit from Holodia, VZFit from Virzoom, and Les Mills Body Combat from Odders Lab.

46.     ███████████████████████████████████████████████████████████
████  Other than Supernatural and FitXR, ██████████████████████████
█████████████████████████████████████████████

**B.     The Relevant Geographic Market**

47.     The relevant geographic market in which to analyze the competitive effects of the Acquisition is the United States. While VR app suppliers may be located outside the United States, customers in the relevant markets affected by the Acquisition are located in the United States. The availability of VR apps and headsets for consumers varies by country, and VR consumers in the United States can only buy headsets and apps that are available in the United States. Industry participants recognize the United States as a market.

## MARKET CONCENTRATION

48.     The VR Dedicated Fitness App market is highly concentrated.

49.     Market concentration within a properly defined relevant antitrust market is a useful indicator of the competitive effects of a merger. The 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") measure market concentration using the Herfindahl–Hirschman Index ("HHI"). The Merger Guidelines outline the principal analytical techniques, practices, and enforcement policy of the FTC and Department of Justice with respect to mergers involving competitors. Though the Merger Guidelines are not binding on the courts, courts frequently cite the Merger Guidelines as persuasive authority.

50.     The HHI for a given market is calculated by summing the squares of the individual firms' market shares. HHIs range from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). A market HHI above 2,500 is classified as highly concentrated.

51.     If a merger combines two participants in a relevant market, thereby increasing the HHI by more than 200 points and resulting in a highly concentrated market, it is presumed to enhance market power and is, therefore, presumptively unlawful.

52.     The market for VR Dedicated Fitness Apps is highly concentrated, ████████ ████████████████████████████████████████████████████████████ ████████████████████

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

14

53. Supernatural ████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████

54.     The VR Dedicated Fitness App market HHI has been well above the thresholds for a market to be considered "concentrated" or "highly concentrated" under the Merger Guidelines.

## EVIDENCE OF LIKELY ANTICOMPETITIVE EFFECTS

55.     In addition to this presumption of illegality, additional evidence indicates that the Acquisition may substantially lessen competition in the relevant market for VR dedicated fitness apps.

**A.     Anticompetitive Effects in the VR Dedicated Fitness App Market**

56.     The Acquisition would cause anticompetitive effects by eliminating potential competition from Meta in the relevant market for VR dedicated fitness apps. These include eliminating any probability that Meta would enter the market through alternative means absent the Acquisition, as well as eliminating the likely and actual beneficial influence on existing competition that results from Meta's current position, poised on the edge of the market. As the Merger Guidelines explain, "A merger between an incumbent and a potential entrant can raise significant competitive concerns."

**1.     It Is Reasonably Probable That Meta Would Have Entered the VR Dedicated Fitness App Market Through Alternative Means Absent This Acquisition**

57.     Meta has the economic characteristics, size, resources, capabilities, advantages, and incentives to enter the VR Dedicated Fitness App market—and it has seriously considered

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

15

doing so—by means other than this Acquisition. Meta could have chosen to build a VR dedicated fitness app from scratch, add dedicated fitness functionality to an existing app, and/or acquire a smaller studio that could support and supplement Meta's existing strengths to facilitate its entry.

58.     Consistent with its long-term strategy for its VR devices to become a widely used platform that it ultimately will control, Meta has committed tens of billions of dollars to its Reality Labs division, which develops its VR and AR products, including more than $7.7 billion in 2020, $12.4 billion in 2021, and $3.6 billion in the three-month period ending in March 2022. Meta is already well on the way to realizing Mr. Zuckerberg's goals of owning both the dominant platform and the "killer apps" on that platform. Meta already produces the best-selling VR headset in the United States by a wide margin. Meta's Quest Store is the leading distribution platform of VR apps. And Meta is the leading seller of VR apps, with a portfolio that includes Beat Saber, the market-leading VR fitness app, and Horizon Worlds, a massive social app that features its own game-creation tools for users.

59.     Meta has the financial resources to develop a dedicated fitness app on its own—either by creating a new app or by adding new features to an existing app such as Beat Saber. It also has more than enough resources to enter the market through acquiring a generalist studio that could supplement Meta's formidable first-party studios group in developing a VR dedicated fitness app.

60.     In 2021, Meta had an annual profit of $46.7 billion, and spent more than $12 billion on its Reality Labs division.

61.     With its vast financial resources, Meta continues to add features and content to the apps it has already released, and to develop and release new apps. Meta has also developed multiple full-featured VR apps in-house. What's more, the ███████ it proposes to spend on this acquisition is █████████████████████████████████████████████ ████████████████████████ During that time and on that budget, Within built Supernatural from the ground up into the ██████████ VR dedicated fitness app.

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

16

62.     Meta could build instead of buy within a reasonable period of time if it could not proceed with this Acquisition. Indeed, ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████

63.     Meta has developed multiple VR apps from scratch before, including the ambitious Horizon Worlds, which allows users to create and explore virtual worlds; Horizon Workrooms, an app that lets Meta test out new use-cases and platform-level features in the emerging VR productivity category and allows users to connect and collaborate in real-time; the Horizon Venues live-events app; and the Horizon Home social-space app.

64.     Meta has also developed and released Oculus Move, a platform-level fitness tracker on the Oculus Quest that allows users to track active time and calories burned across apps.

65.     Through its string of prior acquisitions, Meta already owns seven of the most successful VR development studios in the world, including Beat Games, the studio behind Beat Saber. And, as of March 2021, Meta had nearly 10,000 employees housed within Reality Labs, its division devoted to virtual reality.

66.     Meta's control over the Quest platform also gives it unique access to VR user data, which it uses to inform strategic decisions.

67.     In addition, Meta controls which VR apps appear and are featured in its Quest Store. This control guarantees that Meta could reach millions of existing VR users with a built-from-scratch or expanded app through an especially important avenue for consumer discovery.

68.     Meta—formerly known as "Facebook Inc."—rebranded its entire business as "Meta" to reflect its focus on VR. Its brands, including Meta and Quest, are well-known to VR users. Meta also has substantial marketing experience as to a wide range of VR apps, including Beat Saber, that it could leverage to enter the VR Dedicated Fitness App market. Indeed, users

already associate Meta's Beat Saber app with incidental fitness. This "name awareness" would facilitate Meta's organic entry into the VR Dedicated Fitness App market, as a dedicated fitness-oriented version of Beat Saber would be in line with users' understanding of the Beat Saber brand.

69. Meta also has incentives to enter the VR Dedicated Fitness App market.

70. ███████████████████████████████████████████████████████████████████████████████

71. Meta is well aware that fitness VR apps could enable it to reach new categories of consumers. █████████████████████████████████████████████████████████████

72. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

73. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

74. █████████████████████████████████████████████████████████████████████████

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE No. 5:22-cv-04325-EJD

18

75. 

76.

77.

78.

79.     Thus, not surprisingly, after Meta's acquisition of Beat Games and immediately prior to the launch of Supernatural, Beat Saber released a new track called "FitBeat," which included virtual "walls" or "obstacles" that users would have to dodge. ███████████ ████████████████████████ Obstacles also appear on other tracks, forcing users to duck and dodge, but they can be turned off.

80.     ████████████ has already included both a 360-degree mode where targets come from all sides and a no-fail mode that allows users to complete tracks despite missing blocks in

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

19

recent updates—a feature that fitness-focused users can adopt to ensure an uninterrupted workout.

81. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████

82. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████

83.     In fact, Meta's internal codename for the proposed acquisition of Within was "Project Eden," a reference to its belief that Apple was also interested in acquiring Within.

84.     Meta also hired away the head of product for Supernatural at Within to work at Meta following the Supernatural launch. That individual's portfolio at Meta included expanding Meta's presence into new verticals, including the VR fitness vertical.

85. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████

86. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████

87.     Accordingly, absent this anticompetitive Acquisition, there is a reasonable probability that Meta would have exercised one of its other available options to enter the VR Dedicated Fitness App market.

**2.   It is Reasonably Probable That Alternative Entry by Meta Would Substantially Deconcentrate the Market and Have Other Procompetitive Effects**

88.     Meta's entry into the VR Dedicated Fitness App market—whether by adding new features to one of its existing apps or developing a new VR dedicated fitness app from scratch—would have the effect of substantially deconcentrating and increasing competition in the market.

89.     Building instead of buying would entail developing additional expertise, undertaking product research and design, hiring more employees, and making other key investments. Meta recognizes that building its own VR dedicated fitness app would require time, additional developer talent, and effort. But such efforts would reflect the very essence of competition, the dynamic that the antitrust laws seek to protect and promote.

90.     Alternative entry by Meta would introduce a new competitor into the market with the backing of one of the world's largest, most well-resourced, and most experienced VR industry participants. Such entry would increase consumer choice, increase innovation, spur additional competition to attract the best employees, and yield a host of other competitive benefits. Crucially, it would *also* maintain the independent presence and competitive vitality of the ▮▮▮▮▮▮ VR dedicated fitness app ▮▮▮▮ Supernatural.

91.     The Acquisition would eliminate the probability of such entry, potentially dampening future innovation and leading to a market with less beneficial rivalry and competitive pressure.

### 3.   Within Reasonably Perceived Meta as a Potential Entrant to the VR Dedicated Fitness App Market

92.     In light of Meta's economic characteristics, size, resources, capabilities, advantages, and incentives, it would be eminently reasonable for a VR dedicated fitness app market participant to perceive Meta as a potential entrant.

93.     As explained in detail above, Meta is a massive, wealthy company with extensive control over and experience in various aspects of the VR industry. It has recently expanded into a variety of VR-related areas, including by acquiring the most popular VR incidental fitness app (Beat Saber) and by internally developing a system-level fitness tracking tool that can run in the background of other apps (Oculus Move). In a recent earnings report, Meta announced that it anticipated spending some $10 billion across its Reality Labs division, which has found its biggest success to date with the Quest 2 Headset and Quest Store, and that it is committed to increasing those investments over the next several years. The VR dedicated fitness app market is especially attractive for a host of reasons, giving Meta a strong incentive to enter it. And Meta internally identified multiple means of entering the VR dedicated fitness app market.

94.     ███████████████████████████████████████████████████████████████████████████████████████████████████████

95.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

96.     Meta also lured away Within's head of product for Supernatural shortly after Supernatural's launch.

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

22

### 4. Meta's Presence as a Perceived Potential Entrant Likely Influences Competition in the VR Dedicated Fitness App Market

97. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The Acquisition would eliminate that competitive influence.

98. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

99. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

100. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

101. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE No. 5:22-cv-04325-EJD

23

1

2

3      102.

4      ████████████████████████████████████████████ That competitive

5   pressure—and all of the benefits it yields—would be eliminated by the Acquisition.

6                          **LACK OF COUNTERVAILING FACTORS**

7      103.    Defendants cannot demonstrate that new entry or expansion by existing firms

8   will be timely, likely, or sufficient to offset the anticompetitive effects.

9      104.    There are multiple barriers to entering or expanding in the relevant market,

10  including time, network effects, ongoing development and content creation costs, post-launch

11  support, capital, brand recognition, and the need for consumers to be able to discover the app.

12  Developing a high-quality entrant also requires hiring the "talent needed to create true triple-A

13  VR experiences," talent that Meta acknowledges is increasingly scarce.

14     105.    To be sold on the Quest store, Meta itself must decide to approve an app through

15  a technical review and a curation process by Meta that examines "quality, polish, entertainment,

16  value, and utility." This can be a lengthy process and there is no guarantee any third-party app

17  will ultimately be approved.

18     106.    No other company has the combination of resources, VR know-how, and control

19  over the leading app store and the overall Quest VR experience that Meta has.

20     107.    Once Meta—which also owns the Quest platform and app store—entrenches ██

21  ████████████ in VR dedicated fitness through the Acquisition, it will effectively raise

22  barriers to entry and expansion as other companies interested in the space will understand that

23  they need to compete with a deep-pocketed platform operator that owns the ██████ VR

24  dedicated fitness app.

25     108.    Defendants cannot demonstrate cognizable, verifiable, transaction-specific

26  efficiencies that would be sufficient to reverse the strong presumption and evidence of the

27  Acquisition's likely significant anticompetitive effects.

28

## <u>LIKELIHOOD OF SUCCESS ON THE MERITS,</u>
## <u>BALANCE OF THE EQUITIES, AND NEED FOR RELIEF</u>

109.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the equities, using a sliding scale. The principal equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interests cannot tip the scale against a preliminary injunction.

110.     The Commission is likely to succeed in proving that the effect of the Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act or Section 5 of the FTC Act.

111.     Preliminary relief is warranted and necessary. Should the Acquisition ultimately be adjudicated unlawful, reestablishing the status quo would be difficult, if not impossible, if the Acquisition has already occurred in the absence of preliminary relief. Allowing the Acquisition to close before the completion of the administrative proceeding would cause irreparable harm by, among other things, enabling the combined firm to begin altering Within's operations and business plans, accessing Within's sensitive business information, eliminating key Within personnel, changing Within's product development efforts, and preventing Within from raising the funding necessary to continue operations and maintain its growth trajectory. In the absence of relief from this Court, substantial harm to competition would occur in the interim.

112.     Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

113.    Preliminarily enjoin Defendants from taking any further steps to consummate the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

114.    Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

115.    Award such other and further relief as the Court may determine is appropriate, just, and proper.


Dated: October 7, 2022                         Respectfully submitted,

                                               /s/ Abby L. Dennis
Of counsel:                                    ABBY L. DENNIS
                                               Senior Trial Counsel

HOLLY VEDOVA
Director                                       PEGGY BAYER FEMENELLA
Bureau of Competition                          Acting Assistant Director

JOHN M. NEWMAN                                 JOSHUA GOODMAN
Deputy Director                                Acting Deputy Assistant Director
Bureau of Competition
                                               JEANINE BALBACH
                                               MICHAEL BARNETT
                                               E. ERIC ELMORE
                                               JUSTIN EPNER
                                               SEAN D. HUGHTO
                                               FRANCES ANNE JOHNSON
                                               ANDREW LOWDON
                                               KRISTIAN ROGERS
                                               ANTHONY R. SAUNDERS
                                               TIMOTHY SINGER
                                               ERIKA WODINSKY
                                               Attorneys

                                               Bureau of Competition

AMENDED COMPLAINT FOR A PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT, CASE NO. 5:22-cv-04325-EJD

26