Mark C. Hansen (*pro hac vice*)
mhansen@kellogghansen.com
Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999

Michael Moiseyev (*pro hac vice*)
michael.moiseyev@weil.com
Chantale Fiebig (*pro hac vice*)
chantale.fiebig@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940
*Counsel for Defendant Meta Platforms, Inc.*

Christopher J. Cox (Bar No. 151650)
chris.cox@hoganlovells.com
HOGAN LOVELLS US LLP
855 Main Street, Suite 200
Redwood City, CA 94063
Telephone:  (650) 463-4000
Facsimile:  (650) 463-4199
*Counsel for Defendant Within Unlimited, Inc.*

(Additional Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:22-cv-04325-EJD |
|       Plaintiff, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| META PLATFORMS, INC., et al., | |
|       Defendants. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| | Dept.:  Courtroom 4 – 5th Floor |
| | Judge:  Hon. Edward J. Davila |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .........................................................................................................................1

BACKGROUND ...........................................................................................................................4

ARGUMENT ................................................................................................................................6

I.   The FTC Cannot Establish a Likelihood of Success on the Merits ...................................6

    A.   No Evidence Supports the Nine-App "VR Dedicated Fitness" Market .................7

    B.   The FTC Cannot Prove Any Elements of Its Potential Competition
         Theory ................................................................................................................11

        1.   The FTC Proffers No Evidence That Its "VR Dedicated
             Fitness" Market Is Oligopolistic – as *Marine Bancorporation*
             Requires ..................................................................................................11

        2.   The "Actual Potential Competition" Claim Also Fails Because
             There Is No Evidence Meta Would Enter if It Did Not Acquire
             Within ......................................................................................................14

        3.   The "Perceived Potential Competition" Claim Fails Because
             There Is No Evidence That Fear of Meta's Entry Stopped
             Anticompetitive Conduct ..........................................................................20

    C.   The FTC Cannot Show Any Likelihood of Harm to Consumers .........................22

II.  The Equities Sharply Weigh Against Preliminary Injunctive Relief................................24

CONCLUSION...........................................................................................................................25

DEFENDANTS' OPPOSITION                                    Case No. 5:22-cv-04325-EJD

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) ...............23

*B.A.T. Indus., Ltd.*, *In re*, 1984 WL 565384 (FTC Dec. 17, 1984).................13, 15, 16, 17, 18, 19

*BOC Int'l Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977) ...............................................15, 19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........................12

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................9, 10, 11

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ....................................10

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) .........................................8

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ..........................................................6

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ........................................14

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977)..................................7, 15, 16, 17, 18, 19

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ........................................25

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980)........................................................24

*FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84 (N.D. Ill. 1981)........................................24

*FTC v. Lab. Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011)............... 6-7, 10, 24, 25

*FTC v. Meta Platforms Inc.*, 2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) ................................6

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)....................................................14

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ........................................11

*FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708 (9th Cir. 1976)........................................25

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ........................................7, 15, 17, 19

*FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) ........................................ 7

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)........................................6, 24

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989)........................................6

*Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943 (E.D. Mo. 2009),
    *aff'd*, 623 F.3d 1229 (8th Cir. 2010) ........................................20

ii

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ..............................................7, 8

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..................................10

*IT&T Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975)....................................10

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23
    (2d Cir. 2015)............................................................................................................7

*Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255
    (5th Cir. Unit A Feb. 1981)........................................................................................18

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ............................................24

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).......................................... 12-13

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ...................9

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982)....................................................13, 14, 18, 20

*Twin City Sportservice, Inc. v. Charles O. Finely & Co.*, 512 F.2d 1264
    (9th Cir. 1975)..........................................................................................................10

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019)..............................................22

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).....................................22

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014).........................14

*United States v. Booz Allen Hamilton, Inc.*, 2022 WL 9976035
    (D. Md. Oct. 17, 2022)...........................................................................................11

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)........................................................14

*United States v. Hughes Tool Co.*, 415 F. Supp. 637 (C.D. Cal. 1976).........................................21

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ......................2, 7, 11, 12, 13,
    15, 18, 19, 20, 21

*United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973),
    *aff'd mem.*, 418 U.S. 906 (1974), ...........................................................................20

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980)..............................................12, 15, 16,
    17, 18, 19, 20, 21

*United States v. U.S. Sugar Corp.*, 2022 WL 4544025 (D. Del. Sept. 28, 2022)...........................11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)..............18

DEFENDANTS' OPPOSITION                 Case No. 5:22-cv-04325-EJD

**STATUTES**

Clayton Act, 15 U.S.C. § 12 *et seq.*:

§ 7, 15 U.S.C. § 18 ........................................................................................ 7, 15, 22, 24

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* .................................................6

§ 13(b), 15 U.S.C. § 53(b) ..............................................................................6, 7, 24

DEFENDANTS' OPPOSITION                                    Case No. 5:22-cv-04325-EJD

# INTRODUCTION

Meta Platforms, Inc. ("Meta") is an American success story.  Over nearly two decades of innovation and investment, its flagship services (Facebook, Instagram, Messenger, WhatsApp) have enabled billions of people around the world to communicate, share, and be entertained.  But business success is fragile.  Meta faces not only fierce competition in all of its business but also the reality that Apple and Google, companies many times Meta's size, control the platforms that Meta relies on to conduct its business.

To confront these challenges – and because it has never been content to rest on past success – Meta is investing billions to pioneer development of a new computing platform.  Built on internet-enabled devices, virtual reality ("VR") and augmented reality ("AR") – and the metaverse experiences that these technologies enable – will offer people the ability to socialize, work, and enjoy other activities in a brand new way.  Other large and successful technology companies like ByteDance, HTC, Sony – ███████████████ – are following Meta's lead into VR, AR, and the metaverse.  The competition in this space is already intense and is only growing.  Many observers have commented on the audacity of Meta's strategy, and some have questioned its prospects.  But Meta's vision is a more open ecosystem, free of the dominance of Apple and Google, and it has made a major bet that it will succeed.

To realize that vision, Meta needs more than just a VR platform strategy.  It needs a wide range of attractive applications ("apps") that enable consumers to *do* things on these platforms.  Although Meta has attempted to develop some VR apps, it is fundamentally a VR platform developer and not a VR app developer.  It has instead encouraged, funded, and (in a few cases) acquired third-party app developers – all to help create a menu of appealing options that will attract consumers to these novel platforms.  In short, Meta's announced and executed strategy is to expand the VR "ecosystem."  This expansion is critically important because VR is currently a niche product, limited for the most part to a modest audience of "gamers."

This case involves the acquisition of Within Unlimited, Inc. ("Within"), a small startup that developed and offers a VR fitness app called "Supernatural."  Meta seeks to acquire Within and its expert VR developers and engineers focused on fitness as part of Meta's efforts to expand the

1

audience for VR beyond "gamers" while scaling Supernatural.  Owning a fitness app will help Meta make both VR hardware and software better suited to this new fitness use case.  That will be good for Meta, developers, and consumers.

The Federal Trade Commission ("FTC") no longer claims the acquisition may lessen *horizontal* competition between Supernatural and Meta's Beat Saber.  Rather, it concedes this is a *vertical* acquisition – Meta is acquiring a company that makes software to complement its Quest hardware.  The pro-competitive benefits of such transactions are well-recognized; there has not been a single successful antitrust challenge to a vertical acquisition litigated in 50 years.  The FTC therefore attempts to block this acquisition because it eliminates "actual" or "perceived" potential competition.  But its theories find no support in existing law; the FTC is seeking to make new law, asking this Court to do what Congress and the courts have *not* done.

The reason this case cannot succeed is clear:  it does not satisfy the authoritative standards that the Supreme Court set down in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974), which swept aside a patchwork of prior "potential competition" cases.  *Marine Bancorporation* holds that *no* potential competition theory applies unless the relevant market is "oligopolistic" and protected by steep entry barriers, where a small number of entrenched firms can and do coordinate pricing and behavior to protect high profits.  The Supreme Court pointedly refused to endorse the actual potential competition theory and expressed skepticism that *any* such claim could ever work – certainly not without "proof" that the acquirer would actually enter itself but for the transaction.  And, as to perceived potential competition, the Court held that the theory requires that a perceived entrant on the edge of the market *actually* and *uniquely* restrained oligopolistic, coordinated behavior.  The FTC alleges (let alone proves) nothing of the sort.

The parties disagree fundamentally on the law:  the FTC ignores the substance of *Marine Bancorporation*, pretending that it need not satisfy the Supreme Court's rigorous and precise test.  It urges this Court to block the acquisition because, in the agency's view, it would be better if Meta "built" rather than "bought."  Such regulatory central planning has no legal support and does not come close to satisfying *Marine Bancorporation*.  And the FTC's evidence fails to meet even the toothless standard that it puts forth.

2

***The FTC is not likely to succeed on the merits.***  The FTC's "VR dedicated fitness app" market – which the FTC increased from five to nine firms since it commenced this case – is a litigation fiction.  *Every relevant competitor* who will testify – including representatives of three of the FTC's claimed in-market apps and one that is poised to enter – will state that there are many other VR and non-VR fitness alternatives available to consumers beyond the nine cherry-picked apps that comprise the FTC's gerrymandered market.  And even the FTC's invented market is neither oligopolistic nor even "concentrated" in any meaningful respect.  It is robustly competitive with many competitors jockeying for consumers' attention and more entering all the time.

As to actual potential competition, Meta had and has no intention of entering the alleged market by building its own VR fitness app or modifying an existing app – and the FTC has *no* evidence to the contrary.  Instead, substantial evidence will show that the senior executives who would have been required to approve any such plan – and its funding – were never even presented with a proposal and would not have approved it in any event.  The FTC's reliance on scraps of emails reflecting employee brainstorming is not even close to proof of what Meta would or will actually do, particularly given its financial challenges and priorities.

As to perceived potential competition, the relevant competitors (most notably Within) will uniformly testify that they do not perceive Meta as a likely entrant and certainly not a *uniquely* likely or well-positioned entrant.  They did not make decisions based on concern over Meta as an entrant, much less halt anticompetitive coordinated conduct for that reason.  The competitors instead view many other fitness and technology firms as potential entrants.  There is no credible evidence that fear of Meta, and Meta alone, had any actual effect on competition.

***The balance of the equities does not support an injunction.***  If the FTC gets its injunction, ████████████████████████████████████████████.  Meta will fall behind larger rivals like ███████████████████████████.  But as part of Meta, Supernatural can reach additional consumers and jumpstart innovations that will make VR a more effective alternative in the crowded fitness space – broadening VR's reach to new audiences and use cases.  Moreover, if the FTC succeeds in killing this deal based on nothing more than the assertion that Meta could build rather than buy, it will deal a cruel blow to investment in the VR ecosystem,

3

where the possibility of being acquired is a key incentive.  The FTC offers nothing to counterbalance, other than a self-serving claim that it is protecting the public interest.  No public interest is served by blocking this pro-competitive acquisition.

## BACKGROUND

Meta is investing billions of dollars in – and making a substantial bet on – VR.  Its aim is audacious:  to build the next "general computing" platform, competitive with today's dominant PC and smartphone incumbents, e.g., Apple and Google.  *See* Ex. 1 (Zuckerberg 11:1-12:16, 197:10-198:4, 200:4-201:5); Ex. 2 (Bosworth 113:15-115:1); Ex. 3 (PX0224-002).  Meta manufactures a popular VR headset – the Quest 2 – and it recently released an innovative new headset, the Quest Pro.  *See* Ex. 4 (Carlton Rep. ¶ 37); Ex. 5 (Zyda Rep. ¶ 84 & Fig. 1).

But vigorous competition among many powerful competitors will determine winners and losers in this new arena.  *See* Ex. 4 (Carlton Rep. ¶¶ 36-39).  VR is nascent – the FTC admits that the "VR industry is currently characterized by a high degree of innovation and growth," Am. Compl. ¶ 25 – as Meta's Quest 2 sales are only a fraction of PC, smartphone, and gaming console sales.  *See* Ex. 4 (Carlton Rep. ¶¶ 34-35 & Tbl. 1); Ex. 5 (Zyda Rep. ¶¶ 83-84 & Fig. 1).  And VR competition is dynamic, featuring significant actual and expected entry from some of the most successful technology companies in the world.  *See* Ex. 4 (Carlton Rep. ¶¶ 36-37); ██████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ .

So far, VR is also niche, appealing mostly to a small audience of gaming enthusiasts.  *See* Ex. 1 (Zuckerberg 200:4-201:5); Ex. 3 (PX0224-002).  To grow VR, Meta and its rivals need a rich ecosystem of apps that will attract a broad range of users, who will attract more app developers, who will in turn attract even more users.  *See* Ex. 1 (Zuckerberg 92:20-93:18); Ex. 9 (Verdu 9:1-10:23); Ex. 4 (Carlton Rep. ¶¶ 144, 169, 180); *see also* Am. Compl. ¶ 6.  Meta therefore offers developers support, including a platform for distribution plus technological and financial assistance – even for third-party apps that compete against Meta apps.  *See* Ex. 2 (Bosworth 204:21-205:8); Ex. 10 (Rabkin 47:7-19); Ex. 11 (Rubin 30(b)(6) 64:6-68:10); Ex. 4 (Carlton Rep. ¶¶ 141-144, 183-185).  Meta's goal is a library with, ultimately, many thousands of apps to rival app stores on

4

smartphones and PCs – not only games but also apps for social, productivity, and many more use cases.  *See* Ex. 1 (Zuckerberg 51:21-53:20); Ex. 11 (Rubin 30(b)(6) 23:19-26:11, 38:5-20).

Fitness is one such use case that can expand VR's audience beyond gamers (who tend to be younger males) to a broader population (including older and female users).  *See* Ex. 9 (Verdu 61:13-62:13); Ex. 4 (Carlton Rep. ¶ 66).  In just three years, developers have built more than 100 apps for the Quest platform that Meta classifies as "fitness" apps – *see* Ex. 12 (Paynter 30(b)(6) 56:22-23); Ex. 13 (PX0451) – and developers expect additional significant new entry soon.  *See* Ex. 14 (Garcia Decl. ¶¶ 9-11, 17-19); Ex. 15 (Janszen Decl. ¶¶ 10, 19-25, 37).

However, the fitness use case in VR remains unproven.  *See* Ex. 16 (Vickey Rep. ¶¶ 29-31). Fitness, and "connected fitness" in particular, is a crowded field, with scores of products, services, and applications available to consumers on- and off-VR, ranging from Apple Fitness+ – ███ ██████████████████████████████████████████████████████ – to the augmented reality Peloton Guide, video streaming on YouTube, and more.  *See* Ex. 4 (Carlton Rep. ¶¶ 69-80 & App'x Tbl. 12); Ex. 16 (Vickey Rep. § IV(A)(3) & App'x C); ████ ████████████████████████████████████████████████████████ ███████████████████.

Meta determined that it would be a good idea to support VR fitness.  *See* Ex. 1 (Zuckerberg 153:7-154:2).  It discussed but dismissed the idea of building an app from the ground up – Meta has little experience building VR apps from scratch, and it possesses zero fitness expertise, experience, or branding, among other resources.  *See* Ex. 10 (Rabkin 194:4-196:22); Ex. 20 (Rubin 166:11-171:8); *see also* Ex. 21 (Meta's Supp. Resp. to FTC Interrog. No. 5).  Instead, Meta's success with VR apps has largely been improving and scaling startups.  *See* Ex. 20 (Rubin 173:5-175:21); Ex. 4 (Carlton Rep. ¶¶ 192-193); *see also* Ex. 11 (Rubin 30(b)(6) 53:12-55:13).

So Meta decided to support third-party developers bringing VR fitness apps to the public, including Within, Odders Labs (which develops one of the in-market apps), and more.  *See* Ex. 22 (Meta's Supp. Resp. to FTC Interrog. No. 3); Ex. 23 (META-E-LIT-DATA-0000029); *see also* Ex. 24 (Brown 30(b)(6) 11:12-14, 14:13-16, 16:23-17:1); Ex. 11 (Rubin 30(b)(6) 38:5-20, 64:6-17); Ex. 4 (Carlton Rep. ¶¶ 141-144).  Meta saw Within's Supernatural – a VR fitness app ████████

1 ██████████████████ a high-quality user experience built on promising technologies, *see* ██

2 ██████████████████; Ex. 11 (Rubin 30(b)(6) 27:25-28:20, 35:9-19) – as a way to

3 showcase fitness as a VR use case, attract a new and broader group of users to VR, and spur new

4 entry among developers.  *See also* Ex. 14 (Garcia Decl. ¶¶ 25-26); Ex. 15 (Janszen Decl. ¶¶ 29-31).

5      Meta is acquiring Within to grow the VR ecosystem.  If the acquisition closes, Meta will

6 improve and scale Supernatural; and Meta will use the Within studio as a laboratory for improving

7 the Quest platform for all fitness apps by developing technologies it will share freely with

8 competitive fitness app developers – just as Meta uses its gaming studios to innovate technologies

9 that it shares with app developers that compete against Meta's own games.  *See* Ex. 11 (Rubin

10 30(b)(6) 8:14-12:5, 53:12-55:13); *see also* Ex. 10 (Rabkin 171:8-172:5).

11      But if the Court blocks the acquisition, ████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████ Meta will not build its own VR fitness app for many reasons, including the relatively

15 low priority for this use case.  *See* Ex. 2 (Bosworth 211:1-216:4); Ex. 11 (Rubin 30(b)(6) 31:13-

16 33:1); *see also* Ex. 1 (Zuckerberg 147:10-152:11).  Investment in VR fitness generally will take a

17 significant blow.  *See* Ex. 4 (Carlton Rep. ¶¶ 40-41, 189); *see also* Ex. 14 (Garcia Decl. ¶¶ 25-26);

18 Ex. 15 (Janszen Decl. ¶¶ 29, 31).  And consumers will be worse off for it.

19 **ARGUMENT**

20 **I.    The FTC Cannot Establish a Likelihood of Success on the Merits**

21      Section 13(b) of the Federal Trade Commission Act requires the FTC to show a "likelihood

22 of ultimate success."  *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999).  Consistent

23 with traditional equitable standards, that entails establishing "probable success."  *FTC v. World*

24 *Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  The FTC does not, as it asserts (at 11), carry

25 its burden merely by raising "questions."  *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159-

26 60 (9th Cir. 1984) (per curiam).  Rather, courts are "charged with exercising their 'independent

27 judgment' and evaluating the FTC's case and evidence on the merits."  *FTC v. Meta Platforms Inc.*,

28 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022) (citation omitted); *see also FTC v. Lab. Corp.*

*of Am.*, 2011 WL 3100372, at *15 (C.D. Cal. Mar. 11, 2011) ("serious question" standard does not eliminate "FTC's need to demonstrate a likelihood of success on the merits").

      Under the prevailing substantive standard set by *Marine Bancorporation*, the FTC has <u>lost</u> each of the three potential competition cases that it has brought under Section 13(b) in the last 50 years. *See FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) (denying Section 13(b) injunction); *FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) (same); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same). The FTC does not attempt to satisfy *Marine Bancorporation* here – it just ignores it. This claim fails – like all those before it – for at least three reasons. *First*, the FTC's made-for-litigation "VR dedicated fitness" market is impermissibly narrow. Supernatural competes in a space that is robustly dynamic and competitive, not limited to the few VR apps the FTC arbitrarily selected. (Part A) *Second*, the FTC cannot prove a single element of its potential competition theories: there is no evidence that (1) the market is afflicted by oligopoly structure or behavior; (2) Meta would actually enter on its own; or (3) market participants perceive Meta as the only potential entrant such that it actually deterred coordinated anticompetitive conduct. (Part B) *Third*, the FTC has not shown (and cannot show) that the acquisition is likely to result in harm to competition and consumers, as Section 7 requires. (Part C)

## A.    No Evidence Supports the Nine-App "VR Dedicated Fitness" Market

      **1.**    The FTC's claim fails because it cannot establish a relevant antitrust market. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 619 (1974). Specifically, the FTC's market definition – limited to just nine selected "VR dedicated fitness apps" – impermissibly omits scores of "[e]conomic substitutes," i.e., products that "have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted). Products are reasonably interchangeable in the antitrust context where consumers can use them "for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015). The FTC's market does not include, as it must, "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Hicks*,

897 F.3d at 1120-21; *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1015 (N.D. Cal. 2021) (plaintiff's market definition "cannot ignore economic reality").  No witness other than the FTC's economist – who has no expertise in this area – has provided evidence to support the FTC's market.  Not one.  Every witness with actual knowledge of this arena has refuted the FTC's artifice.

Scores of products, services, and apps are available to consumers who want to exercise.  *See* Ex. 16 (Vickey Rep. § IV(A)(3) & App'x C); Ex. 27 ██████████████████████████.  That includes 150 apps on the Quest platform that Meta classifies as "fitness," *see* Ex. 12 (Paynter 30(b)(6) 56:22-23); fitness apps on gaming consoles and other VR platforms, *see* Ex. 4 (Carlton Rep. ¶¶ 104-112); and scores of off-VR "connected fitness" products and services, e.g., Apple Fitness+, the Peloton Guide, and more, *see* Ex. 16 (Vickey Rep. § IV(A)(3) & App'x C).  Meta's ordinary course documents – including each the FTC cites (at 5 & n.1) – explain that many VR apps the FTC omits ██████████████████████████ (Ex. 28 (PX0102-049)), ██████████ ██████████████████████████ (Ex. 29 (PX0452-003)), and ██████████ ██████ (Ex. 30 (PX0557-008)).  *See also* Ex. 4 (Carlton Rep. ¶¶ 104-112 & App'x Tbl. 13).

Witnesses from the so-called "VR dedicated fitness app" market confirm that omitted VR apps and off-VR fitness products are competitors.  ██████████████████████████ ██████████████████████████ *see* ██████████████████████████ ██████████████████████████.  *See* Ex. 31 (PX0672 at 046) ██████████████████████████ ██████; Ex. 32 (PX0664) ██████████████████████████; Ex. 33 (PX0667 at 033) ██████████████████████████; Ex. 34 (WITH000258643 at 650-51) ██████████████████████████.  The developer of Les Mills Body Combat identifies the following competitors:  "at-home smart fitness equipment or apps (e.g., Peloton, Mirror, Tonal, Apple Fitness+, Zwift, ClassPass); fitness solutions offered on gaming consoles . . . ; and fitness options offered on competing and emerging VR systems," Ex. 14 (Garcia Decl. ¶ 17) – all of which the FTC omits.  And the founder of VirZoom, another "VR dedicated fitness app," lists as competitors "over 200 fitness related apps" on VR plus "in-home connected" fitness products.  Ex. 15 (Janszen Decl. ¶¶ 21-24).

Established fitness and technology firms as well as new entrants likewise view VR fitness as competitive with off-VR products.  For example, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████.  And Black Box VR – a fitness company and VR app developer – plans to launch a new VR fitness app "within the next year" that will "compete with all of those options (both physical, at-home, and two-dimensional apps)."  Ex. 36 (Lewis Decl. ¶¶ 18-20, 31).  This industry recognition of product overlap destroys the FTC's artificial market definition.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 (D.C. Cir. 1986) (crediting the view of industry participants).

**2.**     The FTC's arguments in support of its proposed market cannot come close to establishing a likelihood of success in overcoming these facts.

**a.**     The FTC relies on supposed "practical indicia," but its selective and self-contradictory assertions do not substantiate its market definition.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The FTC claims (at 13-14) that "VR dedicated fitness apps" have "peculiar characteristics and uses" because they can be immersive and portable, or include trainer-designed courses and fitness tracking – but that says nothing about whether other products offer similar features, much less whether such characteristics are so distinctive that other fitness products do not compete.[1]  *See* Ex. 4 (Carlton Rep. ¶¶ 104-105).  "[M]erely asserting that a commodity is in

---

[1] The FTC asserts (at 14-15) that "VR dedicated fitness" appeals to an "older" and "more female" audience – *cf.* Ex. 28 (PX0102-019) (█████████████████████████ ████████) – without even attempting to show that these consumers do not consider off-VR fitness products as substitutes.  And the FTC's citation dump (at 15) includes contradictory ordinary course documents showing that ████████████████████████████████ ██████████████████████████ Ex. 37 (PX0529-004); Ex. 30 (PX0557-016), and ████████████████████████████████, *see* Ex. 38 (PX0908).

9

1   some way unique is insufficient to plead" – let alone prove – "a relevant market." *Concord Assocs.,*

2   *L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016); *see also IT&T Corp. v. Gen. Tel. & Elecs.*

3   *Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (criticizing rote application of *Brown Shoe* indicia to

4   ignore what is "economically significant"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137,

5   1149 (N.D. Cal. 2020) (differentiated features do not put products in separate markets).

6          The FTC makes *no* showing (nor could it) that myriad other connected fitness products,

7   services, and apps off-VR do not also feature portability, immersion, fitness tracking, and trainer-

8   designed workouts – dozens *do* have these features.  *See* Ex. 16 (Vickey Rep. § IV(A)(3), (B) &

9   App'x C); Ex. 4 (Carlton Rep. App'x Tbl. 12).  It instead relies (at 13-14) on sleight of hand – e.g.,

10  noting the Peloton Bike is not portable, but ignoring that Peloton's AR product (the Peloton Guide)

11  and mobile fitness app are portable, *see* Ex. 16 (Vickey Rep. ¶ 43) – and incomplete snippets of

12  testimony from deponents who also concluded that ████████████████████████████████

13  ████████████████, Ex. 39 (Pruett 135:16-136:4), or that ██████████████████████

14  ██████████████, *see* Ex. 9 (Verdu 22:18-23:7).  For example, the FTC cites Mr. Zuckerberg's

15  deposition (at 14), while eliding his testimony that ████████████████████████████████

16  ████████████████████████  Ex. 1 (Zuckerberg 209:8-211:11).  And of millions of produced

17  pages, the FTC cites three documents (at 13-14) as supposed proof that VR has unique fitness

18  features, even though each ██████████████████████████████████████████████████████

19  ██████████.  *See* Ex. 40 (PX0111-001) ████████████████████████████████████████

20  ██████; Ex. 41 (PX0573-001) ██████████████████████████████████████████████████

21  ██████████████; Ex. 42 (PX0906-007) ██████████████████████████████████████████.

22         The FTC does no better pointing (at 14) to how "VR dedicated fitness apps" supposedly

23  have different prices and pricing models.  "[T]he relevant market is not governed by the presence of

24  a price differential between competing products," *Twin City Sportservice, Inc. v. Charles O. Finely*

25  *& Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975), and products are not in separate markets "simply

26  because consumers pay for those products in different ways," *Lab. Corp.*, 2011 WL 3100372,

27  at *18.  More striking, many of the apps that the FTC includes in the market are *not* subscription-

28  only services.  *See* Ex. 16 (Vickey Rep. ¶ 47); Ex. 4 (Carlton Rep. ¶ 109).  And as to price, the FTC

10

simply ignores the many off-VR subscription alternatives – including Apple Fitness+ – that are cheaper than Supernatural. *See* Ex. 4 (Carlton Rep. ¶ 112); Ex. 16 (Vickey Rep. ¶ 49). The range of business models and a continuum of pricing for on- and off-VR fitness products make price an "unrealistic" way to define the market. *Brown Shoe*, 370 U.S. at 326.

      **b.**      The FTC offers no evidence at all regarding consumers' actual substitution patterns; it instead relies (at 15) exclusively ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. *Cf.* Ex. 4 (Carlton Rep. ¶¶ 69-74 & Tbls. 11-13) ██████████████████████████████████████████████████ ████████████████████████. That survey is junk science that provides evidence of nothing except perhaps the enthusiasm of a ████████████████ of the early adopters who like Supernatural. *See United States v. Booz Allen Hamilton, Inc.*, 2022 WL 9976035, at *13 (D. Md. Oct. 17, 2022) (rejecting methodologically flawed hypothetical monopolist test); *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022) (rejecting hypothetical monopolist test contrary to industry evidence); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 308-09 (D.D.C. 2020) (similar). ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████. *See* Ex. 43 (Dubé Rep. ¶¶ 28-31); *see also id.* ¶¶ 32-46 (describing other flaws in the survey); Ex. 4 (Carlton Rep. ¶¶ 89-93). There is neither quantitative nor legally valid support for the FTC's contrived market definition. *See* Ex. 4 (Carlton Rep. ¶¶ 88, 91, 93 & Tbls. 14-16).

      **B.**      **The FTC Cannot Prove Any Elements of Its Potential Competition Theory**

          **1.**      **The FTC Proffers No Evidence That Its "VR Dedicated Fitness" Market Is Oligopolistic – as *Marine Bancorporation* Requires**

      **a.**      *Marine Bancorporation* – the Supreme Court's last and definitive word on potential competition – holds that the "potential-competition doctrine . . . comes into play *only* where there *are* dominant participants in the target market engaging in interdependent or parallel behavior *and*

11

with the capacity effectively to determine price and total output of goods or services." *Marine Bancorporation*, 418 U.S. at 630 (emphases added).  That requires the FTC to prove that the "VR dedicated fitness" market is *not* "in fact genuinely competitive" today.  *Id*. at 631; *see also United States v. Siemens Corp.*, 621 F.2d 499, 505 n.6 (2d Cir. 1980) ("[T]he perceived potential competition doctrine is only available to the Government if the market is oligopolistic.").  The FTC utterly fails to satisfy this demanding standard applicable to both of its theories – it does not even try.  And the evidence here shows an intensely competitive space with constant new entry – conditions that the Supreme Court has held foreclose any potential competition claim.

 *First*, the FTC proffers no evidence that any "participants" in the so-called "VR dedicated fitness" market "*are* . . . engaging" in oligopolistic conduct.  *Marine Bancorporation*, 418 U.S. at 630 (emphasis added).  There is no evidence of coordination, parallel pricing, or profit-maximizing output restraints.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (defining oligopoly behavior).  The nine apps the FTC includes are brand new – two entered in 2022 – and wide-ranging.  *See* Ex. 4 (Carlton Rep. ¶¶ 56-62).  Far from coordinated pricing, their prices and pricing structures are all over the place – ranging from free, to one-time purchase, to monthly only subscriptions, to monthly or annual subscriptions.  *See id.* ¶ 88 & App'x Tbl. 12.  There is no evidence of any coordinated price increases.  *See id.* ¶¶ 126-129 & App'x Tbl. 4.  Nor is there any evidence of supracompetitive pricing or profits – on the contrary, ███████████ ███████████████████████████████████████████████████ ███████ .  *See* ████████████████████████████████████████████████ ; *see also* Ex. 4 (Carlton Rep. ¶¶ 90, 120).  Two of the FTC's other "VR dedicated fitness apps" have submitted sworn testimony that there is no parallel or interdependent behavior as to pricing or otherwise.  *See* Ex. 14 (Garcia Decl. ¶¶ 34-35); Ex. 15 (Janszen Decl. ¶¶ 36-38); *see also* Ex. 44 (Singer Rep. ¶¶ 132-136) (describing current competition).  This evidence is unrefuted.

 *Second*, the FTC has also failed to show, as it must, that the structure of the claimed market is such that the nine current "VR dedicated fitness apps" have "the capacity effectively to determine price and total output."  *Marine Bancorporation*, 418 U.S. at 630.  For firms to have such power, "entry barriers must be significant."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir.

12

1995); *see also In re B.A.T. Indus., Ltd.*, 1984 WL 565384, at *8 (FTC Dec. 17, 1984) (rejecting potential competition claim where entry barriers were low). The FTC has no evidence to make such a showing; in fact, more firms enter constantly. *See* Ex. 4 (Carlton Rep. App'x Tbls. 12-13). Every firm in the FTC's market began as a tiny startup. *See id.* ¶¶ 60-61; Ex. 14 (Garcia Decl. ¶ 31); Ex. 15 (Janszen Decl. ¶¶ 3-4); *see also* Am. Compl. ¶ 61. And the number of those firms *grew* by nearly 30 percent in 2022 alone, even using the FTC's contrived market definition, *see* Ex. 4 (Carlton Rep. ¶ 57 & Tbl. 7); with more entry expected in 2023, *see* Ex. 36 (Lewis Decl. ¶¶ 13-14); Ex. 4 (Carlton Rep. ¶¶ 51, 129). That actual and expected entry demonstrates that building a successful VR fitness app takes skill and luck, but not a lot of cash or an existing network of users. *See* Ex. 20 (Rubin 171:14-172:11); Ex. 4 (Carlton Rep. ¶¶ 61, 151, 155-156). The FTC's assertion that Meta might increase entry barriers by restricting access to Quest – which it has never done – is pure speculation and economically irrational: Meta needs *more* third-party apps on its VR platform to attract consumers. *See* Ex. 1 (Zuckerberg 51:21-53:20); Ex. 2 (Bosworth 121:21-122:5, 171:7-172:11, 204:21-205:8, 229:2-230:18); Ex. 11 (Rubin 30(b)(6) 66:16-68:10); *see also* Ex. 4 (Carlton Rep. ¶ 180); Ex. 5 (Zyda Rep. ¶¶ 46-47, 89-96). And there are many other existing and forthcoming VR platforms besides Meta's on which to launch apps. *See* Ex. 4 (Carlton Rep. ¶¶ 36-39, 45, 55 & App'x Tbl. 1); Ex. 5 (Zyda Rep. ¶¶ 89-96); Ex. 45 (Nylander Decl. ¶¶ 18-21); ███ ██████████████████████████ .

     **b.**     The FTC asserts (at 16-17) that it satisfies *Marine Bancorporation* simply by claiming the market is concentrated based on snapshot revenue figures. But that is both factually incorrect, as the "market" is vibrant and growing, and legally irrelevant.

     To start, the FTC ignores the express terms of *Marine Bancorporation*: evidence of oligopolistic *behavior*, not just a showing that the market is concentrated, is *required*. The FTC cannot succeed without evidence of "actual market behavior, and especially the presence . . . of significant parallel conduct." *Marine Bancorporation*, 418 U.S. at 632 n.34. That makes perfect sense because, if the market is *behaving* competitively, then there are no grounds for treating one firm's potential entry as critical to competition. The FTC says nothing about behavior and even invokes (at 16) *Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982), which explains that "high

13

concentration" ratios make a market "a *candidate* for the potential-competition doctrine," subject to examination for oligopolistic "structure" and actual "conditions in the market." *Id.* at 352-53 (emphasis added).[2]  The FTC's tacit admission that it cannot satisfy the oligopoly element should end this case.  *See FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004) ("[P]laintiffs have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined.").

Further, the FTC's claim (at 17) of "concentration" is empty, because historical revenue proves nothing about the structure of the claimed market – factually, *see* Ex. 4 (Carlton Rep. ¶¶ 115-121, 132-133), or legally, *see United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 501 (1974) ("Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete.").  As market participants have testified, firms in this dynamic new arena are vying for customers – not yet measuring progress by revenue.  *See* Ex. 15 (Janszen Decl. ¶ 30). ███████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ *See* ███████████████  The blossoming of new apps – including four the FTC added to its list of five *since filing its complaint* – is a testament to the fact that the "market" is not remotely concentrated or blocked.  *See* Ex. 4 (Carlton Rep. ¶¶ 124-130).  This is the very picture of vigorous competition.  *See* Ex. 36 (Lewis Decl. ¶¶ 13-14).

### 2. The "Actual Potential Competition" Claim Also Fails Because There Is No Evidence Meta Would Enter if It Did Not Acquire Within

The FTC does not even try to argue that there is "clear proof" Meta would actually build its own "VR dedicated fitness app" but for the transaction.  Yet the FTC itself has held that such clear

---

[2] Contrary to the FTC's assertion (at 17 n.3), *United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014), does not lower the bar for emerging technologies – the court did not "weigh in on this debate." *Id.* at *76.  And the Ninth Circuit has clarified that antitrust courts must be wary of interfering with "novel business practices – *especially* in technology markets," lest intervention impede "innovation." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990-91 (9th Cir. 2020).

14

proof is required.  *See B.A.T. Indus.*, 1984 WL 565384, at *10 ("Our review of the legal and economic bases for the actual potential competition doctrine has persuaded us that clear proof that independent entry would have occurred but for the merger or acquisition should be required to establish that a firm is an actual potential competitor.").  The FTC adopted that standard after the Supreme Court doubted the theory's existence on the ground that "[u]nequivocal proof that an acquiring firm actually would have entered de novo but for a merger is rarely available."  *Marine Bancorporation*, 418 U.S. at 624; *see also Atl. Richfield*, 549 F.2d at 294 ("[t]he novelty of the doctrine and the absence of definitive authority sanctioning it and defining its parameters could well serve as a basis for denial of a preliminary injunction under [§] 13(b)").[3]

The FTC's attempt to avoid that law echoes its most recent failed actual potential competition case (*Steris*).  There as here, the FTC argued for a lower standard, but could not satisfy it, even with far more credible evidence of likely entry.  *See Steris*, 133 F. Supp. 3d at 966 (citing FTC's brief).  The FTC has not come close to making any showing of probable entry; its claim rests on nothing more than snippets of emails about ideas Meta never pursued.  Substituting the FTC's business judgment for that of Meta's witnesses is not proof of anything.

    **a.**    The evidence is unequivocal:  Meta never had any plan and still has no plan to build a VR fitness app, and it will not build one if the acquisition is blocked.  The company decided to pursue an acquisition because the brainstormed ideas to build were impractical concepts and Meta never pursued them in any serious way.  *See* Ex. 9 (Verdu 110:10-111:8, 178:7-180:18, 198:18-200:22).  No one at Meta ever presented a plan for building a fitness app to the Meta decision makers who would need to sign off.  *See* Ex. 1 (Zuckerberg 243:6-7) ███████████████████ ████████████████████████████████; *id.* at 164:3-164:7; Ex. 2 (Bosworth 223:21-22) ███████████████████████████████████; *see*

---

[3] The theory fails here, assuming *arguendo* it exists.  *See* Dkt. 108, at 16-17.  Neither the Supreme Court, the Ninth Circuit, nor this district has ever accepted "actual potential competition" as a viable Section 7 claim.  *See Siemens*, 621 F.2d at 504 (noting "the Supreme Court's reluctance to embrace the doctrine"); *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 25 (2d Cir. 1977) (similar).

15

*also* Ex. 9 (Verdu 178:7-20).  And those Meta senior executives testified that no Meta-developed VR fitness app would have been approved before the Within deal, nor would it be approved now. *See* Ex. 1 (Zuckerberg 150:9-14, 238:12-240:17); Ex. 2 (Bosworth 211:1-16).  Ignoring this conclusive testimony, as the FTC does, is no answer for it.  The absence of any "concrete plans" that made it to "progressively higher levels of corporate management" is fatal.  *B.A.T. Indus.*, 1984 WL 565384, at *6, *12-13.

The ideas went nowhere for good reason:  Meta has no fitness expertise, limited and non-fungible VR engineering resources, and no history of successfully building VR apps from scratch. *See*, *e.g.*, Ex. 9 (Verdu 182:1-15, 229:3-231:7) ███████████████████████████████ ███████████████████████████████████████████ ████████; Ex. 46 (Dass 100:4-103:5) ██████████████████████████; Ex. 10 (Rabkin 194:4-195:15) ██████████████████████████████████; Ex. 47 (Stojsavljevic 147:25-148:12) ████████ ███████████████████; Ex. 39 (Pruett 284:6-18) ████████████████████████ ████████; Ex. 20 (Rubin 166:11-172:11) (same); Ex. 2 (Bosworth 225:2-227:1).  That evidence eviscerates the claim.  *See Siemens*, 621 F.2d at 507; *see also Atl. Richfield*, 549 F.2d at 296 (no evidence of actual potential entry where acquirer lacked "complete technical expertise").

The contemporaneous ordinary course documents are consistent in recounting Meta's lack of serious interest in building a VR fitness app.  ███████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 48 (PX0179-002); *see also* Ex. 49 (PX0127-001) ████████████████████████████████████████████ ███████████████; Ex. 50 (META-E-2R-03628924 at 924) ████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████.  Completely

1    contrary to the FTC's theory, ████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████   Ex. 51 (META-E-2R-06413061 at 063, 065).  By contrast, the FTC identifies no

5    documents that evince any "concrete" planning, budgeting, or steps – let alone approval.[4]  *B.A.T.*

6    *Indus.*, 1984 WL 565384, at *6; *see also Atl. Richfield*, 549 F.2d at 296 (without more, mere

7    "continuing interest . . . and continuing studies as to the best means of entry . . . fails to show a

8    significant commitment at the decisional level").

9           Each Meta document the FTC identifies (at 20) reflects merely that Meta considered

10   alternative entry, yet ultimately dismissed the concept.  *See* Ex. 48 (PX0179-002).  There was never

11   a plan to build.  And even a plan would not suffice unless it had been approved by responsible

12   executives.  *See Steris*, 133 F. Supp. 3d at 977 (denying injunction because "the business plan" for

13   alternative entry "had not been approved").[5]  As Meta's Chief Technology Officer and head of its

14   VR division explained, ███████████████████████████████████████████

15   ████████.  Ex. 2 (Bosworth 211:1-16, 217:2-221:6, 226:1-8, 227:24-228:24).  Ideas that never

16   developed into plans prove nothing, and plans not presented and approved are far short of the mark.

17   *See B.A.T. Indus.*, 1984 WL 565384, at *13 ("Internal plans that have not been approved at that

18   level cannot be relied upon, regardless of how enthusiastically they promote independent entry,

19   because they cannot be characterized as the concrete plans of the corporation itself."); *see also*

20   *Siemens*, 621 F.2d at 508 ("reliance upon a few memoranda of lower echelon" employees "as

21

22

23          [4] The Meta document labeled ███████████████████████████████████

24   ████████████████████████████████.  Ex. 52 (META-E-LIT-00052181).

25          [5] The contrast with the evidence in the only recent potential competition case the FTC has

26   (unsuccessfully) attempted (*Steris*) is stark.  There, the target was already providing services in

27   Europe, and there was an already-approved project (at the board level) to enter the market in the

28   United States.  *See Steris*, 133 F. Supp. 3d at 972-73.  The court found *that* evidence insufficient.

17

indicative of an intent to enter the market de novo is misplaced," particularly where "their views do not appear to have been brought to the attention of the decision-making management").

**b.**    The FTC argues that (1) the Court should disregard Meta's witnesses and documents and rely instead on "objective" evidence (i.e., the FTC's business judgment of what would be best), and (2) "reasonable probability" of actual entry is good enough.  Both arguments are wrong.

*First*, the FTC's argument (at 19-20) that Meta *could* have entered on its own is unavailing. Ever since *Marine Bancorporation* rejected a potential competition claim and strictly limited the doctrine going forward, no court has accepted speculation based on the FTC's assessment of what a firm *could* do.  *See Tenneco*, 689 F.2d at 353-54 ("interest," "incentive," and "financial resources" to enter only amounted to "unsupported speculation"); *Siemens*, 621 F.2d at 507 ("interest and incentive to enter" was "inadequate to demonstrate the likelihood, much less the certainty," of entry); *Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255, 1268 (5th Cir. Unit A Feb. 1981) (similar); *Atl. Richfield*, 549 F.2d at 299 (same).  The FTC itself has held that resources and motive are "not sufficient" for an actual potential competition claim.  *B.A.T. Indus.*, 1984 WL 565384, at *11, *13.

The "objective" standard is not objective at all.  It is actually a "regulator knows best" standard.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (warning against "antitrust courts . . . act[ing] as central planners").  Meta's resources and supposed motive do not give it any more objective ability to build its own app than myriad others – including firms that, unlike Meta, have fitness background and expertise.  The FTC's highlighting (at 19-20) of the decision in *March 2020* – 18 months before the acquisition – to add a "FitBeat" song track to Beat Saber is revealing.  FitBeat was a two-minute track with no fitness features, not an attempt to test Beat Saber's potential as a fitness app.  *See* Ex. 53 (Carmack 63:8-23).  And, in any event, Meta never iterated on the concept, released additional fitness features, or even added a single additional fitness track, *foreclosing* the FTC's actual potential competition claim.  *See* Ex. 4 (Carlton Rep. ¶¶ 137-139).  Meta's "failure to develop a technologically sound" VR fitness app in the intervening 18 months between FitBeat and Meta's announcement of the transaction plainly "indicates that it lacks the necessary technological expertise" for entry on its own.  *Siemens*, 621

18

F.2d at 507; *see also Atl. Richfield*, 549 F.2d at 296 (dismissing "objective" evidence favoring entry where the acquirer did not have "complete technical expertise" to enter).

*Second*, the FTC's claim (at 18-19) that it need only show a "reasonable probability" is not the law.  Courts have routinely rejected that standard as unduly speculative following *Marine Bancorporation*'s warning – as has the FTC.  *See Siemens*, 621 F.2d at 506-07 (affirming order denying preliminary injunction without "clear proof that entry would occur"); *Atl. Richfield*, 549 F.2d at 294-95 (denying preliminary injunction where no evidence supported that "entry by internal expansion would appear to have been certain" because *Marine Bancorporation* "impl[ies] that the standard is one of 'unequivocal proof' in a case where only actual potential competition is claimed"); *see also B.A.T. Indus.*, 1984 WL 565384, at *9 n.34.

In any event, here, as in *Steris*, the FTC cannot satisfy its own "reasonable probability" standard – on the contrary, Meta considered building a VR fitness application but then categorically rejected the idea.  Further, "[i]f the FTC is correct, the evidence should show that if the merger does not go through," then Meta "is likely to revive its plans and build . . . in the near future."  *Steris*, 133 F. Supp. 3d at 977.  Yet here, as in *Steris*, the evidence is all to the contrary.  Mr. Zuckerberg explained that, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████  Ex. 1 (Zuckerberg 150:9-14, 238:12-240:12).  And ████████████████████████████████████████████████████████████████████

████████████████████████████████████  *Id.* at 240:14-17.  The head of Reality Labs was even more categorical: ██████████████████████████████████████████████████████

███████████████████████.  *See* Ex. 2 (Bosworth 211:1-16, 217:2-221:6, 226:1-8, 227:24-228:24).

**c.**      The FTC's claim also fails because the FTC has nothing to show that any entry would or could be "imminent."  *Marine Bancorporation*, 418 U.S. at 623 n.22.  Eliminating the mere "ephemeral possibility" of actual entry at some "wholly speculative" date uncertain is insufficient as a matter of law.  *BOC Int'l*, 557 F.2d at 28-29 (requiring entry in the "near future"); *see also Siemens*, 621 F.2d at 507 (similar); *Steris*, 133 F. Supp. 3d at 978 (requiring entry "within a reasonable period of time").  It would take Meta – which is without any in-house fitness expertise or

19

resources – *years* to build, launch, distribute, and market its own "VR dedicated fitness app." *See* Ex. 20 (Rubin 169:5-14); Ex. 11 (Rubin 30(b)(6) 31:13-33:1, 39:3-8); *see also* Ex. 9 (Verdu 189:15-190:14) ███████████████████████████████████████.  The only document the FTC cites (at 20) disproves its case: ███████████████████████████████████ ████████████████████████████████████.  Ex. 54 (PX0144-001) (emphasis added); *see also* Ex. 47 (Stojsavljevic 160:15-161:20) ████████████████.

### 3.    The "Perceived Potential Competition" Claim Fails Because There Is No Evidence That Fear of Meta's Entry Stopped Anticompetitive Conduct

The FTC presents no evidence, as it must, that "the acquiring firm's premerger presence on the fringe of the target market *in fact* tempered oligopolistic behavior on the part of existing participants in that market." *Marine Bancorporation*, 418 U.S. at 624-25 (emphasis added); *see also Tenneco*, 689 F.2d at 355; *Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943, 947 (E.D. Mo. 2009), *aff'd*, 623 F.3d 1229 (8th Cir. 2010).[6]

*First*, the FTC cites no evidence that existing "VR dedicated fitness apps" even perceive Meta as a potential entrant.  One-third of the apps the FTC claims are in the market have given sworn testimony that they did not consider Meta a likely competitor.  They also testified that fear of Meta's possible entry had *no* effect on their conduct, pricing, or behavior.  *See* Ex. 14 (Garcia Decl. ¶¶ 30-32); Ex. 15 (Janszen Decl. ¶¶ 32-35); Ex. 36 (Lewis Decl. ¶¶ 26-30); *see also* ████████████ ████████████████████████████.  And a startup that intends to enter the market next year swears the same.  *See* Ex. 36 (Lewis Decl. ¶¶ 26-30).  This uncontradicted industry testimony is dispositive.  *See Siemens*, 621 F.2d at 509 (crediting market participant's testimony that acquirer's "possible entry never had any impact upon any pricing or marketing decision").  It also makes sense: ██████████████████████████████████ – to say nothing of fitness

---

[6] The FTC incorrectly asserts (at 21-22) the standard is that the acquirer merely have a "likely influence" on market participants and competition, citing *exclusively* cases decided before *Marine Bancorporation* (e.g., *United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973)) and, as in so many other respects here, ignoring that standard.

applications specifically.  *See* Ex. 49 (PX0127-001); Ex. 20 (Rubin 166:11-172:11); Ex. 39 (Pruett 196:24-197:18, 284:6-18); Ex. 2 (Bosworth 212:21-216:4); Ex. 5 (Zyda Rep. ¶¶ 120-124).  Industry observers and participants are aware of publicity about Meta's failings in that respect.  *See* Ex. 4 (Carlton Rep. ¶¶ 146-147); Ex. 5 (Zyda Rep. ¶ 124); *see also* Ex. 14 (Garcia Decl. ¶¶ 30-32); Ex. 15 (Janszen Decl. ¶¶ 32-35); Ex. 36 (Lewis Decl. ¶¶ 26-30).

        *Second*, the FTC has no evidence that any concern about Meta "*in fact*" prevented app developers from engaging in coordinated anticompetitive conduct – a necessary predicate of a perceived potential competition claim.  *Marine Bancorporation*, 418 U.S. at 624-25 (emphasis added).  Those applications perceive *myriad* potential entry from firms of all stripes – large and small, on-VR and off-VR; losing just one could have no effect on how firms compete, particularly where market participants did not consider that firm (Meta) a likely entrant.  *See Siemens*, 621 F.2d at 509 ("Usually this is proved by evidence that the actual or perceived potential entrant is one of but a few likely entrants."); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 645-46 (C.D. Cal. 1976) (similar).  Current and future "VR dedicated fitness apps" monitor potential entry or expansion from many firms, e.g., Apple, among others.  *See* ███████████████████████████ ██████████████; Ex. 14 (Garcia Decl. ¶¶ 30-32); Ex. 15 (Janszen Decl. ¶¶ 23-25, 37); Ex. 36 (Lewis Decl. ¶ 31).  Indeed, the advantages the FTC ascribes to Meta – "vast resources" and "the market's potential" – are also held by larger technology firms with cash *and* fitness experience, including Apple and Google.  *See* Ex. 4 (Carlton Rep. ¶¶ 51, 156-157); *see also* Ex. 5 (Zyda Rep. ¶¶ 89-97); Ex. 16 (Vickey Rep. ¶¶ 25, 27).  Indeed, ████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████.  *See* Ex. 4 (Carlton Rep. ¶¶ 51-52, Tbl. 6 & App'x Tbl. 12).  ████████████████████████████████████ ███████████████████████.  *See id.* ¶ 37; Ex. 5 (Zyda Rep. ¶ 95).

        Out of millions of produced pages, the FTC's perceived potential competition claim rests (at 22-23) on just three Within internal documents – ███████████████████████████ ████████████████████████████████████████████████████████████████████.  *See* Ex. 55 (PX0615, Nov. 2020); Ex. 56 (PX0619, June 2019); Ex. 57 (PX0621, Dec. 2020).  The

earliest of these expressly ███████████████████████████████████████████████████

████████████████████████████. Ex. 56 (PX0619-002, 003).  The next one █████████████

██████████████████████████████████████████████████████████████████████

████████████████████ Ex. 55 (PX0615-008).  And the most recent document, ████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████. Ex. 57 (PX0621-002).  As for Meta releasing "FitBeat" on Beat

Saber 18 months before the transaction, Meta's decision not to expand upon that one-off endeavor

(a single two-minute song track; not a fitness app) confirms – and signals to the market – that it is

not a potential entrant interested in building on its own.  *See* Ex. 53 (Carmack 63:8-64:14); *see also*

███████████████████████████████████████████████████.

Finally, the FTC disproves its own case by arguing (at 22) that market participants perceive

Meta as a potential entrant because Beat Saber is "widely recognized as providing incidental

fitness."  Following that logic – i.e., "incidental fitness" equates to perceived ability to enter – then

*more than 100* other VR fitness apps that provide at least "incidental fitness" also qualify as

potential entrants.  *See* Ex. 12 (Paynter 30(b)(6) 56:22-23); Ex. 16 (Vickey Rep. ¶ 29).  In any

event, the Within founders gave sworn testimony as to the company's actual views of competition;

other than urging the Court to ignore them, the FTC has no answer to this dispositive proof.

### C. The FTC Cannot Show Any Likelihood of Harm to Consumers

Likely harm to consumers is a necessary element of every Section 7 claim.  *See United*

*States v. Baker Hughes Inc.*, 908 F.2d 981, 900 n.12 (D.C. Cir. 1990) (Section 7 requires "a

judgment whether the challenged acquisition is likely to hurt consumers"); *see also United States v.*

*AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (same).  The FTC must prove that the merged

entity would raise prices or restrict output.  But there is no evidence of that; on the contrary, Meta's

clear incentive is to make Supernatural more appealing and widely available to consumers.

*First*, there is no evidence that Meta intends to raise prices or restrict output of Supernatural.

The evidence is that Meta intends to expand the audience for Supernatural in order to drive

expansion of headset sales.  *See* Ex. 1 (Zuckerberg 152:20-154:24); Ex. 11 (Rubin 30(b)(6)

5:6-7:13).  If anything, Meta is an empirical price *cutter*.  *See* Ex. 4 (Carlton Rep. ¶ 182).  It would be

22

economically irrational for Meta to raise Supernatural's price.  *See id.* ¶ 180.  The FTC's entire

theory – which expressly depends on the notion that Meta sees Supernatural as a way to attract

additional users to the VR platform, *see* Am. Compl. ¶¶ 5-8 – directly contradicts the FTC's

assertion that Meta might seek to earn a few additional dollars from a mere ███████████ at

the expense of attracting additional users to its fragile VR platform.  Indeed, Meta has *never* raised

the price of an app after acquisition.  *See* Ex. 4 (Carlton Rep. ¶¶ 181-182 & App'x Tbl. 11).  The

FTC's expert speculates without foundation that Meta could raise prices, *see* Ex. 44 (Singer Rep.

¶¶ 140-155), but he ignores all of the losses that Meta would incur from a price increase that will

make consumers less likely to purchase a Quest headset, *see* Ex. 4 (Carlton Rep. ¶ 180).

     *Second*, the FTC intimates that Supernatural's *rivals* might be hurt because Meta will seek to

restrict access to its platform to favor Supernatural.  That is not a colorable theory of harm to

consumers, or even to rivals, who have access to other VR platforms no matter what Meta does.

*See id.* ¶¶ 36-37, 159; Ex. 5 (Zyda Rep. ¶¶ 46-47, 89-96).  The theory is also illogical in light of

Meta's need to promote greater consumer adoption of VR overall.  *See* Ex. 4 (Carlton Rep. ¶¶ 30,

180); Ex. 5 (Zyda Rep. ¶¶ 100-108).  Restricting access would inhibit growth, frighten off the

developers Meta is courting, reduce the app library that will draw consumers to VR, and cost Meta

lost commissions across *all* application sales.  *See* Ex. 4 (Carlton Rep. ¶¶ 30, 172-175, 180); Ex. 5

(Zyda Rep. ¶¶ 46-47, 89-96); Ex. 11 (Rubin 30(b)(6) 40:9-16).  That is why Meta has given open

distribution, technological assistance, and sometimes even financing to *hundreds* of VR games

directly competitive with Meta's own VR games, including Beat Saber.  *See* Ex. 11 (Rubin 30(b)(6)

37:10-24, 64:6-68:10); *see also* Ex. 4 (Carlton Rep. ¶¶ 184-185).  Meta even uses its own VR

games and apps to test hardware and software improvements that it freely shares with third-party

game and application developers – just as it would use Within to grow VR fitness overall.  *See* Ex.

11 (Rubin 30(b)(6) 8:14-12:5, 53:12-55:13).  The FTC's speculation that Meta might at some

unknown date take actions contrary to its own business interests is beyond farfetched – another

reason to reject the claim.  *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d

947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

Lacking a theory of harm to consumers, much less evidence to support that claim, the FTC reveals its true colors as central planner rather than enforcer.  It guesses (at 20-21) that things could be *better* if Meta were obligated to build to compete with Supernatural.  *See*, *e.g.*, FTC Mem. 12 ("The proposed Acquisition . . . den[ies] consumers the benefit of adding another effective competitor to the market.").  But Section 7 bars transactions that are likely to *harm* competition, not ones that fail to enhance competition in the manner the FTC prefers.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 454-55 (2009) (no antitrust duty to *improve* competition).

## II.     The Equities Sharply Weigh Against Preliminary Injunctive Relief

The FTC cannot demonstrate, as it must, that the equities favor the injunction that will torpedo this acquisition.  *See Lab. Corp.*, 2011 WL 3100372, at *15, *21 ("[T]he FTC must present evidence and make an actual showing [that] the equities favor enjoining the transaction.").  Equitable balancing under Section 13(b) mandates consideration of both "public equities" and the "private interests" of the parties.  *Id.* at *21-22.  Because a preliminary injunction would ███████████ ███████████████████████████████████████████████████████████████████, *see* Ex. 1 (Zuckerberg 150:19-152:11); Ex. 2 (Bosworth 212:16-20) – both considerations weigh against an injunction.  *See FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981) ("the usual rule that a preliminary injunction is an extraordinary and drastic remedy is particularly true in the acquisition and merger context" because the "'preliminary' relief sought by the FTC would doom this transaction"); *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) ("[A]s a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated.").

*First*, the public equities – which "include improved quality, lower prices, increased efficiency, [and] realization of economies of scale" – disfavor an injunction.  *Lab. Corp.*, 2011 WL 3100372, at *22; *see also Warner*, 742 F.2d at 1165 (recognizing public's interest in "beneficial economic effects and pro-competitive advantages"); *Great Lakes Chem.*, 528 F. Supp. at 98-99 (similar; denying Section 13(b) preliminary injunction).  Killing the acquisition will impede VR technology improvements, setting back VR fitness generally, and reduce overall VR growth and output.  *See* Ex. 11 (Rubin 30(b)(6) 5:13-12:5); Ex. 4 (Carlton Rep. ¶¶ 187-189).  Halting the

24

acquisition would also harm non-party developers that would benefit from post-acquisition VR technology improvements and suffer from post-injunction reductions in VR investment.  *See* Ex. 14 (Garcia Decl. ¶¶ 20-26); Ex. 15 (Janszen Decl. ¶¶ 29-31); Ex. 36 (Lewis Decl. ¶¶ 21-25).  Against this evidence, the FTC's rote assertion (at 24) that public interests always favor the enforcer – where there is *no* evidence that the public will suffer[7] – should carry zero weight.

     *Second*, the private interests weigh against an injunction.  *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985) (denying injunction given defendant's "precarious financial position"); *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 717 (9th Cir. 1976) (Kennedy, J.) (similar); *Lab. Corp.*, 2011 WL 3100372, at *23 (same).  Killing the acquisition ███████████████████ ██████████, *see* Ex. 4 (Carlton Rep. ¶ 116), ███████████████████████ ████████████████, *see* ████████████  And Meta will fall behind current and future VR rivals, losing time it cannot recover to dynamic and fast-moving competition.  *See* Ex. 1 (Zuckerberg 30:10-18, 35:13-24, 154:3-21, 159:8-13, 227:15-18); Ex. 2 (Bosworth 34:1-13, 148:12-149:5, 212:3-6); Ex. 4 (Carlton Rep. ¶ 51).

     The stakes go well beyond this deal.  The VR ecosystem depends on thousands of entrepreneurs who are willing to risk their time and capital on development of complementary technologies.  For many such entrepreneurs, not only does acquisition provide the best route to scaling their apps, but it also provides a time-honored way to realize a return on risky investment – the promise of which encourages such productive risk-taking in the first place.  *See* Ex. 5 (Zyda Rep. ¶ 126); Ex. 4 (Carlton Rep. ¶ 189).  If the FTC can block this deal simply by arguing that Meta has the resources to build a fitness app in-house rather than acquiring one that has already demonstrated promise, virtually no deal in the VR space is safe, and the entire ecosystem is in jeopardy.

## CONCLUSION

     The Court should deny the FTC's motion for a preliminary injunction.

---

    [7] The FTC *asserts* (at 24) only that it "may" have to "unscrambl[e] the eggs" post-acquisition, but it says nothing about why that matters here.  *See* Ex. 20 (Rubin 137:1-138:17); Ex. 9 (Verdu 178:21-180:18); *see also* Ex. 58 (Agreement and Plan of Merger §§ 1.1, 1.10).

DATED:  November 14, 2022

Respectfully submitted,

By: /s/ *Mark C. Hansen*

Christopher J. Cox (Bar No. 151650)
HOGAN LOVELLS US LLP
855 Main Street, Suite 200
Redwood City, CA 94063
Telephone:  (650) 463-4000
Facsimile:  (650) 463-4199
chris.cox@hoganlovells.com

Lauren Battaglia (*pro hac vice*)
Logan M. Breed (*pro hac vice*)
Benjamin Holt (*pro hac vice*)
Charles A. Loughlin (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
lauren.battaglia@hoganlovells.com
logan.breed@hoganlovells.com
benjamin.holt@hoganlovells.com
chuck.loughlin@hoganlovells.com

*Counsel for Defendant Within Unlimited, Inc.*

Mark C. Hansen (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
mhansen@kellogghansen.com
apanner@kellogghansen.com

Bambo Obaro (Bar No. 267683)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone:  (650) 802-3000
Facsimile:  (650) 802-3100
bambo.obaro@weil.com

Michael Moiseyev (*pro hac vice*)
Chantale Fiebig (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940
michael.moiseyev@weil.com
chantale.fiebig@weil.com

Liz Ryan (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Telephone:  (214) 746-8158
liz.ryan@weil.com

Eric S. Hochstadt (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
eric.hochstadt@weil.com

*Counsel for Defendant Meta Platforms, Inc.*