Abby L. Dennis, DC Bar No. 994476
Peggy Bayer Femenella, DC Bar No. 472770
Joshua Goodman, NY Bar (No Number)
Jeanine Balbach, MD Bar (No Number)

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

*adennis@ftc.gov; pbayer@ftc.gov;
jgoodman@ftc.gov; jbalbach@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **META PLATFORMS, INC., et al.** <br><br> Defendants. | Case No. 5:22-cv-04325-EJD <br><br> **PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY TO DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION MOTION** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**Table of Contents**

I.   INTRODUCTION ..................................................................................................... 1

II.   ARGUMENT ........................................................................................................... 3

    A.   *Marine Bancorp.* Did Not Sweep Aside Prior Antitrust Jurisprudence ................ 3

    B.   Defendants' Additional Purported Requirements Have No Basis in the Law. ...... 8

    C.   Defendants' Market Definition Arguments Miss the Point. ............................... 12

    D.   The Eleventh-Hour Failing-Firm Defense Is Precluded by the Law—and the Facts. ............................................................................................................... 13

    E.   Defendants' Other Arguments Have No Merit. .................................................. 14

III.  CONCLUSION ...................................................................................................... 15

**Table of Authorities**

**Cases**

*BOC Int'l Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977) ................................................................. 9, 10

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......................................................... 13, 15

*California Trucking Ass'n v. ICC*, 900 F.2d 208 (9th Cir. 1990) ..................................................... 9

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ....................................... 12

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) .......................................................... 13, 14

*Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) (Davila, J.) ........................ 12

*Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) ........................................ 4

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) .................................................................. 9

*FTC v. Hackensack Meridian Health, Inc.*, No. CV 20-18140, 2021 WL 4145062 (D.N.J. Aug. 4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) ..................................................... 14

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ........................................ 12

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ...................................................................... 5

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................................... 12

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................. 14

*FTC v. Warner Commc'ns*, 742 F.2d 1156 (9th Cir. 1984) ........................................................ 3, 8

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) .................................................... 3

*Golden Grain Macaroni Co. v. FTC*, 472 F.2d 882 (9th Cir. 1972) ............................................. 14

*In re B.A.T. Indus., Ltd.*, 1984 WL 565384 (FTC Dec. 17, 1984) ................................................... 9

*L.A. Memorial Coliseum Commission v. NFL*, 726 F.2d 1381 (9th Cir. 1984) ........................... 12

*Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285 (D.C. Cir. 1989), *aff'd*, 493 U.S. 888 (1989) ........................................................................................... 13, 14

*Montana Power Co. v. EPA*, 608 F.2d 334 (9th Cir. 1979) ........................................................... 9

*ProMedica Health Sys., v. FTC*, 749 F.3d 559 (6th Cir. 2014) .................................................... 14

*Rep. of Texas Corp. v. Bd. of Governors*, 649 F.2d 1026 (5th Cir. 1981) ..................................... 9

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .................................................... 12

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ..................................................... 15

*United States v. Bertelsmann SE & CO. KGaA*, 2022 WL 16949715 (D.D.C. Nov. 2022).. 10, 15

*United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729 (D. Md. 1976) ............................... 8

*United States v. El Paso Nat. Gas Co.*, 376 U.S. 651 (1964) ........................................................ 4

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ........................................... *passim*

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) ...................................................... 14

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ...................................... 15

*United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974) ............................................. *passim*

*United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964) .............................................. *passim*

*United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226 (C.D. Cal. 1973),
    aff'd, *Phillips Petrol. Co. v. United States*, 418 U.S. 906 (1974) ............................. 2, 4, 9, 10

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) ...................................................... 9

*Yamaha Motor Co.  v. FTC*, 657 F.2d 971 (8th Cir. 1981) ......................................................... 14

**Statutes**

15 U.S.C. § 18 .............................................................................................................................. 15

**Other Authorities**

STIGLER COMMITTEE ON DIGITAL PLATFORMS, MARKET STRUCTURE AND
    ANTITRUST SUBCOMMITTEE, REPORT (2019) ............................................................ 7

U.S. Dep't of Justice & FTC  Horizontal Merger Guidelines (2010) ...................................... 6, 12

I.      INTRODUCTION

The Federal Trade Commission ("FTC") does not dispute that Meta Platforms, Inc. (Meta), formerly Facebook, is "an American success story." Opp. at 1. Facebook revolutionized the world when it launched nearly 20 years ago, changing the way in which billions of people communicate with their communities, friends, and family. Naturally, this success story led to many suitors seeking to acquire the company in Facebook's early days; powerhouses like Microsoft and Google came knocking, but Mark Zuckerberg rebuffed them at each and every turn. When the company ultimately went public in 2012, it was one of the biggest technology companies on the planet, valued at over $100 billion. Meta's economic resources and user base continued to grow even more over the decade that followed.

In light of that history, Defendants' arguments that Meta could not possibly have developed its own VR dedicated fitness app (Opp. at 15-17, 19), and that an injunction temporarily halting this one unlawful proposed acquisition would chill entrepreneurship by threatening a "time-honored way to realize a return on risky investment" (Opp. at 25), ring hollow. They are also just not true. Defendants would have this Court ignore uncontroverted evidence establishing Meta's resources, capabilities, and incentives to enter the VR Dedicated Fitness App market (Br. at 18-20), as well as documents and testimony showing it intended to do just that but-for the proposed acquisition (Br. at 20-21), in favor of self-serving testimony by certain executives (Opp. at 16-17). Courts have repeatedly expressed skepticism about such subjective, post-hoc evidence, and respectfully this one should as well. Moreover, behind Defendants' sky-is-falling lamentations that "the entire ecosystem is in jeopardy" (Opp. at 25) lies an inconvenient truth: Meta continues to make other acquisitions in the virtual reality ("VR") industry, including acquiring three separate studios in the year since its proposed acquisition of Within Unlimited, Inc. ("Within") was announced.[1]

---

[1] Dkt. No. 84 (Defendant Meta Platforms, Inc.'s Answer and Affirmative Defenses) ¶ 34; Dkt.123-2 (Meta Responses and Objections to FTC Interrogatory No. 1) at 8-9, 10.

Perhaps recognizing these facts, Defendants turn to the law, attempting to craft new requirements and heightened showings at each stage of the analysis. They argue that "the FTC is seeking to make new law" (Opp. at 2), but it is they who argue—without any support at all—that the Supreme Court in *United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974), "swept aside" *sub silentio* a decade's worth of antitrust jurisprudence from that very same Court (Opp. at 2). Defendants cannot, and do not, explain how *Marine Bancorp.* "swept aside" this jurisprudence when the Court there relied on the very cases—chiefly, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), which was decided just the year before—that are conspicuously missing from Defendants' opposition. Nor can they explain how the Supreme Court affirmed a case employing that same jurisprudence *after* deciding *Marine Bancorp.*, or how the Ninth Circuit continues to rely on those cases decades later. In reality the *Marine Bancorp.* Court "swept aside" *Falstaff* much like the FTC "just ignores" *Marine Bancorp.* (Opp. at 7)—by citing to it over ten times. *See* Br. at 12, 13, 16, 18, 18 n.4, 18 n.5, 19, 21.

As explained in the FTC's opening brief (Br. at 12, 16-17), the requirements for the potential-competition doctrine,[2] as articulated in *Marine Bancorp.* and *Falstaff*, are straightforward and satisfied here: The target market is concentrated, *Marine Bancorp.*, 418 U.S. at 630; for actual potential competition, Meta has "available feasible means" for entering the market and "those means offer a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects," *id.* at 633—or, as subsequent courts have put it, there is a reasonable probability that Meta would have entered the market but for the proposed acquisition; and, for perceived potential competition, Meta's

---

[2] Defendants assert that the FTC "concedes this is a vertical acquisition." (Opp. at 2). This is not true: the alleged lessening of potential competition is horizontal in nature. *E.g., United States v. Phillips Petrol. Co.*, 367 F. Supp. 1226, 1232 (C.D. Cal. 1973), *aff'd, Phillips Petrol. Co. v. United States*, 418 U.S. 906 (1974) ("[I]f the company which enters the market by acquisition had entered unilaterally, it would have supplied an additional competitive force . . . .").

position on the fringe of the target market has "*likely* effects" on current market participants. *Marine Bancorp.*, 418 U.S. at 624 (emphasis added). Defendants' attempts to bake in additional requirements have no basis in Supreme Court jurisprudence.

Defendants' remaining arguments fare no better. They argue that "[s]cores of products, services, and apps are available to consumers who want to exercise" (Opp. at 8), but this strawman argument is beside the point: the FTC has never alleged that VR apps are the only way to exercise. The question is simply whether, within a spectrum of closer and more distant substitutes, VR dedicated fitness apps meet the criteria of a relevant antitrust market. As explained in the FTC's opening brief, they do. Br. at 13-16. Defendants also contend that the FTC has failed to show harm to consumers (Opp. at 22-24), but it is axiomatic that reduced competition and loss of choice harm consumers. And their newest argument, an eleventh-hour Hail-Mary failing-firm defense, is precluded by the law—and the facts here.

The FTC has demonstrated a likelihood of success on the merits,[3] and the equities favor a preliminary injunction. Respectfully, this Court should grant the FTC's motion.

## II. ARGUMENT

### A. *Marine Bancorp.* Did Not Sweep Aside Prior Antitrust Jurisprudence.

The linchpin of Defendants' opposition is that the Supreme Court's decision in *Marine Bancorp.*—without ever mentioning that it was doing so—"swept aside a patchwork of prior

---

[3] Defendants contend the FTC asserts it may "carry its burden merely by raising 'questions.'" Opp. at 6. The FTC's opening brief, which cites verbatim from black-letter Ninth Circuit law, *see FTC v. Warner Commc'ns*, 742 F.2d 1156, 1162 (9th Cir. 1984), belies Defendants' misleading assertion. Br. at 11. This is not their only selective quotation regarding the legal standard; quoting *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989), they claim the FTC must show "probable success." Opp. at 6. Not so: "Because irreparable injury must be presumed in a statutory enforcement action, the district court need only to find *some chance of probable success* on the merits." *World Wide Factors*, 882 F.2d at 347 (emphasis added).

1  'potential competition' cases" to create "authoritative standards" that the FTC purportedly
2  cannot satisfy. *See* Opp. at 2. If the Supreme Court did indeed upend at least a decade's worth
3  of antitrust jurisprudence in *Marine Bancorp.*, it did so in curious fashion: by extensively
4  relying on the very caselaw that Defendants contend that it "swept aside." Not surprisingly, no
5  court has ever advanced so radical a proposition: certainly not the Supreme Court itself, which
6  affirmed a lower-court case employing that jurisprudence after *Marine Bancorp.*, *United States
7  v. Phillips Petrol. Co.*, 367 F. Supp. 1226, 1234 (C.D. Cal. 1973), *aff'd*, *Phillips Petrol. Co. v.
8  United States*, 418 U.S. 906 (1974); or the Ninth Circuit, which continues to cite approvingly to
9  it. *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) (citing *Falstaff*,
10 410 U.S. 526 (1973); *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964); and *United
11 States v. El Paso Nat. Gas Co*., 376 U.S. 651 (1964)). Moreover, while *Marine Bancorp.* may
12 be governing law on potential competition, the "authoritative standards" that Defendants claim
13 it laid down are nowhere to be found in the majority opinion.
14     In *Marine Bancorp.*, the Court analyzed a proposed merger between a large, nationally
15 chartered bank based in Seattle and a medium-size, state-chartered bank in Spokane within the
16 context of extensive state banking regulations that precluded the Seattle bank from entering the
17 Spokane market *de novo*. 418 U.S. at 605, 609-12. Given those regulations, the Court not
18 surprisingly affirmed the district court's dismissal of the Government's perceived potential
19 competition claim after a full trial on the merits, as "[r]ational commercial bankers in Spokane,
20 it must be assumed, are aware of the regulatory barriers that render [the acquiring bank] an
21 unlikely or an insignificant entrant except by merger." *Id.* at 605, 639. Its holding is narrow and
22 should be read in the unique, heavily regulated context of commercial banking. *Id.* at 605-06
23 ("We hold that in applying the potential-competition doctrine to commercial banking, courts
24 must take into account the extensive federal and state regulation of banks, particularly the legal
25 restraints on entry into this line of commerce"). Indeed, the Court ultimately concluded by
26 reiterating the "pertinent" factors future courts should consider in "any potential-competition
27 case" "where regulatory restraints are not determinative," "including the economic feasibility
28

and likelihood of de novo entry, the capabilities and expansion history of the acquiring firm, and the performance as well as the structural characteristics of the target market." *Id.* at 642.

In reaching its holding, the Court embraced its earlier perceived potential competition cases. Quoting *Penn-Olin Chem. Co.*, the Court reiterated that "the proscription expressed in § 7 against mergers 'when a "tendency" toward monopoly or [a] "*reasonable likelihood*" of a substantial lessening of competition in the relevant market is shown,' applies alike to actual and potential-competition cases." *Id.* at 622 (quoting 378 U.S. at 171) (emphasis added) (alteration in original). And, citing *Falstaff*, which it had decided just the year prior, the Court emphasized that "the principal focus of the doctrine is on the *likely* effects of the premerger position of the acquiring firm on the fringe of the target market." *Id.* at 624 (citing 410 U.S. at 541-37) (emphasis added). Hardly shying away from, much less sweeping aside, its prior jurisprudence,[4] it identified a number of factors that, "[i]n developing and applying the doctrine," the Court had previously recognized may support a finding that a proposed acquisition is illegal, including "if the target market is substantially concentrated," "if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential de novo entrant," and "if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market. In other words, the Court has interpreted § 7 as encompassing what is commonly known as the 'wings effect'—*the probability* that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter de novo." *Id.* at 624-25 (citing *Falstaff*, 410 U.S. at 531-37) (emphasis added).

From this survey of the Court's jurisprudence, Defendants remarkably extract an implicit overturning of *Falstaff* and other potential-competition cases. But even assuming *arguendo* that were true—and it is not—*Marine Bancorp.* does not support Defendants'

---

[4] Among others, the Court highlighted *Falstaff* (Br. at 12, 16-18, 21-22) and *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) (Br. at 21). *Marine Bancorp.*, 418 U.S. at 624 & n.25.

assertion that potential-competition theories cannot apply "unless the relevant market is 'oligopolistic' and protected by steep entry barriers, where a small number of entrenched firms can and do coordinate pricing and behavior to protect high profits." Opp. at 2.[5] In fact, the Court made clear that, even at the merits stage, a plaintiff is *not* required to show parallel behavior (much less parallel behavior to protect "high profits"): "by introducing evidence of concentration ratios of the magnitude of those present here the Government established a prima facie case that the Spokane market was a candidate for the potential competition doctrine." *Marine Bancorp.*, 418 U.S. at 631 (concentration ratios indicating that three banking organizations controlled "approximately 92%" of market sufficient). Such is the case here.

The Court in *Marine Bancorp.* does say that "the doctrine has meaning only as applied to concentrated markets. That is, the doctrine comes into play only where there are dominant participants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services." *Marine Bancorp.*, *Id.* at 630. This statement reflected the economic understanding of the time, in which market concentration was understood to manifest mainly through price and output coordination. But in the ensuing decades, antitrust law and economics have increasingly recognized other harms from limited competition, such as harm to innovation and harm from eliminating direct (unilateral) competition between market participants. *See* U.S. Dep't of Justice & FTC Horizontal Merger Guidelines ("Merger Guidelines") (2010) § 6 (unilateral effects); § 6.4 (innovation and product variety); *id.* ("curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products"). *Marine Bancorp.* does not suggest any basis for limiting the potential competition doctrine from preserving such other benefits of potential

---

[5] Defendants suggest that the VR Dedicated Fitness App Market cannot be oligopolistic because Within is "████████" Opp. at 12. They cite no authority for their argument that a condition for oligopoly is that all participants must be profitable—which has no basis in law or fact.

deconcentration.[6] Indeed, the very next sentence demonstrates that the Court's point was a practical one: "If the target market performs as a competitive market in traditional antitrust terms, the participants in the market will have *no occasion* to fashion their behavior to take into account the presence of a potential entrant." *Marine Bancorp.*, 418 U.S. at 630 (emphasis added). For example, one farmer selling wheat into a competitive market does not care or fashion his behavior to take into account whether a new farmer might also do so. But, here, Within did take into account potential entry (Br. at 21-22), confirming that this is the type of market suited for the potential competition doctrine.

Likewise, *Marine Bancorp.* does not mandate that "a perceived entrant on the edge of the market *actually* and *uniquely* restrained oligopolistic, coordinated behavior." Opp. at 2 (emphases in original). Rather, it affirmed that the proper standard for analyzing mergers is one of "reasonable likelihood," which "applies alike to actual and potential-competition cases." 418 U.S. at 622 (citing *Penn-Olin*, 378 U.S. at 171). Moreover, as the Court explained, "the principal focus of the [perceived potential competition] doctrine is on the *likely* effects of the premerger position of the acquiring firm on the fringe of the target market." *Id.* at 624 (emphasis added). In *Marine Bancorp.*, "the District Court 'appraised the economic facts' about [the acquirer] and the [relevant] market 'in order to determine whether in any realistic sense [the acquirer] could be said to be a potential competitor on the fringe of the market with *likely influence* on existing competition.'" *Id.* at 640 (quoting *Falstaff*, 410 U.S. at 533-34) (emphasis added). This analysis was "not in error." *Id.* Subsequent courts have likewise concluded that a

---

[6] Years of recent experience with mass digital markets (unknown in 1974) have shown that digital oligopolies, once entrenched, are often persistent, making such markets appropriate for preserving the possibility of deconcentration by potential competitors. *See, e.g., generally* STIGLER COMMITTEE ON DIGITAL PLATFORMS, MARKET STRUCTURE AND ANTITRUST SUBCOMMITTEE, REPORT (2019); *see also id.* at 35 (digital platform markets "prone to tipping—a cycle leading to a dominant firm and high concentration").

PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PRELIM. INJUNCTION MOTION
CASE NO. 5:22-CV-04325-EJD                          7

plaintiff need not show actual (much less unique) effects on market participants. *E.g.*, *United States v. Black & Decker Mfg. Co.*, 430 F. Supp. 729, 773 (D. Md. 1976) ("In sustaining its burden of proving that Black & Decker exerted a procompetitive edge effect prior to its merger with McCullouch, the government need not introduce evidence of actual market response to Black & Decker's influence."). And the evidence *does* show that Meta "in fact tempered," *Marine Bancorp.* 418 U.S. at 625, Within's behavior. Br. at 21-22.[7]

### B. Defendants' Additional Purported Requirements Have No Basis in the Law.

With respect to actual potential competition, Defendants further argue "clear proof" and not "reasonable probability" is the governing standard (Opp. at 14-15, 19); that Meta's entry into the market must be "imminent" (*id.* at 19-20); and that the self-serving and contradictory after-the-fact testimony of certain executives trumps contemporaneous evidence (*id.* at 16)—not to mention a mountain of objective evidence showing that Meta has the capabilities, resources, and incentives to enter the VR Dedicated Fitness App market but-for the proposed acquisition.

First, Defendants point to scant authority for their argument that a "reasonable probability" will not carry the Government's burden, as it does in *every other Section 7 case*. *See, e.g.*, Warner Commc'ns Inc., 742 F.2d at 1160 ("It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect."). *Penn-Olin*, cited approvingly by *Marine Bancorp.* as one of the cases that "defined" the potential-competition doctrine, 418 U.S. at 623-24 & n.25, is clear: "to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty. This we will not

---

[7] Defendants assert that "the FTC's perceived potential competition claim rests (at 22-23) on just three Within internal documents" (Opp. at 21), wholly ignoring evidence showing that Meta itself knew that Within perceived it as a potential entrant; for example, during a meeting with Within in April 2021, Meta's head of Developer Relations, wrote in a workchat: "███████ ███████████████████████████████████████████████████████████████" PX 514 (Meta) at 2.

do." *Penn-Olin Chem. Co.*, 378 U.S. at 175. Indeed, the overwhelming weight of authority—including *United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980), on which Defendants puzzlingly rely—favors a "reasonable probability" standard. *E.g.*, *id.* at 506–07 ("there must, for purposes of determining whether such relief is appropriate, be at least a 'reasonable probability' that the acquiring firm would enter the market" (quoting *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 28 (2d Cir. 1977)); *BOC Int'l Ltd.*, 557 F.2d at 28 n.7 (rejecting "clear proof" standard, noting "ample express authority, including congressional authority, in favor of a reasonable probability standard"); *Rep. of Texas Corp. v. Bd. of Governors*, 649 F.2d 1026, 1047 (5th Cir. 1981). As in their motion to dismiss, Defendants rely heavily on *In re B.A.T. Indus., Ltd.*, 1984 WL 565384 (FTC Dec. 17, 1984), and *FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977), ignoring that both of these outliers involved only actual potential competition, *Atl. Richfield*, 549 F.2d at 294 (creating a novel requirement of "'unequivocal proof' in a case *where only actual potential competition is claimed*" (emphasis added)), rather than, as here, where both actual and perceived potential competition are eliminated. *Phillips Petrol.*, 367 F. Supp. at 1234 (elimination of both perceived and actual potential competition "renders the anticompetitive consequences of the acquisition even greater").[8] In addition to departing from the actual standard, these two decisions are simply inapplicable here.

      Second, as they did in their motion to dismiss, Defendants attempt (again) to conjure up a novel requirement that entry be "imminent" by selectively quoting a single word from *Marine*

---

[8] Defendants insinuate that the FTC is bound by the Commission's 1984 decision in *B.A.T. Industries*, ignoring an axiomatic principle of administrative law—that an agency has the inherent power to revisit its precedents as long as it provides a sufficient explanation for doing so. *See, e.g., California Trucking Ass'n v. ICC*, 900 F.2d 208, 212 (9th Cir. 1990) ("Federal agencies have the power to 'adjust . . . policies and rulings in light of experience.'") (quoting *Montana Power Co. v. EPA*, 608 F.2d 334, 347 (9th Cir. 1979)).

1  *Bancorp*. They are not the first defendants in a Clayton Act case to try this ploy. *See United*
2  *States v. Bertelsmann SE & CO. KGaA*, 2022 WL 16949715, at *10 n.14 (D.D.C. Nov. 2022)
3  ("Although defendants quote *United States v. Marine Bancorp.* for the proposition that a
4  merger's anticompetitive effects must also be 'imminent' to violate the Clayton Act, the full
5  quotation from that case is that the 'loss of competition which is *sufficiently* probable and
6  imminent' is the concern of § 7." (emphasis in original) (citations omitted)). This Court should
7  decline Defendants' invitation to graft on a brand-new requirement to the Clayton Act. *See BOC*
8  *Int'l Ltd.*, 557 F.2d at 29 ("we need not decide whether the probable entry of the acquiring firm
9  must be 'imminent' in an actual potential entrant situation"). In any event, evidence
10  demonstrates that Meta could have entered the market but-for the acquisition ▆▆▆▆▆▆
11  ▆▆▆▆▆▆▆. *E.g.*, PX533 (Meta) at 1; PX144 (Meta) at 1.
12      Third, and finally, Defendants urge this Court to dismiss objective evidence as "the
13  FTC's business judgment of what would be best" (Opp. at 18), and instead to just accept the
14  after-the-fact word of Mr. Zuckerberg and Andrew Bosworth, Meta's Chief Technology
15  Officer, that "no Meta-developed VR fitness app would have been approved before the Within
16  deal, nor would it be approved now." Opp. at 16; *see also id.* at 17 ▆▆▆▆▆▆▆▆▆▆▆▆.
17  The Supreme Court, however, has stated that "[p]otential competition cannot be put to a
18  subjective test," *Penn-Olin Chem. Co.*, 378 U.S. at 174, and has cautioned that a requirement of
19  such evidence would heighten the required showing under Section 7. *Id.* at 175 ("Unless we are
20  going to require subjective evidence, this array of probability certainly reaches the prima facie
21  stage. As we have indicated, to require more would be to read the statutory requirement of
22  reasonable probability into a requirement of certainty. This we will not do."); *Falstaff*, 410 U.S.
23  at 546 ("subjective evidence should be preferred only when the objective evidence is weak or
24  contradictory.") (Marshall, J., concurring).
25      Moreover, courts have long been skeptical of self-serving corporate testimony because
26  executives in potential competition cases invariably opine that they would not have entered but-
27  for the challenged acquisition. *E.g.*, *Phillips Petrol.*, 367 F. Supp. at 1238 ("It will thus be in a
28

1  company's self-interest to present subjective evidence of a lack of any intent to enter the market
2  unilaterally and of a lack of any effect on the competitive behavior of firms in the market arising
3  from the company's presence on the edge of the market."). For good reason, as the testimony of
4  Messrs. Zuckerberg and Bosworth demonstrate: Mr. Zuckerberg may say "no Meta-developed
5  VR fitness app would have been approved before the Within deal" (Opp. at 16), but he also
6  testified that ███████████████████████████████████ PX50 (Zuckerberg
7  (Meta) Dep.) at 144:2-11 ███████████████████████████████
8  ███████████████████████████████████████████
9  ███████████ And Mr. Bosworth may say that ███████████████████
10 ███████████████████████ (Opp. at 17), but he also testified that
11 ███████████████████████████████████████████
12 ███████████████████ (PX54 (Bosworth (Meta) Dep.) at 210:17-21), and another
13 Meta witness testified that ███████████████████████████████
14 ███████████████████████ PX56 (Carmack (Meta) Dep.) at 53:18-
15 54:6.⁹  That Meta has not chosen to act on its ability to launch a competing product since

---

[9] Defendants contend that the "evidence is unequivocal: Meta never had any plan and still has no plan to build a VR fitness app, and it will not build one if the acquisition is blocked." Opp. at 15. Hardly. The evidence in fact shows that Meta's plans for organic entry were tabled when Meta rushed to buy Within to ensure Apple—which, to date, still has not introduced a VR headset—would not do so. *E.g.*, PX 117 (Meta) at 1 ███████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████; Br. at 20-21. And, contrary to Defendants' insinuations, these plans were not the idle brainstorming of "lower-echelon" employees (Opp. at 15, 17)—they made it all the way up to Mr. Zuckerberg himself. PX118 (Meta) at 1 ██████████████████
███████████████████████████████████████████

1  announcing the Within acquisition, and its self-serving statements that it will not do so, are not
2  relevant and should not persuade the Court. *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d
3  410, 435 (5th Cir. 2008) (evidence "deemed of limited value whenever such evidence could
4  arguably be subject to manipulation"); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 88
5  (D.D.C. 2017) (actions taken to improve litigation position should be discounted).

      **C.   Defendants' Market Definition Arguments Miss the Point.**

7        Defendants spend five pages attacking the FTC's relevant market definition, but their
8  arguments all boil down to one obvious false dichotomy: Plaintiff concedes—and has never
9  disputed—that all fitness products compete with each other to some degree. That undisputed
10 fact, which Defendants waste pages trying to prove, is ultimately irrelevant to the issue of the
11 relevant antitrust market in this case. *E.g.*, *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865,
12 886 (E.D. Mo. 2020) ("It is indisputable on the record in this case that coal competes with
13 natural gas and renewables in a broader energy market. Still, the FTC has presented more than
14 sufficient evidence that there is *also* a distinct competitive market among SPRB coal producers
15 that satisfies the applicable criteria for market definition") (emphasis in original); *FTC v.
16 Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("the mere fact that a firm may be termed
17 a competitor in the overall marketplace does not necessarily require that it be included in the
18 relevant product market for antitrust purposes"). Indeed, much like Defendants here, the NFL in
19 *L.A. Memorial Coliseum Commission v. NFL* argued that the relevant market was extremely
20 broad and included "all forms of entertainment." 726 F.2d 1381, 1393 (9th Cir. 1984). But the
21 Ninth Circuit affirmed a jury verdict for the plaintiff, noting that "the NFL itself narrowly
22 defined the relevant market by emphasizing that NFL football is a unique product." *Id.*

23       The relevant antitrust market question is whether, within a spectrum of closer and more
24 distant substitutes, VR dedicated fitness apps meet the criteria of a relevant antitrust market. *See*
25 *Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1108 (N.D. Cal. 2013) (Davila, J.)
26 ("championship boxing . . . is a sufficiently separate part of the trade or commerce to constitute
27 the relevant market")); *see also* Merger Guidelines § 4 ("Customers often confront a range of
28

1  possible substitutes . . . . Market shares of different products in narrowly defined markets are
2  more likely to capture the relative competitive significance of these products, and often more
3  accurately reflect competition between close substitutes."). As explained in the FTC's opening
4  brief, they do. Moreover, the FTC is the only party that performed a hypothetical monopolist
5  test, the outcome of which is consistent with (1) Meta viewing VR dedicated fitness apps as a
6  meaningful market category for undertaking the proposed acquisition and being
7  (*e.g.*, PX123 (Meta) at 1; PX560 (Meta) at 2; PX286 (Meta) at 1
8  ); (2) internal analyses of VR apps
9  (*e.g.*, PX487 (Meta) at 4); *see also* Br. at 15), and (3) the *Brown Shoe* factors (Br. at 13-16).

   **D. The Eleventh-Hour Failing-Firm Defense Is Precluded by the Law—and the Facts.**

11       Defendants claim that the equities counsel against a preliminary injunction because "[i]f
12  the FTC gets its injunction,                                        ".
13  Opp. at 3; *see also id.* at 25 (                                        ). As a
14  threshold matter, the only support for Defendants' bold assertion that "a preliminary injunction
15  would                —which they curiously redact in their public filing—is (again) the
16  testimony of Messrs. Zuckerberg and Bosworth. For the reasons discussed above, this Court
17  should be skeptical of this self-serving testimony.[10] Moreover, a preliminary injunction would
18  "kill" the deal only to the extent that Defendants choose to abandon the transaction—
19  
20           PX6 (Agreement and Plan of Merger) at 73-74 (termination provisions).
21       In any event, this Court should reject Defendants' attempt to sneak a "failing firm"
22  defense into this case at this late junction. The Supreme Court has "narrowly confined the scope
23  of the doctrine." *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1288
24  (D.C. Cir. 1989), *aff'd*, 493 U.S. 888 (1989). The burden of establishing the defense falls on
25  those who assert it, *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 138-39 (1969), and it is a

---

[10] Mr. Zuckerberg                            . PX50 (Zuckerberg (Meta) Dep.) at 150:16-151:10.

1  "heavy burden." *Golden Grain Macaroni Co. v. FTC*, 472 F.2d 882, 887 (9th Cir. 1972).
2  Defendants do not even attempt to meet it.[11] Nor could they: the evidence shows that, just days
3  before this deal was announced, Chris Milk of Within ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX632 (Within) at 1. Moreover,
5  if the parties abandon their acquisition, Within will not be left in the cold: ▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX6 (Agreement
7  and Plan of Merger) at 75. To the extent that Defendants raise a "flailing" or "weakened"
8  competitor argument—"the Hail-Mary pass of presumptively doomed mergers," *ProMedica*
9  *Health Sys., v. FTC*, 749 F.3d 559, 572 (6th Cir. 2014)—that too fails for the same reasons.

    **E. Defendants' Other Arguments Have No Merit.**

Defendants' remaining contentions are similarly unavailing.

They assert that "[l]ikely harm to consumers is a necessary element of every Section 7 claim." Opp. at 22. But Section 7 requires only that the FTC "show that there is a reasonable probability that the challenged transaction will substantially impair competition." *FTC v. Hackensack Meridian Health, Inc.*, No. CV 20-18140, 2021 WL 4145062, at *14 (D.N.J. Aug. 4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) (*quoting FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 22 (D.D.C. 2015)). Consumers in a relevant product market are harmed by acquisitions of potential competitors in that market that violate Section 7. *See, e.g., Yamaha Motor Co. v. FTC*, 657 F.2d 971, 979 (8th Cir. 1981) ("entry by Yamaha would certainly have had a significant procompetitive impact."). Further, reduction of competition and consumer choice has long been

---

[11] The party asserting this defense must show three elements: (1) the allegedly failing firm must face "the grave probability of a business failure," *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 507 (1974); *accord Michigan Citizens*, 868 F.2d at 1288 (transaction "must be the 'last straw' at which the company can grasp"); (2) the prospects of successful reorganization must be "dim or nonexistent," *Citizen Publ'g Co.*, 394 U.S. at 138; and (3), "the company that acquires the failing company or brings it under dominion is the only available purchaser." *Id*.

1  recognized as a cognizable harm from mergers. *See, e.g., Brown Shoe Co. v. United States*, 370
2  U.S. 294, 345 n.72 (1962) ("[E]xpansion through merger is more likely to reduce available
3  consumer choice while providing no increase in industry capacity, jobs or output.").

4  Along those same lines, Defendants argue, without citation to any authority, that the
5  FTC must show that "the merged entity would raise prices or restrict output." Opp. at 22. Not
6  so. Section 7 identifies lessening of "competition," not "higher prices or lower output," as the
7  statutory test. 15 U.S.C. § 18. Mergers can lessen competition in a variety of ways besides
8  raising prices or restricting output. *See, e.g., United States v. AT&T, Inc.*, 916 F.3d 1029, 1045
9  (D.C. Cir. 2019) ("[M]ergers can create harms beyond higher prices for consumers, including
10 decreased product quality and reduced innovation."); *United States v. H & R Block, Inc.*, 833 F.
11 Supp. 2d 36, 82 (D.D.C. 2011) (finding that a merger could yield multiple anticompetitive
12 effects, including limited innovation); *see also Bertelsmann SE & CO. KGaA*, 2022 WL
13 16949715, at *30 (merger could lead to worse contract terms being offered to authors).

14 Defendants further contend that the FTC "speculates without foundation" regarding the
15 possible effects of the proposed acquisition. Opp. at 23. But it is Defendants who engage in
16 unsubstantiated assertions regarding the future. Although they may hope that the proposed
17 acquisition will "grow the VR ecosystem," and that "Meta will improve and scale Supernatural"
18 and "use the Within studio as a laboratory for improving the Quest platform for all fitness apps
19 by developing technologies" (Opp. at 6), that is hardly certain in light of Meta's past experience
20 with integrating studios. PX56 (Carmack (Meta) Dep.) at 103:16-19 ███████████
21 ████████████████████████████████████████████████████████
22 PX52 (Stojsavljevic (Meta) Dep) at 75:15-21 ████████████████████
23 ████████████████████████████████████████████████████████
24 ████████████████. In any event, Defendants do not even attempt to argue these aspirations
25 meet the requirements of merger-specific, verifiable, cognizable efficiencies.

26 **III.   CONCLUSION**
27 The FTC respectfully requests this Court grant its motion for a preliminary injunction.
28

| | |
|---|---|
| Dated: November 21, 2022 | Respectfully submitted,<br><br>/s/ Abby L. Dennis<br>Abby L. Dennis<br>Peggy Bayer Femenella<br>Joshua Goodman<br>Jeanine Balbach<br>Michael Barnett<br>E. Eric Elmore<br>Justin Epner<br>Sean D. Hughto<br>Frances Anne Johnson<br>Andrew Lowdon<br>Lincoln Mayer<br>Erika Meyers<br>Susan A. Musser<br>Adam Pergament<br>Kristian Rogers<br>Anthony R. Saunders<br>Timothy Singer<br>James H. Weingarten<br><br>Federal Trade Commission<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580<br>Tel: (202) 326-2381<br><br>Erika Wodinsky<br>90 7th Street, Suite 14-300<br>San Francisco, CA 94103<br>Tel: (415) 848-5190<br><br>*Counsel for Plaintiff Federal Trade Commission* |