Mark C. Hansen (*pro hac vice*)
mhansen@kellogghansen.com
Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999

Michael Moiseyev (*pro hac vice*)
michael.moiseyev@weil.com
Chantale Fiebig (*pro hac vice*)
chantale.fiebig@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940
*Counsel for Defendant Meta Platforms, Inc.*

Christopher J. Cox (Bar No. 151650)
chris.cox@hoganlovells.com
HOGAN LOVELLS US LLP
855 Main Street, Suite 200
Redwood City, CA 94063
Telephone:  (650) 463-4000
Facsimile:  (650) 463-4199
*Counsel for Defendant Within Unlimited, Inc.*

(Additional Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:22-cv-04325-EJD |
| Plaintiff, | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| META PLATFORMS, INC., et al., | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| Defendants. | |
| | Dept.: Courtroom 4 – 5th Floor |
| | Judge: Hon. Edward J. Davila |

**TABLE OF CONTENTS**

Page

PROPOSED FINDINGS OF FACT ................................................................................................1

I.    The Merging Parties and the Proposed Transaction .............................................................1

II.   Meta Faces Intense and Growing VR Platform Competition ...............................................3

      A.    VR/AR Is Highly Dynamic, Nascent, and Competitive ...........................................3

      B.    Meta's Substantial Investment in Building Its VR Ecosystem ..................................9

III.  Within's Supernatural App Faces Intense Competition.......................................................14

      A.    Within Is an Innovative Startup with a Promising but Fragile Fitness App .........14

      B.    Supernatural Faces Intense Fitness Competition On- and Off-VR.......................16

IV.   Meta Is Not a Potential Supernatural Competitor...............................................................22

      A.    Meta Never Planned To Build Its Own VR Fitness App.......................................22

      B.    VR Fitness Apps Do Not Perceive Meta as a Unique Competitive Threat ..........27

V.    Meta Decided To Acquire Within To Promote VR Adoption and Growth......................29

VI.   Meta's Pro-Competitive Incentives To Grow Supernatural and VR Broadly ..................32

PROPOSED CONCLUSIONS OF LAW.......................................................................................34

I.    Legal Standards....................................................................................................................34

      A.    Preliminary Injunction ...........................................................................................34

            1.    Likelihood of Success on the Merits...........................................................34

            2.    Equitable Balancing ....................................................................................34

      B.    Section 7 of the Clayton Act ..................................................................................34

      C.    Loss of "Potential Competition" as a Basis for Section 7 Liability......................35

            1.    Actual Potential Competition......................................................................36

            2.    Perceived Potential Competition.................................................................37

II.   The FTC Is Not Likely To Succeed on Its Section 7 Potential Competition Claim .........38

A. "VR Dedicated Fitness Apps" Are Neither a Relevant Antitrust Market nor Oligopolistic – Failing Both *Marine Bancorporation* Predicates..........................38

1. Nine Selected "VR Dedicated Fitness Apps" Do Not Comprise a Relevant Antitrust Market..........................................................................38

2. The FTC Cannot Show That the "VR Dedicated Fitness App" Market Is Oligopolistic – as *Marine Bancorporation* Requires............................42

B. The "Actual Potential Competition" Theory Fails for Other Reasons .................44

C. The "Perceived Potential Competition" Theory Also Fails for Other Reasons.....48

D. The FTC Is Not Likely To Prove Harm to Consumers...........................................49

III. The Equities Disfavor Preliminary Injunctive Relief ........................................................49

CONCLUSION.............................................................................................................................50

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) ..........35, 49

*B.A.T. Indus., Ltd.*, *In re*, 1984 WL 565384 (FTC Dec. 17, 1984).......................37, 43, 45, 46, 47

*BOC Int'l Ltd. v. FTC*, 557 F.2d 24 (2d Cir. 1977) .................................................36, 47

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........................43

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...................................39, 40, 44

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46 (2d Cir. 2016).....................................39

*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018)....................................37

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) .......................................38

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ...................................................34

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) .......................................................35

*FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977)........................36, 37, 45, 46, 48

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ............................................................50

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980)..................................................................49

*FTC v. Foster*, 2007 WL 1793441 (D.N.M. May 29, 2007) .......................................................35

*FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84 (N.D. Ill. 1981)...........................................49

*FTC v. Lab. Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011)................34, 38, 40, 50

*FTC v. Meta Platforms Inc.*, 2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) ..............................34

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ..........................................................41

*FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708 (9th Cir. 1976)........................................................50

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ......................36, 45, 46, 47

*FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) ...............................................................36

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984).............................................34, 50

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) .................................................34

Defendants' Proposed Findings of Fact & Conclusions of Law         Case No. 5:22-cv-04325-EJD

*Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943 (E.D. Mo. 2009),
    *aff'd*, 623 F.3d 1229 (8th Cir. 2010) ........................................................37, 48

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018).............................................38

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..................40

*IT&T Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975).........................39

*Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255
    (5th Cir. Unit A Feb. 1981)....................................................................46

*Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir. 1974)..............35

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)................................43

*Republic of Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 649 F.2d 1026
    (5th Cir. Unit A June 1981) ...................................................................36

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .................39

*Super Premium Ice Cream Distrib. Antitrust Litig., In re*, 691 F. Supp. 1262
    (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow*
    *Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990)................................40

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982)......................................36, 37, 44, 46, 48

*Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810 (N.D. Cal. 2021) ..............................41

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264
    (9th Cir. 1975)....................................................................................40

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ............................... 36-37

*United States v. AT&T, Inc.*:

    310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ...................50

    916 F.3d 1029 (D.C. Cir. 2019) ..............................................................35

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).............................35

*United States v. Booz Allen Hamilton, Inc.*, 2022 WL 9976035
    (D. Md. Oct. 17, 2022).........................................................................41

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ....................................35

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)......................................44

iv

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .........................35, 36, 37, 38, 42, 43, 44, 45, 47, 48

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004).................................39, 40

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980)...........................36, 37, 45, 46, 47, 48

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ........................................................43

*United States v. U.S. Sugar Corp.*, 2022 WL 4544025 (D. Del. Sept. 28, 2022).........................42

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ......................................................39

*Yamaha Motor Co. v. FTC*, 657 F.2d 971 (8th Cir. 1981) ...........................................................37


**STATUTES**

Clayton Act, 15 U.S.C. § 12 *et seq.* ..............................................................................................34

§ 7, 15 U.S.C. § 18....................................................................................34, 35, 36, 38

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ...........................................................1, 34

§ 13(b), 15 U.S.C. § 53(b) ................................................1, 34, 35, 36, 46, 47, 49


**ADMINISTRATIVE MATERIALS**

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010).................44

Defendants' Proposed Findings of Fact & Conclusions of Law          Case No. 5:22-cv-04325-EJD

**PROPOSED FINDINGS OF FACT**

**I.     The Merging Parties and the Proposed Transaction**

1.      Defendant Meta Platforms, Inc. ("Meta") is a publicly traded corporation organized under Delaware law and headquartered in Menlo Park, California.  *See* Ex. DX1237 at 11 (Meta Platforms, Inc., December 31, 2021 Form 10-K).

2.      Meta manufactures virtual reality ("VR") devices – including the Quest 2 (which sells for $399 or $499 depending on the model) and the Quest Pro ($1,499) – and operates a VR platform from which VR users can access thousands of VR applications ("apps").  *See* Ex. DX1230 (Carlton Rep. ¶¶ 37, 44, 49) (discussing VR devices and "extensive entry" of VR apps, including across different VR platforms); Ex. DX1233 (Zyda Rep. ¶¶ 82, 84 & Fig. 1) (describing Meta's current VR market penetration).

3.      Defendant Within Unlimited, Inc. ("Within") is a privately held company organized under the laws of Delaware with headquarters in Los Angeles, California.  *See* Ex. DX1072 (Merger Agreement at 3).

4.      Within is a VR app developer that makes Supernatural – a VR fitness and wellness app with approximately ███████████ (as of October 2022) who pay $19 per month or $180 per year for access to a library of guided and unguided exercise courses, trainer-led workouts, and meditation sessions – which Meta distributes on its VR platform.  *See* Ex. DX1230 (Carlton Rep. ¶ 77, App'x Tbl. 12 at 180) (████████████████████████████████ ████████████████████████████████████████████████); Ex. DX1232 (Vickey Rep. ¶ 30, Tbl. 1 & n.51) (subscribers as of October 2022).

5.      On October 22, 2021, Meta and Within signed an Agreement and Plan of Merger pursuant to which Meta would acquire all of Within in a transaction valued ████████.  *See* Ex. DX1072 (Merger Agreement §§ 1.1, 1.3); Ex. DX1198 (Bosworth 156:4-7) (purchase price).

6.      By its terms, either party can terminate the Merger Agreement if the transaction has not closed by April 23, 2023.  *See* Ex. DX1072 (Merger Agreement § 7.1(b)).

7.      In this Court, the Federal Trade Commission ("FTC") seeks a preliminary injunction under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), barring Meta's

acquisition of Within, pending a trial before an Administrative Law Judge of the FTC, subsequent appeal to the FTC Commissioners, and subsequent appeal to a federal court of appeals.  *See* Am. Compl. at 2 (Dkt. 101-1).

8.  The FTC initially alleged in the original complaint that Supernatural competes broadly with a host of other VR apps, including Meta's own game Beat Saber, such that the acquisition was likely to harm competition in a "broad" VR fitness app market.  *See* Compl. ¶¶ 50, 109, 117, 123 (Dkt. 1) (describing the "broad" market in which Supernatural competes against many other VR apps and games).

9.  The FTC subsequently dropped the allegation that Supernatural competes with any VR apps that Meta owns.  *See* Am. Compl.

10.  The acquisition of a VR app developer (Within) by a VR platform owner (Meta) is a "vertical" acquisition; such vertical acquisitions are generally pro-competitive and common in the emergent VR industry.  *See* Ex. DX1230 (Carlton Rep. ¶¶ 172-175) (explaining the pro-competitive benefits of vertical acquisitions, ███████████████████████████████████ ███████████████████████████████████████████████); Ex. DX1244 at 1 (███████████████████████████████).

11.  If the Court grants a preliminary injunction that prevents the transaction from closing, then one or both parties will terminate the Merger Agreement because they likely cannot wait until the administrative proceeding and subsequent appeals conclude – ████████████ ████████████████.  *See* Ex. DX1198 (Bosworth 212:15-20) (████████████████████ ██████); *see also* Ex. DX1215 (Zuckerberg 150:19-152:11) (similar).

12.  Since its founding in 2014, Within has spent ████████████████████ ████████████████████████████████████████████████ ████████████  *See* Ex. DX1119 (███████████████████████); Ex. DX1118 (██████████████████████████████).

13.  Within's prospects for raising additional funds, if the acquisition is blocked, ██ ████████████████████████████████████████████████ ████████████████████████████.  *See* Ex. DX1217 (Milk 19:8-12,

212:20-215:3) (█████████████████████████████████████

███████████████████); *see also* Ex. PX0065 (Koblin 18:4-19:2) (███████████

███████████████████████████████████████).

## II.    Meta Faces Intense and Growing VR Platform Competition

### A.    VR/AR Is Highly Dynamic, Nascent, and Competitive

14.    VR and "AR" (or augmented reality) devices are internet-connected platforms that produce computer-generated images and sounds that may appear real, imaginary, or as a combination of virtual and real elements.  *See* Ex. DX1230 (Carlton Rep. ¶ 6 n.2) (describing VR, AR, and "MR" or mixed reality); Ex. DX1198 (Bosworth 50:7-13) (similar).

15.    A number of leading technology companies currently sell VR/AR devices in the United States, including Meta, Sony, HTC, and Valve.  *See* Ex. DX1230 (Carlton Rep. ¶¶ 36-39) (███████████████████████████████████████); *see also* Ex. DX1285 at 1 (██████████████████████████████████).

16.    This competition is dynamic:  for example, until recently, the leading VR device was the Sony PSVR headset (introduced in 2016); the Meta Quest 2 overtook the PSVR in technological advances (as well as unit sales); ███████████████████████████████ ██████.  *See* Ex. DX1224 (Wyss 10:14-22, 32:12-34:9) (███████████████████ █████); Ex. DX1220 (Garcia 50:21-51:13) (VR fitness app developer discussing Sony products and upcoming release); Ex. DX1233 (Zyda Rep. ¶¶ 31-32, 89-97) (discussing the history of consumer VR devices as well as current and expected new entry); Ex. DX1258 at 9 (████████ ███████████████████████████████).

17.    ████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████.  *See* Ex. DX1230 (Carlton Rep. ¶¶ 36-39) (████████████████████████████████ ███████████████████████████ ██████); Ex. DX1257 at 4 (████████████████████████ ██████); Ex. DX1219 (Casanova 43:19-44:7) (███████████████████████

); Ex. DX1245 at 11 (███████████████); *see also* Ex. DX1303 at 23-28 (███████████████).

18.     ByteDance (the parent company of TikTok) recently introduced new VR headsets in Europe and Asia – the Pico 4 and Pico 4 Pro – ███████████████. *See* Ex. DX1264 at 1 (███████████████); Ex. DX1268 at 2 (███████████████); Ex. DX1221 (Choate 10:9-14) (███████████████); Ex. DX1220 (Garcia 50:16-51:20) (VR fitness app developer describing Pico as "a great platform"); *see also* Ex. DX1233 (Zyda Rep. ¶¶ 92-93 & Tbl. 5) (███████████████); Ex. DX1230 (Carlton Rep. ¶ 37) (███████████████).

19.     ███████████████. *See* Ex. DX1255 at 3, 6 (███████████████); Ex. DX1257 at 4-5, 14-19 (███████████████); *see also* Ex. DX1233 (Zyda Rep. ¶ 94) (███████████████); Ex. DX1230 (Carlton Rep. ¶ 37) (███████████████).

20.     ███████████████ *See* Ex. DX1245 (███████████████); Ex. DX1246 (████); Ex. DX1247 (███████████████); Ex. DX1248 (████); Ex. DX1226 (Payne 26:5-28:15, 34:15-37:13) (███████████████); *see also* Ex. DX1230 (Carlton Rep. ¶ 37) (███████████████).

21.     VR/AR manufacturers and platforms thus expect substantial entry into and competition for consumers of this emerging technology. *See* Ex. DX1015 at 16 (███████████████

4

1 █████████████████████████████████████████████████████

2 █████████████████████); Ex. DX1006 at 9 (██████████████████████

3 ████████████████████████████████████████████████████████████

4 ██████████████████████████████); Ex. DX1215 (Zuckerberg 44:22-48:2, 178:35-

5 20) (discussing expected new VR entry); Ex. DX1292 (Nylander Decl. ¶ 19) (CFO of Varjo, a VR

6 device manufacturer, describing the "competitive landscape" as "nascent and rapidly evolving" with

7 "several manufacturers of XR/VR devices"); Ex. DX1246 at 5-6, 8 (██████████████████

8 ████████████████████████████████████████████████████████████

9 ███████████████████████████████████); Ex. DX1248 at 9

10 (████████████████████████████████████████████████████████████

11 ████████████████████); Ex. DX1226 (Payne 61:10-63:19) (███████████████

12 ██████████████████); Ex. DX1262 at 2 (██████████████████████████

13 ███████████████████████); Ex. DX1302 at 4 (██████████████

14 ████████████████████████████████████████████████████████████

15 ███████████████); Ex. DX1303 at 34 (█████████████████████████

16 ██████████████████████████████████████).

17 22. VR app developers likewise expect substantial new entry among VR device

18 manufacturers. *See* Ex. DX1217 (Milk 130:5-132:22, 145:14-24, 167:17-168:1) (addressing

19 Within's expectations for new VR entry); Ex. PX0065 (Koblin 78:13-80:24, 234:8-19) (similar);

20 Ex. DX1291 (Garcia Decl. ¶ 11) (VR fitness app developer: "Both consumers and developers alike

21 currently have many different VR hardware platforms to choose from, including: Sony PlayStation

22 VR (PSVR), HTC Vive Pro 2 and Cosmos, Valve Index VR, HP Reverb G2, Varjo Aero, Pico Neo

23 3 Pro, G2 4K, and Pico 4, among others. Additionally, other major technology companies, like

24 Apple and HTC, are widely and credibly speculated to be releasing new and updated VR headsets in

25 the near-term future."); Ex. DX1220 (Garcia 52:13-19) (similar); Ex. DX1290 (Janszen Decl. ¶ 10)

26 (VR fitness app developer: "I expect that VR will continue to attract more developers, platforms,

27 hardware providers, and users in the coming years."); Ex. DX1289 (Lewis Decl. ¶ 16) (VR fitness

28 app developer: "Virtual reality is an emerging and dynamic technology space, with many

companies investing heavily in hardware and, according to industry reports, many companies poised to develop new virtual reality hardware and equipment."); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 36-37) (discussing new entry); Ex. DX1233 (Zyda Rep. ¶¶ 89-95 & Fig. 2) (█████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ).

23.     A crucial aspect of competition among VR/AR manufacturers – each of which operates a VR platform from which consumers can download apps, i.e., things to do in VR – is to build a content-rich ecosystem of first- and third-party VR apps.  *See* Ex. DX1230 (Carlton Rep. ¶¶ 42, 46, 184) ███████████████████████████████████████████████████████ █████████████████████████████████████████; Ex. DX1233 (Zyda Rep. ¶¶ 78, 87, 100-101) █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████ ); Ex. DX1070 at 1 (██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ); Ex. DX1290 (Janszen Decl. ¶ 18) (VR app developer: "Meta needs developers, like VirZOOM, to populate its app store with content in order to attract consumers to its platform.  Meta is competing for VirZOOM – offering distribution, technical assistance, and even financial grants – because that is how it competes against other platforms and headset manufacturers."); Ex. DX1215 (Zuckerberg 31:6-32:4) (████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ); Ex. DX1292 (Nylander Decl. ¶¶ 19-21) (CFO of VR device manufacturer describing importance of "interesting content"); Ex. DX1224 (Wyss 57:19-58:8) (███████████████████████ ); Ex. DX1204 (Dass 26:23-27:6) (█████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ).

24.     Meta distributes VR apps on its Quest headsets through the Quest Store – which has hundreds of apps available for download (mostly games) – and the App Lab, an alternative distribution channel with thousands of apps available.  *See* Ex. DX1233 (Zyda Rep. ¶ 42 & Tbl. 3)

6

(describing Meta's app distribution ███████████████████████████████████████████

██████████████████████████████████████); Ex. DX1208

(Pruett 36:3-9, 110:14-19, 114:23-115:7) (discussing Meta's App Lab).

25.     A wide spectrum of developers have created the nearly 3,000 apps available on

Meta's VR devices, ranging from small startups to large technology companies.  *See* Ex. DX1233

(Zyda Rep. ¶ 81 & Tbl. 3) (███████████████████████████████████████); Ex.

DX1230 (Carlton Rep. Tbl. 3) (██████████████████████████████████).

26.     Quest users also can download VR apps from other VR app stores, including

SideQuest and Valve's SteamVR Store, which have hundreds (or thousands) of VR apps available

for download on Quest and other VR devices.  *See* Ex. DX1233 (Zyda Rep. ¶¶ 41, 46-47, 105 &

Tbl. 3) (██████████████████████████████████████████

██████████████████████████████); *see also* Ex. DX1306 (████████

████████████████████████████████); Ex. DX1303 at 22 (████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████); Ex. DX1258 at 14, 27 (████████████████████

████████████████████████████████████████

████████████████████████).

27.     For now, VR/AR devices are "nascent" in the sense that the technology is still

developing and changing rapidly, and consumers have yet to adopt the technology in large numbers

– total VR/AR device sales in the United States are a fraction of PC, smartphone, and gaming

console sales – as VR's audience has so far been limited predominantly to younger males who use

VR as a niche gaming platform.  *See* Ex. DX1215 (Zuckerberg 200:4-201:5) (████████

████████████████████████████████████); Ex. DX1212 (Rubin 30(b)(6) 24:4-25:10) ████████

██████████████████████████████████); Ex. DX1198 (Bosworth 98:10-24,

220:1-21) (██████████████████████████████████████);

Ex. DX1015 at 2 ████████████████████████████████████

1  ██████████████████████████████████████████; Ex. DX1258 at 11 ████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████; Ex. DX1245 at 2 (████████████████████████

5  ████████████████████████████████████████████████████████████

6  ██████████████); Ex. DX1246 at 11 (███████████████████████████████

7  ██████████████████████████████████████████████████); Ex. DX1224

8  (Wyss 44:2-45:21) (███████████████████████████████████); Ex. DX1230

9  (Carlton Rep. ¶¶ 34-35 & Tbl. 1) (██████████████████████████████

10 ████████████████████████████); Ex. DX1233 (Zyda Rep. ¶¶ 33, 83-84, 96 & Fig. 1)

11 (███████████████████████████████████); *see also* Ex. DX1290 (Janszen Decl.

12 ¶ 10) (VR app developer:  "The VR industry is still very new.  VR is an emerging and dynamic

13 technology space, with many companies investing heavily in hardware and poised to develop new

14 VR hardware and equipment."); Ex. DX1223 (Janszen 22:18-24:8, 100:2-101:4) (██████).

15         28.     According to numerous witnesses with VR/AR expertise and experience, the success

16 of VR/AR as a new computing platform will depend on the availability of attractive and engaging

17 apps – beyond just gaming – to motivate mass consumer adoption of these devices.  *See* Ex.

18 DX1215 (Zuckerberg 31:6-32:4, 51:21-53:20, 92:20-93:18, 200:4-201:5) (███████████████

19 ██████████████████████████); Ex. DX1214 (Verdu 9:1-10:23)

20 (█████████████████████████████████████████); Ex. DX1212

21 (Rubin 30(b)(6) 23:19-26:11) (████████████████████████████████

22 ████████████████████████████); Ex. DX1198 (Bosworth 113:21-

23 115:1) (████████████████████████████████████████████████████

24 ████████████████████); Ex. DX1258 at 11 (████████████████████

25 ██████████████████████████████); Ex. DX1266 at 2 (████████████

26 ████████████████████████████████████████████████████████████

27 ██████████████); Ex. DX1302 at 17 (██████████████████████████

28 ██████████████████████████████████); *see also* Ex. DX1100 at 19

1  (███████████████████████████████████████████████████████

2  ██████████); *see also* Ex. DX1233 (Zyda Rep. ¶ 34) (██████████████████████

3  ████████████████████████████████████████).

4       29.    That, in turn, will require VR/AR manufacturers to attract a wide range of third-party

5  app developers to VR so that they will build out the VR/AR ecosystem with more than just games,

6  i.e., productivity apps, social apps, educational apps, fitness apps, and more.  *See* Ex. DX1212

7  (Rubin 30(b)(6) 38:5-20) ████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████; Ex.

11 DX1198 (Bosworth 204:21-205:8) ███████████████████████████

12 ██████████████████; Ex. DX1224 (Wyss 21:12-19) (████████████████████

13 ████████████████████████); Ex. DX1230 (Carlton Rep. ¶¶ 42-44, 144, 169)

14 (███████████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ██████████████████████); Ex. DX1233 (Zyda Rep. ¶ 34) (██████).

18      **B.    Meta's Substantial Investment in Building Its VR Ecosystem**

19      30.    Meta decided around 2014 to invest in this new computing platform, betting on VR

20 technology as the successor to today's PCs, laptops, smartphones, and tablets.  *See* Ex. DX1215

21 (Zuckerberg 11:1-12:16, 22:11-22, 59:8-60:3, 60:16-23) (describing Meta's initial investment into

22 Oculus and ██████████████████████████████████████████).

23      31.    Having identified the promise in this emergent technology, Meta set out to build its

24 own VR platform to access developers and consumers directly, without intermediation by other

25 firms such as Apple and Google.  *See* Ex. DX1215 (Zuckerberg 35:13-37:15, 197:10-198:4, 200:4-

26 201:5) (discussing Meta's interest in building a general computing platform not subject to control

27 by current platform owners); *see also* Ex. DX1258 at 23-24 (████████████████████████

28 █████████████████████).

32.     Apple and Google, by virtue of their control over smartphone operating systems, can have significant influence, if not control, over what developers (including Meta) can build on those platforms, as well as the terms on which Meta and others reach the people who want to use apps – including Facebook, Instagram, WhatsApp, and Messenger – which has, according to Meta, resulted in significant limitations on its business.  *See* Ex. DX1215 (Zuckerberg 11:1-12:16, 29:21-31:5, 35:13-37:15, 197:10-198:4, 200:4-201:5) ████████████████████████████; Ex. DX1198 (Bosworth 65:7-25) (discussing Apple's and Google's conduct).

33.     Meta conducts its VR/AR business through its Reality Labs Division, led by Andrew Bosworth (Meta's Chief Technology Officer), who reports directly to Mark Zuckerberg (Meta's Chief Executive Officer).  *See* Ex. DX1215 (Zuckerberg 86:20-92:1) (responsibility for the Reality Labs budget); Ex. DX1198 (Bosworth 16:5-21) (describing his role and reporting structure).

34.     Meta's spending at Reality Labs exceeded $12.4 billion in the most recent fiscal year, █████████████████████████████████.  *See* Ex. DX1237 at 51 (Meta Platforms, Inc., December 31, 2021 Form 10-K); Ex. DX1215 (Zuckerberg 87:7-10, 89:7-17) (████████████████████████████████); *see also* Ex. DX1233 (Zyda Rep. ¶ 126) (████████████████████████████████████ ████████████████████████).

35.     So far, Meta has sustained substantial losses on its VR/AR business – losses it has been willing to incur with the aim of making a success of this business in the future.  *See* Ex. DX1237 at 68 (Meta Platforms, Inc., December 31, 2021 Form 10-K).

36.     To obtain a return on Meta's substantial investment, there will need to be far greater consumer adoption of VR/AR devices.  *See* Ex. DX1233 (Zyda Rep. ¶¶ 29, 126) (███████████ ████████████████████████████████); *see also* Ex. DX1230 (Carlton Rep. ¶ 184) (discussing Meta's incentives).

37.     Meta has therefore invested substantially in its strategy to grow the overall VR/AR ecosystem by expanding the menu of attractive apps that will draw consumers to VR/AR and boost device sales.  *See* Ex. DX1215 (Zuckerberg 98:7-100:13) (████████████████████████ ████████████████████████████); Ex. DX1211 (Rubin 92:18-

10

93:2) █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████; Ex.

DX1212 (Rubin 30(b)(6) 38:12-20, 63:4-64:5) (██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████); *see also* Ex. DX1036 at 4-5 (██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████).

38.     Specifically, Meta has actively encouraged third-party app developers to build VR apps for the Quest platform by providing multiple distribution channels, free technical assistance, and even funding.  *See* Ex. DX1063 (listing Meta's content financing and funding); Ex. DX1060 (similar); Ex. DX1200 (Brown 30(b)(6) 11:12-14, 14:13-16, 16:23-17:1) (discussing Meta's financial assistance, ██████████████████████████████████); Ex. DX1212 (Rubin 30(b)(6) 38:5-20, 64:6-68:10) (describing some of Meta's financial incentive, grant, and funding programs for third-party developers); Ex. DX1210 (Rabkin 47:7-19) ████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████████████████████; Ex. DX1208 (Pruett 16:25-18:4, 39:20-42:5, 42:17-45:12) (describing Meta's engineering support for third-party developers); Ex. DX1204 (Dass 95:10-96:6) (describing Meta's assistance for third-party developers); Ex. DX1220 (Garcia 45:5-46:3) (VR fitness app developer describing Meta's support); Ex. DX1230 (Carlton Rep. ¶¶ 141-144) (discussing Meta's support for third-party VR app developers); Ex. DX1233 (Zyda Rep. ¶¶ 103-104, 107-108) (describing the technical and financial support that Meta provides to third-party VR app developers).

39.     Some of those third-party apps have used Meta's technical and financial assistance to launch VR apps on both the Quest platform and other VR platforms competitive with Meta – to the

11

benefit of the entire VR/AR ecosystem. *See* Ex. DX1212 (Rubin 30(b)(6) 67:4-68:10) (█████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████); *see also* Ex. DX1204 (Dass 228:6-229:16) (describing how

Meta's assistance allowed a small team to launch a new VR fitness app).

40.     Today, the vast majority of VR apps on the Quest platform come from third-party

developers, such as VirZOOM and Odders Labs, both of which have apps in the FTC's claimed

market. *Compare* Ex. DX1233 (Zyda Rep. Tbl. 3) (███████████████████████████████

██████████) *with* Ex. DX1215 (Zuckerberg 84:22-85:16) (Meta owns fewer than 60 apps).

41.     It does not take a large team or substantial resources to make a successful VR app –

VR platforms and venture capital are ready to provide financial support – but it is hard to make a

VR app that consumers will love; that takes skill and creativity. *See* Ex. DX1211 (Rubin 171:14-

172:11) ██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████; Ex.

DX1230 (Carlton Rep. ¶¶ 60-61, 155-156) (█████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████); Ex. DX1070 at 1 (█████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████).

42.     In a small number of instances, Meta has sought to support its VR ecosystem by

acquiring third-party app developers or developing its own first-party app internally. *See* Ex.

DX1230 (Carlton Rep. ¶¶ 181-182, 188, 192) (██████████████████████████████████████);

Ex. DX1212 (Rubin 30(b)(6) 8:14-12:5, 54:7-55:13) (discussing Meta's acquisitions).

43.     For example, in 2019, Meta acquired Beat Games (today still managed by its original

founders who now work for Meta), the developer of Beat Saber, which Meta helped grow into one

of the most successful VR apps in the world – including by making it available on rival VR

platforms. *See* Ex. DX1197 (Beck 52:13-24, 69:24-71:22, 72:6-11) (Beat Games founder

discussing the acquisition and noting that Meta has not made Beat Saber exclusive to the Quest

platform); Ex. DX1233 (Zyda Rep. ¶¶ 30, 127, 131) (discussing Beat Saber's improvements and growth following the Meta acquisition); Ex. DX1230 (Carlton Rep. ¶¶ 31, 181-182, 191-193, Tbl. 19 & App'x Tbl. 11) (discussing the pro-competitive benefits from the Beat Games acquisition – and showing Meta is a price cutter); Ex. DX1013 at 1 (████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████).

44.     Meta has been less successful at developing first-party apps internally from scratch: for example,  Meta built in-house Horizon Worlds – a VR social app that allows users to access a "metaverse" – but the app has not gained traction with users amid technological difficulties (as industry participants, including other VR app developers, have observed).  *See* Ex. DX1211 (Rubin 53:15-55:21, 166:11-172:11) (████████████████████████████████████████ ████████████████████████████████████████████████); Ex. DX1198 (Bosworth 215:17-25) (████████████████████████████████); Ex. DX1210 (Rabkin 195:16-196:22) (██████████████████████████████████████); Ex. DX1201 (Carmack 101:15-23) ████████████████████████████████████████ ██████████████████████████████████████████; Ex. DX1233 (Zyda Rep. ¶ 124) (████████████████████████████); Ex. DX1230 (Carlton Rep. ¶¶ 146-147) (same); *see also* Ex. DX1291 (Garcia Decl. ¶¶ 30-32) (VR fitness app developer:  "I have not seen any evidence that Meta possesses any qualities, characteristics, or abilities that uniquely position it to develop a virtual reality fitness application"); Ex. DX1290 (Janszen Decl. ¶¶ 32-35) (VR fitness app developer comparing Meta to other platform owners that are "notoriously bad at developing apps and games for their platforms from internal resources"); Ex. DX1223 (Janszen 34:1-36:9) (████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████).

45.     VR/AR device sellers competing for customers by offering content-rich ecosystems must attract experienced third-party VR developers – entities with expertise in developing apps

using this emergent technology – to create compelling apps for their platforms.  *See* Ex. DX1215 (Zuckerberg 98:6-99:20) (███████████████████████████████████████████ ██████████████████████); Ex. DX1198 (Bosworth 171:7-172:11, 204:21-205:8, 229:2-230:18) (██████████████████████████████████████████████████████████████ ████████████████████████████████████); Ex. DX1214 (Verdu 8:13-10:23) (similar); Ex. DX1211 (Rubin 92:9-93:12) (similar); Ex. DX1212 (Rubin 30(b)(6) 66:16-68:10) (██████████████████ ██████████████████████████████████████████████████████); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 42-44, 144, 183-185) (██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████).

III.    **Within's Supernatural App Faces Intense Competition**

      A.    **Within Is an Innovative Startup with a Promising but Fragile Fitness App**

      46.    In 2014, Chris Milk and Aaron Koblin – at the time experienced visual artists – founded Within.  *See* Ex. DX1217 (Milk 13:14-16, 16:25-17:10) (discussing his background); Ex. DX1103 at 8, 13, 27 (deck discussing Within's founding and founders); Ex. DX1104 at 4 (similar).

      47.    Within has since developed VR/AR technologies and apps ████████████████ ████████████████████████████████████████████████.  *See* Ex. DX1071 at 1 (████████████████████████████████████).

      48.    In April 2020, Within launched Supernatural, a VR fitness app that aims to attract consumers interested in purchasing home digital or "connected fitness" products, services, and apps. *See* Ex. DX1217 (Milk 26:8-10, 31:7-25) (discussing launch and product development); Ex. PX0065 (Koblin 118:4-120:2) (similar); Ex. DX1077 at 8-9 (████████████████████████████ ████████████████████████████████████████████████████████████); Ex. DX1130 at 1-2, 52 (██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████); Ex. DX1134 at 1 (████████████████████████████████████████████████ ████████████████████); Ex. DX1126 at 32 (████████████████████████████████ ████████████████████████████████████████████████).

49. To make Supernatural appealing to consumers with many fitness alternatives, Within invested heavily in studio-quality visuals, high-quality music licensing, and additional trainer-led workouts ███████████████████. *See* Ex. DX1217 (Milk 172:4-22).

50. Supernatural gained a following in the relatively limited community of VR/AR users and currently has approximately ███████████. *See* Ex. DX1232 (Vickey Rep. Tbl. 1) (Supernatural subscribers as of October 2022).

51. ████████████████████████████████████████ ███████████████████████████████████████ ██████████████. *See* Ex. DX1230 (Carlton Rep. ¶¶ 65-67, 69-74 & Tbls. 11-13) (███████ ████████████████████████████).

52. Supernatural's user base remains small in comparison with other home fitness alternatives, such as Apple Fitness+, Lululemon's Mirror, Nike Training Club, and Peloton's several products (including the augmented reality Peloton Guide and mobile Peloton app) – some of which have millions of subscribers. *See* Ex. DX1230 (Carlton Rep. ¶ 54 & App'x Tbl. 12); Ex. DX1232 (Vickey Rep. Tbl. 1).

53. Within does not even try to ████████████████████████████ ████████████████████. *See* Ex. DX1217 (Milk 19:8-12, 172:4-22, 191:18-194:14, 212:20-215:3); Ex. DX1081 at 1-2 (██████████████████████ ████████████████).

54. ████████████████████████████████████ ██████████████████████████████████ ██████████████████████ *See* Ex. PX0065 (Koblin 18:4-19:2, 149:23-151:16) (███████████████); Ex. DX1217 (Milk 19:8-12, 172:4-22, 191:18-194:14, 212:20-215:3) (███████); Ex. DX1119 (███████████████████████); Ex. DX1118 (██████████████████); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 90, 120) (████████ ████████████████████████████████████ ████████████████████████).

55.     Within is working hard to develop new fitness features for Supernatural that will attract a broader audience to VR fitness.  *See* Ex. PX0065 (Koblin 32:1-33:7, 137:2-14).

**B.     Supernatural Faces Intense Fitness Competition On- and Off-VR**

56.     Competition for connected fitness consumers is broad and vigorous, with scores of alternatives both on- and off-VR.  *See* Ex. DX1232 (Vickey Rep. § IV(A)(3) & App'x C) (fitness industry expert identifying more than 50 off-VR connected fitness products, services, and apps as consumer substitutes for VR fitness apps – many of which allow consumers to exercise and gain fitness, not limited to those in the FTC's claimed market); Ex. DX1230 (Carlton Rep. ¶¶ 63-74, 104-112 & App'x Tbls. 12-13) (identifying scores of competitive products, services, and apps on- and off-VR); Ex. DX1233 (Zyda Rep. ¶¶ 48-70) (describing VR fitness apps the FTC omits from its market, as well as several fitness products and services available on non-VR gaming platforms).

57.     Established fitness companies recognize the intense competition in this crowded space.  *See* Ex. DX1257 at 25-29 (██████████████████████████████████████ ████████████████████████████); Ex. DX1252 at 4 (███████████ ████████████████████████████████); Ex. DX1256 at 57 (██████████████); Ex. DX1219 (Casanova 33:4-19) (███████ ██████████████████████████████████); Ex. DX1283 at 1-2 (████████████ ██████████████████████); Ex. DX1286 at 5-7 (████████ ██████████████████████████████ ██████████); Ex. DX1295 at 6 (████████████ ██████████████████████); Ex. DX1222 (Healey 19:4-24:5) (████████ ████); Ex. DX1298 at 20 (Peloton Form 10-K:  "We face significant competition in every aspect of our business, including at-home fitness equipment and content, fitness clubs, in-studio fitness classes, and health and wellness apps."); Ex. DX1300 at 2 (████████████ ████).

58.     ██████████████████████████  *See* Ex. DX1287 (██████████████

1   █████████████████████████████████████████████████████████████

2   ██); Ex. DX1278 at 1 (██████████████████████████████████████).

3          59.     Every VR fitness developer to testify agrees that VR fitness apps compete against

4   many on- and off-VR connected fitness products – not just the nine "VR dedicated fitness apps" the

5   FTC identifies.  *See* Ex. DX1291 (Garcia Decl. ¶ 17) (VR fitness app developer listing as its

6   competitors:  "other immersive fitness solutions, such as at-home smart fitness equipment or apps,"

7   "fitness solutions offered on gaming consoles," and "fitness options offered on competing and

8   emerging VR systems"); Ex. DX1220 (Garcia 41:18-42:8) (similar); Ex. DX1290 (Janszen Decl.

9   ¶¶ 21-25) (VR fitness app developer:  "VR fitness applications offered on Meta's Quest Store

10  compete with all the various options, including health clubs, in-home connected, and mobile fitness

11  apps."); Ex. DX1223 (Janszen 24:10-27:20, 29:19-31:9, 114:9-115:7, 147:16-148:19) (█████); Ex.

12  DX1289 (Lewis Decl. ¶¶ 18-20, 31) (VR fitness app developer identifying "Peloton and Apple

13  Fitness+" as competitors); *see also* Ex. DX1233 (Zyda Rep. ¶ 55) (noting that many VR fitness

14  apps the FTC omits from its market describe themselves in fitness terms); Ex. DX1215 (Zuckerberg

15  210:1-211:11) (██████████████████████████████████████████████

16  ███); Ex. DX1198 (Bosworth 138:10-139:5) █████████████████████

17  ████████████████████████████████; Ex. DX1214 (Verdu 22:18-23:7) ████████████

18  ████████████████████████████████████████████████████████

19  ████████; Ex. DX1211 (Rubin 117:11-118:7) (██████████████████████

20  ██████████████████████████████████████).

21         60.     Within, for example, considers many on- and off-VR fitness products, services, and

22  apps to be competitors for fitness consumers ████████████████████████████.

23  *See* Ex. DX1217 (Milk 37:17-39:25, 61:21-63:16, 137:14-138:1, 149:2-150:2, 180:18-183:5,

24  191:18-193:23) (██████████████████); Ex. PX0065 (Koblin 78:13-79:24, 149:23-

25  151:16, 246:21-248:14) (similar); Ex. DX1095 at 12-16 (████████████████████

26  ████████████████████████████); Ex. DX1103 at 29 (████████████████

27  ████████████████████████████████████████████████████████);

28  Ex. DX1077 at 8-9 (████████████████████████████████████

Defendants' Proposed Findings of Fact & Conclusions of Law        Case No. 5:22-cv-04325-EJD

1  ██████████████████████████); Ex. DX1130 at 1 (███████████████

2  █████████████████████████████████████████████); Ex.

3  DX1134 at 1 (██████████████████████████████████████████████

4  ████); Ex. DX1126 at 31-35 (████████████████████████████

5  ███████████████████████████████████████████████████

6  ████████████████); Ex. DX1080 at 1 (██████████████████████).

7        61.    Some fitness products and services are available both on- and off-VR, e.g., fitness

8  consumers can stream workouts and guided-exercise courses on YouTube, including in VR.  *See*

9  Ex. DX1232 (Vickey Rep. ¶ 15) (███████████████████████████); Ex.

10 DX1214 (Verdu 22:18-23:7) (████████████████████████████); Ex.

11 DX1249 (██████████████████████████████████████████).

12       62.    There is continual entry into VR fitness – the FTC increased its asserted antitrust

13 market from five to nine firms since it filed the complaint, including two new entrants in 2022 – and

14 Meta now classifies 150 apps on the Quest platform as "fitness" apps.  *See* Ex. DX1207 (Paynter

15 30(b)(6) 56:22-23) (describing Meta's current internal app categorization); Ex. DX1232 (Vickey

16 Rep. ¶ 29) (Meta identifies more than 100 apps on the Quest platform as "fitness"); *see also* Ex.

17 DX1230 (Carlton Rep. ¶¶ 56-62, 107-110, Tbl. 7 & App'x Tbls. 12-13) (discussing VR fitness apps

18 that the FTC omits from its market); Ex. DX1233 (Zyda Rep. ¶ 43) (███████████████

19 ███████████████████████████████████████████████████

20 ██████████████████████████████); Ex. DX1194 (Sony website

21 identifying VR fitness apps available on the PSVR platform).

22       63.    For example, in 2022, a small VR developer called Odders Lab launched a new VR

23 fitness app – Les Mills Bodycombat, in partnership with the Les Mills fitness brand – that has

24 grown rapidly into one of the best-selling fitness apps on the Quest store.  *See* Ex. DX1291 (Garcia

25 Decl. ¶ 7) (business director of Odders Lab describing Les Mills Bodycombat); Ex. DX1220

26 (Garcia 75:21-76:3) (Les Mills Bodycombat has recently achieved profitability – unlike Within);

27 Ex. DX1230 (Carlton Rep. ¶¶ 59-60 & Tbl. 8) (discussing Les Mills Bodycombat launch); Ex.

28 DX1233 (Zyda Rep. ¶ 79 & Tbl. 2) (███████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████); *see also* Ex.

3  DX1287 at 1 (███████████████████████████████████████

4  ████████████████████████████████).

64.     Every VR fitness app developer to offer testimony in this case expects more entry imminently.  *See* Ex. DX1291 (Garcia Decl. ¶¶ 9-11, 17-19) (VR fitness app developer:  "There have been at least 6 VR fitness applications introduced in the past three years, and at least 2 in the past eight months.  I expect that more will be introduced as early as this coming year."); Ex. DX1220 (Garcia 59:8-16, 60:19-61:4) (similar); Ex. DX1290 (Janszen Decl. ¶¶ 10, 19-25, 37) (VR fitness app developer:  "the VR fitness application ecosystem is currently in its infancy, but is rapidly expanding and new entrants are entering the space frequently"); Ex. DX1223 (Janszen 110:13-111:2) (█████); Ex. DX1289 (Lewis Decl. ¶ 20) (VR fitness app developer:  "I expect that more will be introduced within the next year"); Ex. DX1217 (Milk 69:12-79:24, 146:2-14) (Within expects additional entry).

65.     And one fitness company – Black Box VR – has stated that it anticipates launching a new VR fitness app in 2023.  *See* Ex. DX1289 (Lewis Decl. ¶¶ 13-14) ("Our goal is to release the app on the Quest Store in 2023 and we are on track to meet that goal."); *see also* Ex. DX1230 (Carlton Rep. ¶ 189) (discussing anticipated Black Box VR app).

66.     ███████████████████████████████████████████

███████████████  *See* Ex. DX1269 at 1-2 (████████████████████

█████████████████████████████████████████); Ex. DX1271 at 1

███████████████████████████████████████████████████

█████; Ex. DX1277 at 5 (███████████████████████████████████); Ex.

DX1280 at 1 (████████████████████████████████████████████

█████████████████████████████████████); *see also* Ex.

DX1230 (Carlton Rep. ¶ 51) (████████████████); Ex. DX1233 (Zyda Rep. ¶¶ 89, 94-95)

(███████████████████████████████████████); Ex. DX1232 (Vickey Rep.

¶¶ 25, 27) (██████████████████████████████████████████).

67. ███████████████████████████████████
████████████████████████████. Ex. DX1257 at 4, 14-19 (███████████████████); *see also* Ex. DX1233 (Zyda Rep. ¶ 94) (██████████████████); Ex. DX1230 (Carlton Rep. ¶ 51) (█████). ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ *Id.* at 14. █████████
████████████████████████████████████ *Id.* at 4, 17-19.
████████████████████████████████████████████████
████████████████████████████. *Id.* at 24-29 (███████████████).

68. ██████████████████████████████████████
████████████████████████. *See* Ex. DX1245 at 10 (████████████
████████████████████████████████); Ex. DX1247 at 15, 18 (████
████████████████████████████); Ex. DX1249 at 27 (███████████
████████████████████████████████████████); Ex. DX1226 (Payne 81:3-6) (█████████████████████████████);
*see also* Ex. DX1233 (Zyda Rep. ¶ 95) (█████████████████).

69. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████ *See* Ex. DX1266 at 17-18 (█████████████
████████████████████████████████████████████
████████████); Ex. DX1267 (██████████████████████████████
████████████████████████); Ex. DX1221 (Choate 52:22-53:5, 54:7-15) (████
████████████████████████████; *see also* Ex. DX1291 (Garcia Decl. ¶ 7) (noting that Les Mills Bodycombat, an in-market app, is available on Pico devices).

70. ████████████████████████████████. *See* Ex. DX1117 (████████████████████████████████████████████); Ex. PX0065 (Koblin 71:24-72:7) (█████████████████████████); Ex. DX1217 (Milk 146:2-14, 175:9-176:21) (similar); *see also* Ex. DX1103 at 20 (██████████████████████

█████████████████████████████████████); Ex. DX1092 at 117 (█████████████████
████████████████████████████████████████████████████████).

71.     Every VR fitness developer to offer testimony anticipates substantial additional
competition from new entrants with fitness backgrounds – but not from Meta (which has no fitness
experience).  *See* Ex. DX1217 (Milk 61:3-63:2, 63:17-66:20) (discussing Within's expectations);
Ex. PX0065 (Koblin 58:13-59:18, 62:21-63:5, 246:16-247:11) (similar); Ex. DX1103 at 28 (████
████████████████████████████████████); Ex. DX1291 (Garcia Decl. ¶¶ 30-
32) (describing importance of "fitness knowledge," among other factors, and stating that "I have not
seen any evidence that Meta possesses any qualities, characteristics, or abilities that uniquely
position it to develop a virtual reality fitness application"); Ex. DX1290 (Janszen Decl. ¶¶ 32-35,
37) ("We have not made business decisions based on any concern that Meta may offer a new fitness
app or a modified version of a current app that competes with VirZOOM."); Ex. DX1289 (Lewis
Decl. ¶¶ 26-31) ("While we are appropriately concerned that new products will be offered and will
compete with our app, we don't believe Meta as an independent developer was or is likely to be one
of them, and we have never had particular concern about Meta, which has been helpful to us (and
itself) in developing the VR ecosystem.").

72.     For example, Within's CEO wrote in March 2021 that ██████████████████
██████████████████████████████████████ Ex. DX1085 at 2, 4 (text message).

73.     Each VR fitness developer witness with personal knowledge also testified, without
contradiction, that it competes vigorously and without coordination or interdependent conduct.  *See*
Ex. DX1291 (Garcia Decl. ¶¶ 34-35) ("[T]he VR fitness application ecosystem is highly
competitive and dynamic, and I would not characterize any firm as dominant.  I do not believe it is
fair or accurate to describe it as an oligopoly."); Ex. DX1290 (Janszen Decl. ¶¶ 36-38) ("I am
unaware of any interdependent or parallel behavior by anyone offering these products."); Ex.
DX1223 (Janszen 143:8-147:4) (██████); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 124-130 & App'x
Tbl. 4) (explaining absence of parallel conduct and presence of contrary evidence).

74.     To illustrate, these many VR fitness apps offer a range of prices and pricing models,
from free, to one-time purchase, to monthly only subscriptions, to monthly or annual subscriptions.

*See* Ex. DX1232 (Vickey Rep. ¶ 47) (discussing multiple pricing models of the nine so-called "VR dedicated fitness apps"); Ex. DX1230 (Carlton Rep. ¶¶ 88, 109-112 & App'x Tbl. 4) (discussing differences in pricing models and prices, ████████████████████████).

75.    Because of the broad nature of competition – the many competitors, many and varied pricing amounts and structure, constant entry, varied distribution channels, and other factors – there is no evidence that competitors can or do coordinate their actions, as to either pricing or other aspects of their conduct.  *See* Ex. DX1230 (Carlton Rep. ¶¶ 124-130 & App'x Tbls. 4, 13) (discussing market and economic evidence confirming absence of coordination or parallel conduct); Ex. PX0065 (Koblin 148:16-151:19) (Within founder discussing the Supernatural pricing); Ex. DX1220 (Garcia 74:13-16) (rival VR fitness app developer confirming the same).

76.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████.  *See* Ex. DX1217 (Milk 24:2-24,
194:11-14) (████████████████████████████████████████); Ex. PX0065
(Koblin 18:10-19:7) (similar); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 115-121, 131-133)
(████████████████████████████████████████████████████);
Ex. DX1290 (Janszen Decl. ¶ 38) ("In this early stage, our pricing strategy is solely designed to increase our user base.  We measure our progress by the number of subscribers to our product and our ability to both retain existing users and grow that number while maintaining fixed costs.").

IV.    **Meta Is Not a Potential Supernatural Competitor**

A.    **Meta Never Planned To Build Its Own VR Fitness App**

77.    The Meta executives with authority to approve the development of a competing app, Messrs. Zuckerberg and Bosworth, testified without contradiction that they were never presented a proposal for the development of such a product.  *See* Ex. DX1215 (Zuckerberg 164:2-7, 242:14-243:11) ████████████████████████████████████████████; Ex.
DX1198 (Bosworth 223:18-224:5) ████████████████████████████████████
████████████████████████; *see also* Ex. DX1209 (Rabkin 30(b)(6) 28:18-29:1, 31:15-32:6, 38:8-39:24) ████████████████████████████████████████

██████████████████████████; Ex. DX1214 (Verdu 178:7-20) ████████████████

████████████████████████████████████████████████████████████████████

███████████████.

78.     For example, Mr. Bosworth, who controls the Reality Labs budget, testified that he would have to approve spending on any such proposal, but no one ever even asked him to consider (let alone authorize) any such approval – there is no contrary evidence.  *See* Ex. DX1198 (Bosworth 211:1-16, 217:2-221:6) ████████████████████████████████████████

████████████████████████.

79.     And Mr. Bosworth testified that he would not approve spending to build a new VR fitness app, either from scratch or by modifying an existing Meta app.  *See* Ex. DX1198 (Bosworth 226:1-8, 227:24-228:24).

80.     Meta employees at lower levels of Reality Labs considered how to grow the Quest ecosystem beyond gaming by encouraging the development of apps for non-gaming VR "use cases," including options for fitness.  *See* Ex. DX1035 at 1-2 ████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████.

81.     Some of these employees considered internal development of a fitness app, as well as modifying Beat Saber to make it more like Supernatural.  *See* Ex. DX1214 (Verdu 110:10-111:8, 178:7-180:18, 198:18-200:22) ████████████████████████████████████████

██████████████████████████████████; Ex. DX1213 (Stojsavljevic 112:9-11) ████████████

██████████████; Ex. DX1205 (Barrios 175:23-176:5) ██████████████████████████████

████████████████████████.

82.     None of these ideas ever materialized in a proposal.  *See* Ex. DX1215 (Zuckerberg 143:7-17, 144:12-19, 163:24-164:7, 242:14-243:1) ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████; Ex. DX1198 (Bosworth 223:21-22) ████████████████████████████

████████████████████████████████████████████████████; Ex. DX1209 (Rabkin

30(b)(6) 28:18-29:1, 31:15-32:6, 38:8-39:24) ████████████████████████████
████████████████████████████████████████ .

83.     Instead, all of the Meta employees involved in this brainstorming testified, without contradiction, that these ideas never proceeded beyond the discussion stage, never received approval from any senior manager, and were all discarded as impractical for various reasons – there is again no contrary evidence.  *See* Ex. DX1214 (Verdu 229:3-231:7) ██████████████
████████████████████████ ; Ex. DX1204 (Dass 100:4-103:5) ████████████████
████████████████████████████████████████████████████████
████████████████████ ; Ex. DX1210 (Rabkin 194:4-195:15) (████████████
████████████████████████████████████ ); Ex. DX1209 (Rabkin 30(b)(6) 28:18-29:1,
31:15-32:6, 38:8-39:24) (███████████████████████████████████████████
████████ ); Ex. DX1213 (Stojsavljevic 147:25-148:12) (█████████████████
██████████████████████████ ); Ex. DX1208 (Pruett 284:6-18) (█████████████
████████████████████████████ ); Ex. DX1202 (Chiao 143:9-17) (████████████
██████████████████████ ); *see also* Ex. DX1211 (Rubin
166:11-172:11) █████████████████████████████ .

84.     In a series of documents created between March and May 2021, Meta employees recorded the decision not to create a first-party fitness app from scratch and listed reasons for that decision, ████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████ .  *See* Ex. DX1016 at 1 (███████████████████████
████████████████████████████████████████████████████████
██████████████ ); Ex. DX1012 at 1 (similar).

85.     For example, in March 2021, Meta's Director of VR Content explained that Meta would need to acquire, rather than build, a VR fitness app because: ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Defendants' Proposed Findings of Fact & Conclusions of Law          Case No. 5:22-cv-04325-EJD

1  ███████████████████████████████████████████████████████████████

2  ████████████████████████" Ex. DX1011 at 1; *see also* Ex. DX1016 at 1 (same).

3      86.    In a fitness strategy memo from May 2021, Meta wrote: ████████████████

4  ██████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████ Ex. DX1016 at 7.

7      87.    And in May 2021, Meta confirmed in writing, ████████████████████

8  ██████████████████████████████████████████████████████████████████████████

9  ████████████ Ex. DX1020 at 3-5.

10     88.    Meta employees evaluating VR fitness therefore concluded that Meta does not have

11  the capabilities necessary to build its own VR fitness app.  *See supra* ¶¶ 83-87.

12     89.    Indeed, Meta assessed ████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████. *See* Ex. PX0144 (Meta message thread from March 2021, in which

15  Meta's then-head of Oculus VR content strategy writes: ████████████████████████████

16  ██████████████████████████████████████████████████████████████████████████;

17  Ex. DX1211 (Rubin 169:5-14) (████████████████████████████████████

18  ████████████████████████); Ex. DX1212 (Rubin 30(b)(6) 31:13-33:1, 39:3-8) (similar);

19  Ex. DX1214 (Verdu 189:15-190:14) (████████████████████████████████

20  ████████████████████████); Ex. DX1213 (Stojsavljevic 160:15-161:20) (████████████

21  ██████████████████████████████████████████████████████████).

22     90.    Meta likewise conclusively decided against modifying Beat Saber into a fitness app.

23  *See* Ex. DX1215 (Zuckerberg 143:7-17, 144:12-147:3, 148:4-149:3, 242:14-243:11) (███████

24  ████████████████████████████████████████████

25  ██████████████████████████████████████████████████████████████████████████

26  ████████████████████████); Ex. DX1198 (Bosworth 139:18-142:9) (████████████████

27  ██████████████████████████████████████████████.

28

91.     Beat Games, the studio that develops Beat Saber, was against a modification that, in its view, would compromise its highly successful game.  *See* Ex. DX1197 (Beck 106:7-107:14, 116:10-22, 140:22-141:8) (founder, former CEO, and current music director of Beat Saber explaining ██████████████████████████████████████████████████████████████

██████████████); *see also* Ex. DX1214 (Verdu 179:19-180:18, 198:18-200:22, 229:3-231:7)

(██████████████████████████████████████████████████████████).

92.     Meta grants the VR app developer studios it acquires significant autonomy and creative control, given their expertise.  *See* Ex. DX1211 (Rubin 137:1-138:6, 169:17-170:18, 173:5-175:21) (describing the creative control Meta affords the small handful of VR studios it acquires).

93.     Meta gave no further consideration to modifying Beat Saber into a fitness app.  *See* Ex. DX1210 (Rabkin 173:16-174:11) ████████████████████████████████████

██████; Ex. DX1201 (Carmack 40:23-43:24) ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████; Ex. DX1198

(Bosworth 142:2-9, 220:22-221:6) ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████; *see also* Ex. DX1230 (Carlton Rep.

¶¶ 136-139) (██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████); Ex. DX1233 (Zyda Rep. ¶¶ 110-118) (████████

███████████████████████████████████████); Ex. DX1217 (Milk 32:10-14)

(███████████████████████████████████); Ex. PX0065 (Koblin 64:14-65:13, 169:3-170:4) (similar).

94.     Mr. Bosworth testified that the foregoing considerations would have killed any formal proposal for Meta to build its own VR fitness app prior to when Meta offered to acquire Within, and that the same considerations – ████████████████████████ – foreclose any possibility that Meta would build its own VR fitness app if the Court blocks the transaction.  *See*

26

1  Ex. DX1198 (Bosworth 211:1-16, 217:2-221:6, 226:1-8, 227:24-229:1) (███████████

2  ██████████████████████████████████████████████████████████████████████████

3  ██████████████).

4       95.    Mr. Zuckerberg similarly testified that he will not allow Meta to develop its own VR

5  fitness app ██████████████████ – and that he would have by now suspended any such

6  program even in a hypothetical world where other Meta executives authorized one in 2021 (they did

7  not).  *See* Ex. DX1215 (Zuckerberg 150:6-14, 238:12-240:17, 144:12-145:9) (███████████

8  ██████████████████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████████).

12      96.    Other market participants, including VR fitness app developers, testified that they

13 did not (and do not) believe that Meta was (or is) uniquely likely to offer a VR fitness app because,

14 among other reasons, it lacked (and still lacks) fitness experience and VR app development

15 expertise.  *See* Ex. DX1291 (Garcia Decl. ¶¶ 31-33) (developer of in-market VR fitness app

16 testifying that it "do[es] not believe Meta was or is likely to [enter], and we have never had

17 particular concern about Meta," but instead its "competitive concerns" include "possible entry by

18 other fitness companies, like Peloton or Equinox, and VR developers more broadly"); *see also* Ex.

19 DX1279 at 1-2 (██████████████████████████████████████████████████████████

20 ████████████████████████████████████████).

21      97.    No witness with personal knowledge has testified otherwise.  *See supra* ¶¶ 83-96.

22     **B.**    **VR Fitness Apps Do Not Perceive Meta as a Unique Competitive Threat**

23      98.    No witness involved in developing VR/AR fitness apps testified that the concern

24 Meta might build its own VR fitness app affected any competitive decision.  *Cf.* Ex. DX1217 (Milk

25 191:18-194:10) (████████████████████████████████████████████████████████

26 ██████████████████); Ex. PX0065 (Koblin 148:16-151:23, 169:5-11) (similar); Ex. DX1290

27 (Janszen Decl. ¶¶ 32-35) (VR fitness app developer dismissing idea of Meta as a potential entrant

28 influencing competitive decisions); Ex. DX1223 (Janszen 34:2-36:9) (███████).

99.     VR app developer witnesses instead have testified that they did not and do not consider Meta a likely entrant – let alone a uniquely likely entrant – but instead monitor entry from a broad array of actual and potential competitors with fitness experience.  *See supra* ¶ 96.

100.    For example, in a document from 2019 – *before* Supernatural launched and *before* Meta closed its acquisition of Beat Games – a Within employee noted that █████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████.  *Compare* Ex. DX1074 at 1 (Within email discussion from December 2019) *with* Ex. DX1083 at 10 (September 2020 text message from Milk stating that the ████████████████████████████████████████ ████████████████████████████████████); *see also* Ex. DX1217 (Milk 61:9-62:8, 63:17-65:7) (█████████████████████████████████████████████); Ex. PX0065 (Koblin 58:13-59:9, 63:2-16, 232:8-14) (similar).

101.    Meta has no particular advantages that would make it a uniquely likely potential VR fitness app competitor – many other companies, including some with actual fitness experience, have financial resources and █████████████████████████.  *See* Ex. DX1233 (Zyda Rep. ¶¶ 123-124) (██████████████████████████████████ ████████████████████); Ex. DX1230 (Carlton Rep. ¶¶ 51-52, 152-159) (███████████ ████████████████████████████████████████████████████████ ██████████████████); Ex. DX1220 (Garcia 70:2-12) (VR fitness app developer; similar).

102.    Nor are whatever resources Meta possesses necessary for entry, as every VR fitness app that exists began as a small startup.  *See* Ex. DX1289 (Lewis Decl. ¶¶ 30-31) (VR fitness app developer explaining that it is "possible that such apps can and will be developed by small studios like ours and Within's," as the developer is "not aware of any unique advantages that Meta would have in doing this with greater success than other companies"); Ex. DX1230 (Carlton Rep. ¶¶ 56-62 & Tbl. 7) ████████████████████████████████; Ex. DX1233 (Zyda Rep. ¶ 81) (████████████████████████████████████████████████████████); *see also* Ex. DX1291 (Garcia Decl. ¶ 31) (VR fitness app developer describing itself as "small" studio).

103.     As the developer of Les Mills Bodycombat testified, "Odders Lab has never believed, or even considered, that Meta would develop a VR fitness application on its own, nor did it feel competitive pressure from the potential that it would."  Ex. DX1291 (Garcia Decl. ¶ 32).

**V.     Meta Decided To Acquire Within To Promote VR Adoption and Growth**

104.     Even though Meta executives never gave active consideration to building a first-party VR fitness app, employees at Reality Labs were interested in fitness as a promising VR use case ███████████████████████████████████████████.  *See* Ex. DX1021 at 1 (████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████; Ex. DX1020 at 1 (████████████████████████████████████████████████████); Ex. DX1003 at 2 (███████████████████████████████ ████████████████████████ ████████████████████████████████████); Ex. DX1210 (Rabkin 40:1-41:13, 44:3-45:14, 164:25-166:7) (explaining Meta's interest in the fitness use case); Ex. DX1215 (Zuckerberg 153:7-154:2) ████ ████████████████████████████████; *see also* Ex. DX1006 at 12, 14 ████████████ ████████████████████████████████████ ████████████████████████████████ ███████████████████████████.

105.     VR fitness appeals to a broader audience (more female and older) than VR games, and attracting this new audience to VR could grow the AR/VR ecosystem by attracting new third-party developers – including for use cases beyond fitness – that can attract even more users.  *See* Ex. DX1211 (Rubin 132:7-14) ████████████████████████████████ ████████████████████████████; Ex. DX1214 (Verdu 22:4-17, 90:16-91:2, 107:11-21) (describing appeal of VR fitness to a broader consumer audience than VR gamers); Ex. DX1198

(Bosworth 168:20-169:6, 187:13-21) █████████████████████████████████
████████████████████████████████████████████; Ex. DX1215 (Zuckerberg 168:2-
169:44, 235:17-236:1) (discussing how VR fitness can expand the VR audience); *see also* Ex.
DX1217 (Milk 152:19-153:7) (█████████████████████████████████████████
████████; Ex. DX1100 at 22 ███████████████████████████████████████
██████████████████████████; Ex. DX1230 (Carlton Rep. ¶ 66) ████████.

106.    However, Meta determined it would need to do this by investing in a first-party
fitness studio, writing that its ███████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████ Ex. DX1016 at 4.

107.    In the summer of 2021, Meta became interested in a potential acquisition of Within
for several reasons:  Supernatural appeared to be gaining traction with consumers, and Meta could
support the VR fitness use case by acquiring a VR fitness app.  *See* Ex. DX1214 (Verdu 236:12-
237:1, 246:18-247:17) (█████████████████████████████████████████).

108.    Meta had experience with VR app acquisitions, including scaling Beat Saber, making
it available on non-Meta VR platforms (the Sony PSVR), and even making it free to new purchasers
of the Quest 2 for a time (Meta has never increased the price of a VR app after acquiring it).  *See*
Ex. DX1211 (Rubin 141:21-142:18) (noting Meta has made Beat Saber available on other VR
platforms); Ex. DX1230 (Carlton Rep. ¶¶ 181-182, 191-193, Tbl. 19 & App'x Tbl. 11) (discussing
Meta's post-acquisition growth of Beat Saber); Ex. DX1233 (Zyda Rep. ¶¶ 30, 127, 130-131)
(discussing Beat Saber's growth and innovations following the Meta acquisition, ██████████
████████████████████████████████████████████████████
████████████████████████████████████████████████).

109.    Meta had also successfully used other VR developer acquisitions – including Beat
Games – as laboratories for testing VR hardware and software improvements that it freely shares
with competitive VR app developers to attract them to the Quest platform.  *See* Ex. DX1212 (Rubin
30(b)(6) 8:14-12:5, 53:12-55:13) (████████████████████████████████████
████████████████████████████████████████████████████████

Defendants' Proposed Findings of Fact & Conclusions of Law        Case No. 5:22-cv-04325-EJD



); Ex. DX1039 at 4 (

); *see also* Ex. DX1036 at 6 (

); Ex. DX1198 (Bosworth 183:16-24, 185:19-186:6, 203:21-205:8)

(

).

110.

*See* Ex. DX1217 (Milk 129:21-130:4, 131:5-133:17) ( ); *see also* Ex. DX1215 (Zuckerberg 154:3-21) ( ); Ex. DX1219 (Casanova 93:6-15) ( ).

111.  By contrast, Meta wanted to grow Supernatural using Meta's technical and financial resources, to the benefit of the VR ecosystem broadly.  *See* Ex. DX1023 at 1 (

); *see also* Ex. DX1212 (Rubin 30(b)(6) 27:25-28:20, 34:24-36:3) (

).

112.  After negotiations, Within and Meta executed the Merger Agreement on October 22, 2021.  *See* Ex. DX1072 (Merger Agreement).

113.    The acquisition has remained in limbo for more than a year, which has already

created hardships for Within and its employees, ████████████████████████████

████████. *See* Ex. DX1217 (Milk 212:20-213:19).

114.    ████████████████████████████████████████████

████████████████. *See* Ex. DX1217 (Milk 19:8-12, 172:4-22, 194:11-14, 212:20-

215:3).

**VI.    Meta's Pro-Competitive Incentives To Grow Supernatural and VR Broadly**

115.    Meta witnesses have testified that Meta is acquiring Within to scale Supernatural and

grow the overall VR ecosystem so that it can keep up with intense, dynamic, and fast-moving

competition. *See* Ex. DX1215 (Zuckerberg 30:10-31:1, 35:13-24, 150:16-152:11, 152:22-156:13,

159:8-13, 226:19-227:18) (discussing Meta's interest in scaling Supernatural to benefit of the VR

ecosystem); Ex. DX1212 (Rubin 30(b)(6) 53:12-56:7) ████████████████████

████████████████████████████████████████████████████

████████████████████; Ex. DX1204 (Dass 81:4-82:15) (noting Meta's expectation that the

acquisition will spur broader developer interest and investment in VR fitness); *see also* Ex. DX1198

(Bosworth 148:9-149:5, 211:1-216:4) (explaining additional reasons for the acquisition); Ex.

DX1230 (Carlton Rep. ¶¶ 34-62, 171-193) (explaining growth and competition in this space, as well

as the acquisition's likely pro-competitive effects).

116.    It would be directly contrary to that strategy, and indeed damaging to it, for Meta to

raise the price of Supernatural (or make it less innovative) and thereby make it less attractive to

consumers. *See* Ex. DX1230 (Carlton Rep. ¶¶ 171-193 & App'x Tbl. 11).

117.    A price increase, particularly one above competitive levels (or a quality degradation),

would necessarily make the app less attractive to consumers, who would then be less likely to buy a

Quest headset to enjoy the app, which would depress Quest sales, driving away app developers,

which would drive away customers further. *See* Ex. DX1230 (Carlton Rep. ¶¶ 30, 172-175, 180-

182) (explaining Meta's economic incentives); Ex. DX1233 (Zyda Rep. ¶¶ 100-108) ████████

████████████████████████████████████████████████████

████████████████████████.

118.     The non-party VR app developers who testified uniformly stated that the acquisition is beneficial to competition, because it is a vote of confidence in this nascent space, evidence of an exit ramp that will encourage outside investment and spur more app development, and an overall stimulus to growth of the VR/AR ecosystem.  *See* Ex. DX1291 (Garcia Decl. ¶¶ 20-26) ("the acquisition of Within could be a vote of confidence in VR generally, and in fitness applications in particular"); Ex. DX1290 (Janszen Decl. ¶¶ 29-31) ("It will encourage others to develop VR products, including fitness products, because it is important to entrepreneurs to see that companies are investing in and are willing to acquire and grow apps in this space."); Ex. DX1223 (Janszen 31:11-33:22, 45:18-46:5, 100:2-101:4) (█████); Ex. DX1289 (Lewis Decl. ¶¶ 21-25) ("In fact, Black Box is currently in a funding round and using Meta's acquisition of Within as support for our use case.  This acquisition is helpful to show investors how popular VR Fitness is becoming."); *see also* Ex. DX1233 (Zyda Rep. ¶ 126) (███████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████); Ex. DX1230 (Carlton Rep. ¶¶ 188-189) █████████████████████████████████████ ██████████████████████████████████.

119.     The witnesses are likewise convinced that Meta's business incentives are, and will continue to be, to encourage and promote a broad range of third-party apps on the Quest platform, which it has done to date – as it must to remain competitive with the many other VR devices and distribution platforms available to developers and consumers.  *See* Ex. DX1212 (Rubin 30(b)(6) 5:6-12:5, 37:10-24) (describing Meta's incentive and intent to grow Supernatural, diffuse Within's technologies to other VR app developers, and increase output of Supernatural, VR fitness apps, and all VR apps generally); *see also* Ex. DX1230 (Carlton Rep. ¶¶ 171-193) (discussing Meta's incentives and the acquisition's likely pro-competitive effects); Ex. DX1210 (Rabkin 42:24-43:8, 44:3-45:14) (████████████████████████████████████████ ███████); Ex. DX1220 (Garcia 63:20-64:14, 66:21-67:11) (VR fitness app developer confirming).

33

**PROPOSED CONCLUSIONS OF LAW**

**I.     Legal Standards**

      **A.     Preliminary Injunction**

      120.   Section 13(b) of the Federal Trade Commission Act allows the FTC to obtain a "preliminary injunction" where a person "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission" – including Section 7 of the Clayton Act, 15 U.S.C. § 18 – and where the FTC makes "a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b); *see also FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159-60 (9th Cir. 1984) (per curiam).

            **1.     Likelihood of Success on the Merits**

      121.   Section 13(b) requires the FTC to show a "likelihood of ultimate success," *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999), i.e., "some chance of probable success on the merits," *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  In making that assessment, courts are "charged with exercising their 'independent judgment' and evaluating the FTC's case and evidence on the merits."  *FTC v. Meta Platforms Inc.*, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022) (citation omitted); *see also FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *15 (C.D. Cal. Mar. 11, 2011) ("serious question" standard does not eliminate "FTC's need to demonstrate a likelihood of success on the merits").

            **2.     Equitable Balancing**

      122.   Section 13(b) also requires the FTC to show that a balancing of the equities favors preliminary injunctive relief.  *See Lab. Corp.*, 2011 WL 3100372, at *15, *21 ("[T]he FTC must present evidence and make an actual showing [that] the equities favor enjoining the transaction."). Equitable balancing under Section 13(b) mandates consideration of both "public equities" and the "private interests" of the parties.  *Id.* at *21-22.

      **B.     Section 7 of the Clayton Act**

      123.   Section 7 prohibits an acquisition where its effects "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

34

124.     To make that showing, the FTC must prove the acquisition would harm consumers in a relevant antitrust market.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 900 n.12 (D.C. Cir. 1990) (Section 7 requires "a judgment whether the challenged acquisition is likely to hurt consumers"); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (similar). Proving harm to consumers entails showing that the "combined entities" could "exercise market power by raising prices and restricting the availability of a product or service to customers."  *FTC v. Foster*, 2007 WL 1793441, at *51 (D.N.M. May 29, 2007).

125.     Harm to competition that harms consumers is a necessary element of any Section 7 claim invoking "potential competition" as a theory of liability.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 625 (1974); *see also Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 860 (2d Cir. 1974) (Friendly, J.).

126.     For a Section 7 claim, "antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future."  *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116-17 (D.D.C. 2004); *see also Marine Bancorporation*, 418 U.S. at 622-23; *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

127.     "[A] failure of proof in any respect will mean the transaction should not be enjoined."  *Arch Coal*, 329 F. Supp. 2d at 116.

**C.     Loss of "Potential Competition" as a Basis for Section 7 Liability**

128.     There is doubt over the extent to which loss of potential competition can support a Section 7 claim.  The FTC has not even attempted to bring a claim asserting a loss of "perceived" potential competition in nearly 40 years, and the Supreme Court has expressly declined – twice – to recognize the validity of a claim asserting a loss of "actual" potential competition.  *See Marine Bancorporation*, 418 U.S. at 639 ("we do not reach it"); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 537 (1973) ("leav[ing] for another day the question").

129.     Under the prevailing substantive standard set by the Supreme Court in *Marine Bancorporation* – which severely restricted any use of a potential competition theory of Section 7 liability – the FTC has lost each of the three potential competition cases that it has brought under

Defendants' Proposed Findings of Fact & Conclusions of Law          Case No. 5:22-cv-04325-EJD

Section 13(b) seeking a preliminary injunction.  *See FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) (denying Section 13(b) injunction); *FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) (same); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same).

130.    The "potential-competition doctrine . . . comes into play *only*" in relevant antitrust markets "where there are dominant participants" that are "engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services," but that "fashion their behavior to take into account the presence of a potential entrant." *Marine Bancorporation*, 418 U.S. at 619, 630-31 (emphasis added); *see also Tenneco, Inc. v. FTC*, 689 F.2d 346, 352-53 (2d Cir. 1982) (requiring oligopoly even in the presence of high concentration ratios); *Republic of Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 649 F.2d 1026, 1044 (5th Cir. Unit A June 1981) (oligopoly is "necessary" to the doctrine); *United States v. Siemens Corp.*, 621 F.2d 499, 505 n.6 (2d Cir. 1980) (same).

### 1.    Actual Potential Competition

131.    "Actual potential competition" claims without at least clear proof of imminent entry are legally invalid.  Whether a firm would have taken some alternative course (build) in the absence of its chosen path (buy) – a hypothetical built on a hypothetical – is too speculative to make a showing of likely harm to competition under Section 7.  *See Marine Bancorporation*, 418 U.S. at 622-23 (declining to accept the theory; noting that Section 7 "deals in probabilities, not ephemeral possibilities") (internal quotation marks omitted).  "The novelty of the [actual potential competition] doctrine and the absence of definitive authority sanctioning it and defining its parameters could well serve as a basis for denial of a preliminary injunction under § 13(b), since it is difficult, if not impossible, to determine FTC's chances of ultimate success when the law is so uncertain and the parameters of the doctrine obscure." *Atl. Richfield*, 549 F.2d at 294.

132.    Accordingly, the theory finds no support in any decision of the Supreme Court, the Ninth Circuit, or this district.  *See Marine Bancorporation*, 418 U.S. at 624.  Other courts have doubted its existence.  *See Siemens*, 621 F.2d at 504 ("[o]ne possible reason for the Supreme Court's reluctance to embrace the doctrine is that it rests on speculation"); *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 25 (2d Cir. 1977) ("the issue of the doctrine's basic validity" is unresolved); *United*

36

*States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) (similar).  The Eighth Circuit's decision in *Yamaha Motor Co. v. FTC*, 657 F.2d 971 (8th Cir. 1981), is in accord, as that was in effect an *actual* competition case – not an actual *potential* competition case – where one competitor agreed with another that it would not sell already-existing products in a target geographic market.

133.    The FTC itself has limited the doctrine to cases in which it has at least "clear proof" that the acquirer would actually enter the target market on its own but for the acquisition.  *In re B.A.T. Indus., Ltd.*, 1984 WL 565384, at *10 (FTC Dec. 17, 1984) ("Our review of the legal and economic bases for the actual potential competition doctrine has persuaded us that clear proof that independent entry would have occurred but for the merger or acquisition should be required to establish that a firm is an actual potential competitor."); *see also Siemens*, 621 F.2d at 506-07 (affirming order denying preliminary injunction where there was no "clear proof that entry would occur"); *Atl. Richfield*, 549 F.2d at 294 (similar).

134.    That strict limitation follows the Supreme Court's warning that actual potential competition is inherently speculative because "[u]nequivocal proof that an acquiring firm actually would have entered de novo but for a merger is rarely available."  *Marine Bancorporation*, 418 U.S. at 624; *see Atl. Richfield*, 549 F.2d at 294 (similar); *see also DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764-65 (9th Cir. 2018) (rejecting potential competition claim as "classic speculative conclusion" based on "only speculation as to how" the competitors might behave).

## 2.    Perceived Potential Competition

135.    The "perceived potential competition" theory is also tenuous – the Supreme Court has limited it to cases presenting extreme facts.  The doctrine is valid *only* where there is proof that "the acquiring firm's premerger presence on the fringe of the target market *in fact* tempered oligopolistic behavior on the part of existing participants in that market."  *Marine Bancorporation*, 418 U.S. at 624-25 (emphasis added).  Such proof requires showing that market participants were coordinating or colluding on price – or could have engaged in equivalent oligopoly conduct – and stopped or avoided such conduct specifically because of fear that the acquirer (and not other potential competitors) might enter.  *See Tenneco*, 689 F.2d at 355; *see also Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943, 947 (E.D. Mo. 2009), *aff'd*, 623 F.3d 1229 (8th Cir. 2010).

37

1

**II.    The FTC Is Not Likely To Succeed on Its Section 7 Potential Competition Claim**

2

      **A.    "VR Dedicated Fitness Apps" Are Neither a Relevant Antitrust Market nor**

3

           **Oligopolistic – Failing Both *Marine Bancorporation* Predicates**

4

      136.    For both of its potential competition theories, the FTC must prove, first, that the

5

nine-app "VR dedicated fitness" market is a properly defined relevant antitrust market.  *See Marine*

6

*Bancorporation*, 418 U.S. at 618 (establishing a "relevant product market" is "a necessary predicate

7

to deciding whether a merger contravenes the Clayton Act") (internal quotation marks omitted); *see*

8

*also Lab. Corp.*, 2011 WL 3100372, at *17 (FTC's burden).

9

      137.    In addition, the FTC must prove that the properly defined relevant antitrust market is

10

presently an "oligopoly" – as to both behavior (e.g., in-market participants engage in parallel or

11

coordinated anticompetitive conduct) and structure (e.g., substantial entry barriers protect the

12

oligopoly's anticompetitive behavior).  *See supra* ¶ 130.

13

      138.    The FTC has not made either predicate showing in this case.

14

      **1.    Nine Selected "VR Dedicated Fitness Apps" Do Not Comprise a Relevant**

15

           **Antitrust Market**

16

      139.    The FTC has not carried its burden of establishing a "relevant product market" – "a

17

necessary predicate to deciding whether a merger contravenes the Clayton Act."  *Marine*

18

*Bancorporation*, 418 U.S. at 618 (internal quotation marks omitted); *see also Lab. Corp.*, 2011 WL

19

3100372, at *17 (FTC's burden).  A valid antitrust market must include all "[e]conomic

20

substitutes," i.e., products and services that "have a 'reasonable interchangeability of use' or

21

sufficient 'cross-elasticity of demand' with the relevant product."  *Hicks v. PGA Tour, Inc.*, 897

22

F.3d 1109, 1120 (9th Cir. 2018) (citation omitted); *see id.* at 1120-21 (relevant antitrust market must

23

include "the group or groups of sellers or producers who have actual or potential ability to deprive

24

each other of significant levels of business").  A relevant antitrust market must also reflect

25

"economic reality," *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1015 (N.D. Cal. 2021),

26

which the FTC's nine-app "VR dedicated fitness" market does not.

27

      140.    *First*, the FTC's market definition improperly omits fitness products, services, and

28

apps – on- and off-VR – that are "reasonabl[y] interchangeab[le]" by consumers "based upon price,

38

use and qualities." *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) (internal quotation marks omitted).  Scores of products, services, and apps are available to consumers who want to exercise.  *See supra* ¶¶ 56-61.  That includes dozens of "connected fitness" products and services off-VR, e.g., Apple Fitness+, the Peloton Guide, and the Peloton mobile app, among many more.  *See id*.  It also includes more than 100 additional VR apps on just the Quest platform alone that Meta classifies as "fitness."  *See supra* ¶¶ 62-66.

141.    *Second*, industry participants confirm that so-called "VR dedicated fitness apps" – like Supernatural – compete with these many other on- and off-VR products, belying the FTC's market definition.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 (D.C. Cir. 1986) (crediting the view of industry participants).  Each "VR dedicated fitness app" developer that has testified agrees it competes with many fitness products and services outside the FTC's market.  *See supra* ¶¶ 59-60.  That includes many VR apps beyond the FTC's cramped nine-app market, which draws support from no witness testimony and zero ordinary course business documents.  *See supra* ¶¶ 56-61.  ███████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████.  *See supra* ¶¶ 57-58.

a.    **The FTC's Evidence Does Not Contradict the Industry Evidence**

142.    The FTC does not overcome the foregoing industry evidence through "practical indicia" of a separate "VR dedicated fitness app" market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059-60 (N.D. Cal. 1998) (rejecting plaintiff's "attempt to define the market on the basis of price or product variances" because "the record [in the case] show[ed] both a spectrum of consumer choices, and active competition for those choices"), *aff'd*, 190 F.3d 974 (9th Cir. 1999).

143.    *First*, the FTC does not prove its market by asserting that VR is immersive and therefore does not compete with less or differently immersive fitness products.  "[M]erely asserting that a commodity is in some way unique is insufficient to plead" – let alone prove – "a relevant market."  *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016); *see also IT&T Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (market definition should turn

39

on what is "economically significant"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1149 (N.D. Cal. 2020) (differentiated features do not put products in separate markets).  The FTC makes no showing that "immersion" or other VR features are uniquely appealing to consumers – such that they would not switch to another fitness product without those features – or even that other on- and off-VR products the FTC omits are not comparably immersive and portable.  Merely identifying a differentiated feature – VR is separate because it is VR – is tautology, not evidence of a separate market.  *See In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (rejecting market defined by reference to "physical or price differences" because "various adjectives" do not "establish separate markets"), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990).

144.    *Second*, the FTC does not prove its claimed market by asserting that "VR dedicated fitness apps" have different prices and pricing models.  "[T]he relevant market is not governed by the presence of a price differential between competing products," *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975), and products are not in separate markets "simply because consumers pay for those products in different ways," *Lab. Corp.*, 2011 WL 3100372, at *18.  The FTC's "VR dedicated fitness app" market omits many products – on- and off-VR – that are comparably priced to or even cheaper than the in-market apps.  *See supra* ¶¶ 56-57.  And many of the FTC's in-market apps are not even themselves subscription products. *See supra* ¶ 74.

145.    *Third*, the FTC has not shown that "VR dedicated fitness apps" are a relevant antitrust market because they appeal to "distinct customers."  *Brown Shoe*, 370 U.S. at 325; *see also Oracle*, 331 F. Supp. 2d at 1131 ("the issue is not what solutions the customers would *like* or *prefer* for" the need they are satisfying, but "what they *could* do in the event of an anticompetitive price increase by [the hypothesized] post-merger").  The evidence shows only that VR fitness apps appeal to a broader demographic – more women and older consumers – than VR *games*.  *See supra* ¶ 27. That says nothing about whether "VR dedicated fitness apps" appeal to a demographic of fitness consumers unwilling to substitute to other connected fitness products.  *See supra* ¶¶ 56-66.

1

2

        **b.**      **The FTC's Hypothetical Monopolist Test Is Irreparably Flawed and Proves Nothing**

3      146.    The FTC has not proven its market definition through a hypothetical monopolist test

4  that attempts to measure the effect of a small but significant and non-transitory increase in price,

5  because its test – and the consumer survey on which it relies – "cannot measure the most

6  fundamental principle in defining a market[,] cross-elasticity of demand." *Teradata Corp. v. SAP*

7  *SE*, 570 F. Supp. 3d 810, 840 (N.D. Cal. 2021).

8      147.    *First*, the hypothetical monopolist test here does not measure whether consumers

9  substitute between "VR dedicated fitness apps" and other on- and off-VR fitness products. *See FTC*

10  *v. RAG-Stiftung*, 436 F. Supp. 3d 278, 308-09 (D.D.C. 2020) (rejecting flawed application of

11  hypothetical monopolist test).

12

13            . *See* Ex. DX1231 (Dubé Rep. ¶¶ 28-31).

14

15

16

17  . *See id.* ¶¶ 30-31.

18

19

20          *See supra* ¶ 51.

21      148.    *Second*, the survey on which the FTC's test relies is methodologically flawed,

22  rendering it unsuitable as evidence of market definition. *See United States v. Booz Allen Hamilton,*

23  *Inc.*, 2022 WL 9976035, at *13 (D. Md. Oct. 17, 2022) (rejecting methodologically flawed

24  hypothetical monopolist test).

25

26          . *See* Ex. DX1231 (Dubé

27  Rep. ¶¶ 21-27); *see also id.* ¶¶ 28-31 (

28      ); *id.* ¶¶ 32-33 (

1  ██████████); *id.* ¶ 34 (██████████████████████████████); *id.* ¶¶ 35-43

2  (██████████████████████████).  The FTC's expert also ██████████████

3  ████████████████████████████████████████████████

4  ██████.

149.  *Third*, the expert's survey is unreliable on its face because it generates completely

nonsensical and contradictory responses.  For example, ████████████████████████

████████████████████████████████

████████████████████  *See id.* ¶ 56.  ██████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████.  *See id.* ¶ 60.  These are among

several other examples of inexcusably illogical and unreliable survey results.

150.  *Fourth*, the FTC's hypothetical monopolist test produced results that are contrary to

industry evidence and economic logic, which trump given the foregoing flaws in the expert's

survey.  *See United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022)

(rejecting hypothetical monopolist test contrary to industry evidence).  ████████████████

████████████████████████████████████████████

████████████████████████████████.  *See supra* ¶¶ 12-13, 76, 114.

Finding that Within is behaving as an economically irrational actor casts doubt on the survey

underlying the FTC's hypothetical monopolist test, indicating that the foregoing methodological

errors have produced a similarly errant result.  *See* Ex. DX1231 (Dubé Rep. ¶¶ 48-53).

## 2.  The FTC Cannot Show That the "VR Dedicated Fitness App" Market Is Oligopolistic – as *Marine Bancorporation* Requires

151.  Because potential competition "comes into play only where there are dominant

participants in the target market engaging in interdependent or parallel behavior and with the

capacity effectively to determine price and total output of goods or services" – i.e., oligopoly

behavior and structure – the FTC must demonstrate that it is likely to establish that its claimed

market fits that exacting description.  *Marine Bancorporation*, 418 U.S. at 630.  The FTC has not seriously attempted to do so.  *See supra* ¶ 130 (collecting cases).

152.    *First*, no evidence shows oligopolistic *behavior* such that "there are dominant participants in the target market engaging in interdependent or parallel behavior," *Marine Bancorporation*, 418 U.S. at 630, e.g., oligopoly coordinating, parallel pricing, output restraints, or anything similar, *see Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (defining oligopoly behavior).  The evidence is to the contrary:  every developer the FTC includes in its market to offer testimony has confirmed that there is no coordinated behavior, but instead intense competition, constant consumer turnover, and limited profitability.  *See supra* ¶¶ 62-73.  The in-market apps even have distinct pricing models and prices, the opposite of coordination. *See supra* ¶¶ 74-75.

153.    *Second*, there is no evidence that the *structure* of the claimed market is such that the nine selected apps have "the capacity effectively to determine price and total output of goods or services."  *Marine Bancorporation*, 418 U.S. at 630.  For firms to have such power, "entry barriers must be significant."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995); *see B.A.T. Indus.*, 1984 WL 565384, at *8 (rejecting potential competition claim where entry barriers were low); *see also United States v. Syufy Enters.*, 903 F.2d 659, 671 n.21 (9th Cir. 1990) ("the lack of entry barriers prevents the government from prevailing on its Clayton Act claim").  The proof is to the contrary as entry is constant, with more expected.  *See supra* ¶¶ 62-72.  The FTC even increased the number of in-market firms from five to nine since filing its complaint – most of which entered after Supernatural, *see supra* ¶ 63 – which alone proves there are no significant entry barriers.  Indeed, every in-market firm began as a tiny startup, without substantial cash, installed users, or network effects.  *See supra* ¶ 102; *see also supra* ¶ 41.  And Meta's incentive and executed strategy for growing its VR ecosystem is to facilitate the entry of as many third-party apps as possible.  *See supra* ¶¶ 28-29, 37-39, 105, 115-119.

154.    The FTC's attempt at showing market concentration is insufficient as a matter of law to establish a likelihood of success.  *See Marine Bancorporation*, 418 U.S. at 632 n.34 (requiring evidence of "actual market behavior, and especially the presence . . . of significant parallel

43

conduct").  Even "high concentration" at most makes a market "a *candidate* for the potential-competition doctrine," subject to examination for oligopolistic "structure" and actual "conditions in the market."  *Tenneco*, 689 F.2d at 352-53 (emphasis added).  Concentration is only an indicator of a structure that makes collusion possible, but in markets that are dynamic, nascent, and new, snapshot "concentration ratios . . . can be unreliable indicators of actual market behavior" that must yield to evidence of actual "economic characteristics."  *Marine Bancorporation*, 418 U.S. at 631.

155.    Here, the FTC's measure of market concentration – █████████████████████████████████████████████████████████████.  *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 501 (1974) ("Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete.").  The FTC asserts ███████████████████████████████████████████████████████████████.  But the evidence disproves that:  ██████████████████████████████████████████████████████████████████████████.  *See supra* ¶¶ 12-13, 76, 114.  Its revenue share is irrelevant to the analysis:  every in-market firm to offer testimony on this point – ██████████████ – has testified that revenue is neither what they look at in assessing competitive position nor an accurate measure of market share (number of users is what matters).  *See supra* ¶¶ 53, 76.  That industry evidence forecloses the FTC's reliance ██████████████████████████████████████████████.  *See Brown Shoe*, 370 U.S. at 341 n.69 ("[S]ince [the firms] sold shoes primarily in the low and medium price ranges, and in the light of the conceded spread in shoe prices, we agree that sales measured by pairage provide a more accurate picture of the [the firms'] shares of the market than do sales measured in dollars."); *see also* U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 5.2, at 16-17 (2010) (cautioning against reliance on "historical evidence" to show concentration where there are "recent or ongoing changes in market conditions" that "may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance," including the advance of "a new technology").

**B.    The "Actual Potential Competition" Theory Fails for Other Reasons**

156.    Even if "actual potential competition" states a claim at all, the FTC must prove that Meta was going to enter the "VR dedicated fitness app" market *and* was one of only a few firms

Defendants' Proposed Findings of Fact & Conclusions of Law       Case No. 5:22-cv-04325-EJD

likely to do so.  *See Steris*, 133 F. Supp. 3d at 966 (citing FTC's brief).  The FTC has no proof on either point.

157.    *First*, the FTC – which should be held to its own legal standard – has no "clear proof" (nor any proof at all) that Meta will actually enter the market without the acquisition.  *B.A.T. Indus.*, 1984 WL 565384, at *10; *see supra* ¶¶ 133-134 (collecting cases).  The evidence is unequivocal that senior Meta executives with authority to approve first-party app development – and authorize budgets to even start that work – never considered doing so, never saw a proposal for doing so, and would not have approved such a proposal had one existed.  *See supra* ¶¶ 77-79, 82, 94-95.  Lower-level Meta witnesses bruited about ideas for possible apps but never came forward with a plan to develop one – as confirmed by sworn testimony and contemporaneous documents.  *See supra* ¶¶ 81-90.  The ideas went nowhere because Meta has higher priorities, no fitness expertise, and limited history of successfully building VR apps from scratch.  *See supra* ¶¶ 83-94.  That evidence forecloses the actual potential competition claim – under any standard.  *See Siemens*, 621 F.2d at 507-08 ("reliance upon a few memoranda of lower echelon" employees "as indicative of an intent to enter the market de novo is misplaced," particularly where "their views do not appear to have been brought to the attention of the decision-making management"); *Atl. Richfield*, 549 F.2d at 296 ("continuing studies as to the best means of entry . . . fail[] to show a significant commitment at the decisional level").  What the FTC must show – "concrete" planning, i.e., a presentation to and approval from decision-level management, *B.A.T. Indus.*, 1984 WL 565384, at *6 – never happened here.  *See supra* ¶¶ 77-79, 82, 94-95.

158.    The FTC proposes a lower standard than its own *B.A.T. Industries* "clear proof" test – mere "reasonable probability" of actual entry – but that standard is contrary to the weight of authority.  *See supra* ¶¶ 133-134.  Courts have instead rejected it as unduly speculative following *Marine Bancorporation*'s warning (as did the FTC itself).  *See Atl. Richfield*, 549 F.2d at 294-95; *B.A.T. Indus.*, 1984 WL 565384, at *9 n.34; *see also Siemens*, 621 F.2d at 506-07 (rejecting potential competition claim, even under "reasonable probability" standard, and stating that "preferably" there would be "clear proof that entry would occur" for such claims "since the loss threatened by the acquisition is not of existing, but only of potential, competition").  In any event,

the minimum necessary to show even "reasonable probability" of entry would be evidence that, "if the merger does not go through," Meta "is likely to revive its plans and build . . . in the near future." *Steris*, 133 F. Supp. 3d at 977.  But there is no such evidence; the uncontradicted testimony of senior Meta executives – supported by contemporaneous business documents – is that the company never had plans to build its own VR fitness app and will not make, let alone adopt and authorize funding for, those plans for the first time if the Court enjoins this transaction.  *See supra* ¶¶ 77-95.

159.    The contrast between this case and *Steris* – a Section 13(b) actual potential competition case the FTC lost even after the court *assumed* (without deciding) the applicability of the "reasonably likely" standard – is instructive.  In *Steris*, the acquired company was already providing its services in Europe – i.e., it was already making the competitive product at issue so there was no question of building from scratch – and there was a plan to enter the U.S. geographic market that the *board of directors approved*.  *See Steris*, 133 F. Supp. 3d at 972-73.  Following board approval, "core team members" attended a "kickoff" to launch the U.S. endeavor.  *Id.* at 973.  The target had begun securing options contracts from U.S. customers that it would serve upon entry into that geographic market.  *Id.*  The target even had signed a "lease extension" for the buildout of a U.S. factory.  *Id.* at 974.  Despite that evidence, the district court found that it was not even "reasonabl[y]" "probabl[e]" that the acquiring company would enter on its own but for the acquisition.  *Id.* at 978.

160.    The FTC's retreat to "objective evidence" – that it need not show any planning of actual entry under any standard, so long as it can show Meta "could" enter on its own and might benefit economically from doing so – is unsupported speculation that no court has accepted in decades as a basis to block an acquisition.  *See Tenneco*, 689 F.2d at 353-54 ("interest," "incentive," and "financial resources" to enter only amounted to "unsupported speculation"); *Siemens*, 621 F.2d at 507 ("interest and incentive to enter" was "inadequate to demonstrate the likelihood, much less the certainty," of entry); *Mercantile Texas Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255, 1268 (5th Cir. Unit A Feb. 1981) (similar); *Atl. Richfield*, 549 F.2d at 299 (same).  Even the FTC has held that resources and motive are "not sufficient" for an actual potential competition claim.  *B.A.T. Indus.*, 1984 WL 565384, at *11, *13.  The objective factors the FTC identifies, such

46

as financial resources and a VR platform on which to build, are not unique to Meta.  *See supra*

¶¶ 66-71, 101.  And Meta is without several objectively necessary tools to build a "VR dedicated

fitness app," including fitness-knowledgeable VR engineers or any fitness background at all (in

contrast to other potential entrants).  *See supra* ¶¶ 83-89.

161.    *Second*, the FTC has no proof that Meta is the only firm or one of very few firms that

could enter – as it has acknowledged it must prove in a Section 13(b) case asserting a loss of actual

potential competition.  *See Steris*, 133 F. Supp. 3d at 966 (citing FTC's brief; "an actual potential

competitor violates Section 7 if . . . there are few other firms that can enter effectively").  But the

evidence establishes that many firms *could* enter and at least as effectively as Meta, if not more so.

*See supra* ¶¶ 66-71, 101-102.  The very same objective factors the FTC identifies as evidence that

Meta could enter – such as access to capital and engineering resources – are common to many

firms, including every tiny startup to make a VR fitness app.  *See supra* ¶¶ 101-102.  And Meta's

status as a platform owner makes it no better positioned to enter than ███████████████████

████████████████████████████████████████████████████.  *See supra* ¶¶ 66-

68.  ████████████████████████████████████████████████

████████████████████████████████████.  *See supra* ¶¶ 19, 67.

162.    Finally, the FTC's claim fails for the additional and independent reason that no

evidence shows that Meta's entry would or could be "imminent."  *Marine Bancorporation*, 418

U.S. at 623 n.22; *see also B.A.T. Indus.*, 1984 WL 565384, at *10 (absent imminent entry, "[t]he

likelihood of injury to future competition may . . . not be particularly great even if independent

entry but for the merger or acquisition is a virtual certainty," because "there is no guarantee that

[current competitive] conditions will persist until the future time at which independent entry might

occur").  Removing by acquisition the mere "ephemeral possibility" of actual entry at some "wholly

speculative" date uncertain has no effect on competition.  *BOC Int'l*, 557 F.2d at 28-29 (requiring at

least entry in the "near future," rejecting FTC claim without that showing); *see also Siemens*, 621

F.2d at 507 (similar); *Steris*, 133 F. Supp. 3d at 978 (requiring entry "within a reasonable period of

time").  ████████████████████████████████████████████████

████████████████████████████████████████████████

Defendants' Proposed Findings of Fact & Conclusions of Law        Case No. 5:22-cv-04325-EJD

████ .  *See supra* ¶ 89.  If there is a "VR dedicated fitness app" market at all, it loses nothing by forgoing hypothetical, speculative, and delayed entry from Meta.

### C.       The "Perceived Potential Competition" Theory Also Fails for Other Reasons

163.    The perceived potential competition theory fails because there is no evidence – and the FTC has not even pointed to any – that Meta's "premerger presence on the fringe of the target market *in fact* tempered oligopolistic behavior on the part of existing participants in that market." *Marine Bancorporation*, 418 U.S. at 624-25 (emphasis added; wiping away earlier potential competition cases with a lower requirement); *see also Tenneco*, 689 F.2d at 355.

164.    *First*, the FTC has no evidence that existing or forthcoming "VR dedicated fitness apps" even perceive Meta as a potential entrant.  *See Ginsburg*, 649 F. Supp. 2d at 947 (dismissing perceived potential competition claim).  *Every* in-market "VR dedicated fitness app" witness explained that Meta was not perceived to be a uniquely likely entrant and that any possible entry by Meta had no effect on conduct, pricing, output, or behavior.  *See supra* ¶¶ 98-99, 103.  That reflects widely reported difficulties that Meta has had developing its own first-party VR apps, as well as its dearth of fitness expertise (or even experience).  *See supra* ¶¶ 44, 83, 96.  This uncontradicted testimony from market participants is dispositive.  *See Siemens*, 621 F.2d at 509 (crediting market participant's testimony that acquirer's "possible entry never had any impact upon any pricing or marketing decision").

165.    *Second*, the FTC has no evidence that existing or forthcoming "VR dedicated fitness apps" perceive Meta as a *uniquely* likely entrant (i.e., the one firm *in fact* tempering anticompetitive conduct).  *See Siemens*, 621 F.2d at 509 ("Usually this is proved by evidence that the actual or perceived potential entrant is one of but a few likely entrants."); *Atl. Richfield*, 549 F.2d at 300 (similar).  Current and future "VR dedicated fitness apps" monitor potential entry or expansion from many firms, including scores of other existing VR apps, as well as potential entry from off-VR fitness and technology firms.  *See supra* ¶¶ 59-60, 64-66, 71, 98-99.  That fear appears well-founded, as several of these firms have plans to enter or have at least considered entry or have actually entered (as established fitness brand Les Mills entered just this year by partnering with a small VR app developer).  *See supra* ¶¶ 62-72.

### D.   The FTC Is Not Likely To Prove Harm to Consumers

166.   The FTC also has not shown a likelihood of success in proving, as it must, that the transaction is likely to harm consumers.  *See supra* ¶¶ 123-125.  There is no evidence to support a claim that Meta is likely to increase Supernatural's prices if the acquisition is completed – it has only speculation as to this element.  *See supra* ¶¶ 116-117.  The empirical, economic, and witness evidence is all the exact opposite – Meta is more likely, if anything, to cut Supernatural's price, expand output, and improve quality.  *See id*.  Similarly, Meta's incentive is to increase output and quality of VR apps generally, including by improving the Quest platform for fitness by sharing technology innovations Meta develops by integrating Within.  *See supra* ¶¶ 28-29, 115-119.

167.   Meta's uncontested incentive, strategy, and actually executed plan – which it followed as to third-party VR games even after acquiring Beat Saber and making it the number one game on Quest – is to grow the VR ecosystem by lowering app prices and increasing high-quality app content.  *See supra* ¶¶ 43, 115-119.  The notion that Meta would try to recoup its ███████ investment in Within by increasing the price of Supernatural for its ██████ subscribers – ███████ ███████████████████████████████ – by $1 or $2 a month does not "make economic sense."  *Adaptive Power Sols.*, 141 F.3d at 952.

## III.   The Equities Disfavor Preliminary Injunctive Relief

168.   The FTC also has not proven, as Section 13(b) requires at this stage, that the equities favor a preliminary injunction halting the transaction.  *See supra* ¶ 122.

169.   The Court considers both the public interest and the parties' private interests.  *See supra* ¶ 122.  Here, both equitable considerations disfavor a preliminary injunction because it would kill the transaction.  *See supra* ¶ 11.  That makes the relief the FTC seeks particularly dramatic – and the equities weighing against it particularly significant.  *See FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981) ("the usual rule that a preliminary injunction is an extraordinary and drastic remedy is particularly true in the acquisition and merger context" because the "'preliminary' relief sought by the FTC would doom this transaction"); *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (similar).

170.     *First*, the public equities – which "include improved quality, lower prices, increased efficiency, [and] realization of economies of scale" – disfavor killing a pro-competitive transaction. *Lab. Corp.*, 2011 WL 3100372, at \*22; *see also Warner*, 742 F.2d at 1165 (recognizing public's interest in "beneficial economic effects and pro-competitive advantages").  An injunction here would impede the development and sharing of improvements in VR technology and the Quest platform to the detriment of *other* VR fitness apps and VR consumers.  *See supra* ¶¶ 109, 115, 119. It also would set back VR investment – deterring venture capital funding if the possibility of an exit by Meta acquisition is off the table – again to the detriment of all VR developers and consumers. *See supra* ¶ 118.  Blocking this vertical acquisition could call into question the ability of not just Meta but many other firms to engage in pro-competitive acquisitions to the benefit of competition and consumers.  *See also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018) ("Further complicating the Government's challenge is the recognition among academics, courts, and antitrust enforcement authorities alike that many vertical mergers create vertical integration efficiencies between purchasers and sellers."), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

171.     *Second*, the parties' private interests strongly weigh against preliminary injunctive relief.  *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985) (denying injunction given defendant's "precarious financial position"); *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 717 (9th Cir. 1976) (Kennedy, J.) (similar); *Lab. Corp.*, 2011 WL 3100372, at \*23 (same, stating this "is also an important equitable consideration").  Halting the acquisition for an administrative proceeding will kill it.  *See supra* ¶ 11.  ██████████████████████████████████████████ ██████████████████████████████████.  *See supra* ¶¶ 12-13, 76, 114.  Meta too will be at risk of falling behind current and future VR rivals – as many are considering VR fitness – losing unrecoverable time to dynamic competition.  *See supra* ¶¶ 16-23, 28-29, 66-70, 119.

## CONCLUSION

The FTC's motion for a preliminary injunction is denied.

DATED:  November 21, 2022

Respectfully submitted,

By: /s/ *Mark C. Hansen*

Christopher J. Cox (Bar No. 151650)
HOGAN LOVELLS US LLP
855 Main Street, Suite 200
Redwood City, CA 94063
Telephone:  (650) 463-4000
Facsimile:  (650) 463-4199
chris.cox@hoganlovells.com

Lauren Battaglia (*pro hac vice*)
Logan M. Breed (*pro hac vice*)
Benjamin Holt (*pro hac vice*)
Charles A. Loughlin (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone:  (202) 637-5600
Facsimile:  (202) 637-5910
lauren.battaglia@hoganlovells.com
logan.breed@hoganlovells.com
benjamin.holt@hoganlovells.com
chuck.loughlin@hoganlovells.com
*Counsel for Defendant Within Unlimited, Inc.*

Mark C. Hansen (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
mhansen@kellogghansen.com
apanner@kellogghansen.com

Bambo Obaro (Bar No. 267683)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065-1134
Telephone:  (650) 802-3000
Facsimile:  (650) 802-3100
bambo.obaro@weil.com

Michael Moiseyev (*pro hac vice*)
Chantale Fiebig (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940
michael.moiseyev@weil.com
chantale.fiebig@weil.com

Liz Ryan (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Telephone:  (214) 746-8158
liz.ryan@weil.com

Eric S. Hochstadt (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
eric.hochstadt@weil.com

*Counsel for Defendant Meta Platforms, Inc.*